UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                          :

UNITED STATES OF AMERICA      :   **SEALED INDICTMENT**

             - v. -         :   19 Cr. ___

MICHAEL HILD,            :

        Defendant.      :

- - - - - - - - - - - - - - - - x

**19 CRIM 602**

**JUDGE ABRAMS**

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.    At all times relevant to this Indictment, Live Well Financial ("Live Well") was a private company based in Richmond, Virginia.  By 2014, Live Well's business primarily involved originating, servicing, and securitizing Home Equity Conversion Mortgages ("HECMs"), also known as "reverse mortgages."

2.    At all times relevant to this Indictment, MICHAEL HILD, the defendant, was the chief executive officer of Live Well.  He was also the company's majority shareholder as of September 2016.  HILD founded Live Well in or about 2005.

3.    From 2008 until December 2018, Eric Rohr ("Rohr") was Live Well's chief financial officer.

4.    From 2014 through March 2019, Darren Stumberger ("Stumberger") was employed at Live Well's trading desk in the

New York area.  In addition, during various times from 2014 through May 2019, two co-conspirators not named as defendants herein ("CC-1" and "CC-2") were employed at Live Well's trading desk in the New York area.

5.    At all times relevant to this Indictment, the "Pricing Service" was a widely-utilized subscription service that published prices for thousands of fixed income securities and whose customers included a variety of entities in the securities and financial services sectors.

6.    At all times relevant to this Indictment, "Lender-1" was a Manhattan-based financial services firm that provided securities lending and financing services to participants in the securities markets such as pension funds, endowments, asset managers, insurance companies, investment banks, broker-dealers and prime brokers.  Lender-1 was a wholly owned subsidiary of a larger financial services firm based in China.

7.    At all times relevant to this Indictment, "Lender-2" was a Manhattan-based financial services firm that provided prime brokerage and securities lending services to hedge funds and other market participants.  Lender-2 was a wholly owned subsidiary of a larger financial services firm based in Korea.

8.    At all times relevant to this Indictment, "Bank-1" was an FDIC-insured bank headquartered in Troy, Michigan.

**Background on Repurchase Agreements and
the Expansion of Live Well's Bond Portfolio**

9.   In or about 2014, Live Well acquired a portfolio of
approximately 20 bonds, each entitling the holder to receive a
portion of the interest payments, but not principal payments,
from a particular pool of reverse mortgages ("HECM IO bonds").
Live Well purchased the HECM IO bond portfolio from a
multinational investment bank at a price of approximately $50
million.

10.   Live Well financed its acquisition of the HECM IO bond
portfolio primarily through a series of repurchase ("repo")
agreements with various lenders.   A repo agreement is a short-
term loan in which both parties agree to the sale and future
repurchase of an asset within a specified contract period.   The
seller sells the asset to the lender with a promise to buy it
back at a specific date and at a price that includes an interest
payment.   Functionally, a repo agreement is a collateralized
loan in which title of the collateral is transferred to the
lender.   When the loan is repaid by the borrower, the collateral
is returned to the borrower through a repurchase.

11.   The term of a repo arrangement typically ranges from
overnight to 30 days.   At the end of the loan term, the lender
can either demand repayment of the loan or agree to "roll" the
debt into a new loan agreement.   Each time the debt is rolled,

the collateral is formally returned to the borrower and then resold to the lender.  In the event the lender refuses to roll the loan and the borrower fails to repay the loan principal, the lender is entitled to liquidate the collateral and recover the outstanding loan amount.

12.  In a repo transaction, the lender generally loans an amount that is some percentage less than the value of the collateral at issue in order to protect against the risk of the collateral's declining in value during the loan.  This percentage reduction is generally referred to as a "haircut." As an example, in a repo arrangement involving a security with a fair market value of $1,000,000 and a 10% haircut, the lender would extend $900,000 in financing to the borrower.

