UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

UNITED STATES OF AMERICA,       19 Cr. 602 (RA)

Plaintiff,

v.

MICHAEL HILD,

Defendant.

———————————————————————x

**DEFENDANT MICHAEL HILD'S MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE ANY AND ALL EVIDENCE AT TRIAL RELATED TO LWF'S WINDDOWN, RE-VALUATION OF THE SECURITIES IN ISSUE BY DEFENDANT'S COMPANY DURING THE PERIOD OF ITS WINDDOWN, AND THE POST-WINDOWN "FIRESALE" LIQIDATION OF THE COLLATERAL AT ISSUE BY DEFENDANT'S ALLEGED "VICTIM LENDERS"**

Benjamin G. Dusing
Law Offices of Benjamin Dusing, PLLC
809 Wright's Summit Pkwy, Ste 120
Fort Wright, KY 41011
Telephone: 859-635-5000
bdusing@bgdlaw.com

*Counsel for Michael Hild*

# INTRODUCTION

The charges against Mr. Hild in this case may be fairly summarized as alleging that Mr. Hild directed a scheme to defraud certain lenders by intentionally misrepresenting the value of certain securities pledged as collateral for the loans in question such that Mr. Hild's company, Live Well Financial, Inc. ("LWF") was able to borrow more funds from the lenders than LWF would have were the value of the collateral for the loans obtained accurately represented by LWF. The representations of the collateral's value were made by LWF, allegedly at Mr. Hild's direction, not to the alleged "victim" lenders directly but to a third-party valuation company, Interactive Date Corporation ("IDC"), which was in the business of independently valuing complicated securities of the kind pledged by LWF as collateral for the loans in question and on whom Mr. Hild knew (it is alleged) the alleged victim lenders relied in determining the value of the collateral pledged by LWF for the loans in question. Because the alleged "victim" lenders lent to LWF based on the value of the collateral pledged, and because the alleged "victim" lenders valued the collateral in question by reference to IDC's "pricing" of the collateral, LWF and Mr. Hild were able to increase the amount of funds they could borrow from the alleged "victim" lenders by intentionally misrepresenting the value of the collateral securing the loans to IDC (knowing that the alleged "victim" lenders would rely on the values published by IDC in determining the amounts to lend LWF). More or less, this is the essence of the charges in this case against Mr. Hild.

A basic premise of the government case against Mr. Hild is, of course, that the values of the complicated securities pledged as collateral for the purchase-money loans sought and obtained by LWF from the alleged "victim" lenders (synthetic, interest-only "strips" of reverse-mortgage-backed securities known as Home Equity Conversion Mortgages ("HECM IOs"), which

2

guaranteed an uncertain future revenue stream for an uncertain period of time) were in fact less than the values LWF provided IDC. To convict Mr. Hild, the government must prove more than that, of course – but it must at least prove that. It is not clear, however, how the government intends to prove this basic point at trial, however. Prove it the government will have to – indeed, the point is anything but conceded by Mr. Hild.

Proving that the securities were in fact worth less than what LWF told IDC they were worth would seem to require expert testimony. Indeed, the indisputable complexity of the complicated securities at issue – for which there was no active secondary market whatsoever, such that any notion of a "market value" necessarily required resort to complicated modeling exercises (even for IDC, a third-party valuation company whose very existence and purpose was to endeavor to "price" such hard-to-value securities) – renders the issue of their value subject matter indisputably outside the scope of an average juror's common experience and knowledge. (In fact, the evidence at trial will be that even IDC itself would acknowledge that the value of the complicated securities at issue is very much an art, not a science, and can be very much a matter of reasonable professional disagreement.) For present purposes, the point is simply that proving the value of the securities in question would seem to indisputably require the government to put on witnesses with "specialized knowledge" of the subject matter (i.e., expert testimony).

The jury will hear no such proof at the trial, however – from any government witness. The government did not disclose any such witnesses or testimony, and the deadline for doing so (and for making the necessary disclosures in connection therewith, as mandated pursuant to Federal Rule of Criminal Procedure 16(e)) has long since come and gone.

How, then, can the government at trial "prove" the true "market value" of the complicated securities at issue – a necessary prerequisite to proving that the values of the securities provided

3

by LWF to IDC were "inflated"?  Apparently, the government intends to rely at trial on proof of the fact that the securities in question (a) allegedly were judged by LWF to be worth much less by those who assumed control of the company after LWF closed its doors (in May 2019) and Mr. Hild no longer controlled it (June 2019), and (b) were ultimately sold by the alleged "victim" lenders in liquidating transactions that fetched approximately $65 million less than the amount owed by LWF to the alleged "victim" lenders.

