UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA  :

    - v. -  :

                                                           19 Cr. 602 (RA)

MICHAEL HILD,
                                         :

       Defendant.
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Scott Hartman
Jordan Estes
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1
FACTUAL BACKGROUND....................................................................................1
   Live Well's Bond Portfolio and Repurchase Agreements..............................................2
   The Scheme to Mismark the Bond Portfolio.................................................................3
ARGUMENT...............................................................................................................5
   I.   BECAUSE A "SCHEME TO DEFRAUD" DOES NOT REQUIRE PROOF OF AN OBJECTIVELY "FALSE" STATEMENT, HILD SHOULD BE PROHIBITED FROM ARGUING THAT THE "REASONABLENESS" OR "ACCURACY" OF THE MARKS LIVE WELL SUBMITTED TO IDC IS A DEFENSE TO THE CHARGES.........................5

   II.   THE COURT SHOULD PRECLUDE ARGUMENT OR EVIDENCE SUGGESTING THAT IDC OR THE LENDERS WERE NEGLIGENT OR CARELESS IN FAILING TO STOP THE FRAUD. ...................................................................................................6

   III.   HILD SHOULD BE PRECLUDED FROM OFFERING AUDIO RECORDINGS OF HIS IRRELEVANT, SELF-SERVING HEARSAY STATEMENTS. .................................8

   IV.   THE COURT SHOULD PRECLUDE ANY ARGUMENT THAT THE DEFENDANT LACKED INTENT TO DEFRAUD BECAUSE HE BELIEVED THAT NO ULTIMATE HARM WOULD BE SUFFERED BY THE VICTIM LENDERS. ..................10

   V.   THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OR MAKING ARGUMENT REGARDING HIS OWN CONSULTATION WITH COUNSEL DURING THE CHARGED SCHEME OR THE FACT THAT HIS CO-CONSPIRATORS COSULTED WITH COUNSEL DURING THE SCHEME...................12

   VI.   THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR SYMPATHY. 14
CONCLUSION..........................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998)....5

*In re Live Well Financial, Inc.*, 19-11317 (LSS) ................................................................4

*Neder v. United States*, 527 U.S. 1 (1999) ........................................................................8

*SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019)13

*Shannon v. United States*, 512 U.S. 573 (1994) ..............................................................15

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*, 522 U.S. 148 (2008) ..................5

*United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) .......................................................7

*United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008)14

*United States v. Berger*, 188 F. Supp. 2d 307 (S.D.N.Y. 2002) ......................................11

*United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013) .12

*United States v. Del Rosario*, No. S1 12 Cr. 81, 2012 WL 2354245 (S.D.N.Y. June 14, 2012) ..15

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997).............................................13

*United States v. Ferguson*, 676 F.3d 260 (2d Cir.2011) .................................................11

*United States v. Godwin*, 272 F.3d 659 (4th Cir. 2001) ..................................................11

*United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997)...........................................11

*United States v. Gupta*, 747 F. 3d 111 (2d Cir. 2013) ......................................................9

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) .................................................15

*United States v. Isola*, No. 10 Cr. 833 (WHP), 2012 WL 243083 (S.D.N.Y. Jan 11, 2012) ..........7

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008)....................................................12

*United States v. Lin*, 225 F.3d 647 (2d Cir. 2000)..........................................................14

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) .........................................................9

*United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005)................................................9

*United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2011).8

*United States v. Okun*, Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009)....................11

*United States v. Reese*, 933 F. Supp. 2d 579 (S.D.N.Y. 2013).......................................15

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) .......................................................5

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004)....................................................7

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) .................................................... 12

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..................................................................... 9

**RULES**

Federal Rule of Evidence, Rule 801(d)(2)(A). ................................................................................ 9

Federal Rules of Evidence, Rule 403 ............................................................................... 6, 10, 14

Federal Rules of Evidence, Rule 803(3) ....................................................................................... 10

## PRELIMINARY STATEMENT

The Government respectfully submits this motion *in limine* to (1) preclude the defense from arguing that the "reasonableness" or "accuracy" of the marks Live Well submitted to IDC is a defense to the charges, (2) to preclude the defense from arguing that the negligence of IDC or the lenders is a defense to the charges, (3) to preclude the defendant from offering irrelevant, self-serving hearsay statements, (4) to preclude the argument that the defendant lacked intent to defraud because he believed no ultimate harm would come to the victims, (5) to preclude evidence, questioning or argument regarding consultation with counsel by the defendant and certain cooperating witnesses, (6) to preclude irrelevant evidence and argument designed to elicit juror sympathy.

