UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
———————————————————— x
                      :
UNITED STATES OF AMERICA,        :          19 Cr. 602 (RA)
                      :
Plaintiff,            :
                      :
v.                    :
                      :
MICHAEL HILD,         :
                      :
Defendant.            :
                      :
                      :
———————————————————— x
```

**DEFENDANT MICHAEL HILD'S MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE***

Benjamin G. Dusing
Law Offices of Benjamin Dusing, PLLC
809 Wright's Summit Pkwy, Ste 120
Fort Wright, KY 41011
Telephone: 859-635-5000
bdusing@bgdlaw.com

*Counsel for Michael Hild*

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………..1

FACTUAL BACKGROUND………………………………………………………………..1

    MR. HILD FOUNDS LWF AND GUIDES IT TO INDUSTRY PROMINENCE……….1

    THE STIFEL TRANSACTION…………………………………………………………..3

    EVOLUTION OF MANAGEMENT AND VALUATION OF THE BONDS AT LWF...6

    THE IDC MODEL HAS MAJOR PROBLEMS………………………………....……...7

    THE PREFERRED SHAREHOLDER BUYOUT…………….…………………..…10

    MR. HILD'S COMPENSATION…………………………..………………………...10

    REGULATORY CHANGES IN THE MARKET…………………..…………....……11

    REGULATORY INVESTIGATION OF LWF…………………………………….13

    LWF CLOSES AND WINDS DOWN…………………………....………..………..14

ARGUMENT…………………………………………………………………………....17

I.    MR. HILD SHALL NOT ARGUE THAT "THE 'REASONABLENESS' OR 'ACCURACY' OF THE MARKS LIVE WELL SUBMITTED TO IDC IS A DEFENSE TO THE CHARGES," BUT PROOF OF THE "REASONABLENESS" AND "ACCURACY" OF SUCH MARKS IS CLEARLY RELEVANT INSOFAR AS IT IS PROBATIVE OF MR. HILD'S INTENT……………………………………………17

II.    MR. HILD SHALL NOT ARGUE THAT HE SHOULD BE AQUITTED BECAUSE IDC OR THE "VICTIM" LENDERS WERE NEGLIGENT OR CARELESS IN FAILING TO STOP THE ALLEGED FRAUD, BUT PROOF OF WHAT INFORMATION IDC PROVIDED TO LWF'S LENDERS IS RELEVANT EVIDENCE……………………18

III.    MR. HILD SHOULD NOT BE PRECLUDED FROM OFFERING PORTIONS OF THE AUDIO RECORDINGS OFFERED BY THE GOVERNMENT CONTAINING STATEMENTS MADE BY MR. HILD…………………………………………..19

IV.    MR. HILD SHALL NOT ARGUE THAT HE LACKED INTENT TO DEFRAUD BECAUSE HE BELIEVED THAT NO ULTIMATE HARM WOULD BE SUFFERED BY THE "VICTIM" LENDERS…………………………………………………..22

V.    MR. HILD SHOULD NOT BE PRECLUDED FROM INTRODUCING EVIDENCE OF THE FACT THAT (A) DURING A LARGE PART OF THE SCHEME TO DEFRAUD ALLEGED IN THE INDICTMENT HE AND THE COMPANY WERE REPRESENTED BY COUNSEL IN CONNECTION WITH MATTERS DIRECTLY RELATING TO LWF'S MANAGEMENT AND VALUATION OF THE BOND PORTFOLIO AND MR. HILD'S AND LWF'S DECISIONS WITH RESPECT TO SAME DURING THIS PERIOD WERE UNDERTAKEN WITH THE INVOLVEMENT OF COUNSEL, OR (B) MR. HILD'S ALLEGED CO-CONSPIRATORS SECRETLY MET WITH A PRIVATE ATTORNEY OVER THE COURSE OF THE ALLEGED SCHEME TO GET LEGAL ADVICE REGARDING LWF'S MANGEMENT AND VALUATION OF THE BOND PORTFOLIO BUT NEVER TOLD MR. HILD…………………………….……………22

VI.   MR. HILD DOES NOT INTEND TO INTRODUCE "EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR SYMPATHY," BUT EVIDENCE THAT MR. HILD WAS MISLED REGARDING VARIOUS ASPECTS OF THE BOND PORTFOLIO WHEN PURCHASING IT FROM STIFEL IS ADMISSIBLE AS CRITICAL EVIDENCE OF MR. HILD'S (LACK OF) KNOWLEDGE AND INTENT…………………………………………………………………………….24

CONCLUSION……………………………………………………………………….…25

# TABLE OF AUTHORITIES

**CASES**

*SEC v. Am. Growth Funding II, LLC*, 2018 U.S. Dist. LEXIS 205197 at \*10-11 (citing *U.S. v. Hill*, 643 F.3d 807, 850-51 (11th Cir. 2011) ........................................................................................... 23

*United States v. Brandt,* 196 F.2d 653, 657 (2d Cir. 1952) ................................................................ 18, 19

*United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at \*5 (W.D.N.Y. Jan. 20, 2009) ....... 20, 21

*United States v. Mundle*, 2016 U.S. Dist. LEXIS 34736 ........................................................................ 25

**RULES**

Fed. R. Evid. 801(d)(1)(B) ...................................................................................................................... 22

Fed. R. Evid. 106 .................................................................................................................................... 20

**INTRODUCTION**

The Government's Motion *in Limine* (the "Government's Motion") seeks to preclude the defense from making certain arguments and introducing certain evidence at trial – six (6) categories of argument and evidence in total. These six (6) categories of argument and evidence sought to be precluded are addressed in turn herein. The defense respectfully submits that the Government's Motion *in Limine* should be denied.

**FACTUAL BACKGROUND**

The Government's "facts" as set forth in its motion do not tell nearly the whole story. Indeed, critical facts are left out and/or glossed over. This is unfortunate. Any legal analysis of the propriety and admissibility of the arguments and evidence sought to be precluded and excluded requires, of course, a comprehensive and correct understanding of the facts to be established at trial. Accordingly, this is the first order of business.

