# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 19 Cr. 602 (RA)** |
| | : | |
| **MICHAEL HILD,** | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| **Defendant.** | : | |

# DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
# OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL
# OR, IN THE ALTERNATIVE, A NEW TRIAL

## <u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............................................... 2

    I. The Indictment ...................................................................................................................... 2

    II. The Trial ............................................................................................................................... 3

ARGUMENT ............................................................................................................................. 3

    I. THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS
    PURSUANT TO RULE 29 ......................................................................................................... 3

        A. The Evidence Was Insufficient to Prove that Bond Values Were Misrepresented .... 4

        B. The Evidence Was Insufficient to Prove Mr. Hild's Intent to Defraud ................... 11

    II. THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS
    PURSUANT TO RULE 33 ......................................................................................................... 15

        A. This Court Should Order a New Trial Because Un-waived Conflicts of Interest
        Deprived Mr. Hild of Effective Assistance of Counsel .................................................. 15

            1. Relevant Facts ...................................................................................................... 15

            2. Applicable Law ..................................................................................................... 26

            3. Discussion ............................................................................................................. 29

        B. This Court Should Grant a New Trial Because Mr. Dusing and Ms. Lawrence
        Rendered Ineffective Assistance Under *Strickland v. Washington* .............................. 37

        C. This Court Should Order a New Trial Because the Verdict Was Against the Weight
        of the Evidence .............................................................................................................. 40

        D. The Court Should Order a New Trial Because the Government Elicited Improper and
        Highly Prejudicial Opinion Testimony from Multiple Lay Witnesses Regarding
        Valuation Methodologies ............................................................................................... 41

            1. The SEC Witness Improperly Testified that the Values Were a "Mark Up" in
            Violation of Rule 701 ............................................................................................... 42

            2. Former Live Well Employees Improperly Testified to Their Lay Opinions that
            Live Well's Conduct was "Wrong," "Incorrect," and "Fraud" ............................ 44

        E. Because the Indictment Did Not Charge an Omissions Theory of Fraud, there Was a
        Constructive Amendment and Prejudicial Variance when the Government Repeatedly
        Argued Fraudulent Omissions ....................................................................................... 47

CONCLUSION ........................................................................................................................ 50

# **TABLE OF AUTHORITIES**

## **Cases**

*A. Terzi Productions, Inc. v. Theatrical Protective Union*,
   2 F. Supp. 2d 485 (S.D.N.Y. 1998) ............................................................................. 5

*CFTC v. Wilson*,
   No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ........................ 9, 10, 12

*Chiarella v. United States*,
   445 U.S. 222 (1980) .................................................................................................. 49

*Cuyler v. Sullivan*,
   446 U.S. 335 (1980) .................................................................................................. 26

*Eze v. Senkowski*,
   321 F.3d 110 (2d Cir. 2003) ...................................................................................... 38

*Figeuroa v. Schiraldi*,
   No. 10 Civ. 1821 (RA), 2013 WL 3486925 (S.D.N.Y. 2013) .................................... 26

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) ........................................................................................ 25

*Henry v. Poole*,
   409 F.3d 48 (2d Cir. 2005) ........................................................................................ 37

*Henry v. Scully*,
   78 F.3d 51 (2d Cir. 1996) .......................................................................................... 40

*Herrera v. Russi*,
   1996 WL 651017 (E.D.N.Y. Nov. 6, 1996) ............................................................. 28, 30, 37

*Hyman v. Brown*,
   927 F.3d 639 (2d Cir. 2019) ...................................................................................... 26

*Lindstadt v. Keane*,
   239 F.3d 191 (2d Cir. 2001) ...................................................................................... 38, 40

*LoCasio v. United States*,
   395 F.3d 51 (2d Cir. 2005) ........................................................................................ 26

*Mathis v. Hood*,
   1990 WL 100869 (S.D.N.Y. July 11, 1990) ............................................................. 27

*Pavel v. Hollins*,
  261 F.3d 210 (2d Cir. 2001) ................................................................. 39

*Rugiero v. United States*,
  330 F. Supp. 2d 900 (E.D. Mich. 2004) .................................... 27, 31, 35

*Strickland v. Washington*,
  466 U.S. 668 (1984) .................................................................. 37, 38, 39

*United States v. Agrawal*,
  726 F.3d 235 (2d Cir. 2013) ................................................................. 47

*United States v. Archer*,
  977 F.3d 181 (2d Cir. 2020) ................................................................. 41

*United States v. Brown*,
  623 F.3d 104 (2d Cir. 2010) ................................................................. 28

*United States v. Cancilla*,
  725 F.2d 867 (2d Cir. 1984) ................................................................. 27

*United States v. Cassese*,
  428 F.3d 92 (2d Cir. 2005) ............................................................. 4, 14

*United States v. Clark*,
  740 F.3d 808 (2d Cir. 2014) ................................................................... 3

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) ................................................................. 46

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994) ................................................................... 4

*United States v. D'Amelio*,
  683 F.3d 412 (2d Cir. 2012) ................................................................. 47

*United States v. Ferguson*,
  246 F.3d 129 (2d Cir. 2001) ........................................................... 40–41

*United States v. Finnerty*,
  474 F. Supp. 2d 530 (S.D.N.Y. 2007) ..................................................... 4

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) ........................................................... 42, 43

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004) ........................................................................ 43

*United States v. Hestie*,
    439 F.2d 131 (2d Cir. 1971) ........................................................................ 40

*United States v. Jones*,
    393 F.3d 107 (2d Cir. 2004) .......................................................................... 4

*United States v. Kapelioujnyj*,
    547 F.3d 149 (2d Cir. 2008) ..................................................................... 3–4

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ........................................................................ 43

*United States v. Levy*,
    25 F.3d 146 (2d Cir. 1994) .......................................................................... 26

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015) ........................................................................ 32

*United States v. Malpiedi*,
    62 F.3d 465 (2d Cir. 1995) ........................................... 1, 26, 29, 33–34, 37

*United States v. Melhuish*,
    No. 19-485 (2d Cir. July 27, 2021) ............................................................. 38

*United States v. McLain*,
    823 F.2d 1457 (11th Cir. 1987) ....................................................... 27, 31–32

*United States v. Monaco*,
    194 F.3d 381 (2d Cir. 1999) ........................................................................ 11

*United States v. Mulheren*,
    938 F.2d 364 (2d Cir. 1991) ...................................................................... 4, 8

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000) .................................................................... 4, 11

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007) .................................................................... 4, 11

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008) .......................................................................... 5

*United States v. Schwarz*,
   283 F.3d 76 (2d Cir. 2002) ................................................................. 34

*United States v. Scop*,
   846 F.2d 135 (2d Cir.) ......................................................... 41–42, 45

*United States v. Tarricone*,
   996 F.2d 1414 (2d Cir. 1993) ............................................................. 38

*United States v. Trapilo*,
   130 F.3d 547 (2d Cir. 1997) ................................................................. 5

*United States v. Tucker*,
   716 F.2d 576 (9th Cir. 1983) ............................................................. 38

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ....................................................... 4, 11, 47

*United States v. Watson*
   866 F.2d381 (11th Cir. 1989) ............................................................. 27

*United States v. Walker*,
   289 F. Supp. 3d 560 (S.D.N.Y. 2018) ................................................ 41

*United States v. Wozniak*,
   126 F.3d 105 (2d Cir. 1997) ....................................................... 49–50

*United States v. Zackson*,
   6 F.3d 911 (2d Cir. 1993) ................................................................. 39

*Winkler v. Keane*,
   7 F.3d 304 (2d Cir. 1993) ................................................................. 26

## <u>Rules</u>

Fed. R. of Crim. Proc. 29 ......................................................... 1, 2, 3

Fed. R. of Crim. Proc. 33 ......................................... 1, 29, 40, 41, 47

Fed. R. Evid. 701 ................................................... 41, 42, 43, 45

Ky. R. Civ. P. 59.05 ......................................................... 18

Ky. R. Civ. P. 73.02(1)(a) ................................................. 18

N.Y. R. of Prof'l Conduct 7.3(a) ...................................... 27

N.Y. R. of Prof'l Conduct 7.3(a) ................................................................. 15

## Other Authorities and Sources

Benjamin Dusing, Facebook (May 12, 2021),
    https://www.facebook.com/100005928908054/videos/thank-you-eric-deters-for-doing-a-
    recent-show-that-i-guess-mentioned-me-havent-s/1675422985998649/) ............................... 25

Benjamin G. Dusing, *My Story*, Kentucky Bar Association Bench & Bar Magazine (May 2015),
    https://cdn.ymaws.com/www.kybar.org/resource/resmgr/Benchbar/B&B_May_2015_web.pdf
    ............................................................................................................................... 18

Federal Criminal Practice: A Second Circuit Handbook § 82 at 180 (21st ed. 2021) ................. 26

Paula Christian, *Local Attorney to Defend Friend in Massive David Versus Goliath Fraud Case
    in New York City*, ABC 9 WCPO Cincinnati (March 4, 2020),
    https://www.wcpo.com/news/local-news/i-team/local-attorney-to-defend-friend-in-massive-
    david-versus-goliath-fraud-case-in-new-york-city) ................................................................. 15

The Bulldog Show, *Why Does Ben Dusing Have his Law License? Listen to This*, YouTube
    (May 10, 2021), https://youtu.be/MXVxEyTA0ac ................................................................. 25

The Bulldog Show, *Local Political News*, YouTube (June 16, 2021),
    https://youtu.be/Ltx7DkutA-M?t=175 ........................................................................................ 25

Defendant Michael Hild respectfully submits this memorandum of law in support of his renewed motion for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), or alternatively, for an order vacating his conviction and granting a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33").

## PRELIMINARY STATEMENT

This is a case about a defendant who never should have been convicted at trial, and who was deprived of the chance to mount an effective trial defense because his counsel was secretly laboring under serious conflicts of interest stemming from counsel's own misconduct.

In the first instance, this Court should enter a judgment of acquittal on all counts pursuant to Rule 29 because the proof at trial failed to establish beyond a reasonable doubt that Mr. Hild committed any of the charged crimes. The charges all rest on the government's assertion that Mr. Hild misrepresented (or caused others to misrepresent) the value of bonds held by Live Well Financial ("Live Well") to induce lenders to loan additional cash. But the evidence at trial failed to prove that Live Well misrepresented the bond values, or that Mr. Hild had intent to defraud.

To the extent any count survives the Rule 29 motion, the Court should order a new trial under Rule 33 because Mr. Hild's trial counsel, Benjamin Dusing and Brandy Katy Lawrence, were laboring under actual undisclosed and un-waived conflicts of interest that adversely affected their performance, such that "prejudice is presumed." *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995). In particular, during Mr. Hild's trial (which ran from April 13 to April 30), Mr. Dusing and Ms. Lawrence were secretly litigating serious custody cases in Kentucky (where Mr. Dusing was a party, represented by Ms. Lawrence) in which Mr. Dusing had been sanctioned for his behavior. Both sides in Kentucky filed multiple lengthy motions during Mr. Hild's trial, and Mr. Dusing was facing the threat of additional sanctions and jail time

1

for his misconduct there, with a hearing scheduled on May 4—a date that could have landed in the middle of Mr. Hild's defense case. Mr. Dusing and Ms. Lawrence asked the Kentucky court for adjournments, but the Kentucky court denied their requests.

Without the adjournments they needed, Mr. Dusing's and Ms. Lawrence's obligations to the Kentucky court were "inherently in conflict" with their representation of Mr. Hild at trial, *id.* (internal quotation marks omitted), where a robust defense case could have lasted well into May and, among other things, conflicted with the May 4 hearing date in Kentucky. In addition, Mr. Dusing and Ms. Lawrence hid their conflicts from this Court, apparently fearful of either being fired from the case, or otherwise losing their ability to use the case to try to delay the Kentucky proceedings. Because Mr. Dusing's and Ms. Lawrence's conflicting Kentucky obligations inherently conflicted with plausible defense strategies, such as calling additional witnesses and introducing additional exhibits in Mr. Hild's defense case, prejudice to Mr. Hild is presumed and a new trial is required. Mr. Dusing and Ms. Lawrence also provided ineffective assistance of counsel in the traditional sense by committing numerous errors at trial.

Beyond the conflicted and deficient performance of Mr. Hild's counsel, this Court should also grant Mr. Hild a new trial because (a) the government elicited improper lay opinion testimony regarding the bonds' value and the ultimate issue of whether there was "fraud," (b) constructively amended the indictment by pursuing an omission-based fraud theory, and (c) obtained a verdict that was against the weight of the evidence.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Indictment

On August 26, 2019, Indictment 19 Cr. 602 (RA) (the "Indictment") was filed charging Mr. Hild with conspiracy to commit securities fraud, conspiracy to commit wire and brank fraud, securities fraud, wire fraud, and bank fraud. Each count of the Indictment relied on the

allegation that Mr. Hild and others "misrepresent[ed] the value of certain bonds" by "submit[ting] inflated prices" for those bonds to the pricing service IDC, which allegedly "induc[ed] Live Well's Lenders to increase the amount of cash they were willing to lend to Live Well."  (Indictment ¶¶ 50(a), 51, 56, 58, 60–60, Docket Entry 2.)

