UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                          :

UNITED STATES OF AMERICA

                                          :

         - v. -

                                            :      19 Cr. 602 (RA)

MICHAEL HILD,

                                          :

               Defendant.

                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL</u>

 

 

AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Scott Hartman
Jordan Estes
Assistant United States Attorneys

     - Of Counsel -

## TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ................................................................. 1

    A. Procedural History ....................................................................................................... 1

    B. The Government's Case .............................................................................................. 1

    C. Background on Live Well and the Bond Portfolio ..................................................... 2

    D. The Beginning of the Fraudulent Scheme ................................................................. 4

    E. The Fraudulent Financial Statements ........................................................................ 5

    F. The Shareholder Buyout ............................................................................................. 6

    G. The Liquidity Events in February and March 2017 ................................................... 6

    H. The End of the Fraudulent Scheme ........................................................................... 7

I. THE EVIDENCE WAS SUFFICIENT TO SUSTAIN HILD'S CONVICTIONS ..................................... 8

    A. Applicable Law .......................................................................................................... 8

    B. There Was Sufficient Evidence that Hild Engaged in a Scheme to Defraud ................. 10

        1. Applicable Law ................................................................................................... 10

        2. Discussion ........................................................................................................... 11

    C. There Was Sufficient Evidence of Hild's Intent to Defraud ........................................ 16

        1. Applicable Law ................................................................................................... 16

        2. Discussion ........................................................................................................... 16

II. HILD RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL ......................................... 19

    A. Applicable Law ........................................................................................................ 20

        1. Conflicts of Interest ............................................................................................ 20

        2. Right to a Hearing .............................................................................................. 21

    B. Discussion ................................................................................................................ 22

        1. No Actual Conflict Existed ................................................................................. 23

        2. Hild Cannot Show a Lapse in Representation ................................................... 28

        3. The Record is Sufficient for the Court to Reject the Defendant's Claims .................... 31

III. A NEW TRIAL IS NOT WARRANTED ON OTHER GROUNDS ................................................... 32

    A. Applicable Law ........................................................................................................ 32

    B. The Government Did Not Elicit Improper Opinion Testimony ..................................... 33

        1. Applicable Law ................................................................................................... 33

2. There Was Nothing Improper About Dennis Hamilton's Testimony ........................... 34

3. There Was Nothing Improper About Testimony That Scenario 14 Was "Wrong" ...... 35

C. There Was No Constructive Amendment or Prejudicial Variance ................................. 37

1. Applicable Law ............................................................................................... 37

2. Discussion ...................................................................................................... 38

D. The Weight of the Evidence Supports a Conviction ....................................................... 40

1. Applicable Law ............................................................................................... 40

2. Discussion ...................................................................................................... 40

CONCLUSION ............................................................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Armienti v. United States*, 234 F.3d 820 (2d Cir. 2000) ............................................ 20, 23, 24, 25

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ................................................................ 33

*Burger v. Kemp*, 483 U.S. 776 (1987) ............................................................................. 20, 29

*CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), ......... 15

*Ciak v. United States*, 59 F.3d 296 (2d Cir.1995) ....................................................................... 27

*Herrera v. Russi*, No. CV-95-187 (CPS), 1996 WL 651017 (E.D.N.Y. Nov. 6, 1996) ......... 26, 27

*Holland v. United States*, 348 U.S. 121 (1954) ............................................................................. 9

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) .................................................. 16, 39

*LoCascio v. United States*, 395 F.3d 51 (2d Cir. 2005) ..................................................... 21, 28, 30

*Mathis v. Hood*, No. 87 Civ. 6234 (RPP), 1990 WL 100869 (S.D.N.Y. July 11, 1990) ............. 26

*Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245 (2d Cir. 2014) .................................. 16, 39

*Mickens v. Taylor*, 535 U.S. 162 (2002) ..................................................................... 20, 21, 27

*Morelli v. United States*, 285 F. Supp. 2d 454 (D.N.J 2003) ........................................................ 24

*Puglisi v. U.S.*, 586 F.3d 209 (2d Cir. 2009)..................................................................... 22, 32

*Rugiero v. United States*, 330 F. Supp. 2d 900 (E.D. Mich. 2004)............................................... 26

*Sealed Appellee v. Sealed Appellant*, 900 F.3d 663 (5th Cir. 2018)............................................ 32

*Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363 (2d Cir. 1988)...................................... 33

*Strickland v. Washington,* 466 U.S. 668 (1984) ........................................................................ 30

*United States v. Aguilar*, 585 F.3d 652 (2d Cir. 2009) .................................................................. 8

*United States v. Aiello*, 814 F.2d 109 (2d Cir. 1987).................................................. 21, 22, 29, 32

*United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018) ..................................................................... 15

*United States v. Baker*, 899 F.3d 123 (2d Cir. 2018).................................................................... 19

*United States v. Bell*, 584 F.3d 478  (2d Cir. 2009)...................................................................... 33

*United States v. Brown*, 623 F.3d 104 (2d Cir. 2010)................................................................... 19

*United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984)................................................................ 26

*United States v. Cote*, 544 F.3d 88 (2d Cir. 2008)....................................................................... 33

*United States v. Cuti, 720 F.3d 453 (2d Cir. 2013)* .................................................................... 33

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) .............................................................. 38

*United States v. Dove*, 884 F.3d 138 (2d Cir. 2018)..................................................................... 38

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ................................................................... 38

*United States v. Ebbers, 458 F.3d 110 (2d Cir. 2006)*................................................................. 14

*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008)................................................................... 9

*United States v. Espaillet*, 380 F.3d 713 (2d Cir. 2004) ................................................................ 8

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) .............................................................. 40

*United States v. Florez*, 447 F.3d 145 (2d Cir. 2006) ................................................................... 19

*United States v. Gambino*, 864 F.2d 1064 (3d Cir. 1988) .................................................. 21, 26, 30

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005).................................................................. 34

*United States v. Giovannetti, 919 F.2d 1223 (7th Cir. 1990)* ...................................................... 33

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002)................................................................. 9, 15

*United States v. Gordon*, 987 F.2d 902 (1993) ............................................................................ 10

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) .............................................................. 9

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008). ................................................................. 8

*United States v. Iorizzo*, 786 F.2d 52 (2d Cir. 1986) ............................................................ 19, 21

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) ................................................................ 9

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) .................................................................... 40

*United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013) .................................................................... 15

*United States v. Johansen*, 56 F.3d 347 (2d Cir. 1995) .............................................................. 38

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) ................................................................. 33

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) ................................................................. 40

*United States v. Levy*, 25 F.3d 146 (2d Cir.1994) ................................................................. 21, 31

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) ............................................................... 9

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) ........................................................... 32

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) ..................................................... 9, 38

*United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987) ......................................................... 26

*United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) .............................................................. 15

*United States v. Mucciante*, 21 F.3d 1228 (2d Cir. 1994) .......................................................... 38

*United States v. Natelli*, 527 F.2d 311(2d Cir. 1975) ................................................................. 18

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ............................................................... 8, 9

*United States v. Rea, 958 F.2d 1206 (2d Cir. 1992)* .................................................................. 34

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................................................. 14

*United States v. Rogers*, 209 F.3d 139 (2d Cir. 2000) ................................................................ 20

*United States v. Salmonese*, 353 F.3d 608 (2d Cir. 2003) .......................................................... 38

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ............................................................ 33

*United States v. Santos*, 541 F.3d 63 (2d Cir. 2008) .................................................................... 9

*United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002) ................................................................ 21

*United States v. Shellef*, 732 F. Supp. 2d 42 (E.D.N.Y. 2010) ................................................... 33

*United States v. Skop*, 846 F.3d 135 (2d Cir. 1988) ................................................................... 36

*United States v. Temple*, 447 F.3d 130 (2d Cir. 2006) .............................................................. 8, 9

*United States v. Triumph Capital Group, Inc.*, 544 F.3d 149 (2d Cir. 2008) ............................... 9

*United States v. White*, 2021 WL 3354983 (2d Cir. Aug. 3, 2021) ............................................ 15

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ................................................... 34, 35, 36

*Winkler v. Keane*, 7 F.3d 304 (2d Cir. 1993) ............................................................................. 30

# Rules

Fed. R. Crim. P. 33 ...................................................................................................................... 32

Fed. R. Evid. 602 ......................................................................................................................... 33

Fed. R. Evid. 701 ......................................................................................................................... 33

The Government respectfully submits this memorandum in opposition to defendant's motion for a judgment of acquittal or a new trial following his conviction on April 30, 2021 on securities fraud, wire fraud, and bank fraud offenses.  As discussed below, the motion should be denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural History

Indictment 19 Cr. 602 (RA) (the "Indictment") was unsealed on August 29, 2019, and charged defendant Michael Hild in five counts. Count One charged Hild with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Count Two charged Hild with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349. Count Three charged Hild with substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2. Count Four charged Hild with substantive wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and Count Five charged Hild with substantive bank fraud, in violation of 18 U.S.C. §§ 1344 and 2.

Trial against Hild began on April 13, 2021. On April 30, 2021, the jury found Hild guilty of all five counts of the Indictment.

