## § Affidavit of Benjamin G. Dusing §

1. My name is Benjamin G. Dusing.  I was trial counsel for Mr. Hild in the criminal prosecution captioned *United States v. Michael Hild*.

2. This affidavit is submitted at the request of the government in this case and pursuant to the Court's Order dated August 6, 2021, finding that Mr. Hild has waived the attorney-client privilege and ordering me to provide sworn testimony addressing the allegations in affidavit form.

3. I have been made aware of the post-trial motion submitted by Mr. Hild's new counsel in the case making certain allegations against me and Ms. Katy Lawrence involving, generally, the assertion that Ms. Lawrence and I had some sort of conflict of interest in representing Mr. Hild at trial and that our performance was deficient.  I have reviewed the post-trial filing containing these assertions and the declaration submitted by Mr. Hild in connection therewith.

4. The information provided herein is not exhaustive of the subject matter addressed but is limited to addressing the specific issues raised by Mr. Hild in his post-trial filing, as best I understand the allegations, in as narrow a manner as possible while still providing the necessary information per the Court's directive.

5. This affidavit is lengthy insofar as there is considerable context to the "facts" presented in the motion for new trial filed by Mr. Hild's new attorneys and in the supporting documents submitted with same, and it is difficult to address adequately and fully the allegations contained therein in short form.  Therefore, the instant paragraph is intended as a summary, general response to the allegations.  Most broadly, it appears that the allegations and arguments set forth in the post-trial motion filed by Mr. Hild's new counsel pertaining to the alleged "distraction" and "conflict" created by the activity in my domestic court

1

litigations ongoing to some extent (albeit unexpectantly, and for the most part without my knowledge) during the time when Ms. Lawrence and I were trying the Hild case in this Court proceed from two critical mistaken factual premises. First, insofar as the general supposition seems to be that Ms. Lawrence was my lawyer for my domestic court matters pending at that time and that any activity occurring during the period of Mr. Hild's trial had then necessarily to be being performed by either Ms. Lawrence or me, such supposition is simply wrong. Ms. Lawrence was "co-counsel" for me on my domestic litigations; my primary attorney was Jeff Otis. Mr. Otis handled any and all family court filings in my domestic court litigations during the period of Mr. Hild's trial. I was not aware of much of the activity in my domestic court litigations set forth in Mr. Hild's post-trial motion, and my understanding is that Ms. Lawrence was generally unaware as well. Mr. Otis handled all of the court filings and attended to the family court business alleged to have been a "distraction" for Ms. Lawrence and me during the time that we were in New York trying Mr. Hild's case. None of that was, then, a distraction at all. Second, the suggestion that Ms. Lawrence and I "cut short" a fulsome presentation of Mr. Hild's defense so that we could return to Kentucky for a hearing on May 4, 2021 in one of my domestic court matters is similarly wrong as a basic matter of fact. Neither Ms. Lawrence nor myself appeared at whatever hearing occurred in my domestic court case in which there was a hearing on May 4, 2021. It makes little sense, then, that we would "cut short" Mr. Hild's defense in New York to hurry back to Kentucky to handle a court hearing that I did not necessarily even know about and did not even attend. (To my memory, I cannot personally say that I was even aware at the time that such a hearing had been scheduled, or was occurring.) Mr. Otis, my primary counsel on both domestic litigations until well after the conclusion of Mr.

Hild's trial, handled the May 4th hearing. In short, most of the allegations and inferences drawn from the "facts" presented by Mr. Hild's new lawyers in his post-trial motion proceed (erroneously) from the (incorrect) basic factual premises that (a) Ms. Lawrence was my primary/only attorney for my family court litigations in the Kenton County (Kentucky) Family Court, and (b) Ms. Lawrence and/or myself attended whatever May 4, 2021 hearing occurred in one of those litigations. Both factual premises are simply wrong. The inferences drawn by Mr. Hild's new counsel as set forth in the post-trial motion are therefore wholly mistaken. Most of the allegations set forth in the post-trial motion are addressed directly or indirectly simply by pointing out the erroneous factual nature of these two basic factual assumptions from which nearly all of the accusations and arguments presented therein proceed. Having provided the information in this paragraph by way of brief overview, the paragraphs to follow address the allegations contained in Mr. Hild's post-trial motion in a more detailed manner.

6. I did not "solicit" the representation of Mr. Hild in any way, shape, or form. Mr. Hild and I have known each other for approximately 30 years and went to high school together, graduating in the same high school class from a small, all-boys Catholic high school here in northern Kentucky. Mr. Hild and I were close friends (at least, from my perspective), and were part of a close-knit high school class whose members have kept in touch. In or about January 2020, I was contacted by a fellow high school classmate and friend of Mr. Hild and me about Mr. Hild's situation, about which I had not at that time heard. Mr. Hild had been indicted at that point several months prior, and had existing counsel (the McGonigle firm). The way the situation was presented to me through the outreach by our classmate was that Mr. Hild wanted to discuss the situation with me and wanted to discuss

3

retaining me as his lawyer, but was uncomfortable reaching out to me for that purpose and broaching the issue of me representing him. This was the context of the email I sent to Mr. Hild attached to his declaration submitted with his post-trial filing.

7. Once we connected, Mr. Hild and I had numerous, extensive, long conversations, initially on the phone, regarding his circumstances. The basic premise of those initial discussions was that we were talking as friends, not potential-client and potential-lawyer. I was explicit on this point, and purposefully and consciously took steps to make sure that Mr. Hild understood that my outreach was expressly not for the purpose of soliciting his representation but for the purpose of providing love, kindness, support, and a compassionate ear that could listen from a perspective of unique life experience and understanding regarding the difficult journey Mr. Hild, as a friend, would be traveling in defending himself from the charges. These conversations were solely in my capacity as a friend, and the subject of my representation of Mr. Hild was not discussed in these initial conversations at all, to my memory. My concern was the mental and spiritual health and welfare of my friend, not his legal situation per se.

8. To the best of my memory, within days of our initial conversation, Mr. Hild traveled here to Kentucky to spend the weekend with me. This was a personal, not a professional, visit, and Mr. Hild was in a very bad way. I was very concerned about his emotional, spiritual, and mental health and overall welfare and this was the focus during his visit. It was only after several days of discussions that the possibility of my representation of Mr. Hild was broached in a serious way. Mr. Hild's main frustration at that point in time, as expressed to me, was that he was unsatisfied with his attorneys who were then representing him, felt like they did not care and were not doing anything to prepare his defense, and that he felt

like he could not afford them.  Moreover, he indicated that absent his ability to pay them

they were not doing anything and would not move forward in preparing his defense.  He

expressed feeling helpless and scared.  It was in this context that the possibility of me

taking over the representation initially arose.  Multiple subsequent conversations were had

over the following days and weeks about the possibility of changing counsel at that juncture

such that I would represent Mr. Hild moving forward.

9.    Mr. Hild's counsel both prior to and subsequent to me are well acquainted.  The Morvillo

firm represented the McGonigle firm in connection with Mr. Hild's criminal trial.  As the

Court is aware, throughout Mr. Hild's trial one major issue that continued to percolate was

the issue of whether it would be necessary for me to call Tom McGonigle or other members

of the McGonigle firm that had been involved in Mr. Hild's representation in the SEC

investigation (the precursor to the instant criminal matter) in connection with an "advice

of counsel" defense that I was prepared to assert on Mr. Hild's behalf depending on the

government's proof at trial.   The time period of the alleged criminal conspiracy as

identified in the indictment spanned many years.  The McGonigle firm represented Mr.

Hild during roughly the second half of that time period.  If the government was inclined to

present evidence about things that Mr. Hild or Live Well Financial, Inc. ("LWF") did or

did not do during the period of the McGonigle firm's representation of Mr. Hild, there was

a defense in the nature of an "advice of counsel" defense in play in relation to any such

proof.  Such a defense would likely require waiver of the attorney-client privilege – not

only by Mr. Hild, in these circumstances, but potentially by a whole host of other actors at

one time represented jointly with Mr. Hild by the McGonigle firm.  Since two of the actors

represented by the McGonigle firm at the same time that they represented Mr. Hild were,

at trial, the government's primary witnesses against Mr. Hild at that point, needless to say there were going to be a lot of thorny issues (for a lot of actors, not just Mr. Hild), if the government decided to present evidence at trial regarding that period covered by the alleged conspiracy during which the alleged conspirators (including Mr. Hild) were represented jointly by the McGonigle firm. If the government did not talk about this period at trial, however, none of these difficult (and, to some extent, to speak frankly, uncomfortable) issues would need to be addressed. Ultimately, the government did not "go there," so to speak, consistent with an informal understanding between the government and the defense that amounted to an ongoing dialogue (often involving the Court, at times, at various sidebars and other out-of-the-presence-of-the-jury colloquies) that ran throughout the trial. I had to be prepared to present the evidence of the McGonigle firm's role and guidance to Mr. Hild in the event that the government did ultimately introduce evidence at trial relating to any action or inaction Mr. Hild or LWF took during the period of the McGonigle firm's representation of Mr. Hild (and LWF, and the others). I thus subpoenaed Tom McGonigle to appear at trial, in the event it would be necessary to put on proof in the nature of an "advice of counsel" defense for Mr. Hild or otherwise introduce proof regarding the McGonigle firm's role in advising Mr. Hild that would be probative of Mr. Hild's intent (*the* issue in the case). The McGonigle firm (or, at least Mr. McGonigle himself) engaged Jonathan Sack of the Morvillo firm to represent him in connection with the subpoena. Mr. Sack contacted me regarding the subpoena, and Mr. McGonigle's potential trial testimony. I had several email and phone calls with Mr. Sack during the latter part of Mr. Hild's trial regarding the various issues that would arise in the event that I called Mr. McGonigle at the trial. (Another issue was the fact that LWF was at that point,

of course, no longer controlled by Mr. Hild, had been appointed a Trustee through the bankruptcy process, had new counsel engaged by the Trustee, and counsel for the Trustee had contacted me to remind me (correctly) that the Trustee would need to waive any privilege held by LWF, that Mr. Hild did not have the authority to do so, and that the Trustee was not inclined to agree to a waiver of the privilege on the part of LWF.)  To be clear, the Morvillo firm – Mr. Hild's counsel who replaced my firm as counsel for Mr. Hild (and who currently represents him) – represented the McGonigle firm in connection with its role as a potentially key witness in Mr. Hild's defense at the trial.  To put it mildly, the essence of the message communicated to me by Mr. Sack on behalf of his client Tom McGonigle in his communications with me during the latter stages of the trial as the time approached for the defense's case to begin was that, in short, it would be wonderful if I did not have to call Mr. McGonigle.  My message to Mr. Sack was, in short, that I happened to agree but that it was not up to me.  I would not know whether the government would try its case consistent with what I felt like was our informal understanding that it would not seek to introduce proof pertaining to the period of the McGonigle firm's representation of Mr. Hild until the government had formally concluded its case and it had not.  From the perspective of Mr. Hild's defense, the best scenario was that the government did not "go there," so to speak; in that event, there would be nothing to have to defend against, in that regard.  The need for an "advice of counsel" defense (or similar defense involving introducing proof of the role of the McGonigle firm's role in guiding the personal and corporate decision-making of Mr. Hild and LWF during the period of the representation) would be obviated, and the many "prickly" legal issues implicated by my need to put on such proof on Mr. Hild's defense obviated as a result.  In the end, this is in fact what

happened. The government honored our informal understanding that it would not introduce proof regarding LWF's pricing of the bonds in question during the period of the McGonigle firm's representation (generally overlapping with the period that began when Mr. Hild, LWF, and the other relevant actors received formal notice of the SEC investigation). Accordingly, the decision was made – with Mr. Hild's full knowledge and blessing – not to call Mr. McGonigle and I released him from his subpoena (communicated through Mr. Sack). Mr. Sack's interest in the proceedings clearly did not evaporate at that point, however, as he was a presence in the courthouse during the defense's presentation of its case, he introduced himself personally to me at that time, and he was in the courtroom for closing arguments in the case. It seems important, given the allegations advanced against me and Ms. Lawrence in Mr. Hild's post-trial motion, that there be a fulsome and robust disclosure of *all* the facts to the Court at this juncture, and it seems to me that the omission of any reference in the post-trial motion to the fact that Mr. Hild's new counsel is not some "random stranger" here, but who was in and around the action at trial and who in fact had an interest in it insofar as it represented a witness subpoenaed by the defense to testify, should be known to the Court. For one thing, the facts as put before the Court in Mr. Hild's post-trial motion are presented as if I was Mr. Hild's original counsel in the criminal matter. I was not. The McGonigle firm was. The Morvillo firm (of all actors) knows this. Furthermore, given that the Morvillo firm represented Mr. McGonigle in connection with his potential witness testimony at Mr. Hild's trial, from a certain perspective the insertion of the Morvillo firm at this juncture to represent Mr. Hild could be seen as not too different from the McGonigle firm reinserting as Mr. Hild's counsel. The "solicitation" and "conflict" issues presented by the circumstances of the Morvillo firm's representation of

Mr. Hild would seem to me to be, at the very least, relevant facts that should be put before the Court in these circumstances. This is especially the case given the conflicts issues related to the McGonigle firm's one-time representation of not only Mr. Hild and LWF (now adverse to Mr. Hild) but also the two main witnesses against Mr. Hild in his criminal prosecution (Eric Rohr and Darren Stumberger) who now acknowledge participating in a conspiracy the existence of which Mr. Hild denies. Such subject matter is no longer my concern, of course. That being said, I do find it relevant for purposes of the Court's consideration of the allegations made against me and my firm, and Ms. Lawrence, in the post-trial motion filed by the Morvillo firm on Mr. Hild's behalf. Certain of the communications between Mr. Sack and myself exchanged in connection with our discussions regarding the potential testimony of Mr. McGonigle (referenced above), are attached hereto as *Attachment A*.

10. I am an experienced white collar criminal defense attorney and former federal prosecutor in two separate U.S. Attorney's offices and well understand, from both perspectives, the seriousness and gravity of a federal white collar criminal prosecution. The charges Mr. Hild was/is facing could conceivably land him in prison for the rest of his life. Under any circumstances, accepting the representation of a white-collar criminal defendant is an awesome personal and professional responsibility. Such responsibility when the client is not just any client but a dear childhood friend is, of course, on a whole different level. I was not eager to accept the responsibility, did not solicit it under any definition of the term, accepted it in the end only after considerable prayer and reflection and only because in the end Mr. Hild was my friend and was in a bad spot and had sincerely asked me to, and I could not comfort my conscience that I could refer him to anyone else better suited by way

of their experience and training to represent him under the specific circumstances.  I was particularly reluctant to take over such a serious representation mid-stream from other lawyers only eight (8) months prior to the scheduled trial date, with the possibility of an adjournment unlikely, and an acceptable plea offer obviating the need for a trial equally unlikely based on my considerable experience handling such matters.

11. It was understood from the outset that I would be taking significant economic and other risks in taking on the engagement on the terms required by Mr. Hild's situation and that under any circumstances the engagement would be economically sacrificial on the whole for my law firm and me personally.  (The suggestion in Mr. Hild's post-trial motion that he funded my personal litigations is wildly incorrect for a lot of reasons, but this is one of them.)  I accepted the engagement because my friend asked me to, knowing that the engagement would require enormous sacrifices of me in every way, and because I understood him to be in a bad spot and was asking my unique assistance in a situation where I was in the best position to do so and highly qualified to do so and he trusted me on account of our history.  It made sense to me why he was requesting that I take over, and I felt an obligation to help my friend because I felt like I was uniquely situated to do so and there was a moral imperative and he had asked.

12. Mr. Hild had at least a general understanding of my personal circumstances and the fact that I had two major family court litigations ongoing at that time from the outset.  In fact, in our initial conversations I would often try to compassionately and charitably relate to his feelings of being unfairly persecuted and poorly treated by discussing my own experiences in my personal domestic litigations with my ex-wife and former fiancé, as a way of relating best I could to what he was feeling at the time.  From the beginning of the representation

and at all points in time from that point moving forward, Mr. Hild had at least a general awareness of the nature and status of my domestic litigations in the Kenton Family Court referenced in his filing. At no point in time were these private matters a "distraction," however. I believe Mr. Hild understood this then, and, very frankly, I believe he understands that even now.

13. The two domestic court litigations referenced in Mr. Hild's filing involve (a) post-decree modifications to the terms of my Separation Agreement with my ex-wife, whom I divorced in 2016 (the *Dusing v. Tapke* matter); and (b) a paternity action initiated by a subsequent paramour (and, for a time, my fiancé) in relation to the paternity of a daughter I fathered by her (LFD) now 2 years old (the *Bakker v. Dusing* matter). Both matters were/are in the Kenton County (Kentucky) Family Court, and the Presiding Judge in both actions is the Hon. Christopher J. Mehling. The *Bakker* matter was initiated at or about the time of the birth of my daughter by LFD's mother in or about April 2019. Prior to the initiation of this litigation, I had no previous meaningful experience of any kind either as a party or lawyer in family court. I was represented in the *Bakker* matter, and later in the *Tapke* matter after it was initiated, by my long-time attorney and close friend, Mr. Jeff Otis. Although other counsel represented me at various times in various ways in addition to Mr. Otis during the pendency of both of the litigations, Mr. Otis was my primary counsel in both litigations until late May 2021, when Ms. Lawrence replaced him as my primary attorney in the matters. Ms. Lawrence, a long-time friend and professional collaborator, entered her appearance in my domestic litigations in or about the end of January 2021, on a *pro bono* basis, but merely as "co-counsel."

14. At all times relevant to the events described in Mr. Hild's post-trial filing, Jeff Otis was my attorney in the *Tapke* litigation and Ms. Lawrence was "co-counsel" of record. In or about mid-2020, I formally entered my appearance also as counsel of record in a *pro se* capacity, for various reasons. One reason was that I had had enough experience in the Kenton Family Court at that juncture to feel like something was very much not right about how the court operated, and that the progression of my cases was inconsistent with the most basic notions of the "rule of law" as I understood it.

15. The Kenton County Family Court has a history of corruption and misconduct. Recently, a colleague of Judge Mehling's became only the third judge in the history of the Commonwealth of Kentucky to be impeached from her elected office. The *Bakker* case was handled for a time by this now-disgraced former judge, before being transferred to Judge Mehling. Prior to the *Bakker* litigation commencing, I was told by other litigants who had previously had matters in the Kenton Family Court that the court was "backward" and "old school" and that there was an unofficial system of special-privileges for certain local family court lawyers who practiced in the court, that a party "could not win" if the adverse party was represented by certain lawyers and the litigation in front of a certain judge, and there were "special relationships" between certain lawyers and certain judicial staffers in a position to direct the course of litigations that were inappropriate. The lawyer retained by LFD's mother for the *Bakker* litigation, Stephanie Dietz, was/is one of (if not the) preeminent family court practitioner in the Kenton Family Court and a former candidate and prospective candidate to be a Judge on the court. Prior to LFD's mother breaking off communication and contact with me abruptly after retaining Ms. Dietz, five (5) weeks before the birth of our daughter (in April 2019), it was more or less suggested to

me by LFD's mother that Ms. Dietz had told her that she had certain relationships in place

at the Kenton Family Court in Judge's Mehling's chambers such that Ms. Dietz had Judge

Mehling's court "in her pocket."   It was threatened that if I did not pay LFD's mother

certain financial remuneration and "walk away" from being a dad to our daughter that she

would take me to court, accuse me of domestic violence and abuse and all sorts of things,

see that my personal and professional reputation was "ruined," take me for "all I had," and

prevent me from being a part of our daughter's life.   At the time, the suggestion that the

Kenton Family Court and matters proceeding under Judge Mehling in particular could be

influenced or even dictated based on special relationships Ms. Dietz (or anyone) had with

Judge Mehling's staffers in chambers seemed preposterous, and I gave zero credence to

such a suggestion by LFD's mother.

