# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 19 Cr. 602 (RA)** |
| | : | |
| **MICHAEL HILD,** | : | |
| | : | **ORAL ARGUMENT** |
| **Defendant.** | : | **REQUESTED** |

## DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................. 1

I.   THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS
PURSUANT TO RULE 29 ......................................................................................... 1

  A.   The Evidence Was Insufficient to Prove that Bond Values Were Misrepresented.......... 1

  B.   The Evidence Was Insufficient to Prove Mr. Hild's Intent to Defraud .......................... 5

II.   THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS
PURSUANT TO RULE 33 ......................................................................................... 6

  A.   Mr. Hild Received Ineffective Assistance of Counsel Due to His Counsel's Unwaived
Actual Conflicts that Resulted in a Lapse of Representation .................................. 6

  B.   The Government Elicited Improper and Highly Prejudicial Opinion Testimony.......... 22

  C.   The Indictment Did Not Charge an Omissions Theory of Fraud, Resulting in
Constructive Amendment and Prejudicial Variance at Trial.................................. 25

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

*Armienti v. United States*,
   234 F.3d 820 (2d Cir 2000) ................................................................................ 6–7

*CFTC v. Wilson*,
   No. 13 Civ. 7884, 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)................................ 4

*Herrera v. Russi*,
   No. 95-187, 1996 WL 651017 (E.D.N.Y. Nov. 6, 1996) ......................................... 21

*Mickens v. Taylor*,
   535 U.S. 162 (2002) .............................................................................................. 17

*Persels & Assocs., LLC v. Cap. One Bank, (USA), N.A.*,
   481 S.W.3d 501 (Ky. 2016)..................................................................................... 13

*Puglisi v. United States*,
   586 F.3d 209 (2d. Cir. 2009) .................................................................................... 9

*Sealed Appellee v. Sealed Appellant*,
   900 F.3d 663 (5th Cir. 2018) .................................................................................. 21

*United States v. Barnwell*,
   No. 15 Cr. 620 (NSR), 2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) ............... 23–24

*United States v. Davidson*,
   308 F. Supp. 2d 461 (S.D.N.Y. 2004) ..................................................................... 23

*United States v. Iorizzo*,
   786 F.2d 52 (2d Cir. 1986) ....................................................................................... 7

*United States v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007) ................................................................................... 23

*United States v. Levy*,
   377 F.3d 259 (2d Cir. 2004) ................................................................................... 15

*United States v. Levy*,
   25 F.3d 146 (2d Cir. 1994) ............................................................................... 7, 17

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ................................................................................... 23

*United States v. Tarricone*,
   996 F.2d 1414 (2d Cir. 1993) ...................................................................... 8, 15, 21

*United States v. Williams*,
  372 F.3d 96 (2d Cir. 2004) .................................................................................. 21

*United States v. Yannotti*,
  541 F.3d 112 (2d Cir. 2008) ................................................................................ 24

## **<u>Rules</u>**

Fed. R. Evid. 704 .............................................................................................................. 24

Ky. R. Civ. P. 11 ....................................................................................................... 13, 14

Ky. R. of Civ. P. Ann. 11 Cmt. 3 ................................................................................... 13

Ky. R. of Civ. P. Ann. 11 Cmt. 6 ................................................................................... 13

Ky. R. Sup. Ct. 3.130(4.5) ................................................................................................ 9

N.Y. R. of Prof'l Conduct 1.7 ....................................................................................... 22

N.Y. R. of Prof'l Conduct 3.4(a)(4) ................................................................................ 9

Tex. Disciplinary R. of Prof'l Conduct 1.06 ................................................................. 22

Defendant Michael Hild respectfully submits this reply memorandum of law in further support of his renewed motion for a judgment of acquittal on all counts, or alternatively, for an order vacating his conviction and granting a new trial.

## ARGUMENT

Mr. Hild demonstrated in his opening brief ("Br.") that the evidence was insufficient to support his conviction, and that he received ineffective assistance of counsel. The government's opposition brief ("Opp.") not only fails to answer Mr. Hild's sufficiency claims persuasively, but also relies on a stunning affidavit from Mr. Hild's prior counsel whose wild factual assertions run contrary to both the record and common sense. That prior counsel's affidavit would lack credibility comes as no surprise, given the numerous adverse credibility determinations against him from other courts. What is surprising is that the government—after prosecuting Mr. Hild for misrepresentations—would ask the Court to rely on an affidavit so replete with apparent misrepresentations. For the reasons described below, the Court should enter a judgment of acquittal, or in the alternative order a new trial. At a minimum, the Court should order a hearing.

## I.  THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS PURSUANT TO RULE 29

### A.  The Evidence Was Insufficient to Prove Bond Values Were Misrepresented

In his brief, Mr. Hild showed how the government failed to prove that Live Well's bond valuations were fraudulently inflated because Scenario 14 was a good faith estimate of the bonds' actual value. (Br. 4–10.) In its opposition brief ("Opp."), the government asserts that it proved a scheme to defraud because the evidence established that "Live Well submitted *above-market* bond prices to IDC and concealed from the lenders that (i) the prices were not market values, and (ii) Live Well was secretly behind the IDC prices." (Opp. 11 (emphasis added).) But the government is dodging the issue. The Indictment alleges Mr. Hild engaged in a scheme

1

to defraud "by *misrepresenting* the value of certain bonds."  (Indictment ¶¶ 56, 58 (emphasis added); *see also id.* ¶¶ 50(b), 60.)  To the extent Live Well submitted what Mr. Hild and others believed were *accurate* bond values to IDC, those values were not misrepresented.

Despite alleging in the Indictment that Mr. Hild "misrepresent[ed] the value of certain bonds," the government now appears to be arguing that Scenario 14 prices were misleading even if they were accurate because (1) they were "above market" and (2) they originated with Live Well rather than IDC.  (Opp. 11.)  These arguments are unpersuasive.

First, the fact that Live Well's valuations may have been higher than others' does not make Live Well's valuations misleading or incorrect.  Indeed, Live Well's personnel believed their valuation methodology was superior to other methodologies (*e.g.*, GX 407 at 21–22), and it would have been misleading for Live Well to value the bonds too low.  The government also presented no evidence that a market participant who understood Scenario 14 would not have paid those higher prices.  In any event, there was no requirement that Live Well give prices to IDC at which the bonds could be immediately bought and sold.  Rather, the contracts between Live Well and the lenders defined "market value" simply as the price "obtained from" IDC (*e.g.*, GX 603 at 11), and the IDC contracts confirmed that IDC quotes "may not conform to actual purchase or sale prices in the marketplace" (DX D.1a.2 at 2).  Given Scenario 14's accuracy, and that the contracts with IDC permitted Live Well to provide quotes that did not conform to purchase and sale prices, it was not misleading for Live Well to give Scenario 14 values to IDC.

Second, the fact that Live Well "communicated" pricing information to IDC, and the fact that IDC used it, was neither secret nor misleading.  IDC's own contracts confirmed that IDC could base prices on "information communicated [to IDC] by its clients."  (*E.g.*, DX D.1a.2 at 2.)

The government falls back on the notion that putting aside the contracts, Live Well's behavior did not conform to what the lenders "wanted," where the lenders "*wanted* market value prices" and "*wanted* prices that came from an independent source." (Opp. 11 (emphasis added).) But even if the lenders "wanted" quotes from IDC that reflected prices at which the bonds could be immediately liquidated in the market, the actual agreements here say the opposite, that the IDC prices "may *not* conform to actual purchase or sale prices." (DX D.1a.2 at 2.) In any event, the evidence did not prove that the Scenario 14 prices were not equivalent to market prices, in the sense that no evidence showed that an educated buyer would not have paid Scenario 14 prices.

The government responds that "there is no evidence to suggest the market *would* have actually paid higher prices" (Opp. 14 (emphasis added)), but it was not Mr. Hild's burden to prove this point. Rather, it was the government's burden to prove that the Scenario 14 prices were fraudulently inflated and the market would *not* have paid Scenario 14 prices. The government's witnesses, however, testified that Scenario 14 was an effort to provide a good faith estimate of the intrinsic value of the bonds, and this evidence supports the inference that market participants who understood Scenario 14 would pay those prices. (Br. 5–6.[1]) The only other evidence the government offered regarding the bonds' sale prices was from a lender who sold in a fire sale, which is not probative outside that context. (*See* Opp. 14 (citing Misiano Tr. 605).)

