UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/7/2022
```

UNITED STATES OF AMERICA,

v.

MICHAEL HILD,

Defendant.

No. 19-CR-602 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Following a fourteen-day jury trial, Defendant Michael Hild was convicted of committing securities fraud, wire fraud, and bank fraud, as well as conspiring to do so. The evidence established that Hild and his co-conspirators at Live Well Financial ("Live Well"), a company he founded and for which he operated as Chief Executive Officer, engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of bonds used as collateral to secure cash loans. Although the loan amounts were nominally based on prices provided by a third party, the evidence demonstrated that Live Well had directly supplied valuations to that third party, unbeknownst to its lenders, basing them on its own internal pricing methodology rather than on what the bonds could readily be sold for in the market. As a result, Live Well was able to purchase the bonds at one price, provide the third party its own inflated valuations, and then use those inflated bond values as collateral to take out loans worth significantly more than the price for which the bonds could be sold. This arrangement resulted in a substantial cash windfall for Live Well, defeated the design of the loan agreements with the lenders, and left the loans critically undercollateralized.

After he was convicted, Hild filed motions for a judgment of acquittal, or, in the alternative, for a new trial. His motions advance arguments regarding sufficiency of the evidence, prejudicial

error related to certain opinion testimony, and ineffective assistance of counsel under the standard governed by *Strickland v. Washington*, 466 U.S. 668 (1984)—each involving issues by now familiar in this district.

Hild also raises a novel legal argument, however, which presents a challenging question at the intersection of the Sixth Amendment right to conflict-free counsel and the modern reality—all too familiar to those who work in the legal profession—that other obligations, personal and professional, inevitably arise, even when ensuring a fair trial for the accused. Namely, can a scheduling 'conflict,' in the colloquial sense, together with the preoccupation and workload that accompany it, rise to the level of an "actual conflict" under the framework of *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), and its progeny, requiring a limited "presumption of prejudice" upon a motion for a new trial? Or, in the alternative, should such a scheduling 'conflict' instead be viewed under the *Strickland* rule, requiring a defendant to demonstrate both that counsel's representation fell below a reasonable professional threshold, and that such error prejudiced the outcome?

Specifically, Hild claims that his trial counsel, Benjamin Dusing and Brandy Katy Lawrence, labored under an "actual conflict of interest" leading to a lapse in his representation because, at the time of his trial, they were involved in ongoing litigation in Kentucky related to the custody of Dusing's daughter. Hild argues that, because a hearing in the Kentucky litigation was scheduled on a date that could have overlapped with the end of his trial in New York, and because Dusing and Lawrence were "preoccupied" with this litigation, the Court should view his motion under *Sullivan*'s more lenient framework, thereby warranting him a new trial.

Hild and Dusing have submitted declarations with competing narratives regarding whether, and the degree to which, the Kentucky litigation affected Hild's defense at trial. For the purposes of the present motion, however, the Court assumes each of Hild's such allegations to be true. And

in light of some of the unusual and troubling circumstances present here, the Court does not take issue with Hild's characterization of this case as one distinguishable "from the run-of-the-mill case where a lawyer has multiple obligations." Oral Arg. Tr. 9. At the time of Hild's trial, Dusing was confronting the loss of custody over his daughter, stood accused of domestic abuse, and ultimately faced serious professional sanctions given his violent and erratic behavior. (Indeed, he was subsequently suspended from practicing law in two states.) Such circumstances may well have taken a psychological toll, and could understandably have left Dusing deeply concerned about events in Kentucky while at trial in New York. But in another sense, balancing multiple obligations and personal and professional priorities is the norm of the profession. Where the issue complained of is divided attention, rather than divided loyalties, *Strickland* stands ready to remedy any attorney's failure to effectively advocate for the accused at trial, regardless of why his representation "fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

The Supreme Court has cautioned against "expansive application" of the rare "*Sullivan* exception" for an actual conflict, such that it would swallow the *Strickland* rule. *Mickens v. Taylor*, 535 U.S. 162, 175–76 (2002). To grant Hild the remedy he seeks would do just that. The Court therefore concludes that, where an attorney with otherwise undivided loyalties "shirks his ethical obligation to dutifully represent his client" due to another obligation—be it a vacation, caring for an ailing loved one, attending a child's play, another client's trial, or a hearing such as Dusing's— "*Strickland* provides the appropriate analytic framework." *United States v. O'Neil*, 118 F.3d 65, 72 (2d Cir. 1997).

Once viewed through the well-established *Strickland* lens, the Court concludes that Dusing's representation of Hild at trial was not constitutionally deficient. To the contrary, over

3

the course of a two-and-a-half-week trial, the Court observed Dusing's representation first-hand and found him to be a zealous and articulate advocate—at the very least on par with other white-collar litigators who regularly practice in this district. Dusing presented a clear defense theory that was similar in many respects to the theory set forth in Hild's post-trial briefing and he advanced that theory by way of robust cross-examination, and through the testimony of his client, which spanned multiple days. The Court is unconvinced that such representation fell outside the "wide range of reasonable professional assistance" so as to constitute *Strickland* error. 466 U.S. at 684. Even assuming it did, Hild fails to demonstrate that, but for any alleged error, "the result of the proceeding would have been different." *Id*.

Accordingly, for the additional reasons that follow, Hild's motions are denied in their entirety.

## BACKGROUND

Hild's Rule 29 motion relies on arguments regarding the sufficiency of the evidence presented at trial, whereas his Rule 33 motion largely relies on events occurring outside the trial record to establish purported ineffective assistance of counsel.

Accordingly, this opinion will proceed, first, by describing the facts established at trial, *see infra* at 5–14, and applying the operative standard for Hild's Rule 29 motion, *see infra* at 15–26; second, by describing the events giving rise to Hild's argument in his Rule 33 motion of ineffective assistance of counsel (due to an alleged "actual conflict" or otherwise), *see infra* at 27–30, and applying the law to those claims, *see infra* at 30–53; and, finally, by addressing Hild's arguments in the alternative for a new trial, *see infra* at 53–64.

## I.     Evidence Presented at Trial

### A.     Founding of Live Well and Reverse Mortgage Servicing

Live Well was established in 2005, and, at all relevant times, Hild was its CEO, Tr. 1247, 1867, and largest shareholder, Tr. 1904–05; *see also* GX321.  Hild founded Live Well to pursue a business opportunity in the burgeoning reverse mortgage space.  Tr. 1785–88.  Reverse mortgages, or Home Equity Conversion Mortgages ("HECMs"), are a financial product designed to provide liquidity to senior homeowners whose net worth is primarily tied up in their home equity.  Tr. 57–58, 578–79, 1788.  HECMs permit individuals to receive monthly cash income by using their home equity as collateral.  Tr. 579.  For many years, Live Well operated as a traditional and reverse mortgage broker and servicer: it reviewed applications from borrowers, approved loans, and then serviced those loans.  Tr. 946, 1790–91, 1814.

Beginning in approximately 2011, Live Well began securitizing reverse mortgages into bonds called HECM mortgage-backed securities ("HMBSs").  Tr. 947.  After it began to sell these securities, it "[g]rew dramatically."  Tr. 1806.  Packaging the mortgages as bonds allowed Live Well to generate revenue more quickly by selling pools of similar reverse mortgages to investors in bulk, rather than one-by-one.  Tr. 947–49.  Key among these bonds was a subcategory called HECM "interest only" ("HECM IO") bonds, which are made up of derivatives of HECMs that include only the interest portion of the loan rather than the entire reverse mortgage.  Tr. 59, 60, 950–52; *see also* Tr. 1814.  The HECM IO bonds are particularly attractive to investors because holders of those bonds receive regular interest payments.  Tr. 1818.

### B.     Expansion Into Purchasing HMBSs & the Stifel Transaction

In 2014, Live Well expanded beyond securitization of reverse mortgages into the purchase of HMBSs.  Tr. 58–59, 951–52, 1817.  Hild stated that the goal of purchasing these bonds and

holding them as investments was to diversify the company's revenue and reduce its susceptibility to cyclical changes in the mortgage space.  Tr. 1814.

At Hild's direction, the company acquired a portfolio of fifteen HECM IO bonds worth $55 million from Stifel Financial, a small investment bank that had previously held and traded in HMBSs (the "Stifel Transaction").  Tr. 57, 72–73, 951–53.  In addition to the bond portfolio, Live Well also hired three Stifel employees—Darren Stumberger, Ernie Calabrese, and Dan Foster— who had managed the portfolio at Stifel, to continue their work at Live Well.  Tr. 969.  Stumberger, described by Hild as the "reverse mortgage bond guru," Tr. 1815–17, was a particularly important hire due to his expertise in the area, *see id.; see also* Tr. 73–74, 969.

Live Well did not have the cash on hand to buy the bonds outright, and it thus financed the acquisition using a combination of cash, "warehouse loans" it had access to through its mortgage business, and loans collateralized by the underlying bonds, the latter of which were referred to as "repo financing."  Tr. 76–77, 731–32, 952.  The repo financing agreements were loans structured as repurchase agreements in which Live Well sold the bonds to lenders and agreed to buy them back at a specific price after a short period had passed, typically thirty to sixty days.  Tr. 76–77, 261; *see also* Tr. 1826.  At the end of the period, lenders would generally "roll" the loan forward, Tr. 674–75, but they could alternatively end the lending agreement and demand repayment of the loan amount, Tr. 572–75.  In the case that Live Well was unable to repay the loan at the end of the term, the lenders would keep the collateral (the HECM IO bonds), which they could either hold or sell to repay the defaulted loan.  Tr. 76–77.

Typically, the loan amount was determined by discounting the value of the underlying bond by 10% to 30%.  Tr. 86.  This discount, often called a "haircut," ensured that the lenders remained sufficiently collateralized if the bonds decreased in value, and priced in the risk of a lender having

to sell the bonds.  Tr. 81, 588–89; *see also* Tr. 396, 573, 674–77.  Different repo lenders extended loans with different haircut amounts, and Live Well preferred to borrow from lenders with lower haircuts, thereby maximizing the amount of cash it was loaned.  Tr. 1069, 1162, 1461.

As the prices of the collateral fluctuated up or down, either party could request that the loan amount be adjusted accordingly.  Tr. 85–87.  If the value of the collateral decreased, lenders could require partial repayment of the loan amount via margin call, Tr. 85–86, and if the value of the bonds increased, Live Well could request to borrow more via "reverse margin call," Tr. 86–87.

With one exception, the loan agreements between Live Well and the lenders required that the prices for the bonds be set by an independent third party.  Tr. 78–80, 575–76, 598–600.[1]  To take one example, Live Well's contract with Mirae Asset Securities (USA) Inc. ("Mirae") required that the amount of the loan be adjusted based on "the aggregate Market Value of all Purchased Securities."  GX603 at 3; Tr. 599–600.  "Market Value" was defined as:

> the price for such Securities on [a given] date obtained from (i) Interactive Data Corporation ("IDC") or (ii) if no quotation is available from IDC, then a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein.

GX603 at 11; *see also* Tr. 598–601.  As lenders typically lacked the expertise or experience required to value the bonds themselves, *see* Tr. 575–76, they thus relied on a third party— Interactive Data Corporation ("IDC")—to provide prices, *id.*; *see also* Tr. 81–82.  Stumberger testified that, based upon conversations with the lenders, it was his understanding that they required third-party prices "because [they] wanted independent, unbiased view[s] on valuations," and did not want the loan amount determined by the borrower or lender.  Tr. 81–83.

At the time of the Stifel Transaction in 2014, however, IDC was itself unable to value the bonds, and thus relied on "broker quotes" to provide pricing.  Tr. 173.  Also at that time, Live Well

---

[1]    One lender, Nomura, had its own trading desk that set the loan amount "based on the market."  Tr. 79.

was providing estimates as to what the bonds could be sold for in the market as broker quotes to IDC. Tr. 83. In other words: IDC published prices provided by Live Well, which were in turn used in repo agreements to calculate the size of the loans Live Well could secure from most of its lenders.

In January of 2015, IDC began using its own independent pricing model to value the bonds. Tr. 85; GX104. Hild and the co-conspirators, however, determined that IDC's model was deficient. Tr. 281–83. Among other issues, IDC was "running the portfolio evaluations daily," and doing so caused a daily decline in the bond prices. Tr. 85–87. The overall downward pressure on the bond prices in turn led to margin calls from the lenders as they became under-collateralized. *Id*. The corresponding need to constantly repay the loans caused strain at Live Well, so Stumberger and his team were directed by Hild to "rectify this problem," Tr. 87–88. Ultimately, IDC ceased modeling the bonds independently and returned to publishing Live Well's broker quotes. Tr. 88–89. Under that system, Live Well "suppl[ied] prices daily to IDC," which IDC used "verbatim." GX104. Live Well and IDC agreed that IDC would "not model the[] bonds until [Live Well was] interested in them doing so." Tr. 89, GX104. Thus, by February of 2015, Live Well had resumed providing broker quotes to IDC. Tr. 93–94.

### C. Shift to Scenario 14 Pricing

Live Well developed its own internal models to project the value of the bonds later in 2015. Tr. 100–05, 990–93; GX113. Evidence adduced at trial showed that Hild and other Live Well employees believed that the market generally undervalued reverse mortgage bonds. As Stumberger, who, as noted, Hild described as the "reverse mortgage bond guru," explained, the yield requirement of the bonds "should theoretically . . . drift down gradually" over time, but "it wasn't working like that in the market." Tr. 111–12; *see also* GX402. He described the prevailing

methodology as "improper" and "not sound," Tr. 112, and acknowledged the difference between the theoretical value of the bonds and "what happens in reality," GX402.

