# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MICHAEL HILD,

Defendant.

:
:
:
:
:
:
:
:

No. 19 Cr. 602 (RA)

## SENTENCING SUBMISSION ON BEHALF OF MICHAEL HILD

MORVILLO, ABRAMOWITZ, GRAND
IASON & ANELLO, P.C.

Brian A. Jacobs
Alexander M. Levine
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (fax)
bjacobs@maglaw.com

*Attorneys for Defendant Michael Hild*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 2

    A.   Childhood ................................................................................................................ 2

    B.   Early Adulthood ...................................................................................................... 4

    C.   Formation of Live Well Financial ........................................................................... 6

    D.   Michael's Modest Lifestyle and Revitalization of Richmond, Virginia, and the Chesapeake Bay ...................................................................................................... 7

    E.   Michael's Devotion to His Family and Friends ...................................................... 11

    F.   Impact of Prosecution............................................................................................. 14

SENTENCING DISCUSSION ................................................................................................ 16

    I.     THE APPLICABLE LEGAL STANDARD ................................................................. 16

    II.    THE ADVISORY GUIDELINES AND LOSS AMOUNT ........................................... 17

    A.   The Loss Amount Cannot Be Reasonably Estimated and May be Zero ...................... 17

    B.   Michael's Personal Gain ........................................................................................ 18

    C.   The Loss Amount Used to Calculate the Guidelines Range Overstates the Seriousness of the Offense ...................................................................................... 21

        1.   The Disproportionate Effect of the Fraud Loss Table ............................... 22

        2.   The ABA "Shadow Guidelines" Confirm that the PSR's Guidelines Calculation Far Overstates the Severity of the Crime ...................................................... 23

    III.   A SUBSTANTIALLY BELOW GUIDELINES SENTENCE IS JUST ...................... 24

    A.   Michael's History and Characteristics of a Lenient Sentence........................................ 25

    B.   The Nature and Circumstances of the Offense Are Mitigating Factors........................ 27

    C.   A Prison Sentence Will Not Further the Goals of Retribution or Specific or General Deterrence .............................................................................................................. 27

    D.   A Significant Variance is Necessary to Avoid Unwarranted Sentencing Disparities.... 29

CONCLUSION...................................................................................................................... 32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................... 16

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................ 22, 24, 26, 28, 29

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016) ................................................... 22

*United States v. Bahel*,
   662 F.3d 610 (2d Cir. 2011) ................................................... 20

*United States v. Banks*,
   55 F.4th 246 (3d Cir. 2022) ................................................... 21

*United States v. Booker*,
   543 U.S. 220 (2005) ................................................................ 16

*United States v. Bryant*,
   128 F.3d 74 (2d Cir. 1997) ..................................................... 17

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005) ................................................... 25

*United States v. Carmona-Rodriguez*,
   No. 04 CR 667RWS, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) ......... 26

*United States v. Caspersen*,
   No. 16-cr-414 (JSR) (S.D.N.Y. Dec. 7, 2016) ................................. 28, 30

*United States v. Confredo*,
   528 F.3d 143 (2d Cir. 2008) ................................................... 21

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012) ................................................... 17

*United States v. Corace*,
   146 F.3d 51 (2d Cir. 1998) ..................................................... 32

*United States v. Cuti*,
   No. 08 CR. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ...... 17

ii

*United States v. Deutsch*,
   987 F.2d 878 (2d Cir. 1993) ................................................................ 17

*United States v. Faibish*,
   No. 12-cr-265(ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) .................................. 21, 23

*United States v. Gonzalez*,
   647 F.3d 41 (2d Cir. 2011) ................................................................ 32

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................ 22, 25, 26, 27, 28

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008) .............................................................25-26

*United States v. Johnson*,
   No. 16-cr-457(NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ...................................... 24

*United States v. Johnson*,
   No. 17-cr-482 (Oct. 15, 2018, S.D.N.Y.) ................................................... 31

*United States v. McKinney*,
   No. 22-cr-20249, 2022 WL 17547467 (E.D. Mich. Dec. 9, 2022) ........................................ 25

*United States v. Park*,
   No. 16-cr-473(RA) (S.D.N.Y. Aug. 1, 2017) ............................................... 22, 30

*United States v. Pina*,
   No. 18 CR. 179, 2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019) ................................. 17

*United States v. Randell*,
   761 F.2d 122 (2d Cir. 1985) ................................................................ 16

*United States v. Ruiz*,
   No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982 (S.D.N.Y. May 10, 2006).............................. 26

*United States v. Skowron*,
   839 F. Supp. 2d 740 (S.D.N.Y. 2012) ...................................................... 20

*United States v. Stanley*,
   12 F.3d 17 (2d Cir. 1993) ................................................................. 21

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ..............................................................27-28

*United States v. Thurston*,
   544 F.3d 22 (1st Cir. 2008)..............................................................25-26

iii

*United States v. Uddin*,
    551 F.3d 176 (2d Cir. 2009) .................................................................................. 17

**Statutes**

18 U.S.C. § 3553 .........................................................................................................*passim*

18 U.S.C. § 3572(a) ............................................................................................................ 31

18 U.S.C. § 3664(a) ............................................................................................................ 31

18 USC § 3663A(b)(1)(B) ................................................................................................. 31

**Other Authorities**

American Bar Association, *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014),
    https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf ........................................................................................................................*passim*

Amy Baron-Evans, Sentencing by the Statute (Apr. 27, 2009),
    https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf ............................................................................. 29

Anderson's Neck Oyster Company, https://www.andersonsneck.com/conservation/ ......7-8, 10-11

"Hot Seat: Michael Hild," HousingWire (May 9, 2016),
    https://www.housingwire.com/articles/45840-hot-seat-michael-hild/ ................................2, 7-8

National Institute of Justice, Five Things About Deterrence,
    https://www.ojp.gov/pdffiles1/nij/247350.pdf. ....................................................................1-26

U.S. Sent'g Comm'n, *Guidelines Manual* (2021) ..............................................................*passim*

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf ............ 27

U.S. Sent'g Comm'n, Statistical Information Packet, FY 2020, S.D.N.Y. .................................. 31

U.S. Sent'g Comm'n, Statistical Information Packet, FY 2021, S.D.N.Y. .................................. 31

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of defendant Michael Hild, who is scheduled to be sentenced by Your Honor on January 27, 2023.  For the reasons set out below, we respectfully request that the Court impose a sentence of probation, or at the most, a sentence of incarceration substantially below the low end of the range recommended by the United States Sentencing Guidelines (the "Guidelines"), and below the ABA "Shadow Guidelines" range of 37 to 46 months.

The factors set forth in Section 3553(a) of Title 18, United States Code, support such a sentence, which would be sufficient but no greater than necessary.  First, Michael's history and characteristics weigh heavily in favor of leniency.  As the dozens of letters to the Court from Michael's family members and longtime friends demonstrate, Michael is a committed husband, son, brother, and friend.  Michael lives modestly with his wife of two decades in the same home they bought after they married, and has exhibited a decades-long commitment to his community, engaging in initiatives and working hard to improve housing and the local environment.  Second, the nature and circumstances of the offense also weigh in favor of leniency, as the conduct described in the Presentence Report was precisely the kind of "risk shifting" offense that the ABA Shadow Guidelines recognize is "generally less culpable than those where loss is specifically intended."  (Application Note 2(A)(3).)  Third, there is no need for specific deterrence, and any need for general deterrence will be amply satisfied by a below-Guidelines sentence.[1]  Finally, Michael's case compares favorably with others in this District in which

---

[1] In a 2016 bulletin published by the National Institute of Justice ("NIJ")—the research, development, and evaluation agency of the U.S. Department of Justice—the NIJ succinctly summarized that "increasing the severity of punishment does little to deter crime," that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime."  *See*

Courts have imposed substantially below-Guidelines sentences.

