UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -

MICHAEL HILD,

          Defendant.

:
:
:
:
:
:
:

  19 Cr. 602 (RA)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

Jordan Estes
Scott Hartman
Assistant United States Attorneys

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

THE OFFENSE CONDUCT ........................................................................................................... 2

DISCUSSION .............................................................................................................................. 9

   I.     The Sentencing Guidelines Calculation ............................................................................ 9

      A.    The Loss Among is Correctly Calculated ..................................................... 10

      B.    Obstruction of Justice .................................................................................. 12

   II.    A Substantial Term of Imprisonment Is Warranted ....................................................... 14

      A.    Nature and Circumstances of the Offense and Need for Just Punishment ................. 14

      B.    History and Characteristics of the Defendant .............................................. 15

      C.    The Need for General Deterrence and to Promote Respect for the Law ................... 16

   III.   Hild's Section 3553(a) Arguments ................................................................................ 16

   IV.   Forfeiture ...................................................................................................................... 19

   V.   Restitution ...................................................................................................................... 19

i

The Government respectfully submits this memorandum in connection with the sentencing of defendant Michael Hild, which is scheduled for January 27, 2023 at 4:00 p.m.

As set forth below, the advisory Guidelines range under the United States Sentencing Guidelines for Hild is 324 to 405 months' imprisonment. The Government agrees that a Guidelines sentence of that length is unwarranted and does not ask for such a sentence. But given the serious nature of the defendant's criminal conduct and the need for deterrence, to promote respect for the law, and for just punishment, the Government believes that a substantial sentence of incarceration like the sentence of 180 months' imprisonment recommended by the Probation Office is necessary and appropriate to achieve the goals of sentencing.

## THE OFFENSE CONDUCT

The evidence presented at trial established that the defendant orchestrated a brazen, multi-year scheme to fraudulently inflate the value of bonds held by his company, Live Well Financial, and repeatedly lied to and misled the company's lenders and outside auditors in order to enrich himself and his co-conspirators.[1]

Live Well was a private company based in Richmond, Virginia that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages ("HECMs"). (Tr. 944-47). Hild founded Live Well and was its Chief Executive

---

[1] The description of the offense conduct set forth below is consistent with the Court's findings of fact in connection with its opinion and order denying Hild's post-trial motions under Federal Rules of Criminal Procedure 29 and 33. *See United States v. Hild*, ___ F. Supp. 3d ___, 2022 WL 17484992, at *2-*8 (S.D.N.Y. Dec. 7, 2022). Throughout this memorandum, "GX" refers to Government exhibits that were introduced at trial; "Tr." refers to the trial transcript; "PSR" refers to the Final Presentence Investigation Report; and "Def. Mem." refers to the defendant's sentencing submission.

Officer and largest shareholder. (Tr. 944-45, 1089, 1131-32; GX 321).

      In or about 2014, at Hild's direction, Live Well acquired a portfolio of bonds, each entitling the holder to receive a portion of the interest payments, but not the principal payments, from a particular pool of reverse mortgages ("HECM IO bonds."). (Tr. 58-59, 951-52, 968-69). Live Well purchased the HECM IO bond portfolio from Stifel for approximately $50 million. (Tr. 72-73). At the same time that Live Well purchased the HECM IO bond portfolio, Hild hired three employees of Stifel, including cooperating witness Darren Stumberger, to manage and grow the newly acquired bond portfolio. (Tr. 73-74, 969). Stumberger and the other two employees were referred to as the trading desk, and they worked out of offices in New York and New Jersey. (Tr. 73, 970).

