# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **No. 19 Cr. 602 (RA)** |
| | **:** | |
| **MICHAEL HILD,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## SENTENCING REPLY MEMORANDUM ON BEHALF OF MICHAEL HILD

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................. 1

I.  THE ARGUMENTS AND CASES IN THE GOVERNMENT'S MEMORANDUM
    SUPPORT LENIENCY ...................................................................................... 3

II.  THE GOVERNMENT'S ESTIMATED LOSS AMOUNT IS SPECULATIVE .............. 7

III.  THE AGGRAVATED ROLE AND OBSTRUCTION OF JUSTICE ENHANCEMENTS
    DO NOT APPLY ............................................................................................... 11

    A.  The Aggravated Role Enhancement Is Not Supported by the Trial Record .................... 11

    B.  Michael Did Not Obstruct Justice in Exercising His Constitutional Right to
        Testify in His Defense .................................................................................. 12

IV.  THE COURT SHOULD NOT ORDER FORFEITURE OR RESTITUTION ................ 16

CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Araujo,*
  539 F.2d 287 (2d Cir. 1976) ................................................................... 16

*United States v. Booth,*
  No. 21 Cr. 652 (JSR) (Aug. 4, 2022 S.D.N.Y.)............................................ 4

*United States v. Burgos,*
  324 F.3d 88 (2d Cir. 2003) ...................................................................... 11

*United States v. Coppola,*
  671 F.3d 220 (2d Cir. 2012) ................................................................... 10

*United States v. Cuti,*
  No. 08 CR. 972 DAB, 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ..................... 17

*United States v. Greenfield,*
  44 F.3d 1141 (2d Cir. 1995) .................................................................... 11

*United States v. Hu,*
  No. 20 Cr. 360 (AKH) (Apr. 5, 2022 S.D.N.Y.) .......................................... 4

*United States v. Johnson,*
  No. 17 Cr. 482 (Oct. 15, 2018, S.D.N.Y.) ............................................. 2, 7

*United States v. Pena,*
  751 F.3d 101 (2d Cir. 2014) .................................................................... 13

*United States v. Qin,*
  No. 21 Cr. 75 (VEC) (Sept. 1, 2021 S.D.N.Y.) ............................................ 5

*United States v. Rosario,*
  988 F.3d 630 (2d Cir. 2021) ............................................................... 13, 16

*United States v. Ruiz,*
  No. 21 Cr. 695 (VSB) (June 16, 2022 S.D.N.Y.) ......................................... 5

*United States v. Sadleir,*
  No. 20 Cr. 320 (PAE) (June 7, 2022 S.D.N.Y.) .......................................... 5

**Statutes**

18 U.S.C. § 3553 .................................................................................................................*passim*

**Other Authorities**

American Bar Association, *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf ........................................................................................................................*passim*

Michael Schwartz, Richmond BizSense, "Creditors: Live Well Financial Under Watch by FBI, SEC" (June 19, 2019), https://richmondbizsense.com/2019/06/19/creditors-live-well-financial-watch-fbi-sec ............................................................................................ 9

Michael Schwartz, Richmond BizSense, "Updated: Creditors Look to Force Live Well Financial Into Bankruptcy" (June 12, 2019), https://richmondbizsense.com/2019/06/12/breaking-news-creditors-look-force-live-well-financial-bankruptcy ................................................................. 9

U.S. Sent'g Comm'n, *Guidelines Manual* (2021) ................................................................*passim*

Defendant Michael Hild respectfully submits this reply memorandum in response to the government's sentencing memorandum dated January 20, 2023 ("Gov. Mem.").

## ARGUMENT

In its original sentencing submission ("Def. Mem."), the defense argued that a sentence of 0-36 months was sufficient but no greater than necessary, and was supported by Michael's history and characteristics, as reflected in the dozens of letters from his family and friends, among other Section 3553(a) factors.  The government's own sentencing submission, to a significant extent, confirms why leniency is appropriate.

