```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: 12/13/2023           │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

        Plaintiff,

    -against-

MICHAEL HILD.

        Defendants.

-----------------------------------------------------------------X

**19-cr-00602-RA-1**

**ORDER SCHEDULING HEARING
AND REQUIRING ADDITIONAL
INFORMATION IN SUPPORT OF
RESTITUTION**

**KATHARINE H. PARKER, United States Magistrate Judge:**

  Following Defendant Michael Hild's ("Hild" or "Defendant") sentencing for his conviction on charges that he conspired to, and did, commit, securities fraud, bank fraud, and wire fraud, the Government has, pursuant to 18 U.S.C. §§ 3663A and 3664, sought restitution on behalf of four institutional victims: Mirae Asset Securities ("Mirae"), Industrial and Commercial Bank of China Financial Services ("ICBC"), Flagstar Bank ("Flagstar"), and Customers Bank ("Customers"), collectively ("the Victims").  On September 12, 2023, the Honorable Ronnie Abrams referred the issue of restitution to the undersigned to manage any discovery needed and make a recommendation as to a restitution amount.  (Dkt. 193.)  After first meeting with the parties, on October 11, 2023, this Court issued an order directing the government to provide enumerated categories of "information and related supporting documentation" regarding the proposed restitution amounts as well as an "argument in favor of its proposed restitution amount."  (Dkt. 198.)  Hild's response and objections to the Government's submission was due and submitted on November 20, 2023.  *Id.*

  Unfortunately, the Court is still unable to calculate appropriate restitution amounts for the victims.  Quite simply, the Government failed to provide sufficient documentation to enable

the Court to make a recommendation on restitution.  Accordingly, the Court discusses the relevant standards for computation of a restitution award and deficiencies in the Government's submission below to provide additional clarity to its October 11, 2023 order.  The Court will hold a hearing on **January 2, 2024, at 10:00 a.m.** in Courtroom 17D, 500 Pearl Street, New York, New York.  The Government shall bring witnesses who can provide testimony and additional exhibits to explain and support its proposed restitution amounts.  At the hearing, Hild will be permitted to ask clarifying questions about the calculations and evidence supporting the proposed restitution amounts.   By **December 29, 2023**, the Government shall submit any additional documentary evidence it intends to present on January 2, 2024.

**Background**

The Court assumes the reader's familiarity with the underlying facts and procedural history of this action, about which the Court has previously written extensively.  *See United States v. Hild*, No. 19-CR-602 (RA), 2023 WL 5928350, at *1 (S.D.N.Y. Sept. 12, 2023).  The following is taken from the Court's prior opinion and summarizes those facts relevant to the calculation of Defendant's restitution obligations.

Hild was charged in a five-count indictment with conspiracy to commit securities fraud, 18 U.S.C. § 371; conspiracy to commit wire and brank fraud, 18 U.S.C. § 1349; securities fraud, 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. § 240.10b-5; wire fraud, 18 U.S.C. §§ 1343 and 2; and bank fraud, 18 U.S.C. §§ 1344 and 2.  Hild maintained his innocence and proceeded to trial, which lasted fourteen days.

The evidence at trial established that Hild and his co-conspirators at Live Well Financial ("Live Well") engaged in a multi-year scheme to fraudulently inflate the value of a portfolio of Home Equity Conversion Mortgage "interest only" bonds ("HECM IO bonds") used as collateral to secure cash loans.  Although the loan amounts were nominally based on market prices for the HECM IO bonds provided by a third party, the evidence demonstrated that Live Well had directly supplied valuations to that third party, unbeknownst to its lenders, basing them on its own novel internal pricing methodology rather than on what the bonds could readily be sold for in the market.  As a result, Live Well was able to purchase the bonds at one price, provide the third party its own inflated valuations, and then use those inflated bond values as collateral to take out loans worth significantly more than the price for which the bonds could be sold, resulting in a substantial cash windfall for Live Well. *Hild*, 2023 WL 5928350 at *1.