13.  In order to ensure that a loan remains adequately collateralized and the "haircut" percentage remains constant, repo agreements typically provide that the lender may make a margin call if the value of the collateral falls during the term of a repo loan.  When a lender makes a margin call, the borrower is required to provide the lender sufficient additional cash or securities to rebalance the transaction and maintain the lender's haircut.  Thus, for example, if a lender with a 10% haircut were to extend financing of $900,000 based upon a collateral valuation of $1 million, and the value of the collateral fell to $800,000, at the time of the margin call, the

4

borrower would be required to return $180,000 ($900,000 - $720,000) to the lender, or post sufficient additional securities of that value, to maintain the 10% haircut.

14.   At the same time that Live Well purchased the HECM IO bond portfolio, MICHAEL HILD, the defendant, established a trading desk within Live Well to manage and grow Live Well's bond portfolio.  The Live Well trading desk had offices in Manhattan, New York and in Rumson, New Jersey.  To staff the trading desk, HILD hired Stumberger, CC-1, and CC-2, who had all previously worked at the investment bank from which Live Well acquired the bond portfolio.

15.   From in or about 2014 to in or about May 2019, Live Well's HECM IO bond portfolio grew in size from approximately 20 bonds to approximately 50 bonds, due to the acquisition of new bonds.

16.   In order to finance its purchase of additional bonds, Live Well relied upon a series of lenders (collectively, the "Lenders") to provide financing through agreements -- either repo agreements or secured loans -- in which Live Well's HECM IO bond portfolio served as the collateral.  Live Well frequently transferred its bonds from lender to lender depending on several factors, including the size of the total credit line the lender was willing to extend, the amount that the lender would advance

5

against a particular bond, and the interest rate the lender demanded.

17.    The majority of the Lenders were securities dealers, whose lending arrangements with Live Well were structured as repo transactions in which title to the collateral was transferred to the particular lender.    Another lender was Bank-1.    Bank-1's lending arrangement with Live Well was structured as a secured loan, with certain HECM IO bonds held as collateral by a third-party custodian.

### The Pricing of Live Well's Bonds

18.    Live Well's financing agreements with all but one of the Lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to determine the market value of the bond as of the measurement date.    The Lenders then used the value of the bond, coupled with the application of a haircut of generally 10% to 20%, to determine the amount of money to lend Live Well.

19.    The Lenders generally utilized the Pricing Service to obtain prices, or "marks," for various securities, including debt instruments like bonds.    Because of the Lenders' familiarity with, and use of, the Pricing Service, in or about August 2014, Stumberger and others, including CC-1, reached out to the Pricing Service to request that it initiate coverage of the particular HECM IOs that Live Well planned to acquire.    The

Pricing Service agreed and soon thereafter began to publish prices for Live Well's HECM IO bonds.   The Pricing Service team responsible for pricing HECM IO bonds was located in Manhattan, New York.

## Live Well's Financial Statements

20.   The Lenders generally required that each year Live Well provide audited financial statements and that it provide unaudited financial statements at interim intervals that, depending on the lender, ranged from monthly to quarterly.   The amount of Live Well's total assets as reflected in its financial statements, including the total value of the bonds that Live Well utilized as collateral with respect to the Lenders, was material to the Lenders in evaluating both Live Well's continued creditworthiness and whether to grant Live Well's occasional requests to increase its overall credit line.

21.   In preparing these financial statements, Live Well itself utilized the prices published by the Pricing Service to value its own assets, including the HECM IO bonds, which it referred to as "Government Bonds Available for Sale."   The footnotes to Live Well's audited financial statements indicated that Live Well carried its Government Bonds Available for Sale at "Fair Value," which the financial statements defined as "the exchange price that would be received for an asset or paid to transfer a liability (exit price) in the principal or most

advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date."

22.  Each year, in connection with the preparation and audit of Live Well's financial statements, MICHAEL HILD, the defendant, signed a letter to Live Well's external auditors in which he represented, among other things, that "the fair value measurements . . . represent our best estimate of fair value as of the measurement or reporting date."