The government's reliance on such proof, however, is misplaced.  For one, how those in control of LWF valued the securities in question after LWF had shut its doors and had announced its intention to winddown is proof of nothing.  By any standard, the value of the securities in question was hardly easy to ascertain, and it does not follow at all that because others in charge of LWF after Mr. Hild had departed valued the securities to be worth less at that time the securities were not worth what LWF thought they were worth (and told IDC it believed them to be worth) over the (earlier) period in question.  This is even more so the case given that posture of the company after it announced its winddown in the first week of May 2019 was decidedly different than during the earlier periods set forth in the Indictment (2014-2017, roughly), the period dating from LWF's acquisition of the securities in question (September 2014) through mid-2017, during which time the value of the securities in LWF's view and as shared with IDC steadily increased.  Although it appears that that those who took control of LWF following the announcement of its winddown and Mr. Hild's departure from the company in connection therewith not long thereafter restated the value of the securities in question on LWF's balance sheet, the lower valuations at that time could be (and are, of course) explained by quite a number of things (including, most notably, the fact that the securities in question were likely to be liquidated, and liquidation value is very different from, say, fair value).  There is simply zero relevance to the issues to be decided.

The same is the case with respect to any proof regarding the amount fetched by the alleged "victim" lenders upon liquidation of the collateral after LWF's default on its obligations secured thereby. That the alleged "victim" lenders sold the securities for what they sold them for – far less than the total amount they were owed by LWF – is certainly not proof of the securities "fair market value" (or even that the securities could be said to have had one). Logically, merely because something can be sold does not mean that there is an active market for that thing, and one's ability to sell something at a certain price certainly does not mean that that price reflects a "fair market value." Here, the circumstances of the alleged "victim" lenders sale of the securities in question – what amounted to a forced sale of esoteric securities, for which there was undeniably no active market, for liquidation purposes (a "firesale, to put it colloquially") – make plain that the fact of the sale and the value received by the "victim" lenders in connection therewith has no relevance whatsoever to any determination of fair value (or fair market value, to the extent the government could contend there was a market for the securities).

Because these aspects of the government's proof anticipated to be presented at trial – evidence related to the winddown of LWF, revaluations of the securities in question by LWF during the period of the winddown, and the fact and amount of the ultimate sale of the securities in question in liquidating transactions by the alleged "victim" lenders upon LWF's default of its respective obligations to the lenders – have no relevance to the issues to be decided by the finder of fact at the trial of this case, and in fact would likely confuse if not mislead the finder of fact, such evidence is inadmissible under the rules of evidence and should be excluded. The appropriate analysis, as outlined below, as guided by the legal authorities cited herein, compels this conclusion.

# ARGUMENT

**A. Evidence Pertaining to the Winddown of LWF, Revaluations of the Securities in Question by LWF during the Period of the Winddown, and the Fact and Amount of the Ultimate Sale of the Securities in Question in Liquidating Transactions by the Alleged "Victim" Lenders Upon LWF's Default of its Respective Obligations to the Lenders Is Not Relevant Under Rules 401 and 402 of the Federal Rules of Evidence**

Evidence is relevant only if it has a "tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Here, there is little relevance to what persons other than Mr. Hild believed the securities to be worth at a point in time quite subsequent to the period relevant to the basic allegations as set forth in the Indictment and in circumstances completely different from those in existence at the time Mr. Hild is alleged to have directed LWF to overstate intentionally the values of the securities in question to IDC. There is simply no logical connection – and thus zero probative value – in these aspects of the government's anticipated proof. Such evidence, therefore, is irrelevant and should be excluded under Rule 402.

**B. Even if Relevant, Admission of Evidence of the Winddown of LWF, Revaluations of the Securities in Question by LWF during the Period of the Winddown, and the Fact and Amount of the Ultimate Sale of the Securities in Question in Liquidating Transactions by the Alleged "Victim" Lenders Upon LWF's Default of its Respective Obligations to the Lenders Would be Unduly Prejudicial, Cause Confusion of the Issues and Mislead the Jury Under Rule 403 of the Federal Rules of Evidence.**

Even if evidence related to the winddown of LWF, revaluations of the securities in question by LWF during the period of the winddown, and the fact and amount of the ultimate sale of the securities in question in liquidating transactions by the alleged "victim" lenders upon LWF's default of its respective obligations to the lenders was relevant in some way (which it is not), it should nonetheless be excluded because any probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues and misleading the jury. Fed. R. Evid. 403.