## FACTUAL BACKGROUND

As alleged in the Indictment, from at least in or about September 2015 through in or about May 2019, Hild, the Chief Executive Officer of Live Well Financial ("Live Well"), participated in a scheme with others – including Live Well's Chief Financial Officer, Eric Rohr, and Live Well's chief bond trader, Darren Stumberger – to fraudulently inflate the purported value of a portfolio of bonds owned by Live Well.[1] The purpose of the inflation was to induce various securities dealers and at least one federally-insured bank to lend Live Well money far in excess of the bonds' tradable value. Using the proceeds of the fraud, Hild gained control of Live Well's board of directors and proceeded to extract over $20 million from the company for his personal use. As of mid-2019, when

---

[1] Both Rohr and Stumberger have pled guilty to federal charges related to their participation in the scheme and are expected to testify at the trial in this case.

Live Well ceased operations and entered bankruptcy, the debt that Live Well owed to its lenders on the bond portfolio exceeded the portfolio's carrying value by approximately $65 million.

### Live Well's Bond Portfolio and Repurchase Agreements

Live Well was a Richmond, Virginia-based company that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages ("HECMs"). In or about 2014, Live Well acquired a portfolio of approximately 20 bonds ("HECM IO bonds"), each entitling the holder to receive a portion of the interest payments, but not the principal payments, from a particular pool of reverse mortgages. Live Well purchased the HECM IO bond portfolio for approximately $50 million. At the same time that Live Well purchased the HECM IO bond portfolio, Hild established within Live Well a New York City-based trading desk to manage and grow Live Well's bond portfolio. Stumberger supervised the trading desk.

Live Well financed the acquisition and growth of its bond portfolio through a series of loans in which Live Well used its bond portfolio as collateral. The majority of Live Well's lenders were securities dealers whose lending arrangements with Live Well were structured as bond repurchase agreements, also known as "repo agreements." A repo agreement is a short-term loan in which both parties agree to the sale and future repurchase of an asset within a specified contract period. The seller sells the asset to the lender with a promise to buy it back at a specific date and at a price that includes an interest payment. Functionally, a repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. When the loan is repaid by the borrower, the collateral is returned to the borrower through a repurchase. Additionally, at least one of Live Well's lenders was an FDIC-insured bank, and its lending arrangement with Live Well was structured as a secured loan, with certain bonds held as collateral by a third-party custodian.

The Scheme to Mismark the Bond Portfolio

Live Well's financing agreements with all but one of the lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to determine the market value of the bond as of the measurement date. The lenders then used the value of the bond, minus a 10% to 20% "haircut" generally, to determine the amount of money to lend Live Well.

The lenders generally relied on a particular widely utilized subscription service (the "Pricing Service") to price various securities. In or about September 2014, Hild, Rohr, Stumberger, and their co-conspirators embarked on a scheme to cause the Pricing Service to publish valuations for the bonds that far exceeded actual market prices. By doing so, the conspirators induced the lenders to extend credit to Live Well far in excess of the prices for which the bonds could be sold in the market. The inflated prices were based on a set of market assumptions that the conspirators called "Scenario 14."

Hild was aware that if the lenders had known that the Pricing Service was publishing bond prices that did not reflect fair value (meaning the price at which a lender could sell the bond in the market if necessary to recoup its capital), they would have refused to use those prices in determining how much money to loan to Live Well. To prevent the Pricing Service and the lenders from learning that the prices did not reflect market value, Hild directed Rohr, Stumberger, and others to take steps to conceal their provision of inflated marks to the Pricing Service. Ultimately, due to the asset overvaluation and the purchase of additional bonds using the capital generated by the scheme, Live Well grew the purported value of its bond portfolio to $500 million by December 2016.