It is respectfully submitted that the parties' proof at trial will establish the following:

<u>Mr. Hild Founds LWF and Guides It to Industry Prominence</u>

Mr. Hild founded Live Well Financial, Inc. ("LWF") in 2005 as a start-up. LWF was in the reverse-mortgage business. Initially, LWF merely originated and serviced reverse-mortgage loans. Over time, LWF became an issuer.

The company got its footing and was poised to grow substantially after it received an injection of approximately $10 million in capital from certain "preferred investors" in 2008 and 2009. Pursuant to the terms of their investment, these Preferred Investors held certain special corporate governance rights and privileges. Nonetheless, Mr. Hild retained control of the company by virtue of his ownership of his own shares and his alliance with LWF's Common Shareholders (Mr. Hild's friends and family, generally) and continued to serve as LWF's CEO

and chairman of its Board of Directors.

The capital supplied by the Preferred Shareholders' investment facilitated the build-out of the company. By 2012, LWF had a national footprint and employed over two hundred (200) people nationwide. Headquartered in Richmond, Virginia, the company became increasingly relevant in the industry as other, bigger traditional industry participants exited the reverse-mortgage space in response to the global financial crisis. By 2012, the industry had evolved such that Mr. Hild understood that the future success and sustainability of the company would require expanding its "business lines" to include investing in reverse-mortgage-backed securities – essentially, bonds comprised of a pool of reverse-mortgages "packaged" into a single security. The value of such bonds was a function of the indeterminate future revenue stream generated over the indeterminate life of the bonds, itself a function of the indeterminate life of the underlying reverse-mortgages comprising the security. By at least 2012, Mr. Hild was actively looking for an opportunity for LWF to invest in such bonds.

During these years, Mr. Hild was routinely in contact with an old acquaintance long-active in the industry, Darren Stumberger. Mr. Hild first met Mr. Stumberger in 2006. Over the years, their shared interest and involvement in the reverse-mortgage business led them to have regular contact and led to the development of a professional friendship. Mr. Hild was aware of Mr. Stumberger's reputation as "the guru" as to financial products related to the securitization of reverse mortgages.

In or about 2012, LWF's acquisition of long-sought regulatory approvals put the company in a position to "break out," so to speak. And "break out" it did. LWF became a leading originator, servicer, and issuer of reverse-mortgages, and profitable for the first time in its history.

LWF's rapid growth and expansion translated to a steadily-increasingly need for

operational financing for the company. Mr. Hild had always personally guaranteed LWF's debts. The issue of Mr. Hild being compensated for the risk he assumed so that the company could finance its operations – both past and present – became a source of contention between Mr. Hild and his Common Shareholder allies on the one hand and the Preferred Shareholders on the other.

The Stifel Transaction

In July 2014, Mr. Stumberger reached out to Mr. Hild with an exciting business proposition. He proposed that Mr. Hild acquire from Mr. Stumberger's then-employer (Stifel) its portfolio of HECM IO bonds and the team who managed them (led by Mr. Stumberger himself). Mr. Stumberger pitched Mr. Hild on the notion that the esoteric securities were underappreciated and undervalued at Stifel but could be quite lucrative if Mr. Stumberger and his team could manage them with a free-hand at LWF.

For Mr. Hild and LWF, Mr. Stumberger's business proposition amounted to the rarest of opportunities. It presented just the kind of opportunity for LWF to expand into the "investor" space Mr. Hild had long been looking out for. That Mr. Hild would have an industry talent of Mr. Stumberger's stature and known expertise managing the portfolio made the opportunity all the better. It also provided Mr. Hild important peace of mind – after all, neither Mr. Hild nor LWF had ever invested in (much less managed) a portfolio of such securities (unquestionably among the most complicated financial instruments in existence).

Given that the transaction had to be consummated, if at all, within a matter of months (due to certain external time constraints on the Stifel side), Mr. Hild and his team at LWF quickly set about conducting the appropriate due diligence and modeling of the proposed investment. In doing this, Mr. Hild relied heavily on LWF's Chief Financial Officer ("CFO") and Chief Compliance Officer ("CCO"), Eric Rohr, a longtime colleague of Mr. Hild's dating back to their

days working together at Capital One (prior to Mr. Hild founding LWF). Mr. Rohr was the logical person to spearhead the due diligence and modeling efforts given that the proposed transaction called for LWF to purchase the bond portfolio from Stifel for $55 million, and LWF would have to finance the purchase. This meant quickly securing an additional source of financing for the company, since the amount of financing available through LWF's existing lenders would be insufficient to finance the full purchase price. Furthermore, the availability of reliable financing moving forward after the purchase would be of critical importance to LWF's ability to maintain the investment moving forward. (Indeed, the availability of stable, long-term financing options – and the liquid nature of the bonds, in the event LWF would later want to unload the investment – were basic premises of the transaction, as to which Mr. Hild many times sought and Mr. Stumberger many times provided firm assurances.)

Mr. Rohr's leading role made even more sense as the transaction unfolded. The financing issue quickly percolated to the fore after it became clear after the first-part of the transaction had been completed (executed in two separate parts) that LWF would have to utilize so-called "repo financing" to finance at least part of the second-part of the purchase – at least in the short-term.

Repo financing was new for LWF. Repo financing is extremely short-term financing (generally 30- or 60-days, and even shorter for some lenders). Also, its overall cost can be very expensive. Accordingly, being forced to resort to repo financing was suboptimal. Furthermore, as it was quickly learned by Messrs. Hild, Rohr, and others on the LWF side, many repo lenders required that any HECM IO bonds being financed (and pledged as collateral for such financing) be regularly "priced" by a specific third-party valuation company, Interactive Data Company ("IDC"). A self-described "global leader" in the industry "evaluating hard-to-value instruments," IDC was a subscription service that evaluated such securities and regularly published "pricing"

for them. Repo lenders (and other lenders) would rely – in some cases exclusively, it turned out – on IDC's published "pricing" in making their lending decisions.