## II.    The Trial

Trial commenced on April 13, 2021.  (Tr. 2.)  Following the government's case, Mr. Hild made a Rule 29 motion (Tr. 1700–1704), which the Court denied (Tr. 1707).  For the defense case, which began April 27, the defense called Stuart Cantor, a former board member of Live Well, and Mr. Hild, and introduced a handful of exhibits.  The defense case concluded on April 28 and the defense renewed its Rule 29 motion, which the Court again denied.  (Tr. 2117–18.) After closing arguments on April 29, the jury found Mr. Hild guilty on April 30.  (Tr. 2325–26.)

## ARGUMENT

## I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS PURSUANT TO RULE 29

This Court should enter a judgment of acquittal pursuant to Rule 29 because the evidence was insufficient to prove beyond a reasonable doubt either that Mr. Hild misrepresented the value of the bonds at issue or that Mr. Hild intended to commit the charged crimes.

Rule 29 requires a court to set aside a guilty verdict and "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29. "[I]f [courts] are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, [they] must take seriously [their] obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt."  *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014) (emphasis in original).  While a defendant challenging a jury's verdict carries a heavy burden, that "burden

3

is not an impossible one." *United States v. Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008) (evidence insufficient to prove defendant's knowledge of valuation of instrument); *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (affirming judgment of acquittal in insider trading case where willfulness not proved beyond reasonable doubt); *United States v. Jones*, 393 F.3d 107, 113 (2d Cir. 2004) (remanding with instructions to enter acquittal where evidence insufficient to prove defendant's involvement in conspiracy); *United States v. Finnerty*, 474 F. Supp. 2d 530, 532 (S.D.N.Y. 2007) (granting motion for acquittal in securities fraud case after finding that evidence did not show customers were misled), *aff'd*, 533 F.3d 143 (2d Cir. 2008).

Although the court must draw all reasonable inferences in the government's favor, the Second Circuit has made clear that "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). Thus, the evidence is insufficient if it is "at least as consistent with innocence as with guilt." *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991); *D'Amato*, 39 F.3d at 1256.

### A. The Evidence Was Insufficient to Prove that Bond Values Were Misrepresented

For each count charged in the Indictment, the government was required to prove at trial that Mr. Hild and others misrepresented the value of certain bonds by, among other things, submitting "inflated" prices to IDC in order to induce lenders to loan Live Well more cash. (Indictment ¶¶ 50(a) & (b), 53, 56, 58, 60, Docket Entry 2.) *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (government must prove material misrepresentations for securities fraud); *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (same for wire fraud); *United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007) (same for bank fraud).

The prosecutors repeatedly asserted in their jury addresses that the bond prices that Mr. Hild and others presented to IDC and others—which were generated by an internal Live Well

model called "Scenario 14"—were "inflated" "pie-in-the-sky prices" that "bore no relation to where you could sell the bonds in the market." (Tr. 29, 2122; *see also, e.g.*, Tr. 2126 ("These bonds were not valued based on where you could sell them."), Tr. 2148 ("These Scenario 14 prices are way above where these bonds trade in the market, and the defendant knew that.").)[1]

The proof at trial, however, provided no basis for the jury reasonably to conclude that the Scenario 14 prices were "inflated" or misleading as the government claimed. To the contrary, the proof at trial—including the testimony of the government's two primary cooperating witnesses—was at least equally consistent with the conclusion that the Scenario 14 prices were an effort to determine *accurate* values for the bonds. There was a complete absence of proof—such as expert testimony—that an educated buyer who understood Scenario 14 would not have paid Scenario 14 prices.

Instead of proving beyond a reasonable doubt that Scenario 14 resulted in "inflated" prices, the government's proof was equally consistent with the opposite inference: that Scenario 14 was an effort to "get it right." (Stumberger Tr. 311–12.) One of the government's cooperating witnesses, Mr. Stumberger, agreed that Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint." (Stumberger Tr. 311–12.) Another of the government's

---

[1] In a motion in limine, the government cited several cases for the proposition that it did not need to prove a misrepresentation, but those cases are inapposite. (*See* Mot. in Limine at 5, Docket Entry 43 (quoting *United States v. Royer*, 549 F.3d 886, 899–900 (2d Cir. 2008), *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997), *A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 501 (S.D.N.Y. 1998).) In *Royer*, the government asserted an alternative theory of market manipulation in which the defendants "sought to artificially affect the prices of various securities" by "orchestrat[ing]" the publication of negative information misappropriated from FBI and SEC databases after they had shorted the stock. *See* 549 F.3d at 891 & 900. In *Trapilo*, the Second Circuit noted in a footnote that smuggling liquor and tobacco to avoid paying taxes could constitute a scheme to defraud under the wire fraud statute. 130 F.3d at 550 n.3. In *A. Terzi*, then-Judge Sotomayor distinguished *Trapoli* as inapplicable because that case involved smuggling, an act that "might involve no statement at all" and which is "inherently a dishonest and deceptive act." 2 F. Supp. 2d at 501 (granting motion to dismiss RICO claim premised on wire fraud because scheme "contains no element of deception whatsoever"). Here, the Indictment charged a theory of affirmative misrepresentations regarding the values of the bonds. (*See, e.g.*, Indictment ¶¶ 50, 54, 56, 58, 60, Docket Entry 2.)

cooperating witnesses, Mr. Rohr, likewise testified that Scenario 14 was a "good" way to value the bonds (Rohr Tr. 1251), stating "Scenario 14 as an analysis, I actually think, and continue to think, was good work." (Rohr Tr. 1275; *see also* Rohr Tr. 1586 (referring to Scenario 14 as the "secret sauce that we obviously felt like was some brilliant insight [in]to valuations"), 1586–87 (the "basis of Scenario 14" was "understanding how the market worked and how we thought it. . . should work").)

The evidence showed that Mr. Hild, too, believed Scenario 14 produced more accurate valuations than other models. Mr. Rohr explained how Mr. Hild expressed that he believed the intrinsic value of the bonds reflected in Scenario 14 reflected the proper value. (Rohr Tr. 1253; DX G.1 at 6 (Rohr Decl.).) In addition, Mr. Hild testified that he believed Scenario 14 was "a better, more accurate methodology" that caused him to understand that the pre-Scenario 14 prices were "wrong, mathematically incorrect." (Hild Tr. 2043.) Mr. Hild explained that he understood that Scenario 14 was based on some "kind of middle-of the road assumption" with "some embedded conservativism," and was an attempt to model the bonds' true value. (Tr. 1865–66.) After Scenario 14 was implemented, the fact that Live Well was able to service all related debt and interest confirmed the accuracy of the model, and Live Well did not default on any of its obligations. (Rohr Tr. 1277–78.)

Based on the Indictment, it appears the government may well have charged this case based on the inaccurate belief that the Scenario 14 values were simply false, with no basis in reality. At trial, however, the government's cooperating witnesses undercut this theory when they testified that Scenario 14 was an effort to model the bonds accurately. To salvage its case in the face of this contrary testimony from its own witnesses, the government fell back on the creative argument that the prices Live Well submitted to IDC and included on financial

6

statements should have been prices at which the bonds could be sold in the "market," whereas Scenario 14 reflected the "intrinsic" value of the bonds.  (*See, e.g.*, Tr. 2155.)  In other words, faced with cooperator testimony about the accuracy of Scenario 14—at least from "an intrinsic value standpoint" (Stumberger Tr. 544)—the government pivoted from the argument that the Scenario 14 prices were simply "inflated" to the argument that whatever the "intrinsic" value of the bonds, Live Well should have been providing prices to IDC and others at which the bonds could be sold in the "market," and nobody in the market would pay Scenario 14 prices.

The evidence, however, was at least equally consistent with Mr. Hild's innocence as with the government's revised theory of the case.  Far from establishing that the market would not pay Scenario 14 prices, the evidence at trial established that the government's cooperators and Mr. Hild alike all believed that the market would pay higher prices for the bonds in the event that Live Well disclosed Scenario 14 to the market.  The reason why the "intrinsic" Scenario 14 prices differed from the "market" prices was because Live Well kept Scenario 14 secret.  Thus, the Scenario 14 prices that Live Well submitted to IDC and others were not "inflated," as the government argued, but rather were "accurate," and differed from the market prices simply because the market had not yet been educated on Live Well's superior model.

Based on the evidence at trial, Live Well kept Scenario 14 secret for good reason: to preserve its competitive advantage.  The testimony of the government's own cooperators was clear on this point.  For example, Mr. Rohr admitted that he—along with Mr. Hild, Mr. Stumberger, Mr. Foster, and Mr. Calabrese—believed Scenario 14 was a "brilliant insight" regarding the bonds' "valuations" (Tr. 1586), and expressed concern that if this "insight" were exposed Live Well would pay "higher price[s]" and lose its "competitive advantage" (Rohr Tr. 1007).  Mr. Stumberger, as well, testified that he understood that "Live Well's thought process

[was] that the higher valuations were kind of a secret sauce or proprietary." (Stumberger Tr.
144.) Under this theory, if Scenario 14 were shared with the market, it "would create additional
competition for bonds from dealers and investors." (Stumberger Tr. 382.)

Instead of offering proof that the bonds could not be sold at Scenario 14 prices to an
*educated* buyer who understood Scenario 14 (such as via expert testimony), the government
instead introduced evidence of sales to *un*-educated buyers, such as when one of the lender's
representatives testified about how it effectively sold a bond in a fire sale after Live Well
defaulted. (*See* Misiano Tr. 625–26.) The government also offered speculation from lay
witnesses regarding hypothetical sales to uneducated buyers. (*See, e.g.*, Rohr Tr. 1171.) These
meager efforts, however, do not change the fact that the government's own evidence established
that Live Well personnel believed market prices would go up if Scenario 14 were disclosed. At a
minimum, the trial evidence was "at least as consistent with innocence as with guilt," *Mulheren*,
938 F.2d at 372 (quotation omitted), such that this Court should enter a judgment of acquittal.

The government's theory that the market would not have paid Scenario 14 prices was
undercut further by the extensive evidence showing that the bonds were unusual, illiquid, and
hard to value. Given that there was hardly a market for the bonds in the first place, and that the
process of valuing them was extraordinarily complex, the government's position that the
Scenario 14 prices were higher than "market" prices ignores the evidence showing that there was
no real market, and that to the extent there was, it was a poorly informed market at best. The
evidence showed that the holders of the bonds were typically "long-term holders" (Stumberger
Tr. 241); there were few market participants; and any secondary market had "very poor"
liquidity. (Stumberger Tr. 530; *see* Rohr 1270 (agreeing bonds were "very illiquid"); Misiano

Tr. 588.)  Mr. Stumberger acknowledged that the bonds are "among the most complex in fixed income" and require "expertise" to value.  (Stumberger Tr. 235; *see also* Rohr Tr. 1275.)

The government's pat theory that the "market" would not pay Scenario 14 prices was also undercut by the evidence that even IDC, the independent third-party valuation service that published the values of infrequently traded securities, had difficulty modeling the price of the bonds.  (Rohr Tr. 1243.)  As a result, IDC accepted quotes from brokers (Stumberger Tr. 173), including from Stifel, the previous owner of the bonds before Live Well (and Mr. Stumberger's former employer) (Stumberger Tr. 91), and from Live Well itself after it purchased the bond portfolio because "IDC didn't have the capability to come up with the valuations themselves." (Stumberger Tr. 83.)  IDC's struggle to model the bonds was what led Live Well to come up with Scenario 14 in the first place.  Per Mr. Stumberger, IDC's "model didn't work, they were doing it wrong" (Tr. 502), but when Live Well raised its concerns with IDC, per Mr. Rohr, they did "not mak[e] any progress with them being able to . . . adequately articulate their methodology."  (Rohr Tr. 977.)  Because IDC could not model the bonds effectively, IDC asked Live Well to resume providing broker quotes.  (Stumberger Tr. 288.)  The fact that IDC could not model the bonds itself only confirms what the other evidence established: there was no real functioning market for the bonds, and Scenario 14 was a superior model.

Mr. Hild's case is analogous in important respects to the recent decision in *CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), in which then-District Judge Richard J. Sullivan entered a judgment for the defendants and against the government following a bench trial (an option Mr. Dusing did not explore with the Court or the government).  In *Wilson*, Judge Sullivan found, the government was "[u]nable to prove" that the prices at issue (in a similarly illiquid market) "were actually inflated or above fair market value."

*Id.* at *14.  If anything, the government's case in *Wilson* was stronger than the government's case against Mr. Hild, because in *Wilson*, the government at least tried to present expert testimony on the valuations at issue (albeit testimony that Judge Sullivan rejected), whereas in Mr. Hild's case, the government presented no expert to rebut what the two cooperating witnesses and Mr. Hild himself said: that the Scenario 14 values were a good faith effort to determine true value.

In sum, the government failed to prove that Live Well provided inflated bond prices to IDC or others.  The government did not call any expert witness to explain how Scenario 14 functioned, or to explain why the Scenario 14 prices that Live Well provided to others were "inflated" as opposed to accurate; the government's cooperators said that Scenario 14 was a good faith effort to value the bonds; the evidence showed that the bonds were illiquid and difficult to value (which explains why uneducated buyers in the market would value the bonds lower than Scenario 14); and IDC itself struggled to model the bonds.  The fact that Live Well was able to purchase the bonds at a low price and then profit off of repo transactions—a fact on which the government relied in summation (Tr. 2142, 2151)—does not support an inference that Live Well's valuation method was invalid.  As Mr. Rohr testified, he and Mr. Stumberger and Mr. Hild were simply "smarter than everybody else in understanding these things" (Tr. 1593), and as Judge Sullivan wrote in *Wilson*, "[i]t is not illegal to be smarter than your counterparties" or to "understand a financial product better" than others.  2018 WL 6322024, at *21; *id.* at *13 (judgment for defendants where government "offered no evidence or explanation demonstrating" prices "were artificially high").