### B.  The Government's Case

The evidence at trial established that Hild, along with others at his company, Live Well Financial ("Live Well"), engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of bonds owned by Live Well in order to induce various lenders into loaning more money to Live Well than they otherwise would have had they known the actual value of Live Well's bond portfolio. The scheme allowed Live Well to grow its bond portfolio exponentially, from approximately 15 bonds with a stated value of approximately $50 million in 2014 to approximately 50 bonds with a stated value of over $500 million by the end of 2016. In May 2019, in conjunction

with an effort to wind down the company, Live Well wrote down the value of its portfolio by over $200 million.

The Government presented the testimony of eight witnesses, including testimony from two members of the scheme, Eric Rohr and Darren Stumberger. The Government also introduced over 140 exhibits, including recorded calls, showing Hild's knowing and willful participation in scheme.

### C.  Background on Live Well and the Bond Portfolio

Live Well was a private company based in Richmond, Virginia that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages ("HECMs"). (Tr. 944-47). Hild founded Live Well and was its Chief Executive Officer and largest shareholder. (Tr. 944-45, 1089, 1131-32; GX 321).

In or about 2014, at Hild's direction, Live Well acquired a portfolio of bonds, each entitling the holder to receive a portion of the interest payments, but not the principal payments, from a particular pool of reverse mortgages ("HECM IO bonds."). (Tr. 58-59, 951-52, 968-69). Live Well purchased the HECM IO bond portfolio from Stifel for approximately $50 million. (Tr. 72-73). At the same time that Live Well purchased the HECM IO bond portfolio, Hild hired three employees of Stifel, including Stumberger, to manage and grow the newly acquired bond portfolio. (Tr. 73-74, 969). Stumberger and the other two employees were referred to as the trading desk, and they worked out of offices in New York and New Jersey. (Tr. 73, 970).

Live Well financed the acquisition and growth of its bond portfolio through a series of loans in which Live Well used the bond portfolio as collateral. (Tr. 76-77, 731-32, 952, 1002, 1061). Many of Live Well's lenders were securities dealers whose lending arrangements with Live Well were structured as bond repurchase agreements, also known as "repo agreements." (Tr. 76-77, 568-72, 672-75, 953-54). A repo agreement is a short-term loan in which both parties agree to

the sale and future repurchase of an asset within a specified contract period. (Tr. 76-77, 572-75). The seller sells the asset to the lender with a promise to buy it back at a specific date and at a price that includes an interest payment. (Tr. 572-75). Functionally, a repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. (Tr. 76-77). When the loan is repaid by the borrower, the collateral is returned to the borrower through a repurchase. (Tr. 572-75). In practice, the loans were frequently "rolled" at the end of the term into a new short-term loan. (Tr. 574, 675, 850-51).

Additionally, at least one of Live Well's lenders was an FDIC-insured bank, and its lending arrangement with Live Well was structured as a secured loan, with certain bonds held as collateral by a third-party custodian. (Tr.  729, 731).

Live Well's financing agreements with all but one of the lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to determine the market value of the bond as of the measurement date. (Tr. 79-80, 598-600, 697, 1069-70; GX 603, 702, 1003). The lenders generally relied on a widely utilized subscription service, Interactive Data Corporation ("IDC"), to price various securities. (Tr. 600, 697, GX 603, 1003). The lenders used the IDC price to determine the amount of money to lend to Live Well. (Tr. 575, 600). The lenders would not lend Live Well an amount equivalent to the price of the collateral; rather, they took a 10-20% haircut off that price to protect against market risk. (Tr. 81, 573-76). In the event of a default by Live Well, the lenders could sell the collateral to recoup the money they lent Live Well. (Tr. 573, 674; GX 603, 702, 1003).

When Live Well first obtained the bond portfolio IDC did not yet have the capability to value the bonds itself, so IDC agreed it would take "broker quotes" from Live Well on a temporary

basis, until IDC could provide its own evaluated pricing of the bonds. (Tr. 83-84, 971, 1535). By

at least early 2015, IDC was using its own pricing model to value the bonds. (Tr. 84).

Hild and others at Live Well were unhappy with IDC's prices of the bonds. (Tr. 85-87,

972). After a discussion with IDC, in February 2015, Live Well and IDC agreed that they would

return to the "broker quote" system, in which Live Well provided IDC its prices for the bonds. (Tr.

87-89, 978-79; GX 104). IDC then published those prices verbatim. (GX 978-79, 1014-15; GX

104). There was no disclosure from IDC of who the broker quotes came from; nor did Live Well

disclose its role in broker quotes to its lenders. (Tr. 603, 623, 997-1012, 1017).

### D.   The Beginning of the Fraudulent Scheme

The fraudulent scheme began in or about September 2015, when Hild and his co-

conspirators began using a certain method of pricing the bonds. (Tr. 993-94). Rather than price the

bonds as the market would price them, Hild asked the bond traders to run pricing "scenarios," with

varying inputs, to see how those different inputs affected the price. (Tr. 95-98; GX 113). Hild

selected the price that would go to IDC based on the scenario he liked best, which was typically

the scenario that provided Live Well with the most liquidity. (Tr. 103-04).

Hild and his co-conspirators ultimately selected a particular scenario – "Scenario 14" – to

use in the pricing of the bonds. (Tr. 105-06, 114-15, 993-96). Among other things, Scenario 14 did

not account for the "yield" (*i.e.*, the return an investor sees on the bond) demanded by the market,

which generally required the price of a bond to be lowered each month to maintain that high yield.

(Tr. 110-15, 994).

As a result, the bond prices under Scenario 14 increased dramatically. (Tr. 1009, 1027-29,

1068; GX 1600). For example, after pricing bonds that were acquired in September 2015 with

Scenario 14 methodology, those bonds alone increased in value by approximately $11 million. (Tr.

1028-29; GX 120).

Hild and his co-conspirators were well-aware that the prices under Scenario 14 were not obtainable in the market and that, if the lenders scrutinized the IDC marks and learned this fact, they would either end the lending relationship or significantly reduce the amount of money they were willing to lend to Live Well. (Tr. 993-1011; GX 401, 403, 404). To hide the scheme from the lenders and IDC, Hild directed that the trading desk use a "glide path" to implement the Scenario 14 prices. (Tr. 1009; GX 402). On recorded calls, Hild explained that the glide path was to avoid triggering "alarm bells all over the place." (Tr. 1009; GX 402). The conspirators thus concealed from lenders (i) that they were supplying prices to IDC; and (ii) that the marks published by IDC did not reflect market realities. (Tr. 993-1011; GX 401, 403, 404). Indeed, because the markups under Scenario 14 generally exceeded the haircuts of the repo lenders, with the markups, the lenders no longer had any protection against market risk. (Tr. 128-29, 1002). If Live Well defaulted, there was virtually no chance that the lenders could sell the bonds on the market to cover the amount owed by Live Well. (Tr. 1007, 1143, 1160, 1171).

Ultimately, due to the asset overvaluation and the purchase of additional bonds using the capital generated by the scheme, Live Well grew the purported value of its bond portfolio to over $500 million by December 2016. (Tr. 1069; GX 1600).

### E.  The Fraudulent Financial Statements

In addition to providing inflated bond prices to IDC, Hild and his co-conspirators also deceived Live Well's lenders by misrepresenting the value of the bond portfolio in Live Well's financial statements. The bond portfolio was Live Well's largest asset, and Live Well used the same inflated Scenario 14 bond values in the financial statements, making it appear that Live Well's assets were more valuable than they really were. (Tr. 1081-89; GX 310, 312, 314). Live Well falsely represented that it valued the bond portfolio at "exit prices" – that is the price for which a buyer and seller would transact. (Tr. 1085; GX 310, 312, 314). Live Well similarly used

inflated Scenario 14 prices to calculate Live Well's revenue on the bond portfolio. (Tr. 1083-84; GX 310, 312, 314). The lenders relied on these fraudulent financial statements in determining how much credit to extend to Live Well. (Tr. 595-98, 688-93).

### F.   The Shareholder Buyout

In addition to using the liquidity generated by the scheme to expand Live Well's bond portfolio, in or about September 2016, Hild used $18 million generated from the repo lenders to buy out the preferred stockholders in Live Well. (Tr. 1128-31; GX 311). The elimination of the preferred stockholders gave Hild control of the company and allowed him to substantially increase his personal compensation. (Tr. 1131-41). Accordingly, Hild's compensation jumped from approximately $1.4 million in 2015, to approximately $5 million in 2016, approximately $9.7 million in 2017, and over $8 million in 2018. (Tr. 565-67; GX 2000).

### G.   The Liquidity Events in February and March 2017

The fraudulent scheme escalated in early 2017 after one of the repo lenders, Wedbush, asked Live Well to have a broker provide a price for one of the bonds Wedbush was lending against. (Tr. 1142). Hild and his co-conspirators discussed how to address the issue on a call, because having a broker price the bond could result in the lenders discovering that the bonds values were fraudulently inflated. (Tr. 1145; GX 407). They discussed going to a "slimy" broker who would be willing to help out with their fraudulent scheme. (Tr. 1147; GX 407).

Shortly after that issue with Wedbush, Wedbush told Live Well that it wanted to reduce Live Well's credit line and stop lending against certain bonds known as "MACRs." (Tr. 1157). Wedbush's request caused a liquidity crisis, because Live Well needed to pay down its debt to Wedbush, and it could not do so by selling the bonds, because the bonds could not be sold on the market at their fraudulently inflated values. (Tr. 1157-60). Hild described the liquidity crisis as a "catastrophe." (Tr. 1164; GX 151). Indeed, Rohr testified that if Live Well defaulted on its debt to

Wedbush, that would create cross-defaults with other lenders, likely leading to the company's insolvency. (Tr. 1164).