16. Over the course of approximately the first year or so of the *Bakker* litigation, and at or

about the time the *Tapke* matter became active (in or about early- to mid-2020), I had begun

to have a bad feeling about the integrity of the Kenton Family Court based on my personal

experiences over time in that forum.   Over the course of 20-years as a lawyer in good

standing barred in both Kentucky and Ohio, with decades of experience trying both civil

and criminal cases (albeit overwhelmingly in federal court), I had not then (and haven't

since) seen a court function in the manner in which my litigations in front of Judge Mehling

in the Kenton Family Court did.   Anecdotally, I understood that I was not the first litigant

with matters before the court who was suffering adverse consequences as a result of the

procedural abnormalities I felt to be fairly obvious and rampant, and fundamentally

inconsistent with basic notions of the rule of law and professional rules of ethics and the

governing judicial canons.   Certain instances of what I felt to be obvious (if not criminal)

misconduct occurred, which my lawyer (Mr. Otis) reported to the Kentucky Bar Association in or about July 2020. The specific issue that finally caused my lawyer to formally report an issue involved Ms. Dietz and a certain staffer in Judge Mehling's chambers generally known to manage his docket and draft his opinions and orders, and was a situation in which these actors had ex parte communications to arrange an "emergency hearing" with a special judge for the purpose of avoiding enforcement of an order entered by Judge Mehling favorable to me in or about July 2020, after Judge Mehling had gone on vacation. The "emergency hearing" to override Judge Mehling's order was arranged by Ms. Dietz and the court staffer at issue wholly without my or my lawyer's knowledge and did not happen only because the "special judge" that had been arranged to hold the hearing refused to do so on the grounds that it was improper. Mr. Otis' formal complaint was officially directed only towards Ms. Dietz, not the court staffer involved; nonetheless, the court staffer was directly implicated by virtue of the nature of the complaint. (The status of the complaint by Mr. Otis in relation to this incident is unknown by me or Mr. Otis at this time.)

17. During this period there were other alarming procedural irregularities which occurred in the *Bakker* litigation which in my view merited reporting to the appropriate authorities charged with investigating public corruption, for the public good. I contacted the FBI, who I knew from my time as a federal prosecutor had primary jurisdiction in investigating public corruption matters, and reported the facts I found concerning to a Special Agent who met with me for that purpose. At that point in time, the court in the *Bakker* matter had yet to issue its "permanent orders" in the case addressing the issues of custody, parenting time, and child support of my daughter (LFD), and therefore I had yet to suffer any meaningful

substantive prejudice in the case.  My primary motivation was a generalized commitment to the rule of law and belief in and commitment to the integrity of our court system generally, and a generalized awareness by that point that prior litigants had been badly damaged in some cases by the dysfunctionality of the operation of the Kenton Family Court.

18. The *Tapke* matter was not active during the period of the events described in Mr. Hild's affidavit, and was concluded for the most part as of September 2020, when the court issued an order after a short "trial" (held in August and September 2020) on the limited issues presented in that case.  The court issued a written ruling on the issues decided in the case on September 30, 2020, which is referenced in Mr. Hild's filing.  The court's opinion and order was unusually lengthy and disparaging of me in its factual findings in an unusual way but did not materially alter the essence of the co-parenting relationship between me and my ex-wife in relation to our three (3) children, of whom we have joint custody and have parenting time on a 50/50 basis during the summer months and a slightly predominant schedule in favor of my ex-wife during the school year months.  Strangely, the court had made several procedural rulings adverse to my interests in connection with the trial that were quite extraordinary by any standard, among other things prohibiting me from introducing at the trial any evidence of any kind other than my own testimony and precluding me from using documentary exhibits even for impeachment purposes in defending against the relief sought by my ex-wife.  The court's order (dated September 30, 2020) is presently on appeal.

19. The *Bakker* matter was originally scheduled for trial in July of 2019 but was repeatedly delayed due to a variety of continuances, including pandemic considerations.  Ultimately,

a trial date was set for late February 2021.  By that time, the trial of Mr. Hild's matter had been tentatively scheduled for April 2021.  Generally, however, the court system was just beginning to return to normal functioning following the COVID pandemic shut-downs and it was unclear whether the Hild trial would actually go in April.  For a variety of reasons, but primarily because I contracted COVID in early 2021 (an experience that turned out to be severely debilitating), I moved the Kenton Family Court for a continuance of the February trial date in the *Bakker* matter.  Another reason for the requested continuance was the possibility that the Hild trial would actually proceed in April 2021, in which case the *Bakker* trial's timing would be inconvenient.

20. In or about the fall or winter of 2020, there were additional events and occurrences that I had witnessed as part of the *Bakker* proceedings that caused me to grow even more concerned about the procedural integrity of the Kenton Family Court and specifically regarding matters proceeding before Judge Mehling.  (I take pains to make clear that in no way am I suggesting that Judge Mehling himself was involved in these things, or even that he was aware of them.)  By that point in time, I had begun to be more active and vocal as my own *pro se* attorney in raising formal objection to things I felt highly-inappropriate and contrary to the professional rules and judicial canons that were occurring from my perspective.  My objections were clearly not popular with the court.  They also seemed not to be understood by Judge Mehling, who seemed to have no knowledge of the various machinations of the court staffers in his chambers and the various ways in which the docket and rulings of the court were being manipulated and certain lawyers being granted unfair advantage and access to the court's authority (from my perspective, then and now).  It seemed rather plain to me that disqualification of the presiding judge was required under

the governing rules at that juncture and was the only solution to the problem (in my case at least), and several motions for disqualification of the presiding judge were made beginning in mid-2021 after a succession of seriously-troubling events occurred (from my perspective).   Disturbingly, the idea of the appointment of a special judge to hear the *Bakker* matter (and preside over certain downstream issues which had arisen in the *Tapke* matter) met stiff resistance from opposing counsel, the court, and other judicially-appointed actors involved at that time.   A series of motions seeking the disqualification of the presiding judge arising from independent incidents occurring over time was thereafter filed in both litigations, continuing through to the present to include a total of *nine* motions for disqualification seeking to get my litigations out of the Kenton Family Court such that my cases can be decided on the law and the facts in conformance with the rule of law (and nothing else).   All of these motions were denied, each without a hearing.

21. At some point during this period a follow-up report was made to the FBI, reporting the events that had transpired occurring after the initial report was made and which gave rise to my by-then still-heightened concerns.   The procedural irregularities occurring during this point were of particular concern given that seriously problematic reports by potential witnesses in the *Bakker* matter were being reported to me and Mr. Otis, to include reports of attempts to influence the testimony of subpoenaed witnesses in the *Bakker* case, flagrant instances of manipulation of evidence that were coming to light, and things of that (crazy) nature about which one would think any court of law would be concerned and which required judicial intervention to address.   Yet, motions filed regarding these issues were repeatedly ignored by the court.

22. Preparation for the Hild trial proceeded wholly independent of all of the above (and after most of the above), and was necessarily intense and comprehensive from the beginning of my retention. The size and scale of the trial, which included the review and organization of over 4 million documents, necessarily required effectively the full-time conversion of my practice in dedication to the Hild matter. This was especially the case given that I inherited the matter from former counsel, there were significant problems with the transfer of the case materials, and initially the trial date was only eight (8) months away. The Hild matter had the full dedication of not only myself but virtually my entire office staff from the moment of my retention straight through the trial of the matter in April 2021.

23. At no time in any way, shape, or form were the proceedings in my domestic court litigations a distraction to the preparation of Mr. Hild's defense. I had retained counsel, including Mr. Otis, who handled the domestic litigations. While I had client-level involvement and knowledge of the things I needed to know about, and occasionally did more in a *pro se* attorney capacity, the specific preparations for the *Bakker* trial and other matters were directly attended to by Mr. Otis and the other lawyers and paraprofessionals in overwhelming part.

24. Ms. Lawrence began representing me on a *pro bono* basis as co-counsel in both domestic litigations in or about January 2021, after the *Tapke* matter was more or less concluded and approximately six (6) weeks prior to the scheduled trial of the *Bakker* matter in February 2021. She regularly worked out of my office during this time, and from that point forward, as the level of our professional collaboration expanded to matters outside of my own personal litigations in the Kenton Family Court. Ms. Lawrence was introduced to Mr. Hild, to my memory, in this context. Mr. Hild was full-time present locally and working on his

defense with me on a daily basis, with dedicated office space arranged in my office, from

on or about February 4, 2021 through until the beginning of the trial of his matter in New

York.

25. From the time that I was retained by Mr. Hild through the duration of the trial of his matter,

Mr. Hild and I were intensely engaged and generally in weekly if not daily contact (on

average) one way or another in attending to the preparation of his case in his criminal

matter and/or regarding various of the collateral issues that were arising related to the

operation of his wife's businesses and some of the other civil collateral matters that were

then arising as a result of his pending criminal charges.  We also frequently talked on a

personal level, as friends, about his general health and welfare and state of mind in light of

what he was going through.  At no time ever did Mr. Hild express any concern whatsoever

about any distraction my domestic litigations might be to our preparation of his defense in

any manner.  Frequently, Mr. Hild would offer kind words of solace and comfort as a

friend, often inquiring about the status of my domestic litigations.

26. At some point the *Bakker* litigation took a particularly nasty turn, generally beginning after

I became increasingly vocal as my own *pro se* attorney in voicing my objections to various

of the things occurring in the case, and to a limited extent in the *Tapke* matter in relation to

other issues that arose in that case beginning in the fall of 2020, that I was observing and

felt were completely inappropriate and plainly against the rules.  Generally, at the core of

my objections was the role of certain of Judge Mehling's staff in shaping the litigations in

a manner plainly contrary to the rules of procedure and the governing standards of judicial

conduct, and especially the nature of the relationship between Mr. Dietz and a particular

staffer.  I also became aware at this time that certain persons acting on Ms. Dietz's behalf

or at her direction were contacting certain of my clients directly or indirectly and suggesting generally that my representation of these clients was compromised because I was distracted by my domestic litigations, including especially the litigation involving Ms. Dietz's client.

27. Mr. Hild was one such client that was contacted by someone clearly connected to Ms. Dietz in an effort to interfere in the client relationship. As I would only later find out from Mr. Hild, Mr. Hild and/or his wife was contacted by a "local attorney" (as reported by Mr. Hild) to communicate to Mr. Hild that he should be concerned about his representation by me in his case on account of the "distraction" my personal family court litigations were. Mr. Hild informed me of this, only in passing, sometime later in time, in the course of a phone call in or about late 2020 which was initiated by me the purpose of which was to address the by-that-point acute issue of non-payment for the hundreds of thousands of dollars in massively-discounted legal fees and approximately $100,000 in litigation costs "fronted" by my firm which was not part of our understanding and which needed to be addressed. The issue of non-payment had been outstanding for many months at that point and the costs associated with an out-of-town trial, especially the lodging costs associated with staying in New York at a hotel for a month of trial, were now significant additional "fronted" costs being borne by me. Mr. Hild explained that he was not in a position to approach the contractual guarantor (his wife) regarding authorizing payment for the outstanding fees and costs long due and owing at that point for several reasons, one of which is that according to Mr. Hild the outreach from the "local attorney" disparaging me and suggesting that I was "taking advantage of" Mr. Hild to pay for my family court litigations would become an issue with the contractual guarantor if I pressed the issue at that time. The outreach by

the attorney did not seem to me to be of major concern to Mr. Hild at all, and he had not affirmatively raised the issue of my potential "distraction" with me.  By this time, however, I had generally become aware that this sort of "client interference" on the part of people acting at the direction of or indirectly for Ms. Dietz had been going on for some time, and consequently I made a point to address the issue with Mr. Hild right there and then directly and expressly out of an abundance of caution.  (Several clients had reported similar sorts of outreaches, and it was becoming a matter of professional responsibility for me.)  I specifically asked Mr. Hild if he had any concerns about me being "distracted," and if so I indicated that as a matter of professional responsibility it was important that we address them there and then.  Mr. Hild indicated that he did not have any such concerns.  He indicated that he just mentioned the issue because it was a reason he did not want to discuss the issue of the outstanding balance owed my firm at that point with the contractual guarantor.  This was the one and only instance in which the idea that my domestic court litigations were in any way a "distraction" came up, in any capacity at all, until after I had returned to Kentucky following the conclusion of Mr. Hild's criminal trial in New York.

28.  Mr. Hild's casual mention of the outreach from the "local lawyer" clearly connected to Ms. Dietz (in my view, on account of the information provided to me by Mr. Hild in describing how the person who made the outreach described themselves to him) represented the end of my patience with Ms. Dietz in regards to her practice of seeking to interfere in my publicly-known client relationships as part of what by then appeared to be a bizarre, scorched-earth campaign to discredit, attack, and punish me for speaking up and out about the things I had spoken up about.  Multiple prior clients had reported similar outreaches, but I had not to that point sought formal judicial intervention to enjoin the wholly-

21

inappropriate practice, hoping that Ms. Dietz would just calm down and knock it off at some point.  In response to the reported outreach to Mr. Hild, however, a motion was filed on my behalf with the Kenton Family Court seeking to enjoin Ms. Dietz from having direct or indirect contact with any of my client relationships, and reporting the information regarding the outreach to Mr. Hild all-but-certainly made at the direction of Ms. Dietz directly or indirectly to the court.  This motion was subsequently (and inexplicably) denied.

29. Although I myself was not distracted from Mr. Hild's defense preparations, nor Ms. Lawrence once she came aboard to assist me with the trial, I did have concerns about distractions on Mr. Hild's end as the time came for more intensive, face-to-face preparation with Mr. Hild in the months leading up to his trial in New York.  Specifically, it had been agreed that Mr. Hild would travel to Kentucky in or about January 2021 and remain local from that point forward through to the trial date for the purpose of working full-time, side-by-side with me on a daily basis in preparation of his defense.  It had been explained to Mr. Hild that this was especially necessary in his case given the document-intensive nature of the case and the difficulties in conducting preparation for such a case on a long-distance basis over the phone or via "facetime" (both regular methods of our communication in preparing Mr. Hild's defense for the first year or so of my representation of him).  Mr. Hild, however, was busy in his hometown of Richmond, Virginia attempting to keep his wife's many business interests afloat, a tall order under the circumstances (not only the circumstances of Mr. Hild's indictment, but the COVID pandemic public closures and eviction moratoriums).  I became concerned that proper priority was not being given to the preparation for the criminal trial, and I expressed this to Mr. Hild many times.  Ultimately, Mr. Hild did not come to Kentucky until early February 2021, roughly two months before

the scheduled start of his criminal trial in New York.  Although I believe that this was adequate time to finalize the preparation of his defense, in the end, and firmly believe that we were maximally prepared to present his defense at trial, it did cause me some concern at the time.

30. By that time, Ms. Lawrence was officially "co-counsel" on my domestic litigations, the only one that was really active at that point being the *Bakker* matter, which was scheduled to go to trial (a 4-5 day bench trial) via "Zoom" hearing in late February.  Mr. Hild was aware of this one and only conflict in my trial prep schedule, and both of us had long planned around it.  Mr. Hild, after all, had trial preparation to do (documents and transcripts to review) that did not involve my direct participation.  Ms. Lawrence took the lead for the most part in the *Bakker* trial, but was assisted by Mr. Otis, my primary and original, long-time counsel on the domestic litigations going back years at that point.  Mr. Otis was also more or less working full-time out of my office at that point, putting the exhibits together for the *Bakker* trial and otherwise working with Ms. Lawrence.  My involvement was minimal in the preparations and was not necessary for the most part, the litigation having been pending at that point for nearly two years and the exhibits to be used and witnesses to be called arranged for and marked a long time ago at that point. After two years of intense motion practice and vociferous (and often personal, *ad hominem*) attacks by opposing counsel in the *Bakker* litigation, there was no suspense on either side as to the evidence that would be presented at the trial and the main themes of the evidence on both sides.

31. Following Ms. Lawrence's entry of appearance as "co-counsel" in the *Bakker* case, and her assumption of a primary role in actively litigating the matter, she herself became targeted in an unusual way for attack and personal and professional ruination.  Most notably, the

23

attorney for Ms. Bakker (Ms. Dietz) very "coincidentally" was retained by Ms. Lawrence's former spouse, from whom Ms. Lawrence had very recently filed for divorce, in their divorce litigation then-pending in a different local family court jurisdiction.  As it was, Ms. Lawrence had asked me to represent her in the proceedings, at the time wholly without suggestion of being contentious litigation, and I had agreed to do so (and had begun doing so) on a *pro bono* basis.  Ms. Dietz's representation of Ms. Lawrence's soon-to-be-ex-husband thus put Ms. Dietz in the position of being opposing counsel to me in Ms. Lawrence's litigation, and in a position to cross-examine Ms. Lawrence in Ms. Lawrence's divorce proceeding in Ms. Dietz's role as counsel for Ms. Lawrence's ex-husband in that litigation.  To say that this made for an awkward arrangement of counsel and clients given that Ms. Dietz and Ms. Lawrence were set to square off as opposing counsel on behalf of their respective clients (Ms. Dietz representing Ms. Bakker, Ms. Lawrence representing me) only weeks later in the *Bakker v. Dusing* trial in Kenton Family Court is to put it mildly.

32. During this period, Ms. Lawrence and I came to learn that we were actively being surveilled by a private investigator engaged by Ms. Dietz.  It was also learned that Ms. Dietz had come to be in possession of materials related to me, and indirectly Ms. Lawrence, that had been provided to her by a former employee of my law firm (who had direct and active involvement in helping my lawyers in working on the *Bakker* litigation, no less).  Despite having actual notice of the confidential nature of the contents of the materials effectively stolen from my law firm and the active involvement of the local police in addressing the situation, Ms. Dietz nonetheless disseminated these materials and put them in the public record in the form of various pre-trial and other related filings in the *Bakker* case.

33. Other strange, bizarre occurrences ensued involving Ms. Dietz's use of Ms. Lawrence's divorce proceeding as a means to fight a "proxy war" against me, as her bizarre and increasingly-troubling preoccupation with "bringing me down" took on a surreal, almost cinematic and ultimately sinister character. As but one example, during a pre-trial hearing in Ms. Lawrence's divorce proceeding, at which I was representing Ms. Lawrence and Ms. Dietz was representing Ms. Lawrence's former spouse, Ms. Dietz ambushed Ms. Lawrence in cross-examining her regarding highly-sensational subject matter using private videos made of Ms. Lawrence by her former husband without her knowledge and consent the existence of which was previously unknown and which had not been disclosed to me, as counsel for Ms. Lawrence, prior to the proceeding. The illicit and graphic depictions of Ms. Lawrence produced by her former husband, a violation of the voyeurism laws of the Commonwealth of Kentucky (in my view), distributed to me (off the record) at the proceeding by Ms. Dietz (also a felony violation of criminal laws of the Commonwealth of Kentucky, in my view), shocked the conscience and had a predictably damaging emotional impact on Ms. Lawrence. Ms. Lawrence reported the matter to the local sheriff's office, who has been actively investigating the matter and who has informed Ms. Lawrence that the matter has been submitted to the local felony prosecutor's office for consideration of criminal charges.

34. The seemingly bizarre conduct of Ms. Dietz in relentlessly attacking both myself and Ms. Lawrence both inside and outside of the courtroom in attempting to publicly embarrass and humiliate us, it seemed, made the trial of the *Bakker* matter in the Kenton Family Court a very interesting event indeed as the date for the trial approached. In light of Ms. Dietz's actions in ambushing Ms. Lawrence in her divorce proceeding and the possibility of

criminal prosecution of Ms. Dietz by the local authorities arising from same a very real possibility at that point, my lawyers filed a motion to disqualify Ms. Dietz from representing Ms. Bakker at the February trial in our family court case in Kenton Family Court. Despite being filed well in advance of the first day of trial, the court staffer in Judge Mehling's chambers presented the motion to Judge Mehling only after he had taken the bench on the first day of trial in a manner that suggested that it had just been filed, in keeping with what I and others by that point had identified (we felt) as being the staffer's preferred method of "killing" certain motions involving allegations of misconduct on the part of Ms. Dietz and other "preferred" court insiders such that the motions would not be reviewed by Judge Mehling. Predictably, the motion was summarily denied on the spot by Judge Mehling and never seriously considered.