The government describes at length the evidence showing that Mr. Hild and others at Live Well discussed how Scenario 14 values were higher than the valuations by other market participants. (Opp. 12.) But each piece of evidence the government cites only confirms that rather than attempting to misrepresent the bonds' values to IDC, Mr. Hild and others (including

---

[1] But for trial counsel's ineffective assistance, an expert witness was available to confirm that in the absence of a liquid market, a bond's intrinsic value is the best estimate of the bond's market value. (*See* Davis Decl. ¶ 5.) Thus, based on this expert's testimony, Scenario 14 values *were* market values.

the government's cooperators) believed that Scenario 14 was a *more accurate* methodology, such that they were conveying accurate values to IDC.  For example, Mr. Stumberger told Mr. Hild that the way the other market participants were valuing the bonds "[m]ay not be right, or proper, or sound," and Mr. Hild agreed that "[t]here's no debating that."  (Opp. 13 (quoting GX 407 at 21–22).)  The government block-quotes these very statements, arguing that they show Mr. Hild "knew [the bond prices] were above market value."  But the government is misconstruing this evidence, which only shows that Mr. Hild and Mr. Stumberger believed that other market participants were not valuing the bonds correctly.  In fact, in language the government leaves out just before the quoted passage, Mr. Hild asks, "the reason we're in this space is because we're one of the few people that know how to value these securities, right?"  (GX 407 at 21.)  Rather than supporting the government's case, this evidence (especially with the left-out quote) demonstrates Mr. Hild believed Live Well was accurately valuing the bonds.

The government tries to distinguish *CFTC v. Wilson*—in which Judge Sullivan found that the government had failed to prove that prices in an illiquid market "were actually inflated or above fair market value," No. 13 Civ. 7884, 2018 WL 6322024, *14 (S.D.N.Y. Nov. 30, 2018)— by noting (weakly) that *Wilson* followed a bench trial and there was no jury determination to defer to (Opp. 15).  But a jury verdict cannot stand when it is unsupported by the evidence, and to counter *Wilson*, the government fails to cite any case that is at all comparable to this one.

The government also argues that it was not required to call an expert witness to testify how a market participant would have valued the bonds.  (Opp. 14 (citing cases).)  It is true that there is no such requirement.  In the cases the government cites, however, the government was not required to call experts regarding specific accounting rules because it had otherwise presented sufficient evidence of fraud.  In this case, however, the absence of an expert is telling,

4

because there was no other evidence establishing that Scenario 14 values were fraudulently inflated.  The absence of expert testimony confirms the government failed to meet its burden.

Finally, the government argues that the "equipoise" rule is not applicable because it is only relevant where the evidence is "nonexistent or so meager as to preclude the inferences necessary."  (Opp. 15 (quotation omitted).)  But that is precisely what Mr. Hild has argued:  The evidence that Mr. Hild "misrepresented" the value of certain bonds by using Scenario 14 prices was so meager that the jury's verdict cannot stand.

### B.  The Evidence Was Insufficient to Prove Mr. Hild's Intent to Defraud

The evidence likewise failed to demonstrate Mr. Hild's intent to defraud.  The government principally argues that Mr. Hild's fraudulent intent was demonstrated by the evidence that he "intentionally deceiv[ed] his lenders about the nature of IDC prices" (that is, that they came from Live Well).  (Opp. 16–17.)  The government's argument here is that Live Well's agreements with the lenders called for an "independent" third party pricing service, and the evidence showed, according to the government, that Mr. Hild "knew that IDC was *not* independent because it was publishing Live Well's bond prices 'verbatim.'"  (Opp. 17 (emphasis in original).)  The government's argument, however, stretches the evidence, which even in the light most favorable to the government does not show Mr. Hild's fraudulent intent.

The government's premise that "IDC was *not* independent because it was publishing Live Well's bond prices 'verbatim'"—and that this somehow showed Mr. Hild's fraudulent intent—is faulty.  The fact that IDC published Live Well's prices does not prove that IDC was *required* to do so and lacked independence.  The evidence at trial explained why IDC was using Live Well's prices:  IDC was unable to value the bonds, and asked Live Well to provide quotes.  (Stumberger Tr. 85, 288; Rohr Tr. 1243.)  Further, IDC's contracts permitted IDC to base quotes on "information communicated [to IDC] by its clients" such as Live Well.  (*E.g.*, DX D.1a.2 at 2.)

5

The government argues that Mr. Hild's intent was proved by steps he and others took to "hide their scheme" by phasing in the implementation of Scenario 14 and purchasing whole tranches of bonds.  (Opp. 17.)  But this evidence is equally consistent with Mr. Hild taking steps to preserve Live Well's competitive advantage (or "secret sauce" (Stumberger Tr. 144)).  As the government acknowledges, "there is nothing inherently wrong with keeping secret an investment thesis that views a security as undervalued by the market."  (Opp. 17.)

Finally, the government argues that Mr. Hild's compensation provides "powerful evidence that Hild's actions were intentional efforts to defraud the lenders."  (Opp. 18.)  But the government also admits that "it is true that an executive's desire for more compensation is not necessarily indicative of a guilty mind" in the absence of other evidence.  (*Id.*)  Where other evidence did not prove intent, compensation evidence does not do so either.

On the whole, the government failed to prove that bond values were misrepresented or that Mr. Hild had an intent to defraud.  The Court should enter a judgment of acquittal.  Should the Court not grant Mr. Hild's motion for an acquittal, it should grant his motion for a new trial pursuant to Rule 33 because the verdict was against the weight of the evidence.  (Br. 40–41.)[2]

## II.    THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO RULE 33

### A.  Mr. Hild Received Ineffective Assistance of Counsel Due to His Counsel's Unwaived Actual Conflicts That Resulted in a Lapse of Representation

Mr. Dusing and Ms. Lawrence labored under an undisclosed and unwaived conflict due to the simultaneous litigation of Mr. Dusing's Kentucky court case, which was inherently in conflict with and adversely affected their representation of Mr. Hild.  (Br. 15–37.)

In its opposition brief, the government agrees that an actual conflict exists when "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to

---

[2] The government's additional claims regarding the evidence are addressed in the addendum to this brief.

a course of action."  (Opp. 20 (quoting *Armienti v. United States*, 234 F.3d 820, 824 (2d Cir

2000)).)  The government likewise agrees that to establish a Sixth Amendment violation, a

defendant who establishes an actual conflict "need not prove prejudice," but rather must prove "a

lapse in representation resulted from the conflict," that is, "that some plausible alternative

defense strategy or tactic might have been pursued, and that the alternative defense was

inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."

(Opp. at 21 (quoting *United States v. Iorizzo*, 786 F.2d 52, 58 (2d Cir. 1986); *United States v.

Levy*, 25 F.3d 146, 157 (2d Cir. 1994)).)

In his opening brief, Mr. Hild demonstrated that these standards were met because Mr.

Dusing's and Ms. Lawrence's interests in their Kentucky litigation diverged from Mr. Hild's,

and their interests in the Kentucky case were inherently in conflict with alternative trial

strategies.  Most importantly, in the Kentucky case, a series of key motions were on that court's

motion calendar for May 4, 2021, including Mr. Dusing's own motion to vacate a court order

that he has recently called "one of the most special court orders in the history of American

jurisprudence" that "trashes me in a special way" and "reads like a note from the Unabomber,"

as well as his opposing counsel's multiple motions for sanctions.  (Levine Decl. Ex. B.5 (Dusing

Facebook video at 4:55 (Aug. 24, 2021)).)  In the middle of Mr. Hild's trial, Mr. Dusing and Ms.

Lawrence asked the Kentucky court to adjourn all deadlines (including May 4) until after June 1,

but the Kentucky court denied the motion just before Mr. Hild's defense case began.

In the absence of an adjournment, Mr. Dusing's and Ms. Lawrence's trial obligations

were inherently in conflict with the Kentucky litigation, as they would need to curtail Mr. Hild's

defense case to ensure that trial would be over by May 4. ████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

(Levine Decl. Ex. A.)  Because Mr. Dusing and Ms. Lawrence's Kentucky case inherently

conflicted with Mr. Hild's and adversely impacted the defense, a new trial is required.

At this stage, Mr. Hild "is not required to establish that he will necessarily succeed on the

claim" to be entitled to a hearing; rather, Mr. Hild merely must establish that "he has a

'plausible' claim of ineffective assistance of counsel." *United States v. Tarricone*, 996 F.2d

1414, 1418 (2d Cir. 1993).  Mr. Hild has easily met this burden.  Indeed, counsel's affidavits are

so incredible that this Court should discredit them and grant Mr. Hild's motion without a

hearing.  *See id.* at 1418 (if defendant could show he will "necessarily succeed on the claim, . . .

no hearing would be necessary").  If the Court is inclined to credit any of the assertions in

counsel's affidavits, however, Mr. Hild has demonstrated, *infra*, numerous factual disputes that

can only be resolved at a hearing, including whether the defense curtailed its case due to Mr.