An assumption regarding yield requirements, among others, was incorporated into a new methodology for valuing the bonds called Scenario 14. Because the Scenario 14 assumptions differed from factors "in the market," the prices of the bonds derived using Scenario 14 were typically higher than those for which they could be sold. Tr. 113–14. Indeed, the jury heard testimony from multiple co-conspirators that they knew the Scenario 14 prices exceeded what the bonds were worth in the market. Tr. 158, 993–97, 1014.

Nevertheless, at Hild's direction, Tr. 91, 93, 103, Live Well began to submit Scenario 14 prices to IDC in September of 2015, Tr. 137, 150, 322–23, 410, 998–99. The shift to Scenario 14 prices in turn resulted in an $11 million increase in the value of Live Well's portfolio. Tr. 119–22; GX402 at 29. But because such a substantial increase in a single day would "raise alarm bells all over the place," in Hild's own words, GX402 at 29, he directed his employees to implement the price increase gradually using a "glide path," *id.*, so as to avoid triggering any "red flags," Tr. 121–22; *see also* Tr. 1004–11; GX402; GX403; GX404.

Because most of its repo agreements relied on IDC, the change to Scenario 14 pricing allowed Live Well to enter loan agreements where the loan amount would exceed the purchase price of the bond, which resulted in an immediate windfall for the company. Tr. 128 (Stumberger testifying Live Well could "purchase new bonds in the market and apply the pricing, the Scenario 14 pricing, submit that to IDC, and because the lenders were relying on IDC pricing, they would be lending more money than needed to purchase the bond at the market."); *see also* Tr. 129–34. As Eric Rohr, the company's Chief Financial Officer, explained, "every time we bought bonds, we would have money left, extra money coming back to our pocket." Tr. 1002. Hild referred to

this process as a "little bit of a self-generating money machine." *Id.* All told, by the end of 2015, the shift to Scenario 14 valuations had resulted in an increase in the value of the company's portfolio of more than $47 million. Tr. 1084.

The witnesses' testimony was consistent that the Scenario 14 assumptions model was created as an "academic exercise" to value the bonds. Tr. 995. The jury heard competing narratives, however, concerning the intent behind submitting the Scenario 14 prices to IDC. According to Hild, these prices were the company's best effort to value the bonds, and thus submitting those values to IDC was appropriate. *See, e.g.,* Tr. 1874–76. Several co-conspirators, however, testified that they knew that providing the Scenario 14 prices to IDC and then borrowing against those prices was "wrong," Tr. 307–09, 1002, 1539, and that they believed that if the lenders had known the IDC prices were based on Live Well's internal investment "thesis," rather than the prices the bond could be readily sold for in the market, the lenders would not have entered the agreements, Tr. 136, 309–12, 996–1009. The lenders expressed this same view directly. Tr. 605–10.

Stumberger went further, testifying that Hild directed the submission of Scenario 14 prices not as part of a good faith effort to value the bonds, but *in order to* increase Live Well's ability to borrow cash from lenders:

> Q. How did you feel about the decision to submit these [Scenario 14] prices to IDC?
> A. I was concerned. I was nervous.
> Q. You said this was done at whose direction?
> A. Michael [Hild]'s.
> Q. Based on your conversations with Mr. Hild, did you have an understanding about why he wanted these higher prices to be submitted to IDC?
> A. Yes.
> Q. What was your understanding?
> A. That it would create a situation, because of the higher valuations, that Live Well could borrow more money via [reverse] margin call.

Tr. 115–16.  Live Well continued submitting prices to IDC, and, from 2015 onward, IDC published those prices "verbatim."  Tr. 1014; 1254–55.

### D.      2017 Liquidity Events

In January 2017, one lender, Wedbush, asked to speak with a Live Well dealer for more information about how the bonds were being valued.  Tr. 166–67.  On a recorded call, Hild and other co-conspirators discussed how to respond to the request.  *See* GX407.  There were several risks posed by Wedbush discussing prices with a dealer, in that Wedbush could learn the IDC rates were above market rates and/or learn that the prices were broker quotes that came from Live Well.  Tr. 166–77.  Hild and others discussed their options: Live Well could screen a dealer in advance, to see if they would come up with a valuation matching the Scenario 14 prices on IDC, or they could find a "slimy" dealer willing to represent the IDC prices were correct.  Tr. 169–75, 1147, GX407.  Eventually, Hild questioned whether they could persuade Wedbush that the rates were not improper, given that Live Well was uniquely qualified to evaluate the bonds.  Tr. 136–42.  Stumberger responded that Wedbush and other dealers were not concerned with the "intrinsic" value of the bonds, but rather on what they could be sold for in the market:

> HILD: . . . the reason we're in this space is because we're one of the few people that know how to value these securities, right?  Would you not disagree with the statement, Darren?  That most of the folks that are out there don't know how to value these securities including the big guys?

> STUMBERGER: Well, the dealers—the dealers make the market.  They offer bonds a certain way.  They finance them a certain way.  So, whether they—they're doing it right or not is —

> HILD: Well, that's my point—

> STUMBERGER: —I don't think Scott [at Wedbush] cares about that.  Scott cares about what is the market.  And it's gonna be defined—the market is going to be defined as something that is an 8 or 9% yield to 50 HPC on the— on the—on the sell side.  On the—on the ask.  The bid is behind—is a higher yield.  That's what he's gonna get from, we know, the guys who are pedaling the paper. May not be

11

right, or proper, or sound, but that's what's gonna be defined as the market. That's just realistic.

HILD: There's no debating that.

GX407; *see also* Tr. 136–42.[2]  Hild and his co-conspirators also discussed whether to disclose their methodology to the market, which would hurt Live Well "in some respects" because, even if the others in the market agreed, it would increase the purchase price of the bonds. Tr. 1155–56. Another option they considered was to mark down the portfolio to market rates. Tr. 1156–57. Hild considered this option "obviously a non-starter," as it would have resulted in a $50 million loss on the company's income statement and triggered a substantial margin call. Tr. 1157.

In addition to requesting additional quotes, Wedbush also stated it was "no longer comfortable extending credit" with respect to a certain type of bond (MACRs), and that it would reduce Live Well's overall credit line. Tr. 1157. These events created "potential liquidity problems" for the company. Tr. 1157. No other lenders would finance the MACRs, and because they could not be sold at the rate Live Well was "carrying them," Live Well would need almost $22 million in cash to avoid defaulting on its debts. Tr. 1158–63; GX151. Even after Stumberger and Foster "optimized" as best they could, Live Well was left with an effective deficit of $21.8 million, a situation Hild described as a "catastrophe." Tr. 1164; GX151.

Rohr testified that "at some point" it became clear to the Live Well team that the bonds could not be reshuffled and new financing was unavailable such that the "only way out of this situation was somehow getting the value of [Live Well's] collateral increased and getting more credit, and therefore, being able to borrow more against the existing collateral to kind of help facilitate some of these moves and pending liquidity hits." Tr. 1166–67. Rohr testified that Hild

---

[2]    The jury heard similar testimony, that the lenders ultimately cared only about the price for which the bonds could be sold in the market, from one lender directly. *See* Tr. 600–01

instructed them "to raise prices in IDC," although Hild acknowledged that "the trading desk is not going to like it." Tr. 1167. No market rationale was supplied for this proposed increase, and Rohr testified the prices were no longer consistent even with the inflated valuations calculated under Scenario 14. Tr. 1167–68. Rohr described feeling "sick to [his] stomach" at this point, as the prices being submitted were "beyond even our own investment thesis . . . way beyond that." Tr. 1168.

Stumberger and others eventually modeled potential scenarios that would resolve the liquidity crisis, including one option, "Scenario 4," which they ultimately agreed to submit. Tr. 1169. Rohr testified that the "purpose" of Scenario 4 was "to resolve the pending liquidity crisis" at Live Well. Tr. 1169–70. Like Scenario 14, the prices were gradually increased over the course of several weeks to avoid setting off "red flags." Tr. 1169–75; GX408.

In February of 2017, Wedbush indicated that it may not renew its loans when they expired in March, which created another substantial threat: because Wedbush offered the most favorable rates, it would "create a really negative liquidity situation," in Rohr's words, if Wedbush stopped financing the loans. Tr. 1183–84. Rohr testified that Hild continued to direct price increases at that point in an effort to avoid "potentially business-ending, company-ending situations," but that Hild's position was ultimately untenable, as there was "no way out" of the situation. Tr. 1185. Live Well continued to "adjust pricing in IDC" in response to further liquidity events in March 2017, Tr. 1198–1200, increasing the value of the portfolio by another $21 million, Tr. 1202–04.

After the liquidity crisis eased, these prices were gradually returned to the prices derived using Scenario 14. Tr. 1196–97, 1205. Soon after, in September of 2017, Live Well received a subpoena from the Securities and Exchange Commission ("SEC"), which led to a two-year investigation. Tr. 1205.

### E.      Financial Statements

In addition to the evidence regarding the IDC prices and loans, the government also presented evidence regarding Live Well's financial statements.  Because the bond portfolio was Live Well's largest asset, the application of Scenario 14 prices to that asset resulted in a valuation of the bonds in Live Well's financial statements that was higher than the market rate.  Tr. 1081–89, 1601–11.  Lenders testified that they relied, in part, on the financial statements in making decisions about lending to Live Well.  Tr. 591, 594–98, 682, 685–93.

Rohr testified that, as CFO, he was involved in preparing the company's financial statements, Tr. 1080, and was directed by Hild to value the portfolio using IDC prices to avoid any discrepancies, Tr. 1083.  It was Rohr's view that the characterization of the bonds in the financial statements was not true, both because the prices were above what the bonds could readily be sold for, and because the prices did not come from an independent third party.  Tr. 1087–89.

In 2019, Rohr was replaced as CFO by Glen Haddock, Tr. 1598, who worked at Live Well but was not involved in the fraud, Tr. 1601–02.  Haddock eventually learned that Live Well was providing IDC prices, Tr. 1608–09, and after evaluating the portfolio on his own, expressed his view to Hild that the bonds were overvalued, Tr. 1610–11.  Ultimately, he refused to sign the company's 2019 audited financial statements, Tr. 1616–17, and shortly thereafter Live Well announced it would cease operations and unwind, *see* Tr. 1617–19.

## II.    Procedural History

On August 26, 2019, Hild was charged in a five-count indictment with conspiracy to commit securities fraud, 18 U.S.C. § 371; conspiracy to commit wire and brank fraud, 18 U.S.C. § 1349; securities fraud, 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. § 240.10b-5; wire fraud, 18 U.S.C. §§ 1343 and 2; and bank fraud, 18 U.S.C. §§ 1344 and 2.  Hild maintained his innocence and

proceeded to trial, which began on April 13, 2021. Closing arguments concluded on April 29, 2021, and after deliberating for one day, the jury found Hild guilty on all five counts.

On July 27, 2021, Hild moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. The government filed its opposition on August 20, and Hild filed his reply on September 3, 2021. The Court heard oral argument on Hild's motions on May 18, 2022, and the parties have since filed a series of letters citing supplemental authorities.

## DISCUSSION

For the reasons that follow, Hild's motions for a judgment of acquittal and for a new trial are denied.

### I.      Rule 29 Motion

#### A.      Legal Standard

Pursuant to Rule 29, "on the defendant's motion," a Court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "As a general matter, a defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (cleaned up). To prevail, a defendant must show, "considering all of the evidence, direct and circumstantial, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (cleaned up). In evaluating a challenge to the sufficiency of the evidence, the Court views "the evidence in the light most favorable to the government, and draw[s] all reasonable inferences in support of the jury's verdict." *United States v. Anderson*, 747 F.3d 51, 54 (2d Cir. 2014). This is an "exceedingly deferential standard of review." *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008).

"The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (cleaned up).  Indeed, the Second Circuit has repeatedly cautioned that in reviewing the sufficiency of the evidence, "the court must be careful not to usurp the role of the jury," and may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (cleaned up).  A court "defer[s] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence."  *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006).

Deference to the jury's assessment of the evidence in conspiracy cases is "especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."  *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010).  "[B]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence," *United States v. Wexler*, 522 F.3d 194, 207–08 (2d Cir. 2008), and even "[s]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general," *United States v. Mariani*, 725 F.2d 862 (2d Cir. 1984).  Finally, the evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), "as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

### B.    Analysis

Hild challenges the sufficiency of the evidence as to all five counts.  In doing so, he advances two lines of argument: (1) that the government failed to demonstrate he misrepresented

the value of the bonds, and (2) that the government failed to prove his fraudulent intent.  The Court rejects both arguments.  Viewing the evidence in the light most favorable to the government and drawing all inferences in its favor, *see Hassan*, 578 F.3d at 126, the Court finds that a reasonable jury could have convicted Hild based on the evidence presented at trial.