For all of these reasons and those set out below, we ask that the Court impose a sentence of probation, or alternatively, a sentence of below 37 months' imprisonment.

## BACKGROUND

### A.      Childhood

Michael was born in 1974, in Benton Harbor, Michigan, and raised by his mother and father primarily in Fort Wright, Kentucky, along with his younger brother.  (PSR ¶ 74–75.) Michael's father developed data processing systems for banks.  (PSR ¶ 74.)  His mother was a homemaker when Michael was young, and then later opened a bookstore and coffee shop that she ran with Michael's father.  (PSR ¶ 74.)

In many ways, Michael's upbringing was that of a typical middle-class family in the Midwest.  (*See* PSR ¶ 76.)  Michael attended Catholic school and regularly attended church services.  (PSR ¶ 76.)  From an early age, Michael's parents taught him a strong work ethic. Michael's first job was detasseling corn at the age of 13, for $3.80 per hour.[2]

Michael's brother is a ███████████████████████████████████ ████████████████████████████████████████████████████████████ ████████.  (Ben Hild Letter, Ex. 2 at 1.)  He describes Michael as his "mentor," "the first person to show me the true meaning of being a man and friend," and credits him for making him who he is:  "It is evident to say that I would not be where I am in my life if it were not for my older brother, Michael C. Hild!" (Ex. 2 at 1.)

---

National Institute of Justice, Five Things About Deterrence, https://www.ojp.gov/pdffiles1/nij/247350.pdf.

[2] "Hot Seat: Michael Hild," HousingWire (May 9, 2016), https://www.housingwire.com/articles/45840-hot-seat-michael-hild/

Even in his childhood, Michael "was an early achiever," graduating as "Student of the Year" from his middle school.  (Don Hild Letter, Ex. 3 at 1.)  At Covington Catholic High School, Michael had high grades and graduated near the top of his class.  (PSR ¶ 91; *see also* Don Hild Letter, Ex. 1; Marc Janson Letter, Ex. 37.)  Michael remains close with his childhood friends and Covington Catholic High School classmates, many of whom rallied in support of Michael throughout his trial and to today.  Michael's childhood friends describe him as "an honest person," "the guy that stood up for those that couldn't stand up for themselves" and someone who "<u>always</u> did the right thing."  (Steve Kramer Letter, Ex. 26 at 1; Alex Edmondson Letter, Ex. 9 at 1 (emphasis in original).)  One friend recalls that Michael "would tutor me in math and physics when I would struggle – which was frequently" and concludes, "my life has been better because I had Mike in my life."  (Marc Janson Letter, Ex. 37.)

The parents of Michael's childhood friends similarly recall him as a "an example of the right kind of kid," "the type of person a parent of four children would wish their children would hang out with," and "someone I could rely on to make sure my son didn't fall off the path." (Garry Edmondson Letter, Ex. 10 at 1; Joyce Edmondson Letter, Ex. 11 at 1.)  Like their children, they continued to support Michael through his trial, with one family even offering their home to Michael to live in in Kentucky while he prepared for trial.  (Joyce Edmondson Letter, Ex. 11 at 1.)

While Michael was in high school, his grandmother, then in her 90s, moved to live with Michael and his family.  (Bonnie Phillips Letter, Ex. 8 at 9.)  Michael's cousin recalls that it was Michael who—even though just a teenager—cared for his grandmother:

> She was in her 90s at this period, Michael would take Grandma to the library with him, find her a comfortable chair, a book to read and she just loved the fact that he would take the time to be with her. He would also drive her around the historic areas of Cincinnati and Kentucky, stopping to

3

> read outloud the signage at the places that were of interest, as her eyesight at a distance made it difficult for her. He would also take her out for an ice cream along the banks of the Ohio River. While most young men of this age are out and about, Michael and Grandma held a special bond.

(Bonnie Phillips Letter, Ex. 8 at 9.)  Another cousin characterized the way Michael cared for his grandmother—not the offense conduct here—as emblematic of his true character:

> He showed our aging Grandma (she lived to be 100) great compassion, patience and tenderness by including her in his daily activities, whether they were faith, academic or sports related.  These are some of the character traits which define my cousin Mike.  He is a kind and gentle soul.  He cares deeply about his family, his faith and his community.  The acts to which he has been found guilty are not consistent with the Mike that I know and dearly love.

(Gail Gersonde Letter, Ex. 15 at 1.)

**B.    Early Adulthood**

In 1993, Michael enrolled in Cornell, where he continued to be a strong student even as he played Division I football as a wide receiver.  (PSR ¶ 90.)  Michael repeatedly made the Dean's List and participated in the competitive "Cornell in Washington" program, at which he interned at the Federal Reserve Board.  (PSR ¶ 90.)

After Michael graduated with a Bachelor of Arts degree in economics, he began working as an analyst for Cigna Retirement and Investment Services, in Hartford, Connecticut. (PSR ¶ 96.)  From 1998 to 2006, Michael worked at Capital One, rising to the level of business manager.  (PSR ¶ 95.)  While working at Capital One, Michael completed an executive education program at the University of Virginia's Darden School of Business.  (PSR ¶ 92.)

In 1999, Michael met his wife, Laura, who is currently the Studio Practice Leader for Health Interiors at the Richmond, Virginia office of an architecture and commercial design firm. (PSR ¶ 78; Laura Hild Letter, Ex. 1.)  Laura describes her and Michael as "best friend[s]," and

notes that he "was then and is now attentive, smart, caring, creative, and had a tremendous amount of drive." (Laura Hild Letter, Ex. 1 at 1.)

Michael and Laura have supported each other through difficulties in their more than 23 years together. Shortly after Michael and Laura were engaged, Michael's mother was diagnosed with ███████. (Laura Hild Letter, Ex. 1 at 2.) At first, Michael's mother recovered, but her ████ returned. (Laura Hild Letter, Ex. 1 at 2.) Michael helped pay for his mother's medical bills and cared for her until she passed away at the age of 56, in 2002, shortly before Michael and Laura's wedding. (Laura Hild Letter, Ex. 1 at 2.)

The death of Michael's mother had a significant impact on Michael. Michael's mother was "his confidant in many ways" and "[t]hey shared a strong bond with one another." (Laura Hild Letter, Ex. 1 at 2.) In addition to having to provide emotional ballast for his family, Michael rescued his family from financial ruin. As Laura recalls:

> This tremendous amount of pressure and responsibility was passed on to Mike far too early. Mike had to immediately take action so that his Dad wouldn't be in financial ruin. He not only bailed out his dad, but he also paid off the student debt that his brother had accrued during college. The financial burden that Mike took on[] overshadowed his time to properly mourn his Mother's passing.

(Laura Hild Letter, Ex. 1 at 2.) In particular, Michael stepped in to rescue the bookstore and coffee shop founded by his mother because his father was unable to carry on the business. After his father "could not bear to operate the wine/book bar without his devoted wife and partner, Mike formed a partnership with two friends . . . to keep his parents' dream alive." (Shannon Tomlinson Letter, Ex. 5 at 1.) In doing so, "[h]e put [on hold] his dreams of owning a house to try to keep his mother[']s wine bar/coffee shop going. He also paid off his brother[']s college debt." (Joanne Hendrix Letter Ex. 22 at 1.)