      Live Well financed the acquisition and growth of its bond portfolio through a series of loans in which Live Well used the bond portfolio as collateral. (Tr. 76-77, 731-32, 952, 1002, 1061). Many of Live Well's lenders were securities dealers whose lending arrangements with Live Well were structured as bond repurchase agreements, also known as "repo agreements." (Tr. 76-77, 568-72, 672-75, 953-54). A repo agreement is a short-term loan in which both parties agree to the sale and future repurchase of an asset within a specified contract period. (Tr. 76-77, 572-75). The seller sells the asset to the lender with a promise to buy it back at a specific date and at a price that includes an interest payment. (Tr. 572-75). Functionally, a repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. (Tr. 76-77). When the loan is repaid by the borrower, the collateral is returned to the borrower through a repurchase. (Tr. 572-75). In practice, Live Well's loans were frequently "rolled" at the end of the term into a new short-term loan. (Tr. 574, 675, 850-51).

      Additionally, at least one of Live Well's lenders was an FDIC-insured bank, and its

lending arrangement with Live Well was structured as a secured loan, with certain bonds held as collateral by a third-party custodian. (Tr. 729, 731).

Live Well's financing agreements with all but one of the lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to determine the market value of the bond as of the measurement date. (Tr. 79-80, 598-600, 697, 1069-70; GX 603, 702, 1003). The lenders generally relied on a widely utilized subscription service, Interactive Data Corporation ("IDC"), to price various securities. (Tr. 600, 697; GX 603, 1003). The lenders used the IDC price to determine the amount of money to lend to Live Well. (Tr. 575, 600). The lenders would not lend Live Well an amount equivalent to the price of the collateral; rather, they took a 10-20% haircut off that price to protect against market risk. (Tr. 81, 573-76). In the event of a default by Live Well, the lenders could sell the collateral to recoup the money they lent Live Well. (Tr. 573, 674; GX 603, 702, 1003).

When Live Well first obtained the bond portfolio, IDC did not yet have the capability to value the bonds itself, so IDC agreed it would take "broker quotes" from Live Well on a temporary basis, until IDC could provide its own evaluated pricing of the bonds. (Tr. 83-84, 971, 1535). By at least early 2015, IDC was using its own pricing model to value the bonds. (Tr. 84).

Hild and others at Live Well were unhappy with IDC's prices of the bonds. (Tr. 85-87, 972). After a discussion with IDC, in February 2015, Live Well and IDC agreed that they would return to the "broker quote" system, in which Live Well provided IDC its prices for the bonds. (Tr. 87-89, 978-79; GX 104). IDC then published those prices verbatim. (GX 978-79, 1014-15; GX 104). There was no disclosure from IDC of who the broker quotes came from; nor did Live Well disclose its role in broker quotes to its lenders. (Tr. 603, 623, 997-1012, 1017).

### A. The Beginning of the Fraudulent Scheme

The fraudulent scheme began in or about September 2015, when Hild and his co-conspirators altered their method of proving bond prices to IDC. (Tr. 993-94). Rather than price the bonds as the market would price them, Hild asked the bond traders to run pricing "scenarios," with varying inputs, to see how those different inputs would affect the price. (Tr. 95-98; GX 113). Hild selected the price that would go to IDC based on the scenario he liked best, which was typically the scenario that provided Live Well with the most liquidity. (Tr. 103-04).

Hild and his co-conspirators ultimately selected a particular scenario – "Scenario 14" – to use in the pricing of the bonds. (Tr. 105-06, 114-15, 993-96). Among other things, Scenario 14 did not account for the "yield" (*i.e.*, the return an investor sees on the bond) demanded by the market, which generally required the price of a bond to be lowered each month to maintain that high yield. (Tr. 110-15, 994). As a result, the bond prices under Scenario 14 increased dramatically. (Tr. 1009, 1027-29, 1068; GX 1600). For example, after pricing bonds that were acquired in September 2015 with Scenario 14 methodology, those bonds alone increased in value by approximately $11 million. (Tr. 1028-29; GX 120).