At the outset, to its credit, the government agrees that a Guidelines sentence "is unwarranted and does not ask for such a sentence."  (Gov. Mem. 2.)  The government does not recommend any specific below-Guidelines sentence, however, other than to state just once that it "believes that a substantial sentence of incarceration like the sentence of 180 months' imprisonment recommended by the Probation Office" is appropriate.  (*Id.*)

Instead of recommending any specific sentence, the government cites six cases that it asserts involved "similar conduct," which resulted in sentences ranging from 72-144 months—substantially below the Probation Office's recommendation of 180 months.  (*Id.* 18–19.)  In fact, in half of the cases on which the government relies, the court imposed a sentence of less than half that recommended by the Probation Office here, even though each of the six cases involved more culpable conduct than the present case.

In all but one of those cases, the defendant was convicted of stealing money from individual investors, often in Ponzi-like schemes, and pocketing the money.  The present case, by contrast, charged that Michael and others misrepresented the value of collateral (certain bonds) to financial institutions in order to obtain loans.  The evidence at trial showed that Live Well submitted price quotes of bonds based on certain propriety pricing "scenarios" that estimated the

intrinsic value of the bonds and Live Well paid its lenders until its default and bankruptcy.  The government did not allege that Live Well did not actually own the bonds or did no work to arrive at a valuation of the bonds.  Therefore, contrary to the government's claim of "brazen" misconduct (Gov. Mem. 2), this case actually involves what the Shadow Guidelines call "risk-shifting" conduct, which is "generally less culpable than those [cases] where loss is specifically intended" such as Ponzi-like cases, and should result in a more lenient sentence.  (Def. Mem. 1 & 24.)  Accordingly, even a sentence in the range of 72-144 months reflected in the government's Ponzi cases would be inappropriately high.

In addition, the government grounds its request for a substantial sentence in the loss amount at issue in the case.  But the government's arguments demonstrate how its estimated loss amount is speculative and unfounded, as the government has asked the Court to allow it three additional months to determine the amount of restitution (to which the defense objects), despite the fact that this case has been pending for several years.  Further, the government asks the Court to apply leadership and obstruction Guidelines enhancements, but neither is supported by the facts or the law.

The government's memorandum also largely does not respond to significant and important points in the defense's sentencing submission that support a lenient sentence in the range of 0-36 months' imprisonment.  For example, the government is silent on the Shadow Guidelines.  The government also fails to address key cases such as the *Johnson* case, in which a court in this district imposed sentences of 36 months and 30 months on two defendants who, like Mr. Hild, were convicted of misrepresenting the value of collateral to lenders, except that the *Johnson* case involved a loss amount of more than $350 million, nearly four times the loss

amount the government asserts applies here.  The government also largely does not respond to the dozens of letters detailing Michael's character and contributions to his local community.

A consideration of the entirety of the sentencing submissions here, including the forty letters, the Section 3553(a) factors, the Shadow Guidelines, and the sentences imposed in other cases, weighs in favor of a sentence of between 0-36 months' imprisonment.[1]

This reply memorandum responds to certain of the government's arguments in turn.[2]

## I.    THE ARGUMENTS AND CASES IN THE GOVERNMENT'S MEMORANDUM SUPPORT LENIENCY

The government agrees that a below Guidelines sentence is appropriate, but does not recommend any specific sentence, except to state that it "believes that a substantial sentence of incarceration like the sentence of 180 months' imprisonment recommended by the Probation Office is necessary and appropriate to achieve the goals of sentencing."  (Gov. Mem. 2.)  Even assuming the government's arguments on the Guidelines are correct—which they are not (*see infra* II & III)—the government does not offer support for a sentence anywhere close to 180

---

[1] As noted in the original sentencing submission, to the extent the Court imposes a prison sentence, the defense plans to move for bail pending appeal based on, among other things, the denial of Michael's motion for a new trial, which this Court acknowledged "raise[d] a novel legal argument" in an area "with little relevant case law."  (Dkt. 140 at 2 & 39.)

[2] The defense disputes the government's characterization of the offense conduct, including for the reasons noted in its post-trial motion briefs.  (*See* Dkts. 104 & 120.)  Because the Court is familiar with the facts, the defense does not reiterate those points here.  It bears noting, however, that certain of the government's assertions in its sentencing memorandum are unsupported by the trial record.  For example, the government asserts that Michael "manipulated others into assisting in the fraud, including Hayden Novikoff."  (Gov. Mem. 15.)  But Mr. Novikoff testified that he never had a one-on-one conversation with Michael other than in passing in a restroom and only participated in a few conference calls with him, which casts doubt on the claim that Mr. Hild somehow "manipulated" Mr. Novikoff.  (Tr. 888–89; *see also* Tr. 1936 (Michael recalling only one phone call with Mr. Novikoff and stating that he would not have recognized him without introduction).)  Additionally, the government's allegation regarding Michael's post-trial conduct involving his trial counsel (Gov. Mem. 18) is baseless.  It was Michael's trial counsel—whose affidavit this Court declined to credit in deciding Michael's post-trial motion—who was found to have threatened Michael online and was suspended from practicing law in two states for threatening others online, among other things.  (Dkts. 124, 125, 139.)  Michael has not been accused of any crime in this regard, contrary to the government's suggestion.