After deliberating for one day, the jury found Hild guilty on all five counts.  He was sentenced on January 27, 2023 to 44 months' imprisonment.  At his sentencing, the Court ordered Hild to pay restitution to the victim lending institutions, (*see* Dkt. 148), but reserved judgment on the amount of restitution to be paid pending further justification from the Government.  *See Dolan v. United States*, 560 U.S. 605, 611 (2010) (holding, where a district court has ordered restitution within the 90-day period set pursuant to 18 U.S.C. § 3664(d)(5), but has not set an amount, that it retains jurisdiction to order the amount at a later date).

The Government filed a proposed order of restitution on April 24, 2023, calculating that Defendant owed approximately $69 million.  (Dkt. 161.)  Those submissions included information related to millions of dollars in "coupon payments"—that is, annual interest payments—received by the Victims for holding the HECM IO bonds, which were offered as collateral by Live Well.  (*Id*.)  Hild objected to the Government's reliance on affidavits it had previously submitted in its Sentencing Affidavit, which the Government had affirmed were "not sufficiently detailed to determine which expenses the victims have incurred that are compensable" for restitution purposes.  (Dkt. 144 at 19.)  The Court filed an order indicating that, although it had ordered Hild to pay restitution to the victims, it would not specify the amount "without additional justification for doing so."  (Dkt. 164.)  The Government made an additional submission on May 16, 2023, (Dkt. 168,) which attached affidavits from the four Victims and calculated Defendant owed $73 million in restitution.  Hild thereafter filed his motion for a new trial on May 29, 2023.  (Dkts. 173–74.)

On July 27, 2023, Hild moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. Hild argued that evidence of the coupon payments constituted newly discovered evidence.  The Court denied both motions. *United States v. Hild*, 644 F. Supp. 3d 7, 19 (S.D.N.Y. 2022).  Hild has since appealed that ruling to the Second Circuit.

### Legal Standard

Pursuant to the Mandatory Victims Restitution Act ("MVRA"), the "court shall order" a defendant convicted of "an offense against property under" Title 18, "including any offense

4

committed by fraud or deceit," to pay restitution to "an identifiable victim or victims" who "has suffered a ... pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1).  "The 'primary and overarching goal of the MVRA is to make victims of crime whole' to 'compensate these victims for their losses and to restore the[m] to their original state of well-being.'" *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (quoting *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011)).  A "victim" for purposes of the statute is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

The Government bears the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense."  18 U.S.C. § 3664(e).  "The purpose of restitution is to compensate victims for their losses," and so restitution must be ordered "in the full amount of, but not in excess of, his, her, or its loss." *United States v. Gonzalez*, 647 F.3d 41, 65, 67 (2d Cir. 2011).  "The government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence." *United States v. Donaghy,* 570 F.Supp.2d 411, 423 (E.D.N.Y.2008) (citing 18 U.S.C. § 3664(e); *United States v. Reifler,* 446 F.3d 65 (2d Cir. 2006)).  Nonetheless, "the loss need not be determined with precision and [ ] the court need only make a reasonable estimate of the loss, given the available information." *United States v. Germosen,* 139 F.3d 120, 129, 130 (2d Cir.1998) (internal quotation marks omitted) (holding, the "quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same" in calculating both offense level under the Sentencing Guidelines and restitution).

If a victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the court must set a date for the final determination of the victim's losses, which must occur no later than 90 days after sentencing.  18 U.S.C. § 3664.  Notwithstanding the foregoing, the Supreme Court has held that "a sentencing court that misses the 90–day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount."  *Id.* at 2537; *see also United States v. Gushlak*, 728 F.3d 184, 192 (2d Cir. 2013) (affirming restitution order issued eighteen-months after sentencing absent evidence of prejudice to Defendant).  The Second Circuit has similarly declined to reverse a restitution order because of "a district court's failure to determine identifiable victims' losses within ninety days ... unless [the defendant] can show actual prejudice from the omission." *United States v. Zakhary,* 357 F.3d 186, 191 (2d Cir.2004); *see also United States v. Catoggio,* 326 F.3d 323, 329–30 (2d Cir.2003) (applying this rule).