23.  In addition to submitting its financial statements to the Lenders, Live Well regularly submitted its financial statements to agencies of the United States Government, including the Department of Housing and Urban Development (the "Government Agencies"), in order to maintain its authorization to issue government-backed mortgages.  Like the Lenders, the Government Agencies relied upon Live Well's financial statements, including the amount of its assets, to verify that Live Well was a going concern and was not overleveraged.

**The Scheme to Defraud**

Overview

24.  Beginning in or about September 2015, MICHAEL HILD, the defendant, Rohr, Stumberger, and others known and unknown, engaged in a scheme to defraud Live Well's Lenders by causing them to extend credit on the basis of inflated bond values that

8

Live Well provided to the Pricing Source.  The inflated bond prices allowed Live Well to substantially increase its access to cash at the expense of the Lenders, who were deceived into lending sums of money that, in many instances, exceeded the true market value of the collateral by substantial sums.  HILD personally profited from the scheme by using the excess liquidity that it generated to buy out other shareholders, after which he substantially increased his personal compensation.

### Live Well Provides "Broker Quotes" to the Pricing Service

25.  In or about August 2014, when the Pricing Service agreed to list prices for Live Well's HECM IO bond portfolio, a representative of the Pricing Service informed Stumberger and CC-1 that the Pricing Service would develop a model to price the bonds independently.  The Pricing Service representative indicated, however that, in the interim, the Pricing Service would publish marks for Live Well's bonds based upon "broker quotes" provided by Live Well.

26.  From in or about August 2014 to in or about November 2014, Live Well provided the Pricing Service with quotes for its HECM IO bonds.  During that time period, the Pricing Service published the price quotations that Live Well provided with few if any modifications.

27.   In or about late 2014, the Pricing Service ceased to rely on quotations provided by Live Well and instead began pricing Live Well's HECM IO bonds using the Pricing Service's own methodology for modeling fair value.   The Pricing Service's effort to price the bonds on its own was short lived, however. MICHAEL HILD, the defendant, complained to others at Live Well that fluctuations in the bond prices published by the Pricing Service were inconsistent with Live Well's own modeling and were resulting in Live Well's having to pay margin calls to its lenders on short notice.   HILD's sentiment was shared by others at Live Well.   HILD therefore directed Stumberger and CC-1 to challenge the Pricing Service's methodology.

28.   In the face of criticism from Live Well, in or about February 2015, the Pricing Service agreed to cease deriving prices from its own analysis and to return instead to relying on broker quotes provided by Live Well.   As Stumberger reported to MICHAEL HILD, the defendant, and Rohr in an email on February 12, 2015, "We will be supplying prices daily to [the Pricing Service] . . . . They will use the prices verbatim and not model these bonds until we are interested in them doing so."   As HILD well knew, the Lenders were unaware of the Pricing Service's shift from attempting to price the HECM IO bonds itself to relying exclusively upon Live Well to provide prices.

<u>HILD's Role in Generating Bond Prices</u>

29.   After February 2015, Live Well began submitting bond prices to the Pricing Service on a regular basis.  In order to arrive at the prices to send Live Well, MICHAEL HILD, the defendant, instructed CC-1 to prepare a spreadsheet showing how different market assumptions affected the value of Live Well's bonds as well as the total value of Live Well's bond portfolio. HILD then reviewed these spreadsheets on regular telephone calls with Rohr and members of the trading desk, including Stumberger, CC-1 and CC-2.  After discussing the validity of various market assumptions, and seeing how those assumptions impacted the bond pricing, HILD chose which set of assumptions (or "scenario") should be utilized to determine the bond prices that Live Well submitted to the Pricing Service.  In many cases, HILD selected the set of assumptions that generated the highest bond value.