As this Court itself has recognized, evidence should be excluded when it is "only likely to inject irrelevancy and confusion into this case if allowed in evidence." *United States v. Al Kassar*, 582 F. Supp. 2d 498, 500 (S.D.N.Y. 2008).

Permitting evidence related to the winddown of LWF, revaluations of the securities in question by LWF during the period of the winddown, and the fact and amount of the ultimate sale of the securities in question in liquidating transactions by the alleged "victim" lenders upon LWF's default of its respective obligations is more than merely irrelevant – it is dangerous. Permitting the jury to hear this evidence would practically invite the jury to make precisely the unwarranted, logical leap regarding the value of the securities that the government may be seen as tacitly soliciting by way of its very introduction. Were the jury to draw the inference from such evidence that the values provided by LWF to IDC at issue in the case were in fact inflated values, it could well improperly convict on that basis. There is real risk of confusion brought to bear by introduction of the evidence that simply cannot be denied. This is precisely the type of evidence Rule 403 is intended to prohibit. *See, e.g., United States v. Morel*, 751 F. Supp. 2d 423, 431-32 (E.D.N.Y. 2010) (applying Rule 403 analysis and excluding evidence where risk of improper inferences was substantial).

Indeed, where, as here, the risk of the jury drawing improper inference is particularly heightened, Rule 403 takes on special significance as a bulwark against wrongful convictions. As this court has previously observed, "[a] court must conscientiously balance[] the proffered evidence's probative value with the risk for prejudice,'" one form of "unfair prejudice speak[ing] to the capacity of some concededly relevant evidence to lure the factfinder into [rendering its verdict] on a ground different from proof specific to the [charges brought]." *Federal Housing Finance Agency v. Nomura Holding America, Inc.* 68 F.Supp. 3d 499, 505

(S.D.N.Y. 2014) (internal citations omitted). Specifically, "the proffered evidence may have a tendency to prove some adverse fact not properly in issue or unfairly excite emotions against the [opposing party]." *Id.* (citations omitted). Such judicial admonitions instruct a cautious prudence in tempering the liberal spirit of admissibility otherwise encouraged by the rules of evidence in situations such as the instant one.

Furthermore, introduction of such evidence risks diverting the trial of the real issues to be insofar as Mr. Hild will then have to introduce proof explaining and distinguishing the post-winddown and liquidation-sale valuations so that the jury does not get the wrong idea. The presentation of such evidence would only further elongate and complicate what is already a complicated, "white collar" fraud trial. The introduction of such "counter evidence" would contribute still further to the risk of confusion of the issues among the jury, cause undue delay by creating a trial within a trial, and distract the jury from the central issues of the case. *See, e.g., Plew v. Limited Brands, Inc.*, No. 08 Civ. 3741 (LTS) (MHD), 2012 WL 379933, at *8 (S.D.N.Y. Feb. 6, 2012) (applying Rule 403 and excluding evidence that "risk[ed] inviting a mini-trial on an issue that is both legally inconsequential and potentially unfairly prejudicial"). None of this is good for the interests of justice and the common interest in a fair and just trial on the merits based on the truly-relevant proof.

## CONCLUSION

For the foregoing reasons, this Court should enter an order preventing the United States from offering evidence of LWF's winddown, re-valuation of the securities in issue by Defendant's company during the period of its winddown, and the post-winddown "firesale" liquidation of the collateral at issue by Defendant's alleged "victim" lenders.

Dated: Fort Wright, KY
March 11, 2021

                                        Respectfully submitted,

                                        s/ Benjamin. G Dusing
                                        Benjamin G. Dusing
                                        Law Offices of Benjamin Dusing, PLLC
                                        809 Wright's Summit Pkwy Ste 120
                                        Fort Wright, KY 41011
                                        Telephone: 859-635-5000
                                        bdusing@bgdlaw.com
                                        *Admitted Pro Hac Vice*

                                        *Counsel for Michael Hild*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of March, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will serve a notice of electronic filing on the following:

Jordan Estes
*Assistant United States Attorney*

Scott Hartman
*Assistant United States Attorney*

                                                */s/ Benjamin G. Dusing*
                                                Benjamin G. Dusing