In addition to using the liquidity generated by the scheme to expand Live Well's bond portfolio, in or about September 2016, Hild used $18 million generated from the bond financing to

3

buy out the preferred stockholders in Live Well.  The elimination of the preferred stockholders gave Hild exclusive control of the company and allowed him to substantially increase his personal compensation.  Accordingly, Hild's compensation jumped from approximately $1.4 million in 2015, to approximately $5 million in 2016, approximately $9.7 million in 2017, and over $8 million in 2018.

In or about late 2018, Rohr resigned as chief financial officer of Live Well.  In or about May 2019, the company's interim chief financial officer informed Hild that he would not sign the company's interim financial statements because he believed that the company's carrying value for the HECM IO bond portfolio was significantly overstated.  On or about May 4, 2019, Live Well announced that it would cease operations and unwind.  After the announcement of Live Well's closing, Live Well's interim chief financial officer provided a balance sheet to Live Well's lenders showing that Live Well had reduced the value of its bond portfolio by approximately $141 million.  As of May 31, 2019, the debt Live Well owed to its lenders on the bond portfolio exceeded the portfolio's carrying value by approximately $65 million.

On June 10, 2019, three of Live Well's lenders filed a Chapter 7 petition for involuntary bankruptcy against Live Well in the United States Bankruptcy Court for the District of Delaware.  *See In re Live Well Financial, Inc.*, 19-11317 (LSS).  On or about July 1, 2019, the bankruptcy court appointed a trustee for Live Well.

# ARGUMENT

## I. BECAUSE A "SCHEME TO DEFRAUD" DOES NOT REQUIRE PROOF OF AN OBJECTIVELY "FALSE" STATEMENT, HILD SHOULD BE PROHIBITED FROM ARGUING THAT THE "REASONABLENESS" OR "ACCURACY" OF THE MARKS LIVE WELL SUBMITTED TO IDC IS A DEFENSE TO THE CHARGES.

In pretrial discussions with the Government, Hild has suggested that he intends to argue that he cannot be convicted of fraud in connection with the scheme described in the indictment, because the valuations that Live Well submitted to IDC were subjective and, in some cases, qualified with cautionary language. Because material statements made for the purpose of deceiving another party establish a scheme to defraud even where those statements are factually defensible, Hild should be prohibited from arguing that the "reasonableness" of Live Well's IDC submissions is a defense to fraud or otherwise suggesting that the government is required to prove that the valuations that Live Well submitted to IDC were objectively false.

The Second Circuit has recognized repeatedly that a defendant may be convicted of having participated in a scheme to defraud based upon statements calculated to deceive another party, even where those statements were arguably true. *See, e.g., United States v. Royer*, 549 F.3d 886, 899-900 (2d Cir. 2008) ("'conduct itself can be deceptive,' and so liability under § 10(b) and Rule 10b–5 does not require a specific oral or written statement" (quoting *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*, 522 U.S. 148, 158 (2008)); *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (holding that schemes that violate "fundamental notions of honesty, fair play and right dealing violate the wire fraud statute, even in the absence of false statements); *cf. A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998) (Sotomayor, J.) ("[A] defendant, by his conduct alone, can intend to deceive another and engage in a

scheme to defraud, even though the defendant's statements themselves contain no misrepresentations").

In this case, the Government expects to argue and prove that the marks that Hild caused Live Well to submit to IDC were unreasonable and not supported by market realities. The jury should not, however, be left with the misimpression that if it fails to find that the marks themselves were objectively false, Hild must be acquitted. Rather, if the evidence establishes that Hild schemed to deceive his lenders, for example with respect to the origin or nature of the IDC valuations, he may be convicted if the other elements of the offense are met, and it is irrelevant whether the marks that Live Well submitted to IDC were reasonable or even accurate.

Even if the "reasonableness" of Live Well's marks an absolute defense – which it is not – argument that he should be acquitted because those marks were facially accurate should be excluded under Fed. R. Evid. 403 as confusing the issues, misleading the jury, and undue delay. As set forth above, proof of a scheme to defraud turns on a defendant's intent, and not whether a particular statement is true or false in some technical or specialized way. Allowing the defendant to argue about the "reasonableness" of Live Well's marks will distract the jury's attention from the real issue presented in this case – whether the defendant intended to trick or deceive Live Well's lenders.