One immediate problem was that IDC was not at that time "pricing" all of the HECM IO bonds LWF was purchasing from Stifel and which LWF was seeking to finance through the repo lender to whom Mr. Stumberger had introduced LWF in order to make the deal happen. The repo lender which was to finance those bonds required that IDC publish "prices" for any bonds it was to finance. This of course meant that IDC had to agree to start "pricing" these bonds – and not only that, to agree to continue "pricing" them in the future. In short order this was arranged, largely on account of Mr. Stumberger's direct involvement. Mr. Stumberger (and other members of his team at Stifel) were experienced with the portfolio, of course, and had worked with the repo lenders and consequently IDC for many years.

In working with Mr. Stumberger to secure financing for the Stifel-LWF transaction, Mr. Hild (and Mr. Rohr) learned not only of the role of IDC in securing repo financing for the HECM IO bond portfolio but also of IDC's reliance on Mr. Stumberger (and his Stifel team) for "pricing" information regarding the bonds. Indeed, Messrs. Hild and Rohr learned that IDC had looked to Mr. Stumberger for years to provide "broker quotes" for the HECM IO bonds in the Stifel portfolio, which IDC would typically use as its published "pricing" for those HECM IO bonds. These "prices" would then be used by the repo lenders Mr. Stumberger had relationships with (and through whom he had arranged for Stifel to finance the bonds) to determine how much funds the repo lender would lend to Stifel to finance the bond portfolio.

Despite the "circular" nature of the practice of the security holder (Stifel/LWF) providing "pricing" to IDC, IDC publishing those very same "prices," and the repo lender relying on IDC's published "independent" valuation in setting its financing terms, Messrs. Hild and Rohr saw

firsthand that the practice was widely-accepted and known to all involved parties. Indeed, Messrs. Hild, Rohr, and Stumberger (and his Stifel team) spoke directly with the repo lender involved in financing the second-part of the Stifel transaction and no less than IDC itself about the interesting financing arrangement.

Mr. Hild received assurances from IDC that IDC would continue to publish "pricing" for all the HECM IO bonds in the portfolio (including for any such bonds later-acquired) and would continue to do so in the future. IDC explained that it would continue to accept "broker quote" pricing from Mr. Stumberger for the time being but that IDC would build a model to evaluate the bonds and use its own model to determine its published "pricing" once it had been constructed.[1] The plan was that once IDC had constructed its model, IDC would no longer rely on "broker quotes" submitted by Mr. Stumberger but would publish evaluated "pricing" generated by IDC's model.

<u>Evolution of the Management and Valuation of the Bonds at LWF</u>

Shortly after the transaction was closed, Mr. Hild learned that Mr. Stumberger had misrepresented to him the liquidity of the HECM IO bonds LWF had purchased. In effect, the bonds did not trade. There was no secondary market for LWF to sell the bonds into should it want to do so in the future. Mr. Hild also came to understand that Mr. Stumberger had also misrepresented the availability of stable, reliable long-term financing for the bonds. Mr. Hild came to realize that Mr. Stumberger had not been forthright with him regarding the portfolio's reliance on the short-term, suboptimal repo financing. Mr. Hild immediately set out to secure stable, long-term, traditional (i.e., "warehouse") financing for the portfolio – quite a tall order

---

[1] IDC used models to price hard-to-value securities for which there was no active market (like the HECM IO bonds LWF was purchasing from Stifel) because the absence of an active market made any determination of a "market price" logically impossible. Indeed, the proof at trial will be that Mr. Hild believed that at no time during the relevant period was there ever a "market" per se for the bonds in question, and thus no real "market" value of the bonds.

given the uniqueness and complexity of the underlying securities. Mr. Hild would work tirelessly – but ultimately unsuccessfully – right through until the end (in May 2019, when Mr. Hild was forced to close LWF) to secure stable, reliable, traditional financing for the bond portfolio to replace the unstable, short-term, costly repo financing that had never been part of Mr. Hild's plan to finance the portfolio in the first place (and which had, in effect, been thrust upon him mid-stream during the course of the Stifel purchase).

Following the transaction, the parties proceeded as planned. For a brief time, Mr. Stumberger continued to submit "broker quotes" (generally, the recent Stifel-LWF transaction pricing) to IDC, which then published these "prices," which LWF's repo lenders would use to set the terms of the financing it extended for LWF to continue to purchase (and repurchase, given the short-term repo lending term). After several months, however, IDC finished constructing its internal model. At that point, IDC began publishing its own independently-generated "prices" using its model.

### The IDC Model has Major Problems

Shortly after IDC began doing so, however, it became clear that IDC's model had serious problems. The values it generated defied basic market conventions, were objectively illogical, and – most impactfully for LWF – were all over the place. Given that IDC was publishing "prices" daily at the time, the volatility of the "prices" IDC was publishing and the resultant consequences on LWF's financing arrangements with the repo lenders it utilized to finance the portfolio began to wreak havoc. (IDC's volatile daily pricing translated to huge daily "margin calls" by LWF's lenders, which required the company to send large amounts of cash out of the company and also created major operational inefficiencies.)

IDC itself recognized that its model had major problems. To address the issue, Mr.

Stumberger and his team (based in LWF's offices in New York and New Jersey, which had been established to accommodate Mr. Stumberger's move from Stifel to LWF) engaged IDC directly. After a series of discussions, IDC basically "gave up" its modeling exercise. At IDC's request, the parties agreed that they would return to the old system, by which Mr. Stumberger would provide IDC with "broker quotes" in the form of the security-holder's (LWF's) internal valuations of the bonds. The understanding was that IDC would use these values to "price" the bonds in the short term – until it could fix its internal model – but that IDC would at some point in the future once again begin "pricing" the bonds on its own again. (IDC of course was not *required* to accept LWF's values of the bonds, of course; for that matter, IDC could have stopped pricing the bonds altogether, or arranged to "price" the bonds some other way – at any point in time.)