Because the government failed to prove that Mr. Hild and others misrepresented bond values to IDC or others, this Court should enter a judgment of acquittal.

### B.  The Evidence Was Insufficient to Prove Mr. Hild's Intent to Defraud

This Court should also enter a judgment of acquittal because the evidence was insufficient to prove that Mr. Hild had an intent to defraud anyone.  The securities fraud, wire fraud, bank fraud, and the conspiracy charges in the Indictment all require that the government prove the defendant acted with fraudulent intent.  *See Vilar*, 729 F.3d at 93 (securities fraud); *Pierce*, 224 F.3d at 165 (wire fraud); *Rigas*, 490 F.3d at 231 (bank fraud); *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (conspiracy).  The evidence presented at trial, however, was insufficient to prove Mr. Hild's intent to defraud, as it was equally consistent with Mr. Hild operating in good faith to obtain and preserve a competitive advantage for Live Well.

As noted, the evidence showed that the bonds were highly complex and difficult to value, and that Mr. Hild depended on others to manage the bond portfolio.  Before Live Well bought a portion of the bonds in 2014, Mr. Hild did not know what an HECM IO bond was (Hild Tr. 1819–20), and Live Well had no experience with the bonds or repo financing.  (*Id.*, 1825; Rohr Tr. 1586.)  Mr. Stumberger, by comparison, "was recognized within the industry as . . . the reverse mortgage bond guru."  (Hild Tr. 1816; *see also* Stumberger Tr. 410–11 (Stumberger describing himself as having "extensive experience" and "among the most highly respected trader bankers in the segment of this market").)  As such, when Live Well bought the bonds from Stifel, part of the deal was that Mr. Stumberger would join Live Well and continue to manage the bond portfolio.  (Hild Tr. 1820.)  After he joined Live Well, the company continued to rely on Mr. Stumberger and his team for their knowledge and expertise with the complex bond portfolio and to "manage it on a day-to-day basis."  (Rohr Tr. 1587.)

Mr. Stumberger conceded that he did not have any intent to defraud.  He testified: "Did I go to work every day purposely knowing I was doing something wrong?  The answer is no." (Stumberger Tr. 411.)  Mr. Rohr also effectively conceded he had no intent to defraud.  (Rohr Tr.

11

1223–24.)  And as noted, both Messrs. Stumberger and Rohr testified Scenario 14 was an effort

to provide a good faith estimate of intrinsic value.  (Stumberger Tr. 311–12; Rohr Tr. 1251.)

The fact that Scenario 14 took several months to develop corroborates this fact.  (Tr. 294.)

     The government repeatedly suggested at trial that Mr. Hild's intent to defraud was

demonstrated by Mr. Hild not disclosing that Live Well was providing quotes to IDC and that the

valuation represented Live Well's belief as to the intrinsic value of the bonds, but not the price at

which the bonds could be sold.  But Mr. Hild had no duty to disclose these things to lenders, and

the evidence confirmed that Mr. Hild possessed a good faith belief in the accuracy of the

Scenario 14 valuations.  It was not a crime for Mr. Hild to attempt to "t[ake] advantage" of Live

Well's "more accurate assessment of the fair market value."  *Wilson*, 2018 WL 6322024, at *19.

     The government did not present any evidence showing that Live Well had an obligation

to disclose its methodology.  To the contrary, the lenders' agreement with Live Well specifically

defined "market value" simply as the price "obtained from [] Interactive Data Corporation

('IDC')" (*See, e.g.*, GX 603 at 11 (IDC agreement with a lender); *see* Misiano Tr. 630; *see also*

Rohr Tr. 955.)  Live Well's agreement with IDC stated that the bonds were "complicated

financial instruments" with "many methodologies . . . available to generate approximations of the

market value of such securities, and there is significant professional disagreement about which is

best."  Accordingly, "[n]o evaluation method, including those used by [IDC], may consistently

generate approximations that correspond to actual 'traded' prices of the instruments."  (DX

D.1.a.2 at 9.)  IDC's agreement also noted that valuations could be based on broker quotes and

"market information communicated to [IDC] by its clients."  (DX D.1.a.2 at 2; *see also* Misiano

Tr. 632–33 (employee of lender testifying that he understood that IDC published broker quotes

and that he understood the difference between broker quotes and prices evaluated by IDC).)

Live Well also repeatedly disclosed to IDC and the lenders that the prices provided may be based on "estimates that may involve highly subjective assessments" and "do[] not imply . . . actual traded levels (if any) . . . [and] do[] not imply a theoretical liquidation value." (DX A.322 at 4; *see also, e.g.*, DX A.341 & DX A.328.)

The evidence also showed that the decision not to share the Scenario 14 methodology with the market was made for legitimate business reasons. In one phone call that was recorded (unbeknownst to Mr. Hild) just after the inception of Scenario 14, Mr. Stumberger proposed sharing Live Well's proprietary pricing methodology with the broader market because he believed the market would agree with Live Well's valuations. (Stumberger Tr. 137; GX 404-T at 49.) Mr. Stumberger said, "I do wanna start to socialize this concept a lit bit . . . I think when you talk about it, everyone's gonna agree with it." (GX 404-T at 49.) Mr. Hild responded by noting that there were "two competing schools of thought here." (GX 404-T at 49.) Live Well could either "keep the insight for your own, and you . . . let everyone know your idea once you're standing in the endzone" or share the pricing methodology with the market. (GX 404-T at 50.) Live Well ultimately decided not to share the methodology (at least until it was "standing in the endzone").

At trial, Mr. Stumberger testified that he understood that "Live Well's thought process [was] that the higher valuations were kind of a secret sauce or proprietary." (Stumberger Tr. 144.) If Scenario 14 were shared with the market, it "would create additional competition for bonds from dealers and investors." (Stumberger Tr. 382.) Mr. Rohr had a similar belief. (*See* Rohr Tr. 1593 (agreeing that Live Well did not share its valuation methodology because it believed it understood the market better than everybody else).) Mr. Hild relied on Mr. Stumberger and Mr. Rohr as the subject matter experts for managing the bond portfolio and

accounting given Mr. Hild's lack of experience in either area.  (*See, e.g.*, Hild Tr. 1820–21, 1868, 1894.)  And Mr. Hild testified that no one expressed any legal concerns about using the Scenario 14 valuations to him.  (Hild Tr. 1870.)  This evidence shows that Mr. Hild and Live Well kept the methodology proprietary to protect their advantage, not to deceive others.

At trial, the government also relied on the degree to which Mr. Hild benefited financially from his position at Live Well, including by getting paid for personal guarantees (under which Mr. Hild is currently facing litigation due to those personal guarantees being called).  (*See, e.g.*, Rohr Tr. 1117–21,1124–35; Summation Tr. 2122, 2242–43.).)  But the mere fact that Mr. Hild had a financial stake in Live Well and received payments does not "equate to a willful violation of the securities laws."  *Cassese*, 428 F.3d at 102 (evidence of defendant's financial stake in transaction not sufficient).  Furthermore, the evidence showed that Mr. Hild's compensation was recommended by an independent consultant and approved by Mr. Cantor, not Mr. Hild.  (*See* Cantor Tr. 1738, 1771.)

Finally, the evidence of intent was also insufficient because even accepting the government's premise that Scenario 14 values were not "market" values, Live Well did not represent them as market values to IDC or the lenders that would be obtainable from uneducated buyers.  The facts that IDC published the Scenario 14 values, and that lenders assumed those values were readily obtainable in the market (rather than obtainable only from an educated buyer), do not make IDC's values false and misleading or show that Mr. Hild made material misrepresentations with intent to defraud.

Even in the light most favorable to the government, the evidence gives equal support to the view that Mr. Hild did not intend to defraud.  The Court should enter a judgment of acquittal.

## II.   THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO RULE 33

### A.  This Court Should Order a New Trial Because Un-waived Conflicts of Interest Deprived Mr. Hild of Effective Assistance of Counsel

Both before and during Mr. Hild's trial, his two lawyers, Mr. Dusing and Ms. Lawrence, were laboring under actual undisclosed and un-waived conflicts of interests that adversely affected their performance, and that require this Court to order a new trial.  In particular, Mr. Dusing was himself a party in multiple actions in Kentucky Family Court, where he was represented by Ms. Lawrence, and where he was facing multiple sanctions motions, the threat of jail time, and the possibility of disciplinary proceedings and an investigation into the bribery of a witness.  These Kentucky actions came to a head immediately before and during Mr. Hild's trial in multiple ways, and inherently conflicted with Mr. Dusing's and Ms. Lawrence's ability to mount a robust defense of Mr. Hild.  Neither Mr. Dusing nor Ms. Lawrence informed this Court of the conflicts or obtained Mr. Hild's informed consent as required by the applicable rules. Because both Mr. Dusing and Ms. Lawrence labored under actual un-waived[2] conflicts that impacted Mr. Hild's defense, this Court should order a new trial.

### 1.   Relevant Facts[3]

Before and during Mr. Hild's trial, Mr. Dusing was engaged in active disputes with two different mothers of his children in Kentucky Family Court, where Ms. Lawrence served as his

---

[2] Mr. Hild was also deprived of his right to counsel of his choice by the fact that Mr. Dusing improperly solicited Mr. Hild while Mr. Hild was represented by other counsel, in violation of the rules of professional conduct.  *See* Hild Decl. ¶ 1, 2, Ex. A; Paula Christian, *Local Attorney to Defend Friend in Massive David Versus Goliath Fraud Case in New York City*, ABC 9 WCPO Cincinnati (Mar. 4, 2020), https://www.wcpo.com/news/local-news/i-team/local-attorney-to-defend-friend-in-massive-david-versus-goliath-fraud-case-in-new-york-city (reporting that Mr. Dusing reached out to Mr. Hild in January 2020 after learning of his arrest); N.Y. R. of Prof'l Conduct 7.3(a) (generally prohibiting solicitation).

[3] For the Court's convenience, the addendum to this brief provides a timeline comparing the key events in the Kentucky litigation described in this section with the key events at Mr. Hild's trial.

counsel.  During Mr. Hild's trial, the Kentucky matters entered critical phases, and Mr. Dusing's and Ms. Lawrence's conflicting interests in Kentucky inherently conflicted with Mr. Hild's.

In the first of the pertinent Kentucky cases, *Dusing v. J.T.*, Mr. Dusing filed a series of motions in late 2020 against the respondent, J.T., and the Guardian *ad Litem* for their child, relating to the care of the child.  *See* Case No. 15-CI-1945 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.) ("*Dusing v. J.T.*").  On October 12, 2020, the court overruled Mr. Dusing's motions and detailed Mr. Dusing's erratic behavior and "signs of paranoia." (10/12/2020 Findings of Fact, Conclusions of Law and Orders at 2, *Dusing v. J.T.*)  In particular, to justify denying the motions, the court found that Mr. Dusing told his children he "might as well kill himself" and characterized a dinner with his children as their "last supper."  (*Id.*)  Mr. Dusing filed further motions, and his adversary sought sanctions.  On March 9, 2021, a little over a month before the start of Mr. Hild's trial, the Honorable Christopher J. Mehling issued additional Findings of Fact, Conclusions of Law and Orders (the "3/9/21 Opinion").  In the 3/9/21 Opinion, Judge Mehling rejected Mr. Dusing's motions and sanctioned Mr. Dusing for making motions that were "not based upon a reasonable factual inquiry" and that were "not based upon legal authority." (3/9/21 Opinion at 7.)  Judge Mehling awarded attorneys' fees to both J.T. and the Guardian *ad Litem*, and held Mr. Dusing in contempt, sentencing Mr. Dusing to "7 days in jail." (3/9/21 Opinion at 8.)  Judge Mehling provided that the sentence would be conditionally discharged upon Mr. Dusing's compliance with court orders and providing 10 hours of volunteer service within six months (a period that ultimately included Mr. Hild's trial).  (*Id.*)

The second and more pressing Kentucky case, *J.B. v. Dusing*, was pending before Judge Mehling at the same time as *Dusing v. J.T.*  *See* Case No. 19-CI-560 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.) ("*J.B. v. Dusing*").  In this second action, the petitioner, J.B., was seeking sole

16

custody of her child with Mr. Dusing based on Mr. Dusing's violent and abusive behavior.  The case proceeded to trial in February and March 2021, when Mr. Dusing ought to have been focused on preparing Mr. Hild's case for trial in April.  The case had originally been scheduled to proceed to trial in May 2020, but was delayed repeatedly by Mr. Dusing.  (2/2/21 Findings of Fact, Conclusions of Law and Orders at 1, *J.B. v. Dusing*.)  When Mr. Dusing again asked to postpone the trial for three months due to the conflict with Mr. Hild's trial (1/19/21 Mot. for Indefinite Continuance of the February Trial Dates, *J.B. v. Dusing*), Judge Mehling denied the motion, in part because Mr. Dusing "presented no evidence that he has sought a continuance of the trial of *United States v. Hild*" from this Court.  (2/2/21 Findings of Fact, Conclusions of Law and Orders at 2, *J.B. v. Dusing*.)  Judge Mehling also denied Mr. Dusing's request for an adjournment based on a COVID-19 diagnosis because Mr. Dusing presented no evidence.  (*Id*.)