To survive the liquidity crisis, Hild ordered that the trading desk inflate the bond prices in IDC above the already-inflated Scenario 14 prices. (Tr. 1167). Hild provided no justification for the price increases, which Rohr said made him "sick to [his] stomach." (Tr. 1168). The trading desk ultimately marked up the portfolio by over $36 million. (Tr. 1172; GX 408). At Hild's direction, they implemented the price increases incrementally, to avoid raising red flags with IDC or the lenders. (Tr. 1172-73; GX 408). Shortly after those price increases were implemented, Live Well entered into new lending relationships with Flagstar Bank ("Flagstar") and Mirae Asset Securities ("Mirae"). (Tr. 1186-94).

## H.  The End of the Fraudulent Scheme

In the summer of 2017, Live Well reversed the price increases that were implemented in February and March 2017 to survive the liquidity crisis, but the bond prices remained at the fraudulently inflated Scenario 14 values. (Tr. 1196-97). Shortly thereafter, Live Well received a subpoena from the United States Securities and Exchange Commission ("SEC"), and thereafter the prices in IDC remained static, at above-market Scenario 14 levels. (Tr. 1205).

In or about 2018, two of Live Well's repo lenders, Mirae and the Industrial and Commercial Bank of China ("ICBC"), began questioning the high pricing for Live Well's bonds. (Tr. 1205-08). Both lenders tried to reduce the amount they were lending to Live Well, but Live Well did not have the money to pay down the debt. (Tr. 606-11, 1208).

Around that time, Rohr began considering leaving Live Well, because, as he put it, he was "morally bankrupt." (Tr. 1213). Rohr told Hild he was thinking of leaving, and Hild warned him that they "potentially could face criminal charges if the lenders lost money." (Tr. 1215). Around that time, Rohr asked Hild to reduce Hild's compensation, in an effort to generate more liquidity

for the company to help pay the lenders back. (Tr. 1215). Hild refused. (Tr. 1216). Rohr did not return to work after that. (Tr. 1216).

Hild replaced Rohr with Glen Haddock, who had no knowledge of the fraudulent scheme. (Tr. 1601-12). In or about May 2019, Haddock informed Hild that he would not sign the company's interim financial statements because he believed that the company's carrying value for the bond portfolio was significantly overstated. (Tr. 1616-17). In or about May 2019, Live Well announced that it would cease operations and unwind. (Tr. 1617-18). After the announcement of Live Well's closing, Haddock provided a balance sheet to Live Well's lenders showing that Live Well had reduced the value of its bond portfolio by over $200 million. (Tr. 1620-22; GX 323).

## I.  The Evidence Was Sufficient to Sustain Hild's Convictions

### A.  Applicable Law

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011); *accord United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009).  A jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quotation marks and citation omitted).  A court may overturn a conviction "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *See United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quotation marks omitted).  The Second Circuit's review of such a claim is "exceedingly deferential." *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government.  *See United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006).  The Court must analyze the pieces of evidence "in conjunction, not in isolation," *Persico*, 645 F.3d at 104 (internal quotation marks omitted) (quoting *United*

States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).  The Court must also "credit [ ] every inference that the jury might have drawn in favor of the government," *Temple*, 447 F.3d at 136-37 (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).  "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

"In order to avoid usurping the role of the jury, courts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 158-59 (2d Cir. 2008) (quotation marks and citations omitted); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).  Moreover, "'the jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).  Because the jury is entitled to choose which inferences to draw, the Government, in presenting a case based on circumstantial evidence, "need not 'exclude every reasonable hypothesis other than that of guilt.'" *Guadagna*, 183 F.3d at 130 (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)).

In a conspiracy case, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quotation marks omitted).  As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it

with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906-07 (1993).

### B. There Was Sufficient Evidence that Hild Engaged in a Scheme to Defraud

Hild first contends that the Government failed to prove a scheme to defraud because the evidence was insufficient to prove that the bond values were inflated. In doing so, Hild falls back on his argument that he believed that the inflated values were the "intrinsic value" of the bonds. (*See* Memorandum of Law ("Mem.") at 5-10). Hild's argument misses the point: regardless of how *Live Well* valued the bonds intrinsically, Hild knew the *market* valued the bonds differently, and he hid from his lenders that the prices were not market value. The evidence overwhelmingly established that Hild defrauded his lenders by causing them to extend credit based on bond prices that he knew were well above market value.

#### 1. Applicable Law

As the Court instructed the jury, for securities fraud, the Government was required to prove that the defendant did any one of the following:

> (1) employed a device scheme or artifice to defraud, or
>
> (2) made an untrue statement of material fact or omitted to state a material fact which made what was said under the circumstances misleading, or
>
> (3) engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller.

(Tr. 2274). As the Court further instructed the jury, fraud "includes all kinds of manipulative and deceptive acts, whether by making false statements or otherwise," and the fraud "need not relate to the investment value of the securities involved in this case." (Tr. 2275). In addition, the Court instructed the jury that "[i]ntentionally deceitful statements or half-truths or the concealment of

10

material facts…also may constitute false or fraudulent statements under the statute." (Tr. 2275-76).

Similarly, with respect to wire fraud, the Court instructed the jury that a scheme to defraud is "a plan to deprive another of money or property by trick, deceit, deception, swindle, or overreaching." (Tr. 2287).  The Court further instructed the jury that "even if you find that the statements the government contends were made or contemplated by the defendant in furtherance of the scheme were literally true, you can still find that the first element of the wire fraud statute has been satisfied if the statements and/or conduct of the defendant were deceptive." (Tr. 2288).

### 2.  Discussion

Viewing the evidence in the light most favorable to the Government, the evidence was more than sufficient to find that Hild engaged in a scheme to defraud Live Well's lenders. The evidence firmly established that at Hild's direction, Live Well submitted above-market bond prices to IDC and concealed from the lenders that (i) the prices were not market values, and (ii) Live Well was secretly behind the IDC prices. The evidence further established that Live Well used the above-market values in its financial statements, thus deceiving Live Well's lenders into believing that Live Well had more assets and revenue then it actually did. (Tr. 595-98).

Rohr and Stumberger testified extensively about the scheme to defraud and how they deceived the lenders. As they both explained, Scenario 14 was initially part of an academic exercise to come up with the value of the bonds if they were held to maturity. (Tr. 110-14, 993-95). Then there was an inflection point: they had to choose whether to submit the Scenario 14 prices to IDC, and whether to educate the market and their lenders on the prices. (Tr. 996-1015). Hild and his co-conspirators discussed how the lenders wanted market value prices, how they wanted prices that came from an independent source, and how the lenders would be at risk if they had to sell the bonds into the market. (Tr. 997-1008). Nonetheless, at Hild's direction, they began

11

submitting the above-market Scenario 14 prices to IDC. (Tr. 115, 996).

The evidence overwhelmingly established that the prices submit to IDC were above market value. Rohr and Stumberger both testified that the prices were above market value (Tr. 115 ("by lowering the yield that dramatically, it would be a departure or a break from where the market how the market was doing it"); Tr. 996 ("we felt like the value of the bonds were higher than what the market was valuing the bonds"), and their testimony was supported by numerous exhibits.

For example, the jury heard multiple phone calls where Hild and his co-conspirators discussed that the bonds were not market value:

- On a September 9, 2015 call, Rohr told Hild and others that they were "way out in front of the market," meaning "the market's way undervaluing it," but he cautioned they would face a tough situation if they had to sell their portfolio into the market. (GX 402).

- On a September 10, 2015 call, Hild stated that, with respect to their Scenario 14 methodology, "the market doesn't look at it this way…I mean, we've already established that." (GX 403).

- On a January 14, 2016 call, Hild asked to compare "current market pricing" versus "what the inherent markup would be to the full SC14." (GX 406).

- On a January 12, 2017 call, Stumberger told Hild how the market "offers bonds a certain way…May not be right, or proper, or sound, but that's what's gonna be defined as the market." (GX 407).

The jury could also infer that the IDC prices were not market value by the fact that Live Well was purchasing bonds at one price and then immediately marking them up 20%. (Tr. 1018-20, 1028-29; GX 117; 120). Hild described this process as a "self-generating money machine," because Live Well's lenders would lend against the marked-up Scenario 14 values, and thus on many occasions, the lenders would give Live Well more money than the price it paid for the bonds, resulting in "extra money coming back to [Live Well's] pocket." (Tr. 1001-02, GX 402). As the lenders testified, this was precisely the opposite of how the repo agreements were supposed to

12

work: the lenders intended to lend *less* than the market value of the bond, so that even if there were fluctuations in market price, they could recoup the amount they were owed. (Tr. 573, 576). To that end, Rohr testified that he knew doing this was "wrong," because he believed the lenders would be concerned if they knew Live Well was buying the bonds at one price and they were lending against a higher price that what Live Well paid. (Tr. 1002-03).