35. Adding to the intrigue of the nightmare of a family court litigation that was (and is) the *Bakker* case, Ms. Lawrence had reported to me shortly before the start of the *Bakker* trial that she was extremely concerned that the *Bakker* litigation was "fixed." She reported to me that as much had been expressed to her by Ms. Dietz in a telephone conversation Ms. Lawrence had with Ms. Dietz a week or so prior to the trial date (amounting to an attempt by Ms. Lawrence to settle the case on my behalf, and avoid all the ugliness that comes with family court trial practice). I expressed disbelief that the outcome of a trial could actually be predetermined in a modern court of law in the United States of America and that such things surely did not actually occur, but privately could tell from Ms. Lawrence's disposition and the clear effect the impact of her conversation with Ms. Dietz had on her that she sincerely believed that the *Bakker* trial was effectively "fixed" and that the court staffer who by that point in time had been identified (in our view) as Ms. Dietz's clear

"inside ally" at the family court and who had helped steer the litigation in favor of Ms. Dietz's client from the outset had arranged with Ms. Dietz to secure the outcome desired by Ms. Dietz and her client.  That at no point in the two-year history of the *Bakker* litigation had Ms. Dietz expressed any sincere interest whatsoever in resolving the case short of trial further supported Ms. Lawrence's sincerely expressed view to me prior to trial that "the fix was in."  There was, however, nothing really Ms. Lawrence or I could do about it, if in fact this was true. Even if true, proving such a thing would be all-but-impossible.  We proceeded to finalize our trial preparations, hoping for the best.  Ms. Lawrence remained greatly disturbed by what Ms. Dietz had said to her on their call, however, and urged me to raise the issue stridently with Judge Mehling at the outset of the *Bakker* trial.  For fear of retaliation (and for other reasons), I directed Ms. Lawrence and Mr. Otis not to raise the issue with the court.

36. It was against this troubled, confusing backdrop that the *Bakker* trial proceeded in late February 2021, approximately six (6) weeks prior to the scheduled start of the Hild trial. Mr. Hild was present locally full-time by this point (living at a home owned by a fellow high school classmate) and was working daily full-time on his criminal trial preparations under my direction out of a physical location in my office. Mr. Hild thus literally witnessed not only my own involvement, limited as it was, in the preparations for the *Bakker* trial, but also the *Bakker* trial itself, which took place via "Zoom" videoconferencing with me and my lawyers participating on a daily basis from my glass-walled office conference room.  Ms. Lawrence took the lead role at the trial, while I directed and cross-examined a limited number of witnesses.  Although Mr. Otis only examined one witness, he was a full participant and present for the entire trial.  Consistent with his role as my primary counsel,

he took the lead in terms of the organization, planning, and strategy for our side in regards to the trial.

37. During my participation in the *Bakker* trial, I would often consult with Mr. Hild during breaks regarding various questions he had involving his preparations for his criminal trial. We touched base on a daily basis, either before or after the *Bakker* trial started for the day (or both), regarding the things he was reviewing (having been directed to do so by me) in preparation for his trial.   During this time he offered positive words of friendly encouragement to me in relation to the *Bakker* proceeding.   Examples of text messages received from Mr. Hild during this time in this regard are attached hereto as *Attachment B*.

38. For the above reasons, the statement in Mr. Hild's declaration in paragraph 5 that he had no knowledge of any activity in my domestic court litigations is demonstrably false.  The *Bakker* trial was actively discussed with Mr. Hild, the need to arrange our preparation of his defense in relation to his criminal trial around the minor conflict it presented was actively discussed, our criminal trial prep plans were consciously made keeping the brief proceeding specifically in mind, it was actively physically witnessed by Mr. Hild on a daily basis during this time as it proceeded (on my end) via "Zoom" from the main conference room of my office, and it was the subject of text communications from Mr. Hild during this time.  It is difficult to understand the basis for Mr. Hild's assertion to the contrary in his declaration at paragraph 5.

39. The *Bakker* proceeding in no way impacted preparations for Mr. Hild's criminal trial in April and the idea that it could or would be a "distraction" in any way was never raised by Mr. Hild at any time.  It never entered my mind to raise the subject with Mr. Hild, as it was plainly not a distraction in any way.

28

40. The trial of the *Bakker* matter did not conclude as scheduled, and therefore the court scheduled an additional day for the parties to put on proof in early March. Mr. Hild never raised any issues about the minor inconvenience this caused in regards to our erstwhile preparation of his defense in regards to his criminal trial, nor did I think to do so. Mr. Hild's trial preparation in its final stages was exquisitely planned in advance to maximize the efficacy of the limited time for preparation as the trial approached and as the issues to be controverted at the trial came into clearer focus through discussions with the government attorneys regarding stipulations to certain evidence and motion *in limine* practice before the Court over the course of the month or so preceding the start of Mr. Hild's criminal trial. Per the preparation plan, Mr. Hild used the time when I was in the *Bakker* trial in February and during the single day in March to review the thousands of potential exhibits and other evidence produced by the government anticipated to be used against him in support of his conviction at trial. He also used the time to attend to important other issues percolating back in Richmond relating to his and his wife's business interests. The *Bakker* trial simply did not impact Mr. Hild's trial preparation at all, in any respect, for these reasons.

41. After the conclusion of the *Bakker* trial following the delayed day of proof in early March, I thereafter had minimal involvement in the *Bakker* matter. The only substantive work left to do on the case was the preparation and submission of a "post-trial submission" (no longer than 15 pages) requested by the court of both sides. The submission was due on March 29, 2021. Mr. Otis and Ms. Lawrence took the lead in its preparation, in consultation with me as the client. My focus was entirely on the Hild trial at that point.

42. At some point in approximately March 2021, the attorneys for the government in Mr. Hild's case approached me about agreeing to an adjournment of the trial date in Mr. Hild's

case until the fall of 2021.  I discussed the issue with Mr. Hild extensively.  Mr. Hild was

adamant that we proceed to try the matter in April, as scheduled, and that we not agree to

the adjournment proposed by the government.  One of the reasons cited by Mr. Hild as

support for his belief that agreeing to delay the trial was not in our favor was his stated

belief in the thoroughness of our preparations and his belief that we were more prepared

than the government to proceed in April.  (I agreed with Mr. Hild's assessment on this

point.)  Another reason we discussed was that the government had not disclosed an expert

witness by the agreed, court-ordered deadline, and therefore as it stood could not introduce

expert opinion testimony at the trial – something I firmly believed, based on my experience

and upon my review of the relevant case law, was necessary to support a conviction in Mr.

Hild's case.  Although we had been unsuccessful in securing an expert witness to provide

testimony on our side of the kind Mr. Hild's new lawyers suggest in their post-trial filing I

was constitutionally ineffective in presenting at trial, it remained that the government (not

us) had the burden of proof.  As discussed with Mr. Hild many times during this period, I

believe (and still believe) that the absence of expert testimony to establish a value of the

bonds at issue in the case was a critical oversight by the government in its proof.  Both Mr.

Hild and I agreed that an adjournment of the trial date could result in the government being

afforded the opportunity to detect this hole in its planned trial proof and to correct it.  After

discussing the pros and cons with Mr. Hild thoroughly, consistent with my professional

obligations, I declined the government's informal proposal to jointly move the Court for a

further adjournment.  Subsequently, the April trial date in Mr. Hild's case was solidified,

and we received formal notice from the Court's trial-scheduler to this effect.  At that point,

we were locked in to try Mr. Hild's case in April.

43. If there were any concerns on Mr. Hild's end about my domestic litigation in the Kenton Family Court being a "distraction," or any concerns at all whatsoever regarding the state of our trial preparations in his case, I would have expected Mr. Hild to raise this issue in connection with our discussion of the proposed adjournment of the trial date the government's attorneys in his case had suggested.  If Mr. Hild was not confident in our case preparation in any respect, the proposed adjournment offered in effect an opportunity for 4-5 further months of trial preparation.

44. Also in or about March 2021, at some point either directly before or after the *Bakker* trial, it became clear to me that my presentation of Mr. Hild's defense at his trial would be greatly enhanced if I had a "second-chair" attorney assisting me.  From the beginning of my representation of Mr. Hild, it was envisioned that I would try the case unassisted.  Although Mr. Hild had agreed to retain local counsel, Baker Hostetler (an AMLAW 100 firm at which I was formerly a partner), to provide guidance on procedural and similar local-knowledge-related issues involved in our trial preparations (given that I had not previously tried a case in the Southern District of New York, and my lack of familiarity with the venue), cost constraints and other external considerations rendered the full participation of local counsel at trial a practical impossibility.  The case, however, was very different in March 2021, on the metaphorical eve of trial, than it was at the time I accepted the representation (in or about January 2020), a year earlier.  The delayed trial date had facilitated an expansion of the evidence on both sides, and the scope and scale of the evidence to be defended against and to be presented on our side required, in my view at that time, the assistance of a "second chair" for the presentation of Mr. Hild's defense to be maximally effective at trial.   Given Ms. Lawrence's excellent performance in

representing me at the *Bakker* trial, the expansion of our professional collaboration on various matters by that point in time and my excellent impression of her trial skills and work ethic, as well as our demonstrated compatibility personally and professionally, as well as her surprising willingness at such a late hour to arrange her personal and professional schedule to be able to accommodate an out-of-town trial expected to take upwards of a full month, I approached Mr. Hild about the idea of Ms. Lawrence coming aboard his trial team assisting me at trial in a "second chair" capacity.  Ms. Lawrence through me had become familiar with the Hild matter in a general way, recognized my need for a "second chair" lawyer, was sympathetic to the cause (so to speak), generally eager, and favorably disposed toward Mr. Hild and convinced of his innocence by virtue of her many informal interactions with Mr. Hild during the overlap of their mutual daily work in my office (Ms. Lawrence working with Mr. Otis in representing me in the *Bakker* matter in connection with the February 2021 trial in that matter and Mr. Hild physically present in the office at that time working full-time onsite side-by-side with me in down-the-stretch, full-bore, intensive preparations of his criminal trial defense).

45. Ms. Lawrence coming aboard Mr. Hild's trial team in a "second chair" capacity was actively discussed with Mr. Hild, in my office, on several occasions, extensively, thoroughly, and comprehensively.   Ms. Lawrence had prior federal criminal law experience, but only indirectly, and this was acknowledged to Mr. Hild.  Her role did not require such experience, however.  Ms. Lawrence's role was contemplated to be – and in fact was – to serve in a "second chair" capacity to assist me in the way-bigger-than-originally-anticipated trial tasks we were at that time confronted with (such as locating and contacting potential witnesses, assisting me in organizing the thousands of exhibits marked

by both sides and in play to be introduced and discussed at trial, coordinating witness interviews for third-party witnesses who had retained counsel, coordinating the mechanics of jury selection (a herculean and especially-difficult exercise given the COVID-necessitated procedures to be employed at Mr. Hild's trial in the *voir dire* process), serving as liaison to the Court's staff in arranging and coordinating various important trial-logistics matters, coordinating and overseeing the organization and operation of our onsite "war room" in our New York hotel accommodations, and similar important supportive roles appropriate for her background and experience-level as an attorney).  Ms. Lawrence's role was specifically contemplated to be a "second-chair" role – a role that would have no impact whatsoever on my overall role in guiding and directing trial strategy and decision-making.  Mr. Hild understood this and expressed his understanding of the advantage of me having "second-chair" assistance at trial.  There was, however, the issue of the additional cost Ms. Lawrence's participation would add, and the reality of the cost constraints Mr. Hild had indicated he and the third-party guarantor of the cost of his representation were under.

46. Ultimately, the cost issue was worked out between Mr. Hild and me.  It was worked out in a manner that meant that my law firm would not profit from Ms. Lawrence's participation.  The cost issue having been addressed, Mr. Hild enthusiastically agreed to Ms. Lawrence coming aboard the trial team and assisting me at trial in a "second-chair" capacity.

47. At no point thereafter did Mr. Hild express any negative comments about Ms. Lawrence's performance in her involvement in either my team's trial preparations or presentation of Mr. Hild's defense at trial. In fact, on various occasions Mr. Hild affirmatively recognized

Ms. Lawrence's value both before and during the trial. On several occasions, he recognized her efforts in front of the entire team and other friends and family members at trial.

48. My personal belief as a practitioner is that Ms. Lawrence's value in assisting me at trial was obvious and undeniable, patent, and openly recognized by countless court staff and personnel at various points during the trial. Although I myself examined all of the witnesses at trial on Mr. Hild's behalf and delivered both the opening and closing statements and argued all objections and pretrial matters to the Court, my ability to present Mr. Hild's defense and to deconstruct the government's case against him in all respects was greatly augmented by the tireless, albeit behind-the-scenes, "second-chair" efforts and support of Ms. Lawrence from beginning to end.

49. Mr. Hild was expressly aware, and had long been aware, that Ms. Lawrence was one of the lawyers representing me in my domestic litigations in the Kenton Family Court. Indeed, such was the purpose of her presence in my office on a daily basis during the time Mr. Hild was present in my office on a daily basis during the final months of his criminal case trial prep. She was introduced to him as one of my lawyers on my family court litigations and her purpose in being at my office on a daily basis during this period was expressly known to him to be for that very purpose. On many occasions, Ms. Lawrence and I discussed routine happenings and case-related administrative matters relating to my domestic litigations (and, especially, the *Bakker* trial preparations) in Mr. Hild's presence. Ms. Lawrence's work on my family court cases as one of my lawyers (albeit the one taking the lead on both cases as a practical matter at that juncture) did not conflict at all with her "second chair" role representing Mr. Hild once she came aboard for the reason that by that point in time there was no further work to be done on my domestic court litigations (for

the most part, as a practical matter) once the *Bakker* trial was completed in substance in late February. Active litigation in the *Tapke* matter had long since concluded. After the formal completion of the *Bakker* trial in early March 2021, my domestic court cases were in substance concluded. A ruling in the *Bakker* matter on the issues litigated at trial (custody, parenting time, and child support in relation to my by-then-two-year-old daughter, LFD) was not expected for many months (at the earliest), and full and complete attention was required (and in fact directed) at that juncture on final trial preparations in the Hild matter.

50. In the final weeks prior to our scheduled travel to New York for the Hild trial, Mr. Hild on several occasions made a point to openly thank not only myself but also my team in the office for our hard work and dedication in preparing his defense. His words in this respect were gracious and kind. As a final gesture before he departed to head back to Richmond to pack for the trial in New York, after which he would proceed to travel to New York (meeting us there), Mr. Hild of his own accord gathered myself, Ms. Lawrence, and my entire office staff ("the team") in my office and delivered emotional comments that he had formally prepared in writing and read aloud to all of us. The essence of his message was one of humble thanksgiving and recognition of the hard work and robust and sacrificial preparation on the part of not just myself but my entire team.

51. Due to cost limitations and for other strategic reasons, not everyone working on Mr. Hild's case in my office who had a role in the preparation of his defense would be part of the onsite trial team in New York actively involved in assisting me at trial. Several experienced paralegals and other paraprofessionals would remain in Kentucky, prepared to assist the New York-based team remotely, afterhours and in other respects as the need arose. Those

team members that remained in Kentucky had a separate purpose as well, should the need

arise: to assist Mr. Otis in dealing with anything and everything that might come up in

connection with my family court litigations in the Kenton Family Court or in connection

with representing my firm's other clients in relation to the other clients we served. Mr.

Otis would be in the office full time and was charged, of course, with management of the

*Tapke* and *Bakker* family court litigations in the event that there was activity in either

during the trial of the Hild matter. No such activity was expected, of course. The *Tapke*

matter was not active at that time, in any meaningful respect. The trial of the *Bakker* matter

had just concluded (post-trial submissions from both sides having been submitted to the

Kenton Family Court on March 29, 2021), and based on historical timeframes for the

issuance of opinions and orders of the Kenton County Family Court in the normal course

a written opinion and order deciding the issues that had been litigated at the recent trial was

not realistically expected for several months, at minimum. (Given the voluminous

documentary evidence admitted at the *Bakker* trial – over 5,000 written communications

of the parties – and the fact that the trial involved the testimony of approximately twenty

(20) witnesses (a mega-trial by family-court standards, as I had come to understand) –

realistically a decision was not expected from the court for 3-4 months.)

52. Judge Mehling and his staff in his chambers at the Kenton Family Court were well aware,

many different ways, of the fact that Ms. Lawrence and myself would be out-of-pocket for

the Hild trial and would have a conflict in relation to any family court business scheduled

during our time in New York. The Hild matter had come up in various ways on many

occasions prior to the *Bakker* trial (including a motion for continuance of the *Bakker* trial

filed in part on the grounds of its proximity to the Hild trial), Ms. Lawrence had provided

very specific notice to Judge Mehling's staff and to opposing counsel in both the *Bakker* and *Tapke* litigations of the dates for the Hild trial, its expected length, and indeed even our precise travel dates for our departure for New York (approximately a week before the scheduled start of the Hild trial). Specifically, actual notice was given to all concerned parties that we would be departing for New York on the morning of April 6 and would be out-of-pocket and unable to participate in any hearings or other court business of any kind beginning on that date and continuing for approximately the following month. All relevant parties, including Judge Mehling's staff, were advised many times over of the precise nature of our business in New York – *i.e.*, our around-the-clock defense of our client, Mr. Hild, in a federal criminal jury trial, a matter of the gravest possible consequence which would require our full, "24/7" attention. No one indicated any objection to our travel plans or protested our disclosed unavailability for the duration indicated. Fortunately, both family court litigations at that point being generally inactive no hearings or other matters were scheduled in either case for the full period of our anticipated (and disclosed) period of unavailability.

53. As had been planned, and as was known to all the relevant family court actors, including the relevant staff members in Judge Mehling's chambers, Ms. Lawrence and I and our defense team (3 other paraprofessionals from my office, who would be accompanying me and Ms. Lawrence and assisting us at trial in various supportive roles) departed for New York for the Hild trial on the morning of April 6, 2021. The trial was scheduled to begin on Tuesday, April 13, 2021, but a pretrial conference where meaningful pre-trial issues were to be litigated was scheduled to occur in person on Friday, April 9, 2021. Because there were voluminous trial-related materials to be transported on site, including supplies

and the infrastructure of the "war room" from which we would operate (a separately-dedicated room at the New York hotel where we would be staying) while in New York for the trial, the team would be driving to New York.  Given that travel would take a full day and that we needed to get set up and situated in New York, which would take at least a day, and also given the need to finalize preparations for the important issues to be litigated at the pretrial conference on April 9th, the day of our travel had been carefully selected and preplanned.  That Ms. Lawrence and I would be unavailable as of the morning of April 6, 2021 for purposes of any family court business in the Kenton Family Court was therefore very specifically known to both opposing counsel in both of my family court matters as well as Judge Mehling's chamber's staff.

54. A major event occurred in the *Bakker* family court litigation on the eve of our departure when in the early evening of April 5, 2021 the Kenton Family Court in the *Bakker* litigation issued its opinion and order ruling on the issues that had been litigated at the trial.  The timing of the issuance of the court's order was uncanny, and in keeping with its long history in the litigation of issuing rulings at times when the impact was maximally prejudicial to my side.  The timing of the issuance of the Court's April 5, 2021 order, reflecting its "permanent orders" in the case in ruling on the issues of custody, parenting time, and child support to be paid in relation to my two-year old daughter by Ms. Bakker (LFD), was nothing short of astonishing – for many reasons.  One of those reasons was that it, of course, maximally prejudiced my legal interests and was maximally inconvenient insofar as the time for filing motions seeking relief from the order would run from that date, during which time Ms. Lawrence and I would be indisposed in New York.  That said, Mr. Otis as my attorney was in a position to handle whatever post-trial motions would need to be prepared

and filed and to study the order and advise me of the court's rulings and rationales therefore

and take whatever action was necessary.

55. The issues impacting my relationship with my daughter, LFD, were, of course, of interest

to me. As a *pro se* attorney of record in the case, I received the email transmitting the

court's order directly from the court (as did my other attorneys of record, Mr. Otis and Ms.