Dusing's personal litigation, the reasons the defense did not call an expert witness, and whether

Mr. Dusing's personal interest conflict adversely impacted his trial preparation and conduct.  The

resolution of any one of these issues in Mr. Hild's favor would entitle him to a new trial.

In response to Mr. Hild's arguments, the government relies on a handful of cherry-picked

statements from the lengthy affidavits submitted by Mr. Dusing, Ms. Lawrence, and an attorney

named Jeffrey Otis, and asserts that "[w]ith the benefit of the[se] lengthy affidavits . . . , the

---

█████████████████████████████████████████

██████████████████████████████████████████

Court can conclude that, even with the benefit of a hearing, Hild has 'no chance of overcoming counsel's detailed explanation.'"  (Opp. 32 (quoting *Puglisi v. United States*, 586 F.3d 209, 214–15 (2d Cir. 2009)).)  But the statements the government relies on from counsel's affidavits are not credible, as they are contradicted by other statements in counsel's affidavits, the record, the declarations submitted with this reply brief, and common sense.[4]

First, quoting from Mr. Dusing's affidavit, the government writes that Mr. Dusing "was 'not aware of much of the activity' in the Kentucky litigation and that his co-counsel in that matter 'handled all the court filings.'"  (Opp. 25 (quoting Dusing Aff. ¶ 5).)  Mr. Dusing's affidavit goes even further in portions the government does not quote, stating that on his "domestic litigations," his "primary attorney was Jeff Otis," and "Mr. Otis handled any and all family court filings in my domestic court litigations during the period of Mr. Hild's trial." (Dusing Aff. ¶ 5.)  Mr. Dusing also states that he "was all-but-completely in the dark about whatever developments there were during this time [in New York] in my family court matters" (Dusing Aff. ¶ 58), and claims that he "do[es] not specifically recall being aware of *any* of those filings [in the *J.B.* matter], did not review any of them in their final form, and to the best of my memory had limited, high-level input into them (if any at all)."  (Dusing Aff. ¶ 59 (emphasis added).)  This Court should not credit Mr. Dusing's statements, as his credibility is so questionable the government should not rely on him at all, much less ask the Court to do so.[5]

---

To the extent the Court plans to rely on any other unaddressed assertion in the lengthy affidavits not addressed here, Mr. Hild respectfully requests the opportunity to respond to any such assertions.

[5] Under the New York Rules of Professional Conduct, "[a] lawyer shall not . . . knowingly use perjured or false evidence."  Rule 3.4(a)(4).

To start, for multiple reasons, this Court should not credit Mr. Dusing's statements that Mr. Otis was his "primary attorney" handling the Kentucky cases and that Mr. Dusing was as a result "completely in the dark" and "not aware of any" of the filings.  Most obviously, it was Mr. Dusing and Ms. Lawrence—not Mr. Otis—who signed all of the briefs filed in Kentucky during the period of Mr. Hild's trial.  In the middle of Mr. Hild's trial, Mr. Dusing himself signed and filed two motions *pro se*, including one 44-page motion to vacate the April 5 order.  (4/15/21 Mot. to Alter, Amend, or Vacate, Case No. 19-CI-560 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.) ("*J.B. v. Dusing*"); 4/19/21 Mot. to Redact, *J.B. v. Dusing*.)  Ms. Lawrence signed two filings during Mr. Hild's trial.[6]  (4/9/21 List of Outstanding Motions to be Heard; 4/19/21 Mot. to Continue, *J.B. v. Dusing*.)  In the motion to continue, Ms. Lawrence in mid-April described *herself* as Mr. Dusing's "*principal lawyer*" in this action (4/19/21 Mot. to Continue at 1, *J.B. v. Dusing* (emphasis added)), which flatly contradicts Mr. Dusing's present claim that "Mr. Otis was my primary counsel" in Kentucky and that Ms. Lawrence took over for Mr. Otis only in "late May 2021."  (Dusing Aff. ¶ 13.)  Indeed, Ms. Lawrence did not reference Mr. Otis at all, and instead sought a continuance based on the claim that she and Mr. Dusing were unable to litigate Mr. Dusing's case at the same time as Mr. Hild's trial, a claim that would have been false if Mr. Otis had been handling the case (as Mr. Dusing says).  (4/19/21 Mot. to Continue at 1, *J.B. v. Dusing*.)  On April 30, the day Mr. Hild's trial ended, using the very words Mr. Dusing now uses to describe Mr. Otis, Ms. Lawrence described herself as Mr. Dusing's "primary attorney" in an email asking the Kentucky court to adjourn the May 4 hearing on the ground that she and Mr. Dusing—"the litigant and the primary attorney"—were "out of town" for Mr. Hild's trial and

---

[6] Ms. Lawrence also signed several motions filed shortly after Mr. Hild's trial.  (*See* 5/3/21 Fifth Mot. for Disqualification (signed only by Ms. Lawrence); 5/3/21 Mot. to Continue (same); 5/3/21 Mot. to Vacate (same); 5/5/21 Notice of Appeal (same); 5/11/21 Sixth Mot. for Disqualification (signed by Ms. Lawrence and Mr. Dusing); 5/12/21 Seventh Mot. for Disqualification (same).)

thus were "not going to be prepared to proceed with all these motions."  (5/3/21 Mot. to
Continue at 7 & 8, *J.B. v. Dusing* (also attached in addendum).)  She said nothing of Mr. Otis's
role or availability.

Mr. Dusing's sworn statements that Mr. Otis was his "primary attorney" and that he was
personally "completely in the dark" are also inconsistent with Mr. Otis's affidavit.  Mr. Otis does
not state that he was Mr. Dusing's "primary attorney" in Kentucky, but rather states that he was
"counsel of record" and "worked on" the case during Mr. Hild's trial, which is consistent with
Mr. Otis playing a minor role while Mr. Dusing and Ms. Lawrence took the lead in drafting and
filing briefs during Mr. Hild's trial.  (Otis Aff. ¶¶ 3–4.)

Mr. Dusing's statements about Mr. Otis's lead role are also inconsistent with Mr. Otis's
performance at the Kentucky trial, where Mr. Otis examined just one witness, and Mr. Dusing
(who "self-taught [him]self Kentucky family law" (Dusing Aff. ¶ 55)) and Ms. Lawrence
handled the bulk of the trial.  Mr. Dusing defensively states that "[a]lthough Mr. Otis only
examined one witness, he was a full participant and present for the entire trial," and that
"[c]onsistent with his role as my primary counsel, he took the lead in terms of the organization,
planning, and strategy for our side in regards to the trial."  (Dusing Aff. ¶ 7.)  Mr. Dusing is thus
now claiming that Mr. Otis was his "primary attorney" in Kentucky notwithstanding that Mr.
Otis did not play a primary role in the trial, did not sign (or even get mentioned in) the filings at
issue, and does not describe himself as the primary attorney, and where that Ms. Lawrence
described *herself* to the Kentucky court as the "principal attorney" and "primary attorney."  At
the May 4 hearing, where Mr. Otis appeared via Zoom, he appeared to be unfamiliar with the
exhibits attached to Mr. Dusing's motion to continue and could not discuss them when asked to

do so by the judge, stating, "I'll stand on the motion, sir, it's all I can do."  (Levine Decl. Ex. B.1 at 17:25 (video of 5/4/21 hearing).)

Mr. Dusing also attempts to explain why he was the one who signed and filed the lengthy motion to vacate "*pro se*" on April 15 (in the middle of Mr. Hild's trial), notwithstanding Mr. Otis's supposed role as "primary counsel."  Mr. Dusing now says that he only dictated a "very short section" of the brief, directed "the gist" of the brief to Mr. Otis, and that he otherwise "did not review" the brief in its "final form."  (Dusing Aff. ¶ 59.)  To explain his signature on the brief, instead of Mr. Otis's, Mr. Dusing asserts that because the brief accuses the Kentucky court of corruption and "proves that the [Kentucky] case was decided in advance and not based on a neutral, unbiased consideration of the facts and law," Mr. Dusing preferred that "any consequences would be borne by me and only me (not Ms. Lawrence or Ms. Otis [sic])." (Dusing Aff. ¶ 59.)  Mr. Dusing's post-hoc claim that he did not write a brief that he alone signed and filed—and that he was not even aware of the contents—cannot be credited.  Not only is Mr. Dusing's explanation facially implausible, but it is also inconsistent with Mr. Otis's own affidavit and Kentucky law.  (The style of the brief also matches the florid style of Mr. Dusing's own affidavit, and bears no resemblance to Mr. Otis's.)