The Court's instructions as to each of the counts were similar in many respects.  In the main, each count required that the jury find, first, that Hild had engaged in an act to defraud (or had conspired to do so), and, second, that he had done so with the intent to perpetrate a fraud.  To find Hild guilty of the securities fraud charge, for example, the Court instructed the jury that it must determine that Hild had either "(1) employed a device, scheme or artifice to defraud, (2) made an untrue statement of material fact or omitted to state a material fact which made what was said under the circumstances misleading, or (3) engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon a purchaser or seller;" and that Hild did so "knowingly, willfully, and with the intent to defraud."  Tr. 2273–74.  The Court explained that fraud could be established even if the statements "in furtherance of the scheme were literally true," so long as the "statements and/or conduct of the defendant were deceptive."  Tr. 2288.  It further instructed that "intentionally deceitful statements or half-truths or the concealment of material facts and the expression of an opinion not honestly entertained also may constitute false or fraudulent statements."  Tr. 2275–76.  Thus, the Court observed that, if the jury determined that Hild employed a scheme to "deceive" the lenders, "the manner in which it is accomplished does not matter," and that "fraud" in this context is a general term

> that embraces all of the various means that individuals devise to take advantage of others.  It includes all kinds of manipulative and deceptive acts, whether by making false statements or otherwise . . . .  Deception need not be premised upon spoken or written words alone. The arrangement of the words or the circumstances in which they are used may convey the false and deceptive appearance.

Tr. 2275–76; *see also* Tr. 2287.

Similarly, the Court instructed that, in order to meet its burden on the wire fraud charge, "the government must prove . . . that the defendant employed a device, scheme, or artifice to defraud or obtain money or property by false pretenses, representations, or promises [and did so] with knowledge of its fraudulent intent and with specific intent to defraud." Tr. 2286–87. And the Court gave an effectively parallel instruction on bank fraud, stating that the key distinction was that the government must prove "that there was a scheme to defraud a bank or scheme to obtain money owed by or under the custody or control . . . of a bank by means of materially false or fraudulent pretenses, representations, or promises." Tr. 2295. The same showings were required for the conspiracy counts. *See* Tr. 2307, 2312.

The Court instructed the jury that for all charges, it must find that Hild's conduct was intentional. *See* Tr. 2279–82, 2290–92, 2297–98, 2308–10. In particular, the Court clarified that "even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent." Tr. 2281. As such, it underscored that "good faith" was a "complete defense" to fraud, and that, even if the jury found Hild's statements were inaccurate, the government was required to prove that Hild did not *believe* the statements were true at the time that he made them. Tr. 2281–82. In sum, the Court instructed that the government was required to prove beyond a reasonable doubt that Hild "knew that his conduct was calculated to deceive and that he nevertheless associated himself with the alleged fraudulent scheme." Tr. 2282.

### 1.  Sufficient Evidence Was Presented as to the Fraud

Sufficient evidence was presented for the jury to conclude that Hild deceived the lenders by negotiating loan agreements under which the valuation of Live Well's bond portfolio was based on purported market prices set by an independent third party, but which was, in reality, based on Hild's company's internal, above-market pricing assumptions. Hild contends that the Scenario 14

prices accurately represented the bonds' "intrinsic" value, and that Live Well "kept Scenario 14 a secret," Def. Mem. at 7, solely in order to prevent "additional competition for bonds from dealers and investors," Def. Mem. at 8 (quoting Tr. 383); *see also* Tr. 1870, 1874–76.  That is, it is Hild's position, as it was at trial, that Live Well only withheld the information due to its proprietary nature—the company's "secret sauce." Tr. 1874–76.  The submission of prices based on Scenario 14 to IDC was thus not a misrepresentation, in Hild's view, because the prices were the company's genuine assessment of what the bonds were worth.  Def. Mem. at 7–8.

But this argument was presented to the jury and rejected.  While there is no dispute that Scenario 14 was created as part of an exercise to model the value of the bonds using different assumptions, Tr. 101–03, 115, 996–1015, the jury also heard testimony that Hild and the other co-conspirators knew that the prices submitted to IDC were well above the prices that the bonds could be sold for in the market.  For example, Stumberger testified that he believed the prevailing market methodology of holding the yield requirement static had an "overly onerous" effect on the valuation of the bonds, causing a pricing decline to be greater "than it should be."  Tr. 111. Stumberger explained to Hild that notwithstanding his view that Scenario 14 was the "better" way to price the bonds, in reality the market prices were lower:

> Q: This methodology that you were using to value these bonds, did you discuss with Mr. Hild whether or not it was a methodology that was followed by the market for these bonds?
> A. Yes.
> Q. What did you tell him?
> A. My recollection in the discussions was the market, by lowering the yield that dramatically, it would be a departure or a break from where the market how the market was doing it.
> Q. So the prices that result from this new methodology, how would they compare to market prices?
> A. They were higher.

Tr. 114–15.  Rohr and Stumberger also testified that everyone at Live Well, including Hild,

understood their internal valuation was well above the market value.  Tr. 157–58 ("Q. Was it your understanding that the prices submitted under Scenario 14 were not prices that were obtainable in the market? A. Yes."); Tr. 994 ("Q. [W]as that methodology consistent with the way you understood the market to value the bonds? A. Not the market—it was not the way the people were transacting in the market."); Tr. 1014 ("Mr. Rohr, when Live Well began submitting the prices to IDC, those [S]cenario 14 prices, did you know you couldn't sell the bond at those prices? A. Yes."); *see also* Tr. 993–97.  Such a conclusion was also supported by the facts that (1) Live Well routinely purchased the bonds at one price, and then immediately generated cash via the loans that were based on the much higher IDC prices, Tr. 128; *see also* Tr. 1652–66 (describing the process by which Live Well purchased the bonds and "immediately" marked them up 20%), and (2) Live Well maintained records demonstrating the differences between market prices and Scenario 14 prices, *see* Tr. 207; GX201.

Moreover, there was an understanding at Live Well that the bonds' pricing differed from the pricing that the lenders expected from IDC.  Witnesses both from Live Well, Tr. 116, 136, 309–12, 996–1009, and the lenders, Tr, 572–77, 605–10, testified as to the importance of market rates to the repo agreements.  As one lender explained:

> From a repo perspective, we're not an investor looking at intrinsic value and not thinking of that over the life of this investment we're going to get back X return, I'm more interested in the liquidity, where can I sell it on the market.  What does the market pay for this bond today?

Tr. 601.  Stumberger acknowledged the same reality on recorded call.  GX407 ("Stumberger:[] I don't think Scott [at Wedbush] cares about that. Scott cares about what is the market.").  The evidence presented demonstrated that the IDC rate referenced in the agreements was neither independently determined, nor set at or even near the price for which the bonds could be sold.  A

reasonable jury could conclude, based on that evidence, that Hild and others engaged in a scheme to defraud the lenders.

Stumberger also testified that Hild specifically directed the shift to Scenario 14 in an effort to grow the company's portfolio, rather than as part of a good-faith effort to value the bonds. He stated that the shift to Scenario 14 pricing followed a decrease in the portfolio's value in August 2015, Tr. at 113–115, and that Hild instructed him to submit the Scenario 14 prices because doing so would allow "Live Well [to] borrow more money via [reverse] margin call." Tr. at 116. He similarly ascribed the price increases in February and March of 2017 to Hild's desire "potentially to raise cash, to extract the cash from lenders to use to supplement the move between the lines," Tr. 197, and "to generate cash for these liquidity needs." Tr. 197–98. Stumberger did not recall any market or macroeconomic events that justified those increases. Tr. 197–98. Rohr expressed the same view—that the price increases in February 2017 were not related to any market condition and instead were carried out to alleviate the liquidity crisis at Live Well. Tr. 1166–68. A reasonable jury could have accepted Stumberger's and Rohr's account of the pricing over Hild's.

The government also presented evidence that Live Well's financial statements deceived the lenders. Rohr testified that he believed the financial statements were fraudulent for a number of reasons. First, he had not disclosed to the outside auditors that Scenario 14 prices were submitted to IDC, and that the portfolio value based on the IDC prices was thus not based on prices from an independent source. Tr. 1092–93. Second, the general representation that "the estimation methods and assumptions used in measuring assets and liabilities reported or disclosed at fair value," GX1400, was inaccurate because Live Well was "using estimates and calculations that [were] derived through Scenario 14, which [Live Well] knew [it] could not transact at in the market and therefore not fair value," Tr. 1094. The jury also heard testimony from Rohr that, as a whole,

baking Scenario 14 prices into the financials deceived the lenders into believing that company had greater assets than it actually did, Tr. 1081–89, and from the lenders that they relied on these financial statements, *see* Tr. 594–98; Tr. 686–92.

In the alternative, Hild argues that each count required the government to prove that he misrepresented the bonds by "submitting 'inflated' prices to IDC in order to induce lenders to loan Live Well more cash." Def. Mem. at 4. According to Hild, the government's failure to call an expert witness or demonstrate that a "an educated buyer who understood Scenario 14 would not have paid Scenario 14 prices," Def. Mem. at 5, amounts to a failure to prove such a misrepresentation, which was required for his conviction on each count. But a specific showing that an educated buyer would not have paid the Scenario 14 rates was not required for the jury to find Hild guilty of fraud—indeed, whether a hypothetical "educated buyer" would have paid Scenario 14 prices is largely irrelevant. The jury was presented with evidence that Hild and his co-conspirators took substantial steps to ensure that there were no such "educated buyers" in the market by deliberately obscuring their pricing source and methodology. It was not the case that Live Well was generating revenue by buying bonds based on its investment thesis and holding the asset as it increased in value. Rather, it was buying bonds at market rate and then taking out cash loans against those bonds at rates it set. Tr. 133. Any corresponding growth in the company's value as a result of this scheme, in other words, was due only to its deliberate manipulation in bond valuation. Had Live Well disclosed the pricing methodology, even if the market participants agreed, that would have only "create[d] additional competition for bonds from dealers and investors." Tr. 382. It is exactly because Scenario 14 prices were a departure from the market's valuation that Live Well was able to buy bonds at one rate and immediately generate cash by marking them, via IDC, at the Scenario 14 price.

These circumstances distinguish this case from *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), on which Hild relies.  In *Connolly*, the defendants submitted rates to the London Interbank Offered Rate ("LIBOR") panel that were based, in part, on requests from the trading desk.  *See* 24 F.4th at 834.  The court there held that, notwithstanding testimony from cooperating witnesses that the process was "intuitively wrong," without evidence that the submissions amounted to a "false" response to the LIBOR panel's hypothetical question, the government had failed to establish the "statements were false, half-truths, or fraudulent omissions."  *Id.* at 834–35.  In this case, by contrast, the jury was presented with evidence that the agreements were based on "market prices," to be determined by a third party, and that the rates Live Well submitted to IDC far exceeded the prices the bonds could easily be sold for, that Hild was aware of that difference, and that his combination of misstatements and omissions, specifically designed to prevent the lenders from discovering this discrepancy, amounted to fraud.[3]

While the jury could have accepted Hild's version of events, when viewing the evidence in the light most favorable to the government, a reasonable jury could also have determined that

---

[3]    Hild also relies on *United States Commodity Futures Trading Comm'n v. Wilson,* No. 13-cv-7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018), a recent case involving complex financial fraud, to argue that the government was required to prove Scenario 14 prices were artificially inflated.  That case is distinguishable for several reasons.  First, the market manipulation claim in *Wilson* specifically required proof that the prices were "artificial." *See id.* at *12 (quoting *In re Amaranth Natural Gas Commodities Lit.*, 730 F.3d 170, 173 (2d Cir. 2013)) (stating the CFTC needed to prove that "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.").  Because "the CFTC offered no evidence or explanation demonstrating that IDCH settlement prices were artificially high," *id.* at *13, or that the company "ever made a bid that it thought could not be accepted by a counterparty," *id.* at *11, Judge Sullivan concluded that the CFTC had not carried its burden.

The fraud charges in this case did not mandate such a specific showing, but merely required the government to prove that Hild had participated in a scheme to defraud lenders and that he did so intentionally.  Indeed, the notion of "artificial prices," as that term applies in the market manipulation concept, is a poor fit for the fraud in this case.  Whereas the market manipulation charge in *Wilson* was based on the submission of public bids resulting in an increase in prices and resulting windfall, the conduct in this case was the opposite—Hild never needed to manipulate the visible market rates to create a windfall because the fraudulent scheme allowed him to purchase bonds at market price, submit above-market rates to a third-party pricing entity, and then borrow from lenders using the prices secretly supplied.  The windfall was thus guaranteed, without any exposure to other market participants or corresponding risk.

Hild's direction that Live Well submit Scenario 14 prices was not an effort to "get it right," but rather, part of a scheme designed to defraud the lenders and increase Live Well's cash flow.[4]

## 2. Sufficient Evidence was Presented as to Hild's Intent

Hild also challenges whether the government presented sufficient evidence as to his personal intent to defraud. In the context of a conspiracy, which is "by its very nature is a secretive operation," the government is not required to present direct evidence of intent. *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992); *see also id.* ("[I]t is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.") (cleaned up). Under such circumstances, it is well-established that "a jury's verdict may be based on circumstantial evidence, and the [g]overnment is not required to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (cleaned up). In assessing Hild's intent, the Court instructed that the jury could have relied on a variety of evidence, including Hild's "manifestations, his [] words, his [] conduct, his [] acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical

---

[4]     The Court is likewise unpersuaded that the IDC Master Services Agreement "permit[ted] Live Well to provide quotes that did not conform to purchase and sale prices." Def. Reply at 2. Hild quotes from the IDC agreement, which states that the Evaluations "may not conform to actual purchase or sale prices," Def. Reply at 2, but in context, it is clear that the contract term "Evaluations" does create an expectation that the rates provided by IDC are tied to market rates:

> "Evaluations" shall mean Vendors' *good faith* opinions of value as to what the holder *would receive in an orderly transaction for the securities* (typically in an institutional round lot position) *under current market conditions*. Evaluations are determined based on Vendor's proprietary models and methodologies, using inputs such as trades, bids, cash flows, loan performance data and other relevant market, sector, issue, issuer and credit information then available to Vendor (including market information communicated to Vendor by its clients), market assumptions and broker quotes. Evaluations may not conform to actual purchase or sale prices in the marketplace or to information available from third parties. Valuations based on different information, models, methodologies or assumptions may differ, in some cases materially, from Vendor's evaluations.