Today, Michael is sponsoring Laura in her conversion to Roman Catholicism via the Rite of Christian Initiation of Adults.  If incarcerated, Michael would be unable to fulfill his duties, thus risking Laura's conversion.

### C.   Formation of Live Well Financial

Michael founded Live Well Financial in his kitchen in 2005, a few years after his mother's death, to address a problem his family experienced firsthand.  In the years after the death of Michael's mother, Michael "saw his own father struggle in retirement to maintain his lifestyle while owning assets free and clear."  (Shannon Tomlinson Letter, Ex. 5 at 1.)  "Mike then noticed that more than his father was in this same predicament.  Mike was a problem solver, who devised a way to fulfill a societal need:  reverse mortgages."  (Shannon Tomlinson Letter, Ex. 5 at 1.)  Laura explains:  "Live Well was started for the sole purpose in helping senior citizens financially in their later years.  Mike saw it as an opportunity to help not only seniors but it also gave him a chance to start his own business."  (Laura Hild Letter, Ex. 1 at 2.)  Consistent with his mission, an early beneficiary of Live Well was Michael's aging uncle, who was able to remain in his beloved home of 40 years on a nature sanctuary, which he would not have been able to afford without Michael's help.  (Philip Hild Letter, Ex. 12 at 1.)

Live Well was a bootstrapped venture.  Michael "put everything he had into the company," which was initially funded primarily through Michael's own personal investment.  (Laura Hild Letter, Ex. 1 at 2.)  As Michael raised money from his close friends and family, he "always made sure the payments were made on time and he even had Live Well Financial pay off the remaining balance early."  (S. Blair Korschun Letter, Ex. 31 at 2.)

### D.    Michael's Modest Lifestyle and Revitalization of Richmond, Virginia, and the Chesapeake Bay

Ultimately, Live Well became a successful business due to its focus on mortgages—not the bonds at issue in his trial.  "Even when Live Well became profitable, Mike and Laura remained modest in their lifestyle and expenditures."  (Shannon Tomlinson Letter, Ex. 5 at 2.) Michael and Laura still live in the three-bedroom rowhouse in Richmond, Virginia they purchased for approximately $300,000 in 2003 (PSR ¶ 80)—the same home he founded Live Well from.  Despite their success, Michael and Laura continued to live a modest lifestyle:

> They never caught themselves up in the 'Executive' lifestyle and affect. They live in the same house, a modest one, which they bought when they were first married.  They drive older vehicles.  No grand vacations.  No boats.  They live a modest and simple life.

(Shannon Tomlinson Letter, Ex. 5 at 1.)

Instead of living a lavish lifestyle, Michael and Laura have dedicated themselves to revitalizing the local environment and economy.  In 2010, Michael and Laura bought land on a tributary to the Chesapeake Bay formerly owned by a logging company with the intent of creating a wildlife preserve.  (Beverly Bach Letter, Ex. 6 at 1.)  Upon seeing old oyster shells on the property, they learned that oysters local to the area were historically essential to cleaning up pollution, but had been depleted.  (Beverly Bach Letter, Ex. 6 at 1.)  Michael and Laura started a sustainable, solar-powered oyster farm dedicated to restoring the "keystone species" "from scratch" by planting local oysters in the York River, an estuary that is connected to the Chesapeake Bay.  (Laura Hild Letter, Ex. 1 at 3; Anderson's Neck Oyster Company, https://www.andersonsneck.com/conservation/; "Hot Seat: Michael Hild," HousingWire (May 9,

2016), https://www.housingwire.com/articles/45840-hot-seat-michael-hild/.)  It is estimated that the oysters have cleaned and filtered more than 77 billion gallons of water to date.[3]

Michael and Laura were "not hands off" owners of the oyster farm.  (Shannon Tomlinson Letter, Ex. 5 at 2.)  They dedicated "countless hours" to planting and harvesting oysters and growing the oyster farm "from the ground up."  (Kellie Steger Letter, Ex. 24 at 1.)  In the early days of the oyster farm, Michael and Laura could not afford to hire any staff, so he would use his vacation time at Live Well and "spend Thursday's harvesting oysters and driving them to Richmond restaurants for deliveries," "every week without fail."  (Laura Hild Letter, Ex. 1 at 3.)  "Many vacations and holidays were sacrificed to make sure the oysters were regularly attended to by ensuring their growth and survival."  (Laura Hild Letter, Ex. 1 at 3.)

Laura fondly recalls an instance in which they raced back from a long-weekend wedding anniversary trip in Charleston, South Carolina, to Virginia in the middle of a hurricane to save thousands of oysters:

> I will never forget the time we spent transporting thousands of oysters to safer waters during a hurricane. We were traveling through the storm from Charleston, South Carolina to make it back to the farm before it hit Virginia. To say that we were concerned was an understatement. We had spent so much time growing our oyster babies, it would have been devastating to lose them. Mike was determined to get back and move every cage in the middle of the storm. And without fail, we made it just in time and found the strength to persevere and transport many, heavy oyster cages to calmer waters.

(Laura Hild Letter, Ex. 1 at 3.)  A longtime friend notes:  "Was this business very profitable? No, but they felt the cause was worth it."  (Shannon Tomlinson Letter, Ex. 5 at 2.)  In addition to working the oyster farm, Michael and Laura "were active in lobbying for these waterways to be protected."  (Shannon Tomlinson Letter, Ex. 5 at 2.)

---

[3] Anderson's Neck Oyster Company, https://www.andersonsneck.com/conservation/

A close friend described Michael's involvement with the oyster farm as representative of the approach he takes in all facets of his life:

> One of the things I've always admired about Mike is how deeply invested he gets into any of his endeavors and that he enjoys the hard work and putting the time in; he has never been one that looks for the easy way to do anything.  We spent many weekends setting up and working on the oyster farm that he and Laura built.  Mike was always adamant about processes and procedures, proper permits, and required equipment – he never cut corners or took shortcuts.

(Wilson Rayfield Letter, Ex. 20 at 1.)

The oyster farm was a "catalyst" for Michael's and Laura's other civic endeavors.  Laura explains that the oyster farm "led us to a neighborhood called Manchester in Richmond.  There, we were hopeful in making a difference in a community that hadn't seen good times in quite some time.  We wanted to bring joy and uplift a neighborhood that had been down on its luck and in some respects forgotten."  (Laura Hild Letter, Ex. 1 at 3-4.)

Michael and Laura started a tree planting campaign in Manchester, which had been "devoid of green space given its extension to downtown Richmond."  (Laura Hild Letter, Ex. 1 at 4; Beverly Bach Letter, Ex. 6.)  Michael coordinated with the city arborist and recruited more than 100 volunteers and many sponsors (including Live Well), who came together to plant 100 trees on a rainy day.  (Laura Hild Letter, Ex. 1 at 4.)  As with Michael's other endeavors, he continued in his hard work.  For years, Michael "made sure the trees were watered on a regular basis to ensure their survival."  (Laura Hild Letter, Ex. 1 at 4.)  Then, Michael organized tree-trimming volunteer events and neighborhood clean-ups.  (Wilson Rayfield Letter, Ex. 20 at 1.)