Hild and his co-conspirators were well aware that the prices under Scenario 14 were not obtainable in the market and that, if the lenders scrutinized the IDC marks and learned this fact, they would either end the lending relationship or significantly reduce the amount of money they were willing to lend to Live Well. (Tr. 993-1011; GX 401, 403, 404). To hide the scheme from the lenders and IDC, Hild directed that the trading desk use a "glide path" to implement the Scenario 14 prices. (Tr. 1009; GX 402). On recorded calls, Hild explained that the glide path was to avoid triggering "alarm bells all over the place." (Tr. 1009; GX 402). The conspirators thus concealed from lenders (i) that they were supplying prices to IDC, and (ii) that the marks published by IDC

did not reflect market realities. (Tr. 993-1011; GX 401, 403, 404). Indeed, because the markups under Scenario 14 generally exceeded the haircuts of the repo lenders, with the markups, the lenders no longer had any protection against market risk. (Tr. 128-29, 1002). If Live Well defaulted, there was virtually no chance that the lenders could sell the bonds on the market to cover the amount owed by Live Well. (Tr. 1007, 1143, 1160, 1171).

Ultimately, due to the asset overvaluation and the purchase of additional bonds using the capital generated by the scheme, Live Well grew the purported value of its bond portfolio to over $500 million by December 2016. (Tr. 1069; GX 1600).

### B.  The Fraudulent Financial Statements

Hild and his co-conspirators also deceived Live Well's lenders by misrepresenting the value of the bond portfolio in Live Well's financial statements. The bond portfolio was Live Well's largest asset, and Live Well used the same inflated Scenario 14 bond values in the financial statements, making it appear that Live Well's assets were more valuable than they really were. (Tr. 1081-89; GX 310, 312, 314). Live Well falsely represented that it valued the bond portfolio at "exit prices" – that is the price for which a buyer and seller would transact. (Tr. 1085; GX 310, 312, 314). Live Well similarly used inflated Scenario 14 prices to calculate Live Well's revenue on the bond portfolio. (Tr. 1083-84; GX 310, 312, 314). The lenders relied on these fraudulent financial statements in determining how much credit to extend to Live Well. (Tr. 595-98, 688-93).

### C.  The Shareholder Buyout

In addition to using the liquidity generated by the scheme to expand Live Well's bond portfolio, in or about September 2016, Hild used $18 million generated from the repo lenders to buy out the preferred stockholders in Live Well. (Tr. 1128-31; GX 311). The elimination of the preferred stockholders gave Hild control of the company and allowed him to substantially increase

his personal compensation. (Tr. 1131-41). Accordingly, Hild's compensation jumped from approximately $1.4 million in 2015, to approximately $5 million in 2016, approximately $9.7 million in 2017, and over $8 million in 2018. (Tr. 565-67; GX 2000).

### D.  The Liquidity Events in February and March 2017

The fraudulent scheme escalated in early 2017 after one of the repo lenders, Wedbush, asked Live Well to have a broker provide a price for one of the bonds Wedbush was lending against. (Tr. 1142). Hild and his co-conspirators discussed how to address the issue on a call, because having a broker price the bond could result in the lenders discovering that the bonds values were fraudulently inflated. (Tr. 1145; GX 407). They discussed going to a "slimy" broker who would be willing to help out with their fraudulent scheme. (Tr. 1147; GX 407).

Shortly thereafter, Wedbush told Live Well that it wanted to reduce Live Well's credit line and stop lending against certain bonds known as "MACRs." (Tr. 1157). Wedbush's request caused a liquidity crisis, because Live Well needed to pay down its debt to Wedbush, and it could not do so by selling the bonds, because the bonds could not be sold on the market at their fraudulently inflated values. (Tr. 1157-60). Hild described the liquidity crisis as a "catastrophe." (Tr. 1164; GX 151). Indeed, cooperating witness Eric Rohr, Live Well's chief financial officer, testified that if Live Well defaulted on its debt to Wedbush, that would create cross-defaults with other lenders, likely leading to the company's insolvency. (Tr. 1164).

To survive the liquidity crisis, Hild ordered that the trading desk inflate the bond prices in IDC above the already-inflated Scenario 14 prices. (Tr. 1167). Hild provided no justification for the price increases, which Rohr said made him "sick to [his] stomach." (Tr. 1168). The trading desk ultimately marked up the portfolio by over $36 million. (Tr. 1172; GX 408). At Hild's direction, the trading desk implemented the price increases incrementally, to avoid raising red flags

with IDC or the lenders. (Tr. 1172-73; GX 408). Shortly after those price increases were implemented, Live Well entered into new lending relationships with Flagstar Bank ("Flagstar") and Mirae Asset Securities ("Mirae"). (Tr. 1186-94).