months' imprisonment. The closest the government gets is citing six "investor fraud cases" it considers to be analogous, but not one resulted in a sentence of 180 months' imprisonment, and half of them resulted in sentences of less than half that. The government's cases seem to point toward a sentence in the range of 72-144 months, but even that range is too severe for Mr. Hild.

A brief comparison of the government's cases to this case makes clear that such a range would be inappropriately high for Michael. In all but one of six cases, the defendant was convicted of obtaining personal enrichment by defrauding individual investors, often doing great damage to the individual investors. For example, in *United States of America v. Moore*, a 140-month sentence was imposed on a defendant who, according to the government, was a "predator" and had a "critical role" in a "massive international Ponzi scheme" that "ensnared over 800 victims worldwide," resulting in tens of millions of dollars in losses to individuals, some of whom lost their entire life's savings. No. 18-cr-759 (July 22, 2020, S.D.N.Y.), Dkt. 120. Based on these facts, the government sought a sentence above that recommended by the Probation Office, and the Court imposed an above-Guidelines sentence. *Id.*, Dkts. 120 & 172.

The other most severe sentence cited by the government, of 144 months' imprisonment in *United States v. Hu*, was imposed on a defendant who defrauded retail mutual fund investors of approximately $130 million—far more than the government's speculated loss here—in a decade-long Ponzi scheme. *See* No. 20-cr-360 (AKH) (Apr. 5, 2022 S.D.N.Y.), Dkt. 73. In *United States v. Booth*, which the government also relies on, the defendant was sentenced to 120 months' imprisonment for originating a years-long international investment scheme "orchestrated from 'boiler rooms' in countries such as Thailand and Panama, [which] involved calling potential investors around the world and using high-pressure tactics and elaborate deceptions—such as fake brokerage websites, corporate email accounts, and contracts—to trick

4

the investors into wiring funds in exchange for what the victims believed to be legitimate securities." 21-cr-652 (JSR) (Aug. 4, 2022 S.D.N.Y.), Dkt. 112. In fact, the funds were laundered through overseas bank accounts. *Id.* These cases are not analogous to Michael's case, in which the government has asserted that financial institutions were defrauded by Live Well submitting inflated values of collateral used to obtain loans.[3]

The Shadow Guidelines[4] distinguish such cases in which the conduct was specifically intended to inflict harm on individuals from "less culpable" offenses such as the one the government has asserted here, in which a defendant was alleged to have "shift[ed] the risk of any potential loss from the defendant" to a financial institution by making "false statements for the purpose of a bank loan that is intended to be repaid." (Def. Mem. 24.)

The government completely ignores the Shadow Guidelines, but they warrant careful review. The Shadow Guidelines were formulated to be consulted in cases like this, where the Guidelines sentencing range has been inflated by a (speculative) loss amount. The Shadow

---

[3] The other three cases the government cites that resulted in sentences of half or less the sentence the Probation Office recommends here are also distinguishable. *See United States v. Qin*, 21-cr-75 (VEC) (Sept. 1, 2021 S.D.N.Y.), Dkt. 22 (imposing a 90-month sentence where the defendant, according to the government, used his hedge fund "as his own piggy bank, stealing investor money to live a lavish lifestyle and repeatedly lying to investors about what he was doing with their money" by providing financial statements that he "simply made up"); *United States v. Ruiz*, 21-cr-695 (VSB) (June 16, 2022 S.D.N.Y.), Dkt. 23 (imposing a 72-month sentence where defendant, according to the government, "shamelessly breached his fiduciary duties" and stole from his clients by funneling money through shell transactions and spent the "vast majority" of the stolen funds on his personal expenses); *United States v. Sadleir*, 20-cr-320 (PAE) (June 7, 2022 S.D.N.Y.), Dkt. 81 (imposing a 72-month sentence where defendant, through the use of sham entities and fake identities, misappropriated tens of millions of dollars, in part to purchase a $14 million home in Beverly Hills). Michael, by comparison, has led a modest lifestyle and dedicated himself to revitalizing his local community and the environment. (Def. Mem. 7–11.)