**Discussion**

**A. Amounts Sought by Each Victim**

*1. Flagstar*

The Government seeks the total amount of $16,512,347 in restitution for Flagstar. (Dkt. 206.)  This was calculated as the total remaining principal on the loans due to Flagstar ($30,537,049), plus legal expenses ($153,820) and prepetition interest ($4,420,478), minus the amounts received from third party settlements ($18,600,000).  *Id.*  In support of the total figure, Flagstar submitted a declaration, two spreadsheets, and its previous July 2021

6

declaration.  (Dkt. 204.)  The spreadsheets provide the original face value of the bonds,

proceeds received from holding the bonds and from selling the bonds three months later,

and then provides the difference between the proceeds received and the unpaid balance

of the loan.  (*Id* at 5-6.)  Finally, the affidavit notes that Flagstar collected $18,600,000 from

settlements with unnamed third parties.

The Court has questions about the $30,537,049 in remaining principal.  The original

loan amount was $70,000,000.  First, there are discrepancies in the record as to the

amount of coupon/interest payments Flagstar received from holding bonds that would

have reduced the principal amount remaining on the loan.  Second, Flagstar sold the bonds

to an unnamed third party for a total of $35,367,135 after only holding them for four

months.   The price paid for the bonds also reduced the principal amount remaining on the

loan.  Hild raises a question about the fairness of the price paid for the bonds and requests

that the identity of the purchaser be revealed to rule out any potential conflicts of interest

that may have impacted the price paid (i.e., caused the bonds to be sold for less than they

were worth).

Turning to the first issue, Flagstar held the bonds for four months before selling

them to the unnamed third party.  The Government previously provided this Court with

Flagstar's proof of claim in the LiveWell Bankruptcy proceeding to support its computation

of Flagstar's loss. Dkt. 187-1 at 3.  In the proof of claim, an authorized agent for Flagstar

wrote:

> On September 5, 2019, Flagstar received an interest payment (proceeds of
> Collateral) in the amount of $2,091,163.28, which it applied to repetition interest of
> $104,327.66, and the balance ($1,968,835.62) to principal. . . Flagstar also received
> an additional interest payment (proceeds of Collateral) of $394,666.73. On
> September 20, 2019, Flagstar received another interest payment (Proceeds of
> Collateral) of $709,815.99, which it applied to principal.

*Id* at 3-4.  In short, Flagstar previously affirmed to the Bankruptcy Court that it received

$3,195,646 in proceeds from the bonds during one of the four months it held them before

selling them.

Yet, in the Government's most recent submission, it submits an affidavit from a

Flagstar representative and a spreadsheet stating it received only $394,666 from the "bond

interest (i.e., coupon payments)" during the four months it held the bonds.  (Dkt. 204 at 3 ¶

f.)  This is a significant, unexplained discrepancy that impacts the principal amount

remaining on the loan.  To further confuse the matter further, the Government's

submission states on the one hand, that Flagstar received no coupon payments at all, yet at

the same time, that Flagstar received the above-mentioned $394,666 in coupon payments

and applied them to the loans' principal.  Dkt. 204 at ¶¶ 3 e-f.

In sum, the Court questions the accuracy of the amount of coupon payments

received by Flagstar.  This impacts the amount of principal remaining on the loan at the

time the bonds were sold to the third party.  In other words, the $30,537,049 principal

amount might be substantially less.  Not surprisingly, Hild notes this important discrepancy

in his objection to the Government's restitution request.  Indeed, if Flagstar received

approximately $3,000,000 per month in coupon payments over the four months it held the

bonds, then the principal amount would be approximately $12,000,000 lower than reported by the government.[1]

Turning to the second issue impacting the principal amount – the identity of the purchaser of the bonds – would allow the Court to determine whether there is any concern about the price paid for the bonds.  In this regard, Hild argues that the entity that priced the bonds – LiveWell's competitor, BlackRock – might have underpriced them, particularly if it was the purchaser or one of its affiliates was a purchaser.  (Dkt. 204, Ex. 2 ¶ 9.)  The Court is not convinced this information is critical to a determination of the principal amount because at this point it is totally speculative that there is anything suspect about the price paid for the illiquid bonds.  *Cf. Robers*, 572 U.S. 639, 645-46, (2014) (recognizing that market changes in value of collateral is foreseeable and that victims may sell collateral for less than the price paid).  Nonetheless, the Court agrees that the identity of the ultimate end purchaser would be helpful information to understand what happened to the bonds.