<u>The Implementation of Scenario 14</u>

30.   In or about August 2015, MICHAEL HILD, the defendant, and Rohr became frustrated that Live Well's HECM IO bond portfolio was deteriorating in value due to the payoff of the reverse mortgages underlying older bonds.  In discussing these concerns with Rohr, Stumberger, CC-1, and CC-2, HILD argued that standard assumptions about the riskiness of HECM IO bonds were overstated and that, accordingly, the bonds were underpriced in

the market due to the application of an unfavorable discount
rate.

31.   In order to determine how his hypothesis would affect
the bond portfolio's value, MICHAEL HILD, the defendant,
directed that Stumberger and CC-1 prepare an analysis of the
impact of using a more favorable discount rate.   Acting at
HILD's direction, CC-1 prepared a spreadsheet that showed
multiple different scenarios and how each would affect the
carrying value of Live Well's HECM IO bonds.   One of set of
assumptions, dubbed "Scenario 14," resulted in an increase in
the putative value of the bond portfolio of over $10 million.
The increase in value was due primarily to the fact that
Scenario 14 employed a yield assumption that was substantially
lower than the yield demanded by investors in the market.

32.   After seeing the increase in the value of the bond
portfolio that would be generated by pricing it based upon
Scenario 14, MICHAEL HILD, the defendant, directed that the
trading desk begin feeding prices to the Pricing Service that
were generated by employing Scenario 14.   Stumberger initially
resisted sending Scenario 14 prices to the Pricing Service and
stressed to HILD that the prices generated by Scenario 14 were
not obtainable in the market.   In other words, Stumberger
emphasized to HILD that any sale by Live Well of its bonds would
not result in a purchase price as high as the Scenario 14 marks.

HILD nonetheless insisted on submitting Scenario 14 prices to the Pricing Service.

33.   MICHAEL HILD, the defendant, was well aware that if the Lenders had known that the Pricing Service was publishing bond prices that did not reflect fair value, they would have refused to utilize those prices in determining how much money to loan Live Well or the requisite amount of required collateral. For that reason, HILD took steps to prevent the Pricing Service and the Lenders from learning that the marks published by the Pricing Service for Live Well's bonds did not reflect actual market value.   For instance, HILD affirmatively directed Rohr, Stumberger, and CC-1 that they should phase in Scenario 14 prices incrementally over a number of days, so that the Pricing Service would not detect the large price increases. Additionally, HILD forbade Rohr, Stumberger, CC-1 and CC-2 from disclosing Live Well's new pricing methodology to the Pricing Service or the Lenders.

34.   MICHAEL HILD, the defendant, with the assistance of Rohr, Stumberger, CC-1, and CC-2, also sought to avoid circumstances that could lead the Lenders to discover that Live Well was pricing, and causing the Pricing Service to price, Live Well's bonds at levels well above their actual market value. For example, in or about January 2017, one of the Lenders ("Lender-3") asked Live Well to identify a broker dealer that

could provide an independent price for one of Live Well's bonds.
During a recorded call on January 12, 2017, HILD, Stumberger,
Rohr, CC-1, and CC-2 discussed what could be done to avoid
Lender-3's discovering that the bonds were overvalued.   Rohr
suggested recruiting a broker who was "willing to be slimey" to
provide a valuation that comported with those being published by
the Pricing Service.   Stumberger emphasized that while Scenario
14 was supported by analytics, the Lenders only cared about
market value, to which HILD responded, "There's no debating
that."

35.   The publication of Scenario 14 prices enabled Live
Well to borrow substantially more money from the Lenders than it
could have had the bonds been marked at actual market value.
Live Well utilized the borrowed funds to continue to expand its
portfolio of HECM IO bonds.   Once purchased, Live Well then
marked the value of these bonds using Scenario 14.   The result
was an immediate jump in the value of the bonds from the price
at which Live Well purchased them to their Scenario 14 price,
further evidencing the discrepancy between market value and
Scenario 14-generated marks.   To take one example, two bonds
that Live Well purchased at the end of 2016 for just over $5.4
million and $12.7 million, respectively, were immediately marked
up to over $7 million and nearly $17 million using Scenario 14
within days of being acquired.   By purchasing bonds and then

immediately marking them up using Scenario 14, Live Well was able to borrow more money from the Lenders than it had paid for the bonds themselves. That money was then used by Live Well to expand its bond portfolio further.