II. **THE COURT SHOULD PRECLUDE ARGUMENT OR EVIDENCE SUGGESTING THAT IDC OR THE LENDERS WERE NEGLIGENT OR CARELESS IN FAILING TO STOP THE FRAUD.**

Based on comments by defense counsel, it appears that certain defense evidence or arguments may improperly suggest to the jury that either IDC or the lenders are to blame for purportedly failing to stop the fraud perpetrated by the defendant and his co-conspirators. Any such argument or evidence should be precluded as irrelevant, because the law is clear that a victim's failure to uncover a fraud, even when presented with facts that might indicate that a fraud had been

committed, is no defense to a fraud charge.

In *United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004), the Second Circuit squarely held that a victim's lack of diligence (if any) in detecting a fraud cannot be used as a defense. In *Thomas*, the defendant was charged with inducement of travel in interstate commerce for a fraudulent purpose. At trial, defense counsel cross-examined the victim of the fraud concerning the lack of caution he exercised in his dealings with the defendant. The District Court questioned the propriety of the line of questioning, noting that it was no defense to fraud that the victim was foolish or made insufficient inquiries, and expressed its concern that defense counsel was insinuating to the jury that the victim could have discovered the fraud had he asked the right questions. Defense counsel disclaimed any such intent and was directed to move on. *Id.* at 240-41. The Second Circuit affirmed, holding that it would be no defense that the victim might have discovered the fraud had it probed further, because federal anti-fraud statutes prohibit schemes to defraud, and to establish a scheme to defraud, there is no requirement that the victim act as a person of ordinary prudence would. *Id.* at 241-42 & 241 n.5.

The Second Circuit and courts in this District have also rejected defendants' attempts to suggest to juries that banks, mortgage lenders and other fraud victims could have discovered defendants' efforts at deception, and thus that the defendants were not guilty of fraud. *See, e.g.*, *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (affirming district court's rejection of a defendants' proposed jury instruction for mail fraud stating that the victim could have discovered false representations in the defendant's mortgage applications, and that the victim's failure to do so constituted a defense, and noting that "[t]he majority of circuits to address the issue have rejected this defense, holding that a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud"); *United States v. Isola*, No. 10 Cr. 833 (WHP), 2012 WL 243083 (S.D.N.Y. Jan

7

11, 2012) ("[The defendant] is incorrect that the banks' failure to verify the false information he provided absolves him of guilt. A victim's negligence is not a defense to fraud."); *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2011) ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

The law is equally clear that whether a lending institution was in fact deceived by, or relied upon, a defendant's fraudulent conduct or statements is irrelevant, because the success of a defendant's scheme to defraud is irrelevant to the issue of guilt. *See Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes"; "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.").

In light of these authorities, arguments or evidence suggesting that either IDC or the lenders should have or could have done more to stop the fraud are irrelevant and should be precluded. Any purported negligence by IDC or the lenders, or any steps they purportedly should have taken to prevent the defendant's fraud from succeeding, are simply irrelevant to whether the defendant participated in the charged scheme and whether he had the intent to defraud.

### III. HILD SHOULD BE PRECLUDED FROM OFFERING AUDIO RECORDINGS OF HIS IRRELEVANT, SELF-SERVING HEARSAY STATEMENTS.

During the pendency of the charged scheme, certain of the Government's cooperating witnesses, without the Government's involvement, made audio recordings of conversations that they had with each other and with Hild. All of the recordings have been produced to Hild in discovery. The Government intends to offer portions of certain of these recordings as affirmative evidence of

the charges in this case. That does not, however, entitle Hild to offer unrelated portions of the audio recordings that contain his self-serving hearsay, are irrelevant, or would otherwise be misleading to the jury.

A defendant's out-of-court statement is not hearsay when offered by the Government. Fed. R. Evid. 801(d)(2)(A). ("A statement is not hearsay if . . . [it] is offered against a party and is [] the party's own statement."); *see also, e.g., United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("[U]nder Rule 801(d)(2)(A)," a defendant's statement offered by the Government "is not hearsay, because it is simply a statement of the opposing party."). A defendant, however, does not have a parallel ability to offer his own statements. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

Nor, except in limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind. To be admissible on that basis, the statement must be relevant to a then-existing state of mind or intent regarding a relevant fact. *See, e.g., United States v. Lesniewski*, No. 11 Cr. 1091, 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013).