While Mr. Hild was not involved directly in the discussions with IDC regarding its modeling issues, he did get reports back from Mr. Stumberger and his team members regarding the various issues. In the course of so doing, Mr. Hild became curious as to the modeling exercise generally. Given than Mr. Stumberger and his team were also modeling the bonds for LWF's own purposes, Mr. Hild wanted to understand its basic assumptions. Beginning in late 2014 and/or early 2015 – just months after LWF's acquisition of the bonds from Stifel had been completed – Mr. Hild, along with Mr. Rohr, began having in depth internal conversations about the accuracy of many of the assumptions being used (and which, Mr. Hild would come to learn, had traditionally been used in the industry) to model the bonds. These internal conversations soon turned more serious, and regular. Over the course of the next approximately nine (9) months, these internal conversations eventually led to the development by the LWF team of a whole new, "more correct" methodology by which to model the value of the bonds. This

methodology came to be known as Scenario 14.

The Scenario 14 methodology was not Mr. Hild's work product alone but rather that of the entire group. It was the product of countless hours of analysis, study, rigorous investigation, research, and internal deliberation. Evaluating the HECM IO securities using the Scenario 14 methodology revealed the bonds to be almost-certain to generate a far larger revenue stream over the life of the bonds than reflected by the traditional model (and reflected by their conventional "pricing") – i.e., LWF was sitting on a goldmine. Confident that Scenario 14 was "more correct" than the traditional model used by industry participants and confident in what the LWF team collectively considered its extremely-valuable and hard-earned "insight" – something that was recognized internally as corporate "intellectual property," and therefore something to be carefully guarded from disclosure to the marketplace – the LWF team collectively decided to deploy its new-and-improved HECM IO valuation methodology.

LWF fully implemented its newly-developed methodology to generate its internal valuations of the HECM IO bonds in or about September 2015. Because at this point LWF's internal valuations were generated using Scenario 14, and because LWF's internal "marks" (valuations) of the bonds continued to be provided to IDC by Mr. Stumberger and his team (at IDC's request), IDC's published "pricing" for the HECM IO bonds reflected LWF's Scenario 14 methodology too. LWF would continue to supply IDC with its internal, Scenario 14-generated "marks" for the bonds until LWF closed its doors in May 2019.

Having discovered the hidden value in the HECM IO bonds through the development of its Scenario 14 valuation methodology, LWF subsequently charted a strategic course to expand and grow its HECM IO bond portfolio. Over the next several years, LWF bought bond after bond, ultimately (by mid-2017) acquiring over 50 HECM IO bonds valued by LWF (using its

Scenario 14 methodology) – and, consequently, IDC – at over $500 million.  Working tirelessly – if unsuccessfully – throughout this time-period (and through a variety of methods) to secure traditional, stable, long-term financing for the bond portfolio as a whole, Mr. Hild was nonetheless unsuccessful in this regard.  LWF was instead forced to rely more and more on repo lenders (and other lenders, such as Flagstar, who utilized IDC) to finance the bulk of its large and extremely-profitable HECM IO holdings.

The Preferred Shareholder Buyout

In part as a consequence of LWF's historic profitability and performance during this period – fueled overwhelmingly by the revenue streams generated by LWF's HECM IO bond portfolio – LWF in 2016 was (finally) able to buy out its Preferred Shareholders.  LWF's Preferred Shareholders had been clamoring to be bought out for many years by that point, and the sizeable cash reserve that had been generated by the bond portfolio put the company in a position to give the Preferred Shareholders what they wanted.  The company's repurchase of the Preferred Shareholders' shares (a deal consummated in late 2016) left Mr. Hild owning a majority of the company's outstanding shares.  The redistribution mattered little as a practical matter, however, given that Mr. Hild had always had control of LWF by virtue of his alignment with the company's Common Shareholders (Mr. Hild's friends and family).  The buyout thus had no effect whatsoever in terms of giving Mr. Hild control.

Michael Hild's Compensation

Also, during this period, as the size of LWF's HECM IO bond portfolio grew, so too did its financing needs.  LWF needed more and more financing "capacity."  It steadily acquired it, but not enough to satisfy its appetite to take advantage of the Scenario-14-driven, once-in-a-lifetime HECM IO opportunity temporarily presented by the marketplace.  This, of course,

implicated the long-simmering issue of compensating Mr. Hild for personally guaranteeing LWF's corporate debt. Although the nature of repo lending transactions meant that Mr. Hild was not required formally to execute personal guarantees of LWF's repo lender obligations, as a practical matter he personally guaranteed these obligations too by virtue of the cross-default and other omnibus terms of the other corporate obligations he personally guaranteed. The seemingly ever-expanding amount of corporate risk Mr. Hild was agreeing to shoulder all by himself led to the issue of compensating Mr. Hild for his historical and ongoing risk-taking on LWF's behalf bubbling to the surface in 2016. The company at last addressed this nagging issue by agreeing to compensate Mr. Hild for the personal guarantees he executed so that LWF could finance its operations. LWF's Board of Directors approved compensation for the personal guarantees Mr. Hild had executed in the past as well as those he would execute in the future. LWF engaged a leading compensation consultant to recommend the appropriate amount of the guaranty fees agreed to be paid to Mr. Hild (and certain other historical compensation that had been promised Mr. Hild and which had been for a long time due and owing). Overwhelmingly on account of the large payments made to Mr. Hild by the company in 2016 and 2017 in the form of the guaranty fees due him – the bulk of which represented presently-paid arrearages – Mr. Hild's total compensation for these years spiked considerably.

Regulatory Changes in the Market

Throughout 2016 and into early 2017, LWF continued to expand its bond portfolio at an aggressive pace. As it did so, the reverse-mortgage industry as a whole experienced instance after instance of major disruption on account of a series of major market announcements and resultant (or anticipated) regulatory policy changes. A heavily-regulated industry, the reverse-mortgage industry was uniquely subject to regulatory-policy influence. The net effect of the

series of implemented and anticipated major regulatory policy changes during this period was a mixed bag for LWF and Mr. Hild. On the one hand, the policy landscape was suddenly such that the future of the origination and serving side of LWF's business was grim. On the other hand, the grim production forecast and outlook for the industry as a whole had the effect of significantly increasing – in an "across the board" kind of way – the value of LWF's HECM IO bond holdings.