After the trial, Judge Mehling issued his opinion and judgment on April 5, 2021 (the "4/5/21 Opinion"), awarding J.B. sole custody, just days before the final pretrial conference in Mr. Hild's case and the start of Mr. Hild's trial on April 13.  In the 4/5/21 Opinion, based on the trial record, Judge Mehling found that Mr. Dusing had "perpetuated violence" on the petitioner, including by "biting her face, spitting on her, barricading her in a closet, hitting her head on a wall, pinching, and throwing food, water and other objects at Petitioner."  (4/5/21 Opinion at 2.) Judge Mehling also found that Mr. Dusing subjected her to "physical and emotional abuse" to an "extreme" extent, including through "thousands of written messages via text and email that are emotionally abusive" and that included the "threat[] to kill Petitioner."  (*Id.* at 2, 3, 15, 19.) Judge Mehling noted that Mr. Dusing had "multiple issues as to his credibility," and flagged several demonstrable falsehoods.  (*Id.* at 14.)

Judge Mehling also described how a well-respected doctor Mr. Dusing had retained as an expert witness issued a report containing extensive negative findings about Mr. Dusing, including about Mr. Dusing's protective capacity as a parent.  (*Id.* at 10.)  After the doctor issued the report, the doctor testified that one of Mr. Dusing's attorneys visited the doctor's office and offered him a $5,000 bribe if he would "denote the report as preliminary," an offer the doctor refused.  (*Id.* at 9.)  Another doctor, Judge Mehling found, questioned the necessity of Mr. Dusing's use of Adderall (*id.* at 8, 12), which was notable given Mr. Dusing's self-described past issues with substance abuse.  *See, e.g.*, Benjamin G. Dusing, *My Story*, Kentucky Bar Association Bench & Bar Magazine (May 2015) at 56.[4]  Judge Mehling awarded the mother sole custody.  (*Id.* at 17.)  Judge Mehling's 4/5/21 Opinion also triggered a 10-day deadline for Mr. Dusing to file a motion to alter or vacate the judgment (Ky. R. Civ. P. 59.05), and a 30-day deadline for Mr. Dusing to file a notice of appeal (Ky. R. Civ. P. 73.02(1)(a)), and precipitated what Ms. Lawrence later complained was a "flurry of activity in this litigation on several fronts" that persisted throughout Mr. Hild's trial, as Mr. Dusing faced not only the loss of his child, but also serious personal and professional sanctions.  (4/19/21 Mot. to Continue at 2, *J.B. v. Dusing*.)

On the first day of Mr. Hild's trial, April 13, 2021, J.B.'s counsel filed the first of four motions for sanctions against Mr. Dusing and Ms. Lawrence based on their conduct in their matter.  Among other things, the motion asserted that they should be sanctioned because they filed a frivolous "dishonesty filled diatribe in attempt to ultimately disqualify" opposing counsel on the morning trial was scheduled to begin and sought $5,000 in attorney's fees.  (4/13/21 Mot. for Sanctions, *J.B. v. Dusing*.)  During jury selection at Mr. Hild's trial that same day, Mr. Dusing exercised only seven of his ten strikes, and the Court even confirmed with him that he

---

[4] *See* https://cdn.ymaws.com/www.kybar.org/resource/resmgr/Benchbar/B&B_May_2015_web.pdf.

was choosing to waive his strikes.  (Voir Dire Tr. 198.)  The Kentucky sanctions motion was set

for a hearing on May 4, 2021.  (4/13/21 Mot. for Sanctions at 4, *J.B. v. Dusing*.)

        The next two days, on April 14 and 15, this Court heard testimony from the government's

key cooperating witness, Mr. Stumberger.  Mr. Dusing had neglected to move for the

sequestration of witnesses in Mr. Hild's trial, only to realize that at least two government

witnesses, Mr. Novikoff and Mr. Misiano, had listened to Mr. Stumberger's testimony on April

14.  Mr. Dusing belatedly moved to preclude Mr. Novikoff from testifying, noting that because

Mr. Novikoff "reported to Mr. Stumberger" and "the subject of their testimony overlaps directly

. . . it is hard to imagine that [Novikoff listening to Stumberger's testimony] didn't affect things."

(Tr. 183.)  This Court characterized the situation as "super unfortunate," but said that because

Mr. Dusing "didn't formally move for sequestration, [] nothing has been formally violated."  (Tr.

183.)  While the Court did permit Mr. Dusing to cross-examine Mr. Novikoff on the issue (Tr.

183), he hardly did so.  Instead, Mr. Dusing asked Mr. Novikoff only if he had "listened to a

portion of Mr. Stumberger's testimony" and then concluded his cross examination.  (Tr. 932.)

        Meanwhile, on April 15, Mr. Dusing not only cross-examined Mr. Stumberger, but also

filed a 45-page motion to vacate Judge Mehling's 4/5/21 Opinion in Kentucky, which he signed

on his own behalf, *pro se*, and noticed the motion hearing for May 4, the day that his adversary's

sanctions motion would be heard.  In Mr. Dusing's motion to vacate, which he accompanied with

61 pages of exhibits, Mr. Dusing accused the Kentucky court of being corrupt, asserted that the

outcome was "fixed" against him, and stated that Judge Mehling's 4/5/21 Opinion was "very

clearly a product of wholly improper and illegal conduct" by the Kentucky court staff.  (4/15/21

Mot. to Alter, Amend, or Vacate at 2, 6, *J.B. v. Dusing*.)  Mr. Dusing opened the brief by stating

that he "expects to be jailed for speaking the truth" (*id.* at 2), and closed the brief by stating

"[t]ruth is truth" and "[i]f it gets Respondent jailed, so be it" (*id.* at 44).  Also on April 15, J.B.

filed a motion for additional findings of fact and reconsideration of one point and noticed the

hearing for May 4.  (4/15/21 Mot. for Add'l Findings & Reconsideration.)

    The following day, April 16, as Mr. Dusing continued his cross examination of Mr.

Stumberger,[5] J.B. filed a second motion for sanctions against Mr. Dusing, arguing that he misled

the Kentucky Court of Appeals and Kentucky Family Court when he claimed in a prior filing

that several motions had not been decided when they had actually been ruled on.  (4/16/21 Resp.

to Resp't's List of Motions to Be Heard by the Court and Request for Rule 11 Sanctions and

Award of Attorney's Fees at 3–4, *J.B. v. Dusing*.)

    Apparently recognizing that he could not simultaneously serve effectively as trial counsel

to Mr. Hild and litigate his Kentucky case, on April 19, 2021, Mr. Dusing had his counsel in

Kentucky, Ms. Lawrence, file a motion in the Kentucky court to "continue any and all

proceedings, suspend communications with the Court staff regarding the scheduling of any

future proceedings, and for an extension of the deadline to file responses to any and all actions

until no later than June 1, 2021."  (4/19/21 Mot. to Continue at 1, *J.B. v. Dusing*).  The motion

asserted that the Kentucky litigation deadlines needed to be adjourned until June 1 because both

Mr. Dusing and Ms. Lawrence were handling Mr. Hild's trial.  (*Id.*)  The motion noted that the

Kentucky proceedings had been "a distraction" from Mr. Hild's case and argued that the Mr.

Dusing and Ms. Lawrence would suffer "serious prejudice in this litigation" if the Kentucky

court did not adjourn the deadline.  (*Id.* at 2–3.)  The Kentucky court did not address Mr.

Dusing's motion for a continuance until April 29, 2021, the day of closing arguments in Mr.

---

[5] Mr. Dusing's cross examination of Mr. Stumberger could have been more comprehensive.  For example, Mr. Dusing did not seek to undermine Mr. Stumberger's credibility with emails between Mr. Stumberger and the government.  (*See* DX H.3 & DX H.4.)

Hild's trial, when it entered an order dated April 26 rejecting the motion as improperly filed. (4/29/21 Order, *J.B. v. Dusing*.)

Despite the fact that Mr. Dusing and Ms. Lawrence believed they would suffer "serious prejudice" in their Kentucky litigation if the deadlines were not delayed—not to mention the fact that Mr. Dusing apparently viewed that Kentucky litigation as "most important litigation of my life" (5/11/21 Emergency Mot. Requiring Resp't to Delete His Facebook Account, Ex., at 20, *J.B. v. Dusing*)—neither Mr. Dusing nor Ms. Lawrence said one word about it to this Court, even as Mr. Hild's trial progressed, even as they were admittedly "distract[ed]," and even as this Court criticized their conduct. Indeed, on April 19, 2021—the same day that they filed the motion to continue the Kentucky case until June 1—this Court heard testimony from representatives of Live Well's lenders, and Mr. Dusing failed to lodge a clear objection.

When the Court reconvened the next day, Mr. Dusing informed the Court that it had been his "intention" to object to the lenders' testimony (Tr. 765), and admitted that it was "a little bit of a surprise" to him that the lenders testified extensively about their losses. (Tr. 763; *see also* Tr. 760 (Mr. Dusing stating that he did not expect any evidence from after August 2017).) The Court rejected this out of hand: "No, it's surprising to me that's your position, because from pretrial until now it has been clear to me that's one of the issues at play." (Tr. 761.) The Court further expressed surprise at Mr. Dusing's apparent lack of preparation for the lender's testimony, asking, "[t]here wasn't going to be any consciousness of guilt, any testimony, you didn't think, about what happened and how this played out? Wasn't it in the 3500 material?" (Tr. 760; *see also* Tr. 764 ("How did you expect the government would prove materiality if they didn't ask the victim lenders some of these questions?").) The government characterized Mr.

Dusing's apparent surprise at the lenders' testimony as "frankly preposterous" given the contents

of the discovery and the Indictment, as well as the parties' discussions.  (Tr. 767, 771.)

Two days later, on April 22, opposing counsel for J.B. in Kentucky filed a response to

Mr. Dusing's motion to continue the Kentucky proceedings.  In that motion, J.B.'s counsel

argued that a continuance was unnecessary because Mr. Dusing and Ms. Lawrence clearly were

able to litigate their Kentucky case even though they were on trial in New York.  Counsel cited

the fact that Mr. Dusing and Ms. Lawrence "filed a forty-five (45) page motion just four (4) days

earlier," and "clearly had time to draft a motion despite their insistence they do not."  (4/22/21

Resp. to Mot. to Strike Resp't Mot. to Continue at 2, *J.B. v. Dusing*.)  Of course, to the extent

Mr. Dusing and Ms. Lawrence "clearly had time," that time came at the expense of Mr. Hild.

Counsel for J.B. also filed an opposition to Mr. Dusing's motion to vacate.  The

opposition brief criticized Mr. Dusing and Ms. Lawrence for "mak[ing] threats and allegations

against the Court and its staff that  . . . are completely out-of-line and offensive to the integrity of

this Honorable Court. . . . The audacity it would take for multiple attorneys to file a motion, and

affidavit for that matter, that are so riddled with lies and defamations is mindboggling."  (4/22/21

Resp. to Resp't's Mot. to Alter, Amend, or Vacate and a Mot. for CR 11 Sanctions at 2, *J.B. v.

Dusing*.)  Counsel asked the court to deny Mr. Dusing's motion to vacate, and further asked the

court to impose "significant sanctions" against both Mr. Dusing and Ms. Lawrence for their

"repeated flagrant violation" of Rule 11 by "filing pleadings and affidavits that they know to be

false."  (*Id.* at 3.)  This sanctions motion, too, was scheduled for May 4.  On April 23, 2021, the

Kentucky Court of Appeals denied Mr. Dusing's petition for a writ of mandamus.  (4/23/21

Order Denying Petition for Writ of Mandamus, *Dusing v. Hon. Mehling et al.*, No. 2020-CA-

1410-OA, KY Ct. App.)

The defense case in Mr. Hild's trial began on Tuesday, April 27, when Mr. Dusing told this Court that he planned to call Mr. Cantor and Mr. Hild. (Tr. 1722.) The next day, opposing counsel in Mr. Dusing's Kentucky case filed another motion for sanctions, related to Mr. Dusing's unsuccessful motion for a writ of mandamus. (4/28/21 Mot. for Attorney's Fees Pursuant to CR 11, *J.B. v. Dusing*.) Counsel asserted that Mr. Dusing "must be punished for his continued abuse of the legal system." (*Id.* at 2.) That motion was noticed for May 4. (*Id.* at 4.)

At the time Mr. Hild's defense case began on April 27, the Kentucky court date of May 4 remained in place just one week away, with the Kentucky court scheduled to hear Mr. Dusing's motion to vacate and his adversary's motions for significant sanctions, among other things. Ms. Lawrence would later argue to the Kentucky court that the "setting of the motions . . . for May 4, 2021, despite Ms. Lawrence and Mr. Dusing's unavailability" was "an effort" by their adversaries and the Kentucky court personnel "to 'beat the clock' and have Mr. Dusing sentenced to jail and silenced, in an attempt to keep their corruption quiet. It is plain as day." (5/3/21 (Fifth) Motion for Disqualification of Presiding Judge at 4, *J.B. v. Dusing*.)

Mr. Hild's defense case proceeded apace, in a seeming effort by Mr. Dusing and Ms. Lawrence to conclude the trial before the May 4 Kentucky hearing. Mr. Dusing did not introduce a single exhibit during the direct examination of Mr. Hild, despite the fact that Mr. Hild and Mr. Dusing had marked more than 600 exhibits in advance of the trial, a great many of which could only have been sensibly introduced through Mr. Hild.[6] The government seized on this dearth of defense exhibits, stating in its rebuttal summation, in an example of impermissible burden shifting to which Mr. Dusing did not object: "[Mr. Hild] had no obligation to put

---

[6] On redirect of Mr. Hild, Mr. Dusing introduced three exhibits, none of which pertained to the key issue of the pricing methodology or quotes submitted to IDC.

anything in, to testify, but did you hear recorded call after recorded call during his testimony? Did you see e-mail after e-mail during his testimony?  I don't think so."  (Tr. 2243–44.)