Despite this wealth of evidence, Hild argues that the proof at trial was insufficient because there was not expert testimony that "an educated buyer who understood Scenario 14 would not have paid Scenario 14 prices." (Mem. at 5). This argument misses the point. Hild deceived the lenders by causing them to lend against bond prices that he knew were above market value. As the lenders testified, they cared about how the market valued the bonds, because they needed to know how much they could liquidate the bonds for if Live Well could not repay its debt. (Tr. 575, 600-01, 676). In fact, Hild expressly discussed this point with Stumberger on a recorded call:

> DARREN:    I don't think [Wedbush] cares about that. [Wedbush] cares about what is the market…the market is going to be defined as something that is an 8 or 9% yield to 50 HPC…on the sell side…That's what he's gonna get from, we know, the guys who are pedaling the paper. May not be right, or proper, or sound, but that's what's gonna be defined as the market. That's just realistic.

> MICHAEL:    There's no debating that.

(GX 407).

Hild argues that the evidence showed that the market would pay higher prices for the bonds in the event Scenario 14 was disclosed to the market. (Mem. at 7). But it is irrelevant what the market would have done in a hypothetical world where Hild and his co-conspirators revealed their Scenario 14 methodology to the market or Live Well's lenders. They chose not to do so. And in making that choice, they locked their lenders into their Scenario 14 investment thesis, without any disclosure that the prices were above market value, that Live Well had purchased the bonds for

substantially lower prices, and that Live Well was feeding prices to IDC. This conduct was unquestionably deceptive, as corroborated by the testimony of the lenders, who made clear that they would not have lent the money they did had they known the truth. (Tr. 608, 703).

Moreover, there is no evidence to suggest that the market would have actually paid higher prices for the bonds if Scenario 14 were disclosed. To the contrary, the jury heard testimony from one of Hild's victims, Richard Misiano, that after learning how HECM IO bonds were priced, Mirae determined the Live Well's Scenario 14 prices were as much as 50% above market value. (Tr. 605).

Hild next suggests that the Government's evidence is insufficient because the Government failed to offer expert testimony of how "an *educated* buyer who understood Scenario 14" would have valued the bonds. (Mem. at 8). But there is no requirement that the Government introduce expert testimony to establish securities fraud. *See United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007) (holding that the Government need not present expert testimony about accounting principles to establish securities fraud); *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) (in accounting fraud case, explaining that the "government is not required in addition to prevail in a battle of expert witnesses over the application of individual GAAP rules"). A scheme to defraud may be proven, as here, by testimony from lay witnesses with personal factual knowledge. *See Rigas*, 490 F.3d at 221. And here, witnesses testified that the values provided to IDC and the lenders were inflated, above-market values. (Tr. 115, 994).

Hild further argues that the Government's fraud theory is undercut by evidence showing that the bonds were illiquid and hard to value. (Mem. at 8-9). But as Misiano testified, if anything, the illiquidity of the market would exert *downward* pressure on the bond prices, resulting in lower, not higher prices. (Tr. 589). Moreover, Hild's trial counsel presented these same arguments to the

jury, where they were rejected, and Hild's counsel now has shown no basis to question the jury's findings. *See United States v. White*, 2021 WL 3354983, at *7 (2d Cir. Aug. 3, 2021) ("We defer to the jury's rational determinations 'of the weight of the evidence,' 'the credibility of the witnesses,' and 'choice of the competing inferences that can be drawn from the evidence.'" (quoting *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998)).

Hild also repeatedly claims that this Court must grant his Rule 29 motion for acquittal because "is equally consistent with Mr. Hild's innocence'" (Mem. at 7). Putting aside the factual infirmity of this argument (addressed above), it misstates the law. The Second Circuit has clarified that the "equipoise rule" invoked by Hild, which derives from *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002), applies "only where the evidence 'is nonexistent or so meager' as to *preclude* the inferences necessary to a finding favorable to the government.'" *United States v. Aquart*, 912 F.3d 1, 44-45 (2d Cir. 2018) (emphasis added) (citing *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013)). That is not the case here, where direct evidence established Hild's guilt.

Finally, Hild's citation to the market manipulation case *CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), is inapposite for two principal reasons. First, *Wilson* was a decision following a bench trial, and accordingly, there was no basis to defer to a jury's determinations. Second, in *Wilson*, Judge Sullivan—the factfinder—found that the CFTC had offered no evidence demonstrating that the relevant prices were artificially high. *Wilson*, 2018 WL 6322024, at *13. In contrast, here, there was a wealth of evidence that the Scenario 14 prices, and the even further inflated prices in February and March 2017, were well higher than market value. (Tr. 115, 994-1009, 1065, 1167-74, 1184-85.)

### C.  There Was Sufficient Evidence of Hild's Intent to Defraud

#### 1.  Applicable Law

As the Court instructed the jury, to prove intent to defraud, the Government "need only prove that the defendant acted with an intent to deceive, manipulate or defraud. The government need not show that the defendant acted with an intent to harm." (Tr. 2281). The Court further instructed that "a belief by a defendant, if such belief existed, that ultimately everything would work out so that no investors would lose any money or that particular investments would ultimately be financially advantageous for clients does not necessarily constitute good faith." (Tr. 2281-82). Thus, "[a]s a practical matter . . . the government must establish beyond a reasonable doubt that the defendant knew that his conduct was calculated to deceive and that he nevertheless associated himself with the alleged fraudulent scheme." (Tr. 2282).

#### 2.  Discussion

Hild next argues that there was insufficient evidence of his criminal intent. In particular, Hild argues that he had no duty to disclose to his lenders that Live Well was secretly providing prices to IDC or that Live Well was providing IDC prices that were not market value. (Mem. at 12). But it is well established that "'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014)); *see also Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not ... a defense to ... liability[,] because upon choosing to speak, one must speak truthfully about material issues.").

Here, Live Well had a duty to tell its lenders that it was providing prices to IDC because it entered into agreements with the lenders that provided for bond pricing by an independent, third-

party pricing service. (*See* GX 603). Hild and his co-conspirators understood that the lenders wanted the third party to be independent, so that the lenders would get an unbiased view of the market price of the bond. (Tr. 978, 997-98). Hild and his co-conspirators knew that IDC was *not* independent, because it was publishing Live Well's bond prices "verbatim." (Tr. 978-79, 1009-10, 1189; GX 104). And Hild and his co-conspirators knew that the lenders cared about market prices of the bonds, not Live Well's view as to the bonds' intrinsic value. (Tr. 993-1011; GX 401, 403, 404, 407). Under these circumstances, Hild was not "t[aking] advantage" of some cutting-edge valuation of the bonds (Mem. at 12); he was intentionally deceiving his lenders about the nature of IDC prices.

Hild's deception is illustrated by the steps he and others took to hide their scheme from the lenders. Hild and his co-conspirators recognized that if they implemented the above-market Scenario 14 values right away, the lenders and IDC might ask questions. (Tr. 1009). To avoid raising "alarm bells," Hild directed that the trading desk implement the Scenario 14 values incrementally, on a "glide path." (Tr. 1005-09; GX 402, 403). Hild gave the same direction during the liquidity crisis in February 2017, when Live Well increased the bond prices arbitrarily by over $36 million. (Tr. 1168-75; GX 408). And Hild directed that Live Well buy whole tranches of bonds, so that no one in the market could see that the prices for the Live Well's bonds did not match prices from comparable bonds in a tranche. (Tr. 1040-41; GX 416).

Hild argues that he kept the Scenario 14 methodology secret for "legitimate business reasons." (Mem. at 13). To be sure, there is nothing inherently wrong with keeping secret an investment thesis that views a security as undervalued by the market. The issue here is that Live Well could not purchase the bonds outright; it had to borrow money to do so. And in borrowing that money, Hild understood that Live Well's lenders lent money based upon the price the bonds

would sell in the market, rather than Live Well's proprietary views about how much the bonds were worth. (Tr. 993-1011; GX 401, 403, 404, 407). Nonetheless, at Hild's direction, Live Well kept secret that it controlled the IDC prices, and that the IDC prices were not market value. In doing so, Hild intentionally tricked the lenders into lending more than they otherwise would have.

Hild argues that his lack of intent is shown by the fact that "Live Well repeatedly disclosed to IDC and the lenders that the prices provided" could be based on estimates. (Mem. at 13). This argument is a reference to Live Well's "disclaimer," which was developed months after Scenario 14 was implemented, in an effort to provide cover for the above-market prices being submitted to IDC. (Tr. 153-55, 1078-79). But Hild's argument is misleading, because even if the disclaimer was linked on emails that went to the lenders, the lenders had no idea that Live Well was providing prices to IDC, so a disclaimer about prices was meaningless. (Tr. 608-09). If anything, the jury could draw the opposite inference from the disclaimer: that it shows that Hild and his co-conspirators knew what they were doing was wrong.

Hild also takes issue with the Government's proof that he received over $20 million in additional compensation as a result of the fraud. (Mem. at 14). While it is true that an executive's desire for more compensation is not necessarily indicative of a guilty mind, when paired with evidence that the additional compensation was a result of misleading lenders into lending more than they otherwise would have, this financial incentive provides powerful evidence that Hild's actions were intentional efforts to defraud the lenders and not the product of mistake or accident. As the Second Circuit has recognized, "proof of motive, where available, is often sufficient to convince a reasonable man of criminal intent beyond a reasonable doubt." *United States v. Natelli*, 527 F.2d 311, 318 (2d Cir. 1975)

Moreover, Hild's arguments about intent were raised at trial and rejected by the jury. Hild took the stand and denied participating in the fraudulent scheme. (Tr. 1982-83 ("Q: Mr. Hild, at any point in time, in relation to the subject matter that we have been discussing, did you have the intent to defraud anyone? A: Absolutely not"). Hild claimed to have acted in good faith.  (Tr. 1858, 1869, 2101-02). But the jury rejected his testimony as well as his defense of good faith, and he has shown no basis to question the jury's findings.  *See United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) ("'We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge,' particularly when . . . trial counsel already presented these same credibility arguments to the jury.") (quoting *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006)).