Lawrence). The Hild trial was at that time of course my foremost concern, and had been

for some time, but I did pull up the Kenton Family Court's April 5, 2021 order when

I saw it in my inbox that evening. I did not review the order at that time in its entirety,

however, but merely quickly looked to see specifically what the court had ruled in the case.

I noticed it was a lengthy order, but I was quickly able to find the relevant portions outlining

the court's determinations of the issues. I saw that the court had awarded Ms. Bakker sole

custody of our daughter, that my parenting time with my daughter was not decreased, and

the amount of the child support that I would be required to pay Ms. Bakker. On the whole,

I was, if anything, not surprised and only moderately annoyed by the court's rulings on

these issues. It had long been clear that whatever the court ruled at the trial court level an

appeal would likely be necessary to address the myriad issues that had come up in the case

that would, I had resigned myself to accepting, almost certainly generate a result that would

not be fully to my liking and fair and just on the facts and law in my view. Granting LFD's

mother sole custody was certainly surprising given that such a determination is

extraordinarily rare, justified in only the truly most unique of circumstances under

Kentucky constitutional and statutory law, and amounts to depriving a parent of a

fundamental constitutional right. But Ms. Bakker being awarded sole custody of our two-

year old daughter did not at all mean that I had "lost" my daughter, as is represented by

Mr. Hild's new counsel in his post-trial filing.  Not at all.  The issue of custody pertains to who makes decisions for the child, and is entirely separate and distinct in concept from the issue of parenting time.  Parenting time is the time that a parent "has" their child – physical custody, if you will – and I had long had significant parenting time with my daughter (roughly 50/50, exclusive of "work" and "sleep" hours) and the court's order did not reduce that (indeed, it increased my parenting time with her further still).  By any definition, and certainly for purposes of Kentucky law, the court's order in regards to parenting time amounted to a "shared parenting" arrangement (as opposed to the minimal parenting time that Ms. Bakker had asked the court in the case to award me).  The child support amount would not bankrupt me.  I did not review the rest of the order in any respect, and my focus immediately turned back to the Hild trial.  Mr. Otis would study the order and at a convenient time when Ms. Lawrence and I had a moment after we were settled in in New York I planned to have a call with Mr. Otis and discuss what if anything needed to be done in reaction to the order in the *Bakker* litigation, which he and the other paraprofessionals that stayed behind in my office in Kentucky could prepare and file.  The court's ruling on the custody issue was, frankly, the only major issue for me; at the same time, I well understood (having self-taught myself Kentucky family law over the course of the two-year pendency of the *Bakker* litigation) that especially in my circumstances (an initial custody determination) an award of sole custody was virtually unprecedented and highly legally tenuous (at best) and therefore the easiest issue to get corrected on appeal.  My focus necessarily having returned to preparation for the Hild trial and the logistics of our pending departure for New York, I would not actually read the Kenton Family Court's

April 5, 2021 order in the *Bakker* litigation in full until after I returned to Kentucky following the completion of the Hild trial (and even then, not for several weeks thereafter).

56. My relative disinterest in the substance of the April 5, 2021 order of the Kenton Family Court beyond its actual rulings on the issues in question was also in part a function of my and Ms. Lawrence's immediate recognition upon learning of the court's issuance of the order of what the court's astonishing timing meant as a matter of simple logic.  What it meant was that the *Bakker* litigation had been in fact decided in advance (just as Ms. Lawrence had suspected and feared).  This conclusion was compelled as a matter of logic, given that the Kenton Family Court had not even received the parties' post-trial submissions in the case (the lengthiest and most important filings in the case, and the parties' one-and-only opportunity to present their respective factual and legal arguments in support of their respective positions for the court's consideration) until the close of business on March 29, 2021.  This meant that the Kenton Family Court had somehow a) reviewed and adequately considered both parties' 15-page post-trial submissions; b) reviewed the voluminous documentary and other evidence cited therein (most of which was not put before the court at the actual trial of the matter due to time limitations); c) researched and analyzed the legal authorities on which the parties relied in support of their respective positions; and d) drafted, revised, edited, and finalized a 20-page opinion and order making 111 findings of fact and providing legal justification for denying one of the parties to the litigation fundamental constitutional rights strongly presumed under the state and federal constitutions, all in a matter of six (6) days.  Clearly, that did not (and could not, as a practical matter) happen in six days.  But the conclusion compelled was even more obvious when it was understood that the 6-day period included a 3-day Easter holiday weekend and

two days during which the court's business was dedicated to specific regular dockets that consume the court's business for the entire business day.   In reality, then, the court had somehow accomplished all of the above *in a single day*.  Plainly, that had not (and very clearly could not) happen.  The inference compelled was that the outcome of the litigation and the court's opinion and order in which that outcome was set forth had been decided and drafted in advance.  There was (and remains) no other way.  As shocking as this observation was to Ms. Lawrence and me, there was no time to dwell on it given that we had work to do in the Hild case and that was necessarily our focus.  Other than to observe that it was extraordinarily disturbing that the court's April 5, 2021 order proved as a matter of physics that the Kenton Family Court was indeed corrupted, and that the timing of the April 5, 2021 order in the *Bakker* case itself was irrefutable evidence of same, no further attention was given to the matter at that time.

57. From the time we arrived in New York on the evening of April 6, 2021 until we departed New York on or about May 3, 2021 at the conclusion of Mr. Hild's trial, with the exception of a single Saturday afternoon during which Ms. Lawrence and I spent 4-5 hours walking from our hotel down to Times Square and back (to get some fresh air and briefly unwind), I worked on Mr. Hild's case exclusively more or less non-stop, every single day (including weekends), dawn-until-dusk.  The same was true of Ms. Lawrence, as far as I could tell. Having searched my memory and consulted with Ms. Lawrence to ensure the reliability of my memory, I would estimate that the total amount of time I spent doing anything at all related to my domestic court litigations in Kentucky in the Kenton Family Court during the entire month-long period we were in New York was 90 minutes.  Most of that was answering quick questions relayed to me through our local support staff from Mr. Otis or

having short conversations with those assisting Mr. Otis putting together whatever was being put together to be filed in the Kenton Family Court in response to that court's issuance of its April 5, 2021 order. Ms. Lawrence and I intermittently discussed certain activity that I understood to be happening in the *Bakker* matter, which was being handled by Mr. Otis in Kentucky, and I do recall generally approving this or that proposed course of action. These were short conversations, however, and they occurred in between and around the various projects we were working on in preparing the Hild defense, during walks to and from court, for example. My perspective at the time was that the Hild matter needed my full attention, the *Bakker* litigation had concluded, the court's April 5th order was clearly problematic and would be reversed on appeal (which there would be plenty of time to attend to after the Hild trial), and whatever was going on with respect to the scheduling issues I would from time to time understand from Ms. Lawrence were popping up in the *Bakker* litigation (which made no sense to me whatsoever, since everyone associated with my family court litigations back in Kentucky knew that Ms. Lawrence and I were unavailable at that time), it was all being handled one way or another and I was all about the Hild case.

58. My family court litigations in the Kenton Family Court were simply not on my mind during the time I was in New York for Mr. Hild's trial, in any serious way, shape, or form. For the most part, I was completely unaware of whatever was happening in relation to the *Bakker* litigation during that time, understood Mr. Otis was taking care of anything there was to take care of on the family court fronts (as was his specific, singular purpose during the period of my unavailability for the Hild trial), and was all-but-completely in the dark about whatever developments there were during this time in my family court matters.

59. Regarding the filings in the *Bakker* matter referenced in Mr. Hild's post-trial filings, I do not specifically recall being aware of any of those filings, did not review any of them in their final form, and to the best of my memory had limited, high-level input into them (if any at all). I do recall, vaguely, perhaps dictating a very short section of the 40-page motion to vacate, alter, or amend the April 5th order in the *Bakker* matter. I generally directed to Mr. Otis, relayed through Ms. Lawrence (to the best of my memory), that the gist of whatever was being prepared for filing should be that the timing of the court's April 5th order proves that the case was decided in advance and not based on a neutral, unbiased consideration of the facts and law and should be vacated for this basic reason alone. Because the making of such a statement by an officer of the court is a serious thing and was likely to draw negative reaction from the court, I instructed that the filing should be submitted under my name only (*pro se*) such that any consequences would be borne by me and only me (not Ms. Lawrence or Ms. Otis). This is the reason that particular filing was submitted under my name only.

60. Onsite in New York, my team and I had a series of rooms on the 4th floor of the Beekman Hotel, located within walking distance of the federal courthouse where the Hild trial was held. One of these rooms was the "war room" – generally, where our trial supplies and materials were maintained, where we worked as a group, and where we met with Mr. Hild to prepare his defense during the times when we were not in trial. Mr. Hild shared a room with his wife on the 4th floor. To save money, I shared a room with Ms. Lawrence. Our rooms were located adjacent to one another, and several rooms down from the "war room." On a daily basis, even on those days when we were not in trial (weekends, etc.), both Ms. Lawrence and I were in very close physical proximity to Mr. Hild and generally understood

at all times where everyone was and what they were doing.  Mr. Hild was physically in my
vicinity the overwhelming majority of the time we were in New York, during which time
we were working on his case in some form or fashion.  It is difficult to understand how he
could sincerely believe that my domestic court litigations were or could have been a
"distraction" given that I was not away from Mr. Hild enough, over the course of our entire
time in New York, to have been "distracted" by anything for any length of time.  The same
is true of Ms. Lawrence.

61. Once in New York, the general routine during a trial day was for Ms. Lawrence and I to
rise early (approximately 6:00 a.m., generally) to prepare for the day's testimony and attend
to any other legal issues that were expected to arise that day, working until roughly 8:30
a.m. independent of Mr. Hild before getting showered and dressed for court that day and
meeting Mr. Hild and certain of his family and friends (and our other paraprofessionals
assisting us with the case) in the lobby at or around 9:00 a.m. to walk to the courthouse.
Generally, the court convened the trial at 10:00 a.m. on a daily basis, and we would
conclude at approximately 4:00 p.m., with very few breaks during the trial day (with what
breaks there were being extremely short in duration).  Every single day after the trial day
had concluded, the routine was to "roundtable" in the "war room" at the hotel with Mr.
Hild to discuss the day's testimony, important developments in the case on a "big picture"
level, strategic considerations, questions and/or concerns Mr. Hild might have, and the plan
for that evening's preparations for the evidence to be cross-examined (or put on) the
following day.  The purpose was also specifically to make sure Mr. Hild was fully informed
about any major decisions that had to be made in the case and the full gamut of
considerations weighing for or against a particular strategic course of action.

62. Ultimately, many decisions were made regarding the calling of certain witnesses as part of Mr. Hild's defense case that were strategic decisions made after considerable deliberation both within the trial team and upon consultation with Mr. Hild.  Although several of the potential witnesses identified by Mr. Hild's new attorneys in the post-trial motion were at one point during the trial in line to be called by the defense, the relevant strategic considerations changed almost daily as the evidence in the case was put on and evolved, and ultimately the decision was made not to call certain witnesses that we had originally prepared to call.  Much effort had been made to investigate these witnesses and to interview them to consider the full scope of their testimony and to prepare them to be called to testify on Mr. Hild's behalf during our defense case.  Ms. Lawrence and I were in active communication with these witnesses, and their counsel, during this time.  Ultimately, the decision was made not to call certain of these witnesses, this is true.  But the decisions not to call the witnesses that we did not call were strategic decisions made after significant consideration of the risks and rewards and after fulsome conversation with Mr. Hild.  Mr. Hild was active in seeking to understand my views (which would evolve, as the evidence in the case came in over time) and asked many questions.  In the end, he indicated that he agreed with my recommendations regarding which witnesses to call (and which not to call) during his defense case.  For what it is worth, I stand by the decisions that were made in this regard.

63. The trial of Mr. Hild's case was lengthy and there were good days and bad days in terms of the evidence that was introduced by the government in support of his conviction, as tends to happen.  On the whole, Mr. Hild indicated that he was very pleased with the preparations and performance of both me and my team.  He was very gracious in

complimenting me, and us, openly and liberally.  It was my impression that he was more than satisfied with our performance.  This was especially the case after I delivered a 2-hour closing argument on his behalf.  I was greeted with a warm embrace from Mr. Hild and a warm embrace from his wife.  The other many family and friends in attendance in support of Mr. Hild all offered extremely positive feedback about what they thought of my efforts and that of my team in Mr. Hild's defense.

64. An example of such feedback, from Mr. Hild's brother-in-law, who was present for most of the duration of the trial and was especially helpful in offering observations and support to me and my team throughout, is attached as *Attachment C*.  His post-trial comments are illustrative of the feedback we received, individually and collectively, from Mr. Hild's supporters generally.

65. Mr. Hild was the last witness to testify in the case.  His testimony was extensive. It is suggested in Mr. Hild's post-trial motion that his two (2) days of testimony represented "limited" witness testimony from him.  This view in my opinion reflects a lack of experience with federal criminal trials.  By any standard, in my experience, two days of testimony from any witness (especially the defendant himself) is on the lengthier side.  More generally, the suggestion in Mr. Hild's post-trial motion that Mr. Hild's defense was in any way curtailed or "cut back" is completely in conflict with the government's position for nearly the entire trial (frequently expressed, often in passionate ways) that my efforts on behalf of Mr. Hild at trial were excessive and too lengthy.  The Court will no doubt recall the many sidebars and other scheduling conversations amongst the parties and the Court as the trial wore on, and the general view that the trial was running far longer than

had been anticipated at the outset, in large measure because of the length of my cross-examinations.

66. Several of the factual representations made in Mr. Hild's post-trial brief are very misleading. And stunningly so. As but one example, it is simply not fair to suggest – not remotely – that exhibits were not utilized as part of Mr. Hild's direct testimony. Factually, several exhibits were *introduced*, and the record clearly reflects this. The bigger point, however, is that scores upon scores of exhibits *were used* in Mr. Hild's examination. He was the last witness in a lengthy trial, and most of the main exhibits had been admitted through other witnesses by that point, logically. Here again, the government during trial protested the volume of exhibits that the defense discussed with witnesses (one reason the cross-examinations of the government's main witnesses were so long). Other factual assertions are made in Mr. Hild's post-trial motion the basis for which is hard to understand, given the clear trial record. The defense admitted and utilized hundreds of exhibits. Mr. Hild himself generally reviewed and approved in advance which of the many emails and similar exhibits the team had selected to introduce, admit, and discuss during my examination of the witnesses anticipated to be testifying the following trial day. Mr. Hild was quite active in the preparation of his defense this way, and would occasionally argue strenuously for or against introducing various exhibits (to include which of the recorded calls, and which parts of those recorded calls, would be introduced). Although it was true that I did not move for the separation of witnesses, neither did the government, and the issue that arose in that regard noted by Mr. Hild's new lawyers in the post-trial motion could not have been anticipated by the defense and, in any event, clearly *benefitted* the defense more so than the government in the final analysis. To the best of my memory,

Mr. Hild was in agreement with whatever strategic decisions were made in regards to every single evidentiary decision that was made during the trial.

67. In general, no complaints or objections were registered by Mr. Hild at any time before or after the completion of the trial and the jury's return of its guilty verdict in the case regarding my or my team's performance, any of the strategic decisions that were made in connection with the trial, any concerns about me or Ms. Lawrence being "distracted" in any way, or anything else. I did have objections and complaints pertaining to certain direction and demands Mr. Hild made of me in connection with certain subject matter he wanted me to inquire about of him during his direct testimony in the case. This occurred at the very end of the trial, in the days immediately preceding Mr. Hild taking the stand. Generally, from the beginning there were certain things I strongly felt based on my experience trying cases of this kind that would not work and in relation to which I felt like I had at the beginning of the representation received strong assurances would not be a part of any trial defense. Not only did I not believe that discussion of these things would not be effective, but based on my experience I very strongly felt that putting certain testimony from Mr. Hild in front of the jury would virtually guarantee a finding of guilt. Mr. Hild and I had a heated, strong disagreement regarding his strident direction to me, on the eve of calling him to the stand as a witness in his own defense, that I inquire of certain subject matters. I completely disagreed with Mr. Hild in terms of the wisdom of doing so, and strongly felt like to do so was to effectively abandon certain core aspects of the entire philosophical foundation of his defense long ago agreed upon and on which we had built the foundation of his defense at trial up to that point. Although I prevailed upon Mr. Hild as to certain subject matters, Mr. Hild was adamant that certain subject matters be

discussed.  After taking considerable time to search my conscience and to reflect on the ethical considerations involved, I texted Mr. Hild the morning he was scheduled to testify and informed him of my strong disagreement with his decision to instruct me to ask about certain things during his direct testimony and directing him to put in writing the specific subject matters and questions that he wanted me to inquire about.  I specifically told him that I did not want to be in a position after the fact where he was suggesting that I did not present evidence he wanted me to present.  I clearly indicated my disagreement as to his directive to address certain subject matters during his testimony.  That said, I told him that I felt like it was my obligation under the ethics rules to present whatever testimony he desired to be put before the jury so long as there was no ethical or other legal prohibition against doing so, no matter how strongly I disagreed with the course of action personally based on my experience.  Mr. Hild wrote down a short list of questions and at some point over the course of his two days of testimony presented me with the list of subject matters. At one point or another during his testimony, I inquired of him as to those subject matters. He confirmed as much at the conclusion of his testimony.  If there were other things that Mr. Hild desired that I inquire into, he did not indicate those things to me prior to the conclusion of his testimony and, furthermore, he did not so indicate that to me in any way, shape, or form in my discussions with him following the conclusion of his testimony.  In fact, he expressly confirmed that I had covered the subject matter he had wanted me to cover.   A copy of the text message I sent to Mr. Hild regarding this last-minute disagreement as to the appropriate subject matter about which I was to inquire of him in connection with his testimony at trial is attached hereto as *Attachment D*.

68. At various points during the trial, but in particular after both parties presented their closing argument, the Court of its own initiative offered strong praise of both sides' respective efforts. The comments seemed sincere, and were sincerely appreciated by me (and Ms. Lawrence, to be sure). The trial was a complicated, hard-fought, bitterly contested adversarial proceeding during which both parties struck firm but generally-fair blows within the bounds of the rules, in my view. Although I disagree with the jury's verdict and continue to believe in Mr. Hild's innocence, and that he is entitled to a new trial on certain legal grounds, I am quite proud of my efforts on Mr. Hild's behalf and proud of Ms. Lawrence's efforts and my teams' efforts in general as well, if the truth be known.

69. Mr. Hild's post-trial motion makes reference to certain comments from the Court that it characterizes as the Court directing criticism toward me at various points in the case. These selective excerpts from the trial transcript are misleading, in my view. I did not understand the Court at any point in time during the proceeding to be critical of any aspect of the defense in terms of the defense's preparation or presentation of its case in any way. I understood the Court to be complimentary of same.

70. Various other aspects of the pre-trial motion filed by Mr. Hild are extremely inaccurate and unfair, in my view. One example is the criticism that my performance was deficient because I did not retain an expert witness to testify as to the value of the bonds in question. It should be noted that tremendous effort was made to locate and retain such an expert. Prior counsel had been unable to secure an expert willing to offer the desired opinion, despite exploring several reputable options. I myself extensively researched potential experts. I identified a potential expert in a position to testify at trial and give certain expert opinions that I felt would be helpful to Mr. Hild's defense. I had extensive communications

and contact with this potential expert, at one point traveling to Beavercreek, Colorado to meet with him personally to finalize the terms and scope of his participation at trial in Mr. Hild's defense.  My efforts to retain this expert witness were ultimately unsuccessful, for a lot of reasons.  A primary reason, however, was Mr. Hild's unwillingness to pay the amount of the expert's anticipated fees.  Any suggestion that Mr. Hild's defense was inadequate because the defense did not call an expert witness at trial presupposes the existence of an expert willing to give the desired opinion and also Mr. Hild's willingness to pay for the cost of such an expert, and presupposes wrongly in that regard.