Mr. Otis's affidavit says nothing about drafting the brief, being concerned about alleging corruption in the Kentucky court, or Mr. Dusing signing in his place, and this silence is telling. Mr. Dusing's story, if credited, would also demonstrate a violation of Kentucky law.  Under Rule 11 of the Kentucky Rules of Civil Procedure, "[t]he signature of an attorney or party constitutes a certification by him that he has read the pleading, motion or other paper."  Ky. R. of Civ. P. 11; *see also* Ky. R. of Civ. P. Ann. 11 Cmt. 3 (describing duty as "nondelegable"); Ky. R. of Civ. P. Ann. 11 Cmt. 6 ("a penalty is mandatory if there is a violation").  This rule applies to Mr.

Dusing, who as a *pro se* litigant, was also required under Kentucky law to disclose any "active assistance" in drafting a document signed by him alone. *Persels & Assocs., LLC v. Cap. One Bank, (USA), N.A.*, 481 S.W.3d 501, 508 (Ky. 2016). Under these rules, Mr. Dusing was not permitted to sign a brief he had not read, or to fail to disclose Mr. Otis's active assistance. The Court should not credit Mr. Dusing's assertions about Mr. Otis's role.

Second, in addition to relying on Mr. Dusing's claim that Mr. Otis "handled all the court filings," the government also attempts to rebut Mr. Hild's claim that Mr. Dusing cut short the defense case in order to finish the trial before a May 4 hearing in Kentucky by relying on Mr. Dusing's assertions that he "'cannot personally say that I was even aware at the time that such a hearing [on May 4] had been scheduled or was occurring.'" (Opp. 25 (quoting Dusing Aff. ¶ 5).) Once again, this Court should not credit Mr. Dusing's assertion, and it is implausible on its face. On the signature page of Mr. Dusing's *pro se* April 15 Motion to Alter, Amend, or Vacate the Kentucky judgment, Mr. Dusing signs his name twice, above and below the statement "[p]lease take notice that the foregoing motion shall come on for a hearing on May 4, 2021 at 1:30 p.m." (4/15/21 Mot. to Alter, Amend, or Vacate at 44, *J.B. v. Dusing*.) An attorney's signature "constitutes a certification by him that he has read the . . . paper," Ky. R. of Civ P. 11, and this Court could find on this basis alone that Mr. Dusing knew about the May 4 hearing.

In addition to Mr. Dusing's signature on the motion, on April 30, Ms. Lawrence twice emailed the Kentucky court scheduler, copying Mr. Dusing, writing that "*[w]e* saw the pre ruling docket for Tuesday, May 4, 2021, and saw there are a host of motions scheduled that day. As we have previously advised the Court, it is not clear that we will be back Tuesday from New York."[7]

---

[7] The assertion that Mr. Dusing and Ms. Lawrence would not be able to attend the hearing due to Mr. Hild's trial was false (at the time of this email). Mr. Hild's trial had concluded at this time and Mr. Dusing and Ms. Lawrence arrived back to Kentucky the next day. (Lawrence Aff. ¶ 52; *see* Dusing Aff. ¶ 76.) Contrary to Ms. Lawrence's affidavit (Lawrence Aff. ¶ 56), the Kentucky court did not require that

(5/3/21 Mot. to Continue at 7 & 8, *J.B. v. Dusing* (emphasis added) (also attached in addendum);

*see also* Hild Decl. ¶ 7 (stating Mr. Dusing told him in a phone call after trial that Ms. Lawrence

notified him of the May 4 hearing before Mr. Hild's trial began)).)  Finally, ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Levine

Decl. Ex. A.)

The government also argues that the importance of the May 4 hearing is "significantly

undercut by the apparently uncontested fact that neither Mr. Dusing nor Ms. Lawrence appeared

at that hearing."  (Opp. 25.)  This argument misses the point.  The question for this Court is

whether counsel's interests in that hearing (even if they ultimately decided not to attend)

inherently conflicted with Mr. Hild's.  Based on the record, Mr. Dusing and Ms. Lawrence were

planning to attend and handle the May 4 hearing as late as April 30, the day Mr. Hild's trial

concluded.  As noted, Ms. Lawrence wrote to the Kentucky court scheduler seeking to adjourn

the May 4 hearing on the ground that she and Mr. Dusing ("the litigant and the primary

attorney") are "out of town, and have been for the past month" for trial, and thus would not "be

prepared to proceed with all these motions" on the May 4 calendar.  (5/3/21 Mot. to Continue at

7 & 8, *J.B. v. Dusing*.)  The fact that Mr. Dusing and Ms. Lawrence did not attend the May 4

hearing is thus irrelevant, as they made that decision after Mr. Hild's trial had ended.

In sum, the government's opposition relies on Mr. Dusing's statements regarding Mr.

Otis's role as his primary counsel, and his lack of awareness of events in Kentucky generally or

the May 4 hearing in particular, but those statements are not credible and the Court cannot rely

the motion to continue be re-filed *verbatim* such that it contained falsehoods.  And even if it had, that
would not explain Ms. Lawrence attaching as exhibits these new emails, which falsely suggested that Mr.
Hild's (then-concluded) trial would prevent them from attending the May 4 hearing.

on them.[8]  The Court should grant Mr. Hild's motion, or at a minimum, order a hearing.  *See United States v. Levy*, 377 F.3d 259, 265 (2d Cir. 2004) (remanding for hearing due to attorney's credibility issues).

More broadly, the government's opposition brief fails to reckon with the many statements in Mr. Dusing's affidavit that serve to confirm the conflict of interest that deprived Mr. Hild of his constitutional rights.  Indeed, to the extent counsel's affidavits confirm that Mr. Hild will "succeed on the claim," then "no hearing would be necessary" and the Court should grant Mr. Hild's motion for a new trial.  *Tarricone*, 996 F.2d at 1418.  Mr. Dusing's affidavit spans 76 pages and contains 105 paragraphs, and yet the government only cites *two* of those paragraphs (paragraphs 5 and 70) in the body text of its brief (and five others in footnotes).  (Opp. 23, 25, 28, 31, 32.)  To a great extent, beyond the isolated statements the government asks the Court to credit, the government pretends Mr. Dusing's affidavit does not exist.[9]

---

[8] Mr. Dusing's credibility is further undermined by the multiple adverse credibility determinations by Judge Mehling.  (*See* 2/2/21 Findings of Fact, Conclusions of Law, and Orders, ¶ 9, *J.B. v. Dusing* (holding that Mr. Dusing's claims of "ongoing incapacitation [due to Covid-19] are not credible" given lack of evidence presented and recent televised interview of Mr. Dusing); 4/5/21 Findings of Fact, Conclusions of Law, and Orders, ¶ 106, *J.B. v. Dusing* (finding "multiple issues as to [Mr. Dusing's] credibility" and listing 11 examples); 10/13/20 Findings of Fact, Conclusions of Law, and Orders ¶ 11, Case No. 15-CI-1945 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.) ("*Dusing v. J.T.*") (finding that Mr. Dusing's "credibility is in question" because he admitted on cross-examination that he made statements he had denied during direct examination)).  The Kentucky court also repeatedly sanctioned Mr. Dusing and Ms. Lawrence for submitting motions that had "no factual support in the record," (3/9/21 Order, ¶ 14, *Dusing v. J.T.*), were "unsupported by any evidence" (7/22/21 Order, ¶ 2, *J.B. v. Dusing*), and were "not factually true" (5/26/21 Order, ¶ 1, *J.B. v. Dusing*).

[9] Mr. Dusing's affidavit contains numerous assertions that are not germane to the issues raised by Mr. Hild.  For example, Mr. Dusing's affidavit asserts that it was "false and irresponsible" that "Mr. Hild's filing suggests that there is some sort of criminal investigation ongoing" into Mr. Dusing's conduct in the Kentucky Family Court action.  (Dusing Aff. ¶ 87.)  Citing multiple sources, the opening brief stated only that Mr. Dusing was facing investigation by Kentucky authorities.  (Br. 25.)  Moreover, the witness Mr. Dusing is accused of bribing could be compelled to testify at an evidentiary hearing.  Mr. Dusing also asserts that another lawyer at the undersigned law firm previously represented one of Mr. Hild's prior lawyers.  (Dusing Aff. ¶ 9.)  These issues are irrelevant to the current motion and in any event, Mr. Hild is not adverse to that particular prior counsel.