DX D 1a.2 at 1 (emphasis added). Even if this language could plausibly be read to state that the IDC prices might not be in line with market prices, there was sufficient evidence for the jury to reject such a reading in favor of one that lenders reasonably expected that the IDC prices were tied to "what the holder would receive in an orderly transaction for the securities . . . under current market conditions."

inferences that may be drawn therefrom."  Tr. 2280.

Hild contends, as he did at trial, that he believed the pricing methodology was genuine and to the extent it was not, he was an unwitting participant in the fraud, having relied on Stumberger's bond expertise and Rohr's financial expertise.  *See* Def. Mem. at 12–14; Tr. 1820–21, 1867–68, 1894.  The evidence cited above was likely sufficient, on its own, for the jury to infer Hild's intent, but even if it were not, the jury was also presented with testimony directly bearing on his state of mind.  In particular, the jury heard testimony from Stumberger and Rohr that Hild directed them to increase the prices submitted to IDC in order to increase the company's ability to borrow from lenders.  *See* Tr. 115–16, 1167.  The jury also heard recorded phone calls in which Hild spoke candidly about the scheme.  It heard Hild, for instance, describe what he now characterizes as a legitimate business operation as a "self-generating money machine," GX402; *see also* Tr. 1002, and heard him discuss with co-conspirators how to best avoid detection in light of an inquiry from one of the lenders, GX407; *see also* Tr. 1145–48.  It is reasonable to infer from these statements that Hild understood that supplying Scenario 14 prices to IDC in excess of the market rates was at best misleading, and that he understood the need to prevent the lenders from learning of the fraud.

Hild, moreover, directed Live Well employees at multiple points to take steps to prevent discovery of the scheme, further undermining his contention that he was an unknowing participant.  For example, in September 2015, after the Scenario 14 prices were calculated, the value of Live Well's bond portfolio was expected to increase $11.4 million, but Hild expressed to Stumberger that the company was "sure as hell not going to flow through 11.4 million in one day," and that they "would need to have a gradual, kind of a gradual glide path."  GX402; Tr. 119–21; *see also* Tr. 1008–10.  Stumberger testified that he understood that conversation to suggest he should implement the price increase in several smaller increments ("a tick per day") to avoid detection.

Tr. 120–22.  The same conduct was repeated when Live Well increased prices quoted to IDC again in 2017.  GX409; Tr. 200–01.  Hild also directed co-conspirators to buy tranches of bonds going forward, so that lenders would not see the prices of the individual bonds and discover they did not match the prices from comparable bonds in a tranche.  Tr. 1040–41; GX416.

Moreover, Hild acknowledged during cross examination that, at the height of the alleged scheme, he transferred $17 million from his own account to an account in the name of his wife's business.  Tr. 2068.  The jury could reasonably have found, as the government suggested in its summation, that such a transfer spoke to Hild's consciousness of guilt by showing that, as serious questions were raised about Live Well's pricing methodology and the business began to fail, he was actively "trying to hide the money."  Tr. 2242.

Hild's memorandum describes the purportedly legitimate business purposes behind his conduct, but this focus on his own testimony and evidence ignores the plethora of other evidence presented to the jury supporting an inference that he engaged in the fraud intentionally.  Again, while the jury perhaps could have accepted Hild's version of events—in which he was misled into participating in a conspiracy that was lucrative for him personally and professionally—there was more than sufficient evidence for a reasonable jury to find he acted with criminal intent.  *See United States v. Bandrich*, No. 12-cr-934, 2014 WL 7330434, at *3–4 (S.D.N.Y. Dec. 22, 2014).

\* \* \*

In sum: Hild's Rule 29 motion relitigates the weight that should be accorded to the competing testimony and evidence—matters which were properly submitted to the jury.  Because "the court must be careful not to usurp the role of the jury," and may not substitute its own judgment for that of the jury, *Jabar*, 19 F.4th at 76, the Court finds that Hild has failed to carry his substantial burden and his Rule 29 motion is thus denied.

## II.      Hild's Rule 33 Motion

In the alternative, Hild moves under Rule 33 for a new a trial.  He argues one is warranted because: (1) he was denied effective assistance of counsel in violation of the Sixth Amendment; (2) the verdict was against the weight of the evidence; (3) the government presented improper and prejudicial opinion testimony; and (4) the proof at trial amounted to constructive amendment of the indictment or prejudicial variance.

### A.      Ineffective Assistance of Counsel

Hild first argues that his trial counsel, Dusing and Lawrence, labored under an "actual conflict of interest" leading to a lapse in his representation because of their interest in the litigation ongoing in Kentucky at the time of Hild's trial related to the care and custody of Dusing's daughter. Under Hild's novel theory, he asks that the Court view the scheduling "conflict" presented by a hearing in the Kentucky litigation, and any related work or "preoccupation" occasioned by it, through the "actual conflict" framework of *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), wherein a "presumption of prejudice" applies, *Burke v. United States*, No. 20-4034-CV, 2022 WL 175488, at *2 (2d Cir. Jan. 20, 2022).

In the alternative, he argues that, in any event, Dusing and Lawrence provided ineffective assistance under the more familiar *Strickland* test.  For the reasons described below, the Court finds that a new trial is not warranted on either basis.

### 1.      Additional Factual Background

During 2020 and 2021, Hild's primary defense attorney, Dusing, was a party to two family court cases in Kentucky (the "Kentucky litigation") concerning the custody of his children.  *See Dusing v. J.T.*, No. 15-CI-1945 (KY Kenton Fam. Ct.); *J.B. v. Dusing*, No. 19-CI-560 (KY Kenton Fam. Ct.).  There is no dispute that this litigation was ongoing during preparation for Hild's trial, although this Court was unaware of it at the time.

27

Of particular importance is the second action, *J.B. v. Dusing*, which went to trial in February and March 2021.  On April 5, 2021, eight days before jury selection in this Court, Judge Mehling, the presiding judge in both actions pending in Kentucky, issued a decision awarding sole custody to the child's mother, the petitioner in the second action, based on his findings that Mr. Dusing had "perpetuated violence" on the petitioner, had subjected her to "physical and emotional abuse," was dealing with potential substance abuse issues, and had demonstrated questionable protective capacity as a parent.  *See* Mehling Opinion, April 5, 2021 at 2–19.  Even after this decision was published, several issues remained outstanding, and motion practice continued through Hild's trial in April 2021.  Specifically, Judge Mehling's April 5, 2021 opinion triggered a 10-day deadline for Dusing to file a motion to alter or vacate the judgment, *see* Ky. R. Civ. P. 59.05, and a 30-day period for Dusing to file a notice of appeal, *see* Ky. R. Civ. P. 73.02(1)(a). What followed, as Lawrence would later describe it in a filing in Kentucky, was a "flurry of activity in [the] litigation on several fronts."  Mot. to Continue at 2, April 19, 2021, *J.B. v. Dusing*.

On the same day that jury selection began in Hild's trial, for instance, on April 13, 2021, opposing counsel in the Kentucky litigation filed a motion for sanctions against Dusing and Lawrence, who was both co-counsel in Hild's trial and one of Dusing's attorneys in the Kentucky litigation.  Two days later, on April 15, 2021, Dusing filed a forty-four-page motion seeking to vacate Judge Mehling's decision, while the petitioner filed a motion for findings of additional facts; on the same day, the jury in New York heard testimony from Stumberger, arguably the government's key cooperating witness in Hild's trial.  A day later, on April 16, while the government's case-in-chief proceeded apace before this Court, a second sanctions motion was filed in Kentucky by the petitioner.  Critically, all four of these motions were then noticed to be heard on May 4, 2021.

Throughout this period, both Dusing and Lawrence were in New York representing Hild, and never made this Court aware of any other proceeding. But in Kentucky, Lawrence filed a motion seeking to "continue any and all proceedings, suspend communications with the Court staff regarding the scheduling of any future proceedings, and for an extension of the deadline to file responses to any and all actions until no later than June 1, 2021." Def. Mem. at 20 (quoting Mot. to Continue at 1, April 19, 2021, *J.B. v. Dusing*). Lawrence's motion explained that she and Dusing were handling Hild's trial, that the Kentucky proceedings had been "a distraction" from Hild's case, and that Dusing and Lawrence would suffer "serious prejudice" if the Kentucky court did not adjourn the deadline. *Id.* (quoting Mot. to Continue at 1, April 19, 2021, *J.B. v. Dusing*). Judge Mehling did not immediately respond to the request for adjournment.

By the time Hild's defense case began on April 27, 2021, the Kentucky court had still not published a ruling on the motion to adjourn the May 4 hearing. On April 29, 2021, the day closing arguments began in Hild's case, the Kentucky court finally issued an order denying Dusing's application for a continuance.[5] *See* Def. Mem. at 20–21. A day after closing statements and the Kentucky Court's denial of the motion to adjourn the hearing, on April 30, 2021, the Hild jury returned a guilty verdict.

Although Hild's trial had concluded, Lawrence continued to seek adjournments in the Kentucky litigation via emails dated April 30, 2021 and May 3, 2021, stating that it was "not clear that [they] would be back Tuesday from New York," and that if they were, they would not be prepared to proceed on all the motions noticed for the May 4 hearing. Def. Mem. at 24 (quoting Mot. to Continue at 7–8, May 3, 2021, *J.B. v. Dusing*). Ultimately, the hearing was held by video on May 4, 2021, as originally scheduled. Neither Dusing nor Lawrence appeared at the remote

---

[5]    Although the order was issued on April 29, it was dated April 26. It is unclear whether Dusing and Lawrence knew of the order on April 26 or only once it was published on April 29. *See* Oral Arg. Tr. at 8.

hearing, even though Hild's trial had concluded several days beforehand.  Counsel for Dusing and the petitioner appeared remotely, and the conference lasted approximately eighteen minutes. Judge Mehling addressed some of the pending motions, but held off on deciding others, including the pending sanctions motions against Dusing, until another hearing scheduled for September 10, 2021.  *See* Def. Mem. 20–21 (citing Order, April 29, 2021, *J.B. v. Dusing*).

### 2.        The Dusing Affidavit

In support of its opposition, the government filed a 76-page affidavit by Dusing, complete with text messages exchanged between Hild and Dusing, which the government argues demonstrate factual flaws in Hild's theory of an "actual conflict."  In the main, Dusing's affidavit asserts that the Kentucky litigation, although it presented "scheduling issues," was "simply not on [Dusing's] mind during the time [he] was in New York for Mr. Hild's trial, in any serious way, shape, or form."  Dkt. 118-1, Dusing Aff. at 43.  Among other things, Dusing claims in the affidavit that he was "all-but-completely in the dark" about developments in the Kentucky litigation during Hild's trial, *id*., and that he merely "quickly looked" at Judge Mehling's April 5, 2021 opinion awarding custody of his daughter, resolving to wait to read it "in full until after [he] returned to Kentucky," *id*. at 39–41.  Dusing repeatedly asserts that any activity in the Kentucky litigation did not serve as a "distraction to [him] or Ms. Lawrence in any way in [their] preparation and presentation of Mr. Hild's defense at his trial."  *Id*. at 72–73.[6]

Ordinarily, a court will rely on an attorney affidavit to rebut attacks on a lawyer's alleged conflicts or ineffectiveness, but in light of Dusing's deeply troubling conduct in the Kentucky matter—which included threatening to "blow up" a judge, staff attorneys, and opposing counsel— and his subsequent suspension from the practice of law in two states, *see Inquiry Commission v.*

---

[6]        Ms. Lawrence, as well as Jeffrey Otis, who represented Dusing in the Kentucky action, submitted affidavits as well.  *See* Dkt. 118-2, Lawrence Aff.; Dkt. 118-3, Otis Aff..

*Dusing*, No. 2021-SC-0512-KB (Ky. Feb. 24, 2022) ("Suspension Opinion") (finding "probable cause [] to believe that Dusing's conduct poses a substantial threat of harm to his clients or to the public."); *Disciplinary Counsel v. Dusing*, ___ Ohio St. 3d ___, 2022 Ohio 589 (Mar. 1, 2022), the Court will not do so here.

### 3.      Evidentiary Hearing

Hild first seeks for the Court to hold an evidentiary hearing in connection with his motion for a new trial.  Whether to hold such a hearing is committed to the Court's discretion.  *See United States v. Levy*, 142 F. App'x 508, 510 (2d Cir. 2005) (citing *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995)).  To prevail on a motion for an evidentiary hearing, a defendant "must establish that he has a 'plausible' claim of ineffective assistance of counsel."  *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir. 1993).  Although a district court may hold an evidentiary hearing to further develop a record, it "may also decide a claim of ineffective assistance of counsel [without a hearing] where the record 'provide[s] a sufficient basis upon which to deny the petition.'" *United States v. Scali*, No. 16-cr-466 (NSR), 2018 WL 3536082, at *4 (S.D.N.Y. July 23, 2018) (quoting *Neal v. United States*, 08-CR-0086 (KBF), 15-cv-7665 (KBF), 2016 WL 2993200, at *1 (S.D.N.Y. May 23, 2016)).

In this case, the Court presided over the two-and-a-half-week trial and has now reviewed all the evidence submitted by Hild and the government since the trial concluded.  For the reasons that follow, even assuming that each of the facts contained in the affidavits and other documents submitted by Hild could be proven at a hearing, the Court finds that Hild has still failed to establish that his Sixth Amendment rights were violated.  Therefore, the Court will assume that Hild's proffered evidence would be substantiated for the purpose of resolving the pending motions, and the application for a hearing is denied.