Next, Michael and Laura rehabilitated homes in the area, "gutting and renovating" a number of boarded up and "derelict homes" previously owned by the Richmond Redevelopment and Housing Authority.  (Wilson Rayfield Letter, Ex. 20 at 2.)  An architect in Richmond, Virginia explains, "there was no way this would be a profitable endeavor due to the amount of

work required to make them [] habitable," but Michael and Laura "were very deliberate about wanting to have a positive impact on the community beyond the retail corridor." (Wilson Rayfield Letter, Ex. 20 at 2.) A historic preservationist similarly notes that these were "costly labors of love" for Michael and Laura that were a "gift to a community that had been underserved and generally forgotten," such that the "police would not even enter this area, unless for a great reason, due to the dangerousness of the general area." (Shannon Tomlinson Letter, Ex. 5 at 2.)

Michael and Laura also personally invested their time and money into starting local businesses. A longtime friend and former vendor of Live Well recalls Michael's excitement for opening a local doughnut shop called "Hot Diggity Doughnuts." (Kellie Steger Letter, Ex. 24 at 1.) Despite the fact that the local neighborhood had "seen years of decay and crime," Michael believed that with local businesses he could "build something that would benefit the neighborhood." (Kellie Steger Letter, Ex. 24 at 1.) Like the oyster farm, Michael spent "countless hours" working on the business, "making sure everything was perfect including the doughnut recipe," and discussing his intention to ensure "his employees were joyful." (Kellie Steger Letter, Ex. 24 at 1.)

Michael's efforts to revitalize the community have been successful. One resident of Richmond since 1986 notes that he has "seen the city rise from a place of deterioration and disparity to a thriving and prosperous city largely due to individuals like Michael." (William Means Letter, Ex. 33 at 1.)

If incarcerated, Michael's family's local businesses will likely collapse. Michael has undertaken "the lion['s] share of the work helping to run" these businesses, including Anderson's Neck Oyster Company, Church Hill Ventures, Kingfisher LLC, Gardenia LLC, and Butterbean

Market.  (Laura Hild, Ex. 1 at 6.)  Michael's prosecution has already strained these businesses and made it difficult to hire staff.  Since Laura is working full-time and unable to manage the businesses herself, they will likely shut down if Michael is incarcerated.  The shuttering of these businesses could well set off a chain of bankruptcies, which could lead to a clawback of historic tax credits used by Laura to renovate the derelict homes in Manchester, further imperiling Laura's financial freedom.

Michael has also been active in other community organizations and charities.  Michael has dedicated "countless hours to his church" (Bonnie Phillips Letter, Ex. 8 at 9) and "volunteered at a homeless shelter to bathe those who could not accomplish that on their own." (Ben Hild Letter, Ex. 2 at 1.)  The National Multiple Sclerosis Society sought to recognize Michael's work in the community by naming him as "an honoree at the 34th annual Dinner of Champions," but he turned it down, believing "he was too young to deserve such an honor" and that "the spotlight shouldn't be about him but the community instead."  (Laura Hild Letter, Ex. 1 at 4-5.)

A friend of Michael's and Laura's for more than twenty years sums up the way Michael and Laura eschewed the more extravagant lifestyle available to them in order to benefit their community:

> These are the people that I know and love.  These are the people solving problems for our elderly, the disenfranchised, and the forgotten.  These are the people, who have always lived modestly because their causes were more important.  Frankly, living the "wealthy or privileged" lifestyle has never been their desire or motivation.

(Shannon Tomlinson Letter, Ex. 5 at 2.)

### E.    Michael's Devotion to His Family and Friends

As evidenced by the dozens of letters written in support of Michael by his friends and family, Michael has a strong support system and community.  The letters span decades of

Michael's life, including family members who have known him since birth, lifelong friends, a high school teacher and coach in Kentucky, and former work colleagues.

Michael is a dedicated brother, uncle, and son.  Michael's younger brother notes how Michael has constantly been by his side, through divorce, when he "was a complete mess and had a hard time focusing on life" and when his young son ███████████████████████ █████  (Ben Hild Letter, Ex. 2 at 1.)  "Mikey," as his niece and nephew refer to their only uncle, "loves to get on the floor to play with them for hours" and has been "an amazing role model." (Jennifer Hild Letter, Ex. 4 at 1.)  When Michael's teenage nephew "graduated from high school and was lost for a summer," Michael took him in for a week and served as a mentor.  (Bonnie Phillips Letter, Ex. 8 at 9.)

Today, Michael "is the primary caretaker for his father," who is in his late-70s and ███ ██████████████:  he is ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████  he suffered upon arriving in New York on the eve of Michael's trial. (Shannon Tomlinson Letter, Ex. 5; Don Hild Letter, Ex. 3.).  Michael's father's wife has also ███ █████████████████████████████████.  If imprisoned, Michael will not be able to care for his father.

In addition to being there to support his family through major life events, Michael has dedicated his time to his family and friends in more mundane ways:  from "helping with house renovations, Mike alone painting my dining room 5 coats of Plum Purple making sure that it was properly covering the wall without imperfection, to most importantly helping us by babysitting our daughter."  (Jacob Dyer Letter, Ex.13 at 1.)  A friend recalls that in addition to always being available during difficult times, Michael was "that friend that I knew I could call in a pinch –

once, while I was out of town, he was the guy I called to help my wife by changing a tire in the middle of a hot summer day." (Wilson Rayfield Letter, Ex. 20 at 1.)

In dozens of letters, Michael's family, friends, and former co-workers give specific examples of Michael's integrity. Michael's father recalls that decades after Michael left Capital One, a stranger approached him, and upon realizing that he was Michael's father, "raved on and on, almost to a point of embarrassment, that he never worked for a more honest and moral boss than Mike." (Don Hild Letter, Ex. 3 at 1.) Another former business partner recalls that he "made sure that everyone was held to the highest ethical standards." (Steve Kramer Letter, Ex. 26 at 1.) One former banking officer describes Michael as "one of the most honest, intelligent, helpful, caring, giving and genuine people I have ever met," noting that Michael taught him about the reverse mortgage industry even as he brought on Live Well's competitors as clients. (Louis Berthelette Letter, Ex. 21 at 1.)

A common refrain from Michael's family and friends is that Michael's case and the underlying conduct portrayed by the government at trial are not consistent with Michael's character:

- "I served as the local elected County Attorney for 21 years before my retirement. Before that I was both a public defender and prosecutor in Police Courts. . . . It was with complete shock that I learned about the allegations against Mike. He is the last person I would ever believe would knowingly involve himself in activities of which he stands convicted. It is totally out of character of the person I've known, watched grow up and admired." (Garry Edmondson Letter, Ex. 10 at 1.)

- "[T]he acts to which he has been found guilty are completely inconsistent with his prior history. He is a very responsible son, brother, husband, and real friend to all that truly know him." (Ernie Flokowski Letter, Ex. 30 at 1 (emphasis in original).)

- "I was a bit shocked by this news as all of this seems out of character for Michael and is not consistent with my interactions with him over many years." (S. Blair Korschun Letter, Ex. 31 at 1.)

- "[W]hile I realize that Mike was found guilty, this is not the Mike I have known for most of my adult life." (Steve Kramer Letter, Ex. 26 at 1.)

- "[T]he acts to which he has been found guilty contradict his prior history [and] character!"  (Ben Hild Letter, Ex. 2 at 2.)