### E.  The End of the Fraudulent Scheme

In the summer of 2017, Live Well reversed the price increases that were implemented in February and March 2017 to survive the liquidity crisis, but the bond prices remained at the fraudulently inflated Scenario 14 values. (Tr. 1196-97). Shortly thereafter, Live Well received a subpoena from the United States Securities and Exchange Commission ("SEC"), and thereafter the prices in IDC remained static, at above-market Scenario 14 levels. (Tr. 1205).

In or about 2018, two of Live Well's repo lenders, Mirae and the Industrial and Commercial Bank of China ("ICBC"), began questioning the high pricing for Live Well's bonds. (Tr. 1205-08). Both lenders tried to reduce the amount they were lending to Live Well, but Live Well did not have the money to pay down the debt. (Tr. 606-11, 1208).

Around that time, Rohr began considering leaving Live Well, because, as he put it, he was "morally bankrupt." (Tr. 1213). Rohr told Hild he was thinking of leaving, and Hild warned him that they "potentially could face criminal charges if the lenders lost money." (Tr. 1215). Around that time, Rohr asked Hild to reduce Hild's compensation, in an effort to generate more liquidity for the company to help pay the lenders back. (Tr. 1215). Hild refused. (Tr. 1216). Rohr did not return to work after that. (Tr. 1216).

Hild replaced Rohr with Glen Haddock, who had no knowledge of the fraudulent scheme. (Tr. 1601-12). In or about May 2019, Haddock informed Hild that he would not sign the company's interim financial statements because he believed that the company's carrying value for the bond portfolio was significantly overstated. (Tr. 1616-17). In or about May 2019, Live Well announced

8

that it would cease operations and unwind. (Tr. 1617-18). After the announcement of Live Well's

closing, Haddock provided a balance sheet to Live Well's lenders showing that Live Well had

reduced the value of its bond portfolio by over $200 million. (Tr. 1620-22; GX 323).

**DISCUSSION**

## I.     The Sentencing Guidelines Calculation

The Government submits that the Guidelines range applicable to Hild's conduct is

calculated as follows:

1. Pursuant to U.S.S.G. § 3D1.2, Counts One through Five are grouped together as a single group because the offense level is determined largely on the basis of the total amount of loss or harm.

2. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(M), 24 levels are added because the amount of loss exceeds $65,000,000, but does not exceed $150,000,000.

4. Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), 2 levels are added because the offense involved sophisticated means.

5. Pursuant to U.S.S.G. § 2B1.1(b)(17)(A), 2 levels are added because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.

6. Pursuant to U.S.S.G. § 3B1.1, 4 levels are added because the defendant was a leader of an offense that involved five or more participants.

7. Pursuant to U.S.S.G. § 3C1.1, 2 levels are added because the defendant engaged in obstruction of justice.

Based upon the calculations above, the applicable offense level is 41. Accordingly, at

Criminal History Category I, Hild's Sentencing Guidelines Range is 324 to 405 months'

imprisonment.

The Probation Office concurs with the Guidelines calculation set forth above in all respects,

except that, consistent with its usual practice, the Probation Office takes no position on obstruction

9

of justice and defers to the assessment of the Court. The Probation Office recommends a sentence of 180 months' imprisonment (without taking an obstruction enhancement into account).

In his objections to the Presentence Investigation Report and sentencing submission, Hild challenges the loss amount and the applicability of the obstruction enhancement. As set forth below, his arguments are contrary to the facts and the law and should be rejected.

### A. The Loss Among is Correctly Calculated

The loss amount attributable to Hild's conduct exceeds $65 million and thus results in a 24-level increase, as required by U.S.S.G. § 2B1.1(b)(1)(M). In calculating the loss amount under the Guidelines, a sentencing court need only make a "reasonable estimate." *See* U.S.S.G. § 2B1.1, application note 3(C). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997). Moreover, the calculation of loss need only be determined by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997).