[4] American Bar Association, *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (Nov. 10, 2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

Guidelines were created by a task force comprised of judges (the Honorable Gerard Lynch of the Second Circuit and the Honorable Jed Rakoff of the Southern District of New York), former judges (the Honorable Nancy Gertner and the Honorable John Gleeson), distinguished academics, and observers from the Department of Justice and Federal Defenders.  As set forth in the defense's submission, the Shadow Guidelines suggest a sentence in the range of 37-46 months imprisonment as the starting point (Def. Mem. 23–24), which the government, by ignoring the Shadow Guidelines, does not appear to dispute.

When the Section 3553(a) factors are properly considered, a sentence of 0-36 months' imprisonment, below the Shadow Guidelines range, is appropriate.  As set forth in the defense's sentencing memorandum and dozens of letters, Michael's absence of any criminal history, his devotion to his family and friends, and his decades-long commitment to revitalizing his local community of Richmond, Virginia, and the environment, among other personal characteristics, weigh in favor of leniency under Section 3553(a).[5]  To fund his and his wife's ventures aimed at revitalizing the local community and environment, Michael has lived modestly.  The government largely ignores this and asserts, despite the evidence to the contrary, that Michael was "[m]otivated by greed and disregard of the law" and also stood to benefit from the revitalization of his local community.  (Gov't Mem. 15.)  Those arguments are misplaced and in tension with the account of Michael's character from dozens of his family and friends, which note that Michael's and his wife's ventures were not profitable, but aimed at revitalizing a downtrodden community.  (*See* Def. Mem. 8–9.)

---

[5] Attached as Exhibit A is an additional letter from Michael's brother-in-law recounting Michael's "high importance on family" and his "hours spent working" to improve the community, resulting in "[a] long, lost area of Richmond [] becoming something again."

Further, a sentence in the range of 0-36 months is necessary to avoid unwarranted sentencing disparities.  As an example of a more analogous case than any the government cites, in *United States v. Johnson*, Judge Rakoff sentenced a pair of father and son defendants to terms of 36 months and 30 months, respectively, for defrauding lending institutions of more than $350 million by misrepresenting the value of collateral used to obtain loans.  No. 17-cr-482 (Oct. 15, 2018 S.D.N.Y.), Dkt. 102.  In addition to the misrepresentations, the defendants there, according to the government, "set out on a years' long course of conduct to cover up the problem and continue to draw on the credit facility," including by claiming as collateral assets that were no longer owned by the company.  *Id.*, Dkt. 89 at 3.  The conduct in *Johnson* is far more analogous to the government's assertions here than any of the cases cited by the government, yet resulted in far lower sentences notwithstanding a loss amount of five times that claimed by the government here.  The government, for its part, ignores the sentences in *Johnson*, even while citing the case to highlight the importance of deterrence (Gov. Mem. 17), and despite the fact that Mr. Hild discussed the case in his opening memorandum.  Accordingly, a sentence here of 0-36 months' imprisonment would be fair and just.

## II.     THE GOVERNMENT'S ESTIMATED LOSS AMOUNT IS SPECULATIVE

The government's sentencing memorandum is also flawed for the fundamental reason that it provides only a speculative measure of loss, which greatly inflates the Guidelines range.

In its original sentencing memorandum, the defense explained that the government's estimated loss amount of $95 million was speculative and offered an alternative measure of loss, consistent with the Guidelines, based on Michael's personal gain.  (Def. Mem. 17–21.)  The government does not address Michael's personal gain, and instead vaguely reassures the Court that the loss amount of more than $65 million is "correctly calculated," while simultaneously asking the Court to defer a decision on restitution because the victim statements from the lenders

regarding loss, which the government itself submitted to the Court—and which the government had well over a year to obtain—"are not sufficiently detailed to determine which expenses the victims have incurred that are compensable." (Gov. Mem. 10 & 19.) The government also concedes that the loss amount of $95 million in the Presentence Report, which the Probation Office represented came from the "approximate estimated loss figures furnished by the government" (PSR ¶ 51), cannot be relied upon because "the Probation Office failed to distinguish between loss that should be considered under Section 2B1.1 and the broader set of expenses that may be recoverable as restitution." (Gov. Mem. 11 n.2.)