Thus, at the upcoming hearing, the Government must provide an explanation of how it arrived at the principal amount and account for the discrepancies in the record mentioned above.

Additionally, the Government did not provide any documentation such as legal invoices or attorney billing records to support its request for $153,820 in Flagstar's legal

---

[1] Although the Court determined that the value of the "coupon payments" would have no impact on Hild's guilt for the underlying offenses for Rule 33 purposes, their value is relevant for computing restitution. *Hild*, 2023 WL 5928350, at *9.

fees.  The Court must have some documentation to determine the basis for the fees and whether they are compensable under the MVRA.  *Cf. United States v. Avenatti,* 2022 WL 452385, at *3 (S.D.N.Y. Feb. 14, 2022), aff'd, 81 F.4th 171 (2d Cir. 2023) (Government provided a summary of the billable rates for the attorneys and non-legal staff who worked on the matter, the amounts paid by [Victim], and monthly diary entries from lawyers and non-legal staff, which the firm "redacted to remove privileged information and entries for which [Victim] does not seek restitution); *United States v. Levis,* 2011 WL 497958, at *2 (S.D.N.Y. Feb. 10, 2011) (reviewing five years of legal invoices to determine which expenses were compensable under the MVRA.  As it stands now, the Court cannot assess the propriety of any legal fee award on the record provided.

*2. Mirae*

The Government seeks a total balance of $22,654,282 in restitution for Mirae. (Dkt. 206.)  This was calculated as the total remaining principal due ($49,888,372), plus legal expenses ($72,500), prepetition interest ($615,000), and carrying costs ($6,122,896) minus the amounts received from coupon payments ($34,044,486).  (*Id.*)  The Government submits that Mirae has received no proceeds from any third-party settlement.  In support of the total figure, it submits a declaration from a Mirae representative, four spreadsheets, and a copy of all trade confirmations related to the sale of the bonds.  (Dkt. 202.)

The Court has questions about the amount of coupon payments received by Mirae because the information provided is incomplete.  It does not reflect any coupon payments for the period April 2019 through October 2019 – the first six months when Mirae held the

bonds.  Rather, it reflects coupon payments received from November 2019 through November 2021, at which point Mirae had completed the sale of all of its bonds.[2]

Mirae states it received about $34 million in coupon payments from November 2019 to November 2021.  If this amount were pro-rated for six months, then there could be another $8.5 million in unreported coupon payments, which would reduce the total loss claimed. Thus, the Court cannot properly compute restitution without more information about any coupon payments received by Mirae in the first six months when it held the bonds.

There is also a dispute about whether Mirae received any settlement proceeds.  The Government represents that Mirae received no third-party settlement proceeds, but Hild argues that Mirae was a party to a $29 million settlement in a civil lawsuit related to LiveWell's bankruptcy.  (Dkt. 208.)  Hild cites to the docket in the Bankruptcy Court proceeding but does not provide a copy of the settlement.  If this settlement occurred, then it would further reduce any loss Mirae suffered.  If Hild wishes the Court to take this settlement into account as satisfaction of his restitution obligation, then he has the burden to provide documentation of the amount.  *See United States v. Smathers*, 879 F.3d 453, 460-61 (2d Cir. 2018).  This is true whether the payments were made by Defendant themselves or made by other persons.  *Id.*  At the same time, it is concerning that the Government did not at least mention that Mirae received a settlement payment given that the settlement might completely eliminate the need for any restitution payment and there

---

[2] Mirae sold its bonds in stages.