36.    By in or about December 2016, following the implementation of Scenario 14, Live Well's portfolio sized increased from approximately 20 bonds with a stated value of approximately $50 million, to over 50 bonds with a stated value of over $500 million. As MICHAEL HILD, the defendant, explained during a recorded call with trading desk employees on September 9, 2015: "[I]t is a little bit of a self-generating money machine, right? In that if you buy IOs in the marketplace and then apply this methodology, every single time you do that, you're gonna free up additional borrowing capacity, right?"

37.    In addition to using the liquidity generated by Scenario 14 to expand Live Well's bond portfolio, in or about September 2016, MICHAEL HILD, the defendant, used $18 million in excess cash generated from the repo lenders to buy out the preferred stockholders in Live Well for a total of $29 million. The elimination of the preferred stockholders gave HILD exclusive control of the company and allowed him to substantially increase his personal compensation. Accordingly, HILD's compensation jumped from approximately $1.4 million in

2015, to approximately $5 million in 2016, approximately $9.7 million in 2017, and over $8 million in 2018.

38.   To take full advantage of the inflated marks, Live Well sought to finance the majority of its bonds with Lenders who relied on the Pricing Service.  At the direction of MICHAEL HILD, the defendant, CC-1 regularly analyzed whether the bonds could be moved to different lenders to maximize the amount that Live Well could borrow against the portfolio.  This exercise was known within Live Well as "gymnastics."

Additional Price Inflation to Address Immediate Liquidity Needs

39.   In early 2017, on three separate occasions, MICHAEL HILD, the defendant, directed Live Well employees to submit price increases to the Pricing Service that were above even Scenario 14-generated prices.  These price increases were driven not by any change in market conditions, but rather by Live Well's need for immediate cash.  In two of the three instances, the increased prices were simply round number increases across a group of bonds, untethered to any analysis.

40.   First, in or about January 2017, Lender-3 informed Live Well that it was reducing Live Well's credit line from approximately $226 million to approximately $100 million. MICHAEL HILD, the defendant, regarded this announcement as a "catastrophe" for the company, as Lender-3 applied the smallest haircut of any of Live Well's Lenders and it would accordingly

16

be difficult to refinance the bonds without returning cash to Lender-3 that Live Well did not have.   To address the problem, HILD directed that Live Well submit increased prices to the Pricing Service, so that Live Well could extract cash from its other Lenders that it could then use to repay Lender-3. Following HILD's direction, Live Well submitted inflated quotes to the Pricing Service from on or about February 3, 2017 to on or about February 9, 2017, which, in aggregate, increased the nominal value of Live Well's portfolio by over $35 million.   The additional cash generated from these price increases allowed Live Well to meet its financial obligations to Lender-3.

41.   Second, in or about mid-March 2017, Live Well was informed that another lender ("Lender-4") was demanding that Live Well pay it over $2 million to meet a margin call.   To address the issue, MICHAEL HILD, the defendant, directed that Live Well increase HECM IO prices sent to the Pricing Service so that Live Well could margin call other Lenders and generate the liquidity necessary to pay Lender-4.   Acting on HILD's directive, a conspirator not named as a defendant herein ("CC-3"), who was a Live Well employee, submitted prices to the Pricing Service on March 17, 2017 that increased the prices of five bonds owned by Live Well by exactly $1 each, and increased the price of a sixth bond by $0.50.   These prices were above even Scenario 14 pricing and no analysis was conducted to even

17

nominally support the price increase; rather the amount of the increase was dictated by the size of Lender-4's margin call.