Finally, even where a declarant's out-of-court statement is not otherwise inadmissible hearsay, it "must meet the requirements of, inter alia, relevance, and it must not be excludable on the grounds of undue confusion or prejudice under Rule 403." *United States v. Gupta*, 747 F. 3d 111, 139 (2d Cir. 2013) (affirming preclusion of evidence that a defendant allegedly intended to give "his wealth to charity" as both inadmissible hearsay and irrelevant).

9

While the Government concedes that Hild may be able to offer portions of certain recordings to establish his state of mind at the time the scheme was ongoing, the Court should not allow him to offer self-serving hearsay or statements that are irrelevant to the issues before the jury.

As to hearsay, even under the state of mind exception to the hearsay rule, Hild may not offer "a statement of . . . belief to prove the fact . . . believed." *Cf.* Fed. R. Evid. 803(3). Accordingly, to the extent Hild may seek to offer recordings in which he makes statements about his beliefs or understandings to establish his lack of criminal intent, those statements should be precluded.

Separately, the Court should be attentive to the relevance of any recordings that Hild may seek to offer, as well as the appropriate balancing of the factors under Rule 403. Many of the recordings contain highly technical and lengthy discussions of bond valuation. As explained above, however, even if Hild were to establish that he sincerely believed that his methodology for valuing the bonds was the correct one, he could still be convicted of the charges if the jury nevertheless believed that he sought to mislead the lenders regarding the liquidation value of the bonds or the source of the IDC marks. Accordingly, the probative value of these discussions is limited. Moreover, given the highly technical nature of the discussions, there is a risk that placing them before the jury will confuse the jury or cause juror to focus on issues that are irrelevant to Hild's guilt or innocence.

### IV. THE COURT SHOULD PRECLUDE ANY ARGUMENT THAT THE DEFENDANT LACKED INTENT TO DEFRAUD BECAUSE HE BELIEVED THAT NO ULTIMATE HARM WOULD BE SUFFERED BY THE VICTIM LENDERS.

The Government respectfully requests that the Court preclude the defense from arguing that the jury should infer that the defendant lacked intent to defraud because he believed that the lenders would not suffer any ultimate harm because the loans would ultimately be repaid. Such an argument is contrary to well-established Second Circuit law and should not be permitted at trial.

The "well-intentioned belief that a business venture in which a defendant was involved would be successful and would allow for repayment of money taken from victims does not supply a basis for a defense that there was a good faith belief that a representation was true." *United States v. Okun*, Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) (citing *United States v. Godwin*, 272 F.3d 659, 666-67 (4th Cir. 2001)); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan.") (citing 1A Sand, *Modern Federal Jury Instructions*, ¶ 44.01); *United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (finding that a guilty verdict on securities fraud charges based on the fact that the defendant intentionally caused others to issue false or misleading statements to investors would be proper regardless of evidence of the defendant's belief that his investment strategy would be successful financially).[2]

In situations where a defendant has improperly presented evidence or argument of his good faith belief in the success of a scheme in which false representations have been made to victims, the Second Circuit has routinely upheld the issuance of a "no ultimate harm" charge, which instructs the jury that "a belief of a defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant]." *United*

---

[2] Although, for the purposes of the wire fraud (though not bank fraud or securities fraud) the Government must prove that the defendants contemplated harm, such harm can include only the impairment of the lenders' right to control their assets through discretionary economic decisions. *See United States v. Levis*, 488 Fed. Appx. 481, 486 (2d Cir. 2012) (summary order); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir.2011).

*States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (finding that instruction in a securities fraud trial was appropriate where the defendants, who had defrauded investors in a movie by misleading those investors about how investment monies would be spent, had argued at trial that they had a good faith belief that the movie would be completed); *United States v. Levis*, 488 Fed. Appx. 481, 486 (2d Cir. Jul. 18, 2012) (summary order) (finding that instruction was appropriate where the defendant, who had made misrepresentations regarding the independent valuation of his company to investors, had argued at trial that he did not believe any harm would befall investors). Often the instruction is given when this improper argument arises at trial. Where it is clear prior to trial, as is the case here, that the defense intends to advance an improper legal theory, the argument should be precluded. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *accord United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013).