Such "macroeconomic" variables were not accounted for in LWF's Scenario 14 valuation methodology. Accordingly, by the end of 2016 Mr. Hild and the LWF team had begun to discuss internally how to adjust its internal valuation approach to properly account for the substantial increase of its HECM IO bond portfolio brought about by the material changes to the reverse-mortgage regulatory and policy landscape witnessed over the course of 2016. Never before in its history had the reverse-mortgage industry experienced such major regulatory changes, and there was a clear consensus amongst the LWF team that the net effect of the changes was a dramatic increase in the overall valuation of the LWF HECM IO bond portfolio. It was not obvious how such "macroeconomic"/across-the-board market-based adjustments could be precisely quantified and built into LWF's internal valuations of its HECM IO bond holdings.

Mr. Hild and the LWF team were in the process of figuring this out when the old bugaboo – financing capacity issues – yet again became a source of serious concern over the course of the first few months of 2017. LWF's largest (and preferred) repo lender, Wedbush, informed LWF out of the blue that it was slashing LWF's credit limit by over 50%. Wedbush's decision in this respect temporarily caused a financing challenge for LWF. Unable to secure alternative financing arrangements for its HECM IO bond holdings through other lenders, the decision was made to accelerate LWF's upward adjustment of its internal marks to account for the profound regulatory-landscape developments of 2016. Because IDC was still using LWF's internal valuations to

"price" the bonds for purposes of its subscription service – and because certain of LWF's assortment of lenders at this time relied on IDC's published values to determine the financing it would extend LWF to finance the bonds – the upward adjustment of LWF's internal bond valuations had the effect of mitigating the consequences to LWF of Wedbush drastically reducing LWF's credit limits. Mr. Hild approved the upward, across-the-board adjustment of LWF's internal bond valuations based on the major macroeconomic developments of 2016 but was not involved in the implementation of the upward adjustments at the ground level. (The adjustments were implemented by Mr. Rohr and certain members of Mr. Stumberger's team.) As it turned out, the implementation was clumsy and not uniformly applied to all of the bonds in LWF's HECM IO portfolio.

Over the course of the ensuing months, LWF was able to migrate the bulk of its HECM IO portfolio to other lenders and establish new lender relationships (both repo and non-repo alike). After internal discussions, the extent of the upward adjustment to account for the 2016 regulatory changes was reduced, having the effect of lowering LWF's internal valuations of its HECM IO bond holdings.

<u>Regulatory Investigation of LWF</u>

In or about mid-2017, a regulatory agency initiated an investigation into LWF's valuation of its bond portfolio. LWF engaged counsel to represent it in connection with the regulatory investigation. The same counsel represented Mr. Hild personally in connection with the investigation. The same counsel also represented Mr. Rohr in connection with the investigation for a time. Darren Stumberger, Dan Foster, Ernie Calabrese, and Hayden Novikoff (the members of Mr. Stumberger's New York/New Jersey-based LWF team, which had responsibility for the day-to-day management of LWF's HECM IO portfolio) engaged separate counsel to represent

them in connection with the investigation. LWF, Mr. Hild, Mr. Rohr, Mr. Stumberger, Dan Foster, and Ernie Calabrese had a joint defense agreement and mounted a common defense against the regulatory allegations, actively working together personally and through counsel in doing so. Mr. Foster left LWF in or about February 2017 due to stress-related health reasons (at least, this was Mr. Hild's understanding). The rest continued to work at LWF, involved in managing and overseeing LWF's HECM IO portfolio just as they always had, for the next 1.5 years – more or less until LWF closed its doors (or, in the case of Messrs. Rohr and Stumberger, until just before it closed its doors).

From the time the regulatory issue arose in mid-2017 until May 2019, when LWF closed down, LWF maintained its HECM IO holdings and the above LWF personnel continued to actively manage the portfolio just as it always had. LWF continued to export its internal valuations of the HECM IO bonds to IDC through a member of Mr. Stumberger's HECM Trading team and IDC continued to publish to its subscribers (including LWF's lenders) the values provided by LWF. All of the above LWF personnel denied any wrongdoing individually or on the part of LWF in connection with the ongoing regulatory investigation during this time.

<u>LWF Closes and Winds Down</u>

LWF officially shut-down in May 2019. Mr. Hild was no longer in control of LWF as of June 2019. LWF was forced into bankruptcy in or about this time. A Trustee was appointed to oversee LWF's affairs and direct its winddown. In the final months of LWF's existence, Mr. Hild was not directly involved in the company's financial affairs. His efforts were spent virtually entirely on engaging LWF's main creditors and preventing the company's collapse. During this time LWF had a new CFO, Glenn Haddock. Mr. Haddock reported to Mr. Hild at some point just prior to Mr. Hild making the decision to close down LWF that certain aspects of the

company's financial affairs (previously under the purview of Mr. Rohr) were discomforting and there were other issues of a similar nature that came to light. Mr. Hild had no knowledge of, or involvement in, any restatement of the company's financial statements (including its balance sheet, and the value of LWF's HECM IO portfolio as indicated thereon) which took place either prior to, or after LWF shut down daily operations in May 2019.

From the period dating from in or about August 2017, when LWF and Mr. Hild engaged counsel in connection with the regulatory issue that had arisen, through until May/June 2019, at which point LWF shut down operations and Mr. Hild ceded control of LWF, counsel had full knowledge regarding LWF's management of the bond portfolio and its valuation approach and Mr. Hild and LWF managed the portfolio by and through the oversight of counsel and consistent with the guidance provided by counsel. Counsel was directly involved in discussions with LWF's main lenders as the issues that eventually required LWF to close down intensified.