Mr. Dusing also did not elicit key testimony from Mr. Hild, including testimony regarding why the write-down value of the bonds was based on faulty estimates or how Mr. Hild had no knowledge of the write-down.  Nor did Mr. Dusing elicit testimony regarding the negative impact the SEC's investigation and actions had on Live Well's business, which left the jury with an incomplete view of the facts.  With the only other witness called by the defense, Mr. Dusing introduced only one exhibit, which did not relate to the any of the key issues at trial. (*See* Cantor Tr. 1751 (introducing Ex. D.2.m.2 (Live Well board of director's consent of guarantee fee payments)).)  In all, Mr. Hild was on the witness stand for less than two days, and Mr. Dusing called no other witnesses, despite having subpoenaed multiple additional witnesses for trial.  The parties gave closing arguments on Thursday, April 29, and Mr. Hild's trial concluded with the verdict on the afternoon of Friday, April 30.  (Tr. 2329.)

After Mr. Hild's trial concluded, in an effort to forestall the Kentucky hearing set for May 4 (despite the end of Mr. Hild's trial), Mr. Dusing and Ms. Lawrence falsely claimed to the Kentucky court that Mr. Hild's trial was ongoing.  In particular, at 11:42 p.m. on April 30, after Mr. Hild's trial had concluded, Ms. Lawrence emailed the Kentucky court clerk that "it is not clear that we will be back Tuesday from New York.  If we are, we are not going to be prepared to proceed with all of these motions.  There is no realistic way.  It's a federal criminal jury trial. . . . We would object to this matter being heard on Tuesday."  (5/3/21 Mot. to Continue, Ex., at 7–8, *J.B. v. Dusing*.)  The following Monday, May 3, Ms. Lawrence filed another motion to continue, in which she repeated that she and Mr. Dusing were in New York "working around-the-clock, every single day (including weekends)" on Mr. Hild's trial, not mentioning that trial

had already concluded.  (5/3/21 Mot. to Continue, *J.B. v. Dusing*.)  The motion falsely stated that "the timeframe for completion of the case through a verdict has *lengthened*" and "it is clear that the trial could last well into and *through May*."  (*Id.* (emphasis added).)

Following the May 4 hearing[7] and additional proceedings, Judge Mehling denied Mr. Dusing's motions.  (5/6/21 Order & 5/26/21 Order, *J.B. v. Dusing*).  Judge Mehling has set a hearing for September 10, 2021, at which Mr. Dusing "shall be sentenced" for contempt.  (*See* 7/14/21 Order, *J.B. v. Dusing*.)  Beyond Judge Mehling's actions, both public reports and Mr. Dusing's public statements suggest that Mr. Dusing is also facing disciplinary actions and investigations by the Kentucky authorities based on the conduct described above.  *See, e.g.*, The Bulldog Show, *Why Does Ben Dusing Have his Law License?  Listen to This*, YouTube (May 10, 2021), https://youtu.be/MXVxEyTA0ac (reviewing Judge Mehling's 4/5/21 order); The Bulldog Show, *Local Political News*, YouTube at 2:55 (June 16, 2021), https://youtu.be/Ltx7DkutA-M?t=175.[8]

In a public video posted to his Facebook page shortly after the conclusion of Mr. Hild's trial, Mr. Dusing acknowledged that he and Ms. Lawrence "have bar complaints filed against us" and "jail sentences being threatened."  *See* Dusing Facebook video at 4:12 (May 12, 2021), https://www.facebook.com/100005928908054/videos/thank-you-eric-deters-for-doing-a-recent-show-that-i-guess-mentioned-me-havent-s/1675422985998649/ (last accessed July 24, 2021); *see* 5/3/21 (5th) Mot. for Disqualification of Presiding Judge at 4 (stating opposing counsel "has filed a series of bar complaints and Rule 11 motions against Ms. Lawrence and Mr. Dusing").

---

[7] At the May 4 hearing, Judge Mehling resolved certain issues, but did not resolve the sanctions motions, which are now scheduled for a hearing on September 10, 2021 (also Mr. Dusing's sentencing date in connection with Judge Mehling's finding of contempt).  (*See* 5/6/21 Order & 6/9/21 Order.)

[8] The Court may take judicial notice of the contents of websites whose authenticity is not in question. *See Force v. Facebook, Inc.*, 934 F.3d 53, 60 n.5 (2d Cir. 2019); Fed. R. Evid. 201(b)(2).

### 2. Applicable Law

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *LoCasio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005) (internal quotation marks omitted). "Although a defendant is generally required to show prejudice to prevail on an ineffective assistance of counsel claim, this is not so when counsel is burdened by an actual conflict of interest." *Id.* (internal quotation marks omitted). "Where a defendant shows (1) an actual conflict of interest that (2) adversely affected his counsel's performance, prejudice is presumed." *Id.* (internal quotation marks omitted) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)); *see Hyman v. Brown*, 927 F.3d 639, 670 n.30 (2d Cir. 2019); *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994); *Figueroa v. Schiraldi*, No. 10 Civ. 1821 (RA), 2013 WL 3486925, at *7 (S.D.N.Y. 2013) (Abrams, J.).

To show that a conflict adversely affected counsel's performance such that prejudice is presumed, a defendant "must establish an 'actual lapse in representation' that resulted from the conflict." *LoCasio*, 395 F.3d at 56 (quoting *Cuyler*, 446 U.S. at 349). In other words, the defendant must establish "some plausible alternative defense strategy or tactic" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (quotation omitted); *see also Cuyler*, 446 U.S. at 356 n.3; *Malpiedi*, 62 F.3d at 469. This showing is "more liberal than other circuits" and is also "not an onerous one, given that the defendant does not have to prove that the lapse in representation influenced the result at trial or that, absent the conflict, the lawyer would have conducted the trial differently." Gordon Mehler et al., *Federal Criminal Practice: A Second Circuit Handbook* § 8-2 at 180 (21st ed. 2021) (citing cases) ("Federal Criminal Practice").

It is well established that a lawyer's "personal interests" (such as Mr. Dusing's here) can conflict with the representation of a client. Under the New York Rules of Professional Conduct,

absent a client's written consent, among other things, a lawyer "shall not represent a client" if "there is a significant risk that the lawyer's professional judgment on behalf of the client will be adversely affected by the lawyer's own financial, business, property or other personal interests." N.Y. R. of Prof'l Conduct R. 1.7(a)(2).  It is equally well established that a lawyer's representation of two clients with "differing interests" creates a conflict.  N.Y. R. of Prof'l Conduct R. 1.7(a)(1).  Both of these species of conflicts can only be waived, if at all, by a client's informed consent, in writing.  *See* N.Y. R. of Prof'l Conduct R. 1.7(b)(4); *Federal Criminal Practice* § 8-5 at 192.

Courts have found actual conflicts to exist in cases where an attorney's "personal interests" in avoiding criminal or disciplinary sanctions conflict with a client's interests.  *See, e.g.*, *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) (reversing conviction and asking, "What could be more of a conflict than a concern over getting oneself into trouble with criminal law enforcement authorities?"); *Mathis v. Hood*, No. 87 Civ. 6234 (RPP), 1990 WL 100869, at *4 (S.D.N.Y. July 11, 1990) (finding conflict exists where attorney may have delayed appeal because reversal might have exposed attorney to discipline); *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987) (vacating conviction where lawyer under investigation was incentivized to prolong his client's trial because he knew that he himself would not be indicted until the conclusion of the trial), *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989); *Rugiero v. United States*, 330 F. Supp. 2d 900, 907–08 (E.D. Mich. 2004) (finding "no doubt" of an actual conflict where defense counsel was under investigation by the prosecutor such that he "went to trial in Petitioner's case with his freedom and livelihood in the balance" and was motivated to not engage in productive plea negotiations).

For example, in *Herrera v. Russi*, No. CV-95-187 (CPS), 1996 WL 651017 (E.D.N.Y. Nov. 6, 1996), the district court concluded that the fact that an attorney was facing disciplinary proceedings during his client's trial, which the lawyer did not disclose to his client, amounted to an impermissible personal conflict with a concurrent criminal representation.  In *Herrera*, the lawyer was served with a motion to suspend him from the practice of law (on charges of incapacity due to drug use) on the second day of his client's trial.  The client/petitioner asserted that his lawyer had an actual conflict because the lawyer feared that disclosing the suspension motion to the petitioner could result in the petitioner firing the lawyer, which the lawyer feared could then be used as further evidence of his incapacity at his disciplinary proceeding.  *Id.* at *1. The court agreed, and explained that the attorney had a "personal interest in demonstrating to the Disciplinary Committee that he was competent to practice law," and "may have felt that he could counter" allegations of misconduct "by continuing as petitioner's trial counsel."  *Id.* at *9.  By "disclosing the pending disciplinary charges to the petitioner," however, the attorney "ran the risk that petitioner might replace" him "with other counsel," which would deprive the lawyer "of an opportunity to demonstrate his competence to the Disciplinary Committee and could also be seen as further evidence of [the attorney's] inability to practice law."  *Id.*  "Alternatively," the court went on, "a conflict could arise simply because it is plausible that [the attorney] was unable to zealously represent the petitioner because of [his] *preoccupation* with the investigation into his competence and his possible suspension or disbarment."  *Id.* (emphasis added).

The Second Circuit has made clear that when a defendant such as Mr. Hild seeks to raise a claim that he received ineffective assistance "after conviction but prior to sentencing," the "proper procedural avenue . . . is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33."  *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010).  Where a court

finds that a defendant has demonstrated a "conflict inconsistent with a plausible trial strategy or tactic," a court may grant a new trial without holding an evidentiary hearing. *Malpiedi*, 62 F.3d at 470. This is because under the applicable standard, "after-the-fact testimony by a lawyer who was precluded by a conflict of interest from pursuing a strategy or tactic is not helpful," as "[e]ven the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway." *Id.*

### 3. Discussion

Mr. Dusing's and Ms. Lawrence's strong interests in their Kentucky cases were "inherently in conflict" with their ability to defend Mr. Hild at trial, including with their ability to mount a robust defense case that would last past May 4. *Malpiedi*, 62 F.3d at 469. In light of their conflicts, which they hid from this Court and to which Mr. Hild never gave informed consent at all, let alone in writing (Hild Decl. ¶ 4), this Court must order a new trial.

Mr. Dusing had an actual conflict because his personal interest in his Kentucky litigation conflicted with Mr. Hild's interests in multiple ways. Most obviously, the schedule for Mr. Hild's trial conflicted with the schedule in the Kentucky litigation, in that Mr. Dusing and Ms. Lawrence told the Kentucky court they would suffer "serious prejudice" if the Kentucky deadlines were not adjourned (*see* 4/19/21 Mot. to Continue at 3, *J.B. v. Dusing*), and Mr. Dusing feared he would be "sentenced to jail." (5/3/21 (Fifth) Mot. for Disqualification of Presiding Judge at 4, *J.B. v. Dusing*.) Mr. Dusing's fear of jail was well-founded, given that Judge Mehling had previously imposed a jail sentence on Mr. Dusing that was conditionally discharged only to the extent Mr. Dusing complied with court orders during a period that encompassed Mr. Hild's trial. (3/9/21 Opinion.)

Second, during both the pretrial and trial proceedings in Mr. Hild's case, as another court wrote in similar circumstances, "it is plausible that" Mr. Dusing "was unable to zealously

represent" Mr. Hild because of his "*preoccupation*" with the Kentucky proceedings, *Herrera*, 1996 WL 651017, at *9 (emphasis added)—a case that Mr. Dusing called the "most important litigation of my life" (5/11/21 Emergency Mot. Requiring Resp't to Delete His Facebook Account, Ex., at 20, *J.B. v. Dusing*).

Third, Mr. Dusing apparently had reason to believe he faced potential disciplinary proceedings and investigations into the bribery of a witness in Kentucky, and thus had a personal interest in using Mr. Hild's trial to demonstrate that he was "competent to practice law," *Herrera*, 1996 WL 651017, at *9, and to provide a reason to forestall the Kentucky litigation. Mr. Dusing did not want to risk telling Mr. Hild of the conflict and being fired—or telling this Court and having Mr. Hild's trial adjourned—because he would have lost his ability to counter the allegations in any disciplinary proceedings and to delay the Kentucky matter.

Ms. Lawrence likewise had an actual conflict because her representation of Mr. Dusing in Kentucky conflicted with her representation of Mr. Hild in New York, as Mr. Dusing and Mr. Hild had differing interests. The existence of those differing interests is made manifest in Ms. Lawrence's failure to tell this Court (not to mention Mr. Hild) about what was happening in Kentucky during Mr. Hild's trial, despite Ms. Lawrence's assertions in Kentucky that having to litigate both cases at the same time was causing "serious prejudice." (4/19/21 Mot. to Continue at 3, *J.B. v. Dusing*.) The conflict between Ms. Lawrence's representation of Mr. Dusing, on the one hand, and Mr. Hild, on the other, was exacerbated by the fact that—according to a filing in the Kentucky litigation—she was allegedly engaged in a romantic relationship with Mr. Dusing (2/14/21 Pet'r's Am. Pre-trial Mem., *J.B. v. Dusing*), and he was also the one who added her to Mr. Hild's trial in the first place despite her lack of criminal law experience. (Hild Decl. ¶ 3.) Thus, Ms. Lawrence had reason to favor Mr. Dusing's interests over Mr. Hild's.