For all of these reasons, there was more than sufficient evidence that Hild acted with the intent to defraud.

## II.  Hild Received Effective Assistance of Counsel at Trial

Hild argues that he should be granted a new trial because former counsel suffered from actual, unwaived conflicts of interest.[1] To achieve the relief he seeks, Hild bears the burden of demonstrating (1) that an actual conflict existed, (2) that the conflict resulted in a lapse in representation, and (3) that Hild did not waive the conflict.  *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986). Moreover, because Hild was represented at trial by two competent attorneys, in order to establish a Sixth Amendment violation, he must establish a lapse in representation as to both Mr. Dusing and Ms. Lawrence.[2]  As discussed below, nothing in Hild's brief or the

---

[1] The Government agrees with Hild that it is appropriate and prudent for the Court to consider the defendant's ineffective assistance claims in the context of a motion for a new trial pursuant to Rule 33. (See Mem. at 28 (quoting *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010))).

[2] Affidavits from Mr. Dusing, Ms. Lawrence, and Jeffrey Otis, who represented Mr. Dusing in the Kentucky litigation, are attached as Exhibits 1, 2, and 3.

affirmations that were submitted in support of his motion comes close to carrying this burden, nor do they establish the necessary predicate to obtain a hearing on Hild's allegations.

### A.   Applicable Law

#### 1.   Conflicts of Interest

"A defendant's Sixth Amendment right to counsel includes a right to conflict-free representation." *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000). The Second Circuit recognizes three kinds of conflicts that can arise during representation of criminal defendants. *First,* per se conflicts of interest "are limited to situations where trial counsel is not authorized to practice law or is implicated in the very crime for which his or her client is on trial." *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (citation omitted). *Second*, an actual conflict of interest exists "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."  *Id.* at 824 (quotation marks omitted). *Third*, potential conflicts exist where the interests of a defendant and attorney may diverge, but the attorney's performance has not yet been affected. *See Mickens v. Taylor*, 535 U.S. 162, 171-72 (2002).

There is an actual conflict between lawyer and client "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Armienti*, 234 F.3d at 824 (internal quotation marks and citations omitted). In assessing whether an actual conflict exists, courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client" and "appropriately and necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Burger v. Kemp*, 483 U.S. 776, 784 (1987). In this regard, if an attorney "does not raise a defense on behalf of his client because to do so is not in that client's interest," the fact that such a strategy also benefits another person does not establish that the attorney labored under

a conflict of interest. *United States v. Gambino*, 864 F.2d 1064, 1071 (3d Cir. 1988). "To the contrary, that is a coincidence of interests." *Id.*

Moreover, while a defendant who has established that his attorney labored under an actual conflict of interest "need not prove prejudice," in order to establish a Sixth Amendment violation, he must still prove that "a lapse in representation resulted from the conflict." *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986) (internal quotation marks omitted omitted). *Accord United States v. Schwarz*, 283 F.3d 76, 91-92 (2d Cir. 2002) ("The finding of an actual conflict . . . is only the first step in determining whether [a defendant] has established his claim of ineffective assistance of counsel."). To prove a lapse in representation, a defendant must "demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Levy*, 25 F.3d 146, 157 (2d Cir.1994). "In other words, he must show that trial counsel chose not to undertake the alternative strategy because of his conflict." *LoCascio v. United States*, 395 F.3d 51, 56–57 (2d Cir. 2005) (internal quotation marks and alterations omitted). A "mere theoretical division of loyalties" is not sufficient to obtain relief. *Mickens v. Taylor*, 535 U.S. 162, 163 (2002).

### 2. Right to a Hearing

When considering a claim of ineffective assistance, whether in connection with a motion for a new trial or on collateral review, a district court need not hold an evidentiary hearing where affidavits submitted by the defendant and prior counsel fail to raise a genuine issue of material fact bearing on whether the defendant is entitled to relief. *United States v. Aiello*, 814 F.2d 109, 113-14 (2d Cir. 1987). To warrant a hearing on alleged ineffective assistance of counsel, the defendant's filing "must contain assertions of fact that [he] is in a position to establish by

21

competent evidence." *Id.* at 113. "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." *Id.*

"[W]hen the judge that tried the underlying proceedings also presides over [a claim of ineffective assistance], a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner." *Puglisi v. U.S.*, 586 F.3d 209, 214 (2d Cir. 2009) "The trial judge is [] in a position, based on the knowledge gained in the underlying criminal proceeding and on his or her role as a trier of fact in the [ineffective assistance] proceeding, to hold that the [defendant] had no chance of overcoming counsel's detailed explanation . . . ." *Id.* Where appropriate, summary disposition of claims of ineffective assistance "avoids the delay, the needless expenditure of judicial resources, and the burden on trial counsel and the government." *Id.* at 215 (internal citations and alterations omitted).

## B. Discussion

In support of his motion, Hild argues that the Court should grant a new trial because trial counsel labored under actual, unwaived conflicts of interest that impacted Hild's defense. Hild claims that Mr. Dusing was distracted from his defense of Mr. Hild by his personal legal troubles and that he was motivated to prematurely curtail the trial of this matter so that he could appear in Kentucky state court on a personal matter scheduled for May 4, 2021. As to Ms. Lawrence, Hild argues that her personal and professional relationship with Mr. Dusing, including her role as counsel in his family court cases, caused her to place Mr. Dusing's interests before Mr. Hild's.

Although Hild's motion recounts in lurid detail the salacious aspects of prior counsel's personal legal troubles, it falls far short of making the showing required to obtain a new trial or to trigger an evidentiary hearing on whether prior counsel rendered ineffective assistance. As discussed below, other than "conclusory assertions," *Aiello*, 814 F.2d at 113, Hild has provided no justification for his claim that counsels personal interests were adverse to his own. Nor has he

22

shown that the strategic decisions that counsel made at trial that he now questions were dictated or influenced by counsel's personal interests rather than his own.

### 1. No Actual Conflict Existed

In attempting to manufacture an actual conflict of interest, Hild cites three ways in which, he claims, Mr. Dusing's personal interests came into conflict with his own. First, he argues that the schedule in this matter conflicted with the schedule in the Kentucky matter, such that Mr. Dusing was motivated to prematurely curtail the trial in this matter. (Mem at 29). Second, he argues that Mr. Dusing was preoccupied with the Kentucky matter and thus unable to devote sufficient energy to his case. (Mem. at 28-29). Third, he claims that "Mr. Dusing apparently had reason to believe he faced potential disciplinary proceedings and investigations into the bribery of a witness in Kentucky, and thus had a personal interest in using Mr. Hild's trial to demonstrate that he was competent to practice law, and to provide a reason to forestall the Kentucky litigation." (Mem. at 30 (internal quotations and citations omitted).[3]

To carry his burden of demonstrating an actual, as opposed to a potential conflict, it is not enough for Hild to hypothesize ways in which counsel's interests could have diverged with his own. Rather, he must show that prior counsel were actually put in the position of choosing between Hild's interests and their own. *Armienti*, 234 F.3d at 824 (defendant seeking to show an actual conflict must establish that "attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."). Even in even in cases where the potential for divergent interests has been much greater than those that Hild hypothesizes here, such as where

---

[3] Hild also argues that former counsel solicited him and thereby deprived him of his right to counsel of his choice. (Mem. at 15 n.2). But as set forth in Mr. Dusing's Affidavit, Mr. Dusing did not do so. (Dusing Aff. ¶¶ 6-7). In any event, Hild cites no law to suggest that solicitation provides a basis for a new trial.

counsel was under investigation by the same United States Attorney prosecuting the defendant, courts have found no actual conflict where the factual record did not establish that counsel's interests and those of his client came into conflict. *See, e.g.*, *Armienti v. United States*, 313 F.3d 807, 814 (2d Cir. 2002) ("Because Armienti has failed to demonstrate that [trial counsel] was influenced by any alleged ties to the Gambino family or by the pending investigation, Armienti has failed to demonstrate an actual conflict wherein his interests and those of his lawyer diverged."); *Morelli v. United States*, 285 F. Supp. 2d 454, 467 (D.N.J 2003) (lawyer's personal interest in avoiding indictment for tax evasion were not "inconsistent, diverse or otherwise discordant with a full and thorough cross-examination of IRS agents," because "it would be absurd for Rehbock to have assumed that by foregoing zealous advocacy on behalf of his client, he could somehow curry favor with IRS witnesses.").