71. Although limitations of time and space prevent me from addressing every single trial-strategy decision called into question by Mr. Hild's new counsel in Mr. Hild's post-trial motion, I note that certain of the criticisms leveled reflect, in my view, a fundamental misunderstanding of the nature of federal criminal trial practice and certain of the practical realities of certain aspects of same.  As but one example, it is suggested that I was deficient in failing to use all 10 of the defense's allotted peremptory strikes during jury selection.  Respectfully, it seems to me that any federal criminal practitioner with any experience would well understand that it is not uncommon for a party to not use all of their allotted peremptory strikes, and that in fact using all of the allotted amount just to use the full allotted amount could (and, in Mr. Hild's case, would) have hurt, not helped, the defense in selecting a fair and impartial jury.  As the Court well understands, the decision not to use a peremptory challenge to strike an undesirable juror reflects a strategic determination on the part of counsel that, however undesirable a particular juror at that time in a position to be empaneled if not stricken, the juror who would replace that juror would be *worse* for

the defense. This, of course, explains why the defense in Mr. Hild's case did not use the

full allotment of its peremptory challenges (not negligence of any kind).

72. Following the jury's return of its verdict in the case, both Mr. Hild and myself and the rest

of the defense team were understandably disappointed and emotional.  Mr. Hild was not in

a good state of mind, which is understandable in my view.  I have done this job for quite a

while now, and have long understood that moments such as these are tough, raw, human

moments.  There was a lot of emotion.  The team huddled up with Mr. Hild and certain of

his family members at the hotel immediately after the verdict to discuss what the verdict

meant and, legally, the options moving forward.  I took the lead in those discussions and

outlined the post-trial motions that could (and should, in my view) be filed, and generally

the issues that I perceived that I would recommend raising therein, from my vantage point

at that point in time.  At no time did Mr. Hild or any other member of his family or any of

his friends present at the hotel (there were many) express displeasure with my performance

or insinuate in any way that Mr. Hild's defense had been compromised or deficient in any

way.  To the contrary, both myself and Ms. Lawrence (and the other members of my team)

received warm remarks of gratitude, consolation, compassion, and thanksgiving.

73. I genuinely believed then, and continue to believe now, that the government's case against

Mr. Hild fails as a matter of law for certain reasons put before the Court prior to trial in the

form of certain pretrial motions.  These issues were discussed with Mr. Hild at the hotel

after trial, in various conversations I had with him the evening of the jury's return of its

verdict and over the course of the following days as well.  I had explained to Mr. Hild from

the beginning of the representation that white collar cases were extremely complicated and

it was not uncommon in my experience for cases to be won in the end not necessarily via

an all-out acquittal by the jury at trial but even after a jury's determination of guilt at the post-trial motion stage.  Discussion of the potential need to pursue the matter through to the appellate stage to achieve an ultimate victory had also been explained.  I am disappointed that in my review of the issues presented to the Court by Mr. Hild's new attorneys in the recently-filed post-trial motions the issues I believe to be of substantial merit and that could potentially translate to the award of a new trial or even the Court's entry of a judgment of acquittal notwithstanding the jury's determination of Mr. Hild's guilt at trial are not included (at least, as I would have presented them).

74. In the days following the jury's return of its guilty verdict against Mr. Hild at trial, while still in New York, I was directed by Mr. Hild to begin working on the post-trial motions to be filed, which we discussed at some length.  There was no discussion at that time that he was dissatisfied with my performance or that he was considering terminating me as his counsel.

75. Prior to Ms. Lawrence and I departing New York to return to Kentucky, Mr. Hild expressed his thanks to me privately and we parted after a mutually-tearful embrace outside of our hotel rooms.

76. Ms. Lawrence and I traveled back to Kentucky the day after the verdict, departing in the late morning, traveling by car.  (The other members of our defense team traveled separately.)  I don't specifically recall discussing the status of my family court matters, or what became of the filings put together by Mr. Otis and the paraprofessionals supporting him relating to the *Bakker* case, with Ms. Lawrence at that time.

77. I do recall learning from Ms. Lawrence or Mr. Otis at some point upon our return to Kentucky, or perhaps from Ms. Lawrence in our discussions in the car on the way back

from New York, that there had been a lot of odd goings-on in the *Bakker* case during the period we were in trial in New York.  The entire purpose of the organizational structure of the team for the period of Mr. Hild's trial was to keep me away from anything and everything related to developments in my Kenton Family Court litigations (or in any of my other client matters, to the extent that could responsibly happen) and part of Ms. Lawrence's role in that regard was to liaison with Mr. Otis (in the event Mr. Otis needed anything from me during the Hild trial) in the event he needed guidance or input from us on the family court matters such that I would be bothered the absolute minimum for any reason and could focus instead exclusively on the preparations for and trial of the Hild matter.  My understanding was that Ms. Lawrence had at various times had limited communications with Mr. Otis and others working with him in Kentucky regarding certain things that apparently required attention in the *Bakker* litigation while we were in New York trying the Hild matter.  The purposeful organizational effort to insulate me from any and all distractions during the trial of the Hild matter was very effective, as although I was aware at times that Ms. Lawrence was discussing certain things (in between meetings and prep sessions and before and after court on trial days in the Hild matter) with Mr. Otis and having limited communications with the Kenton Family Court regarding things that, I surmised, were coming up in the *Bakker* litigation, I had no real-time direct involvement in or even knowledge about whatever things were occurring.  Upon our return to Kentucky, I was updated at a high-level by either Ms. Lawrence or Mr. Otis (or both) regarding the bizarre scheduling and docketing developments that had been occurring in the *Bakker* matter during the time when we were trying the Hild matter.

78. My understanding of the events that were occurring during the trial of the Hild matter, as relayed to me by Ms. Lawrence and Mr. Otis, was that the certain staff member in Judge Mehling's chambers whose actions have historically given rise to our historical concerns inexplicably began setting certain motions that had been filed for hearings in the case on dates at which the court and all parties well knew Ms. Lawrence and I would be unavailable (being in New York for the Hild trial, until the very end for an indeterminate period). I was informed that there was a hearing on May 4, 2021 on certain post-trial motions that had been filed. I was also informed that Mr. Otis and/or Ms. Lawrence had filed motions to continue in both family court litigations (in both the *Tapke* and *Bakker* matters) in response to the staff member in Judge Mehling's chambers ignoring Mr. Otis and/or Ms. Lawrence's email communications that we would be unavailable for the hearings being scheduled (as the staff member, and opposing counsel in both cases, well knew). I was also informed that there had been several odd docketing incidents whereby, as I understood it, the staff member in question in Judge Mehling's chambers rejected certain filings that our side had submitted, including the main post-trial filing submitted on my behalf (a motion pursuant to Kentucky Rule of Civil Procedure 59 to vacate, alter, and/or amend the court's April 5, 2021 order in the *Bakker* matter). This was the first filing in which it was flatly pointed out that the court's April 5th order was necessarily the product of a corrupted process insofar as the mere timing of the order itself proved, *ipso facto*, that the case had been decided in advance. I was also apprised that the very same motion to continue was filed in both the *Tapke* and the *Bakker* matters and accepted for filing by the staff member in Judge Mehling's chambers in one but not the other. I did not then and do not now know the precise details of the issues that arose in this regard, only that there were bizarre

occurrences involving the actions of the Kenton Family Court during this time, generally arising from the actions of the staff member in Judge Mehling's chambers giving rise to the historical concerns.

79. The allegation in Mr. Hild's post-trial filing to the effect that I cut short the presentation of Mr. Hild's defense so that I could return to Kentucky for a hearing in the *Bakker* matter on May 4, 2001 is simply not true. I do not recall when I became aware of the hearing on that date, but I do not believe it was before I returned to Kentucky. I did not attend the hearing. Nor did Ms. Lawrence. Candidly, my focus at the time was on researching and outlining the issues to be raised in Mr. Hild's post-trial motions. Ms. Lawrence was generally focused on the same thing. I do not recall the specific timeline, but Mr. Hild and I were having regular communication regarding preparation of the post-trial motions at that point in time. At one point, Mr. Hild asked me to send him the issues I had identified that I suggested, preliminarily, we might want to raise in the post-trial motions in his case. I had written these on the whiteboard in my office. I sent him a picture of the whiteboard listing the issues via text message. My communications with Mr. Hild related to our discussion on this topic are attached hereto as *Attachment E.*

80. At some point in the days thereafter, I received a telephone call from Mr. Hild, who informed me that he was terminating the representation and engaging new counsel immediately, who had already been lined up, and who would be handling the post-trial motions. I was surprised. There had been no prior indication on Mr. Hild's part of any dissatisfaction with my performance at trial or the presentation of his defense, and I was well underway with Ms. Lawrence working on the post-trial motions. I had already discussed an extension of the post-trial motion deadline with the government attorneys,

who had agreed to extend the deadline.  I told Mr. Hild that I would of course respect his decision to terminate the representation, but that I felt like as a matter of professional responsibility and as a matter of conscience I needed to explain what I felt would be the negative consequences to him potentially of making such a change at that particular juncture.  We discussed the reasons Mr. Hild had given for terminating the representation. I do not recall Mr. Hild indicating that he was dissatisfied with my performance at trial, but do recall that the issue of activity in my family court litigations and my involvement in any work being performed in my family court matters during Mr. Hild's trial came up.   I do recall that Mr. Hild seemed to have the impression that Ms. Lawrence and I had been performing work on my family court litigations while we were in court in trial on his matter.  This wasn't true, and therefore I corrected his facts on that point.  Other reasons that were brought up pertained to payment issues, which had been an issue in the later stages of the case.  Mr. Hild and I talked for almost two hours, most of that me addressing the reasons he gave for terminating the representation.  Regarding the issue of me having been "distracted" or there being some kind of "conflict" between my duty in attending to his defense at trial in New York and attending to whatever family court business had been going on (Mr. Hild at that time spoke in terms of a "distraction," there being no mention of any "conflict"), it was odd to me that such a thing would be suggested, and I had the distinct feeling (I can recall) that I had to be missing something.  I felt like Mr. Hild well knew (indeed, had to know, given how closely we worked together on his case, necessarily, while in New York) that I had not been "distracted," and furthermore that I would never have allowed myself to be "distracted" under any circumstances by developments in my own personal family court litigations or in any of my other client-matters for that matter

given the magnitude and seriousness of our work on his case in New York.  I had the

uneasy sense that something had happened that I did not know about, and I was generally

perplexed.  Mr. Hild was suddenly "singing a whole different tune."  Although I do not

remember the specifics of the basis of Mr. Hild's belief that I had been working on my own

domestic litigation during the period I was in New York, I do specifically remember

emphatically correcting his facts on this point, in response to Mr. Hild pointedly asking me

whether I had done any work on my own family court matters while we had been in New

York.  I truthfully told him that I had not (other than the *de minimus* involvement I had had

during that period, previously described herein).  I explained that whatever had been

prepared and filed for my domestic court cases, it had been prepared and filed by persons

not working on his case.  In hindsight, I do not recall whether at the time of the conversation

with Mr. Hild I was even fully apprised of the activity in the *Bakker* matter that had

occurred when we were in the Hild trial.  The conversation with Mr. Hild lasted for almost

two hours, I did most of the talking, I explained certain things that I felt like I needed to

tell him as a matter of professional responsibility so that he could make a fully informed

decision regarding changing counsel at that juncture, and at the end of the conversation Mr.

Hild indicated that he had not been aware of many of the things I had told him and "walked

back" his termination of the engagement.  He sounded calmer at that point, indicated that

he understood differently now that I had explained certain things to him, and that he wanted

a couple days to think things over and would get back to me.  We then ended the call.

81. Following  the  call,  I  had  serious  concerns.    Something  did  not  seem  "right."

Professionally, I strongly felt that substituting counsel at that juncture was a terrible

decision, for a number of reasons, and I felt morally and ethically compelled to make sure

Mr. Hild understood that. Among the reasons that I felt it a bad decision and very much not in the best interests of Mr. Hild was that, in all my years of practicing and being involved in matters such as his, I have never seen a substitution of counsel at the post-trial stage. I could not then, and cannot now, imagine a circumstance in which I would feel, if asked to substitute for trial counsel following the trial of a matter for purposes of litigating the post-trial motion stage, like that was a professionally responsible thing to do. Especially in a complicated, nearly-month-long trial such as Mr. Hild's trial, I could not imagine new counsel being in a position to effectively represent the client's interests in any meaningful way. I was also concerned because I knew that Mr. Hild was in a vulnerable state and that through no fault of his own he could easily fall prey to someone(s) telling him what he wanted to hear instead of honestly how things were and making very bad decisions not purely driven by sincere concern for Mr. Hild's best interests at that time.

82. Mr. Hild called me back after a few days and indicated that he had decided to go ahead and terminate the representation. I of course indicated that I would respect the decision. After that at some point I prepared a detailed "termination of representation" memorandum that memorialized certain things I thought it important to memorialize, to which I attached certain relevant documents. I provided Mr. Hild a copy of the memoranda and the attachments thereto via email several weeks later. Since then, I have had minimal communication with Mr. Hild, what communication there has been generally in the nature of follow-up items related to my firm's release of certain security interests in assets pledged by Mr. Hild and/or his third-party guarantor in connection with securing my firm's costs and fees for our services. The appropriate releases were filed of record several weeks ago, to my knowledge, and he was recently informed of their release.

83. Several other aspects of the allegations set forth in Mr. Hild's post-trial motion relating to me and my family court litigations require brief mention.

84. First, in regards to the motion's reference to certain specific adverse findings found by the Kenton Family Court in its April 5, 2021 order in the *Bakker* case, I fail to see the relevance of the sensational portions cited and can only surmise that the motion does so solely for the purpose of embarrassing me and portraying me in a bad light.   I do not address the substance of those sensational findings (selectively excerpted) herein, other than to say that the findings of fact (and legal rulings) of the Kenton Family Court as set forth in its April 5, 2021 order issued in the *Bakker* case have been appealed, and that I respectfully disagree with the court's factual findings and legal conclusions based thereon as set forth in the order.   The April 5, 2021 order is seriously problematic in many ways, with big-time potential consequences for the Kenton Family Court and its relevant actors.   It is a very big deal for cases to be decided in advance, and while the Kenton Family Court has (understandably) not been willing to acknowledge the difficult truth the order's timing represents, other actors of consequence now involved clearly are.   Regarding some of the more sensational facts found in the order pertaining to my relationship with Ms. Bakker, I find it appropriate under the current circumstances merely to state that I do not believe the court's findings are supported by substantial (or, in most cases, any) evidence.

85. Second, the references in Mr. Hild's motion to the findings of contempt against me in the family court litigations and the sentences purported to be imposed in connection therewith are not fairly presented in my view and, in any event, have variously also been appealed. It is unclear to me what the subject matter has to do with anything.   To the extent the suggestion is that in some way the history in this regard provided special motivation for

me to cut Mr. Hild's defense short and scurry home to avoid further sanction in the Kenton

Family Court, that is simply not true for the reasons stated above and simply does not make

sense. The motion misrepresents that the May 4, 2021 hearing in the *Bakker* matter was in

some fashion a disciplinary hearing at which I was to appear to face the court's wrath.

Obviously, that is not true. I did not attend the hearing, the hearing was part of the court's

regular motion docket (as I understand it), I cannot say I had actual knowledge of the

hearing until I returned to Kentucky from New York (and even then, I cannot say when it

was made known to me), and in any event candidly after two years of enduring various

sanctions and contempt proceedings and jail sentences alternatively being threatened,

imposed, retracted, reimposed, rethreatened, etc. the truth is that I long ago came to accept

that for whatever reason in my particular case such a realty is simply part of the Kenton

County Family Court experience for me. For present purposes, it would seem enough for

me to simply state that I respectfully disagree with the court's factual findings and legal

conclusions on the sanctions and contempt issues in the family court litigations. All the

court's punitive measures on these issues either already have been or will be appealed

(when they legally can be). Respectfully, the family court litigations have been curiosities

from the outset, have not resembled anything remotely like any court proceeding that I

have ever known in my two decades of practice, and generally from my point of view

represent stark examples of the importance of having an independent judiciary immune to

the influences of the democratic processes. It is no secret that I have taken serious,

principled, and (hopefully) respectful exception to the function of the family court system

as has been experienced by me as a parent and litigant and I have openly and publicly called

for positive change in our local family court system as a result. My efforts in this regard

have not been popular (as would be expected) with certain actors who benefit from the status quo, and frankly the retaliatory measures taken are merely further proof that the Kenton Family Court has not been operating the way it should. Although I understand the hard feelings, I certainly mean no disrespect to the court as an institution, or even Judge Mehling (who, indeed, I have come to believe has very little idea about the influence being doled out on a preferential basis by staff members outside of his purview, and almost certainly without his approval). The issue is, clearly, way bigger than my particular litigations, judging from the outreaches that have been made to Ms. Lawrence and me in recent months from other persons in the local community who apparently have had similar experiences in the Kenton Family Court and who have encouraged our efforts to advocate and effect reform as a matter of public policy. Locally, although it was not my intention and certainly not my preference, the issues arising from my family court litigations in the Kenton Family Court have to a large extent played out in the public domain, which is unfortunate but nonetheless the current reality. I accepted the consequences of, in my view, "doing the right thing" long ago.

86. It seems relevant to point out that prior to my family court litigations, over the course of over twenty (20) years as an attorney barred in Kentucky and Ohio I have been in good standing with both bars at all times, have never before been sanctioned, disciplined, ordered to reimburse the legal expenses of an opposing party, found to be in contempt, or otherwise informally reprimanded by a court in any serious way (that I can recall). It seems rather odd, then, that in two years of litigation in the Kenton Family Court I have been, at various times, given a suspended jail sentence, found in contempt, and variously otherwise sanctioned routinely. That the overwhelming predominance of these issues have arisen

*after* Ms. Lawrence and I pointed out the damning reality of the timing of the court's April 5th order should hardly surprise. I point out again that all of the contempt findings and sanctions have been or will be appealed, and in that sense none are final. None have yet survived appellate scrutiny. I can honestly say that my experience in the Kenton Family Court has been the exact opposite of my experience to date in my career as an attorney.

87. Reference too is made in Mr. Hild's filing to some sort of allegation that I was involved in some sort of attempt to bribe a witness in the *Bakker* case who was a professional evaluator. Support for that suggestion doubtlessly comes too from the Kenton Family Court's April 5, 2021 order (as support for most of the scandalous allegations in Mr. Hild's post-trial filing do), which makes some reference to such a thing. Mr. Hild's filing suggests that there is some sort of criminal investigation ongoing as a result. These things are simply not factual. I have not been made aware of any criminal investigation, and the very idea makes no sense to me. As I understand it, the person my attorney (Mr. Otis) is suggested to have attempted to "bribe" was none other than our own retained expert witness in the *Bakker* litigation (at the time). It is not obvious to me how one can "bribe" one's own expert witness. There are other major issues with the suggestion of some sort of attempted "bribery" of the witness, but the point for present purposes is that I am not under investigation and to the extent Mr. Hild's motion suggests I am that suggestion is false and irresponsible.

88. For that matter, it should be made clear that I am not facing disciplinary proceedings from a state bar. This suggestion too is made in Mr. Hild's filing, and it is equally false and irresponsible.