But reading Mr. Dusing's affidavit on the whole only confirms the very conflict that Mr. Hild asserts.  In chronicling the events of April 2021, Mr. Dusing concedes that he believed the timing of Judge Mehling's April 5 Order to be "uncanny" and "nothing short of astonishing" because it "*maximally prejudiced my legal interests* and was *maximally inconvenient* insofar as the time for filing motions seeking relief from the order would run from that date, during which time Ms. Lawrence and I would be indisposed in New York [on Mr. Hild's trial]."  (Dusing Aff. ¶ 54 (emphasis added).)  In Mr. Dusing's mind, the conflict between his personal litigation and his and Ms. Lawrence's representation of Mr. Hild was so actual and obvious that it was known to "both opposing counsel in both of my family court matters as well as Judge Mehling's chamber's staff" (Dusing Aff. ¶ 53) and used to prejudice Mr. Dusing.  Despite viewing the April 5 Order as "shocking," "extraordinarily disturbing," and "[a] major event" that pitted Mr. Dusing's interests against Mr. Hild's (Dusing Aff. ¶¶ 54, 56), it is undisputed that Mr. Dusing and Ms. Lawrence did not disclose the conflict to Mr. Hild or the Court.[10]

Mr. Dusing even uses the word "conflict" repeatedly to describe the relationship between his Kentucky case and Mr. Hild's.  Mr. Dusing writes that to the extent there is the appearance of a conflict, it is "a 'conflict' directly and intentionally caused by the Kenton Family Court (and not this Court)" because "[t]he Kenton Family Court well understood well prior to the beginning of the Hild trial that Ms. Lawrence and I would be unavailable on account of our representation of Mr. Hild at his criminal trial in New York during that time."  (Dusing Aff. ¶ 101.)  Mr. Dusing

---

[10] The government's assertion that Mr. Hild did not show that Ms. Lawrence was also independently ineffective is belied by the evidence, including Ms. Lawrence arguing that she was too overwhelmed by Mr. Dusing's litigation to focus on Mr. Hild's trial.  (4/15/21 Mot. to Continue, *J.B. v. Dusing*.)  In any event, Ms. Lawrence alone could not have competently served as trial counsel, as her administrative role was "specifically contemplated" to "have no impact whatsoever on . . . guiding and directing trial strategy and decision-making."  (Dusing Aff. ¶ 45.)  Furthermore, Ms. Lawrence's late addition to the defense team just before trial despite her lack of experience gives rise to the inference that Mr. Dusing added her to the trial team in part to continue to help litigate his personal cases while in New York.

states that "[t]he 'conflict' imagined in Mr. Hild's post-trial motion, while not real, clearly was intended to be—and it was the Kenton Family Court that intended it."  (Dusing Aff. ¶ 101.) Thus, despite initially denying the existence of a conflict, Mr. Dusing here confirms that, in his view, a group of corrupt state actors created a conflict between his interests and Mr. Hild's.

Particularly in light of Mr. Dusing's sworn statements, this case does not involve an ordinary "overlap in timing" between a busy lawyer's multiple representations of different clients or a "coincidence of interests," as the government meekly asserts (Opp. 24, 26 (quotation omitted)).  The Kentucky case was Mr. Dusing's own, he was facing serious penalties including prison, and he called the Kentucky case the "most important litigation of [his] life."  (Br. 21.)

The inherent conflict between Mr. Hild's interests and his counsel's resulted in a lapse of representation.  The government claims that there was no lapse because Mr. Hild "failed to muster any evidence that counsel's decision-making during the trial was in any way influenced by the desire to shorten the trial" or that the Kentucky litigation "distracted them from preparing for trial."  (Opp. 28, 30.)  Contrary to this claim, Mr. Hild has easily met his burden of demonstrating that Mr. Dusing's and Ms. Lawrence's Kentucky obligations were "inherently in conflict with" putting on a robust defense of Mr. Hild.  Mr. Hild need not provide "a detailed analysis of the testimony," as the government implies.  (Opp. 30.)  To show a "lapse in representation"—that is, to show more than a "theoretical division of loyalties" (Opp. 21 (citing *Mickens v. Taylor*, 535 U.S. 162, 163 (2002))—Mr. Hild must only present some "plausible alternative defense strategy or tactic" that was "inherently in conflict with or not undertaken due to [counsel's] other loyalties or interests."  (Opp. 21, 31 (quoting *Levy*, 25 F.3d at 157).)  Had Mr. Dusing and Ms. Lawrence put on a more robust defense case, it would have inherently conflicted with their ability to handle the May 4 hearing (which they were planning to do as late

as April 30).  The Court should grant Mr. Hild's motion without a hearing, or at a minimum, hold a hearing because Mr. Dusing's claim that he was not "even aware at the time that such a hearing [on May 4] had been scheduled or was occurring" (Dusing Aff. ¶ 5), which the government relies on (Opp. 35), is not credible.

The government's arguments regarding the May 4 hearing also misconstrue the timeline. According to the government, if Mr. Dusing had intended to curtail the trial, he would not have "engaged in extensive cross-examination of all of the Government's witnesses, and particularly Rohr and Stumberger."  (Opp. 28–29.)  This argument, however, ignores that the Kentucky court denied Mr. Dusing's motion to continue the May 4 hearing on April 26 (in an order entered August 29), the same day the defense case began, and Mr. Dusing was only at that point confronted with the inherent conflict between his case and Mr. Hild's.

In his opening brief, Mr. Hild showed that there were multiple different plausible foregone trial tactics, including how Mr. Dusing failed to introduce specific exhibits that showed that the bonds were performing as expected under Scenario 14 and that IDC disclosed to its customers that valuations could be based on broker quotes and input from market participants. (Br. 32–33.)  Mr. Hild expected these exhibits to be introduced—the defense had marked more than 100 exhibits, many of which could only be introduced through him—and relatedly expected based on Mr. Dusing's advice that he would be on the witness stand for at least a week.  (Hild Decl. ¶ 5.)  Mr. Dusing also failed to reference for context any portions of recorded phone calls introduced by the government, despite litigating his ability to do so pre-trial, and failed to call multiple other witnesses.  (Br. 33.)[11]

---

[11] The government's assertion that the above actions would not "meaningfully have prolonged the trial" is unfounded, particularly as Mr. Dusing and Ms. Lawrence were already cutting the timing close.  The trial concluded with only one business day to spare before the May 4 hearing.  That one day and more would have easily been consumed by the tactics described above.  The government also argues that Mr. Hild's

Regarding the time period before Mr. Hild's trial, the government asserts that Mr. Hild offered no evidence to support the assertion that the preparation for his trial, including strategic decisions such as whether to assert an advice of counsel defense or introduce expert testimony, was impacted by Mr. Dusing's preoccupation with the litigation in Kentucky.  Mr. Hild's deadline to disclose an expert witness or provide notice of any advice of counsel defense, however, was February 15, 2021, just a week before Mr. Dusing's trial began in *J.B. v. Dusing*. (*See* D.E. 31.)  Mr. Dusing failed to do either, notwithstanding that a potential expert was lined up whose testimony would have been incredibly helpful to Mr. Hild's defense.

In particular, the defense had identified an expert who would have testified, among other things, that (1) there was no active, liquid market for the HECM IO bonds, and (2) that in the absence of an active, liquid market, the proper value is the intrinsic value of the bond (that is, what Scenario 14 assessed (Stumberger Tr. 311–12)).  (Davis Decl. ¶ 5.)  Mr. Dusing, however, failed to secure this expert's final report in advance of the deadline.  Mr. Dusing now claims that he was "unsuccessful in securing an expert witness to provide testimony on our side" of the kind described in Mr. Hild's post-trial motions (Dusing Aff. ¶ 42), but that is not accurate.  Not only is that assertion inconsistent with Mr. Davis's declaration, but it is also inconsistent with Mr. Dusing's own later statement in the same affidavit, where he writes that he in fact "identified a potential expert" whose opinions "would be helpful to Mr. Hild's defense."  (Dusing Aff. ¶ 70.)

After falsely claiming that he could not locate an expert, Mr. Dusing states that a "primary reason" he was unsuccessful in retaining the expert he did find—Mr. Davis—was "Mr.

---

claim that Mr. Dusing failed to ask certain questions during his testimony deprived him of the right to testify is undermined by the text messages appended to Mr. Dusing's affidavit.  (Opp. 29 n.4.)  But those text messages only confirm Mr. Dusing's last-minute decision to curtail Mr. Hild's testimony contrary to Mr. Hild's wishes.  Further, the suggestion that Mr. Hild should have responded to a nearly five-page text message regarding trial strategy sent only moments before the defense case began and the day of Mr. Hild's testimony is absurd, particularly when Mr. Dusing had disregarded parts of the agreed-upon strategy.  (Hild Decl. ¶ 6.)