### 4.      Actual Conflict of Interest

#### a.      Legal Standard

Unlike most claims of ineffectiveness of counsel, which are evaluated under the familiar standard established by *Strickland*, there is a separate legal framework for evaluating a claim that an attorney labored under "an actual conflict of interest" which "adversely affected [the] lawyer's performance," *Sullivan*, 446 U.S. at 348.   Under that standard, where an attorney's conduct amounts to an "actual conflict," a limited "presumption of prejudice" applies.  *Burke*, 2022 WL 175488, at *2 (2d Cir. Jan. 20, 2022); *see also United States v. Malpiedi*, 62 F.3d 645, 469 (2d Cir. 1995) (same).  Here, Hild argues that Dusing and Lawrence labored under such an "actual conflict" as a result of the concurrent Kentucky litigation.

As an initial matter of terminology, the Court recognizes that the Second Circuit has delineated "three levels of conflicts of interest: '(1) a *per se* conflict requiring automatic reversal without a showing of prejudice; (2) an actual conflict of interest that carries a presumption of prejudice; and (3) a potential conflict of interest that requires a finding of both deficient performance by counsel and prejudice, under the standard established in *Strickland*.'"  *Burke*, 2022 WL 175488, at *2 (quoting *United States v. John Doe No. 1*, 272 F.3d 116, 125 (2d Cir. 2001)). Hild argues that Dusing and Lawrence's conduct should be evaluated under the second level for whether it constituted an "actual conflict of interest," rather than a *per se* or potential conflict.  *See* Def. Reply at 6–7.

In conducting that inquiry, the Second Circuit has "developed a three-stage analysis to determine if prejudice is presumed for an actual conflict of interest."  *Burke*, 2022 WL 175488, at *2.  "First, the defendant must establish that an actual conflict of interest existed, which arises 'when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'"  *Id.* (quoting *United States v. Moree*, 220 F.3d 65, 69 (2d Cir.

2000)).  Second, a defendant must establish an "'actual lapse in representation,' that resulted from

the conflict, which is demonstrated by 'some plausible alternative defense strategy not taken by

counsel.'"  *Id.*  Under this second step—unlike the traditional *Strickland* approach—a defendant

need not establish that the alternative defense "would necessarily have been successful, only that

it possessed sufficient substance to be a viable alternative." *Id.*; *see also LoCascio v. United States*,

395 F.3d 51, 56 (2d Cir. 2005); *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir. 2002).  Finally,

"the defendant must show causation by demonstrating that the alternative defense was inherently

in conflict with or not undertaken *due to* the attorney's other loyalties or interests." *Id.* (emphasis

in original) (cleaned up).  When these conditions are met, prejudice is presumed. *See Williams*,

372 F.3d at 106.  In performing this analysis, the Second Circuit has cautioned that "'a mere

theoretical division of loyalties,'" however, "does not present grounds for a new trial." *United

States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003) (quoting *Mickens*, 535 U.S. at 171).

　　The lynchpin in finding an actual conflict is that counsel's "interests diverge[d]" with

respect to a "material factual or legal issue" pertaining to the representation itself. *Feyrer*, 333

F.3d at 116.  That is, that the incentives for lawyer and client were "*inherently* in conflict," or

misaligned, due to an "attorney's other loyalties." *Schwarz*, 283 F.3d at 92 (emphasis added).

　　The quintessential example of an actual conflict in this Circuit arises where an attorney

engaged in the same criminal conduct as the defendant he is representing. *See United States v.

Fulton*, 5 F.3d 605, 609 (2d Cir. 1993) ("It is well-settled in this circuit that an actual conflict of

interest exists when an attorney engages in wrongful conduct related to the charge for which the

client is on trial."); *see also United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994) (reasoning that,

where an attorney is under investigation by the same prosecutor's office that is prosecuting his

client, even for unrelated criminal conduct, there is a pronounced danger that the attorney may

"have believed he had an interest in tempering his defense of [his client] in order to curry favor with the prosecution"); *United States v. Elder*, 311 F. Supp. 3d 589, 596–97 (E.D.N.Y. 2018) (finding an actual conflict where the attorney "plainly has his own interest in this case—an interest in not having anything come to light that might further complicate his personal situation") (cleaned up).  The Second Circuit has explained that a presumption of prejudice is warranted in those circumstances because an attorney who has participated in the underlying criminal conduct may have an incentive to prevent information that would otherwise aid his client's case from coming to light at trial in order to prevent discovery of his own wrongdoing.  *See United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) ("[W]ith the similarity of counsel's criminal activities to [his client's] schemes and the link between them, it must have occurred to counsel that a vigorous defense might uncover evidence or prompt testimony revealing his own crimes.").  The actual conflict framework is premised on the notion that such a division of incentives—where an attorney, for instance, "may fear that a spirited defense could uncover convincing evidence of the attorney's guilt," *Fulton*, 5 F.3d at 610—presents a heightened risk of violating the Sixth Amendment's guarantee of conflict-free counsel.

Similarly, the Second Circuit has found an actual conflict in the rare circumstance where a "defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant."  *Levy*, 25 F.3d at 156.  For instance, where an attorney was accused of coercing a client's guilty plea, the Second Circuit found an actual conflict, reasoning that the attorney was faced with the option of defending against the clients' accusations of severe misconduct or advocating on the clients' behalf.  *See Lopez v. Scully*, 58 F.3d 38, 41 (2d Cir.1995).

Such a divergence of interests with respect to the action itself is of the kind that could often be identified *ex ante* in a hearing held pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982). Indeed, the Second Circuit has underscored the importance of an "initial, 'inquiry' stage," in situations where a "district court is confronted with 'the specter of conflicts of interest.'" *United States v. Cain*, 671 F.3d 271, 293 (2d Cir. 2012) (quoting *Levy*, 25 F.3d at 153). Such an inquiry requires the court to "investigate the facts and details of the attorney's interests to determine whether" they diverge from those of his client. *Id*; *see also Levy*, 25 F.3d at 152 (observing, in a case finding an actual conflict, that "a clear feature of this case is that the repeated reassignment of the case resulted in a failure to follow the procedures this Court set forth in [] *Curcio* [], procedures that might have resulted in a knowing and intelligent waiver from Levy of his right to a non-conflicted lawyer").

The Second Circuit has clarified, however, that typical ineffective assistance of counsel claims by a client do not rise to the level of an actual conflict. *See, e.g., Jones*, 482 F.3d at 75 ("The defendant's mere assertion, however, that his attorney is providing less than constitutionally effective assistance, which requires the attorney to defend his preparation and strategy, is not itself sufficient to create a divergence of the attorney's interests from those of the defendant."); *Moree*, 220 F.3d at 72 (holding that accusations an attorney had failed to "move for speedy trial, failed to prepare adequately, failed to forward papers, and failed to discuss strategic choices, etc." did not create an actual conflict of interest); *United States v. White*, 174 F.3d 290, 296 (2d Cir. 1999) ("[W]e decline to adopt any broad rule that would suggest that, simply by expressing dissatisfaction with his attorney's performance, a defendant can create 'conflict of interest' that can be said to require the attorney to choose between advancing the attorney's own cause and that of her client."); *Peebles v. United States*, No. 17-CV-463-A, 2022 WL 278179, at *7 (W.D.N.Y.

Jan. 31, 2022). Such a rule makes good sense, as general claims of ineffectiveness do not stem from an inherent misalignment between an attorney's and a client's interests in the outcome of a case. The Circuit has reasoned that, while client accusations that an attorney made poor strategic choices may place the attorney in the "difficult position of having to comment on an asserted disagreement with her client, if only to inform the court as to whether she believes that she can continue the representation," that circumstance, without more, does not amount to an actual conflict. *White*, 174 F.3d at 296.

So too, the Second Circuit has found that a disagreement about a client's failure to pay attorney's fees, although it may cause "some divisiveness between attorney and client," does not give rise to an actual conflict. *O'Neil*, 118 F.3d at 71. Rather, if an attorney under those circumstances ultimately "shirks his ethical obligation to dutifully represent his client as a result of a fee dispute . . . *Strickland* provides the appropriate analytic framework." *Id.* at 72; *see also Mickens*, 535 U.S. at 175–76 (finding the actual conflict doctrine inapposite to circumstances where "representation of the defendant somehow implicates counsel's personal financial interests").

In sum, cases presenting an actual conflict of interest warranting a presumption of prejudice are rare. And the Supreme Court has cautioned against "expansive application" of the actual conflict framework such that it would swallow the *Strickland* rule. *See Mickens*, 535 U.S. at 175. The purpose of the limited "*Sullivan* exception[]" for an actual conflict, it has reasoned, exists solely as "needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* at 176.

### b. Analysis

Hild raises three separate but related theories as to why the timing of his trial and the Kentucky litigation created an "actual conflict" such that his interests materially diverged from

36

those of Dusing and Lawrence.  First, he argues that the "schedule for [his] trial conflicted with the schedule in the Kentucky litigation" and Dusing's and Lawrence's "strong interests" in that proceeding were "inherently in conflict with [the] ability to defend [him] at trial, including with their ability to mount a robust defense case that would last past May 4."  Def. Mem. at 29.  Second, he contends that Dusing and Lawrence were "preoccupied" with the Kentucky litigation, which led to a lack of preparedness and several errors at trial.  Def. Mem. at 29–30.  Third, he argues that Dusing "had reason to believe he faced disciplinary proceedings" and "thus had a personal interest in using Mr. Hild's trial to demonstrate" his competency.  Def. Mem. at 30.

All three theories relate to the pending Kentucky litigation, and primarily, the May 4 hearing that was scheduled during Hild's trial.  While Hild contends that these proceedings were "inherently in conflict with" Dusing's representation, that is not so.  Actual conflicts arise when "counsel's inability to make [] a conflict-free decision" is so substantially impaired that a court may not rely upon the result of the adversarial system.  *Williams*, 372 F.3d at 106.  The Kentucky litigation itself did not form such a divergence of incentives, such that Dusing had "had an actual adverse interest" in the outcome of Hild's trial.  *Mathis v. Hood,* 937 F.2d 790, 795 (2d Cir. 1991).  In other words, unlike the types of conflicts that the Second Circuit have found to be actual conflicts, Dusing and Hild's incentives regarding the outcome of Hild's trial were still aligned—they both wanted to see Hild acquitted.

In essence, Hild alleges that Dusing was simply more attentive to and invested in the outcome of his personal litigation than the outcome of the ongoing criminal trial.  Such a circumstance does not form an actual conflict giving rise to a presumption of prejudice.  Rather, where, as here, an attorney faced with a choice between his client's trial and a personal or other

professional obligation chooses to prioritize that obligation over his "ethical obligation to dutifully represent his client," *Strickland* provides the appropriate remedy.  *O'Neil*, 118 F.3d at 71.

Because claims of attorney conflicts lack the prejudice showing required by *Strickland*, there is an "incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims."  *Moree*, 220 F.3d at 69–70; *see also United States v. Berger*, 188 F. Supp. 2d 307, 333–34 (S.D.N.Y. 2002) ("[C]ourts have noted the incentive for defendants to characterize ordinary ineffective assistance of counsel claims as conflict of interest claims."). But expansive application of this standard would swallow the *Strickland* rule altogether.  As aptly noted in *United States v. Mitchell*, courts "have been careful to guard against defendants' attempts to force their ineffective assistance claims into the 'actual conflict of interest' framework. . . and thereby supplant the strict *Strickland* standard with the far more lenient *Cuyler* [*v. Sullivan*] test." 216 F.3d 1126, 1131 (D.C. Cir. 2000) (cleaned up).  A finding here that Dusing's competing personal and professional obligations constituted an "actual conflict" could open the floodgates to challenges of purported "actual conflicts of interest" in nearly every criminal case, as every attorney has other obligations—personal and professional—that may affect their performance.  It would dramatically alter the existing legal framework to conclude that an actual conflict may arise every time a lawyer has a family vacation, obligations to care for an ailing loved one, or a child to pick up from daycare.

The Court has little doubt that the Kentucky litigation implicated matters critically important to Dusing on a personal level.  He faced the loss of custody over his daughter, among the most challenging circumstances any parent can confront.  Dusing also stood accused of serious misconduct, both personal and professional, that could understandably have left him overwhelmed.

And closely tied to his ability to confront those serious challenges, it is clear that the May 4 hearing date presented, at the very least, potential overlap with Hild's trial.

But a decision granting Hild the relief he seeks here would fit squarely into the judicial adage that "bad facts make bad law." *Haig v. Agee*, 453 U.S. 280, 319 (1981) (Brennan, J., dissenting). The Court is disinclined to open the floodgates to claims of an actual conflict based on circumstances like these. As explained below, because the May 4 hearing, and any preoccupation it occasioned, did not create a division of loyalty or an inherent misalignment of incentives impairing Dusing's ability to make "a conflict-free decision," *Malpiedi*, 62 F.3d at 465, the Court concludes that it does not constitute an actual conflict.

### i.     The Scheduling of the May 4 Hearing Did Not Constitute an Actual Conflict

The parties and the Court agree that there is little relevant caselaw addressing scheduling conflicts between an attorney's competing personal and professional obligations. *See* Oral Arg. Tr. at 15 (Defense Counsel: "I don't know that there's any other case in any circuit where the facts line up perfectly with this one."). Instead, Hild contended both in his memorandum, Def. Mem. at 26–28, 31, and at argument that these circumstances are analogous to cases in which an attorney "manipulates the scheduling of a trial because the lawyer [is] concerned about what will happen when the trial concludes [and] concerned about their own liability." Oral Arg. Tr. at 15. Those cases, however, are distinguishable, and their differences instructive.