- "While it is my personal opinion, based on my family experiences over all these decades, my knowledge and interactions with Michael's character[,] I am obliged to state the acts to which Michael has been found guilty are inconsistent with his prior history."  (Bonnie Phillips Letter, Ex. 8 at 10.)

- "Based on my knowledge of Mike's character, the acts to which he has been found guilty are inconsistent with my prior experiences of Mike."  (Steven Epplen Letter, Ex. 18 at 2.)

- "I knew of the allegations surrounding Michael, I truly never would have believed he could be guilty of them."  (Stephen Raine Letter, Ex. 28 at 1.)

- "Since first learning of the circumstances leading to the closure of Livewell Financial, I have been in a state of shock.  The Mike that I have known for so long has always been a strict rule follower."  (Wilson Rayfield Letter, Ex. 20 at 1.)

- "Based on my knowledge of Mike's character, the acts to which he's been found guilty are surprising and inconsistent with any history I've had with him." (Tammy Sittinger Letter, Ex. 14 at 1.)

- "Nothing that I have witnessed, or known about Mike . . . [and n]othing in Mike's life would ever lead one to even contemplate the verdict against him." (Shannon Tomlinson Letter, Ex. 5 at 1-2.)

- "I can confidently without question state that I'm shocked by what has been insinuated and the charges brought against Mike.  The guilty verdict does not register for me based on the Mike that I know and have known for half my life." (Laura Hild Letter, Ex. 1 at 5.)

**F.    Impact of Prosecution**

Michael's conviction has already had a devastating impact on Michael and his family.

Michael's case was closely followed by the local press in the Richmond and Cincinnati areas

where Michael and his family live.  Michael's and Laura's lives are "plague[d]" by "constant

negative shaming, hatred, gossip, harassing, [and] stalking."  (Laura Hild Letter, Ex. 1 at 6.)

With the collapse of Live Well, Michael lost his sizable investments in the company and

nearly all of his assets.  Michael's wife's job is in potential jeopardy due to Michael's conviction

and the surrounding press coverage, which has spanned years and many dozens of articles

detailing the government's allegations.  (PSR ¶¶ 78, 93.)  Michael has been named in several

14

civil lawsuits related to Live Well, including actions brought by the SEC and bankruptcy trustee of Live Well, and his ongoing legal expenses far outpace his wife's income.  (PSR ¶ 97.)

Regardless of the sentence imposed, this case, related litigation, and ensuing publicity will continue to affect Michael and Laura, who, in the wake of the publicity surrounding this case, has had to file for a protective order at the recommendation of police for her safety and welfare.  A prison sentence would also impact Michael's family.  As a longtime friend of Michael's states:

> Mike also is the primary caretaker for his father, Don.  As Mike has always supported others, his father is no exception.  He has recently had ███████████████████.  If Mike were to be sent away to prison for the majority of his life, not only will this surely kill his father, in the interim, there would be no one to care for him.

(Shannon Tomlinson Letter, Ex. 5 at 2.)  Because his wife also suffers from significant health issues, Michael's father will be left without a caretaker if Michael is incarcerated.[4]

---

[4] As set forth in the post-trial motions, Michael was ill-served by his trial counsel, whom the Court recognized was mired in other litigation that "implicated matters critically important to [trial counsel] on a personal level," thus presenting "unusual and troubling circumstances" in Michael's case.  (Dkt. 140 at 3 & 38.)

## SENTENCING DISCUSSION

The Section 3553(a) factors weigh in favor of leniency in this case.  Michael's history and personal characteristics, including his significant contributions to his community, and a consideration of the "Shadow Guidelines" and other cases in this District, all weigh in favor of a sentence of probation, or at the most, a sentence of less than 37 months' imprisonment.[5]

## I.    THE APPLICABLE LEGAL STANDARD

Since *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing Guidelines are advisory.  Although "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the Guidelines are merely the "starting point and initial benchmark."  *Gall v. United States*, 552 U.S. 38, 39 (2007) (internal citations and quotations omitted).  The Court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented."  *Id.* at 39.  The Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" of sentencing. *Id.*  (Emphasis added.)

---

[5] To the extent the Court imposes a prison sentence, we plan to move for bail pending appeal.  A court may grant bail pending appeal if it finds that:  (1) the defendant is not a flight risk or danger to the community, (2) "the appeal is not for the purpose of delay," (3) "the appeal raises a substantial question of law or fact," and (4) if the substantial question is determined favorably to the defendant on appeal, the "decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed."  *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).  A "substantial question" may be one that is "novel, which has not been decided by controlling precedent," or "that very well could be decided the other way."  *Id.* (quotations omitted).  Michael has been on bail without incident since September 2019.  He poses no risk of flight or danger to others.  Regarding the last two factors, the Court recognized that Michael's motion for a new trial on the basis of his trial counsel being conflicted in his representation of him "raises a novel legal argument [], which presents a challenging question" in an area with "little relevant case law."  (Dkt. 140 at 2 & 39.)  If Michael were to prevail on appeal, he would be granted a new trial, thus satisfying the *Randell* factors.

16

## II.      THE ADVISORY GUIDELINES AND LOSS AMOUNT

Based on a loss amount of approximately $95 million supplied by the government, the Probation Office has calculated an advisory Guidelines range of 262 to 327 months.  (PSR ¶ 108.)  Of the Probation Office's calculated offense level of 39, 24 levels are attributable to the estimated loss amount.  (PSR ¶¶ 59 & 68.)  The calculated loss amount is speculative, however, and in any event, dramatically overstates the seriousness of the offense.

### A.      The Loss Amount Cannot Be Reasonably Estimated and May be Zero

Loss must be established by a preponderance of the evidence.  *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009).  "In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation."  *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012).  While the Guidelines do not require "certainty," they do require that the loss be "a reasonable estimate based on the available facts."  *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997).

Where a loss amount alleged by the government and victims is speculative, a court must disregard it for sentencing purposes.  *See, e.g.*, *United States v. Pina*, No. 18 CR. 179 (JSR), 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (not crediting portion of loss asserted by government that was unsupported by evidence and speculative); *United States v. Cuti*, No. 08 CR. 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (finding no loss shown for sentencing purposes despite government's and probation office's claimed loss amount of $20 million to $50 million because evidence did not show that victims relied exclusively on fraudulent information in overpaying); *see also United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (vacating sentence where trial court's approximation of loss amounted to "pure speculation").

17

The government has estimated a loss of approximately $95 million; according to the Presentence Report, the lenders provided statements asserting that the actual loss was approximately $85 million.  (PSR at 37.)  These figures are highly speculative and inaccurate, however, because the lenders received the bonds upon the default of Live Well.  These bonds continue to produce income for the alleged victims, such that the actual loss cannot be determined and could even result in a profit for the lenders.[6]  As evidenced by Live Well's continued payments on the loans until its bankruptcy, the loans generally performed as expected while they were held by Live Well.  Additionally, the lenders have filed civil suits against Live Well that may result in them recouping some of their alleged loss and potentially incurring no loss.  For example, in early 2021, IDC agreed to settle claims by the trustee of Live Well and a lender for $29 million.  *In re Live Well Financial, Inc.*, No. 19-11317 (Bankr. D. Del. Mar. 3, 2021), Dkt. 304.

### B.      Michael's Personal Gain

Where, as here, the loss "reasonably cannot be determined," the Guidelines instruct a court to calculate the loss amount as "the gain that resulted from the offense."  Guidelines § 2B1.1, Application Note 3(B).  A fair approximation of Michael's personal gain resulting from the offense is less than $9.5 million.