As the Court is aware, each of the victim lenders in this case extended credit to Live Well believing, based on the fraudulent representations of Hild and his co-conspirators, that their loan principal was fully secured (indeed oversecured) by the value of the collateral. "In a case involving collateral pledged or otherwise provided by the defendant," the Guidelines instruct that the loss amount should be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1, application note 3(E)(2). Thus, the actual loss to the lenders for the purposes of Section 2B1.1 consists of the outstanding loan principal as of the date that the lenders foreclosed upon the bonds, less the liquidation value of the bonds and any coupon payments that the lenders received between those two events.

Attached hereto as Exhibits A through D are declarations submitted on behalf of each of the victim lending institutions – ICBC, Mirae, Flagstar Bank and Customers Bank – attesting to the actual loss that each of them suffered as a result of the offense. Applying the loss calculation methodology set forth above, ICBC suffered a principal loss of over $29 million (Ex. A, at 2); Mirae suffered a principal loss of over $20 million (Ex. B, at 2); Flagstar Bank suffered a principal loss of over $13 million (Ex. C, at 2); and Customers Bank suffered a principal loss of over $7.6 million (Ex. D, at 4).[2]

In his sentencing submission, Hild objects that the Government's loss calculations are "speculative and inaccurate . . . because the lenders received the bonds upon the default of Live Well" and "[t]hese bonds continue to produce income" for the victims. (Def. Mem. 18)  This concern is misplaced. As explained, the loss figures set forth in the prior paragraph are properly reduced based on the coupon payments that the lenders received following foreclosure on the bonds and prior to their liquidation, as well as based upon the liquidation value of the bonds themselves. Hild suggests that the victims' market sales of the bonds were not commercially reasonable and that holding the bonds to maturity might ultimately have allowed the lenders to recover their full principal. (Def Mem. 18 & n.6). He has provided no support for that claim, however, and the liquidation values set forth in the declarations are generally consistent with the evidence regarding the extent of the overvaluation that was introduced at trial. In any event, nothing in the Guidelines suggests that in determining "the amount the victim has recovered at the time of sentencing from disposition of the collateral" the Court should consider the defendant's

---

[2] These figures deviate from those in the PSR because, in analyzing the victim declarations, the Probation Office failed to distinguish between loss that should be considered under Section 2B1.1 and the broader set of expenses that may be recoverable as restitution.

own idiosyncratic views about whether that disposition was commercially reasonable.

As for Hild's argument that the loss should be reduced by the amount that the lenders may recover from civil suits against Live Well or third parties, the law is clear that a defendant "is not entitled to a reduction in the loss amount based on a possible recovery" from bankruptcy or collateral litigation. *United States v. Tuzman*, No. 15 Cr. 536 (PGG), 2021 WL 3284231, at *22 (S.D.N.Y. July 29, 2021); *see also United States v. Shkreli*, No. 15 Cr. 637 (KAM), 2018 WL 9539774, at *18 (E.D.N.Y. Feb. 26, 2018), *aff'd*, 779 F. App'x 38 (2d Cir. 2019) ("The Second Circuit repeatedly has held that loss in fraud cases includes the amount of property taken, even if all or part has been returned." (citations and quotation marks omitted)).

## B.  Obstruction of Justice

The two-level enhancement for obstruction of justice pursuant to § 3C1.1 squarely applies in this case based upon Hild's extensive perjury from the witness stand during trial. "[A] defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). "Under a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Id.* at 98. "To base a § 3C1.1 enhancement for 'Obstructing or Impeding the Administration of Justice' upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008) (internal quotation marks and brackets omitted). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998). "In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of

the evidence." *Id*. Hild perjured himself extensively during more than two days of trial testimony.