The government has had ample time to identify a non-speculative loss, and in the absence of a nonspeculative loss calculation, the Court should either decline to impose a loss enhancement under the Guidelines, or impose one based on gain. (*See* Def. Mem. 17–18 (citing cases).) In August 2019, the government indicted Michael and obtained a post-indictment restraining order of Michael's and his wife's assets. Michael was tried in April 2021, and in August 2021, the government sought a preliminary order of forfeiture. (Dkt. No. 114.) In July 2021, the Probation Office filed the Presentence Report, which stated that the "U.S. Attorney's Office reached out to each of" the lenders and received "letters from all four" lenders. (PSR ¶ 51.) Those four letters received more than a year and a half ago appear to be the same ones that the government now submits in support of its estimated loss of $65 million, but concedes are insufficient to calculate restitution.[6]

An examination of one of the lender's statements demonstrates that the government's proffered loss figure is speculative. The government asserts that "Customers Bank suffered a

---

[6] Two of the statements are undated. Despite the government's characterization of the statements as "declarations" (Gov. Mem. 11) or "affidavits" (*id.* at 19), two of the statements are neither sworn under oath nor declared under penalty of perjury. (*See* Gov. Mem. Exs. B & C.)

principal loss of over $7.6 million" (Gov. Mem. 11), but the exhibit cited in support of that assertion undermines that claim. In June 2019, "Customers Bank foreclosed its interest" in the bonds and then, in a sale that attracted "multiple bids from other parties," purchased the bonds *from itself*. (Gov. Mem. Ex. D at 4.) Customers Bank and the government assert that this resulted in a loss of $7.6 million, but that overstates the loss (if any) in at least two ways.

First, Customers Bank "sold" the bonds to itself at a fire sale price.[7] The evidence at trial established that the bonds were illiquid and required an educated market to accurately value the bonds. Rather than sell into an educated market, Customers Bank appeared to do the opposite: bring the bonds to the market at the worst possible time, in the wake of multiple defaults, an involuntary bankruptcy petition filed by lenders against Live Well, and investigations by the SEC and FBI, all of which was publicly reported and would have impaired the value of the bonds.[8] That Customers Bank was willing to pay (itself) more than other bidders to keep the bonds it was most familiar with suggests that the actual value of the bonds is higher than the sale price and that the government's asserted loss amount is overstated. (*See* Gov. Mem. 10 (quoting U.S.S.G. § 2B1.1, Application Note 3(E)(2) for the proposition that the loss should be reduced by "the fair market value of the collateral at the time of sentencing").)

Second, despite the government asserting that the loss amount should be "principal as of the date that the lenders foreclosed upon the bonds, less the liquidation value of the bonds and any coupon payments that the lenders received between those two events" (Gov. Mem. 10),

---

[7] The other lenders also sold the bonds after default in a fire sale that does not accurately reflect the market value of the bonds.

[8] *See, e.g.*, Michael Schwartz, Richmond BizSense, "Creditors: Live Well Financial Under Watch by FBI, SEC" (June 19, 2019), https://richmondbizsense.com/2019/06/19/creditors-live-well-financial-watch-fbi-sec/; Michael Schwartz, Richmond BizSense, "Updated: Creditors Look to Force Live Well Financial Into Bankruptcy" (June 12, 2019), https://richmondbizsense.com/2019/06/12/breaking-news-creditors-look-force-live-well-financial-bankruptcy/.

neither the government nor Customers Bank appears to account for any coupon payments Customers Bank has earned (or will earn) on the bonds since Customers Bank sold the bonds to itself in June 2019.  A bank selling bonds to itself at a discount is not a "liquidation" event.  By apparently considering it to be one, the government has inexplicably excluded years of coupon payments.