is indication in the public docket of the Bankruptcy Court of a settlement.   For purposes of computing restitution, and because this information is a fair discovery item, the Government is hereby ordered to obtain the amount Mirae received in settlement proceeds and provide that amount to the Court and Hild in advance of the January 2, 2024 hearing.

Finally, as with its submission for legal fees for Flagstar, the Government similarly failed to provide documentation supporting $72,500 in restitution for legal fees incurred by Mirae.  Such documentation must be provided in order for this amount to be included in any restitution award.

*3. ICBC*

The Government seeks an award of $19,800,566 in restitution for ICBC.  (Dkt. 206.) This was calculated as the total remaining principal due ($69,926,170), plus legal expenses ($2,005,442), and prepetition interest ($4,316,776), minus the amounts received from coupon payments ($39,947,882), and third-party settlements ($16,500,000).  (*Id.*)  In support of the total figure, the Government submitted a declaration from an ICBC representative, three spreadsheets, a copy of all trade confirmations related to the sale of the collateral, and records related to all coupon payments received.  (Dkt. 203.)

The Court has one question about the prepetition interest figure.  ICBC calculated the $4,316,776 in prepetition interest by providing "a prorated monthly cost and interest due to borrowing funds . . . of $179,866."  (Dkt. 203-1 at 3.)  However, in its affidavit, ICBC states that it "is still attempting to locate any monthly calculations of costs and interest to

borrow funds from [its parent company.]" *Id.*  To the extent ICBC can locate such

calculations, the Government should provide them by January 2, 2024.  This will assist the

Court in determining the methodology used to arrive at the total sought for prepetition

interest.

Finally, no documentation was provided to support the request for $2,005,442 in

legal fees, and the Court cannot assess the propriety of any legal fee award on this record.

*4. Customers*

The Government seeks a total balance of $ 5,984,779 in restitution for Customers.

(Dkt. 206.)  This was calculated as the total remaining principal due ($9,382,612), plus legal

expenses ($117,970), prepetition interest ($218,633), and carrying costs ($714,033), minus

the amounts received from coupon payments ($4,448,469).  (*Id.*)  In support of the total

figure, it submits an affidavit from a Customers representative, two spreadsheets, and a

copy of all trade confirmations related to the sale of the collateral.  (Dkt. 205.)

Unlike the other victims, Customers bought the bonds from itself in July 2020 by

bidding $.01 more than the highest bid received for the bonds.  It paid $15,431,674.38 for

its own bonds.  This amount was factored into and resulted in the remaining principal

amount mentioned above.  However, no current fair market value is provided for the

bonds that Customers still holds and presumably could sell.  This is relevant to ensure that

any restitution amount is reasonable and does not reflect a windfall.

Additionally, Customers received coupon payments from the bonds during the

period April 2019 through July 2020, but only reports the amounts received for the period

August 2019 through July 2020.  Specifically, it states it received about $4.4 million in coupon payments for the period August 2019 to July 2020.  (Dkt. 205-2 at 3).  Assuming equal monthly coupon payments, it appears as if Customers may have received an additional $1.5 million in unreported coupon payments, which would reduce the amount of remaining principal and the total loss.  The Court requires information about coupon payments received during this period to accurately calculate restitution.  The Court also has questions about Customers' representation that it received no coupon payments after July 2020.  The Court requires an explanation as to why coupon payments ceased after Customers sold the bonds to itself.   Absent more information on the coupon payments received, the Court cannot calculate the proper restitution amount.

Finally, no documentation was submitted to support the request for $117,970 in legal fees, and the Court cannot assess the propriety of any legal fee award on this record.

**B.  Hild's Other Objections**

Hild argues that the Government has failed to justify the inclusion of legal fees in its third submission, complains about the inclusion of prepetition interest, and argues that the Government has failed to establish that the Victims' losses directly resulted from Hild's offense conduct.  These arguments are without merit.