42.   Third, in or about late-March 2017, Live Well was informed that one of its primary Lenders ("Lender-5") was ceasing to finance HECM IO bonds and was demanding payment of its loan immediately.   At the time Live Well learned this, Live Well owed Lender-5 approximately $92 million.   As MICHAEL HILD, the defendant, well knew, the bonds that were on repo with Lender-5 were inflated pursuant to Scenario 14 and, accordingly, their sale would not generate the required cash to repay Lender-5.   To address the problem, HILD again directed that Live Well further inflate the prices sent to the Pricing Service, so that Live Well could secure additional cash to pay Lender-5. Pursuant to HILD's direction, on or about March 24, 2017, Live Well submitted prices to the Pricing Service that increased the prices of 27 bonds by exactly one dollar each.   These prices were above even Scenario 14 pricing and, again, no analysis was conducted to even nominally support the price increase.   The price increase had the effect of inflating the total value of Live Well's loan portfolio by an additional $19 million.

**Live Well Ceases Operations and Writes Down Its Bond Portfolio**

43.   In or about August 2018, Lender-2, which had extended repo credit to Live Well backed by certain of the HECM IO bonds, obtained an independent valuation of several bonds that served

as collateral for Lender-2's financing for Live Well.  The
independent prices were significantly below the prices published
by the Pricing Service and the values against which Lender-2 had
extended credit to Live Well.  Shortly thereafter, Lender-1,
which had also lent Live Well money against some of its HECM IO
portfolio, began to suspect that Live Well's bonds were
overvalued.

44.  In or about late 2018, representatives of both Lender-
1 and Lender-2 raised their concerns about bond valuation with
MICHAEL HILD, the defendant.  In response to these concerns HILD
told Lender-2, falsely, that no other lender had raised concerns
about valuation of the bonds.

45.  In response to a demand by Lender-1 that Live Well
repay the loan principal of over $100 million and unwind the
repo arrangement, MICHAEL HILD, the defendant, communicated that
Live Well lacked the cash to make the required payment.  When
Lender-1 demanded that Live Well sell the collateral to generate
the necessary cash, HILD told Lender-1 that he could not do so,
because the bonds were illiquid and did not regularly trade in
the market.

46.  In or about late 2018, Rohr resigned as CFO of Live
Well.  In or about May 2019, the company's interim CFO informed
MICHAEL HILD, the defendant, that he would not sign the
company's interim financial statements because he believed that

the company's carrying value for the HECM IO bond portfolio was significantly overstated.  On or about May 4, 2019, Live Well announced that it would cease operations and unwind.

47.  Following the announcement that Live Well was closing, Live Well's interim CFO provided an interim balance sheet to the three lenders who at that time had extended credit against the HECM IO bond portfolio: Lender-1, Lender-2, and Bank-1.  The balance sheet indicated that in May 2019, Live Well reduced the carrying value of its HECM IO bond portfolio from over $377 million in the prior month to just over $236 million as of May 31, 2019.  The same balance sheet indicated that Live Well's debt against the bond portfolio totaled over $301 million, composed of: (1) over $129 million owed to Lender-1, (2) over $104 million owed to Lender-2, and (3) over $68 million owed to Bank-1.  Thus, as of May 31, 2019, the debt that Live Well owed on the bond portfolio exceeded the portfolio's carrying value by approximately $65 million.

## Statutory Allegations

48.  From at least in or about September 2015 through at least in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL HILD, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in

violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

49.  It was a part and an object of the conspiracy that MICHAEL HILD, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Overt Acts

50.  In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

21

a.   In or about September 2015, MICHAEL HILD, the defendant, directed CC-1, who was in Manhattan, to submit inflated bond prices to the Pricing Service for the purpose of fraudulently inducing Live Well's Lenders to increase the amount of cash that they were willing to lend to Live Well.

b.   On or about February 3, 2017, MICHAEL HILD, the defendant, in response to Live Well's immediate need for cash, directed CC-1, who was in Manhattan, to submit inflated prices to the Pricing Service in Manhattan.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Commit Wire and Bank Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 47 and paragraph 50 of this Indictment are repeated and realleged as if fully set forth herein.