**V.  THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OR MAKING ARGUMENT REGARDING HIS OWN CONSULTATION WITH COUNSEL DURING THE CHARGED SCHEME OR THE FACT THAT HIS CO-CONSPIRATORS COSULTED WITH COUNSEL DURING THE SCHEME.**

In pre-trial discussions with the Government, Hild has indicated that he intends to elicit from certain of the Government's cooperating witnesses that they consulted with counsel during the pendency of the charged scheme and failed to share that fact with the defendant. Hild has indicated that he believes these facts are relevant, because they show that the cooperating witnesses had misgivings about Live Well's conduct but did not share those concerns with Hilds. Separately, the Government has learned that, during at least part of the charged scheme, Hild was represented by counsel in connection with an SEC inquiry into the conduct at issue in this case.

12

The Government understands that Hild does not intend to rely on an advice of counsel defense. Moreover, neither Hild nor the cooperating witnesses at issue have waived the attorney-client privilege with respect to the communications that would be implicated by such testimony or argument. Accordingly, the Government moves to preclude Hild from questioning Government witnesses about their own consultation with counsel or from arguing or suggesting to the jury that his own lawyers blessed or otherwise advised him with regard to his conduct in the case.

With respect to Hild's consultation with his own attorneys, the law has clearly defined the showing that a defendant must make in order to argue that his consultation with attorneys establish a good faith defense to criminality. The defendant bears the burden of producing evidence to establish each of the following three facts: (1) before taking action in connection with the charged conduct, he "honestly and in good faith [sought] the advice of a lawyer as to what he may lawfully do"; (2) he "fully and honestly [laid] all the facts before his counsel"; and (3) he acted strictly in accordance with the advice of his lawyer. *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997) (internal quotation marks omitted). In the absence of such a showing, "[r]eferences to counsel's communications are not relevant." *SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019).

As for questioning of the Government's witnesses regarding their own consultation with counsel, the Court is empowered to control the manner of examination, and properly may limit the areas of cross-examination without violating a criminal defendant's constitutional rights, including precluding a defendant from cross-examination that would reveal communications protected by the attorney-client privilege. *See United States v. Lin*, 225 F.3d 647 (2d Cir. 2000). Here, as noted, the defendant's theory of relevance seems to be that the cooperators' failure to disclose to him their own misgivings about Live Well's approach to pricing its bonds is somehow probative of his good faith.

This is a weak inference, at best, given that the witnesses' failure to share their own concerns does little to establish that the defendant himself acted in good faith. Moreover, even eliciting the fact of the witnesses' decision to consult with counsel would lead the jury to speculate improperly about what the witnesses said to their lawyer and what the lawyer said in response. Given that the contents of those communication are privileged and will not be before the jury, the fact of the communication should be precluded under Rule 403 in order to avoid jury confusion and distraction.

## VI. THE DEFENDANT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR SYMPATHY.

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning his family background or any other similar factors, or the consequences of the SEC inquiry or the Government's investigation, for his business or his livelihood. Nor should the defendant be permitted to elicit testimony or argue that he was duped or misled into purchasing the bond portfolio at issue in this case or that he was promised higher returns than he in fact received – issues he has raised in pre-trial discussions with the Government. Such matters are irrelevant to the issues in this case and do not bear on guilt or innocence. *See United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence

might be imposed."' *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* As a result, "'[c]ourts have routinely precluded evidence of possible punishment,"' *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (quoting *United States v. Del Rosario*, No. S1 12 Cr. 81, 2012 WL 2354245, at *2 (S.D.N.Y. June 14, 2012)), as well as other "arguments aimed at jury nullification," *Reese*, 933 F. Supp. 2d at 583. The Court should do likewise here.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court grant its motions *in limine*.

Respectfully submitted,
AUDREY STRAUSS

United States Attorney
Southern District of New York

By: /s/
Scott Hartman
Jordan Estes
Assistant United States Attorneys

Dated: New York, New York
March 11, 2021

15