After the issuance of the criminal indictment against Mr. Hild and in connection with the production of discovery in this case, Mr. Hild learned for the first time that Messrs. Stumberger, Foster, and Calabrese met with a lawyer on at least two occasions – generally coinciding with LWF's implementation of its Scenario 14 methodology (in September 2015) and subsequently its implementation of the regulatory policy, across-the-board upward adjustment to the bond portfolio values (in early 2017) – in connection with concerns they may have had regarding LWF's practice of providing its internal, Scenario 14-generated valuations of its HECM IO bonds to IDC (and, perhaps, with the Scenario 14 methodology itself). Mr. Hild had no prior knowledge of any concerns on the part of Messrs. Stumberger, Calabrese, Foster, or any other member of his HECM Trading team.

Despite LWF's Code of Conduct and corporate ethics policy imposing an affirmative

obligation on its employees and officers to inform Mr. Hild and/or the company of any concerns regarding suspected wrongdoing of any kind, at no point in time were any concerns regarding LWF's practices related to the valuation and management of its bond portfolio raised with Mr. Hild. Messrs. Stumberger, Foster, and Calabrese did not inform Mr. Hild that they had met with a lawyer regarding their concerns. After the issuance of the criminal indictment in this matter and through the process of the government's discovery production, Mr. Hild learned for the first time that apparently at various points in time beginning roughly in or about September 2015 and extending well into 2017, Messrs. Stumberger, Foster, and Calabrese privately and secretly recorded phone calls in which Mr. Hild discussed management of the LWF bond portfolio with Mr. Stumberger and his team. Mr. Hild was unaware that this was occurring at the time. The practice of privately and secretly recording discussion of corporate business was in violation of LWF's company policy.

In relation to the lenders who financed LWF's HECM IO bond portfolio, it was Mr. Hild's belief that the lenders understood that there was no active market for the bonds being financed and that the bonds would not be able to be sold in the event LWF defaulted on its repayment obligations. Mr. Hild was transparent with the lenders in their discussions regarding the absence of an active market for the securities and LWF's intention (and "investment thesis") to hold the securities to maturity. At all times, it was Mr. Hild's good faith belief that the values of the HECM IO bonds being provided to IDC reflected the true value of the HECM IO bonds. If anything, it was Mr. Hild's belief (and intent) that the values exported to IDC were suppressed values (not inflated values, as alleged by the Government). At all times, it was Mr. Hild's belief that the values reflected his and LWF's good faith belief as to what the HECM IO bonds were worth. At all times, it was Mr. Hild's honest, sincere, good faith belief that its lenders who were

lending against the HECM IO bonds were fully secure and collateralized in the event of a LWF default insofar as they would be repaid the amount owed by LWF from the substantial revenue streams generated by the bonds. At all times, it was Mr. Hild's good faith, sincere belief that the lenders – including the lenders identified as "victims" in this case – understood that they would not be fully repaid the amount owed by LWF in the event of a LWF default were they to sell the bonds pledged as collateral for the loans to a third-party, given the absence of an active market for the bonds.

It is respectfully submitted that all of the above will be established at the trial of this matter.

## **ARGUMENT**

The Government's Motion *in Limine* seeks the preclusion/exclusion of six (6) separate categories of argument and evidence by the defense in this case. These six (6) categories are enumerated on page 1 of the Government's Motion. Each of the six (6) is addressed in turn below.

**I.** **MR. HILD SHALL NOT ARGUE THAT "THE 'REASONABLENESS' OR 'ACCURACY' OF THE MARKS LIVE WELL SUBMITTED TO IDC IS A DEFENSE TO THE CHARGES," BUT PROOF OF THE "REASONABLENESS" AND "ACCURACY" OF SUCH MARKS IS CLEARLY RELEVANT INSOFAR AS IT IS PROBATIVE OF MR. HILD'S INTENT**

The Government asks the Court to preclude Mr. Hild from arguing "that the 'reasonableness' or 'accuracy' of the marks [LWF] submitted to IDC is a defense to the charges" alleged in the indictment. Government's Motion at 5. The Court need not. The defense does not so contend (and shall not so argue at trial).

The defense notes that the Government's Motion is specific to any *argument* offered by Mr. Hild along the above lines. In this way, the preclusion sought is quite narrow – and, for this

reason, the defense does not contest the point.

That said, it is important to note that *evidence* of the "reasonableness" and "accuracy" of the values submitted by LWF to IDC is critically important evidence in the case extremely probative, of course, of Mr. Hild's good faith (the opposite of an intent to defraud) as concerns his involvement with the management and valuation of LWF's HECM IO bond portfolio. Accordingly, the Government's assertion that "it is irrelevant whether the marks that Live Well submitted to IDC were reasonable or even accurate" is (plainly) simply not true. Government's Motion at 6.

The law has long held that in cases where, as here, a criminal defendant's intent to defraud is an element of the crimes charged, he or she must be afforded every opportunity to present what circumstantial evidence exists of his or her good faith – i.e., the absence of any intent to defraud. *See United States v. Brandt,* 196 F.2d 653, 657 (2d Cir. 1952) (observing that "since [good faith] may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh" its relevance (internal citation omitted)). The fact that Mr. Hild believed and intended that the values being provided by LWF to IDC (and which Mr. Hild knew would be relied on, at least for a period of time, by LWF's lenders) were "reasonable" and "accurate" is prime proof of his "good intent" and good faith as concerned his and LWF's dealings with LWF's lenders. The contrary cannot seriously be contended.

## II. MR. HILD SHALL NOT ARGUE THAT HE SHOULD BE AQUITTED BECAUSE IDC OR THE "VICTIM" LENDERS WERE NEGLIGENT OR CARELESS IN FAILING TO STOP THE ALLEGED FRAUD, BUT PROOF OF WHAT INFORMATION IDC PROVIDED TO LWF'S LENDERS IS RELEVANT EVIDENCE

The defense acknowledges that it would be improper to argue at trial that Mr. Hild is not guilty because IDC and/or LWF's lenders failed to detect and stop the alleged scheme to defraud. The defense does not intend to so argue at trial.