Mr. Dusing's and Ms. Lawrence's obligations in Kentucky inherently conflicted with multiple plausible defense strategies, in several ways.

First, and most egregiously, Mr. Dusing and Ms. Lawrence had an incentive to shorten Mr. Hild's trial and not mount a fulsome defense case. Six days after Mr. Hild's trial began, Mr. Dusing and Ms. Lawrence told the Kentucky court they needed an adjournment of all deadlines until June 1, or they would suffer "serious prejudice" (4/19/21 Mot. to Continue at 3, *J.B. v. Dusing*), but the Kentucky court did not act on their request until April 29, the day of closing arguments in Mr. Hild's case. When Mr. Hild's defense case began on April 27, with no action from the Kentucky court and the May 4 Kentucky appearance just a week away, Mr. Dusing and Ms. Lawrence had to decide whether to serve Mr. Hild's interests and put on a robust defense, or whether to serve their own interests and abbreviate the defense in order to return their focus to the Kentucky litigation and their May 4 hearing.

The stakes could not have been higher for Mr. Dusing in Kentucky, where in addition to losing custody of his child, he feared he would be "sentenced to jail" (5/3/21 (Fifth) Mot. for Disqualification of Presiding Judge at 4, *J.B. v. Dusing*), and where he likewise had reason to fear additional sanctions from Judge Mehling, disciplinary action, and an investigation into the alleged bribery of a witness. Mr. Dusing and Ms. Lawrence opted to put on an abbreviated defense case for Mr. Hild, in which they called just one witness besides Mr. Hild, and in which they introduced just a handful of the hundreds of exhibits they had marked (a move the government critiqued in its rebuttal summation (Tr. 2243–44)). Other courts have confirmed that one "adverse effect" from a conflicted attorney is when there is a risk the attorney manipulated a trial's timing to serve his own interests, *see McLain,* 823 F.2d at 1464; *Rugiero*, 330 F. Supp. 2d at 907–08, a risk that exists in the present case.

If not for Mr. Dusing's and Ms. Lawrence's inherently conflicting obligations in Kentucky, there are multiple plausible alternative defense strategies they could have pursued. For example, they could have called as witnesses Certified Public Accountants to provide expert opinion testimony as to the propriety of Live Well's pricing methodology (such as a certified fraud examiner and forensic accountant at Keiter). Expert testimony was critical to Mr. Hild's defense given the complex nature of the bonds and pricing methodologies. *See United States v. Litvak*, 808 F.3d 160, 182 (2d Cir. 2015) (finding that expert testimony could have helped the jury to understand complex residential mortgage-backed securities, which have "more complicated" and "subjective" pricing than typical markets due to their highly specialized nature and lack of an efficient secondary market). They could have called an employee of IDC (such as Chris Krupa) and other employees of Live Well (such as Dan Foster and Ernie Calabrese) to testify about Scenario 14 and the propriety of submitting marks to IDC. They could also have called multiple attorneys in connection with an advice-of-counsel defense for the 2017 to 2019 time period, as well as attorneys who advised on the transfer of assets to Ms. Hild (which the government asserted was evidence of guilt). There is a serious risk that Mr. Dusing and Ms. Lawrence did not pursue any of these alternative defense strategies simply because they needed Mr. Hild's trial to end as quickly as possible, and because they were otherwise preoccupied with their Kentucky cases.

Mr. Dusing and Ms. Lawrence could also have introduced hundreds of documents during Mr. Hild's direct testimony—there were 600 marked defense exhibits—rather than none. These exhibits could have shown that the bonds were performing in line with the Scenario 14 valuations despite the government's suggestions to the contrary (DX D.2p.1 at 1), and that IDC consistently made clear to customers that its valuations could be based on broker quotes and

input from market participants.  (*See, e.g.*, DX D.8a at 3, DX D.8b at 11.)  Mr. Dusing could also have referenced key defense exhibits introduced earlier to elicit testimony from Mr. Hild that at least one lender requested that Mr. Stumberger value the bonds (*cf.* Hild Tr. 1833), and that Mr. Hild and Live Well were unfamiliar with the process of pricing the bonds and use of broker quotes before Mr. Stumberger explained these.  (*See, e.g.*, DX A.18 (8/15/14 email from Mr. Stumberger to Mr. Hild and others explaining that repo lenders "either get[] prices from the dealer . . . or go[] to IDC which goes to the dealer for pricing."); DX A.51 (8/28/14 email from IDC account manager to Mr. Rohr confirming IDC "will definitely accept market data/pricing inputs from Live Well"); DX A.28 (8/11/14 email from Mr. Rohr to Mr. Hild remarking that the "circular reference [of broker quotes] is amazing, and no one thinks that it is strange!").)

Indeed, by curtailing Mr. Hild's testimony—and failing to introduce even a single exhibit during his direct examination—Mr. Dusing and Ms. Lawrence deprived Mr. Hild not only of his right to counsel, but his right to testify in his defense as well.  Further, despite litigating pre-trial their right to include more expansive portions of transcripts of recorded phone calls the government sought to introduce as exhibits (*see, e.g.*, 4/12/21 Letter, Docket Entry 60), Mr. Dusing and Ms. Lawrence failed to introduce any of these portions of the transcripts during Mr. Hild's testimony.  Finally, during summation, Mr. Dusing failed to object at multiple instances including when the government inaccurately asserted that Mr. Hild "was IDC," "controlled IDC" (Tr. 2131), and "used IDC as his puppet for years."  (Tr. 2122.)

Under well-established Second Circuit law, it does not matter if there may have been sound tactical reasons for the decisions Mr. Dusing and Ms. Lawrence made in mounting their abbreviated defense case; all Mr. Hild needs to show to justify a new trial is that the foregone defense strategies were *plausible*.  In *Malpiedi*, for example, the Second Circuit rejected the

argument that conflicted counsel had justifiable reasons for not pursuing an alternative defense, reasoning that when trial counsel is conflicted, the foregone strategy must "be so clearly against the defendant's interest that unconflicted counsel would never pursue it."  62 F.3d at 469; *see United States v. Schwarz*, 283 F.3d 76, 93 (2d Cir. 2002) ("The government argues that [defense counsel's] decision . . . was made for sound tactical reasons and that he did not call [the co-defendant] to testify because [the codefendant] was not a credible witness . . . . [T]his argument is beside the point because [the defendant] does not need to prove that the forgone strategy was reasonable or that it would have affected the outcome of the trial, only that it was a plausible one and that it was forgone."). The foregone strategies described above were more than plausible, and were not remotely "against the defendant's interests."

In addition to cutting short the defense case, Mr. Dusing's and Ms. Lawrence's preoccupation with their Kentucky litigation caused them to commit missteps in their trial preparation and conduct.  Mr. Dusing asserted that a continuance of his own trial in February and March 2020 was necessary because the preparation for Mr. Hild's trial would require Mr. Dusing to "travel [on] an intensive basis, [] prepare witnesses, prepare subpoenas, and potentially to participate in pre-trial hearings."  (1/19/21 Mot. for Indefinite Continuance, *J.B. v. Dusing*.) With that request for a continuance denied and Mr. Dusing apparently unwilling to inform this Court of the conflict, he apparently sacrificed the preparation for Mr. Hild's trial.

Prior to Mr. Hild's trial, expert disclosures and notice of any advice of counsel defense were due on February 15, 2021—a week before Mr. Dusing's own trial in the Kentucky Family Court began.  (Docket Entry30; 4/5/21 Opinion.)  Mr. Dusing and Ms. Lawrence did not disclose any experts or provide notice that they might assert an advice of counsel defense in Mr. Hild's case, despite the fact that expert testimony regarding bond pricing was potentially essential to

Mr. Hild's defense, and despite the fact that without preparing an advice of counsel defense, Mr. Dusing and Ms. Lawrence were unprepared to respond to a large portion of the government's case.  Indeed, Mr. Dusing claimed at trial that he failed to anticipate that the government was "going to have any proof from . . . the post August 2017 period" when Live Well retained counsel.  (Tr. 760.)  In addition, Mr. Dusing failed to provide notice that he might assert an advice of counsel defense in response to the allegation that assets were transferred to Mr. Hild's spouse.

Mr. Dusing also failed to move for the sequestration of witnesses in advance of trial, resulting in Mr. Novikoff listening to a portion of Mr. Stumberger's testimony (Tr. 183), and then did not thoroughly cross-examine Mr. Novikoff with the fact that his testimony may have been influenced by Mr. Stumberger's testimony.  (*See* Tr. 932.)  Mr. Dusing's and Ms. Lawrence's failure to move for sequestration and to enforce a sequestration order—particularly with the trial, including sidebar conferences, being broadcast to anyone who dialed in thanks to procedures adopted due to COVID-19[9]—in itself constitutes an adverse effect on the representation of Mr. Hild.  *See Rugiero*, 330 F. Supp. 2d 908 (finding as one of four adverse effects warranting vacating conviction that attorney "pulled his punches" in failing to enforce a sequestration order).  This was particularly problematic because neither counsel nor the Court were able to observe who was listening in to the trial (including sidebar conferences), as they would normally have been able to do before the COVID-19 procedures were in effect.

During Mr. Hild's trial, Mr. Dusing was also unprepared to cross-examine the lenders on any evidence from after August 2017, including the alleged amount of loss—a failure that this

---

[9] Because Ms. Lawrence was given the only seat next to Mr. Dusing, and Mr. Hild was placed at a separate table behind his counsel, Mr. Hild was prevented from having real time communication with his counsel during the trial.

Court found surprising (Tr. 760, 764), and that the government called "frankly preposterous." (Tr. 767.)  As a result, Mr. Dusing did not cross-examine the lenders with evidence that they would not actually sustain losses as a result of repossessing the loans or that the losses asserted by the government were based on faulty valuations provided by a government cooperator to Bloomberg.  Mr. Dusing was also unprepared to respond to evidence of Mr. Hild's income and the government's suggestion that he had transferred assets to his wife.  (*See, e.g.*, Tr. 2068.)[10]

The fact that Mr. Dusing and Ms. Lawrence failed to disclose the status of their Kentucky litigations to this Court (not to mention Mr. Hild) during Mr. Hild's trial corroborates the substantial degree to which their conflicts influenced their representation of Mr. Hild.  In particular, their failure to disclose their conflicting Kentucky cases—which even the Kentucky court highlighted—prevented this Court from remedying the situation, such as by adjourning Mr. Hild's trial or by giving Mr. Hild the option of changing counsel (which Mr. Hild has now done).

It would clearly have been in Mr. Hild's interests for these issues to be disclosed to this Court, so this Court could have ensured that Mr. Hild's rights were protected.  But Mr. Dusing and Ms. Lawrence had multiple incentives to hide their Kentucky cases from this Court, including because Mr. Hild's trial gave them an excuse to seek multiple adjournments in the Kentucky cases to put off a hearing into Mr. Dusing's misconduct—which they apparently wished to delay as long as possible—and because Mr. Hild's case gave Mr. Dusing a chance to attempt to prove his competence.  Mr. Hild's case also, of course, provided Mr. Dusing and Ms.

---

[10] Had Mr. Dusing adequately prepared, the defense could have potentially introduced exhibits and/or testimony showing that any transfer of assets was based on the advice of professionals provided years before Live Well even purchased the HECM IO bonds.  In addition, in rebuttal, the government improperly stated that the "idea that he had no motive is laughable frankly" because Mr. Hild was "trying to hide the money" he received as compensation by supporting his wife's businesses.  (Tr. 2242.)  The evidence did not show that Mr. Hild was trying to hide money; nothing about the transactions at issue suggested "hiding."

Lawrence with financial benefits, which per Judge Mehling's 4/5/21 Opinion, they needed because Mr. Dusing had "downsize[d] his firm and workload."  (4/5/21 Opinion at 14.)  Indeed, Mr. Hild appears to have unwittingly funded the "most important litigation" of Mr. Dusing's life at the expense of his own case.  If Mr. Dusing had disclosed the Kentucky litigation to this Court and been fired, in the words of another court, he would have been deprived "of an opportunity to demonstrate his competence" to the disciplinary committee, which "could also be seen as further evidence of [his] inability to practice law." *Herrera*, 1996 WL 651017, at \*9.

In sum, this Court should grant a new trial because Mr. Dusing and Ms. Lawrence labored under actual conflicts of interest during their representation of Mr. Hild; plausible alternative defense strategies of calling additional defense witnesses, eliciting more extensive testimony from Mr. Hild, and introducing additional defense exhibits were "inherently in conflict with" Mr. Dusing's and Ms. Lawrence's obligations to the Kentucky court, *Malpiedi*, 62 F.3d at 469; and Mr. Hild did not knowingly waive his right to lawyers unburdened by conflicts.  In these circumstances, a new trial is required in the interests of justice.

### B.  This Court Should Grant a New Trial Because Mr. Dusing and Ms. Lawrence Rendered Ineffective Assistance Under *Strickland v. Washington*

Mr. Hild also received ineffective assistance of counsel in the traditional sense pursuant to *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To demonstrate a violation of the Sixth Amendment right to the effective assistance of counsel, a party must show (1) "that counsel's representation fell below an objective standard of reasonableness . . . . under prevailing professional norms"; and (2) "that the deficient performance prejudiced the defense."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 687–98).