So too here, Hild has failed to articulate an actual conflict of interest that resulted from prior counsel's involvement in the Kentucky litigation. Regarding the overlap in timing, it is not unusual for lawyers to be involved in multiple litigations at the same time. Hild has not cited any authority (and the Government is aware of none) for the proposition that a lawyer's involvement in other litigation while on trial creates an actual or potential conflict of interest such that he could be deemed to have rendered ineffective assistance to the trial defendant. In any event, the record is clear that, to the extent the schedule in the Kentucky litigation conflicted with the schedule in this matter, counsel intended to and did prioritize this matter. Indeed, the motion to continue that Hild relies on to establish the presence of a conflict makes this fact clear, asserting that Mr. Dusing and Ms. Lawrence were "in New York City . . . . working around-the-clock, every single day (including weekends) as they try the federal criminal case of United States v. Michael Hild." (4/19/21 Mot. to Continue at 1, *J.B. v. Dusing*). Mr. Dusing has likewise represented that during

the Hild trial, he was "not aware of much of the activity" in the Kentucky litigation and that his

co-counsel in that matter "handled all the court filings." (Dusing Aff. ¶ 5). Moreover, although

Hild has asserted that Mr. Dusing and Ms. Lawrence were motivated to curtail the trial in this

matter so that they could appear at a May 4 hearing in the Kentucky matter, that argument is

significantly undercut by the apparently uncontested fact that neither Mr. Dusing nor Ms.

Lawrence appeared at that hearing, despite that the trial in this case had concluded several days

earlier. (*See* Dusing Aff. ¶ 5 ("To my memory, I cannot personally say that I was even aware at

the time that such a hearing had been scheduled or was occurring.")).

Similarly, there is no basis for Hild's speculative claim that counsel was preoccupied by

the Kentucky litigation such that they were inadequately prepared for trial in this matter. Hild notes

that on March 9, 2021, a Kentucky family court judge issued an order sanctioning Mr. Dusing and

sentencing him to 7 days in jail if he failed to complete 10 hours of community service within six

months.  (Mem. at 16, 29). But it is simply implausible that this order, which was issued a month

before trial in this case, was a significant distraction or that Mr. Dusing was unable to focus on the

trial because he was preoccupied by the need to perform 10 hours of community service at some

point between March and September. Similarly, Hild suggests that Mr. Dusing's participation in a

family court trial in February and March 2021 unduly distracted him from preparing for the trial

in this matter. (Mem. at 17). Yet, again, it is not uncommon for lawyers to work on multiple matters

at the same time. And the text messages attached to Mr. Dusing's affidavit make clear that, in the

midst of the Kentucky trial, he was actively preparing for this one, including meeting for hours

with the defendant. (*See* Dusing Aff Ex. B). More importantly, Hild has failed to identify any

particular "course of action," *Armienti*, 234 F.3d at 824, that counsel was forced to forgo because

of his involvement in the Kentucky trial.

As for Hild's claim that his personal and legal troubles gave Mr. Dusing "a personal interest in using Mr. Hild's trial to demonstrate that he was competent to practice law," (Mem at 28), that theory, if it could be supported, suggests a "coincidence of interests," not a conflict. *See Gambino*, 864 F.3d at 1071. Similarly, to the extent that Hild claims that Mr. Dusing was motivated to extend the trial to "provide a reason to forestall the Kentucky litigation" (Mem. at 28), it is difficult to see how that motivation would be inconsistent with Hild's interests. (And, of course, it is also entirely inconsistent with Hild's claim elsewhere that Mr. Dusing prematurely curtailed the trial.)

The cases cited by Hild do not counsel a different result. The majority of them concern lawyers whose performance was affected by the fact that they faced criminal prosecution or disciplinary sanctions related to the very proceeding in which he represented the defendant or a closely related matter. *See, e.g.*, *United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984) (trial counsel himself conspired with someone connected to the defendant's fraudulent scheme); *Mathis v. Hood*, No. 87 Civ. 6234 (RPP), 1990 WL 100869, at *4 (S.D.N.Y. July 11, 1990) (lawyer's interest in avoiding discipline for failing to file notice of appeal constituted a conflict of interest); *United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987) (counsel was under investigation by same prosecutor prosecuting the defendant); *Rugiero v. United States*, 330 F. Supp. 2d 900, 907-08 (E.D. Mich. 2004) (lawyer under investigation "had a personal interest in keeping defendant away from the Government at all costs because defendant possessed information harmful" to the lawyer).

The lone case that Hild cites for the proposition that a lawyer's personal entanglements in an entirely unrelated matter might rise to the level of an actual conflict of interest is *Herrera v. Russi*, No. CV-95-187 (CPS), 1996 WL 651017 (E.D.N.Y. Nov. 6, 1996). Hild claims that, in *Herrera* "the district court concluded that the fact that an attorney was facing disciplinary

proceedings during his client's trial . . . amounted to an impermissible personal conflict with a concurrent criminal representation." (Mem. at 28). But that is not what *Herrera* holds. The court in *Herrera* did not purport to reach the question of whether counsel in fact suffered from an actual conflict but instead granted habeas relief because the state trial court had failed in its obligation to inquire into "allegations of professional misconduct to determine whether [counsel] in fact suffered from an actual conflict, a potential conflict, or no genuine conflict at all." 1996 WL 651017, at *9. Moreover, *Herrera* was decided on the basis of a now-abrogated line of Second Circuit cases that required automatic reversal whenever the trial court failed to inquire into a potential conflict. *See Mickens v. Taylor*, 535 U.S. 162 (2002) (holding that "to demonstrate Sixth Amendment violation where trial court failed to inquire into potential conflict of interest about which it knew or reasonably should have known, defendant had to establish that this conflict of interest adversely affected counsel's performance," overruling *Ciak v. United States*, 59 F.3d 296 (2d Cir.1995)). Accordingly, the court did not inquire into whether the hypothesized conflicts adversely affected counsel's performance.

In short, Hild has fallen far short of his obligation to show that Mr. Dusing suffered from an actual conflict of interest rather than a mere "mere theoretical division of loyalties" of the type that the Supreme Court has stated is insufficient to obtain relief. *Mickens v. Taylor*, 535 U.S. 162, 163 (2002).

Finally, whatever merit there may be to Hild's claim that Mr. Dusing suffered from an actual conflict of interest (and, as explained, there is none), there is even less of a basis to impugn Ms. Lawrence's performance. In a brief paragraph of his motion, Hild cites the fact that Ms. Lawrence was counsel in the Kentucky litigation, and filed an adjournment request in that matter arguing that, because of her commitments in this case, the Kentucky court's schedule posed the

risk of "serious prejudice" *in the Kentucky litigation*. (Mem. at 30). But, as already discussed, it is commonplace for experienced attorneys to litigate multiple matters simultaneously, and the record makes clear that, to the extent the schedule in two matters conflicted, Ms. Lawrence, like Mr. Dusing, prioritized this case. (*See, e.g.*, Lawrence Aff. ¶ 34 (Mr. Otis "dealt with anything that came up in Mr. Dusing's family court litigations during the time we were in New York")). Nor does Hild's gratuitous reference to the romantic relationship between Mr. Dusing and Ms. Lawrence, without more, provide a basis to suspect that she violated her ethical duty to act in Hild's interests. In short, because Hild was represented at all times by unconflicted counsel in the form of Ms. Lawrence, even if his allegations regarding Mr. Dusing's loyalties were supportable, he could not show a "lapse in representation" resulting in a Sixth Amendment violation.

### 2. Hild Cannot Show a Lapse in Representation

In addition to failing to show an actual conflict of interest, Hild has failed to show that, because of the conflicts he hypothesizes, "trial counsel chose not to undertake [an] alternative strategy" that would plausibly have benefited him. *LoCascio v. United States*, 395 F.3d 51, 56–57 (2d Cir. 2005) (internal quotation marks and alterations omitted).

Hild hypothesizes two ways in which Mr. Dusing's supposed conflict affected his conduct of the case. First, he argues that Mr. Dusing was motivated to cut short the trial so that he could appear for a hearing in the Kentucky litigation on May 4, 2021. (Mem. at 31, *et seq.*) At the outset, the plausibility of this claim is substantially undercut by the fact that, as discussed, neither Mr. Dusing nor Ms. Lawrence appeared at the May 4 hearing, notwithstanding that the trial of this matter concluded on April 30. (*See* Dusing Aff. ¶ 5, Lawrence Aff. ¶¶ 53, 54).

More fundamentally, Hild has failed to muster any evidence that counsel's decision-making during the trial was in any way influenced by the desire to shorten the trial and, indeed, the record evidence is to the contrary. As the Court knows, Mr. Dusing engaged in extensive cross-

examination of all of the Government's witnesses, and particularly Rohr and Stumberger, each of whom was on the stand for multiple days. Hild's direct testimony likewise spanned multiple days.[4] If, in fact, Mr. Dusing had been motivated to foreshorten the trial, he could easily have done so by curtailing one of these examinations or abbreviating his jury addresses. That he did not do so, and instead took his time with these witnesses and in arguing the case to the jury is evidence upon which the Court can rely in concluding that, even if counsel's interests were arguably in conflict with the defendant's, counsel placed the defendant's interests first. *See Burger v. Kemp*, 483 U.S. at 784 (Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client" and "appropriately and necessarily rely in large measure upon the good faith and good judgment of defense counsel.").