89. It is important to point out certain events that have transpired (and are transpiring) in the wake of the Kenton Family Court's issuance of the April 5, 2021 order in the *Bakker* litigation that provide helpful context both for Mr. Hild's decision to change counsel when he did and for the scandalous allegations relating to me contained therein. In the first place, the April 5th order of the Kenton Family Court is a court order that, on its face, is unlike anything that I have ever personally in my entire career seen issued by a court of law. (I am confident this Court would feel the same way were it to review it.) Although it is a "standout" in so many respects, one is that the court order goes far beyond the factual determinations necessary for determination of the narrow issues presented by the case to make broad and sweeping pronouncements on a whole host of subjects none of which are actually supported by evidence in the record, almost all of which rely on inadmissible hearsay, and none of which are necessary (and, in this sense, not "judicial" at all). More troublingly, various of the "facts" purported to be found by the court in its order relate to collateral disputes spawned by either or both of the nightmarish family court matters and which are plainly intended to advance the interests of the parties adverse to me in those collateral matters. Aside from all the other ways in which the April 5th order reflects a truly-rare, one-of-a-kind judicial order, perhaps the most troubling way is in that it expressly contemplates, on its face, a broader audience. Indeed, a "warning label" of sorts appears on the first page of the order, directed to third-party readers. The bottom line is that is seems rather plain from the order that the order is intended to be used by various persons in various ways in regards to various matters that have nothing to do with the narrow, tangible issues to be decided in the *Bakker* litigation but rather to advance other interests in other matters and to discredit and embarrass me personally. That is, in fact,

precisely how the April 5th order has been used, as explained briefly below.  In this respect, the fact that the April 5th order seems to have magically come to the attention of Mr. Hild's new lawyers (and, perhaps, even Mr. Hild himself) at some point after the conclusion of his criminal case is, very sadly, actually not very surprising at all.

90. In this regard, I note that upon my return from New York following the conclusion of Mr. Hild's trial, virtually from the moment I set foot back in Kentucky, all hell broke loose (for lack of a better term) – all events tied directly to the existence and contents of the April 5th order.  For one, within days of my return to Kentucky, I became aware that the order had come to the attention of a local media personality who produced a regular podcast on the internet.  He produced a serious of podcasts wholly devoted to disparaging me, the lead podcast bearing the title "Why Does Ben Dusing Still Have His Law License?"  While the media personality is hardly a household name, he does have a public following to some extent, and my life was seriously disrupted by the flood of calls, texts, and emails that began coming in from family and friends and other loved-ones wondering what was going on and concerned that I was in some kind of trouble.

91. Shortly thereafter (also within days of my return from New York), I received a text from the wife of federal judge who is a longtime friend and mentor (and former colleague) informing me that she had received an anonymous, no-return-address package in the mail containing the April 5th order and a series of other disparaging orders issued from the Kenton Family Court in my family court litigations and other salacious documents disparaging me.  In the days that followed, I would receive dozens of similar outreaches from other people, all reporting the same thing.  Subsequently, I was informed by a friend

that someone was using an anonymous email distribution service to email a copy of the April 5th order far and wide.

92. Subsequently, I was informed that the attorney for Ms. Bakker (Stephanie Dietz) had filed a formal bar complaint with the Kentucky bar against both me and Ms. Lawrence based entirely on the court's findings in the April 5th order. Interestingly, the timing of the filing of the complaint was just after Ms. Lawrence and I had departed for New York, in that regard too very coincidentally putting Ms. Lawrence and myself in a bad spot in terms of responding to the complaint (required in such circumstances under the rules of the Kentucky bar). The curious timing of the bar complaint filed by Ms. Dietz bears striking resemblance in terms of the overall *modus operandi* of the timing of the Kenton Family Court's issuance of the April 5th order. It is, very frankly, hard to believe that the timing was merely coincidental (especially in light of the long history of such timing "coincidences" occurring, albeit in relation to less consequential court orders, over the history of both family court litigations). Ms. Dietz's complaint was not known to me until after I returned to Kentucky from the Hild trial, and was addressed then.

93. Still further, in the days that followed Ms. Lawrence was contacted by opposing counsel (a known associate of Ms. Dietz) in a civil case in Kenton County not in family court in which I am a party also involving Ms. Bakker as a party who specifically invoked the Kenton Family Court's April 5th order (and the factual finding that I was a serially-frivolous litigant, purported to be made therein) in nakedly attempting to extract a payment to settle the litigation.

94. Thereafter, several clients reached out wanting to meet with me because they too had received anonymous packages containing the April 5th order. Given the nature of my

practice, my clients are generally persons who are emotionally vulnerable and rely on me to guide them through what is in most instances one of the most difficult experiences of their entire lives, and the tumult and anxiety wrought upon such persons is in the extreme when they are presented, out of the blue, in confusing and mysterious circumstances, materials which on their face bear the imprimatur of a court of law and which disparage to an unusual extent and in an unusual way the person (me) in whom they have placed tremendous trust of a very special kind. Although the anxiety and confusion on the part of these clients caused by their mysterious, out-of-nowhere receipt of a copy of the April 5th order was ultimately ameliorated, this was not accomplished without serious human and other tangible costs to all involved.

95. Still further along these lines, and more recently (after the mathematical problem of the Kenton Family Court's April 5th order had been pointed out), various minor issues popped up in both family court litigations which ultimately caused Ms. Lawrence to file a serious of relatively minor motions (some as routine as motions for leave to file certain motions in excess of the prescribed page limitations) in both the *Tapke* and *Bakker* family court litigations. *Every single one of the motions filed on my behalf by Ms. Lawrence was denied by the court and was sanctioned*, each imposing a financial penalty. I feel that the message intended to be sent was obvious. Judge Mehling's comments at a subsequent hearing expressing disbelief that he had imposed sanctions on that scale were, on the one hand, quite confusing, and yet on the other quite consistent with the long-held belief that a certain someone in a position to cause the court to act under Judge Mehling's authority but without his full knowledge was up to her old tricks yet again.

96. On another recent occasion, Ms. Lawrence argued certain motions to the court at a regular "motion hour" that by implication put the still-unexplained issue of the timing of the court's April 5th order before the court. The result was further sanctions to the tune of an additional $1000. More disturbingly, however, a few hours after the hearing the court *sua sponte* put on an order out of the blue in the *Bakker* matter scheduling a "sentencing" of me (and expressly mentioning potential jail time) purportedly arising from a contempt finding nearly two years old (in litigation now concluded). Such an order, requested by no one, completely out of the blue, obviously seemed transparently intended to send a very clear message to me that the obvious questions about the integrity of the Kenton Family Court necessarily arising from the timing itself of the court's April 5th order in the *Bakker* matter should be left alone.

97. Still further, at some point thereafter I noticed that my Facebook account was indicating that a Facebook profile under the name of Judge Mehling, and bearing his picture, was consistently viewing my Facebook account and my postings thereon. This revelation was particularly concerning. For one, there are express ethical opinions published by the Kentucky Bar Association making clear the impropriety of any Kentucky jurist acquiring independent knowledge about a case before a court over which he or she presides (or, god forbid, about a litigant with matters before such a court) through use of social media (and Facebook in particular). Second, as it is, over the past several months I have posted certain content pertaining to my experience in the Kenton Family Court in which I call for, as a matter of public policy, positive change in the family court system and a recommitment to the rule of law in the Kenton Family Court in particular. It would be impossible for any judge of the Kenton Family Court, *or someone who worked for him*, not to have strong

negative feelings about my commentary regarding the family courts in the aforementioned Facebook posts, and it strains credulity to believe that the impartiality of such a judge, *or someone who worked for him*, would not be compromised as a result. Disturbingly, the court in a recent order seemed to acknowledge viewing my Facebook profile (appearing to suggest that to do so is permissible because my Facebook account is publicly viewable). The evidence that the presiding judge in both family court litigations (or, at least, someone using his Facebook account, which is entirely plausible) in fact acquired independent knowledge by viewing my Facebook account is attached hereto as *Attachment F*. The content on my Facebook profile all relates, in one form or another, to the issues relating to the court's integrity arising from the timing and substance of the court's April 5th order.

98. Still further, recently it has come to my attention that Ms. Dietz is now in the habit of encouraging those of her clients with any kind of potential interaction with me whatsoever to review the April 5th order of the Kenton Family Court *and Mr. Hild's recently-filed post-trial motion for a new trial* (which relies heavily, of course, on the April 5th order). It is relevant in this regard that the April 5th order issued by the Kenton Family Court in the *Bakker* case was, quite literally, written in large measure by Ms. Dietz herself. After all, nearly 25% of the court's 111 factual findings were cut-and-pasted in one form or another from Ms. Dietz's proposed findings submitted in the *Bakker* case. The ostensible purpose of having her clients review the April 5th order (and, now, Mr. Hild's post-trial motion) appears to be so that these persons can know what a "bad guy" I am and to subtly encourage them to make allegations against me in their respective litigations in which Ms. Dietz represents them (which has actually happened).

99. Further in relation to the above, since the Kenton Family Court's issuance of the April 5th order (and the occurrence of the above-referenced bizarre events), I have met on two separate occasions for a total of approximately eight (8) hours with the Special Agent of the FBI to whom my initial reports were made who, I ascertain, is at the very least monitoring the situation at the Kenton Family Court at this time.  (I would not know, of course, if the FBI has opened a formal investigation into the court, or involving any of its actors.)  I have provided certain materials to the FBI upon request, including certain of the anonymous packages that had been sent out to various of my family, friends, professional contacts, and clients (which had been provided to me by certain persons who had received them).  It has been made expressly clear in these meetings that I am hardly the only person to have raised questions about the integrity of the operations of the Kenton Family Court and the role of certain persons in a position to manipulate its lawful purpose, and indeed there have been many complaints regarding the court's integrity relating to the subject matter.

100.     The recent events outlined above stemming from and relating to the Kenton Family Court's April 5th order in the *Bakker* case are mentioned herein for the purpose of providing the Court important context for the filing of Mr. Hild's post-trial motion, and for the allegations and assertions pertaining to both myself and Ms. Lawrence made therein. Against the backdrop of the recent events in my family court litigations, and in particular the *Bakker* litigation, the accusations against me (and Ms. Lawrence) set forth by Mr. Hild's new lawyers in the recent post-trial motion filed on his behalf are properly understood not in isolation but as part of what is by now a very clear pattern of behavior on the part of certain actors associated with my family court litigations very clearly and

intensely dedicated to manipulating vulnerable and naturally-unsuspecting third parties (in this case, Mr. Hild, and/or his new lawyers) into "firing shots" at me (and, sadly, Ms. Lawrence) while gleefully providing them the ammunition to do so. Tragically, these malfeasants seek to advance their own personal and illegitimate interests in discrediting and embarrassing me (and Ms. Lawrence), at the expense of the interests of people like Mr. Hild. That they have now taken to using this Court and this litigation for this purpose by, essentially, taking advantage of Mr. Hild's current situation and plight by offering my family court litigations and alleged "distraction" arising therefrom to Mr. Hild as a convenient and expedient way by which he might hope to achieve the undoing of his criminal conviction is very wrong, in every way, in my view. There is no real doubt as a practical matter as to what has happened here, in my view, and I regret that this venerable forum and this important litigation would be used for such a purpose, to such an end. For what it's worth, I do not blame Mr. Hild for the misguided allegations and arguments set forth in his post-trial motion (or even his new lawyers necessarily). I have sympathy for my friend, and lament the tragedy that very real and robust legal arguments that could very well have resulted in the Court granting Mr. Hild a new trial in the interests of justice for very valid legal reasons were foregone in favor of opportunistic claims against me and Ms. Lawrence fundamentally built upon a foundation of tragically incorrect basic factual premises, doubtless brought to him one way or another by persons with agendas.

101.    On this point, it is noted as a final matter that the entire "conflict" imagined by Mr. Hild's new lawyers in his post-trial filing and on which the crux of the allegations and accusations against me and Ms. Lawrence outlined therein are based, while ultimately not a distraction to me or Ms. Lawrence in any way in our preparation and presentation of Mr.

Hild's defense at his trial, was, to the extent of any appearance of such a conflict arising on account of the simultaneous activity in the Kenton Family Court and Hild litigations, a "conflict" directly and intentionally caused by the Kenton Family Court (and not this Court). The Kenton Family Court well understood well prior to the beginning of the Hild trial that Ms. Lawrence and I would be unavailable on account of our representation of Mr. Hild at his criminal trial in New York during that time. No objection was made to our disclosed unavailability, and nothing was scheduled in the Kenton Family Court as of the date of our departure. The "conflict" imagined in Mr. Hild's post-trial motion, while not real, clearly was intended to be – and it was the Kenton Family Court that intended it. The Kenton Family Court as an institution does not itself cause itself to act, of course; rather, actors at the Kenton Family Court in a position to cause it to act must do so. A very scary, very real question left unanswered here (if it is really truly a question at all, at this point) is which specific actor(s) at the Kenton Family Court did so. It is important to recognize that the "factual" support for the allegations and accusations set forth in Mr. Hild's post-trial motion clearly trace to the Kenton Family Court's April 5th order, and the imagined "conflict" hypothesized in Mr. Hild's post-trial motion put in play by the timing of its issuance. It is deeply troubling, indeed, though in the end not the business of this Court necessarily, that the important business of this Court and its constitutional function could be made to play a critical part of a premeditated scheme hatched by corrupt actors hundreds of miles away the essence of which involves the quiet manipulation of a regressive southern state court constituted to dispense justice but which through the corruption of its mission has been used to subvert it. Whatever the motive of those who have sought to use this Court and this litigation to advance their own private interests in Kentucky, there is little

doubt that Mr. Hild's post-trial motion has way more to do with what is going on in Kentucky than it does anything that happened in New York.

102.        Insofar as the agenda I perceive to be being advanced through Mr. Hild and/or his new lawyers has at its core the events that have unfolded in my domestic litigations, and insofar as to me there is no other logical explanation for the agenda being advanced by those advancing it and the lengths to which those advancing it continue to go to advance it other than the principled (and, it was intended, respectful-if-strident) objections I long ago began raising in connection with what I was seeing at the Kenton Family Court in my role as a litigant and lawyer with matters before that court that I viewed to be, in a serious way, legally and morally objectionable, and which cut to the heart of the basic constitutional function of a court of law, and indeed to the governance of the rule of law in general, I attach examples of communications sent by me to the actors taking the actions I believed to be objectionable as *Attachment G.*  By no means are these examples exhaustive of the issues I have raised, nor isolated in terms of their timing.  It is noted, however, that the timing of my objections well antedates the Kenton Family Court's issuance of the April 5th order (fairly seen as the "linchpin" of both the allegations made against me and Ms. Lawrence in Mr. Hild's post-trial filing and the imagined "conflict" Mr. Hild now asserts to be grounds for the Court to overturn his criminal convictions, which, while indeed imagined was clearly intended, and indeed sought to be created by the actors in a position to cause the Kenton Family Court to conduct business during the period it well knew Ms. Lawrence and I were unavailable ourselves to participate in it).  It is further noted that my objections to the actions being taken by the actors taking them on behalf of the Kenton Family Court and in relation to that court antedate the major sanctions and contempt

findings and (conditional/discharged) jail sentences that have marked the recent chapters of the family court litigations.

103.     It is further noted that I am hardly the only party in my domestic court litigations that has taken issue with the Kenton Family Court's findings of fact in my domestic court litigations.  Recently, a court-appointed expert in the *Tapke* litigation wrote a letter to Judge Mehling complaining that the court's findings of fact purporting to characterize the expert's testimony at a recent court hearing in fact grossly mischaracterized his testimony in material ways and that the findings of fact made by the court in that regard were "blatantly erroneous."  A motion filed by Ms. Lawrence seeking to amend the findings about the expert's testimony such that they reflected the expert's actual testimony at the hearing and his accurate testimony on the issues was (inexplicably) denied.

104.     As concerns the suggestion in Mr. Hild's post-trial motion that Mr. Hild funded my domestic court litigations, such suggestion is false, and indeed does not make sense.  In point of fact, the out-of-pocket expense to me of those litigations has been minimal given that Mr. Otis and Ms. Lawrence have donated an overwhelming amount of their legal services provided in connection therewith.  Both have been extremely charitable to me, as a friend and client, in that regard.  Mr. Hild's representation by my firm cannot be said to have funded my domestic court litigations in any meaningful way for the simple reason that, as a consequence of Mr. Otis's and Ms. Lawrence's compassion and charity, there has been little to fund.

105.     Trying the Hild matter before this Court and in this venerable forum was a distinct professional privilege, and I deeply regret that the Court has had to engage legal arguments

that read like tabloid-fodder and which involve the private, personal business of lawyers appearing before it.

Further affiant sayeth naught.

_____
Benjamin G. Dusing

COMMONWEALTH OF KENTUCKY           )
                                   )SS:
COUNTY OF KENTON                   )

Subscribed and sworn to me on this __9th__ day of August, 2021.

```
Julia B. Stoeckel
NOTARY PUBLIC
STATE AT LARGE
KENTUCKY
ID. # KYNP25320
MY COMMISSION EXPIRES MARCH 11, 2025
```

_Notary Public_

# Attachment A

## Re: US v. Hild / Subpoena to Thomas McGonigle

Sack, Jonathan S. <JSack@maglaw.com>

Mon 4/12/2021 10:54 PM

**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Cc:** katybell86@gmail.com <katybell86@gmail.com>

Ben,

Thanks.  Let's try for tomorrow night.  I will call you after your court day.  Good luck.

Jon

Jonathan S. Sack
Morvillo Abramowitz Grand Iason & Anello PC
565 Fifth Avenue
New York, NY. 10017
(212) 880 9410 (office)

Jsack@maglaw.com

Sent from my iPad

On Apr 12, 2021, at 8:18 PM, Benjamin G Dusing <bdusing@bgdlaw.com> wrote:

Hi Jonathan just saw this.  Can talk tomorrow before 9a briefly.  We start tomorrow.  Or tomorrow night.  thx

**Benjamin  G. Dusing**
<image001.png>

**809 Wright's Summit Pkwy Ste 120**

**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

**From:** Sack, Jonathan S. <JSack@maglaw.com>
**Sent:** Saturday, April 10, 2021 4:28 PM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Cc:** katybell86@gmail.com
**Subject:** Re: US v. Hild / Subpoena to Thomas McGonigle

Ben,

Thank you for the update.  That's very helpful.  Please let me know if you would have a few minutes to discuss later today or tomorrow.  I won't take up much of your time.

Thanks, Jon

Jonathan S. Sack
Morvillo Abramowitz Grand Iason & Anello PC

565 Fifth Avenue
New York, NY. 10017
(212) 880 9410 (office)

Jsack@maglaw.com

Sent from my iPad

On Apr 10, 2021, at 12:54 PM, Benjamin G Dusing <bdusing@bgdlaw.com>
wrote:

Hello Jonathan.  In light of the discussion at the pretrial yesterday which in part
involved the government's opposition to Mr. McGonigle being called to testify,
and the Court's decision to "punt" on the issue, I suggest we look to revisit the
issue next weekend at the earliest.  I will have a better sense of things (whether
this is all academic) at that time.  Does that work?

Ben

**Benjamin  G. Dusing**
<image001.png>

**809 Wright's Summit Pkwy Ste 120**
 **Fort Wright, KY 41011**
 **Tele: 859-635-5000**
 **Cell: 859-468-8991**

**From:** Sack, Jonathan S. <JSack@maglaw.com>
**Sent:** Wednesday, April 7, 2021 3:09 PM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Cc:** katybell86@gmail.com
**Subject:** Re: US v. Hild / Subpoena to Thomas McGonigle

Ben,

Thank you for time earlier today.  This confirms, as we discussed, that your
current best estimate is that my client, Tom McGonigle, would not be called to
testify before April 26, 2021.  If that changes, please let me know at your
earliest convenience.

You also indicated that your legal assistant would be in touch with prospective
witnesses and counsel re status.  Please ask him or her to do that in my case.

In addition, I also advised you that Mr. McGonigle has some health concerns
that would be involved in traveling from Virginia to New York for testimony.  I
wish to talk further regarding possible virtual testimony.  In my understanding,
Judge Rakoff in a very recent trial directed virtual testimony for defense (not
government) witnesses.  I am looking to see if I can find more information about
that.

I have one further item to discuss regarding Mr. McGonigle's prospective
testimony. Please let me know when would be convenient to talk in the next day
or two.