Hild's unwillingness to pay the amount of the expert's anticipated fees." (Dusing Aff. ¶ 70.)
Again, that is not so. As explained in Mr. Davis's declaration, Mr. Dusing asked Mr. Davis to
accept an unreasonably low flat fee of $10,000 and Mr. Davis refused. (Davis Decl. ¶¶ 6–7.)
Mr. Davis never made a counteroffer beyond $10,000, and Mr. Dusing did not pursue any further
engagement. (*Id.* ¶ 7.) Mr. Hild never refused to pay $10,000 or any other higher amount, and
was awaiting word from Mr. Dusing as to the costs of Mr. Davis's services. (Hild Decl. ¶¶ 2, 3.)
Mr. Hild had paid Mr. Dusing a substantial retainer, which was more than sufficient to cover
whatever amount Mr. Davis required, a fact Mr. Dusing even pointed out to Mr. Davis. (Hild
Decl. ¶ 4; Davis Decl. ¶ 10.) These facts suggest that rather than Mr. Hild being "unwilling[]" to
pay for Mr. Davis, Mr. Dusing himself may well have been unwilling to devote any portion of
his retainer (beyond the $10,000 Mr. Davis rejected) to Mr. Davis's services, particularly while
in the thick of his personal litigation, and did not give Mr. Hild the option.

Mr. Dusing's failure to notice and call Mr. Davis (or another expert) also runs afoul of
*United States v. Strickland*. (*See* Br. 37–40.) The government suggests that Mr. Hild's
*Strickland* claim fails because Mr. Hild "failed to proffer specific evidence these uncalled
witnesses could have offered that would be helpful to his case." (Opp. 30 n.5.) But Mr. Davis's
declaration amounts to just such a proffer and his testimony would have been immensely helpful
to Mr. Hild's case. There is a reasonable probability Mr. Davis's testimony would have changed
the outcome of the trial by establishing that the intrinsic value of the bonds (per Scenario 14) was
a reasonable assessment of the bonds' market value in the absence of a liquid market—a
proposition that refutes the central premise of the government's case (that Scenario 14 values
were higher than market values). Thus, the Court should grant Mr. Hild's motion without a
hearing, or at a minimum, hold a hearing on Mr. Hild's *Strickland* claim regarding at least Mr.

Dusing's failure to call an expert.  *See Tarricone*, 996 F.2d at 1420 (remanding for hearing on counsel's failure to call expert witness).

Finally, the government attempts to distinguish *Herrera v. Russi* on the ground that the court there failed to "inquire into whether the hypothesized conflicts adversely affected counsel's performance" under a now abrogated line of cases.  (Opp. 26–27 (citing *Herrera v. Russi*, No. 95-187, 1996 WL 651017, at *8 (E.D.N.Y. Nov. 6, 1996)).)  Although the law regarding a district court's duty to inquire has changed in ways that are irrelevant here, *Herrera*'s articulation of the sorts of conflicts that can adversely affect performance remain clear persuasive authority.  The fact that the case had a different procedural posture does not diminish *Herrera*'s statements about how counsel's personal litigation can conflict with a concurrent criminal representation.

Because Mr. Dusing and Ms. Lawrence had a hidden actual conflict that was inherently in conflict with their representation of Mr. Hild, and Mr. Hild has shown plausible alternative strategies not taken due to the inherent conflict, he received ineffective assistance of counsel, necessitating a new trial.  For all of these reasons, this Court should grant Mr. Hild a new trial based on the record before it, or at a minimum order a hearing.[12]

---

[12] The government urges that if any hearing is held, it should focus in part "on whether the defendant impliedly waived the conflict" (Opp. 32, n.6), but there is no evidence in the record that Mr. Hild gave informed consent in writing, so no hearing is necessary on that point.  In the only case the government cites, the Fifth Circuit found that the defendant, a Texas judge convicted of taking bribes from attorneys, had implicitly waived any conflict when he retained the same attorneys he alleged to be implicated in the crime and "opportunistically" raised the issue post-trial.  *Sealed Appellee v. Sealed Appellant*, 900 F.3d 663, 671 (5th Cir. 2018).  Here, Mr. Hild did not intentionally retain conflicted counsel in order to "opportunistically" raise the issue post-trial.  *See United States v. Williams*, 372 F.3d 96, 109–110 (2d Cir. 2004) (finding defendant did not waive conflict even though he "was aware of at least some of [his attorney's] criminal activity" and distinguishing "attempts to game the system" whereby the defendant "was seeking to exploit the conflict of interest rules by retaining conflicted counsel").  Further, unlike in Texas, New York's Rules of Professional Conduct require that a client's informed consent to a conflict "be in writing."  *Compare* N.Y. R. of Prof'l Conduct 1.7 *with* Tex. Disciplinary R. of Prof'l Conduct 1.06, Cmt. 8.  In addition, Paragraph 5 of Mr. Hild's Declaration—which Mr. Dusing claims is

### B. The Government Elicited Improper and Highly Prejudicial Opinion Testimony

In his opening brief, Mr. Hild demonstrated that the government elicited improper opinion testimony in two ways:  (1) an SEC witness testified that the bond values were a "mark up" despite, as a lay witness, having no expertise in bond valuations or Live Well's pricing methodology, and (2) former employees of Live Well testified at the government's urging that the conduct at issue was "fraud" and "wrong."  (Br. 41–47.)

The government first responds that the SEC witness's testimony that Scenario 14 valuations were a "mark up" was not improper because it did not constitute an opinion, but rather the "ordinary meaning" of the term: "a raise in the price in an item for sale."  (Opp. 34 (quotation omitted).)  This argument ignores the importance the government attached to the term "mark up" and the pivotal role this testimony played at trial.  In summation, for example, the government repeatedly referred to "markups" not in the "ordinary" sense of the term but rather as evidence of "a crime."  (*See* Tr. 2136, 2154, 2175.)  The government even specifically equated its own use of the term to connote wrongdoing with the SEC witness's use: "I called this a markup, Mr. Hamilton called it a markup."  (Tr. 2150.)  Alternatively, the government asserts that Mr. Hild "suffered no prejudice from Hamilton's use of the word 'markup' because he and his other co-conspirators also described Scenario 14 prices in that manner."  (Opp. 34.)  The only evidence the government cites of Mr. Hild using the term, however, is one recorded phone call with Mr. Hild referencing the "inherent markup" of certain bonds.  (Opp. 34 (citing GX 406).)  The other use of the word cited by the government was a spreadsheet that Mr. Hild did not receive.  (Opp. 35 (citing GX 128 (email from Foster to Stumberger)).)  These uses did not connote impropriety. Because the SEC testimony was not rationally based on the witness's firsthand perceptions or

---

"demonstrably false" (Dusing Aff. ¶ 38)—accurately states that Mr. Hild did not know of the activity in the Kentucky cases "*in April 2021*," during his trial.

helpful, it violated Rule 701.  As the testimony concerned a key point in the case, and the government repeated this improper opinion through its summation, Mr. Hild's conviction should be vacated.  *See United States v. Kaplan*, 490 F.3d 110, 124 (2d Cir. 2007).

Second, the government does not respond to Mr. Hild's assertion that it was improper for it to ask if there was "any fraud going on at the company at this time" and for Mr. Rohr to respond, "[a]t this point clearly I understand that there was fraud going on at the company."  (Br. 45 (quoting Rohr Tr. 1094).)  Instead, the government disputes the application of the cited Second Circuit case because "[n]either Rohr nor Novikoff testified using language from the securities or wire fraud statutes" or "testify as to the 'ultimate issue.'"  (Opp. 37.)  Of course, the ultimate issue of the trial was whether there "was any fraud going on at the company at this time."  The government attempts to distinguish *United States v. Scop*—in which the Second Circuit held that a witness's testimony that conduct was "fraud" was an improper legal conclusion warranting reversal—as involving expert rather than lay opinion testimony.  (Opp. 36.)  Although *Scop* involved an expert, the Second Circuit's rationale was not so limited.  In finding that testimony on "legal conclusions exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence," the court analyzed the note to Rule 704, which is not limited to expert testimony.  *See* 846 F.2d 135, 140 (2d Cir. 1988) (quoting Fed. R. Evid. 704 advisory committee's note, referencing both 701 and 702); *see also United States v. Davidson*, 308 F. Supp. 2d 461, 477 (S.D.N.Y. 2004) (noting that *Scop* "cited from the Advisory Committee Notes to Fed. R. Evid. 704, 'Opinion on Ultimate Issue,'" and was therefore more broadly applicable).