In the *Mathis* case, for instance, the attorney in question had been appointed to represent an indigent client on his criminal appeal in 1984, but failed to perfect the appeal for two years. *Mathis v. Hood*, 851 F.2d 612, 613 (2d Cir. 1988). By that time, Mathis had filed a disciplinary complaint against the attorney for this "dilatory" performance. *Id.* The district court found that under those circumstances, the attorney had an improper incentive for his own client's appeal to

fail "because reversal might have increased [the attorney's] potential liability for the delay or increased the possibility that [he] would be disciplined as a result of his delinquency in perfecting the appeal." *Mathis v. Hood*, No. 87-cv-6234 (RPP), 1990 WL 100869, at *4 (S.D.N.Y. July 11, 1990). Counsel's incentive to place his own interests above his client's undermined the court's "confidence in the outcome" of the appellate process, and thus a new appeal was granted. *Id.* Importantly, the actual conflict in *Mathis* arose not from the timing of two proceedings, but from the attorney's incentive for his own client's appeal to fail. *See* 937 F.2d at 795 (affirming district court's holding that the attorney "had an actual adverse interest in the outcome of [his client's] appeal"). Again, those circumstances are not present here. While the timing of Hild's trial may have posed a scheduling conflict for Dusing, it did not cause a divergence in their interests regarding the outcome of Hild's trial such that Dusing would have had any incentive for the jury to return a guilty verdict.

Hild relies on two additional cases involving attorneys who postponed the resolution of a client's trial to delay pending indictments against themselves, which are distinguishable for a similar reason. *See United States v. McLain*, 823 F.2d 1457, 1464 (11th Cir. 1987) *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989); *Rugiero v. United States*, 330 F. Supp. 2d 900, 907–08 (E.D. Mich. 2004). In neither case did the court hold that overlapping schedules, standing alone, amounted to a conflict of interest; instead, they held that the attorneys' conflicts resulted from the fact of the pending indictments, and found that those attorneys had manipulated their client's criminal proceeding in service of their own interest. *See McLain*, 823 F.2d at 1464 (finding an actual conflict where the attorney failed to vigorously pursue plea negotiations because he knew he would not be indicted until the case had ended); *Rugiero*, 330 F. Supp. 2d at 908 (finding actual conflict where the attorney was aware that he was under

investigation by the same prosecutor's office that was opposite him in his client's case, and refused plea negotiations and delayed the case for two years in order to gain "time to attempt to dissuade the Government from prosecuting him and delay[] his own indictment").[7]

Dusing's choice between appearing at a post-trial conference in a case where he was a litigant and representing Hild in an unrelated criminal trial is far afield from those circumstances found to jeopardize an attorney's loyalty to their client. The outcome of Hild's criminal case had no bearing whatsoever on Dusing's post-trial motions in his Kentucky family court case, and there was thus no inherent conflict between the conference in Kentucky and Hild's ongoing trial, only a scheduling burden caused by proceedings held close together in time, along with any emotional or psychological toll occasioned by it. Indeed, if anything, Dusing's incentives were *particularly* aligned with Hild's—presenting a "coincidence of interests," not a conflict, *see Untied States v. Gambino*, 864 F.2d 1064, 1071 (3d Cir. 1988)—once professional sanctions and potential disbarment became relevant to the Kentucky litigation. Far from having a motivation to ineffectively represent Hild before this Court, the potential for sanctions effectively left Dusing under a professional magnifying glass, with every incentive to zealously advocate for his client in a high-stakes federal criminal trial.

Moreover, notwithstanding Lawrence's representations to the Kentucky Court that an adjournment was required, neither Dusing nor Lawrence appeared at that hearing even though it was held remotely after Hild's trial had already concluded. *See* Levine Decl. Ex. B.1. While the Court does not credit Dusing's statement that he was "unaware" of the May 4 conference for the purposes of this motion, the fact that he did not attend the remote hearing does undermine, at least

---

[7] *Herrera v. Russi*, No. CV-95- 0187(CPS), 1996 WL 651017, at *9 (E.D.N.Y. Nov. 6, 1996), which Hild cited in his supplemental letter after oral argument, *see* May 6, 2022 Letter, is also inapposite as to conflicting schedules, and is more relevant to Hild's actual conflict claims under his two other theories, *see infra* at 40–43.

to some degree, Hild's portrayal of the hearing, although for purposes of this motion, the Court nevertheless assumes the importance Hild attributes to it.

Hild has also failed to meet the second and third prongs required to establish an "actual conflict." *See Moree*, 220 F.3d at 69 (requiring a defendant to establish "some plausible alternative defense strategy not taken up by counsel," and that the failure to pursue it was due to the alleged actual conflict) (cleaned up).  That is, he has not shown that any plausible trial strategies were foregone—let alone that they were foregone as a result of the scheduling of the May 4 hearing. *See LoCascio*, 395 F.3d at 56.

The only evidence that any trial tactic was not undertaken due to the May 4 hearing is the proffered testimony of a former paralegal who was present at the trial team's meetings.  In addition to stating that Dusing was, contrary to his affidavit, well-aware of the proceedings in Kentucky, The paralegal recalled that Dusing raised the May 4 hearing when discussing trial logistics.  *See* Levine Decl. Ex. A.  The former paralegal stated that Dusing described the May 4 hearing as "inconvenient," and noted that it presented logistical issues when asked by one of Hild's new lawyers:

> *Attorney*: Do you remember what words he used when he said it was inconvenient, the May 4 date?
> *Former Paralegal*: It was in terms of talking about logistics, how much of a defense to put on, weighing several concerns. It was one of the factors, the cost of being in NY longer, the cost of paying witnesses, logistics in general. It was not specifically that one, but pros and cons.
> *Attorney*: So one of the cons of putting on more witnesses was that it would draw the case past May 4?
> *Former Paralegal*: Yes, and have implications for him.
>
> * * *
>
> *Attorney*: Going back to pros and cons list, what were some of the pros of calling additional witnesses in the defense case, do you remember other pros?

> *Former Paralegal*: Some of the concerns were matching the witness list, he said it would look better if we have a lineup of witnesses, said it was important to match them numbers wise.
> *Attorney*: What were other cons, other than May 4?
> *Former Paralegal*: Not having fully vetted them, a gamble, don't know what government is going to bring out. Called "bombs." Also cost and time.
> *Attorney*: Do you remember how he phrased it when he said it would conflict?
> *Former Paralegal*: Just that he wouldn't be able to make his hearing if we call all these witnesses.

*See* Levine Decl. Ex. A.  Although the Court credits this proffered testimony as true, it is unclear whether the witnesses referenced were actually available, what testimony they would have offered, or whether their testimony would have even been plausibly helpful to Hild's case.  In fact, to the extent the former paralegal's statements evince Dusing's contemporaneous view on the topic, it appears that he harbored serious concerns that the witnesses could even be detrimental to the defense case—calling them not "vetted" and a "gamble."  *Id.*

In his post-trial motion, Hild proposes other avenues that were purportedly foregone as a result of the scheduling of the May 4 hearing—primarily that more witnesses could have been called and more evidence introduced—but proof of a causal link is still missing.  For example, Hild suggests that more witnesses, including "Certified Public Accountants to provide expert opinion testimony as to the propriety of Live Well's pricing methodology (such as a certified fraud examiner and forensic accountant at Keiter)," Chris Krupa, an IDC employee, or other Live Well employees who participated in the fraud could have been called to testify.  *See* Def. Mem. at 32.  But he fails to connect the absence of these witnesses to the scheduling of the May 4 hearing.  Indeed, there is no any allegation that these witnesses were prepared to testify, or that they were waiting in the wings or sent home at the last minute to cut the defense case short.

Hild draws particular attention to Dusing's purported error in failing to call a proposed expert, Allen Davis.  Although Dusing's affidavit stated that he did not hire Mr. Davis because of

Hild's unwillingness to pay his fees, *see* Dusing Aff. ¶ 70, this was contradicted by Davis's own affidavit that he was offered a flat fee of $10,000 that he rejected, *see* Davis Decl. ¶¶ 6–7, and Hild's testimony that he was never informed of any fee issue, and would have paid more than $10,000, Hild Decl. ¶¶ 2–3. But even accepting Hild's version of events, critically, his motion does not engage with the fact that his defense team would have needed to notice and disclose any expert it intended to call at trial well before the May 4 hearing was even scheduled in the Kentucky litigation on April 13, 2021, after jury selection in New York had already begun. *See* Fed. R. Crim. P. 16(b)(1)(C); Def. Witness List, April 14, 2021 (not including Davis). Assuming that the failure to call Allen Davis was not due to a dispute regarding his fee—as both Davis and Hild attest, *see* Dkt. 120-1, Hild Decl.; Dkt. 120-2, Davis Decl.—the absence of this expert testimony thus cannot be attributable to any decisions made in light of the scheduling of the May 4 hearing.

Finally, Hild suggests that Dusing could have put on an "advice of counsel" defense, asserting in a conclusory manner that there is a "serious risk" that Dusing did not do so because of the scheduling of the May 4 hearing. But, again, there is no evidence offered as to what this defense might have entailed, that it would have aided Hild's defense, or how a failure to mount such a defense was "due to" the alleged conflict. If anything, the trial transcript intimates that the decision not to present an "advice of counsel" defense may have been one made as a matter of sound trial strategy, as Dusing indicated that the defense presented complex privilege issues which the parties raised in their *motions in limine*. *See* Tr. 20–53. Indeed, when discussing the proposed defense at the final pretrial conference on April 9, 2021, Dusing highlighted the difference between questions regarding the presence of attorneys and a defense that the attorney's advice was relied upon, *see* Tr. 52, suggesting that, well prior to the scheduling of the May 4 hearing, Dusing had already made the decision not to proceed with an "advice of counsel" defense.

The contention that Hild's testimony was curtailed by Dusing's failure to introduce exhibits through his testimony at trial suffers from similar deficiencies.  There is no basis in the record to conclude that the failure to pursue additional lines of questioning, or to admit additional exhibits, during the course of Hild's testimony—which spanned two full days before the jury—was at all related to concerns regarding timing.

### ii.    Dusing's and Lawrence's "Preoccupation" Did Not Create an Actual Conflict

Hild next argues that Dusing's and Lawrence's "preoccupation with [the] Kentucky litigation caused [him] to commit missteps in [] trial preparation and conduct."  Def. Mem. at 34. To be sure, preoccupation can certainly result in ineffective assistance of counsel, as can any number of reasons for counsel failing to act in a reasonably professional manner, including poor legal training, forgetfulness, or a lack of attention to detail.  But an actual conflict of interest does not arise from an attorney's divided attention—it arises from divided *loyalties* such that the interests of a "defendant and his counsel 'diverge with respect to a material factual or legal issue or to a course of action.'"  *Martinez v. Kirkpatrick*, 486 F. App'x 158, 160 (2d Cir. 2012) (quoting *Schwarz*, 283 F.3d at 91).

In *Lopez v. United States*, Judge Crotty addressed a similar claim and found that an attorney's alleged "preoccupation" with concurrent disciplinary proceedings did not amount to an "actual conflict."  No. 10 CR. 798 (PAC), 2017 WL 1424328, at *7 (S.D.N.Y. Apr. 20, 2017), *aff'd*, 792 F. App'x 32 (2d Cir. 2019).  He reasoned that conclusory allegations and the defendant's subjective belief that his attorney was "preoccupied or too busy with the disciplinary proceedings to provide effective assistance, without [] any specific resultant prejudice," was insufficient to establish a conflict.  *Id*. at *7.

This makes good sense, as preoccupation with another matter—whether personal or professional—is different in kind from a divergence of interests with respect to the representation itself.  Whereas an actual conflict compromises the representation due to inherently conflicting incentives, accusations that an attorney was inattentive or distracted are more properly analyzed under *Strickland*, as they concern whether an attorney's performance suffered and fell below a reasonable professional threshold affecting the outcome.  *See Abad v. United States*, No. 09-cv-08985 (GBD), 2011 WL 666361, at *3 (S.D.N.Y. Feb. 7, 2011) (analyzing and rejecting ineffective assistance of counsel claim under *Strickland* where a defendant claimed that his "counsel labored under a conflict of interest because . . . [he] was 'too preoccupied with his duties' in other cases."); *see also John v. United States,* No. 09-cv-3116 (GBD), 2010 WL 2346590, at *3 (S.D.N.Y. June 8, 2010).

The only authority cited by Hild for the notion that "preoccupation" could form the basis for an actual conflict is a single sentence from *Herrera v. Russi*, an out-of-district habeas case in which the court opined that "a conflict could arise simply because it is plausible that [the attorney] was unable to zealously represent the petitioner because of [his] preoccupation with the investigation into his competence and his possible suspension or disbarment."  No. cv-95-0187 (CPS), 1996 WL 651017, at *9 (E.D.N.Y. Nov. 6, 1996).