The Government has asserted that Michael personally gained $22,606,752 in salary and bonus as a result of the fraudulent pricing scheme.  (Dkt. 114 at 6.)  To arrive at its estimate, the government crudely subtracts Michael's salary in 2014 from his total compensation, including personal guarantee fees and director's fees, in each of the years 2015 through 2019.  (*Id.*)  The

---

[6] If the lenders sold the income-generating bonds instead of holding them, they did so at their own risk, particularly since the bonds were extremely complex and required an educated marketplace.  (*See, e.g.*, Tr. 235, 1275.)

government's methodology is based on a fundamental misunderstanding regarding Michael's compensation for personally guaranteeing Live Well's debts and overstates Michael's compensation attributable to the pricing scheme.  Further, the government did not account for the taxes Michael paid on this income.

From 2015 through 2019, Michael received $9,586,230 in salary and bonus.  (GX-2000.)  If, as the government proposes, Michael's 2014 salary and bonus of $845,138 is subtracted from each of the years 2015 through 2019, Michael's salary and bonus falls well below the $9.5 million loss amount that results in a 20-level enhancement.[7]  (*See* Guidelines § 2B1.1(b)(1).)

The government asserts, however, that Michael's remaining remuneration of personal guarantee fees and director's fees—totaling $13,287,637 and $1,303,025, respectively—are attributable to the offense because the fraud provided Michael with the necessary liquidity to buy out Live Well's preferred shareholders and institute the personal guarantee fees and director's fees.  (*See* Dkt. 114 at 6; GX-2000.[8])

This connection is highly speculative and undercut by the record at trial.  The government's own cooperating witness testified that Live Well commissioned an outside consultant to make a recommendation on the personal guarantee fees, which the other director,

---

[7] Even this calculation overstates Michael's gain resulting from the offense because it does not account for any growth in Michael's legitimate compensation since 2014.

[8] Michael's compensation from 2014 through 2018 was set forth in GX-2000:

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Salary and bonus | $845,138 | $1,426,952 | $3,514,047 | $3,428,909 | $1,216,322 |
| Guarantee fees | $0 | $0 | $1,495,480 | $5,142,903 | $6,649,254 |
| Director's fees | $0 | $0 | $0 | $1,131,125 | $171,900 |
| TOTAL | $845,138 | $1,426,952 | $5,009,527 | $9,702,937 | $8,037,476 |

Stuart Cantor, approved, with Michael abstaining from the vote.  (Tr. 1134; *see also* Tr. 1771

(Cantor testifying: "we had the discretion do whatever we did, but we relied on the consultant.

We felt that was the proper way to handle that situation.").)  These fees were remuneration for

Michael having personally guaranteed Live Well's debt—at great personal risk, as evidenced by

the ongoing litigation by lenders against Michael on account of his guarantees—from the early

years of the company, including on loans that were not related HECM IO bond portfolio.  (*See*

Tr. 1591–92 (cooperating witness agreeing that Michael "guarantee[d] a whole lot of corporate

debt" and "had the most financially to lose" as a result of those guarantees), 1733.)  Michael was

the only one who guaranteed Live Well's debt, and the preferred shareholders discussed

compensating Michael for this risk before their buyout.  (Tr. 1733–34.)  Live Well also

commissioned the consultant, whom Mr. Cantor located, to make a recommendation as to

historical and current directors' fees, which the board of directors approved.  (Tr. 1139, 1448,

1905.)

To determine loss based on the defendant's gain, the court must make a "reasonable

estimate" of the loss that resulted from the offense.  Guidelines § 2B1.1, Application Note 3(B);

*cf. United States v. Skowron*, 839 F. Supp. 2d 740, 752 (S.D.N.Y. 2012) (estimating that 20% of

trader's total compensation resulted from the offense and ordering restitution in that

amount), *aff'd*, 529 F. App'x 71 (2d Cir. 2013); *see also United States v. Bahel*, 662 F.3d 610,

650 (2d Cir. 2011) (affirming order of 10% of total compensation as restitution).

Because the government has not linked Michael's compensation with the fraud that

Michael was convicted of and the evidence shows that a significant portion of Michael's

remuneration was unrelated to any fraud, to the extent the Court seeks to use Michael's gain to

approximate loss, the Court should apply a significant discount to the government's estimated

compensation of $22.6 million to determine the proper amount of gain attributable to Michael.

Applying a discount of only 60% to account for the significant portion of Michael's

compensation unrelated to any fraud results in a loss amount of less than $9.5 million—a 20-

point enhancement under the Guidelines.[9]

### C.     The Loss Amount Used to Calculate the Guidelines Range Overstates the Seriousness of the Offense

Regardless of the approach to loss, the Court may avoid a hearing if it decides to impose

a substantially below-Guidelines sentence that is not dependent on the disputed loss amount.

*See, e.g.*, *United States v. Faibish*, No. 12-cr-265(ENV), 2015 WL 4637013, at *3 (E.D.N.Y.

Aug. 3, 2015) (declining to hold *Fatico* hearing because it planned to impose a below-Guidelines

range not dependent on the disputed loss amount).  Because the Guidelines dramatically

overstate the seriousness of the offense, the Court should impose probation, or at most, a

substantially below-Guidelines sentence.

---

[9] To the extent the government seeks to rely on intended loss rather than actual loss, that approach is unsupported by the Guidelines, as the Third Circuit recently recognized in holding that "the ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss.'"  *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022); *see also United States v. McKinney*, No. 22-cr-20249, 2022 WL 17547467, at *7–9 (E.D. Mich. Dec. 9, 2022) (finding *Banks* "persuasive" and granting defendant's objection to PSR.)  Even if the Court were to calculate the intended loss, the evidence at trial showed that Mr. Hild believed that the loans would be repaid, such that there was no intended loss.  *See United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (noting if defendant expected a portion of a loan to be repaid, that amount would not count as an intended loss for sentencing purposes); *see also United States v. Stanley*, 12 F.3d 17, 21 (2d Cir. 1993) (vacating sentence because district court in part because district court did not indicate whether it found that defendant intended to defraud each of his clients).  Indeed, prior to the SEC's investigation, Live Well paid its obligations and it did not default on any debts until 2019, at the time of its wind down.  (*See* Tr. 1959 & 1970–72.)

### 1.      The Disproportionate Effect of the Fraud Loss Table

The Second Circuit has recognized the disproportionate effect a high loss amount can

have on a sentence and has invited district courts "to consider whether the significant effect of

the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines

sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding for trial

court to consider whether "significant effect of the loss enhancement" increasing defendant's

Guidelines offense level from 6 to 16 warranted a below-Guidelines sentence); *see also*

Guidelines § 2B1.1 Application Note 21(C) (noting that the basis for a "downward departure

may be warranted" where the offense level "substantially overstates the seriousness of the

offense").

As Your Honor recognized in a fraud sentencing involving tens of millions of dollars, "in

many instances, loss amount on [its] own is an imprecise and imperfect measure of culpability."

*United States v. Park*, No. 16-cr-473(RA), Dkt. 44 at 47 (S.D.N.Y. Aug. 1, 2017).  Other

sentencing courts in this District have also recognized the "inordinate emphasis that the

Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss"

such that they "lead to a result so patently unreasonable as to require the Court to place greater

emphasis on other sentencing factors to derive a sentence that comports with federal law."