For example:

- In order to paint a picture of himself as a victim of Stumberger's deception Hild lied at trial and claimed that, prior to Live Well's acquisition of the bond portfolio, Stumberger told him that the HECM bond market was highly liquid.

  o In particular, at trial – after Stumberger had testified against him – Hild falsely claimed that Stumberger initially told him that the bonds were "highly liquid." (Trial Tr. 1843:17-1844:18). He then described an "oh, S-H-I-T moment" when he learned that there was "no market" for the bonds. (Trial Tr. 1844:2-18). Hild described being upset at Stumberger because "the guru that was managing this portfolio for us had represented something very different to me at the acquisition." (Trial Tr. 1844:13-16).

  o In contrast, during Hild's SEC testimony, an excerpt of which is attached as Exhibit G, Hild testified that Darren Stumberger told him, in the initial pitch regarding the bonds, that the bonds were illiquid and there was "not an active functioning market." (Ex. G, at 56:5-59:5). He then explained that Stumberger went to "great length to make sure that we understood that once you buy it, you own it, and you hold it to maturity, because there just wasn't an active market." (*Id*. at 59:1-5).

- At trial, Hild also attempted to deceive the jury into believing that the bonds were not sellable in the market, and thus that there could be no "market value" for them. In service of that account, Hild testified falsely that Live Well traders had difficulty selling bonds that Xenith Bank wanted them to sell, and that the sale was accomplished after several months of attempts and only as a result of a "horse trade" with Credit Suisse, where Live Well exchanged the bonds for other bonds. (Trial Tr. 1844:19-1846:21). Hild also falsely testified that this was the only sale of HECM IO bonds in Live Well's portfolio. (Trial Tr. 1846:18-21).

  o On cross-examination, the Government introduced an email, GX 234, which showed that Hild directed the trading desk to sell four bonds on March 16, 2015. (Trial Tr. 2025:11-2026:5). The Government then showed Hild GX 308-X, which demonstrated that the bonds were the day after they were offered, March 17, 2015, to Credit Suisse. (Trial Tr. 2026:6-2027:20).

  o In addition, the Government introduced documents establishing that the bonds sold to Credit Suisse were not the only sale of HECM IO bonds. (*See* Trial Tr. 2110:7-2112:7; GX 236 and 308-X).

Because Hild intentionally gave false testimony about, among other things, conversations

with Stumberger and the sale of bonds, both of which topics were material to Hild's understanding

of the market for the bonds and thus the accuracy of Live Wells marks, an enhancement under Section 3C1.1 of the Guidelines for obstruction of justice is warranted.

## II.      A Substantial Term of Imprisonment Is Warranted

The Government does not dispute that a sentence of over 25 years, the sentence called for by the Guidelines, is not necessary in this case, and the Government does not seek such a sentence. Nonetheless, the factors set forth in Title 18, United States Code, Section 3553(a) demonstrate the necessity of a substantial term of imprisonment like the one recommended by the Probation Office.

### A.  Nature and Circumstances of the Offense and Need for Just Punishment

The nature and circumstances of Hild's offense and the need to provide just punishment warrant a very significant sentence. Hild's criminal misconduct was brazen and egregious. During a period of more than four years, Hild masterminded and directed a sophisticated scheme to defraud Live Well's lenders. He tricked them into lending Live Well hundreds of millions of dollars, much of which went into his own pockets. He hid from them the fact that what they thought were independent market values were in fact made up valuations constructed to fuel his "self-generating money machine." (Tr. 1001-02; GX 402). He repeatedly lied and deceived Live Well's lenders, its auditors, and even his own employees. He used his financial sophistication and position of power within the company to construct a false narrative about how and why he was valuing the bonds the way he was – to cover his tracks. And as it started to come crashing down, in 2019, Hild continued to line his own pockets by authorizing large payments to his own personal account. (GX 2000).

When Live Well was finally forced to declare bankruptcy, Hild left his victims holding the bag to the tune of tens of millions of dollars.  These losses had real world, human consequences. For example, as explained in Mirae's victim impact statement, "the fraud orchestrated by Mr. Hild

and Management all but wiped out Mirae's profits for 2019, thus inflicting huge harm throughout the organization and resulting in the initiation of internal risk and credit reviews, personnel demotions and outright terminations of certain senior staff members, some of whom remain unemployed to this day." (Ex. F).