These discrepancies matter.  A court's findings of loss "must be grounded in the evidence and not derive from mere speculation."  *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012).  Despite suggesting that the loss amount is comfortably within the $65-$150 million Guidelines range, the government's estimated loss totals only approximately $69 million (*see* Gov. Mem. 11), and is flawed.  If the loss claimed by Customers Bank is excluded, the total loss amount falls below the $65-$150 million Guidelines bracket the government asks the Court to apply.  Further, the losses claimed by all the lenders that sold the bonds at deep discounts following default are artificially inflated because testimony at trial established that, while owned by Live Well, the bonds generated cash consistent with the Scenario 14 values, and Live Well did not default on the bonds until 2019, at the time of its wind down.  (Tr. 1878–79, 1959, 1970–72.)  Because the loss "reasonably cannot be determined," the defense offered an alternative measure of loss based on Michael's personal gain, using the government's (also largely unsupported) assertions of Michael's personal gain as a starting point.  (Def. Mem. 18–21.)  The government did not engage with or respond to this analysis at all.  Because the government, despite having more than enough time to do so, has presented a purely speculative loss amount,

the Court should either decline to impose a loss enhancement, or else impose an enhancement of 18 levels based on gain, which is less than $9.5 million.[9] (*See* Def. Mem. 18–21.)

## III.    THE AGGRAVATED ROLE AND OBSTRUCTION OF JUSTICE ENHANCEMENTS DO NOT APPLY

The government agrees that a Guidelines sentence is "not necessary," but still seeks enhancements for (i) Michael's role as "the leader of an offense that involved five or more participants," and (ii) Michael's purported obstruction of justice in testifying in his defense. (Gov. Mem. 9 & 12–14.)  Neither of these enhancements is supported by the facts or the law.

### A.    The Aggravated Role Enhancement Is Not Supported by the Trial Record

The government does not specifically explain why the four-level enhancement is warranted for Michael's role as the "leader of the offense that involved five or more participants," but it asserts elsewhere in its submission that Michael "masterminded and directed a scheme to defraud Live Well's lenders."  (Gov. Mem. 9 & 14.)

The aggravating role enhancement applies only where the defendant "exercised some control over others involved in the commission of the offense" or "at least played a significant role in the decision to recruit or to supervise lower-level participants."  *United States v. Greenfield*, 44 F.3d 1141, 1146–47 (2d Cir. 1995) (quotation omitted).  In evaluating the defendant's role, the court must differentiate the defendant's "legitimate employment" from his role in the "commission of the offense."  *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003); *cf.* U.S.S.G. § 3B1.1, Application Note 4 (noting that defendant's title is not controlling).

Although Michael was the CEO of Live Well, the evidence at trial showed that he was unfamiliar with the bonds at issue and dependent on others, including chiefly Darren Stumberger, who was an expert on the complex bonds.  (*See* Tr. 235 (Mr. Stumberger describing

---

[9] As set forth in the defense's sentencing submission, even this loss amount overstates the seriousness of the offense.  (*Id.* 21–24.)

the bonds as "among the most complex in fixed income"); *see also* Tr. 903–905 (government

witness agreeing that Mr. Stumberger was an expert in the industry and that Mr. Stumberger had

reassured him, based on his experience, that Live Well submitting prices to IDC was a "legal

gray area").)  It was Mr. Stumberger who informed Michael that the third-party pricing service

could not accurately value the bonds and suggested that Live Well could submit its own prices.

(Tr. 89 ("We just had an all hands on call with IDC.  This issue is solved. . . . We will be

supplying prices daily to IDC and IDC will use these. . . . They will use the prices verbatim"

(quoting GX-104, an email from Mr. Stumberger to Michael and others).)  It was Mr.

Stumberger and his team who managed the bonds "on a day-to-day basis."  (Tr. 1587.)  The

leadership enhancement does not apply.

### B.     Michael Did Not Obstruct Justice in Exercising His Constitutional Right to Testify in His Defense

The government asserts that Michael "perjured himself extensively during more than two

days of trial," but offers only two examples out of two days of testimony, neither of which

supports the argument.