*1. Legal Fee and Prepetition Interest Calculation*

Hild objects that the Government seeks, "for the first time," restitution for each of the lenders' attorney's fees ($2,350,732) and pre-judgment interest ($9,570,917).  (Dkt. 206.)  However, "attorneys' fees required to incur to advance the [criminal] investigation or

prosecution of the offense" are recoverable under the MVRA. *United States v. Afriyie*, 27 F.4th 161, 173 (2d Cir.), cert. denied, 143 S. Ct. 326, (2022).   At oral argument counsel for the Government stated the original restitution proposals did not include attorneys' fees or interest payments in an effort to simplify the restitution proceedings.  However, in its October 11th Order, this Court specified a restitution order must compensate the victims "in full," and therefore the Government was not able to unilaterally exclude specific categories of costs otherwise recoverable under the MVRA. *See e.g., Reifler*, 446 F.3d at 133.  Despite Hild's objection, these costs' inclusion was required by this Courts' order on October 11, 2023.

While fees within those categories are recoverable, as discussed above, the Government has failed to provide any supporting documentation to support its request for legal fees.  The Court will not award such fees as part of restitution absent appropriate documentation being submitted on or before January 2, 2024.

Hild also complains about the inclusion of prepetition interest in any restitution award.  Again, however, its inclusion of amounts for prepetition interest is consistent with this Court's prior order.  Nonetheless, the Government does not provide any explanation of its calculation of prepetition interest, or any authority supporting its chosen rates or why they vary per victim. The Court requires an explanation for the rates on or before January 2, 2024.

*2. Losses Directly Resulting from Offense Conduct*

Only actual losses "directly resulting from the offense of conviction" are recoverable under the MVRA. *United States v. Donaghy*, 570 F. Supp. 2d 411, 428 (E.D.N.Y. 2008), aff'd sub nom. *United States v. Battista*, 575 F.3d 226 (2d Cir. 2009).  Hild generally alleges that the government has not established that the loss amounts "directly resulted" from his offense conduct, relying on *United States v. Germosen* 139 F.3d 120, 131 (2d Cir. 1998).  Hild contends that the Victim's losses "directly resulted" from their decisions to sell the HECM IO bonds into a "highly illiquid market" and "during a period of low prices." According to Hild, the Victims are responsible for their losses because they could have decided to hold the collateral and receive an indeterminate recovery amount through the coupon payment over an indeterminate period and could have mitigated or eliminated their loss.  Therefore, he objects to any restitution.

Hild's argument is unpersuasive. That Flagstar, Mirae, and ICBC[3] sold the bonds for less money than Hild contends they were worth does not mean that restitution for their loss is inappropriate.  To start, *Germosen* is inapposite because it stands for the proposition that a court cannot include in a restitution amount losses from crimes not charged in an indictment.  139 F.3d at 131.  That is not the case here.  The Government seeks restitution for victims of the crimes charged in the indictment and provided evidence that the losses were attributable to Hild.  *Hild*, 2023 WL 5928350, at *10 n5 (collecting examples in the

---

[3] Customer's Bank sold its HECM IO bonds to itself at a price $.01 above the highest third-party bid.  It is not clear based on the record whether Customer's Bank continues to hold the bonds or receive coupon payments.

record wherein Hild demonstrated his knowledge of the scheme to mislead lenders).  Said another way, the Victims possess bonds as a *direct result* of Hild's offense conduct.

Insofar as Hild suggests that the Victims should have mitigated their losses by holding the bonds indefinitely, his suggestion is without merit.  He cites no case authority to suggest that the Court has to factor in possible mitigation when making a restitution calculation.  *Robers v. United States*, 572 U.S. 639, 645–46, (2014).

### Conclusion

For the foregoing reasons, the Government shall provide additional information supporting its restitution request consistent with the above on or before January 2, 2024. A hearing is scheduled for **January 2, 2024, at 10:00 a.m.** in Courtroom 17D, 500 Pearl Street, New York, New York.  The parties shall be prepared to introduce evidence and examine and cross-examine any witnesses at the hearing.

**SO ORDERED.**

DATED:        New York, New York
              December 13, 2023

_____
KATHARINE H. PARKER
United States Magistrate Judge