52.   From at least in or about 2015 through at least in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL HILD, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343 and bank fraud, in violation of Title 18, United State Code, Section 1344.

22

53.   It was a part and an object of the conspiracy that
MICHAEL HILD, the defendant, and others known and unknown
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, which would and did affect a
financial institution, in violation of Title 18, United States
Code, Section 1343.

54.   It was a further part and object of the conspiracy
that MICHAEL HILD, the defendant, and others known and unknown,
willfully and knowingly would and did execute and attempt to
execute a scheme and artifice to defraud financial institutions,
the deposits of which were then insured by the Federal Deposit
Insurance Corporation ("FDIC"), and to obtain moneys, funds,
credits, assets, securities, and other property owned by, and
under the custody and control of, such financial institutions,
by means of false and fraudulent pretenses, representations, and
promises, in violation of Title 18, United States Code, Section
1344.

                    (Title 18, United States Code, Section 1349.)

                                   23

**COUNT THREE**
**(Securities Fraud)**

The Grand Jury further charges:

55.   The allegations contained in paragraphs 1 through 47 and paragraph 50 of this Indictment are repeated and realleged as if fully set forth herein.

56.   From at least in or about September 2015 through at least in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL HILD, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HILD engaged in a scheme to defraud various counterparties of Live Well in repurchase agreement ("repo") transactions by misrepresenting

24

the value of certain bonds to be sold as part of these transactions, and causing others to do so, in order to induce these counterparties to purchase the bonds at higher prices than they otherwise would have accepted.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

57.    The allegations contained in paragraphs 1 through 47 and paragraph 50 of this Indictment are repeated and realleged as if fully set forth herein.

58.    From at least in or about September 2015 through at least in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL HILD, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, HILD engaged in a scheme to defraud various counterparties in repo transactions

and other lending agreements, by misrepresenting the value of certain bonds to be sold as part of these transactions or otherwise used as loan collateral in wire transmissions, and causing others to do so, in order to induce these counterparties to purchase the bonds at a higher prices than they otherwise would have accepted or to loan more money to Live Well than they otherwise would have extended.

(Title 18, United States code, Sections 1343 and 2.)

### COUNT FIVE
### (Bank Fraud)

The Grand Jury further charges:

59.   The allegations contained in paragraphs 1 through 47 and paragraph 50 of this Indictment are repeated and realleged as if fully set forth herein.

60.   From at least in or about March 2017 through at least in or about May 2019, in the Southern District of New York and elsewhere, MICHAEL HILD, the defendant, willfully and knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, HILD engaged in a scheme to defraud an FDIC-insured bank

26

("Bank-1") by misrepresenting the value of certain collateral, and causing others to do so, in order to induce Bank-1 to make loans secured by the collateral in greater amounts than those that Bank-1 would otherwise extend.

(Title 18, United States Code, Sections 1344 and 2.)

## FORFEITURE ALLEGATION

61. As a result of committing one or more of the offenses charged in Counts One through Five of this Indictment, MICHAEL HILD, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

### Substitute Assets Provision

62. If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

      (Title 18, United States Code, Sections 981(a)(1)(C) and
    982(a)(2)(A); Title 21, United States Code, Section 853(p);
      Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
GEOFFREY S. BERMAN
United States Attorney

28

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL HILD,

Defendant.

## SEALED INDICTMENT

19 Cr. _____

(Title 15, United States Code, Sections
78j(b) and 78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; Title 18,
United States Code, Sections 2, 371, 1343,
1344, and 1349.)

|  | GEOFFREY S. BERMAN |
|---|---|
| Foreperson | United States Attorney |

08/26/19
(CA)

SEALED INDICTMENT FILED
W/ ARREST WARRANTS

KN PARKER
USMJ