That said, evidence regarding what information precisely IDC provided to LWF's lenders through its subscription service regarding IDC's "pricing" of LWF's HECM IO bonds (and Mr. Hild's understanding of precisely what information IDC provided to LWF's lenders) is plainly admissible. Such evidence bears directly upon the central question of Mr. Hild's intent insofar as Mr. Hild's beliefs and actions in relation to LWF's management of the bond portfolio were informed in material part by Mr. Hild's understanding of what information about the bonds was available to the lenders through IDC's subscription service. Because such evidence bears directly on the issue of Mr. Hild's intent, it is admissible. *See id.*

### III. MR. HILD SHOULD NOT BE PRECLUDED FROM OFFERING PORTIONS OF THE AUDIO RECORDINGS OFFERED BY THE GOVERNMENT CONTAINING STATEMENTS MADE BY MR. HILD

The Government in its Motion asserts that Mr. Hild "should be precluded from offering audio recordings of his irrelevant, self-serving hearsay statements." Government's Motion at 8. The Government here is no doubt referring to certain "portions" of the audio recordings made by the Government's witnesses in this case (Mr. Hild's alleged co-conspirators) during the period of their alleged conspiracy in which Mr. Hild makes comments that amount to highly-probative contemporaneous proof of Mr. Hild's intent as concerns the issue of what was being represented to LWF's lenders in connection with the financing of LWF's bond portfolio (and by whom).[2] In seeking that the defense be precluded from introducing this evidence at trial the Government in

---

[2] Approximately a dozen "portions" of the recordings made by Mr. Hild's alleged co-conspirators featuring statements made by Mr. Hild on the recordings have been anticipatorily marked by the defense as exhibits in this case (and disclosed to the government).

effect seeks to have the jury hear all of the portions of the recorded calls that lend themselves to an inference of nefarious intent on the part of Mr. Hild while keeping from the jury the portions of the recorded calls that support the inference of Mr. Hild's good faith. This is plainly improper and should not be permitted.

The law provides that the presentation of recordings at trial must be fair in presentation. *See United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009) (holding that "self-serving, exculpatory statements … are hearsay, and are therefore generally not admissible, *unless their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence*") (emphasis added). The portions of the calls sought to be introduced by the defense are necessary to ensure that the Government's presentation of those portions of the recorded calls the Government seeks to introduce are fair in presentation – that is to say, to ensure that they do not mislead. In this way, they are appropriate pursuant to the "rule of completeness" embodied in Federal Rule of Evidence 106.[3]

The portions of the calls sought to be introduced by Mr. Hild amount to critical context for the portions of the calls to be introduced by the government. Even if the portions of the calls sought to be introduced by Mr. Hild are from different calls than those sought to be introduced by the Government, they remain important context.

Mr. Hild's alleged co-conspirators recorded, collectively, approximately 168 calls. The recorded calls all generally interrelate. The calls recorded were the regular conference calls had by and between Mr. Stumberger and his HECM trading team members (in New York/New Jersey) and Messrs. Hild and Rohr (in Richmond, Virginia) regarding the management and

---

[3] "Under the rule of completeness embodied by Federal Rule of Evidence 106 …, even though a statement may be hearsay, an omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *Id.* at *5 (internal citations and quotations omitted).

internal valuation of LWF's HECM IOs. The discussions on the calls among the participants interrelate, and generally amount on the whole to a single ongoing dialogue had over time.

It is impossible to comprehend the meaning of comments made by a call participant on one call without having the benefit of that participant's (and the other participants') comments on the same subject matter made on calls which occurred both before and after. The portions of the recorded calls sought to be introduced by the defense are critical contemporaneous proof of Mr. Hild's real-time intent necessary to appropriately contextualize the portions of the calls the Government shall introduce, which in isolation could be seen as supporting the inference of fraudulent intent on the part of Mr. Hild. It would simply be patently unfair and misleading in presentation to permit the Government to introduce those portions of the recorded calls – all regarding the very same subject matter – in which Mr. Hild makes comments suggestive of an intent to defraud but to exclude those portions of the recorded calls providing context for the comments made by Mr. Hild in the portions introduced by the Government and also, separately, proving Mr. Hild's "good intent" on the whole. The Government must not be permitted to mislead and distract by, in effect, selectively-quoting Mr. Hild on the subject matter and stripping his comments on the recorded calls of critical context and background. *See id*.

One basis for the admissibility of the evidence, then, is that what the government refers to as "irrelevant, self-serving hearsay statements" the law in fact recognizes as admissible contextualizing evidence. It is observed that there may be other bases for the admissibility of Mr. Hild's comments on certain of the recorded calls depending on whether he elects to testify at trial. Although the defense recognizes the authorities cited by the Government in its Motion in support of the proposition that admitting recorded, out-of-court statements by a criminal defendant can be seen as an end-run of the Confrontation Clause and the hearsay rules, as a practical matter the

concerns in this respect do not exist where the defendant testifies at trial. For that matter, in the event Mr. Hild does testify at trial, some or all of those portions of the recorded calls sought to be introduced by the defense may be admissible as prior consistent statements under Fed. R. Evid. 801(d)(1)(B). Accordingly, it is respectfully submitted that pre-trial exclusion of any portions of the recorded calls is premature.

**IV.  MR. HILD SHALL NOT ARGUE THAT HE LACKED INTENT TO DEFRAUD BECAUSE HE BELIEVED THAT NO ULTIMATE HARM WOULD BE SUFFERED BY THE "VICTIM" LENDERS**

Mr. Hild agrees that it would be improper to argue for his acquittal on this basis.