Mr. Dusing and Ms. Lawrence's representation of Mr. Hild was deficient and prejudiced Mr. Hild in all of the ways described above.  Indeed, several of their failures are of a sort that courts have found to be ineffective under the *Strickland* standard.

First, the failure to call an expert witness is ineffective and prejudicial when it is known in advance that expert testimony may be necessary to resolve a key issue at trial.  *See United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993) (holding that the defendant established a plausible claim under the *Strickland* standard, where the government's key trial evidence consisted of the defendant's alleged handwriting, and defense counsel failed to call a handwriting expert to rebut the claim); *Eze v. Senkowski*, 321 F.3d 110, 130 (2d Cir. 2003); *see also United States v. Melhuish*, at *43–45, No. 19-485 (2d Cir. July 27, 2021).  Counsel's failure to consult an expert to help counsel him or herself better understand complex issues can also contribute to a finding of ineffective assistance of counsel.  *See Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001) (finding failure to consult an expert "contributed significantly" to defense counsel's ineffectiveness); *see also United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (noting in complex fraud case that "it should have been obvious to a competent lawyer that the assistance of an accountant would be necessary").

Expert testimony in the present case was important due to the complex issues presented at trial and in the government witnesses' testimony.  It was foreseeable that Mr. Hild's trial would turn on the question of whether the complex and difficult-to-value bonds were reasonably valued under Scenario 14.  Yet, Mr. Dusing and Ms. Lawrence did not seek to introduce an expert witness to provide opinion testimony regarding Scenario 14's accuracy.  That error was made even more prejudicial because, as described below, the government was allowed to elicit improper lay opinion testimony that the prices were "mark[ed] up," "wrong," and a "fraud."  *See*

*infra* II.D.1 & II.D.2.  Where a decision not to call a witness is "mainly avoiding work" on the defendant's case, the usual hesitation to not second-guess a lawyer's strategic decisions does not apply.  *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001) ("There are many ways [to] properly to assist a client. . . . But making important decisions with no regard for a client's interest is not one of them.").  The failure of Mr. Hild's trial counsel to call expert witnesses in response to the multiple government witnesses providing their opinions about complex bond pricing was unreasonable and prejudiced Mr. Hild.

Second, defense counsel failed to elicit fulsome testimony from Mr. Hild.  When a lawyer's strategic decisions in a case are "motivated primarily by self-interest," including the time constraints imposed on a lawyer due to another case, *Strickland*'s standard can be deemed satisfied.  *See United States v. Zackson*, 6 F.3d 911, 920 (2d Cir. 1993) (holding that defense counsel's failure to oppose severance due to "enormous time constraints" resulted in defendant having "arguably satisfied the first prong of the *Strickland* test").

Finally, as noted, defense counsel made multiple errors at trial.  As noted above, *supra* II.A.1, Mr. Hild's trial counsel was concededly unprepared for any detailed testimony from victims regarding the loss amount or "proof from . . . the post August 2017 period."  (Tr. 760.)  The Indictment, however, alleged a scheme through May 2019 (Indictment ¶ 48, Docket Entry 2), and the Court characterized defense counsel's misimpression as "surprising."  (Tr. 761.)  Counsel's lack of preparation was prejudicial to Mr. Hild.  Mr. Dusing also acknowledged several times that he had "missed" objections that should have been made.  In addition to failing to move for sequestration of witnesses, as noted *supra* II.A.1, Mr. Dusing conceded that he "did let [two exhibits] come in" by not objecting to them before they were admitted into evidence.  (Tr. 1111.)  Mr. Dusing explained that because the exhibits were recently disclosed, "we haven't

had any real time to review these." (Tr. 1109.)  Because Mr. Dusing did not object to the exhibits before they were admitted into evidence, however, the Court noted, "It's a little bit hard to unring this bell." (Tr. 1111.)  Mr. Dusing also failed to object to the SEC witness testifying that Scenario 14 resulted in a "mark up."  This failure to object to the impermissible opinion testimony prejudiced Mr. Hild, as explained in more detail below.  Mr. Dusing further failed to object to the government's statement in summation that in order to acquit Mr. Hild, the jury would have to "believe" that Mr. Stumberger and Mr. Rohr were "in fact not guilty" of the crimes they pled guilty to (Tr. 2123), an argument that ran afoul of the Second Circuit's admonition that prosecutors should "avoid" arguing that in order to acquit, the jury would have to call the government's witnesses liars.  *See United States v. Hestie*, 439 F.2d 131, 132 (2d Cir. 1971).  Finally, Mr. Dusing failed to object to the impermissible burden shifting argument made by the government in its rebuttal summation.  (*See* Tr. 2243–44.)

Each of defense counsel's errors, taken cumulatively, resulted in deficient performance that prejudiced Mr. Hild.  Accordingly, the Court should grant Mr. Hild a new trial.  *See Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (evaluating performance based on cumulative effect of counsel's errors); *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (same).

### C.  This Court Should Order a New Trial Because the Verdict Was Against the Weight of the Evidence

The Court should grant Mr. Hild a new trial because, for the reasons discussed above, the jury's verdict was seriously erroneous, as the evidence did not show that Live Well misrepresented the value of its bonds or that Mr. Hild had any intent to defraud.

A court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. Proc. 33(a).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129,

134 (2d Cir. 2001).  The court must "examine the entire case, take into account all facts and circumstances," and "must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict."  *Id.* (quoting *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir. 1992)).  In order to grant a new trial, the court must find that the evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020).  A court may grant a Rule 33 motion for a new trial even where it has denied a defendant's Rule 29 motion. *United States v. Walker*, 289 F. Supp. 3d 560, 568 (S.D.N.Y. 2018).

Here, for all of the reasons articulated in Section I, the evidence preponderates heavily against the jury's verdict, which was a manifest injustice because the weight of the evidence failed to show that Scenario 14 valuations were misleading or that Mr. Hild had intent to defraud.

### D.  The Court Should Order a New Trial Because the Government Elicited Improper and Highly Prejudicial Opinion Testimony from Multiple Lay Witnesses Regarding Valuation Methodologies

The Court should grant a new trial because the government repeatedly elicited improper and prejudicial lay opinion testimony that Live Well's conduct was "wrong" or a "fraud"—the key legal issues—from multiple lay witnesses, including a government agent with no firsthand knowledge of the facts.  Under Rule 701 of the Federal Rules of Evidence, when a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  When a lay witness's opinion provides legal conclusions as to the key issues, it is not helpful to the jury under Rule 701(b), and inadmissible because it "would give the appearance that the court was shifting to witnesses the responsibility to decide the case."  *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.) (quotation omitted), *on*

*reh'g,* 856 F.2d 5 (2d Cir. 1988).  When a lay witness's opinion is not the "product of reasoning processes familiar to the average person in everyday life," the standards of Rule 702 apply. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).  These standards were not met here.

### 1.  The SEC Witness Improperly Testified that the Values Were a "Mark Up" in Violation of Rule 701

The SEC witness, Mr. Hamilton, provided the most egregious example of improper lay opinion testimony at Mr. Hild's trial.  In particular, Mr. Hamilton testified that an exhibit he created showed a "mark up" by Live Well of the bonds' value (Hamilton Tr. 1663)—the very conclusion the government sought to have the jurors reach.  In explaining a summary chart showing the change in the bonds' valuation over time, including after Scenario 14 was implemented, Mr. Hamilton used the words "mark up" three times: "if you want to think about that as a mark up, a mark up of about 15 percent . . . All the ones to the right of the dotted line are at least 118 percent or a mark up of at least 18 percent."  (Hamilton Tr. 1663.)  On cross-examination, he testified that his use of the term "mark up" was "one way of thinking about the differences between the valuation and the purchase price," and intended "to illustrate the concept of what is represented" by the chart showing the increase in the bond prices published by IDC once Scenario 14 was utilized.  (Hamilton Tr. 1666.)

By using the word "mark up" repeatedly to describe the Scenario 14 bond valuations, Mr. Hamilton went beyond the testimony the government represented to the Court it planned to elicit. In response to Mr. Hild's motion in limine to preclude Mr. Hamilton's testimony, the government stated that it would "not elicit from Hamilton his opinion as to whether the marks submitted to IDC were reasonable or accurate."  (3/18/21 Mem. Of Law in Opp. to Def.'s Mot. in Limine at 11, Docket Entry 48.)  Instead, per the government, Mr. Hamilton's testimony "will consist of mechanically comparing" the prices of Live Well's bonds, and "[i]n fact, he will offer

42

*no opinion* as to the value of the securities at issue and will draw no conclusions from the data."[11]  (*Id.* (emphasis added))  By referring to a "mark up," however, Mr. Hamilton used words (which the government itself repeated in summation) that typically imply a price increase to obtain a profit, and thus improperly suggested that the bonds were overvalued under Scenario 14.

Mr. Hamilton—a government agent—had no basis to conclude that Scenario 14 prices were "marked up" because he was not an expert in bond pricing and had not evaluated Live Well's bonds to determine whether the Scenario 14 prices were accurate.  (Hamilton Tr. 1665.) He also had no involvement in the SEC's investigation of Live Well.  (Hamilton Tr. 1652.) Therefore, Mr. Hamilton's conclusion was not "based on the witness's first-hand perceptions" or "rationally derived from those first-hand perceptions" as required under Rule 701(a) such that his lay opinion was "an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'"  *Garcia*, 413 F.3d at 211 (quoting 4 *Weinstein's Federal Evidence* § 701.03). Because Mr. Hamilton's opinion was not helpful to the jury, it also failed Rule 701(b), which is "designed to provide assurance against the admission of opinions which would merely tell the jury which result to reach."  *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004) (quotation and alteration omitted).

In *United States v. Kaplan*, the Second Circuit vacated a defendant's conviction on the relevant counts because the improperly admitted testimony "was the central disputed issue in the case" and "the Government repeatedly called the jury's attention" to the improper testimony. 490 F.3d 110, 119 (2d Cir. 2007).  Here, the issue of whether the bond prices were "marked up"

---

[11] The Court did not rule on the motion in limine, as Mr. Hild and the government reached a compromise: the government agreed that it would present evidence regarding the "relationship between the prices at which Live Well purchased bonds and the prices at which it listed those bonds on IDC," but that it would not "seek to offer the evidence regarding comparable bonds to which the defendant objects."  (4/12/21 Letter at 1, Docket Entry 59)

was the key issue in the case.  As in *Kaplan*, the government specifically echoed the improper opinion testimony in closing arguments.  In summation, the government quoted the SEC witness, Mr. Hamilton, *only* for his improper opinion testimony about the "mark up," and noted it was consistent with what the government was seeking to prove to the jury: "*I called this a markup, Mr. Hamilton called it a markup*."  (Summation Tr. 2150 (emphasis added).)  This argument was grossly improper and prejudicial.

The government further amplified Mr. Hamilton's improper opinion testimony by making the words "mark up" a refrain throughout the closing argument.  (*See, e.g.*, Summation Tr. 2128 & 2129 (referring to the bond prices in February 2017 as including a "month-end markup," "overmarked"), 2136 ("arbitrary price mark ups"), 2154 ("that's the bogus yield we're going to use to calculate the Scenario 14 markup"); 2166 ("March markup"); 2175 ("big Scenario 14 markup" and "huge markup"); 2178 ("arbitrary price markups").)  Because the government improperly told the jury to convict because both the government and Mr. Hamilton, the SEC witness, believed the bond values were "marked up," a new trial is required.

### 2. Former Live Well Employees Improperly Testified to Their Lay Opinions that Live Well's Conduct Was "Wrong," "Incorrect," and "Fraud"

The government elicited similarly improper and prejudicial lay opinion testimony from the former employees of Live Well, asking them to characterize whether Live Well's actions were "right" or "wrong."  The government repeatedly asked Mr. Rohr, for example, if Scenario 14 and Live Well's accounting was "wrong."  (*See, e.g.*, Rohr Tr. 1029 (regarding dating financial results, "[i]s it wrong to do it this way?"), 1039 (regarding price submissions, "did you have an understanding of whether that was wrong?"), 1075 (regarding Scenario 14: "Q: I believe you testified earlier that you knew this was wrong, is that right? A: That's correct."), 1077 (regarding Scenario 14, "you testified earlier that you believed scenario 14 was wrong, is that

right?"); *see also* Rohr Tr. 1002 ("Q: how did you feel about buying bonds at one price and then

marking them up?  A: . . . I knew it was wrong").)  In each instance, Mr. Rohr agreed that he

believed Live Well's conduct was wrong.  At another point, in response to being asked if there

was "any fraud going on at the company at the time," Mr. Rohr testified, "[a]t this point clearly I

understand that there was fraud going on at the company."  (Rohr Tr. 1094.)

The government also elicited improper lay opinion testimony from Mr. Novikoff, who

testified "this was really wrong and I wanted Live Well to get caught if it was, so that I was very

saddened to be a part of it."  (Tr. 860–61.)  Mr. Novikoff returned to this theme of "wrongness"

multiple times, testifying later that "I was very confident that this was wrong and that the lenders

were being misled, and I was feeling an incredible amount of guilt about being a party to it and

so I wanted to stop being a part of it."  (Tr. 874.)