Moreover, certain of the decision that Hild criticizes could not even plausibly have been influenced by a motive to cut short the trial. For example, Hild suggests that counsel's interest in bringing the trial to a close caused him to introduce certain exhibits, ask certain questions, or lodge certain objections. (Mem. at 32-33). Aside from the fact that many of the exhibits and lines of inquiry that the defendant suggests were not followed were cumulative of other evidence in the record, none of them, if they had been pursued, would meaningfully have prolonged the trial.  It is therefore implausible to suggest that counsel's decision not to pursue them was a product of the conflict that Hild hypothesizes.

Hild also faults trial counsel for failing to call certain witnesses on the defense case.  But, again, other than "airy generalities, conclusory assertions," *Aiello*, 814 F.2d at 114, he offers no reason to believe that the decision not to call them was influenced in any way by trial counsel's

---

[4] Hild also claims that Mr. Dusing's failure to ask him certain questions during his testimony deprived him of the right to testify in his own defense. (Mem. at 33). That allegation is flatly contradicted by the text messages in Attachment D to Mr. Dusing's Affidavit.

desire to speed up the trial. Equally problematic is the fact that Hild offers no reason to believe that the testimony of these witnesses would have been on balance helpful to his case. While it is true that, in order to establish a Sixth Amendment violation arising from an actual conflict of interest, Hild need not establish prejudice, he must still establish that counsel chose not to call these witnesses "because of his conflict." *LoCascio*, 395 F.3d at 57. And, in assessing counsel's motivations, it is certainly appropriate to consider whether their testimony would have meaningfully advanced the defense case. *See Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993) (finding no Sixth Amendment violation in failure to pursue plea discussions because, while counsel labored under an actual conflict of interest, defendant had indicated refusal to plead); *accord United States v. Gambino*, 864 F.2d 1064, 1072 (3d Cir. 1988) (finding no lapse in representation where record demonstrated that foregone strategy "was specious and could have imperiled the credibility of [the] entire defense"). Because Hild bears the burden of proving that counsel's decision not to call these witnesses resulted from the conflict he identifies, the absence of a detailed analysis of the testimony they could have offered is telling.[5]

The same could be said for Hild's claim that counsel's preoccupation with the Kentucky litigation distracted them from preparing for trial. Hild claims that these distractions prevented counsel from noticing an expert or an advice of counsel defense, (Mem. at 34), but he provides no reason to believe that this was so. He similarly offers no evidence that the deficiencies he purports

---

[5] Because Hild has failed to proffer specific evidence that these uncalled witnesses could have offered that would be helpful to his case, it follows *a fortiori*, that he cannot establish that the failure to call them raises "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" – i.e. that he would have been acquitted. *Strickland v. Washington,* 466 U.S. 668, 688 (1984). Indeed, given the overwhelming evidence of Hild's guilt, there is no basis to conclude that any of the errors that Hild purports to identify in Section II.B. of his brief (apart from not being errors) were outcome determinative. Hild's *Strickland* claims should therefore be denied.

to identify in counsel's trial performance (Mem. at 34-35) resulted from a deliberate decision to privilege counsel's personal interests over his own, rather than strategic considerations or the typical oversights that even skilled and experienced counsel encounter in a lengthy and complex trial.

Take, for example, Hild's claim that counsel's focus on his personal family court litigation caused him to fail to notice and call an expert regarding the valuations at issue at trial. Apart from the fact that there is no factual support for such a claim, it is directly refuted by counsel's assertion that "tremendous effort was made to locate and retain . . . an expert" and that the decision not to notice one was ultimately dictated by the inability to find an expert "willing to give the desired opinion and also Mr. Hild's [un]willingness to pay for the cost of such an expert." (Dusing Aff. ¶ 70). Similarly, Hild's claim that counsel was distracted leading up to the trial is refuted by text messages showing extensive preparations with Mr. Hild, including for his anticipated trial testimony. (*See, e.g.* Dusing Affidavit, Att. B, at Feb. 25, Feb. 28 (Hild noting in a text message to Dusing, "we are about to make progress practicing direct next week"; Dusing representing that he can prepare "all day Monday virtually if you want")).

In short, nothing in Hild's brief comes anywhere close to establishing that there was alternative trial strategy "inherently in conflict with or not undertaken due to [counsel's] other loyalties or interests." *United States v. Levy*, 25 F.3d 146, 157 (2d Cir.1994).

### 3.   The Record is Sufficient for the Court to Reject the Defendant's Claims

Finally, given the total lack of evidentiary support for Hild's claim that counsel labored under an actual conflict or that their trial performance was in any way influenced by their personal interests, the Court can deny the motion without a hearing. As set forth above, to warrant a hearing on alleged ineffective assistance of counsel, the defendant's filing "must contain assertions of fact that [he] is in a position to establish by competent evidence," that create a genuine issue of material

fact on a matter of significance to the claim. *Aiello*, 814 F.2d at 113. Although it is packed with "conclusory assertions," Hild's filing does not proffer any facts that, if further developed at a hearing, would bear on the Court's assessment of trial counsel's motivations and decision-making. The Court presided over the trial of this matter and had occasion to observe the diligence with which trial counsel pursued Mr. Hild's defense and their demeanor during the conduct of trial. With the benefit of the lengthy affidavits submitted by Mr. Dusing and Ms. Lawrence, the Court can conclude that, even with the benefit of a hearing, Hild has "no chance of overcoming counsel's detailed explanation" and, accordingly, that an evidentiary hearing would be a "needless expenditure of judicial resources, and the burden on trial counsel and the government." *Puglisi*, 586 F.3d at 214-15.[6]

## III.   A New Trial is Not Warranted On Other Grounds

### A.   Applicable Law

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)

---

[6] If contrary to the arguments, above, the Court is inclined to hold an evidentiary hearing, the hearing should focus on, among other things, whether the defendant impliedly waived the conflict he now seeks to assert. *See Sealed Appellee v. Sealed Appellant*, 900 F.3d 663, 671 (5th Cir. 2018). Indeed, there is evidence in the record that, contrary to the assertions contained in his affirmation to the Court, Hild was aware of Mr. Dusing's family court litigation well before trial, was working out of the same offices while Mr. Dusing and Ms. Lawrence were conducting the Zoom trial referenced in Hild's filing, and in fact discussed with Mr. Dusing the impact of the Kentucky litigation on his representation of Hild well before the trial in this matter. (*See* Dusing Aff. ¶¶ 24, 27, 49; Lawrence Aff. ¶ 27). At such a hearing, the Government would anticipate calling, among other witnesses, family members of Mr. Hild's who may have been aware of the Kentucky litigation prior to trial in this matter.

(internal quotation marks omitted); *see also United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) ("The test is whether it would be a manifest injustice to let the guilty verdict stand." (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992))); *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (citing *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (A district court should grant a Rule 33 motion only if it, "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.")).  Trial courts must "exercise Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotation marks omitted). "The [c]ourt must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Shellef*, 732 F. Supp. 2d 42, 49 (E.D.N.Y. 2010) (citation omitted).

### B.  The Government Did Not Elicit Improper Opinion Testimony

#### 1.  Applicable Law

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013). "[T]he distinction between statements of fact and opinion is, at best, one of degree." *Id.* (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988)); *see id.* (acknowledging "essential truth" of "Judge Posner's observation that '[a]ll knowledge is inferential, and the combined effect of [Federal] Rules [of Evidence] 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable'" (alterations in original) (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990)). "[P]ersonal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception.'" *Cuti*, 720 F.3d at 458-59 (quoting Fed. R. Evid. 602 advisory committee's note).

A lay witness's testimony "in the form of an opinion is limited to one that is: (a) rationally based on the witness' perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A rational perception is one involving first-hand knowledge or observation. *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). A witness's testimony is not based on scientific, technical, or other specialized knowledge if it is "the produce of 'reasoning processes familiar to the average person in every life.'" *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) (quoting *United States v. Garcia*, 413 F.3d 201, 216-17 (2d Cir. 2005)).

### 2. There Was Nothing Improper About Dennis Hamilton's Testimony

Hild first argues that Dennis Hamilton, an employee of the SEC, gave improper lay opinion testimony when he described the difference between Live Well's purchase price of the bonds and the subsequent IDC price as a "markup." (Mem. at 42). This argument rests on the false premise that the word "markup" constitutes an opinion. To the contrary, Hamilton's use of the word "markup" is consistent with its ordinary meaning: "a raise in the price in an item for sale." *See* The Free Dictionary, available at https://www.thefreedictionary.com/markups (last accessed August 20, 2021). Indeed, when asked about his use of the word on cross-examination, Hamilton acknowledged that he merely meant to "illustrate the concept of what is represented by the arrow" in his chart, *i.e.*, the difference between the purchase price and the IDC price. (Tr. 1666-67; GX 1603).

In any event, Hild suffered no prejudice from Hamilton's use of the word "markup," because he and his co-conspirators also described Scenario 14 prices in that manner. At trial, the jury heard a recorded call from January 13, 2016, where Hild compared "market level pricing" to the "inherent markup" of "full SC14" – the full scenario 14 methodology. (Tr. 1065; GX 406).

Hild's co-conspirators also used the term "markup." For example, a spreadsheet from December 2015 contains a column entitled "% markup," reflecting the difference between Live Well's purchase price for the bonds and Scenario 14 price. (Tr. 152; GX 128). In addition, Rohr testified that the term "Scenario 14 mark up" meant the difference between market values and Scenario 14 prices. (Tr. 1298). In light of this other evidence, including Hild's own admission that Scenario 14 was a "markup," there was no "manifest injustice" from Hamilton's use of that term.