Regards,

Jonathan

Jonathan S. Sack
Morvillo Abramowitz Grand Iason & Anello PC
565 Fifth Avenue
New York, NY. 10017
(212) 880 9410 (office)
███████████████

Jsack@maglaw.com

Sent from my iPad


> On Apr 7, 2021, at 10:50 AM, Benjamin G Dusing
> <bdusing@bgdlaw.com> wrote:
>
>
> ok
>
> **Benjamin  G. Dusing**
> <image001.png>
>
> **809 Wright's Summit Pkwy Ste 120**
> **Fort Wright, KY 41011**
> **Tele: 859-635-5000**
> **Cell: 859-468-8991**
>
> **From:** Sack, Jonathan S. <JSack@maglaw.com>
> **Sent:** Wednesday, April 7, 2021 9:01 AM
> **To:** Benjamin G Dusing <bdusing@bgdlaw.com>
> **Subject:** Re: US v. Hild / Subpoena to Thomas McGonigle
>
> I will call you at noon.  thank you.  Jonathan
>
> Jonathan S. Sack
> Morvillo Abramowitz Grand Iason & Anello PC
> 565 Fifth Avenue
> New York, NY. 10017
> (212) 880 9410 (office)
> ███████████████
>
> Jsack@maglaw.com
>
> Sent from my iPad


>> On Apr 7, 2021, at 8:35 AM, Benjamin G Dusing
>> <bdusing@bgdlaw.com> wrote:
>>
>>
>> Noon?  If that works can just call me on cell below.
>>
>> **Benjamin  G. Dusing**
>> <image001.png>
>>
>> **809 Wright's Summit Pkwy Ste 120**

**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

**From:** Sack, Jonathan S. <JSack@maglaw.com>
**Sent:** Tuesday, April 6, 2021 4:43 PM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Subject:** US v. Hild / Subpoena to Thomas McGonigle

Mr. Dusing,

I'm representing Tom McGonigle in connection with a subpoena for trial testimony in US v. Hild. Please let me know when we can talk about it. I can be reached at 917 903 7493.

Regards,

Jonathan Sack

Jonathan S. Sack
Morvillo Abramowitz Grand Iason & Anello PC
565 Fifth Avenue
New York, NY. 10017
(212) 880 9410 (office)

Jsack@maglaw.com

Sent from my iPad
NOTICE: This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from their computer.

## Re: U.S. v. Hild

Benjamin G Dusing <bdusing@bgdlaw.com>
Sat 4/17/2021 2:00 PM
**To:** Sack, Jonathan S. <JSack@maglaw.com>

John pls call 859-916-4168.  My co counsel's phone.  Mine somehow out of juice.

Benjamin G. Dusing
BGD LAW
809 Wright's Summit Pkwy Ste 120
Fort Wright, KY 41011
Tele: 859-635-5000
Cell: 859-468-8991

**From:** Sack, Jonathan S. <JSack@maglaw.com>
**Sent:** Saturday, April 17, 2021 10:09:13 AM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Subject:** Re: U.S. v. Hild

Ben. I'm on a plane at 11 and then free at about 2. I will plan to call you then. Thanks. Jon

Sent from my iPhone

> On Apr 17, 2021, at 10:04 AM, Benjamin G Dusing <bdusing@bgdlaw.com> wrote:

Have witness prep calls until 11a now but free thereafter

**Benjamin  G. Dusing**
<image001.png>

**809 Wright's Summit Pkwy Ste 120**

**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

**From:** Sack, Jonathan S. <JSack@maglaw.com>
**Sent:** Saturday, April 17, 2021 8:31 AM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Subject:** Re: U.S. v. Hild

Ben. No problem.  I will call you before 11 this morning. Thanks much. Jon

Sent from my iPhone

> On Apr 17, 2021, at 7:54 AM, Benjamin G Dusing <bdusing@bgdlaw.com> wrote:

Hello Mr. Silberfarb.  Understood.

Mr. Sack – sorry I have not been able to get to you this past week.  Just up for air this morning.  General availability today.  859-468-8991.

Ben

**Benjamin  G. Dusing**
<image001.png>

**809 Wright's Summit Pkwy Ste 120**
**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

**From:** Silberfarb, Michael D. <MSilberfarb@blankrome.com>
**Sent:** Friday, April 16, 2021 1:40 PM
**To:** Benjamin G Dusing <bdusing@bgdlaw.com>
**Cc:** 'jsack@maglaw.com' <jsack@maglaw.com>; Schaedle, Mike <Schaedle@BlankRome.com>; 'Hall, Bryan J.' <bjhall@archerlaw.com>; Poluka, Joseph G. <POLUKA@BlankRome.com>
**Subject:** U.S. v. Hild

Mr. Dusing,

This law firm represents the Trustee in connection with the Chapter 7 bankruptcy proceedings of Live Well Financial, Inc. ("Live Well").

We learned yesterday that in connection with your defense of Michael Hild, you subpoenaed Thomas J. McGonigle, who formerly represented Live Well as outside counsel.    While Mr. McGonigle informed us that he does not presently anticipate testifying at the criminal proceedings, we want to remind you that the Trustee is the *only* party who is authorized to waive privilege concerning any privileged material generated in connection with any legal advisor's representation of Live Well.  And to be clear, the Trustee does not, nor does it intend to, waive any privilege (including any work product) with respect to any work performed by Live Well's outside legal advisors. The Trustee would consider waiving privilege only in connection with a request that specifically identifies the scope and subject matter of the proposed waiver.

Moreover, we want to make sure you are aware that, in accordance with Rule 1.6 of the New York ethical rules, the Trustee has not authorized any of its former legal advisors to disclose confidential information learned in the course of their representation of Live Well.

I have cced Mr. Sack, who I understand represents Mr. McGonigle with respect to these issues.  However, please understand that the above statements apply to all of Live Well's outside legal advisors.

Sincerely,


**Michael D. Silberfarb** I BLANKROME
One Logan Square I 130 North 18th Street I Philadelphia, PA 19103
O: 215.569.5417 I C: 917-617-8224
1271 Avenue of the Americas I New York, NY 10020
O: 212.885.5356 I F: 215.832.5417

********************************************************************************************
**************

This message and any attachments may contain confidential or privileged
information and are only for the use of the intended recipient of this message. If
you are not the intended recipient, please notify the Blank Rome LLP or Blank
Rome Government Relations LLC sender by return email, and delete or destroy
this and all copies of this message and all attachments. Any unauthorized
disclosure, use, distribution, or reproduction of this message or any
attachments is prohibited and may be unlawful.

********************************************************************************************
**************

NOTICE: This communication may contain information that is legally privileged, confidential
or exempt from disclosure. If you are not the intended recipient, please note that any
dissemination, distribution, or copying of this communication is strictly prohibited. Anyone
who receives this message in error should notify the sender immediately by telephone or by
return e-mail and delete it from their computer.

# Attachment B

10:50

Michael >

Sat, Feb 20, 12:04 PM

Running late. Will be 12:30ish. Will text when close

5 min out

Sun, Feb 21, 10:22 AM

Call me when you can

Sun, Feb 21, 11:37 AM

Leaving now

Ok

Lost keys. Leaving now for teal

Real

Turning onto Ashby fork

Mon, Feb 22, 8:52 PM

Hope day one of your trial went OK. No need to respond, just thinking about you. 🙏

Really appreciate that, Mike. You have no idea how much that means to me. Thank you. I love you. Yes,

iMessage

10:50 ⌇

MH

Michael >

Really appreciate that, Mike. You have no idea how much that means to me. Thank you. I love you. Yes, went well I felt. In god's hands. I'm sure you can relate.

Truth has a staying power that's inspiring. For both of us.

Are you pencil down on stuff or have things to do? Tentatively plan to meet on Wednesday? Have an off say from trial.

Truck rescued?

Truck is still stuck. Going to try and get it out again tomorrow hopefully with the tractor. I'll let you know.



Tue, Feb 23, 8:10 PM

Checking in. You good? I'm not in trial tomorrow if you want to touch base. Thx for prayers. Love you man.

I got my truck unstuck. We can

10:50



Michael

I got my truck unstuck. We can meet tomorrow if you have time. I only have a small number of notes/comments on the recorded call defense exhibits that we could review. That's likely only a ~15 minute conversation, 30 minutes at most. Alternatively, if you want to continue what we were doing on Sunday with another recorded 1.5 hr direct session, I am up for that as well. Your call.

Good to hear. Let's meet and do both. We will go over recorded call and do another 1.5 hour session direct practice. Meet at 10a?

Perfect. See you then

Thx bro

Wed, Feb 24, 9:52 AM

Fyi-I am set up in the conference room and ready when you are ready.

Thu, Feb 25, 9:55 AM

Ben, I know you're in your trial today/tomorrow, but things are

iMessage

10:50 


MH

Michael >

Thu, Feb 25, 9:55 AM

Ben, I know you're in your trial today/tomorrow, but things are completely unraveling back in Richmond. I feared this was going to happen, and hence my concern of being away for an extended period of time. We've made a lot of progress while I'm here, but I need to go back immediately to Richmond if this trial is being postponed. Can you please ping the court today in an attempt to confirm if the April 12th date is a go?

Thu, Feb 25, 12:08 PM

If we can't get an answer/confirmation, I may just have to leave regardless. Please let me know as soon as possible. Thank you.

Thu, Feb 25, 1:58 PM

Go back to Richmond. I have asked Re the trial date and will let you know ASAP.

Thu, Feb 25, 8:00 PM

Hey man, hope your day went OK. I

  iMessage 

       

10:51 ⌁



Michael ›

Thu, Feb 25, 8:00 PM

Hey man, hope your day went OK. I have not headed back to Richmond (yet), hoping to hear back from the court first about the date.

Hey. Thx. I haven't heard anything about the date yet and I don't know when we will. It could be next week. No way to predict. Done w trial tomorrow at 5p and monitoring email all day, nothing yet though. If you are just going back for a week or so, I say go. Longer than that, maybe stay and wait. But no guest we were will know anything tomorrow, or even Monday etc.

I understand. Shits going wrong back in Richmond, but I also hate to leave right now just when we are about to make progress practicing direct next week-the most important shit. If I go back, I will get sucked in, and it will be difficult to return.

I get it. If you came back wed/thurs next week I don't think would materially effect prep. FYI.

iMessage

10:51 ⌇



Michael ›

> I get it. If you came back wed/thurs next week I don't think would materially effect prep. FYI.

Yeah that isn't going to happen. If I head back, there really isn't any immediate coming back. Laura and Matt (the dude I brought on to try to hold shit together) are hanging on by a thread. The minute I come back, they'll throw everything back onto my plate, and Matt will bail as he is flailing, never to be heard from again. I have one shot on this, and the fuse is lit. It's just a matter of time until I have to go back, because shit is so effed up. So I don't want to go until we reach that point. We are very close, but not quite there.

> K. Sorry man.  Out of trial tomorrow at 5p. Free up then

I understand. We should plan practice sessions as soon as you are available. The sooner the better before I potentially have to leave abruptly.

> Understood. Doing my best. Trying

  iMessage 

       

10:51 ✈



Michael >

I understand. We should plan practice sessions as soon as you are available. The sooner the better before I potentially have to leave abruptly.

Understood. Doing my best. Trying to wait to hear from court/gov about trial date, balancing competing interests here. Will touch base tomorrow

Fri, Feb 26, 6:18 PM

Just out of trial and nothing re trial date. Not from court or from Gov't.

Fri, Feb 26, 8:07 PM

OK, thanks. Hope things ended up the way you wanted them to related to trial.

Thx. Won't find out for a while but I have a good feeling. Truth is truth. Same principle applies in your case. Love you man.

Sun, Feb 28, 2:42 PM

Hey Ben, is the plan to meet tomorrow/Monday at 10 AM for

iMessage

10:51



Michael ›

Sun, Feb 28, 2:42 PM

Hey Ben, is the plan to meet tomorrow/Monday at 10 AM for practicing direct? I am still here, but unsure how much longer I can stay given the situation in Richmond. Hoping we can make a ton of progress on Monday. Please let me know. Thanks.

Yes. I can go all day Monday virtually if you want. 10-3p?  Can do two 1.5-2 hour chunks.  ?

Ok, I will plan to be at your office at 9:45AM tomorrow and be set up in the conference room ready to start at 10AM.

Ok. Really need to figure out whether this trial date is going or not. I'll get on that first thing tomorrow.  Weird I haven't heard back from anyone on that.

Agreed. We are only 5 weeks away. 🙏

Mon, Mar 1, 9:52 AM

iMessage

10:52 ⌇



Michael ›

Wed, Mar 10, 3:48 PM

Hey, I need to chat with you when you wrap up your meeting before you leave.

> Already left. Sorry. Is my kids day.  If emergency call me now. If can wait until between 5:45-6:15 that would be ideal.  The after 8:30p. Lmk

Thu, Mar 11, 9:39 AM

I am done with binder one, and only had three comments to discuss with you. Do you have five minutes if I come down to your office?

Thu, Mar 11, 7:39 PM

> Meet 10 tomorrow at office ?

Yes, sounds good. Hope your day ended well.



> Thx bro. Nice to be done with that shit. Crazy crazy shit.  Flattered by the attention I get from these people but also a little unnerving.  Really feel bad for them ... Julie, Jill, some others ... not happy people.  Real life

iMessage

10:52

Michael



Thx bro. Nice to be done with that shit. Crazy crazy shit. Flattered by the attention I get from these people but also a little unnerving. Really feel bad for them ... Julie, Jill, some others ... not happy people. Real life lessons learned. Anyway ... see you tomorrow. Let's kick some ass. To my knowledge, the government did not file any motions in limine. I need to check that, though. They submitted four dire questions and jury instructions that I need to review and agree to or propose changes to by Monday ... but I don't think they are going to be hugely objectionable. They are what they are. As long as they are correct/ fair ... not much advantage to be gained one way or other. Subpoenas being cut tomorrow I believe with help of nyc counsel ... still have some hope of tracking down Ernie ... but in the end we have our core proof and this things seems squarely presented at this point. No surprises. Just time to tell the truth well. That's the goal. Love you man.

iMessage

# Attachment C

# Many Thanks

From: ████████████████████

To: Adam Basinger abasinger@bgdlaw.com

Date: Mon, May 3, 2021, 10:02 AM

Adam:

I hope all of you know how much it meant for all of the efforts that you put in to the case. It was evident through the preparation and execution. I can imagine that being involved in something so deep like that it almost becomes a personal engagement. I could see your exhaustion and hope none of it was feeling of burden due to the outcome. From my perspective, you all truly did everything you could and gave Mike a chance.

Best of luck throughout your career and I know you will be most successful.

Thanks again,

████████████

# Attachment D

11:18 ✈



MH

Michael >

Mon, Apr 26, 9:47 AM

Just saw. And noted same things. We will discuss.  Is bullshit that the call can hear the sidebars.  THATS WHY THEY ARE SIDEBARS  ... ug.

Mon, Apr 26, 4:58 PM

Huddle?

Sure, be over in a minute

Mon, Apr 26, 7:53 PM

Maybe chat in my room around 9p?

Ok

Mon, Apr 26, 9:05 PM

Whenever you're ready

Tue, Apr 27, 9:42 AM

Morning. Heading down to courthouse with the team a bit early to look at some things and prepare.

Need to say some things of record.

First, I love you.

  iMessage 

       

11:18 ⌁



Michael ›

First, I love you.

Second, I spent a lot of time last night when I should have been preparing for today praying and trying to figure out some big moral/ethical questions. The conversations of yesterday were concerning to me. First time I am hearing things of discontent or frustration or disagreement with what from my perspective was the plan. I don't understand comments like "you don't listen." On any level. I don't feel it's fair or accurate remotely to describe my approach as anything but "the best idea" and there have been countless (even recent) examples where you have had a thought or idea and we ultimately went that way, bc I felt it was the best idea. I don't think it can reasonably be said that it's "my way or the highway" or that there is pride of authorship here, and the very idea is 100% contrary to the basic philosophical premise of my team-based approach and indeed my entire stand-alone law practice. It's surprising to hear anything like that suggested.

iMessage














suggested.

There were other things that occurred yesterday that I was surprised to hear about and would never in a million years sign up for if I had known it would be that way at the outset.   I'm displeased in the extreme by those things. Nonetheless, there is a job to do here and I'm committed to doing it right best I can and see it through, given where we are.

I am committed to doing the right thing.  Whatever that is. I've never been in this position before in any of my cases.  Not remotely.  It's not easy to figure out the moral/ethical/legal obligation here.  After considerable prayer last night, here is where I come out:

It's your life.

I'm not comfortable deciding what is best for you and disregarding your wishes in any regard so long as I'm not being asked to do anything unethical.  No matter how fucking stupid I think it is, if the goal is to win the case

11:18

Michael

win the case.

So, PLEASE WRITE DOWN ON A PIECE OF PAPER ALL THE THINGS YOU WANT ME TO DO, INCLUDING THOSE THAT YOU FEEL YOU HAVE ASKED ME TO THAT I HAVEN'T DONE TO DATE, AND I WILL DO THEM THROUGH YOUR TESTIMONY.  THERE IS NO OPPORTUNITY THAT HAS PASSED GIVEN THAT YOU ARE TESTIFYING. if it's not unethical, I'll do it.

But I want to be of record that I am not responsible for the outcome here then.

I've been heard and I don't need to say it again. Bottom line, this seems all of a sudden about settling scores, convincing people you are a victim here, lambasting those you feel responsible for having you in this predicament, and otherwise engaging the overall fairness of the situation ... as opposed to winning the damn case.

Feel like I was clear that even under the best circumstances it's an uphill climb. That said, I feel like we could

iMessage

11:18 ⬆



Michael ›

the damn case.

Feel like I was clear that even under the best circumstances it's an uphill climb. That said, I feel like we could not be better positioned than wheee we are now. Feel like all I need is for you to do what I feel like we takes about doing. Over and over.

Feel like that's changed.   And I feel like the approach you have indicated you joe want to take (lambasting the SEC, talking about your billion dollars in guarantees, etc.) is the Ed at opposite of what them plan was.

With everything in me, I disagree that that approach is calculated to get the result we are seeing here.

Humility, empathy, soft-spoken ness, sedate, subdued, to the point, etc. is way to go here.  That was the plan. That's what I'd recommend.

So ... that's that.

Pls right it all down.  This isn't my work anymore and I do not want to be in a position after the fact where I'm being accused of not doing this or of doing that etc. Needs to be a

iMessage

11:18

Michael

> Pls right it all down.  This isn't my work anymore and I do not want to be in a position after the fact where I'm being accused of not doing this or of doing that etc.  Needs to be a very clear record of what you wanted me to do here.
>
> I'm praying hard. Thanks.

Tue, Apr 27, 4:44 PM

> Huddle?

Tue, Apr 27, 8:57 PM

> 905 and I'll be quick
>
> U coming over?
>
> U alive?

Thu, Apr 29, 8:40 AM

> Love you man. See you there.  Who flew in from KY?

Kramer

Thu, Apr 29, 9:04 PM

> In my room if u want to come over

iMessage

# Attachment E

11:19 ⌯



Michael ›

On phone.  Can I call you in an hour ?

Yes

Thu, May 6, 12:38 PM

Please text me a picture of your whiteboard for post trial motions as you offered the other day. Thanks.

Home with sick kid <u>until 2p</u> so give me until then but yes

Thu, May 6, 2:48 PM



Fri, May 7, 12:26 PM

Can you please call me?

   

       

# Attachment F



# Attachment G

## RE: Bakker v. Dusing 19-CI-560

From: Stephanie Dietz (sdietz@dofamilylaw.com)

To: KathleenSumme@kycourts.net

Cc: objlaw@yahoo.com

Date: Monday, June 22, 2020, 03:48 PM EDT

Kathy,

For the contempt hearing I think 1 hour.

For trial, the last time we had ( I think like 50 hours).

I assume trial would be in person not zoom so I'd like to get dates after the first of the year.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM
DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee
or agent responsible for delivering the message to the intended recipient, you are hereby notified that any
dissemination, distribution, forwarding, or copying of this communication is strictly prohibited. If you have received this
communication in error, please notify the sender immediately by e-mail or telephone, and delete the original message
immediately. For more information, please visit [_____]. Thank you.

**From:** Summe, Kathleen <KathleenSumme@kycourts.net>
**Sent:** Monday, June 22, 2020 8:45 AM
**To:** Stephanie Dietz <sdietz@dofamilylaw.com>
**Cc:** Jeff Ottis <objlaw@yahoo.com>
**Subject:** RE: Bakker v. Dusing 19-CI-560


Ok, so .....