Another court in this district has rejected the very same argument the government makes here seeking to distinguish *Scop*.  In *United States v. Barnwell*, Judge Roman noted that

23

"[w]hile *Scop* dealt with the admission of expert testimony, the Court sees no reason why other witnesses or documentary evidence should be allowed to proclaim that Defendant's returns are 'frivolous' or constitute a 'scheme.'  Such evidence runs the risk of misleading the jury, unfairly prejudicing Defendant, and invading the province of the jury to decide the ultimate issues in this case."  No. 15 Cr. 620 (NSR), 2017 WL 1063457, at *5 (S.D.N.Y. Mar. 20, 2017).  Mr. Rohr's testimony regarding the company engaging in "fraud"—which was specifically elicited by the government—was improper and warrants reversal.

The government separately argues that the repeated testimony that conduct was "wrong" was proper because it derived from the witnesses' "direct participation in the fraudulent activities," but this argument is also unavailing.  (Opp. 35 (quotation omitted).)  As the government acknowledges, lay witness testimony is admissible "'where a witness derives his opinion solely from insider perceptions of a conspiracy of which he was a member.'"  (Opp. 35 (quoting *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008).)  Mr. Rohr made clear in his testimony that his opinion was informed by his experience and qualifications beyond Live Well:  He cited his "experience as an auditor and—accounting degree," how he "passed the CPA," and his "general dealing with financial statements in my entire professional career." (Rohr Tr. 1039.)  The government then again asked, "was it right or wrong to do this?"  (*Id.*) Mr. Rohr repeated, "It was wrong."  (*Id.*)

Finally, the government asserts that the testimony regarding "wrong" conduct did not involve the "ultimate issue" of Mr. Hild's intent, but "their own beliefs as to whether what they were doing was wrong."  (Opp. 37.)  This is unsupported by the record.  The witnesses were testifying as to Live Well's conduct, which was the ultimate issue in the trial of Live Well's CEO.  For example, the witnesses testified that Live Well's actions were "wrong" in how it dated

financial results (Rohr Tr. 1029), utilized Scenario 14 (Rohr Tr. 1075, 1077), and submitted prices to IDC.  (Rohr Tr. 1039; Novikoff Tr. 874.)  The issue of whether there was "fraud" or it was "wrong" to value the bonds as Live Well did was the key issue in Mr. Hild's trial.  Because this lay opinion testimony usurped the jury's role, the Court should grant a new trial.

### C.  The Indictment Did Not Charge an Omissions Theory of Fraud

In his opening brief, Mr. Hild established that the Indictment did not provide notice of an omissions-based theory.  The government responds by asserting the Indictment adequately alleged the lenders were unaware the pricing service relied on Live Well to source the bonds, Mr. Hild "forbade" others from disclosing Scenario 14 to the lenders, and that Mr. Hild and others "sought to avoid circumstances that could lead the Lenders to discover that Live Well" was pricing the bonds "well above their actual market value."  (Opp. 39 (quoting and citing Indictment ¶¶ 28, 33, 34).)  None of these allegations specifically charges a duty to disclose or provides notice that the government intended to rely on an omissions-based theory.  Accordingly, it is impossible to know whether the jury convicted based on the affirmative misrepresentation theory charged in the indictment or the uncharged—and unproven—omission theory.

### CONCLUSION

For the foregoing reasons, Mr. Hild respectfully requests that the Court enter a judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count without a hearing.  At a minimum, the Court should hold a hearing.  In the event the Court enters a judgment of acquittal on all counts, the Court should also, pursuant to Rule 29(d)(1), conditionally grant Mr. Hild's motion for a new trial in the event that the judgment of acquittal is later vacated or reversed.

Dated:  New York, New York
        September 3, 2021

<div style="margin-left:40%">

MORVILLO, ABRAMOWITZ, GRAND,
    IASON & ANELLO, P.C.

By:  /s/ Brian A. Jacobs
    _____

    Brian A. Jacobs
    Alexander M. Levine
    565 Fifth Avenue
    New York, NY 10017
    (212) 856-9600
    (212) 856-9494 (fax)
    bjacobs@maglaw.com

    *Attorneys for Defendant Michael Hild*

</div>

26

## <u>ADDENDA</u>

## TABLE OF CONTENTS

I.    April 30, 2021 emails from Katy Lawrence to Alice Keys, copying Benjamin Dusing et al., attached as exhibits to 5/3/21 Mot. to Continue at 7 & 8, *J.B. v. Dusing*, Case No. 19-CI-560 (K.Y. Kenton Fam. Ct. of the 16th Jud. Cir.)


II.   Mr. Hild's Response to Certain Asserted "Facts" by the Government

# ADDENDUM I

## Katy Lawrence

| | |
|---|---|
| **From:** | Katy Lawrence <katybell86@gmail.com> |
| **Sent:** | Friday, April 30, 2021 11:42 PM |
| **To:** | 'Keys, Alice'; bethuhl@kycourts.net |
| **Cc:** | 'Stephanie A. Dietz'; 'Jeff Otis'; 'Benjamin G Dusing' |
| **Subject:** | Bakker/Dusing - 19-CI-560 - Objection to Pre Ruling docket |

Alice –

We saw the pre ruling docket for Tuesday, May 4, 2021, and saw there are a host of motions scheduled that day.

As we have previously advised the Court, it is not clear that we will be back Tuesday from New York.
If we are, we are not going to be prepared to proceed with all of these motions. There is no realistic way. It's a federal criminal jury trial. Both the litigant and the primary attorney are out of town, and have been for the past month for this trial.

We asked that this matter be continued to a different day/time. We have a pending motion to continue before the Court. It is unclear why the Court would set all of these motions to be called on Tuesday without addressing the motion to continue which was intended to deal with this entire circumstance.

We would object to this matter being heard on Tuesday. We respectfully ask the Court to address our outstanding motion to continue. (We also note that we have motions pending before this Court that are two years old).

Thank you,
Katy Lawrence
Attorney at Law

CONT : 000007 of 000034

**Katy Lawrence**

| | |
|---|---|
| **From:** | Katy Lawrence <katybell86@gmail.com> |
| **Sent:** | Friday, April 30, 2021 11:22 PM |
| **To:** | 'Keys, Alice'; bethuhl@kycourts.net |
| **Cc:** | 'Ruth Jackson'; 'Howard Tankersley'; 'Jeff Otis'; 'Benjamin G Dusing' |
| **Subject:** | Dusing/Tapke - 15-CI-1945 - Objection to Pre-Ruling Docket |

Alice –

We saw the pre ruling docket for Tuesday, May 4, 2021, and saw there are a host of motions scheduled that day.

As we have previously advised the Court, it is not clear that we will be back Tuesday from New York.
If we are, we are not going to be prepared to proceed with all of these motions. There is no realistic way. It's a federal criminal jury trial. Both the litigant and the primary attorney are out of town, and have been for the past month for this trial.

We asked that this matter be continued to a different day/time. We have a pending motion to continue before the Court. It is unclear why the Court would set all of these motions to be called on Tuesday without addressing the motion to continue which was intended to deal with this entire circumstance.

We would object to this matter being heard on Tuesday. We respectfully ask the Court to address our outstanding motion to continue. (We also note that we have motions pending before this Court that are two years old).

Thank you,
Katy Lawrence
Attorney at Law

Filed    19-CI-00560    05/03/2021    John C. Middleton, Kenton Circuit Clerk

COMT : 000008 of 000034

# ADDENDUM II

**ADDENDUM II**

**Response to Certain Asserted "Facts" by the Government**

| Government's Assertion | Evidence Cited by Government | Response |
|---|---|---|
| "Live Well wrote down the value of its portfolio by over $200 million." (Opp. 2; *see also* Opp. 8.) | Tr. 1620–22 GX 323 | The write-down was based on faulty estimates and decided by Mr. Haddock, without Mr. Hild's knowledge. (*See* Br. 24.[1]) |
| "Live Well's financing agreements with all but one of the lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to determine the market value of the bond as of the measurement date." (Opp. 3.) | Tr. 79–80 Tr. 598–600 Tr. 697 Tr. 1069–70 GX 603 GX 702 GX 1003 | All but one of the repo lenders required that a price be obtained from IDC. (*See, e.g.*, Novikoff Tr. 930; GX 603; GX 702.) IDC's contract with those lenders disclosed that it could rely on broker quotes and input from market participants. (*See, e.g.*, DX D.1a.2 at 2.) IDC was not obligated to use Live Well's values; it chose to do so. (Hild Tr. 1887.)<br><br>Live Well also disclosed that the prices it provided could be based on "highly subjective assessments" and "do[] not imply . . . actual traded values (if any)" or "a theoretical liquidation value." (*E.g.*, DX A.322.) |
| "Hild and others at Live Well were unhappy with IDC's prices of the bonds." (Opp. 4.) | Tr. 85–87 Tr. 972 | According to the government's witnesses, IDC was unable to model the bonds accurately themselves and asked Live Well to resume providing broker quotes. (Stumberger Tr. 83, 288, 502 (IDC's "model didn't work, they were doing it wrong"); Rohr Tr. 977.) |
| "There was no disclosure from IDC of who the broker quotes came from; nor did Live Well disclose its role in broker quotes to its lenders." (Opp. 4.) | Tr. 603 Tr. 623 Tr. 997–1012 Tr. 1017 | IDC was independent and Live Well had no control over IDC's contracts with the lenders or disclosures. (*See* Novikoff Tr. 930.) IDC did, however, disclose that its prices could be based on input from market participants. (*See, e.g.*, DX D.1a.2 at 2; DX D.8a at 3.) IDC was not obligated to use Live Well's values. (Hild Tr. 1887.)<br><br>Live Well also disclosed that prices provided could be based on "highly subjective assessments" and "do[] not imply . . . actual traded values (if any)" or "a theoretical liquidation value." (DX A.322; *see* DX A.341 & DX A.328.) |