As an initial matter, it is unclear whether this sentence refers to an "actual conflict," under the *Sullivan* line, that would give rise to a presumption of prejudice.  The district court in *Herrera* did not analyze whether the conduct amounted to an actual conflict because the state court in the underlying proceeding had failed to inquire as to whether there was "an actual conflict, a potential conflict, or no genuine conflict at all."  *Id.* at *7.  Indeed, in the sentence immediately following the one which Hild quotes, the court explained that "[b]ecause the trial judge, on the basis of [the

attorney's] representation, took no further steps to explore the *potential conflict*, the trial judge failed to satisfy the court's inquiry obligation." *Id.* at *9 (emphasis added).  Moreover, the factual circumstances of that case suggested the attorney may have had an actual conflict because the defense attorney was served with a motion to suspend him from the practice of law while in the judge's chambers during the course of the trial.  *Id.* at *8.  Those suspension papers indicated the attorney was "an immediate and present danger to the public and should be immediately suspended from the practice of law pending the completion of the investigation and prosecution of the pending complaints of professional misconduct." *Id.* at *9.  The district court thus found that had the state court judge inquired further, he might have learned that the defense attorney had an incentive to hide the suspension from his client in order to continue the representation.

Hild also fails, again, to demonstrate that any strategy was forgone at trial, under the second prong of the actual conflict test, let alone that it was "due to" the alleged preoccupation, under the third.  Beyond the assertion that expert disclosures were due a week before trial in the Kentucky litigation in February 2021, he does not offer evidence that the alleged errors were related to Dusing's or Lawrence's "preoccupation" with the Kentucky litigation.

### iii.    Dusing's Potential Disciplinary Proceedings Did Not Create an Actual Conflict

Third, Hild contends that because Dusing "had reason to believe he faced potential disciplinary proceedings and investigations into the bribery of a witness," he had a "personal interest in using Mr. Hild's trial to demonstrate that he was competent to practice law."  Def. Mem. at 30.  This allegation appears to be based on both the pending sanctions motions against Dusing in the Kentucky litigation and separate investigations into his previous conduct.

To be sure, many courts have found an actual conflict where a lawyer "faces possible criminal charges or significant disciplinary consequences," but each of those cases concern

"questionable behavior" the attorney engaged in "*related to his representation of the defendant*."
*Levy*, 25 F.3d at 156 (emphasis added) (collecting cases). As discussed above, when the attorney
discipline is tied to representation of the client, there is an inherent tension *ex ante*, because the
"attorney would have a strong personal desire to refrain from inquiring at the defendant's trial into
certain matters that were directly relevant to, and potentially exculpatory of, his client," but which
may tend to incriminate the attorney. *Id*. at 157; *see Lopez*, 58 F.3d at 43 (finding actual conflict
where the attorney was accused of coercing her client's guilty plea).

     No such concerns, and thus no actual conflict, are implicated here, where the potential
professional discipline was wholly unrelated to Dusing's representation of Hild in his criminal
proceeding. *See Lopez v. United States*, 792 F. App'x 32, 36 (2d Cir. 2019) (affirming district
court's determination that an unrelated "disciplinary proceeding . . . did not create an actual conflict
of interest" where the "potential sanctions against [his attorney] created a financial incentive to
keep the case going and prevent [the client] from pleading guilty."). Indeed, some courts have
gone so far as to find, under circumstances like these, that when an attorney faces potential
professional sanctions due to unrelated conduct, his incentive to effectively advocate to
demonstrate his competence ensures that no actual conflict can exist. *See id.; Waterhouse v.
Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988) ("If anything, the charges pending against [the
attorney] provided an incentive for the vigorous efforts he appears to have expended.").

     In sum, the Court finds that none of the challenges presented by the overlapping timing of
the two proceedings amounted to an actual conflict of interest, and thus any deficiencies in
Dusing's performance—whether they resulted from distraction, a desire to appear in the Kentucky
litigation or otherwise—must be analyzed under *Strickland*. [8]

---

[8]    Because the Court concludes that Dusing's representation did not violate Hild's Sixth Amendment right to
conflict-free counsel, it need not evaluate in the alternative whether Lawrence, a more junior lawyer with no criminal

### 5.   Ineffective Assistance of Counsel Under *Strickland*

Apart from his claim of an actual conflict, Hild argues that, in any event, Dusing's performance was ineffective under the more familiar standard established by *Strickland v. Washington*, 466 U.S. 668, 684 (1984).

### a.   Applicable Law

To be entitled to relief pursuant to *Strickland*, Hild must show both that (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) he suffered prejudice as a result. *Id.* at 688, 691–92.  In evaluating the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. With respect to the second, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Ultimately, to merit vacatur, "counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687).  The Court may reject a claim of ineffective assistance of counsel for failure to satisfy either prong of the *Strickland* standard, without reaching the other. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.").

### b.   Analysis

Hild's argument that Dusing's representation was ineffective relies on the same theories of purported error discussed above regarding Dusing's alleged actual conflict.  With respect to the choice to call certain witnesses or elicit additive testimony from Hild, there has not been a showing

---

experience, was conflicted or could have provided effective assistance notwithstanding Dusing's representation.

that Dusing's choice not to do so was professionally unreasonable. *See Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury.").  But even assuming that the choice to forgo eliciting the additional testimony fell below the threshold of reasonable representation under *Strickland*, "a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice," *United States v. Green*, 104 F.3d 354 (2d Cir. 1996), and Hild fails to establish prejudice here.

Specifically, as he does in his argument for an actual conflict, Hild makes reference to the purported failure to call Allen Davis, the proposed expert, to argue that Dusing was ineffective under *Strickland*.  Assuming the failure to call Davis was unreasonable, *see Garner v. Lee*, 908 F.3d 845, 867 (2d Cir. 2018), the absence of his testimony did not inure prejudice upon the outcome of Hild's trial.  Davis, who was "familiar with leasing and real estate mortgage lending securities and valuing complex and illiquid securities related thereto," Davis Decl. ¶ 1, drafted a preliminary expert report after being consulted as a potential expert for the defense, that included findings that:

> (a) in the absence of an active, liquid [] securities market, the value of a mortgage security is the value of the estimated discounted future cash flows (intrinsic value); (b) there was no active, liquid market for the HECM IO bonds; and (c) it is appropriate for a CEO to rely on other officers in the company, and in particular the CFO, in valuing company assets when preparing.

*Id.* ¶ 5.  Accepting a scenario under which Davis had been retained by the defense, that his expert conclusion at trial had remained consistent with his preliminary report, and that such testimony would have been admitted, while it may have been somewhat helpful to Hild's case, it would not have affected the outcome of the trial with any reasonable likelihood.  Substantively, each of these arguments were already presented to the jury through other testimony.  Live Well employees, *see*

Tr. 240–41, and lenders, *see* Tr. 588, 645, agreed that the liquid market for the HECM IO bonds was, at best, limited.  And the jury heard testimony that the Scenario 14 assumptions model began as an academic exercise to value the bonds.[9]  But there was ample evidence to the contrary—that above-market prices were submitted to IDC in order to generate cash for Live Well—and that lenders expected the IDC prices would reflect an independent third party's evaluation of the price for which the bonds could be sold.  *See United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008) (holding that among the relevant factors in a determination of prejudice "the strength of the Government's case is probably the single most critical factor") (cleaned up).  While the expert's testimony may have been helpful to support Hild's own testimony that the prices were an effort to "get it right," it is not, in other words, reasonably likely that the expert's testimony would have changed the jury's verdict.  *See Jamison v. Griffin*, No. 15-cv-6716 (PKC) (AJP), 2016 WL 1698350, at *24 (S.D.N.Y. Apr. 27, 2016), *report and recommendation adopted by*, 2016 WL 4030929 (S.D.N.Y. July 27, 2016); *see id*. ("While a misidentification expert may have been helpful to the defense, the testimony was not so vital that counsel was ineffective for failing to procure it.").

With respect to Hild's testimony, which spanned multiple days, Hild has failed to show he was prejudiced by counsel's failure to elicit more "fulsome" testimony.  Although Dusing and Hild apparently disagreed about the scope of Hild's testimony, *see* Dusing Aff., Ex. D; Hild Aff. ¶ 6, beyond citing to several exhibits, Hild does not proffer what additional evidence would have been offered or how it would have aided his case.  *See United States v. Green*, 104 F.3d 354, 1996 WL

---

[9]    Rohr also testified at multiple points that Scenario 14 was based on "discounted cash flow principles."  Tr. 993, 995, 1488.  The jury heard a recorded call from Rohr where he stated that "the market value is, in essence, the discounted cash flow of a security."  DX B.26; DX E.26.  On cross examination Dusing asked whether Rohr stood by that definition, and while he explained his position differently at trial, he stated that if the buyer and seller of a security agreed on the cash flow amounts and agreed to transact, that would be correct.  Tr. 1497–98.

665719, at *3 (2d Cir. 1996) ("A defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice."). The same is true for his claim regarding Dusing's failure to examine witnesses regarding the post-August 2017 losses.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687, 693). Even assuming there were errors in Dusing's representation, and considering them cumulatively, *see Gersten v. Senkowski*, 426 F.3d 588, 611 (2d Cir. 2005), the Court does not find that it is "reasonably likely" the result would have been different absent them, *Harrington*, 562 U.S. at 111.

"[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111 (2011) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Here, the Court presided over the trial, and observed Dusing's advocacy first-hand. Although it is true that Dusing could have called more witnesses in the defense's case-in-chief, introduced more exhibits, or explored more topics, the Court was not left with an overall impression that the defense case was lacking. To the contrary, Dusing's performance was strong, and at the very least on par with that of other white-collar litigators who regularly practice in this district. On the whole, he was a zealous, passionate, articulate, and compelling advocate who presented a cogent defense theory that was similar, if not identical, to the theory set forth in Hild's post-trial briefing. He advanced his case by thorough cross examination, especially of the two key government witnesses, and through Hild's testimony. Dusing was also able to synthesize the complicated financial concepts

and transactions at issue in this case, and had a disposition that appeared to be well-received by the jury.

At bottom, there is no "reasonable probability that, but for [any] deficienc[ies], the outcome of the proceeding would have been different." *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999).[10]  Accordingly, Dusing's motion for a new trial based on ineffective assistance of counsel is denied.

### B.      Sufficiency of the Evidence

Hild further argues that he is entitled to a new trial because there was insufficient evidence presented at trial to warrant conviction.  The Court disagrees.

### 1.      Applicable Law

Where a defendant seeks a new trial based on the insufficiency of the evidence, the Second Circuit has cautioned that "Rule 33 authority" should be used "sparingly" and in "the most extraordinary circumstances."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  More recently, the Circuit held that a court "may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (cleaned up).  A district court cannot "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  *Id.*  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice. To grant the motion, there must be a real concern that an innocent person may have been convicted."  *United States v. Aguiar*,

---

[10]      The remaining comparatively minor alleged errors—various missed objections during the trial and Dusing's failure to sequester witnesses pretrial—are similarly insufficient to state an ineffectiveness claim, as they too are not reasonably likely to have altered the outcome.  *See, e.g., Freeman v. Burge*, No. 05-cv-1585 (JFB), 2009 WL 1468464, at *14 (E.D.N.Y. May 22, 2009) ("[G]iven the overwhelming evidence presented by the prosecution at trial, there is no reasonable probability that the verdict at trial would have been different had petitioner's counsel successfully objected to the alleged hearsay testimony.").

737 F.3d 251, 264 (2d Cir. 2013) (cleaned up).

### 2.      Analysis

Hild raises the same arguments in connection with his Rule 33 motion based on insufficiency of the evidence that were advanced in connection with his Rule 29 motion, *see* Def. Mem. at 41, and those arguments fare no better under the Rule 33 standard.  For the reasons outlined in the Court's Rule 29 analysis, *supra* at 16–26, the evidence did not "preponderate [] heavily against the verdict" and the Court does not harbor concerns that permitting the jury's "verdict [to] stand would be a manifest injustice."  *Archer*, 977 F.3d at 188.  Accordingly, Hild's motion for a new trial based on the insufficiency of the evidence is denied.

### C.      Improper Opinion Testimony

Hild next contends that the government solicited improper opinion testimony from several lay witnesses at trial.  The Court ruled on this objection at trial and is not persuaded that a different outcome is warranted at this stage.

### 1.      Applicable Law

A lay witness may generally testify as to facts where "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Pursuant to Federal Rule of Evidence 701, however, lay witnesses may also offer opinion testimony so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Testimony is "rationally based on the witness's perception" where it is *both* (a) based on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions." *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (emphasis in original).  As the Second Circuit explained in *United States v. Rigas*:

> A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise. If, however, the witness's testimony was not a product of his investigation, but rather reflected his specialized knowledge, then it was impermissible expert testimony. In particular, Rule 701(c), which prohibits testimony from a lay witness that is based on scientific, technical, or other specialized knowledge, is intended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.

490 F.3d 208, 224 (2d Cir. 2007) (cleaned up).   In other words, whether a witness possesses specialized knowledge is not material; the question is whether the witness improperly strays from his own experience and testifies as an expert as outlined in Rule 702.  *See id.*; *see also Alto v. Sun Pharm. Indus., Inc.*, No. 19-cv-09758 (GHW), 2021 WL 4803582, at *13 (S.D.N.Y. Oct. 13, 2021) ("A witness with specialized knowledge may testify to facts known to the witness at the time of the events at issue but may not go beyond those facts to apply their expertise.").  Where testimony is improperly admitted, a new trial is warranted only if the testimony had a "substantial and injurious effect or influence in determining the jury's verdict."  *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003).