*United States v. Adelson*, 441 F. Supp. 2d 506, 506-509 (S.D.N.Y. 2006) (sentencing securities

fraud offender to 3.5 years instead of life imprisonment called for under government's

Guidelines calculation), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *see also United States v. Gupta*,

904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (noting "huge increase in the recommended

Guidelines sentences for securities fraud cases" due to emphasis on loss amount resulted in

calculations that "are no longer tied to the mean of what federal judges had previously imposed

22

for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data."), *aff'd*, 747 F.3d 111 (2d Cir. 2014).

Here, 24 levels of Mr. Hild's total offense level of 39 are attributable to the loss amount, dramatically altering the Guidelines range from 18–24 months to 262–327 months—a nearly threefold increase in total offense level and a 13-fold increase in advisory Guidelines sentence.

### 2. The ABA "Shadow Guidelines" Confirm that the PSR's Guidelines Calculation Far Overstates the Severity of the Crime

Recognizing the Guidelines' outsized focus on loss amount in fraud cases, the American Bar Association formed a task force of judges and scholars to propose alternative guidelines in cases such as Mr. Hild's.  *See generally* American Bar Association, *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014) (hereinafter "Shadow Guidelines").[10]  The Shadow Guidelines focus more holistically on the culpability of the defendant rather than just the loss amount in driving the sentence.

The Shadow Guidelines are particularly appropriate here because the Guidelines dramatically overstate the seriousness of the offense.  *See, e.g.*, *Faibish*, No. 12-CR-265 ENV, 2015 WL 4637013, at *2 (considering Shadow Guidelines and "common sense" in finding that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [defendant's] sentencing range beyond any reasonable proportion to his crimes").

Even if the Court applies the estimated loss of $95 million—which is speculative and overstated, *see supra* II.A—the Shadow Guidelines would likely result in a sentencing range of

---

[10]https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

37 to 46 months based on a total score of 21 points:  7 points for the base offense, plus 14 points

for the estimated loss.[11]  A consideration of Michael's personal characteristics, including his

longtime dedication to his community, and the other Section 3553(a) factors weigh in favor of a

more lenient sentence than the 37-46 month range the Shadow Guidelines would suggest as a

starting point.

## III.    A SUBSTANTIALLY BELOW GUIDELINES SENTENCE IS JUST

The Section 3553(a) factors weigh in favor of probation, or at most, a substantially

below-Guidelines sentence that is below even the 37-month low end of the Shadow Guidelines.

Where, as here, a significant alleged loss amount causes "the calculations under the

guidelines [to] so run amok that they are patently absurd on their face, a Court is forced to place

greater reliance on the more general considerations set forth in section 3553(a)."  *Adelson*, 441 F.

Supp. 2d at 515, *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *see also United States v. Johnson*, No. 16

Cr. 457 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (where "application of the

loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more

heavily" on the factors outlined in Section 3553(a)).

Section 3553(a) requires that a court impose a sentence that: (a) "[reflects] the

seriousness of the offense, [promotes] respect for the law, and [provides] just punishment for the

---

[11] The Shadow Guidelines would likely not provide for any enhancement based on culpability or victim impact.  As the Shadow Guidelines explain, "risk shifting" offenses that are not specifically intended to cause losses, such as making "false statements for the purpose of obtaining a bank loan that is intended to be repaid," are "generally less culpable than those where loss is specifically intended."  Application Note 2(A)(3).  The Shadow Guidelines would not provide for any enhancement due to the victim impact because the loss was borne by institutional lenders losing the value of their loans.  *See* Application Note 3(B) ("It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution.").

offense"; (b) "[affords] adequate deterrence to criminal conduct"; (c) "[protects] the public from further crimes of the defendant"; and (d) "[provides] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).  In addition to these mandatory factors, § 3553(a) also directs the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the Guidelines and any policy statements; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(1), (3)–(7).  These factors militate toward a substantial variance below the Guidelines range.  The Probation Office implicitly agrees, having recommended a below-Guidelines sentence of 180 months.  (PSR at 38.)

### A.      Michael's History and Characteristics Weigh in Favor of a Lenient Sentence

Michael's decades-long commitment to his local community and environment, among other personal characteristics, counsels toward a lenient sentence.  Courts recognize that a history of community involvement weighs in favor of a downward variance.  *See, e.g.*, *United States v. Canova*, 412 F.3d 331, 358–59 (2d Cir. 2005) (affirming downward departure based on defendant's history of public service and good works); *Gupta*, 904 F. Supp. at 353 (noting that securities fraud offender "devoted a huge amount of time and effort" to charities in sentencing defendant to 24 months' imprisonment despite Guidelines range of 78 to 97 months' imprisonment); *see also, e.g.*, *United States v. Howe*, 543 F.3d 128, 137–38 (3d Cir. 2008) (affirming a sentence of probation with three months' home confinement for wire fraud despite a Guidelines range of 18-24 months and noting defendant's devotion to family, community, and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a three-month sentence for Medicare fraud conspiracy of more than $5 million based on, among other things,

25

the defendant's charitable work, community service, generosity with his time, and support and assistance of others).

As Judge Rakoff noted:  "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513–14, *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (holding that sentence was not unreasonably lenient); *see also Gupta*, 904 F. Supp. 2d at 353.

For decades, Michael worked tirelessly to improve his local community.  In order to fund his community ventures, he has lived a modest life, living in the same home for more than 20 years and driving an older, 2010 pickup truck.  Unlike even the typical charitable executive, Michael has personally rolled up his sleeves to improve his community, harvesting oysters, planting trees, and improving the homes in his community of Richmond, Virginia.  Based on his proven past experience, one can expect that Michael will return to improving his community.

Courts also recognize that the defendant's age, and the inverse correlation between age and recidivism, is a relevant factor to consider when imposing a sentence.  *See, e.g.*, *United States v. Ruiz*, No. 04 Cr. 1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."); *United States v. Carmona-Rodriguez*, No. 04 CR 667RWS, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (noting lower risk of recidivism for defendants over the age of 40 and imposing a below-Guidelines sentence).

Michael is 48 years old, and has no prior criminal history.  He graduated college, is married, and has no history of drug or alcohol abuse.  At the time of his arrest, he was employed and deeply involved in his community.  All metrics suggest there should be little concern of recidivism.  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 (2004).[12]

## B.      The Nature and Circumstances of the Offense Are Mitigating Factors

The nature and circumstances of the conduct in this case also weigh in favor of a variance.  Michael is remorseful for the impact this case has had on all involved.  But Michael did not set out to commit fraud.  He founded Live Well to solve a social problem—retirees being forced out of their homes—that he witnessed his own father endure.  He grew Live Well into a successful company by focusing on this business and was recognized as a leader in the industry. He did not get involved with the HECM-IO bonds that were the subject of this case until ten years later.  Michael relied on others for their expertise in these bonds, which a government witness characterized as "among the most complex [instruments] in fixed income."  (Tr. 235.)

## C.      A Prison Sentence Will Not Further the Goals of Retribution or Specific or General Deterrence

A prison sentence would not serve the goal of retribution, or afford specific or general deterrence.

Regarding retribution and specific deterrence, the verdict already has, and will continue to have, enormous consequences on Michael's life.  The Second Circuit has observed that "the need for further deterrence and protection of the public is lessened" when conviction impacts a defendant's employment prospects, because "the conviction itself already visits substantial

---

[12] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (quotation omitted) (approvingly quoting trial court and affirming sentence of 20 months' imprisonment despite Guidelines range of 78 to 97 months).