Hild personally derived over $20 million dollars in criminal profits from his scheme. And he obstructed justice by lying extensively to the jury while under oath from the witness stand. His egregious misconduct and lies warrant a significant sentence.

## B.  History and Characteristics of the Defendant

Unlike many of the defendants who appear before this Court, Hild has enjoyed a life of material and financial comfort. It is evident from the Presentence Investigation Report and Hild's background and personal circumstances that he did not commit this crime out of any financial need. By Hild's own account, he is a well-educated, successful businessman, and enjoyed status in his community and the support of his family and friends. He has led a life of personal and financial stability, filled with benefits that many people never receive. But that was not enough for him. Motivated by greed and disregard of the law, Hild perpetrated a brazen scheme to make his already successful business even more personally lucrative. His willingness to commit such a massive crime despite his many advantages weighs in favor of a substantial sentence.

The conduct at issue, moreover, was not a brief aberration for Hild. His scheme lasted for years and was calculated and systematic. He manipulated others into assisting in the fraud, including Hayden Novikoff, a young employee who testified at trial. And he took sophisticated steps to hide his crimes, including directing the creation of financial models that gave a patina of legitimacy to his indefensible valuations. He also did not hesitate to lie under oath to avoid responsibility for his actions. It is clear that a very substantial sentence is necessary here to deter

15

the defendant from again doing what he has done repeatedly and over years—lying to other for personal gain without regard to the risk and harm to others.

**C.  The Need for General Deterrence and to Promote Respect for the Law**

The need for deterrence and to promote respect for the law also mandate substantial term of imprisonment in this case. Because financial fraud schemes like the defendant's are difficult to detect and investigate, significant punishment is necessary to deter others from similar conduct. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, *J.*) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). Should the defendant receive a light sentence, others in the finance industry may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that, even if they are caught, they will not face significant repercussions. *See, e.g., United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely probationary sentence."). A lenient sentence would further erode the public's confidence in the integrity of financial markets by sending the message that corporate executives are only lightly punished when caught engaging in white-collar crimes. To deter criminal conduct by executives like the defendants, effectuate the purpose of the securities fraud laws, and send an appropriate message that this type of fraud and obstruction of justice will not be tolerated, a significant sentence is warranted.

**III.  Hild's Section 3553(a) Arguments**

In his sentencing submission, Hild argues at length that the applicable Sentencing Guidelines overstate the seriousness of the offence and advocates instead for a period of probation.

(Def. Mem. 21-24). While the Government does not believe a Guidelines sentence is warranted, a sentence of probation or anything close to it would fail to serve the purposes of sentencing and, indeed, would undermine them.

In seeking a sentence of probation, the defendant understates the compelling need in this case for a term of imprisonment that is sufficient to afford adequate deterrence and just punishment, as well as to promote respect for the law. As Judge Rakoff, whom the defendant quotes in his own submission, has recognized, "in the case of white-collar offenses, prison time is particularly important as a general deterrent," and a sentence of imprisonment that is too short "becomes the proverbial slap on the wrist. It has, if anything, no deterrent effect; maybe the opposite." *United States v. Johnson*, 17 Cr. 482 (JSR), Aug. 13, 2018 Sentencing Tr. at 13-14. And as to general deterrence, Judge Rakoff has reasoned: "Others similarly situated to the defendant must . . . be made to understand that when you get caught, you will go to jail," accordingly a sentence of probation would "totally fail to send this message." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). These principles squarely apply here. A substantial term of imprisonment is necessary to deter corporate executives and other members of the business community from committing white-collar offenses, and to ensure that the defendant's flagrant violations of the law are justly punished.