First, the government asserts that Michael falsely testified that Mr. Stumberger told him

before Live Well acquired the bonds that the market was "highly liquid" and that he later learned

that there was "no market" for the bonds.  (Gov. Mem. 13.)  According to the government, this

testimony is proven false by Michael's earlier testimony before the SEC in which he testified

that Stumberger told him initially that the bonds were illiquid and there was "not an active

functioning market."  (*Id.*)

Second, the government asserts that Michael "attempted to deceive the jury into believing

that the bonds were not sellable in the market" and falsely testified that Live Well only once sold

the bonds at great difficulty "and only as a result of a horse trade" with a bank.  (*Id.*)  The

government asserts that this testimony was proven false by several exhibits which showed that Live Well actually sold four bonds on one day.  (*Id.*)

Defendants have a constitutional right to testify in their defense.  The Sentencing Guidelines make clear that the obstruction of justice enhancement "is not intended to punish a defendant for the exercise of a constitutional right."  U.S.S.G. § 3C1.1, Application Note 2.  Because "[a]ny sentence enhancement for perjured trial testimony implicates a defendant's constitutional right to testify in his or her own defense," to apply the enhancement, a sentencing court must specifically find that "the defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Rosario*, 988 F.3d 630, 633 (2d Cir. 2021) (quotations omitted) (cautioning that "[d]istrict courts must take these instructions seriously.").  "In other words, before imposing the adjustment, the district court must find that the defendant consciously acted with the purpose of obstructing justice."  *United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014) (quotations and alterations omitted).  The enhancement does not apply if the testimony, even if false, may have been "a result of confusion, mistake, or faulty memory."  *Id.* (quotations omitted).  Neither of the government's purported examples of obstruction of justice meet this high standard.

First, Michael's testimony at trial regarding Mr. Stumberger's pitch of the bonds was not contradictory or inconsistent with his prior SEC testimony.  Instead, the apparent discrepancy stemmed from Mr. Stumberger's changing representations regarding the bonds.  At trial, Michael testified that Mr. Stumberger first gave a presentation representing that the bonds were "highly liquid" and that "[i]f we needed to sell them, we could," but "that turned out to be false."  (Tr. 2004; Tr. 2007–2008.)  In his testimony to the SEC, Michael stated that Mr. Stumberger went to

13

"great length to make sure we understood that once you buy it, you own it, and you hold it to maturity, because there just wasn't an active market that was operating to be able to sell the securities into." (GX-1300 at 59.) At trial, Michael explained that this testimony was consistent because his understanding of the bonds "changed dramatically" "right on the heels" of Live Well purchasing the bonds. (Tr. 2007, 2010.) While the plan was to "buy and hold" the bonds, Michael testified that he only learned "on the heels of that transaction" that Live Well "couldn't sell the bonds at all." (Tr. 2008.) Michael's testimony was not inconsistent; it merely reflected the different representations made by Mr. Stumberger before selling the bonds to Live Well and shortly thereafter.

Michael also clarified that the concepts of the primary and secondary market for the bonds had been "confuse[d] and conflate[d] throughout the trial." (Tr. 2008.) Michael stated to the SEC that Mr. Stumberger had said the purchasing of the bonds was a "highly lucrative piece of the business with little to no active investors' competition." (GX-1300 at 56.) As Michael explained at trial, that statement was referring to the "acquisition of the IO bonds," or the primary market. (Tr. 2006 & 2008.) Michael's recollection of Mr. Stumberger's representations regarding the liquid nature of the bonds during the initial pitch, however, referred to the ability to re-sell the bonds, or the secondary market. Therefore, Michael's testimony regarding the representations made to him regarding the bonds was not perjurious, but an accurate description of how Mr. Stumberger's representations were discovered to be untrue.

Second, Michael did not willfully provide false testimony on the sale of any bonds in Live Well's portfolio. Tellingly, despite claiming that Michael's perjury was "extensive," the government hardly quotes Michael's testimony at all in its few brief bullet points. (Gov. Mem. 13.) A review of the complete testimony on this issue makes clear that Michael repeatedly

14

cautioned that his recollection on the attempted sale of the bonds was vague, as is consistent with the fact that he was not involved in the day-to-day management of the bonds.

Regarding the testimony of the "horse trade" of the bonds that the government alleges was perjurious, Michael testified:

> I think it was – don't quote me on the exact timeframe, but I want to say it was five months, four or five months, maybe as much as six months later Darren reached back out to Eric and I and said he thought he had an idea. . . . He described it as a horse trade. . . .  I want to say it was with Credit Suisse but I'm not a hundred percent certain on that.

(Tr. 1845–46.)  Michael continued that it was "his understanding that was the only sale of any bonds that we had consummated."  (Tr. 1846.)  When asked if it was a sale for "full value," Michael testified:  "You know, I can't say that I can really speak to that because I don't remember the particulars of what the sale price was."  (Tr. 1846–47.)