**V.  MR. HILD SHOULD NOT BE PRECLUDED FROM INTRODUCING EVIDENCE OF THE FACT THAT (A) DURING A LARGE PART OF THE SCHEME TO DEFRAUD ALLEGED IN THE INDICTMENT HE AND THE COMPANY WERE REPRESENTED BY COUNSEL IN CONNECTION WITH MATTERS DIRECTLY RELATING TO LWF'S MANAGEMENT AND VALUATION OF THE BOND PORTFOLIO AND MR. HILD'S AND LWF'S DECISIONS WITH RESPECT TO SAME DURING THIS PERIOD WERE UNDERTAKEN WITH THE INVOLVEMENT OF COUNSEL, OR (B) MR. HILD'S ALLEGED CO-CONSPIRATORS SECRETLY MET WITH A PRIVATE ATTORNEY OVER THE COURSE OF THE ALLEGED SCHEME TO GET LEGAL ADVICE REGARDING LWF'S MANGEMENT AND VALUATION OF THE BOND PORTFOLIO BUT NEVER TOLD MR. HILD**

The Government seeks to preclude the defense from introducing evidence at trial regarding (A) Mr. Hild's own "consultation" with counsel during the alleged scheme, or (B) the fact that his co-conspirators "consulted" with counsel during the alleged scheme. Both forms of evidence are admissible, however. The evidence bears directly on the issue of Mr. Hild's knowledge and intent as concerns LWF's management of its HECM IO bond portfolio and the internal valuations of its bonds provided to IDC (and any concerns that existed about these things).

As to the evidence of Mr. Hild's "consultation" with counsel regarding the subject matter

of the alleged scheme, evidence merely of the fact that counsel was engaged (by both Mr. Hild and LWF) in relation to the subject matter and that Mr. Hild routinely discussed LWF's management of the bond portfolio and its approach to valuing the HECM IO bonds – and, further, that Mr. Hild understood both personal and corporate counsel (one and the same) to have been kept fully in-the-know by Mr. Stumberger and his HECM trading team throughout the period of counsel's engagement – does not implicate any attorney-client privilege concerns and is clearly relevant. That Mr. Hild involved counsel and relied on counsel to point out any legal concerns regarding LWF's management of the bond portfolio and valuation approach during the period that counsel was engaged is plainly strong evidence of Mr. Hild's "good intent" and good faith.

That Mr. Hild is not formally asserting an "advice of counsel" defense does not render the evidence regarding the involvement of his and the company's lawyers inadmissible, of course. As this Court has recognized, "courts routinely allow the jury to hear evidence about interactions with and advice of counsel even if ultimately there is insufficient evidence for an advice of counsel instruction." *SEC v. Am. Growth Funding II, LLC*, 2018 U.S. Dist. LEXIS 205197 at *10-11 (citing *U.S. v. Hill*, 643 F.3d 807, 850-51 (11th Cir. 2011)).

As to the evidence that certain of Mr. Hild's alleged co-conspirators – namely, Messrs. Stumberger, Calabrese, and Foster – met with a private attorney at times precisely coinciding with (a) LWF's move to "full" Scenario 14 internal valuations, and (b) the upward adjustment to LWF's internal valuation of the bond portfolio in early 2017 to account for the major "macroeconomic" regulatory developments/changes, to discuss concerns that they had (apparently) about the effect of these corporate actions, this evidence too is clearly relevant. Evidence merely of the fact that the above-referenced witnesses consulted a private attorney when they did and their reasons for doing so (they had concerns) plainly does not implicate the attorney-

client privilege. The evidence is relevant for several reasons. One is because at no point in time during the period in question was Mr. Hild ever told either about the fact of these private attorney meetings (or, for that matter, that there were any concerns). Another is because the fact of the consultations proves that members of Mr. Hild's team had serious legal concerns and did not raise them internally, which amounted to a violation of LWF policy. Still another is that the underhandedness and deceitfulness reflected by the team members' actions in this regard plainly reflect directly on their credibility as witnesses at trial.

## VI. MR. HILD DOES NOT INTEND TO INTRODUCE "EVIDENCE OF IRRELEVANT FACTS INTENDED TO ELICIT JUROR SYMPATHY," BUT EVIDENCE THAT MR. HILD WAS MISLED REGARDING VARIOUS ASPECTS OF THE BOND PORTFOLIO WHEN PURCHASING IT FROM STIFEL IS ADMISSIBLE AS CRITICAL EVIDENCE OF MR. HILD'S (LACK OF) KNOWLEDGE AND INTENT

Mr. Hild does not intend to introduce at trial any of the things the Government identifies in its motion as "evidence of irrelevant facts intended to elicit juror sympathy," or frankly anything of the sort. The defense agrees that evidence regarding, for example, "the consequences of the SEC inquiry or the Government's investigation, for [Mr. Hild's] business or livelihood," would be improper.

That said, the Government suggests in its Motion that the defense should be precluded from introducing evidence that Mr. Hild was "duped or misled" in connection with his purchase of the bond portfolio from Stifel. Government's Motion at 14. The Government is wrong in this regard. Such evidence is plainly admissible, and is in fact key defense evidence in this case. The evidence regarding what was represented to Mr. Hild by Mr. Stumberger in connection with Mr. Stumberger's proposal that Mr. Hild and LWF acquire the bond portfolio (and its bond portfolio management team) from Stifel directly bears on the issue of Mr. Hild's post-transaction knowledge of and intentions for the bond portfolio acquired. Such evidence is necessary in order

for the jury to understand and correctly interpret Mr. Hild's actions throughout the entire post-transaction period. Separately, such evidence is indispensable "background" evidence necessary for the jury to have a contextualized understanding of the bond portfolio purchase and an indispensable part of "the story" here. The case law has long recognized that such evidence is admissible in these circumstances. "The Second Circuit is clear that the trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Mundle*, 2016 U.S. Dist. LEXIS 34736.

## **CONCLUSION**

For the reasons set forth above, it is respectfully submitted that the Government's Motion *in Limine* to exclude the above-referenced argument and evidence at trial should be denied.


Dated: Fort Wright, KY
        March 18, 2021

Respectfully submitted,

s/ Benjamin. G Dusing
Benjamin G. Dusing
Law Offices of Benjamin Dusing, PLLC
809 Wright's Summit Pkwy Ste 120
Fort Wright, KY 41011
Telephone: 859-635-5000
bdusing@bgdlaw.com
*Admitted Pro Hac Vice*

*Counsel for Michael Hild*