While Rule 701 permits lay witnesses to offer opinions, the Second Circuit has noted that

such testimony concluding that the defendant engaged in "fraud" is the type of "legal

conclusion" that is "highly prejudicial."  *Scop*, 846 F.2d at 140.  At times, the government even

bolstered Mr. Rohr's improper lay opinion testimony with reference to his expertise beyond his

involvement in Live Well.  For example, when asked to explain why he believed it was wrong to

submit certain price quotes, Mr. Rohr testified that his view was based on his "experience as an

auditor and . . . accounting degree, I had passed the CPA and just my general dealing with

financial statements in my entire professional career."  (Rohr Tr. 1039.)  In short, Mr. Rohr's

opinions were based on the "technical[] or other specialized knowledge."  Rule 701(c).

Mr. Hild's trial counsel repeatedly objected to the improper opinion testimony and

moved to strike it from the record, noting that Rohr's testimony was "outside the scope of what

an average juror would know."  (Rohr Tr. 1030–31.)  As Mr. Hild's counsel explained: "The jury

is not going to know whether it's the right way or not.  This is expert testimony."  (Rohr Tr. 1032.)  Recognizing it was "a fine line," the Court overruled the objection, but advised the government to "clear up that it's not based on any specific accounting expertise, it's his experience" in order to "make it sound less like expert testimony."  (Rohr Tr. 1033–34.)  Despite this guidance, Mr. Rohr immediately thereafter explained that he held his opinion because he "was a CPA at one time" and had "passed the CPA exam."  (Rohr Tr. 1034.)

Following another objection, the government asserted in a sidebar conference that *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), held that auditors could testify to accounting issues as fact witnesses, and the Court permitted the witness to continue to provide similar opinion testimony.  (Rohr Tr. 1036.)  *Cuti*, however, is distinguishable.  In that case, auditors were permitted to answer hypothetical questions limited by the factual foundation of prior evidence, such as how the knowledge of certain facts "would have affected that accounting under" "undisputed accounting rules."  *Cuti*, 720 F.3d at 458.  The Second Circuit held that the witnesses provided fact, not opinion, testimony.  *Id.* at 459.  Alternatively, the court held that testimony was permissible as lay opinion testimony because though the accounting rules "appear technical and unfamiliar to everyday life, [] those rules or their interpretation were not in question in this case.  The only issue was whether the withheld facts would have altered the rules' application."  *Id.* at 460.  In Mr. Hild's case, however, Mr. Rohr provided opinion testimony—whether certain acts were "wrong" or "incorrect"—not factual testimony.  (*See* Rohr Tr. 1053 (Court suggesting that Rohr is "going to provide opinion")).  And the opinion provided by Mr. Rohr was not the simple application of undisputed rules.  It was his opinion as to the ultimate issue of the case, based on his expertise.  The same issue permeated other parts of the testimony provided by Mr. Rohr and others, who also testified that Live Well's conduct was

"wrong." (*See, e.g.*, Stumberger Tr. 51; Novikoff Tr. 860, 874; *see also* Haddock Tr. 1608–10 (testifying that bond values "didn't seem normal," were "questionable," and "overvalued").)

The Court should grant a new trial because the jury's role was usurped by pervasive inadmissible lay opinion testimony that the bond values were "marked up" and that Live Well's conduct was "wrong," "incorrect," and a "fraud."

### E.  Because the Indictment Did Not Charge an Omissions Theory of Fraud, there Was a Constructive Amendment and Prejudicial Variance when the Government Repeatedly Argued Fraudulent Omissions

Finally, the Court should grant Mr. Hild a new trial pursuant to Rule 33 because the government constructively amended the Indictment by shifting its theory from the misrepresentation-based scheme alleged in the Indictment to an omissions-based theory that the government emphasized at trial.

The question of whether an indictment is constructively amended turns, at least in part, on whether it has become impossible to determine whether the defendant was convicted solely on charges that the grand jury returned.  A defendant raising a constructive amendment claim must establish that "the presentation of evidence and jury instructions . . . .so modif[ied] essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment."  *Vilar*, 729 F.3d at 81 (internal quotation marks omitted).  In contrast to constructive amendment, a "variance" occurs "when the charging terms of an indictment are unaltered, but the trial evidence proves facts materially different from those alleged in the indictment."  *United States v. Agrawal*, 726 F.3d 235, 260 (2d Cir. 2013).  A variance violates a defendant's constitutional rights only when it "infringes on the notice and double jeopardy protections of an indictment."  *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012).

The government charged the case as involving affirmative material misrepresentations. All five counts of the Indictment alleged a scheme in which Mr. Hild and others misrepresented bond prices to lenders to induce the lenders to increase the amount of cash they were willing to lend. (*See, e.g.*, Indictment ¶¶ 50, 54, 56, 58, 60, Docket Entry 2.) While the Indictment also alleged in its factual recitation that Mr. Hild prevented the lenders from determining that Live Well "was pricing . . . Live Well's bonds at levels well above their actual market value" (*Id.* ¶ 34), the Indictment did not allege a duty to disclose. The government's motion in limine similarly focused on affirmative misrepresentations, stating that the government "expects to argue and prove that the marks that Hild caused Live Well to submit to IDC were unreasonable." (3/11/21 Mot. in Limine at 6, Docket Entry 43.)

At trial, however, the government devoted a substantial portion of its case in chief to presenting evidence that Mr. Hild and others, rather than making any affirmative misrepresentations, instead failed to disclose their valuation methodology to lenders. (*See, e.g.*, Misiano Tr. 603 ("Q: Did IDC separately in another way disclose where the broker quote came from? A: No. Q: Did IDC ever send you a disclaimer for a broker quote? A: No. Q: Did they ever pass on any disclaimer from the broker? A: No."); Misiano Tr. 623 (Q: "At that point had Michael Hild disclosed to Mirae that Live Well was behind the IDC marks? A: No."); Misiano Tr. 667 ("Q: did Michael Hild ever disclose to you that Live Well Financial was behind the IDC prices? A: No. Q: Did anybody else at Live Well ever disclose that they were behind the IDC prices? [...] A: To my knowledge, no."); Levy Tr. 704–05 ("Q: Mr. Levy, did Mr. Hild ever disclose to you that Live Well was the source of the values at IDC? A: They never did."); Rohr Tr. 1095 ("Q: did you ever disclose to the auditors that Live Well was providing IDC prices? A: I did not."); Hild Tr. 2068 ("Q: And when you were undertaking those efforts, you didn't

disclose to Mirae that you were behind the IDC prices, is that right?  A: It never occurred to me."); Gov't Summation Tr. 2140 ("The defendant said it never occurred to him to disclose to the lenders that Live Well was behind IDC prices.").)

This constructive amendment of the Indictment deprived Mr. Hild of his right to notice of the charges against him.  After all of the lenders had testified, Mr. Dusing noted, "the case [has] sort of changed materially in terms of the theory and in terms the expected proof . . . . now it seems to be that the fraud is premised on some implied duty to disclose on the part of Live Well to these . . . alleged victim lenders."  (Tr. 760–61.)  In charging the jury, however, the Court also provided instructions related to an omission-based theory of fraud.  (Tr. 2275.)  It is true that fraud can also be committed by the omission or concealment of a material fact instead of a material misrepresentation, but only where a defendant failed to speak when he had a duty to do so.  *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").  Here, however, there was no duty to disclose: The Indictment did not describe any duty to disclose, and at trial, the government did not introduce any proof that LWF had a duty to disclose the Scenario 14 methodology to IDC or to lenders.

Because the government presented at great length an uncharged "omission" case to the jury, it is impossible to determine whether the Mr. Hild was convicted solely on the affirmative misrepresentation charges the grand jury returned, resulting in a constructive amendment of the Indictment.  At a minimum, the "omission" evidence the government elicited at trial proved facts materially different from those alleged in the Indictment, resulting in a prejudicial variance.  This deprived Mr. Hild of notice of the charges against him.  *See United States v. Wozniak*, 126 F.3d

49

105, 111 (2d Cir. 1997) (vacating conviction and noting that due to constructive amendment, the defendant "well may have been surprised").

Had Mr. Hild known that the government would pursue—and the jury would be charged with—an omission-based theory, he might have chosen a different strategy at trial.  Worse yet, because the proof at trial did not show any duty to disclose, the omission evidence, even if appropriate, was not sufficient to convict and was prejudicial.

## CONCLUSION

For the foregoing reasons, Mr. Hild respectfully requests that the Court enter a judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count.  In the event the Court enters a judgment of acquittal on all counts, the Court should also, pursuant to Rule 29(d)(1), conditionally grant Mr. Hild's motion for a new trial in the event that the judgment of acquittal is later vacated or reversed.

Dated: New York, New York
        July 27, 2021

MORVILLO, ABRAMOWITZ, GRAND,
    IASON & ANELLO, P.C.

By:      /s/ Brian A. Jacobs
        Brian A. Jacobs
        Alexander M. Levine
        565 Fifth Avenue
        New York, NY 10017
        (212) 856-9600
        (212) 856-9494 (fax)
        bjacobs@maglaw.com

        *Attorneys for Defendant Michael Hild*

Addendum

**ADDENDUM**

**Overview of Mr. Hild's Trial and Mr. Dusing's Kentucky Family Court Matters**

| Date | Kentucky Family Court Actions | Mr. Hild's Trial |
|---|---|---|
| 10/12/20 | Judge Mehling's Findings of Fact, Conclusions of Law and Orders, Case No. 19-CI-1945 | Preparation for trial |
| 1/19/21 | Mr. Dusing's Motion for Indefinite Continuance, Case No. 19-CI-560 | |
| 2/2/21 | Judge Mehling's Findings of Fact, Conclusions of Law and Orders denying Mr. Dusing's 1/19/2021 motion for a continuance, Case No. 19-CI-560 | |
| 2/22/21–2/23/21, 2/25/21–2/26/21, 3/11/21 | Trial in *J.B. v. Dusing*, Case No. 19-CI-560 | |
| 3/9/21 | Judge Mehling's Findings of Fact, Conclusions of Law and Orders, Case No. 19-CI-1945 | |
| 4/5/21 | Judge Mehling's Findings of Fact, Conclusions of Law, Orders and Judgment of Custody, Case No. 19-CI-560 | |
| 4/9/21 | | Pre-trial conference |
| 4/13/21 | Opposing counsel's Motion for Sanctions (noticed for hearing May 4, 2021), Case No. 19-CI-560 | Voir dire |
| 4/14/21 | | Opening statements; direct examination of Darren Stumberger |
| 4/15/21 | Mr. Dusing's Motion to Vacate 4/5/2021 Opinion (noticed for hearing May 4, 2021), Case No. 19-CI-560<br><br>Opposing counsel's Motion for Reconsideration of 4/5/2021 Opinion (noticed for hearing May 4, 2021), Case No. 19-CI-560 | Direct and cross examination of Darren Stumberger |
| 4/16/21 | Opposing counsel's Response to Respondent's List of Motions to Be Heard by the Court and Request for Rule 11 Sanctions and Award of Attorney's Fees, Case No. 19-CI-560 | Cross examination of Darren Stumberger |
| 4/19/21 | Mr. Dusing's Motion to Continue (noticed for hearing May 4, 2021), Case No. 19-CI-560 | Direct, cross, redirect, and recross examination of Richard Misiano; direct and cross examination of Alan Levy; direct examination of Joseph Redotey |
| 4/20/21 | | Cross, redirect, and recross examination of Joseph Redoutey; |

i

| | | direct, cross, and redirect of Hayden Novikoff; direct examination of Eric Rohr |
|---|---|---|
| 4/21/21 | | Direct examination of Eric Rohr |
| 4/22/21 | Opposing counsel's Response to Motion to Continue (noticed for hearing May 4, 2021), Case No. 19-CI-560

Opposing counsel's Response to Motion to Vacate and Motion for Sanctions (noticed for hearing May 4, 2021), Case No. 19-CI-560 | Direct and cross examination of Eric Rohr |
| 4/23/21 | Kentucky Court of Appeals' Order denying Mr. Dusing's motion for writ of mandamus | Cross examination of Eric Rohr |
| 4/26/21 | | Redirect and recross examination of Eric Rohr; direct and cross examination of Glenwood Haddock; direct and cross examination of Dennis Hamilton |
| 4/27/21 | | Defense case begins: direct, cross, and redirect examination of Stuart Cantor; direct examination of Mr. Hild |
| 4/28/21 | Opposing counsel's Motion for Attorney's Fees (noticed for hearing May 4, 2021), Case No. 19-CI-560 | Direct, cross, redirect, and recross examinations of Mr. Hild |
| 4/29/21 | Judge Mehling's Order denying Mr. Dusing's motion to continue, Case No. 19-CI-560 | Summations |
| 4/30/21 | | Verdict |
| 5/3/21 | Mr. Dusing's Motion to Continue (noticed for hearing May 4, 2021), Case No. 19-CI-560

Mr. Dusing's Fifth Motion for Disqualification of Presiding Judge (noticed for hearing May 4, 2021), Case No. 19-CI-560 | |
| 5/4/21 | Hearing, Case No. 19-CI-560 | |
| 5/5/21 | Mr. Dusing's Notice of Appeal of 4/5/21 Opinion, Case No. 19-CI-560 | |
| 5/6/21 | Judge Mehling's Order denying Mr. Dusing's motion to continue, Case No. 19-CI-560 | |
| 5/26/21 | Judge Mehling's Order denying Mr. Dusing's motions to vacate 4/5/21 opinion, Case No. 19-CI-560 | |
| 7/14/21 | Order scheduling hearing for Mr. Dusing to "be sentenced on September 10, 2021," Case No. 19-CI-560 | |
| 9/10/21 | Hearing scheduled, No. 19-CI-560 | |