### 3.   There Was Nothing Improper About Testimony That Scenario 14 Was "Wrong"

Hild next argues that a new trial is warranted because the Government testimony from cooperating witnesses that their own conduct was wrongful. This argument is meritless, because the testimony meets the standards for lay opinion testimony under Rule 701, in that it was (a) rationally based on the witnesses' perception, (b) helpful to the jury, and (c) based on "reasoning processes familiar to the average person in everyday life."

The Second Circuit has made clear that "where a witness derives his opinion solely from insider perceptions of a conspiracy of which he was a member, he may share his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness subject to Rule 701, not as an expert subject to Rule 702." *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008). All of the testimony at issue falls squarely within this category. Rohr, who pled guilty pursuant to a cooperation agreement, and Hayden Novikoff, who testified pursuant to a non-prosecution agreement, were both directly involved in the scheme to defraud Live Well's lenders. Accordingly, their testimony was rationally based on their own perception from their "direct participation" in the fraudulent activities. *Id.* at 125-26.

Similarly, their testimony was unquestionably helpful to the jury. One of the central issues in the case was whether Hild intended to defraud his lenders. While neither witness testified about Hild's mental state, each witness testified about their own belief that the conduct was wrongful.

(*See* Tr. 807 ("…I was involved. There are things I did that I think were wrong"); 1002 ("I knew it was wrong"); 1017 ("Q: Mr. Rohr, how did you feel about what you were doing to the lenders? A: I did not feel good at all. Q: Why not? A: I knew it was wrong"). From this testimony, the jury could infer that the participants in the conspiracy acted purposefully, with the intent to defraud. *Cf. Yannotti*, 541 F.3d at 126 (noting that there was "little question" that a cooperator's testimony was "helpful to the jury" because "individuals engaging in illicit activities rarely describe their transactions in an open or transparent manner"). Tellingly, Hild asks the Court to rely on similar testimony given by Stumberger that he views as helpful to his case. (*See* Mem. at 11 (citing Stumberger's testimony that he did not "go to work every day purposely knowing I was doing something wrong")).

Further, that Rohr's testimony drew from his experience as the company's chief financial officer does not render his opinion based on specialized training. Rather, his opinion that what they were doing was wrong—hiding from their lenders that they were behind IDC prices, and that the bond prices were higher than Live Well's purchase price—drew from a reasoning process familiar to average persons. *See Yannotti*, 541 F.3d at 126 (explaining that, although loansharking was not "an activity about which the average person had knowledge," a cooperating witness's testimony opinion testimony about the conspiracy "derived from a reasoning process familiar to average persons").

To support his argument, Hild cites a single case, *United States v. Skop*, 846 F.3d 135 (2d Cir. 1988). (Mem. at 45). But *Skop* did not concern lay opinion testimony at all; rather, it concerned testimony from an expert witness who had no knowledge of the personal events in issue. *See Skop*, 846 F.3d at 138-139. To that end, the Court's central concern was that the witness's testimony "drew directly upon the language of the statue and accompanying regulations" and thus "went well

36

beyond his province as an expert in securities trading." *Id.* at 140. This concern simply does not apply here. Neither Rohr nor Novikoff testified using language from the securities or wire fraud statutes.

Nor did Rohr or Novikoff testify as to the "ultimate issue" of the case as Hild suggests. (Mem. at 46). The ultimate issue in the case was Hild's intent. However, during the questioning, it was clear that the witnesses were not testifying about Hild's intent, but rather, their own beliefs as to whether what they were doing was wrong. For example, after defense counsel raised concerns about this point at a sidebar, the Government elicited the following testimony from Rohr:

> Q. Mr. Rohr, you testified earlier that you believed using scenario 14 was wrong, is that right?
>
> A. In the manner in which we were using it, yes.
>
> Q. Mr. Rohr, just to be clear, is that your own personal belief?
>
> A. That is my personal belief.
>
> Q. And when you have testified about things being wrong, just to be clear, that was all your own personal belief?
>
> A. Yes, that was my personal belief.

(Tr. 1077). As such, it is clear that Rohr's testimony was about his own intent, not Hild's.

In short, Rohr and Novikoff, who were members of the conspiracy, offered precisely the type of lay opinion testimony that was approved in *Yannotti*. Their testimony offers no basis for a new trial.

### C. There Was No Constructive Amendment or Prejudicial Variance

#### 1. Applicable Law

A constructive amendment occurs where "either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United*

*States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). By contrast, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (*quoting United States v. Salmonese*, 353 F.3d 608, 621 (2d Cir. 2003)). In order to merit reversal on appeal, "the variance must have caused the defendant 'substantial prejudice' at trial." *United States v. McDermott*, 245 F.3d 133, 139 (2d Cir. 2001); *see also United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995) (describing two-part test for variance: first, whether the conspiracy alleged in the indictment was proved, and, second, if it was not, whether the defendant was "substantially prejudiced by the variance between the indictment and the proof."). A variance is prejudicial only when it "infringes on the 'substantial rights' that indictments exist to protect -- to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (citation and internal quotation marks omitted); *see also United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) ("A variance is immaterial -- and hence not prejudicial -- where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." (citation and internal quotation marks omitted)).

## 2. Discussion

Hild claims that there was a constructive amendment because the Government "devoted a substantial portion of its case in chief" to evidence that Hild and his co-conspirators failed to disclose to Live Well's lenders that Live Well was behind IDC prices and that the prices were above market values (Mem. at 48-49). However, this line of testimony falls squarely within the charges in the Indictment. In particular, the Indictment alleges as follows:

- "As HILD well knew, the Lenders were unaware of the Pricing Service's shift from attempting to price the HECM IO bonds itself to relying exclusively upon Live Well to provide prices." (Indictment ¶ 28).

- "MICHAEL HILD, the defendant, was well aware that if the Lenders had known that the Pricing Service was publishing bond prices that did not reflect fair value, they would have refused to utilize those prices in determining how much money to loan Live Well or the requisite amount of required collateral. For that reason, HILD took steps to prevent the Pricing Service and the Lenders from learning that the marks published by the Pricing Service for Live Well's bonds did not reflect actual market value. For instance, HILD affirmatively directed Rohr, Stumberger, and CC-1 that they should phase in Scenario 14 prices incrementally over a number of days, so that the Pricing Service would not detect the large price increases." (Indictment ¶ 33).

- "Additionally, HILD forbade Rohr, Stumberger, CC-1 and CC-2 from disclosing Live Well's new pricing methodology to the Pricing Service or the Lenders." (Indictment ¶ 33).

- "MICHAEL HILD, the defendant, with the assistance of Rohr, Stumberger, CC-1, and CC-2, also sought to avoid circumstances that could lead the Lenders to discover that Live Well was pricing, and causing the Pricing Service to price, Live Well's bonds at levels well above their actual market value." (Indictment ¶ 34).

Thus, Hild's claim that "the government charged the case as involving affirmatively material misrepresentations" (Mem. at 48) is misleading. Since the Indictment, the Government has set forth a scheme to defraud that involved both material misrepresentations and omissions.

Hild also faults the Government for failing to prove a duty to disclose. (Mem. at 49). But as discussed in Section I.C.2 above, "'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." *Vivendi*, 838 F.3d at 258 (quoting *Meyer*, 761 F.3d 245, 250 (2d Cir. 2014)). Here, Live Well misrepresented the value of its HECM IO bonds and failed to "tell the whole truth" by failing to disclose that it was secretly providing values to IDC and that those values were not market values. The case was tried and the jury charged based upon this theory, which was entirely consistent with the above-described allegations in the Indictment. Accordingly, Hild's arguments provide no basis for a new trial.

39

### D.   The Weight of the Evidence Supports a Conviction

Reframing his Rule 29 sufficiency argument under Rule 33, Hild contends that the Court should grant his motion for a new trial despite the substantial evidence in support of the jury's verdict because the weight of the evidence does not support a conviction. (Mem. at 40-41). Hild does not come close to meeting the high standard for a new trial, and his motion should be denied.

#### 1.   Applicable Law

A defendant seeking a new trial on the basis that the verdict was against the weight of the evidence bears the burden of demonstrating that a manifest injustice would result from allowing his guilty verdicts to stand. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (citations omitted). Again, as in a Rule 29 motion, this Court must defer to the jury's determinations as to the weight of the evidence and the credibility of the witnesses. *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982). District courts must exercise their "Rule 33 authority sparingly and in the most extraordinary circumstance." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citations omitted).

#### 2.   Discussion

Hild's weight-of-the-evidence arguments fail substantially for the reasons that his motion for judgment of acquittal fails. *See* Section I.C, *infra*. Put simply, the evidence was sufficient for the jury to find Hild guilty. There is no basis for whatever for any concern, let alone a "real" concern "that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (quotation marks omitted). Hild's motion for a new trial should be denied.

## CONCLUSION

For the reasons set forth above, the Court should deny the motions in their entirety.


Dated: New York, New York
       August 20, 2021

                              Respectfully submitted,

                              AUDREY STRAUSS
                              United States Attorney

                    By:    _____/s/_____
                              Scott Hartman
                              Jordan Estes
                              Assistant United States Attorneys
                              (212) 637-2357/2543