1. How much time and how soon do me need the Contempt hearing?
2. How much time and when for the trial?


Give me a clue and I will send dates and times.



*Kathy Summe*

*Judicial Secretary to Judge Christopher Mehling*

*Kenton County Family Court – Division II*

*Kenton County Justice Center*

*230 Madison Avenue*

*Covington, Ky  41011*

*859 292.6533*

**From:** Stephanie Dietz <_____@_____law.com>
**Sent:** Monday, June 22, 2020 8:14 AM
**To:** Summe, Kathleen <_____>
**Cc:** Jeff Ottis <_____>
**Subject:** Re: Bakker v. Dusing 19-CI-560

> Note: This email originated from outside the Kentucky Courts. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Kathy,

I filed an emergency motion on Wednesday for this past weekend. It was not heard. An Order needs to be issued. I asked Alice for an Order if it was denied. It was set for Friday at 11:30 and then suddenly on Thursday night it was canceled.

I do need hearing dates on my contempt motion. And, I'd like to get trial dates.

Sent from my iPad

> On Jun 22, 2020, at 8:10 AM, Summe, Kathleen <_____> wrote:
>
> Does it still need to be set?
>
> *Kathy Summe*
>
> *Judicial Secretary to Judge Christopher Mehling*
>
> *Kenton County Family Court – Division II*
>
> *Kenton County Justice Center*
>
> *230 Madison Avenue*
>
> *Covington, Ky 41011*
>
> *859.292.6533*

**From:** Stephanie Dietz <_____>
**Sent:** Monday, June 22, 2020 8:01 AM
**To:** Summe, Kathleen <_____>
**Cc:** Jeff Ottis <_____>
**Subject:** Re: Bakker v. Dusing 19-CI-560

Note: This email originated from outside the Kentucky Courts. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Not that I'm aware of-

Sent from my iPad

On Jun 22, 2020, at 7:58 AM, Summe, Kathleen <‎‎‎‎> wrote:

Hello lawyers,

Is this on for today at 2:30 PM?

*Kathy **Summe***

*Judicial **Secretary** to Judge Christopher Mehling*

*Kenton County Family Court – Division II*

*Kenton County Justice Center*

*230 Madison Avenue*

*Covington, Ky  41011*

*859.292.6533*

**From:** Keys, Alice <‎‎‎>
**Sent:** Friday, June 19, 2020 6:56 PM
**To:** Summe, Kathleen <‎‎‎>
**Subject:** Fw: Bakker v. Dusing 19-CI-560

Alice G. Keys

Staff Attorney

Kenton Family Court, Division Two

11/30/2020

John C. Middleton, Kenton Circuit Clerk
(4 unread) - objlaw@yahoo.com - Yahoo Mail

Kenton County Justice Center, 5th Floor

230 Madison Avenue

Covington, KY 41011

(859) 292-6533

Fax (859) 292-6617

a.baker@kycourts.net

**From:** Stephanie Dietz <sdietz@defamilylaw.com>
**Sent:** Friday, June 19, 2020 11:37 AM
**To:** Keys, Alice <AliceKeys@kycourts.net>; objlaw@yahoo.com <objlaw@yahoo.com>; Alex
Edmondson <alex@edmondsonlaw.com>; Deanna Dennison <dldennison@aol.com>
**Subject:** RE: Bakker v. Dusing 19-CI-560

> Note: This email originated from outside the Kentucky Courts. Do not click links or open
> attachments unless you recognize the sender and know the content is safe.

Alice,

Thank you for the reply; however, the emergency was for this weekend... I'm just having
a hard time understanding this. If it's denied, then I would think there would be an order
denying it.

I also need dates for all of my outstanding motions including the one for contempt. Mr.
Dusing has been successful in securing dates. My client would like her day in court on
the contempt asap.

Thank you,

Stephanie A. Dietz, Esq.

Filed
11/30/2020
19-cr-00560 11/30/2020           John C. Middleton, Kenton Circuit Clerk

(4 unread) - objlaw@yahoo.com - Yahoo Mail

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. For more information, please visit _____ Thank you

**From:** Keys, Alice <_____>
**Sent:** Friday, June 19, 2020 11:35 AM
**To:** Stephanie Dietz <_____>; objlaw@yahoo.com; Alex Edmondson <_____>; Deanna Dennison <_____>
**Subject:** RE: Bakker v. Dusing 19-CI-560

Stephanie,
I have discussed your request with Judge Moore.  He does not intend to issue an order.
He has requested I review the matter with Judge Mehling on Monday.
Alice

**From:** Stephanie Dietz <_____>
**Sent:** Thursday, June 18, 2020 4:43 PM
**To:** Keys, Alice <_____>; _____; Alex Edmondson <_____>; Deanna Dennison <_____>
**Subject:** RE: Bakker v. Dusing 19-CI-560

> Note: This email originated from outside the Kentucky Courts. Do not click links or open
> attachments unless you recognize the sender and know the content is safe.

Alice,

Can I have an Order then denying my emergency motion for the record?

Stephanie A. Dietz, Esq.

11/30/2020                                                John C. Middleton, Kenton Circuit Clerk
                                    (4 unread) - objlaw@yahoo.com - Yahoo Mail

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO
WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED,
CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader
of this message is not the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, you are hereby notified that any
dissemination, distribution, forwarding, or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify the sender
immediately by email or telephone, and delete the original message from database. For
more information, please visit _____. Thank you.

**From:** Keys, Alice < _____ >
**Sent:** Thursday, June 18, 2020 4:41 PM
**To:** _____ ; Alex Edmondson < _____ >;
Stephanie Dietz < _____ >; Deanna Dennison < _____ >
**Subject:** RE: Bakker v. Dusing 19-CI-560

Counsel,
Upon further review of the motion and the attached report, Judge Moore has instructed
me to advise you that he does not consider this to be a true "emergency" situation
warranting an emergency hearing.  Therefore we will not have a hearing tomorrow.
 Judge Mehling will review the motion upon his return on Monday and determine when it
will be heard.
Thank you.
Alice

**From:** Jeff Otis < _____ >
**Sent:** Thursday, June 18, 2020 3:44 PM
**To:** Alex Edmondson < _____ >; Stephanie Dietz
< _____ >; Deanna Dennison < _____ >; Keys, Alice
< _____ >
**Subject:** Re: Bakker v. Dusing 19-CI-560

Note: This email originated from outside the Kentucky Courts. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

Alice, by the way, in case I was direct, (my apologies if I was not) I represent Ben. **Alex and Deanna do not.** I only included them in the email because they were in the email chain. Stephanie knows this. Notice to Alex and Deanna is NOT notice to Ben.

Jeffrey J. Otis
421 Madison Ave. Covington, KY 41011
PH: 859.261.6968
FX: 859.261.9968
Email:

> On Thursday, June 18, 2020, 03:26:37 PM EDT, Keys, Alice <aliceketys@kycourts.net> wrote:

> As soon as I receive confirmation from Jeff, I will send the Zoom invite.

> **From:** Keys, Alice
> **Sent:** Thursday, June 18, 2020 1:57 PM
> **To:** Alex Edmondson <alexedmondson@dbllaw.com>; Stephanie Dietz < sdietz@dofamilylaw.com >; Deanna Dennison < dfdlegal@aol.com >
> **Cc:** Summe, Kathleen < kathleensumme@kycourts.net >; objlaw@yahoo.com
> **Subject:** RE: Bakker v. Dusing 19-CI-560

> Jeff,
> Please confirm that you will be representing Mr. Dusing at the hearing tomorrow at 11:00 a.m.
> Thanks.
> Alice

> **From:** Alex Edmondson < alexedmondson@dbllaw.com >
> **Sent:** Thursday, June 18, 2020 1:02 PM
> **To:** Keys, Alice <aliceketys@kycourts.net>; Stephanie Dietz < sdietz@dofamilylaw.com >; Deanna Dennison < dfdlegal@aol.com >
> **Cc:** Summe, Kathleen < kathleensumme@kycourts.net >; objlaw@yahoo.com
> **Subject:** RE: Bakker v. Dusing 19-CI-560

> Note: This email originated from outside the Kentucky Courts. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **From:** Keys, Alice [ aliceketys@kycourts.net ]
> **Sent:** Thursday, June 18, 2020 12:59 PM
> **To:** Stephanie Dietz < sdietz@dofamilylaw.com >; Deanna Dennison < dfdlegal@aol.com >; Alex Edmondson < alexedmondson@dbllaw.com >
> **Cc:** Summe, Kathleen < kathleensumme@kycourts.net >
> **Subject:** RE: Bakker v. Dusing 19-CI-560

> Counsel,

11/30/2020                          19-CI-00560 11/30/2020           John C. Middleton, Kenton Circuit Clerk
                                    (4 unread) - objlaw@yahoo.com - Yahoo Mail

I just spoke to Judge **Moore**.  He will allow up to one hour and will hear arguments based upon what is in the record.  Deanna and Alex, please let me know if you will be participating or if Mr. Dusing has new counsel.  Thanks.
Alice

**From:** Stephanie Dietz < >
**Sent:** Thursday, June 18, 2020 9:13 AM
**To:** Keys, Alice < >; Deanna Dennison < >; Alex Edmondson < >
**Cc:** Summe, Kathleen < >
**Subject:** RE: Bakker v. Dusing 19-CI-560

> Note: This email originated from outside the Kentucky Courts. Do not click links or open **attachments unless** you recognize the sender and know the content is safe.

Alice,

Do you know how long?  Is it a hearing or just arguments?

Thanks,


Stephanie A. Dietz, Esq.

From: Keys, Alice <                        >
Sent: Wednesday, June 17, 2020 9:49 PM

19-CI-00560 11/30/2020

11/30/2020

(4 unread) - objlaw@yahoo.com - Yahoo Mail

**To:** Stephanie Dietz <                    >; Deanna Dennison
<                    >; Alex Edmondson <
**Cc:** Summe, Kathleen <                    >
**Subject:** Re: Bakker v. Dusing 19-CI-560

Judge Moore has agreed to hear this motion on Friday at 11:00 **AM**. The
hearing will be set via Zoom teleconferencing.

Alice G. Keys
Staff Attorney
Kenton Family Court, Division Two
Kenton County Justice Center, 5th Floor
230 Madison Avenue
Covington, KY 41011
(859) 292-6533
Fax (859) 292-6617

Mail - Benjamin G Dusing - Outlook

## RE: Hearing on Tapke/Dusing this Thursday and Friday

Benjamin G Dusing <bdusing@bgdlaw.com>
Wed 8/26/2020 11:47 AM

**To:** Keys, Alice <AliceKeys@kycourts.net>
**Cc:** objlaw@yahoo.com <objlaw@yahoo.com>; Ruth Jackson <ruth@northernkentuckydivorce.com>; Stephanie A. Dietz <SDietz@DOFamilyLaw.com>; Summe, Kathleen <KathleenSumme@kycourts.net>

Ms. Keys et al:

Just seeing this. Couple procedural wrinkles here implicated by counsel's request below and the anticipated testimony of this witness on Friday, about which the Court should be aware.

First, I don't think it's appropriate that substantive subject matter of this kind be addressed to court staff in this way. The subject matter is of the kind that really should be addressed to the Court on the record. I am unfamiliar with the customary practices of this forum but have discerned that there is a degree of informality not prevalent in the other forums in which I typically practice; I need not speak to the general custom but do need to respectfully request that in this particular matter and its companion case (Bakker v. Dusing) at least all but the most basic administrative/procedural business to be addressed be addressed on the record and in open court. I do not think it appropriate that these issues get raised and addressed in this manner (off the record, behind the scenes, with court staff). The request below and the expected testimony of Ms. Dietz's client is anything but a routine, administrative matter (for the reasons explained momentarily).

I think it particularly important that emails to Court staff such as this not be had at this time in light of the issues raised by such communications previously in this proceeding, which have been reported to the appropriate governing authorities and which are, upon information and belief, being investigated. Scheduling matters and basic questions affecting the rights and participation of *all* the parties are one thing; specific requests from and any inquiry germane to a particular litigant are quite another.





Sorry for the length of the email, but given the seriousness of the issue I wanted to provide a thorough explanation to the court and all parties.

Best Regards,
Ben



Benjamin G. Dusing

**809 Wright's Summit Pkwy Ste 120**
**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

Mail - Benjamin G Dusing - Outlook

**From:** Stephanie A. Dietz <SDietz@DOFamilyLaw.com>
**Sent:** Tuesday, August 25, 2020 9:27 AM
**To:** Keys, Alice <AliceKeys@kycourts.net>; Summe, Kathleen <KathleenSumme@kycourts.net>
**Cc:** Benjamin G Dusing <bdusing@bgdlaw.com>; objlaw@yahoo.com; Ruth Jackson
<ruth@northernkentuckydivorce.com>
**Subject:** Hearing on Tapke/Dusing this Thursday and Friday

Alice,

May I have  paralegal (Gretchen, who has sat at counsel table) watch the hearing via Zoom on Thursday
or Friday?  Because this is an in person hearing, my client is testifying on Friday, and there are parallels
to my client's case, I'd like to have someone watch.

If not, I know we can request the video.

Additionally, I know the rules for the courthouse and just want you all to be aware I'll be with my client on
Friday while she is testifying.

Just let me know and thank you,



Stephanie A. Dietz, Esq.
Attorney/Family Law Mediator
DIETZ FAMILY LAW, PLLC
130 Dudley Road, Suite 150
Edgewood, Kentucky 41017
(859) 757-4234
Fax: (859) 341-5111
sdietz@dofamilylaw.com
www.dofamilylaw.com

LIKE US ON FACEBOOK!

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT
IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND
EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the
intended recipient, or the employee or agent responsible for delivering the message to the intended
recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify the
sender immediately by e-mail or telephone, and delete the original message immediately. For more
information, please visit http://www.dofamilylaw.com. Thank you.

## Dusing v. Tapke – request for update on status of

**Benjamin G Dusing <bdusing@bgdlaw.com>**
Tue 11/3/2020 7:41 AM

**To:** Keys, Alice <AliceKeys@kycourts.net>; Summe, Kathleen <KathleenSumme@kycourts.net>
**Cc:** objlaw@yahoo.com <objlaw@yahoo.com>; Ruth Jackson <ruth@northernkentuckydivorce.com>

📎 1 attachments (1 MB)
Emergency Motion to Enjoin Respondent from Severing all Contact and Communication with the Parties' Daughter.pdf;

Esteemed Ms. Keys and Mrs. Summe –

I am following up on the status of the two (2) emergency motions that have been filed and are pending before the Court.  I understand that Judge Mehling cannot act on these motions at present, but the judicial power remains vested and it is my understanding that there are administrative procedures in place precisely for circumstances such as these.  Indeed, I believe that the appropriate procedure for the assignment of a judge who can quickly address emergency motions such as those pending here is precisely the procedure that was used by Ms. Keys in securing the assignment of Judge Moore to an emergency motion filed by Ms. Dietz in the Bakker v. Dusing matter several months ago, when Judge Mehling was on vacation.  It is unfortunate that in this circumstance, unlike in the circumstance with Ms. Dietz (where a different Judge was contacted, assigned, and an emergency hearing to hear her emergency motion tentatively set up in less than 24 hours), that there has been such a delay in making the appropriate arrangements.  If you could kindly please advise as to status and let me know if there is anything I can do to expedite the process, pursuant to the applicable administrative procedure, I would very much appreciate it.

Also, if I could please kindly request the courtesy of an acknowledgment of this correspondence, I would be most grateful.  The transmittal email below requested such a courtesy, but I did not receive any such acknowledgement.  I am sure that was just an oversight.  In any event, such an acknowledgment is again requested.  Thank you kindly in advance.  I would note that multiple emergency motions have been brought to the attention of the court by opposing counsel and lawyers for other parties in both this matter and the Bakker v. Dusing matter, and those lawyers' identical communications were not only acknowledged (and responded to), but the emergency motions transmitted to the Court in connection with same were promptly addressed by the Court in short order.  While certain of those motions were heard by Judge Mehling, I respectfully note that at least one was brought before the Court in circumstances where, as here, Judge Mehling was not in a position to exercise the judicial power.  I am unaware of any provision of law providing for different treatment of identical communications and emergency submissions transmitted by pro se litigants such as myself.  I am aware of considerable legal authority, and judicial canons, standing for the exact opposite proposition.  If you believe my understanding to be in error, please by all means feel free to point that out.  As a pro se litigant, it is my understanding that I am entitled to "reasonable accommodation" of any mistaken beliefs as to procedure, and I freely admit that I'm capable of making mistakes.

It is respectfully submitted that the issues raised in both emergency motions that presently languish before the Court – including the most recent (attached) – are unquestionably "emergencies" under any definition of the term.  Indeed, they could not be more serious.  Please do let me know what I can do to assist the Court in performing its legal duty in this circumstance – to ensure that the judicial power is exercised, notwithstanding the fact that under the present circumstances the resident Judge cannot himself exercise it – just as was done in connection with the emergency motion filed by Ms. Dietz (in circumstances in all relevant respects precisely identical to those present here).

Forgive me the very suggestion, as I trust completely that such an occurrence would never be the case, but I would respectfully observe that the current delay and non-responsiveness of the Court (doubtless an oversight) to the emergency motions filed by me, as a pro se litigant in this case, as compared to the prompt attention to those filed by opposing counsel in this and the Bakker v. Dusing matter, could be perceived as disparate treatment.  I hesitate to even raise the suggestion, and do so most respectfully.  Nonetheless, I would hate for anyone to get the wrong idea.

Case 1:19-cr-00602-RA   Document 118-1   Filed 08/20/21   Page 124 of 124

Oversights do happen.  Nonetheless, the Court's acknowledgement of the instant communication and timely efforts to secure a judge, pursuant to the applicable procedures, to address the two (2) now long-pending emergency motions I have filed as a pro se litigant would ensure against even the suggestion of disparate treatment of the respective parties and, silly as it may sound, the appearance of special access to the court's judicial powers by some (everyone else) but not others (me).

I look forward to hearing from you.  (And please, don't feel bad at all about the previous oversight.  God knows I can appreciate how busy the Court is, and I appreciate your public service.)

Most Respectfully,
Ben Dusing, pro se

**Benjamin  G. Dusing**



**809 Wright's Summit Pkwy Ste 120**
**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**

**From:** Benjamin G Dusing
**Sent:** Wednesday, October 28, 2020 2:09 PM
**To:** Keys, Alice <AliceKeys@kycourts.net>; Summe, Kathleen <KathleenSumme@kycourts.net>
**Cc:** Ruth Jackson <ruth@northernkentuckydivorce.com>; objlaw@yahoo.com
**Subject:** Emergency Motion - assistance requested

Court staff –

Please see attached, Emergency Motion to Enjoin Respondent from Severing All Contact and Communication with the Parties' Daughter H.E.D., for the Respondent to Comply with the Court's Order of October 11, 2020, Forthwith for Information Related to H.E.D.'s Session with Her "Counselor" on October 23, 2020 Determining Petitioner's Parenting Time with H.E.D., And for Other Miscellaneous Related Emergency Relief to Prevent Ongoing, Long-Term Trauma to H.E.D. On Account of Complete Severance of Relationship with Petitioner, filed earlier today in *Dusing v. Tapke, 15-CI-1945*.

As a pro se party-litigant I would request reasonable accommodation in endeavoring to navigate the procedural labyrinths under the circumstances, and your assistance in doing so.  Apologies for any inconvenience.  Under the circumstances, is my understanding that a "special judge" would have to be arranged to hear the attached.  I do believe the issue raised by way of the motion qualifies as an "emergency" under the applicable rules.

Would appreciate the courtesy of a response acknowledging receipt.

Most Respectfully,
Ben Dusing, Pro Se

**Benjamin  G. Dusing**



**809 Wright's Summit Pkwy Ste 120**
**Fort Wright, KY 41011**
**Tele: 859-635-5000**
**Cell: 859-468-8991**