---

[1] As noted in the opening brief, this evidence should have been elicited during trial, but was not due to the ineffective assistance of counsel provided by Mr. Dusing and Ms. Lawrence. (Br. 24, 31.)

| | | |
|---|---|---|
| | | The prior owner of the bonds, Stifel, provided the values to be used for lending purposes. (*See* Stumberger Tr. 91, 273.) Mr. Hild believed that this was common and known to the lenders because he understood that one lender had asked Mr. Stumberger to provide prices to IDC to enable Live Well to complete the Stifel transaction and make the bonds eligible for repo financing from that same lender. (*See* Hild Tr. 1833–34.) Therefore, Mr. Hild had no reason to question IDC's request for Live Well to resume providing quotes or think that the lenders would not be aware of this practice. |
| "Rather than price the bonds as the market would price them, Hild asked the bond traders to run pricing 'scenarios,' with varying inputs, to see how those different inputs affected the price." (Opp. 4.) | Tr. 95–98 GX 113 | The government confuses the distinction between the primary market and secondary market for the bonds. The evidence at trial showed that while there was a limited primary market for purchasing the bonds, there was no active, liquid secondary market. (*See* Stumberger Tr. 240–43; Hild Tr. 2007–09.) Referring to the lack of brokers purchasing the bonds on the secondary market, Mr. Stumberger acknowledged that "there really is no market." (DX E.01 at 10.) Scenario 14 was a good faith attempt to model what the intrinsic value of the bonds was, and would be in the secondary market, if Live Well educated and developed the secondary marketplace. |
| "Hild selected the price that would go to IDC based on the scenario he liked best, which was typically the scenario that provided Live Well with the most liquidity." (Opp. 4.) | Tr. 103–04 | The government's witnesses testified that they believed that Scenario 14 was Live Well's good faith evaluation of the intrinsic value of the bonds—"an effort [] to get it right." (Stumberger Tr. 544; *see also* Rohr. 1275 ("Scenario 14 as an analysis, I actually think and continue to think, was good work.").)<br><br>Mr. Hild further testified that Scenario 14 used a "kind of middle-of the road assumption" and had "some embedded conservatism." (Hild Tr. 1865–66.) |
| "Scenario 14 did not account for the 'yield' (*i.e.*, the return an investor sees on the bond) demanded by the market, which generally required the price of a bond to be lowered | Tr. 110–15 Tr. 994 | The government distorts the cited evidence. Mr. Stumberger testified he (the expert on bond valuations) told Mr. Hild that the market's calculation of the yield was "improper, not sound" and "overly onerous" in that "the amount of decline was greater than it should be." (Stumberger Tr. 111–12.) Because the market's |

| | | |
|---|---|---|
| each month to maintain that high yield." (Opp. 4.) | | yield calculation was "theoretically not correct or sound" in Mr. Stumberger's mind (Stumberger Tr. 114), Live Well reevaluated the bonds' values in an attempt to "get it right" (Stumberger Tr. 311–12), ultimately settling on Scenario 14. (Stumberger Tr. 115.) |
| "Hild and his co-conspirators also deceived Live Well's lenders by misrepresenting the value of the bond portfolio in Live Well's financial statements." (Opp. 5.) | | The values were not misstated (*see* Br. 4–10). Further, Mr. Hild appropriately relied on others within the company, including the CFO, to prepare accurate financial statements. (*See* Davis Decl. ¶ 5.[2]) |
| "Hild used $18 million generated from repo lenders to buy out the preferred stockholders in Live Well. The elimination of the preferred stockholders gave Hild control of the company and allowed him to substantially increase his personal compensation." (Opp. 6.) | Tr. 1128–31 GX 311 Tr. 1131–41 | In the years prior to the buyout in 2016, the preferred shareholders had requested that Live Well buy out its shares because they desired liquidity and a return on their investment. (Rohr Tr. 1440; Cantor Tr. 1752–54; *see also* DX A.181 (March 2016 email from a preferred shareholder to Mr. Hild raising idea of buyout of preferred shareholders).[3]) Mr. Cantor, not Mr. Hild, approved changes to Mr. Hild's compensation based on reports prepared by an independent third-party consultant. (Cantor Tr. 1738, 1771.) |
| "They discussed going to a 'slimy' broker who would be willing to help out with their fraudulent scheme." (Opp. 6.) | Tr. 1147 GX 407 | The government's witness, Mr. Rohr, offered as an example of "not good options" consulting a "slimy" market participant. This idea was immediately rejected and was not encouraged by Mr. Hild. (GX 407.) |
| "Hild ordered that the trading desk inflate the bond prices in IDC above the already-inflated Scenario 14 prices. Hild provided no justification for the price increases." (Opp. 7.) | Tr. 1167 | Mr. Hild testified that the change in values was made in good faith due to significant expected regulatory changes (Hild Tr. 1911–13, 1949–50.) Furthermore, Mr. Hild testified that no one within Live Well expressed any concerns about the change in valuation. (Hild Tr. 1913.) Mr. Rohr also testified that he did not tell Mr. Hild that he believed it was incorrect to use Live Well's valuations to prepare the internal financial statements. (Rohr Tr. 1303.) |
| "In the summer of 2017, Live Well reversed the price | Tr. 1196–97 Tr. 1205 | Due to the ineffective assistance provided by trial counsel, the defense was not prepared to assert an |

---

[2] This evidence would have been elicited at trial and as part of an expert report but for the ineffective assistance of counsel provided by Mr. Dusing and Ms. Lawrence.
[3] But for trial counsel's ineffective assistance of counsel, this document would have been entered into evidence through the direct examination of Mr. Hild, as originally planned.

| | | |
|---|---|---|
| increases that were implemented in February and March 2017 to survive the liquidity crisis, but the bond prices remained at the fraudulently inflated Scenario 14 values.  Shortly thereafter, Live Well received a subpoena from the Securities and Exchange Commission ('SEC'), and thereafter the prices in IDC remained static, at above-market Scenario 14 levels."  (Opp. 7.) | | advice of counsel defense or introduce expert testimony to rebut these allegations.  (*See* Reply Br. 19–20.)  Mr. Dusing does not meaningfully explain this lapse in representation, except to falsely state that "[t]he government honored our informal understanding that it would not introduce proof regarding LWF's pricing of the bonds in question during the period of the McGonigle firm's representation (generally overlapping with the period that began when Mr. Hild, LWF, and the other relevant actors received formal notice of the SEC investigation)."  (Dusing Aff. ¶ 9.)  The government did in fact elicit testimony regarding this time period, and Mr. Dusing objected that this testimony was "surprising from the defense's perspective," which had "no advice of counsel [defense] planned."  (Tr. 760, 761.) |
| "Haddock informed Hild that he would not sign the company's interim financial statements because he believed that the company's carrying value for the bond portfolio was significantly overstated."  (Opp. 8.) | Tr. 1616–17 | Prior to his brief stint as CFO, Mr. Haddock had no involvement in the bond portfolio.  (Haddock Tr. 1601.)  He did not have any background or expertise in both valuations or trading and had no basis to determine whether the values were overstated.  (*See* Haddock Tr. 1598–1600.) |
| "Nonetheless, at Hild's direction, Live Well kept secret that it controlled the IDC prices."  (Opp. 18.) | | Testimony by Mr. Stumberger, Mr. Rohr, Mr. Haddock, Mr. Hild, and a lender showed that Live Well did not control IDC.  (*See* Stumberger Tr. 276; Rohr Tr. 1569–70; Haddock Tr. 1632; Hild Tr. 1887; Misiano Tr. 637.)<br><br>But for trial counsel's ineffective assistance of counsel, the defense would have also called as a witness an employee of IDC, who would have testified that Live Well had no control over IDC. |