## 2.      Analysis

### a.      Testimony of Dennis Hamilton

Hild first contends that the Court should not have admitted testimony of Dennis Hamilton, who worked in the Office of Litigation Economics at the SEC, concerning a chart that he had created at the request of the U.S. Attorney's Office comparing the recorded sales prices of various bonds with the prices of those same bonds in the IDC database.  *See* Tr. 1652–53.  The chart was intended to "illustrate comparisons at prices which bonds were purchased and subsequent valuations of those bonds." Tr. 1653.  There is no dispute that the data in this chart was accurate. Instead, Hild objects to Hamilton's use of the term "mark up" three times during the course of his

testimony; Hild claims that this constituted improper opinion testimony on ultimate legal issues in the case, seriously prejudicing him.

The graph shown below illustrated the price of each transaction as a function of the bond's "trade price."  As Hamilton explained to the jury, "if Live Well purchased a bond at 10 and then that next [IDC] valuation that was published was 11, then the valuation would be reflected on the graph as 110 percent because the valuation of 11 would be 110 percent of the purchase price of 10."  Tr. 1661.  When asked to explain the length of the different arrows before and after Scenario 14, Hamilton explained that the arrows after Scenario 14 "go up higher than any of the arrows before," and that the differential or "mark up" of those arrows was higher.  Tr. 1663 ("So the tall one you see to the left of the dotted line represents, if you want to think about that as a mark up, a mark up about 15 percent, so 115 percent is the point on the graph. All the ones to the right of the dotted line are at least 118 percent or a mark up of at least 18 percent.").



Hamilton's use of the term "mark up" was not improper as he used it to describe the difference between the price for which the bond was purchased and the price it then was quoted at by IDC, not as a comment on the propriety of Live Well's valuation methodology. *See* Tr. 1663. And to the extent there was any confusion during direct regarding the Hamilton's intended meaning, it was plainly clarified by defense counsel's cross examination:

> Q. You mentioned some kind of mark up there at the end. Did I hear that right?
> A. I mentioned that's one way of thinking about the difference between the valuation and the purchase price.
> Q. Is it though, given that one of the variables here is Live Well's and the other is a value from IDC – When you say mark up, you're not suggesting – it's a rather inappropriate word to describe this, right, given you're talking about two different things from two different parties?
> A. It was more to illustrate the concept of what is represented by the arrow.
> Q. Which would you agree it more appropriately represents very specifically the difference between the price at which Live Well acquired the bond and the price at which – the price published by IDC for that bond?
> A. That is a good, yes, definition.

Tr. 1666–67. Hamilton's testimony did not comment on the validity of Live Well's pricing model under Scenario 14 or offer an opinion on the matter at all; rather, he merely testified about the data. His use of the phrase "mark up" in that context was therefore not improper.

Although the government did use the term "mark up" in its summation to describe what it characterized as the improperly inflated gap between Scenario 14 prices submitted to IDC and the purchase prices, even if improper, its single reference to "Mr. Hamilton call[ing] it a mark up" is not sufficient to establish prejudice under Rule 33. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone."). Unlike *United States v. Kaplan*, on which Hild relies, the government did not "repeatedly call[] the jury's attention," 490 F.3d at 123, to Hamilton's use of the phrase; the evidence was not "unique," *id*. at 124; and Hamilton's personal assessment of the prices was not a critical piece of evidence as to Hild's intent, *see id*. To the extent Hamilton's testimony on

57

direct was in any way unclear, cross examination clarified that Hamilton used the phrase merely to describe the difference between the IDC price and original sale price—not to comment on the purportedly insidious nature of any price increase. Further, on cross, Hamilton stated he knew nothing about how Live Well made its valuations and that he had used the term mark up "to illustrate the concept of what is represented by the arrow."[11] Accordingly, unlike in *Kaplan*, the Court is not concerned the testimony "substantially swayed" the jury's verdict. *Id*. at 123.

### b.  Testimony of Hayden Novikoff and Eric Rohr

Next, Hild objects to the testimony of two Live Well employees, Hayden Novikoff and Eric Rohr, who testified that they understood the pricing scheme to be fraudulent and wrong. He contends that this "pervasive inadmissible lay opinion testimony" usurped the jury's role in assessing the wrongfulness of the conduct. Def. Mem. at 47. The Court ruled during trial that the witnesses could testify about the financial concepts at issue in the case so long as their testimony was based on their own perceptions and observations and involved reasoning that the jury could understand. The testimony of Novikoff and Rohr did not exceed those bounds and was not otherwise improper.

Specifically, Hild objects now, as he did at trial, to Novikoff's testimony regarding an email he sent in February of 2017. His email stated that a trader at one of Live Well's lenders wanted to "take a look at our positions and see if we are overcollateralized," and noted that he "couldn't find a way to tell [the trader] that I knew our prices would be going up over the next two days," GX162; *see* Tr. 855–56. When asked at trial what was meant by this email, Novikoff explained:

> This was a really tough day for me. This was the first time, as I was starting to be asked to put prices into IDC that had nothing to do with the market, just raise the prices, that I had to actually interact with one of our dealers. And I knew that there was a plan to be raising the prices even further, and that I asked him to take a look

---

[11]      Any potential confusion was further mitigated by the Court's instructions to the jurors that they were the "exclusive judges of the facts," and that statements or arguments by lawyers "are not evidence," Tr. 2249, 2255.

and see how the prices changed.  And I remember him saying I will take a look at the market and let you know, and I knew that what he was going to consider to be the market were the price increases that had nothing to do with the market that I was submitting to IDC myself.

Tr. 856–57.  Hild's counsel objected at trial on the basis that Novikoff's testimony lacked foundation, was not probative, and was misleading.  Tr. 858–59.  Counsel also argued that the use of the term "market" was confusing, and that Novikoff did not have the requisite experience to testify as to "market" prices.  *Id.*  The Court issued a clarification to the jury that Novikoff was "not being called as an expert witness" and his testimony was "based on his understanding in light of his experience and what he was doing day to day."  Tr. 860.

As the Court instructed, Novikoff's testimony was properly circumscribed to a narrative description of on his own experiences—he told the jury what the email meant, how he felt in the moment, and why he believed that what he did was wrong.  While he used the term "market," it was not outside his experience as a participant in the conspiracy to testify that he had been instructed to "put prices into IDC that had nothing to do with the market."  Tr. 856.  Nor was the government asking Novikoff to define market rates for general HECM IO bonds; rather, it only inquired about his direct participation in the fraudulent scheme.  Courts routinely permit such testimony where a co-conspirator's impressions are "derived from his direct participation" in the conspiracy.  *See United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir.2008); *United States v. Ghavami*, 23 F. Supp. 3d 148, 171 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Heinz*, 607 F. App'x 53 (2d Cir. 2015) ("Zaino's testimony (concerning the complex financial transactions that were the subject of the conspiracies) was proper, in that it was based on his participation in the conspiracies.").  Novikoff's testimony regarding his direct participation in the fraud here was properly admitted.

With respect to Rohr, Hild objects to similar testimony that Live Well's pricing was "wrong," and that he knew there was "fraud going on at the company." *See* Def. Mem. 44–45. Hild also argues this testimony was especially improper and misleading because Rohr merely stated that he "was a CPA at one time," rather than that he was in any way qualified as an accounting expert. Def. Mem. at 46 (citing Tr. 1034). But to the extent Rohr—Live Well's Chief Financial Officer—had specific knowledge regarding whether the company's reporting of its revenue was "wrong" or "a fraud," that knowledge was properly derived from first-hand experience, and was not offered as an expert opinion. Rohr did not opine, for instance, as to whether another company's financials were prepared in accordance with the relevant accounting principles. Instead, he testified about financial statements that *he* prepared, that *he* believed to have been fraudulent at the time. For example, Rohr testified that Hild instructed him to "backdate" the financials, and that he felt it had been wrong to move one month's financial result into the previous one. Tr. 1029. This description of specific conduct (and for which Rohr pleaded guilty to fraud) was not an answer to a hypothetical question about accounting standards of the sort that an expert would be called to offer. The fact that Rohr was a CPA in 1995 does not change this analysis, and did not create confusion that he was an accounting expert. [12]

In sum, the Court finds that the testimony of Hamilton, Novikoff, and Rohr was properly admitted. In any event, even if the testimony were improperly admitted, any error was harmless. *See United States v. Dukagjini*, 326 F.3d 45, 61–62 (2d Cir.2003) ("Reversal is necessary only if the error had a substantial and injurious effect or influence in determining the jury's verdict.") (cleaned up). Hamilton's three uses of the term "mark up," especially given the clarification of its

---

[12]   Further, although Rohr was clearly familiar with and knowledgeable regarding financial statements, he did not hold himself out as a CPA on direct, and on cross examination stated explicitly that, although he was licensed as a CPA in 1995, he had not practiced as a CPA since that time. *See* Tr. 1229.

scope on cross examination, did not reasonably have any bearing on the jury's guilty verdict.  And the testimony from Novikoff and Rohr regarding their own assessments of their personal experiences—explaining that they believed their conduct had been wrong—similarly did not bear on the ultimate question of whether Hild shared the same fraudulent intent.  Moreover, the government presented substantial evidence of Hild's guilt, and it is reasonably likely the jury would have found Hild guilty even if the Court had sustained the objections to this testimony.  Any error thus "did not influence the jury, or had but very slight effect, [and] the verdict and the judgment should stand."  *Kotteakos v. United States,* 328 U.S. 750, 764 (1946).

Accordingly, Hild's motion for a new trial on the basis of the testimony from Hamilton, Novikoff, and Rohr is denied.

### D.     Constructive Amendment and Prejudicial Variance

Finally, Hild argues that the Court should grant a new trial pursuant to Rule 33 because, while the government's indictment was premised on a "misrepresentation-based scheme," its evidence and arguments at trial instead relied on an "omissions-based theory," resulting in constructive amendment of the indictment or prejudicial variance.

### 1.     Applicable Law

A defendant's rights under the Fifth Amendment's Grand Jury Clause are violated, and reversal required, when an indictment has been constructively amended—that is, where "the charge upon which the defendant [wa]s tried differs significantly from the charge upon which the grand jury voted."  *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).  "A defendant claiming constructive amendment must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."  *Id.* (cleaned up).

"Not every divergence from the terms of an indictment, however, qualifies as a constructive amendment." *United States v. Lisyansky*, 806 F.3d 706, 712 (2d Cir. 2015).  Although a constructive amendment is a *per se* violation of the Grand Jury Clause requiring reversal, the Second Circuit has "consistently permitted significant flexibility in proof adduced at trial to support a defendant's conviction, provided that the defendant was given *notice* of the *core of criminality* to be proven against him." *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (emphasis in original) (cleaned up).  The Circuit has explained that the "core of criminality" includes "the essence of a crime," not "the particulars of how a defendant effected the crime." *United States v. Vilar*, 729 F.3d 62, 90 (2d Cir. 2013).  "Ultimately, whether an indictment has been constructively amended comes down to whether the deviation between the facts alleged in the indictment and the proof underlying the conviction undercuts the constitutional requirements of the Grand Jury Clause: allowing a defendant to prepare his defense and to avoid double jeopardy." *Bastian*, 770 F.3d at 220 (cleaned up).

Variance, by contrast, "occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012).  Unlike constructive amendment, which is a *per se* violation requiring vacatur, a defendant must establish that "substantial prejudice occurred at trial as a result of the variance." *Khalupsky*, 5 F.4th 279, 294 (2d Cir. 2021) (cleaned up); *see also United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) ("[A] variance in proof rises to a constitutional violation only if it infringes on the notice and double jeopardy protections of an indictment.").

### 2.      Analysis

Hild contends the case was "charged" as a fraud "involving affirmative material misrepresentations," because the Indictment describes a scheme in which Hild "misrepresented

bond prices to lenders to induce the lenders to increase the amount of cash they were willing to lend." Def. Mem. at 55.  By contrast, Hild argues, the government's evidence at trial focused on the failure by Hild and his co-conspirators to disclose the pricing methodology used in Scenario 14 and their attempts to obfuscate its origins.  *See id.*

Hild's position construes both the grand jury's indictment and the government's proof at trial too narrowly.  The "core of criminality" alleged was a scheme in which Hild and the others at Live Well submitted above-market prices to IDC and subsequently took loans against those values contrary to the expectations of Live Well's lenders.  Indeed, the indictment describes a scheme involving both omissions and misstatements, and the evidence at trial demonstrated that Hild and his co-conspirators submitted above-market rates to a third party and also induced lenders into loans based on those inflated prices.  The precise combination of misrepresentations and omissions that Hild deployed to carry out this fraud are immaterial to "the essence of a crime," and instead make up "the particulars of how a defendant effected the crime." *Vilar*, 729 F.3d at 90.  "Discrepancies in the particulars of how a defendant effected the crime do not constructively amend the indictment." *Bastian*, 770 F.3d at 223.  The Court thus determines that there is no danger that the jury convicted Hild for a crime other than what is alleged in the indictment, *see Khalupsky*, 5 F.4th at 293, and that Hild has not made a showing of constructive amendment.  For similar reasons, because the evidence presented at trial did not "prove facts materially different from those alleged in the indictment," *D'Amelio*, 683 F.3d at 417, the Court finds that there was no prejudicial variance.

Accordingly, Hild's Rule 33 motion on the basis of constructive amendment or prejudicial variance is denied.

**CONCLUSION**

For the foregoing reasons, Hild's motions are denied.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entry 102.

Sentencing is hereby scheduled for January 27, 2023 at 4:00 p.m.  The parties shall refer to the Rule 10(A)(i) of the Individual Rules and Practices in Criminal Cases for the appropriate filing timeline for their sentencing submissions.


SO ORDERED.

Dated:      December 7, 2022
            New York, New York

_____
Hon. Ronnie Abrams
United States District Judge

64