In imposing a significantly below-Guidelines sentence in a securities fraud case following a trial, Judge Rakoff noted that the defendant "having suffered such a blow to his reputation . . . is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result." *Gupta*, 904 F. Supp. 2d at 355; *see also United States v. Caspersen*, No. 16-cr-414 (JSR) (S.D.N.Y. Dec. 7, 2016), Dkt. 37 at 59 (Judge Rakoff noting, "there are many studies that suggest that even modest prison time operates as an effective deterrent on white collar defendants as a group"); *Adelson*, 441 F. Supp. 2d at 514 ("[i]n the case of financial fraud, however, an important kind of retribution may be achieved through the imposition of financial burdens.").

Between the guilty verdict here, the actions brought by the SEC and Live Well bankruptcy trustee against Michael, other civil litigation, and the extensive news coverage of this case, Michael's ability to obtain gainful employment is substantially impeded. He has lost nearly all of his assets and the business he founded. His reputation and professional relationships have been indelibly damaged.

Michael's wife has also been impacted tremendously. Her career is in jeopardy. A sentence of incarceration for Michael could risk her ongoing conversion to Roman Catholicism. Furthermore, the case has understandably had a devastating impact on Michael and his family. A prison sentence is not at all necessary for specific deterrence.

Regarding general deterrence, courts in this District have recognized that "even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."

28

*Adelson*, 441 F. Supp. 2d at 514; *Gupta*, 904 F. Supp. 2d at 355 (S.D.N.Y. 2012) ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not" such that "a relatively modest prison should be 'sufficient, but not more than necessary' for this purpose."); *cf.* Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009)[13] ("[E]mpirical research shows no relationship between sentence length and deterrence.").

Any deterrent effect on others is already served by Michael's guilty verdict and the press surrounding this litigation and the civil litigation.  A prison sentence will have no further meaningful deterrent effect.

### D.   A Significant Variance is Necessary to Avoid Unwarranted Sentencing Disparities

Section 3553(a) directs courts to consider the need to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

Several cases from this District illustrate that leniency is appropriate here, and that Michael's sentence should be below even the low-end of the Shadow Guidelines of 37 months, or probation.  In each of these cases, the defendant was responsible for a fraud that resulted in the loss of tens of millions of dollars to individual victims or charitable foundations, and yet received leniency based on many factors that are present in Michael's case as well.

In *United States v. Park*, this Court sentenced the defendant to 36 months' imprisonment, despite a Guidelines range of 151 to 188 months.  *United States v. Park*, No. 16-cr-473 (RA) (S.D.N.Y. Dec. 7, 2016), Dkt. 44.  Your Honor questioned how the defendant "could lie and

---

[13]https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf

steal from those you love and those who trusted you day in and day out – relatives, close friends, former classmates," resulting in a "staggering" loss to more than forty individuals of $23 million," but nevertheless granted leniency.  *Id.* at 47.  Among other factors, Your Honor considered the defendant's community service, which the defendant noted in emphasizing that she lived modestly and was not motivated by greed.  *Id.*  Unlike in *Park*, in which the defendant stole the life savings of her closest family and friends, the present case involves large, highly sophisticated banks, which may ultimately not suffer any losses or be able to recover certain losses, and which are treated differently under the Shadow Guidelines.  *See supra* II.B & II.C.2. Further, Michael appears to have lived a lifestyle of at least comparable modesty and similarly dedicated himself to his community.

In *United States v. Caspersen*, the defendant was convicted of running a $43 million Ponzi scheme and had nearly closed on another $50 million investment scheme.  Judge Rakoff sentenced the defendant to 48 months in prison, noting that the "great bulk of the" Guidelines calculation of 151 to 181 months was driven by the loss amount and as such "borders on the irrational" and is "absurd."  *United States v. Caspersen*, No. 16-cr-414 (JSR) (Dec. 7, 2016, S.D.N.Y.), Dkt. 37 at 3 & 82.  Like in Michael's case, Judge Rakoff noted that the defendant's fraud was not motivated by greed.  Unlike in Michael's case, however, the defendant had allegedly previously defrauded his mother and brother of $2 million.  (*Id.* at 49 & 56.)

Finally, in *United States v. Johnson*, Judge Rakoff sentenced a pair of father and son defendants (the latter of whom was represented by the undersigned counsel), whose Guidelines ranges were 188 months to 235 months, to terms of 36 months and 30 months, respectively. *United States v. Johnson*, No. 17-cr-482 (Oct. 15, 2018, S.D.N.Y.), Dkt. 102.  The government characterized the son as the "mastermind" of a multi-year fraud scheme that resulted in a total

loss of more than $350 million to various lending institutions, but acknowledged that—like Mr. Hild here—he did not "originate" the scheme and ultimately imposed a substantially below-Guidelines sentence of 30 months. *Id.* at 16.  Also like Mr. Hild, the father lived modestly, and despite the vast loss, received a sentence of 36 months.  (*See* Dkt. 87 at 5.)  The lenders' loss amount in *Johnson* was more than three times even the highest possible loss amount in Michael's case, and yet these two defendants received sentences of 36 and 30 months, substantially below the Guidelines range.

Significant variances like these are not anomalies.  Courts in this District routinely vary from the Guidelines ranges in fraud actions.  In 2020 and 2021, courts in this District varied in their sentences in about two-thirds of fraud, theft, or embezzlement cases.  *See* U.S. Sent'g Comm'n, Statistical Information Packet, FY 2021, Southern District of New York (66.3% variance rate), at 16; U.S. Sent'g Comm'n, Statistical Information Packet, FY 2020, Southern District of New York (71.6% variance rate), at 16.

To the extent sentences of three or four years were appropriate in these cases, a sentence of probation, or alternatively, a sentence of imprisonment shorter than the low end of the Shadow Guidelines range (37 months) would be a fair and just sentence for Michael.[14]

---

[14] Neither a fine nor restitution should be imposed.  The Court should not impose a fine because Michael lacks the ability to pay a fine.  *See* 18 U.S.C. § 3572 (a)(1)–(2); (PSR ¶¶ 97–98); *United States v. Corace*, 146 F.3d 51, 57 (2d Cir. 1998).  The Court should not impose restitution at this time because, in addition to Michael's inability to pay, the loss amount has not been proven (*see supra* II.B).  *See* 18 U.S.C. § 3664(a).  Even if the Court determines that the victims did incur an actual loss that can be reasonably determined, any restitution order must be reduced by the value of the property (the bonds) returned to the victims, including the value the bonds will earn over time.  *See* 18 USC § 3663A(b)(1)(B) (offsetting restitution by value of property returned to victim); *United States v. Gonzalez*, 647 F.3d 41, 67 (2d Cir. 2011).

## CONCLUSION

For the reasons set forth above, we respectfully ask the Court to sentence Michael to

probation, or in the alternative, to a term of imprisonment significantly below the Guidelines

range, and in any event below 37 months' imprisonment.

Dated:        New York, New York
              January 13, 2023

                                                /s/ Brian A. Jacobs
                                        _____
                                        Brian A. Jacobs
                                        Alexander M. Levine
                                        Morvillo Abramowitz Grand
                                        Iason and Anello P.C.
                                        565 Fifth Avenue
                                        New York, NY 10017
                                        (212) 856-9600
                                        (212) 856-9494 (fax)
                                        bjacobs@maglaw.com

                                        *Attorneys for Defendant Michael Hild*