Hild also argues that that his personal characteristics, particularly his "decades-long commitment to his local community and environment," (Def. Mem. 25), counsel in favor of a lenient sentence. While the Court should certainly consider the defendant's community involvement in fashioning a sentence, it should also not overlook the fact that, as set forth in the affidavit submitted in support of the Government's post-indictment restraining order (Dkt. No. 9, at 40 *et seq.*), many of the properties that the defendant rehabilitated were purchased with proceeds

17

of the fraud scheme. Nor should the Court ignore the fact that the defendant stood to benefit financially from the revitalization of Richmond and the increasing value of his rental and other properties that might entail.

The Court should also be unmoved by the defendant's argument that, in light of the collateral consequences of the charge and conviction, "a prison sentence is not at all necessary for specific deterrence." (Def. Mem. 28). Though it may be true that the defendant is unlikely to be in a position to commit a multi-million-dollar bond fraud in the future, he has never accepted responsibility for his conduct, he perjured himself at trial, and, even in connection with post-trial proceedings, he engaged in unsavory, if not illegal efforts to harass and intimidate his prior counsel. (*See* Dkt. No. 137 (describing posts on a Twitter account linked to the defendant that, inter alia, accused prior counsel and his law student interns of criminal conduct and appeared to tag their law school)). Indeed, even in his sentencing submission, Hild attempts to shirk responsibility for the fraud, asserting that "relied on others for their expertise in these bonds." (Def. Mem. 27).

Finally, the Court should reject the claim that a sentence in excess of 37 months would lead to unwarranted sentencing disparities between the defendant and similarly situated defendants. Each case must be measured on its own merits, and defendants in investor fraud cases in this District have often received longer terms of imprisonment for similar conduct, including in recent cases such as *United States v. Moore*, No. 18 Cr. 759 (RMB) (140-month sentence for an investor fraud involving $57 million in losses); *United States v. Sadleir*, No. 20 Cr. 320 (PAE) (72-month sentence for an investor fraud involving approximately $32 million in losses); *United States v. Qin*, No. 21 Cr. 75 (VEC) (90-month sentence for an investor fraud); *United States v. Hu*, No. 20 Cr. 360 (AKH) (144-month sentence for an investment advisor who ran a $120 million Ponzi

18

scheme); *United States v. Booth*, No. 21 Cr. 652 (JSR) (120-month sentence for investor fraud involving $2 million in losses); and *United States v. Ruiz*, No. 21 Cr. 695 (VSB) (72-month sentence for an investment adviser who ran a $10 million Ponzi scheme).

## IV.    Forfeiture

As set forth in the Government's August 9, 2021 request (Dkt. No. 114), the Government requests that the Court enter the Government's proposed Preliminary Order of Forfeiture, imposing a personal money judgment on the defendant in the amount of $22,606,752 and the forfeiture of certain specific properties as well as funds held in a trust account as substitute assets. As explained in the Government's August 9 letter, these items represent proceeds of the fraudulent scheme or assets traceable thereto.

## V.    Restitution

Although it is clear that restitution must be imposed under the Mandatory Victims Restitution Act, the affidavits provided by the victims and attached to this sentencing submission are not sufficiently detailed to determine which expenses the victims have incurred that are compensable.[3]  Given this fact and the parties' dispute over loss amount, the Government submits that the better course would be for the parties to meet and confer on the issue of restitution after the defendant's sentencing.  Accordingly, the Government respectfully requests that the Court and the parties resolve any restitution issues within 90 days after the sentencing in accordance with 18 U.S.C. § 3664(d)(5). If amenable to the Court, at or shortly after the sentencing, the Government

---

[3] In addition to the lender victims, the Live Well trustee has submitted a declaration seeking restitution for expenses incurred in the course of cooperating with the Government's investigation.  That declaration is attached hereto as Exhibit E.

will ask the Court to set a schedule for submissions relating to restitution that would enable the

Court to resolve any disputed restitution issues within the 90-day time period.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      /s/                                                       
         Jordan Estes
         Scott Hartman
         Assistant United States Attorneys
         Tel.:    (212) 637-2327/2357/2329

Dated: January 20, 2023
         New York, New York