On cross-examination, Michael clarified "[t]here was a sale of a number of bonds that happened in – in one transaction. . . . I don't recall if that agreement to sell happened in one step for, you know, all the bonds or whether it was a couple of steps, but that was kind of collectively the one sale."  (Tr. 2013; *see also* Tr. 2110 (Michael testifying that he did not know whether the sale "was completed in a series of steps or not" and that he did not "know the exact dates").) The government then introduced an email dated March 16, 2015, in which Michael directed that the "worst performing" bonds be sold (Tr. 2015; GX 234), and noted that several bonds were sold the following day.  (Tr. 2027; GX 308X.)  This is consistent with Michael's testimony that he recalled only one transaction in which a number of bonds were sold in early or mid-2015. The government also noted that an Excel document showed a sale of a bond on November 17, 2014, and introduced an exhibit showing that Michael requested that a bond be sold on November 13, 2014.  (Tr. 2013; GX 308X; Tr. 2112; GX 236.)  Michael stated that he did not recognize the Excel spreadsheet.  (Tr. 2014.)  These documents show only that Michael could

15

not recall the sale of a bond more than six years earlier—not that Michael willfully provided false testimony as to a material fact.  *See Rosario*, 988 F.3d at 633.

Neither of the government's two examples of Michael exercising his constitutional right to testify in his defense support the obstruction of justice enhancement.[10]

## IV.    THE COURT SHOULD NOT ORDER FORFEITURE OR RESTITUTION

In a single paragraph, the government requests that the Court enter its proposed preliminary order of forfeiture (Gov. Mem. 19), while ignoring the issues the defense's sentencing submission raised with its analysis of Michael's gain.  As explained in the defense submission, the government's claim that Michael gained more than $22 million as a result of the offense is wrong because it does not account for any growth in his legitimate compensation and misunderstands the facts as to why Michael's compensation increased over time.  (Def. Mem. 18–21.)  As the evidence at trial showed, Michael received director's fees and guarantee fees that were recommended by an independent consultant and approved by the other member of Live Well's board.  (*Id.* 19–20.)  The government has offered only speculation to link those payments to its allegations here.  Furthermore, the guarantee fees reflected the great risk Michael took on in being the only one to personally guarantee Live Well's debt, as evidenced by the civil litigation now pending against Michael on account of his guarantees.  (*Id.* 20.)  Finally, the real properties sought to be forfeited by the government are held in LLCs owned by Michael's wife (*see* Dkt. 114 at 6) and many have been pledged in good faith by Michael's wife for loans from a credit union, and are not proper substitute assets.

---

[10] In addition to asking the Court to enhance the Guidelines range because Michael exercised his constitutional right to testify, the government also comes close to asking improperly that the Court impose a longer sentence because Michael exercised his constitutional right to trial in the first place, where the government supports its request for substantial imprisonment by arguing that Michael "has never accepted responsibility for his conduct."  (Gov. Mem. 18.)  The fact that Michael did not enter a guilty plea, however, does not provide a proper basis for the Court to impose a higher sentence.  *See United States v. Araujo*, 539 F.2d 287, 292 (2d Cir. 1976).

Regarding restitution, the Court should deny the Court's request for a 90-day extension to obtain sufficiently detailed victim statements and not order restitution.  (*See* Gov. Mem. 19–20.) As noted, *supra* II, the government has had more than enough time to supplement the lender's statements it received in July 2021, but has not done so.  *See Cuti*, No. 08 CR. 972 DAB, 2011 WL 3585988, at *10 (S.D.N.Y. July 29, 2011) (declining to order restitution where government's loss amount was speculative).

## CONCLUSION

For the foregoing reasons, we respectfully ask the Court to sentence Michael to 0-36 months.


Dated: New York, New York
       January 24, 2023

                    MORVILLO, ABRAMOWITZ, GRAND,
                       IASON & ANELLO, P.C.

               By: /s/ Brian A. Jacobs
                    Brian A. Jacobs
                    Alexander M. Levine
                    565 Fifth Avenue
                    New York, NY 10017
                    (212) 856-9600
                    (212) 856-9494 (fax)
                    bjacobs@maglaw.com

                    *Attorneys for Defendant Michael Hild*