UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

MICHAEL HILD,

                Defendant.

19-CR-602 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

In 2021, a jury convicted Michael Hild of securities fraud, wire fraud, and bank fraud, as well as conspiring to do so. His conviction stemmed from his role in a multi-year scheme to inflate the prices of "interest only" bonds that secured a windfall for Live Well Financial, where Hild was the chief executive and largest shareholder. Through that scheme, Live Well purchased bonds at one price and then used them, at their inflated prices, as collateral to obtain loans worth significantly more than the bonds were worth in the market. Although Hild led lenders to believe that an independent third party had calculated the high prices of the bonds, Live Well had in fact calculated them, knowing market prices were lower. Hild now seeks a new trial under Federal Rule of Criminal Procedure 33, citing newly discovered evidence about a cooperating witness's influence on market price calculations. For the reasons that follow, the Court denies Hild's motion.

## BACKGROUND

The Court assumes the parties' familiarity with the underlying facts and procedural history of this action, about which the Court has previously written extensively. *See United States v. Hild*, No. 19-CR-602, 2023 WL 5928350 (S.D.N.Y. Sept. 12, 2023); *United States v. Hild*, 644 F. Supp.

3d 7 (S.D.N.Y. 2022). The following draws on the Court's prior opinions and summarizes the relevant background.

### I. Evidence Presented at Trial

#### A. Founding of Live Well and Reverse Mortgage Servicing

Michael Hild founded Live Well in 2005 to pursue a business opportunity in the burgeoning reverse mortgage space. Tr. 1785–88. Reverse mortgages, or Home Equity Conversion Mortgages ("HECMs"), are a financial product designed to provide liquidity to senior homeowners whose net worth is primarily tied up in their home equity. Tr. 57– 58, 578–79, 1788. At all relevant times, Hild was Live Well's CEO, Tr. 1247, 1867, and largest shareholder, Tr. 1904–05; *see also* GX 321.

Beginning in about 2011, Live Well began securitizing reverse mortgages into bonds called HECM mortgage-backed securities ("HMBSs"). Tr. 947. Packaging the mortgages as bonds allowed Live Well to generate revenue more quickly by selling pools of similar reverse mortgages to investors in bulk. Tr. 947–49. Key among these bonds was a subcategory of interest-only bonds ("HECM IO bonds"), which are made up of derivatives of HECMs that include only the interest portion of the loan. Tr. 59, 950–52; *see also* Tr. 1814. The HECM IO bonds are particularly attractive to investors because holders of those bonds receive regular interest payments. Tr. 1818.

#### B. Expansion Into Purchasing HMBSs

In 2014, Live Well expanded beyond securitization of reverse mortgages into the purchase of HMBSs. Tr. 58–59, 951–52, 1817. At Hild's direction, the company acquired a portfolio of fifteen HECM IO bonds worth $55 million from a small investment bank. Tr. 57, 72–73, 951–53.

Live Well did not have the cash on hand to buy the bonds outright, so it financed the acquisition in part through loans collateralized by the underlying bonds. Tr. 76–77, 731–32, 952. In the case that Live Well was unable to repay the loan at the end of the term, the lenders would

keep the collateral bonds, which they could either hold or sell to repay the defaulted loan. Tr. 76–77, 731.

With one exception, the loan agreements between Live Well and the lenders required that the prices for the bonds be set by an independent third party. Tr. 78–80, 575–76, 598–600. As lenders typically lacked the expertise required to value the bonds themselves, they relied on a third party—Interactive Data Corporation ("IDC")—to provide prices. *See* Tr. 575–76; *see also* Tr. 82–83. As one Live Well employee explained, lenders required third-party prices "because [they] wanted independent, unbiased view[s] on valuations." Tr. 82.

Initially, IDC was itself unable to value the bonds and thus relied on "broker quotes" to provide pricing. Tr. 83, 173. Live Well provided those broker quotes. Tr. 83–84. Accordingly, IDC published prices provided by Live Well, which were then used to calculate the size of the loans Live Well could secure from lenders.

In January of 2015, IDC began using its own independent pricing model to value the bonds. Tr. 84–85; GX 104. Hild and the co-conspirators, however, believed that IDC's model was deficient. Tr. 281–83. Ultimately, IDC ceased modeling the bonds independently and returned to publishing Live Well's broker quotes. Tr. 88–89.

### C.  Shift to Scenario 14 Pricing

Hild and other Live Well employees, meanwhile, believed that the market generally undervalued reverse mortgage bonds. Tr. 112–13, 298–99, 996. Live Well accordingly sought to develop its own internal models to project the value of the bonds later in 2015. Tr. 100–05, 990–93; GX 113. At Hild's direction, Live Well employees ran pricing "scenarios" with inputs that differed from the market. Tr. 95–103, 113–14; GX 113. He ultimately picked a model, known as Scenario 14, that did not account for the yield requirement demanded by the market. Tr. 114–15; GX 113. Because the Scenario 14 assumptions differed from factors "in the market," the prices of the bonds derived using Scenario 14 were typically higher than those for which they could be sold.

3

Tr. 113–15. Indeed, multiple co-conspirators testified that they knew the Scenario 14 prices exceeded what the bonds were worth in the market. Tr. 158, 993–97, 1014.

Nevertheless, at Hild's direction, Tr. 91, 93, 103, Live Well began to submit Scenario 14 prices to IDC in September of 2015, Tr. 137, 150, 322–23, 410, 998–99. The shift to Scenario 14 prices in turn resulted in an $11 million increase in the value of Live Well's portfolio. Tr. 119–22; GX 402 at 29. Because most of Live Well's lender agreements relied on IDC pricing, use of Scenario 14 pricing allowed it to enter into loan agreements where the loan amount exceeded the purchase price of the bond; Live Well thus experienced an immediate windfall. Tr. 128; *see also* Tr. 129–34. By the end of 2015, the shift to Scenario 14 valuations had resulted in an increase in the value of the company's portfolio by tens of millions. Tr. 1084.

Several co-conspirators testified that they knew that providing the Scenario 14 prices to IDC and then borrowing against those prices was "wrong." Tr. 307–09, 1002, 1539. They believed that if the lenders had known the IDC prices were based on Live Well's internal investment "thesis"—rather than the prices the bond could be readily sold for in the market—they would not have entered the agreements. Tr. 136, 139, 309–12, 996–1009. The lenders expressed this same view directly. Tr. 605–10.

### D.  Lenders' Pricing Concerns

Live Well continued submitting prices to IDC, and, from 2015 onward, IDC published those prices "verbatim." Tr. 1014, 1254–55. In early 2017, one lender, Wedbush, grew concerned about the bond pricing and communicated that it wanted to reduce Live Well's credit line and stop lending against certain bonds. Tr. 1153–57. Live Well faced a liquidity crisis as a result. Tr. 166–67, 1157–64, 1183–84; GX 151. Subsequently, in September of 2017, Live Well received a subpoena from the Securities and Exchange Commission ("SEC"), which led to a two-year investigation. Tr. 1205.

Over time, other lenders also grew concerned about how the bonds were valued. In 2018, for example, an investment bank informed Industrial and Commercial Bank of China, that the bonds had been priced 50 percent higher than their market value. Tr. 701. Bloomberg L.P., a professional services company, also provided a lower market price. Tr. 720. In 2019, Flagstar Bank observed that Bloomberg's market pricing was also significantly lower than IDC's. Tr. 749.

### E. Dan Foster's Cooperation

As the SEC investigated, Dan Foster, a Live Well employee, began to cooperate with the government. He signed a proffer agreement with the SEC in November 2017. Def.'s Mot., Ex. C., Dkt. 235. Shortly before a grand jury indicted Hild in August 2019, Foster entered into a non-prosecution agreement with the U.S. Attorney's Office, which disclosed notes of its interview of Foster nearly a month before Hild's trial. Def.'s Mot., Ex. A.

### F. Ceasing Operations

Trouble for Hild and Live Well intensified when a new chief financial officer took over in 2019. Tr. 1599, 1601–02. The new CFO's communications regarding another lender, Customers Bank, soon led him to question the bond pricing. Tr. 1604–08. He learned that Live Well had been providing IDC prices, Tr. 1608–09, and, after evaluating the portfolio, told Hild that the bonds were overvalued, Tr. 1610–11. Accordingly, unlike the previous CFO, who had been complicit in the fraud, Tr. 1087–89, the new CFO refused to sign the Live Well's 2019 audited financial statements, Tr. 1616–17. Shortly thereafter, Live Well announced it would cease operations and unwind. Tr. 1617–19.

## II. Procedural History

Later that year, in August 2019, a grand jury indicted Hild on five counts, namely (1) conspiracy to commit securities fraud, 18 U.S.C. § 371; (2) conspiracy to commit wire and brank fraud, 18 U.S.C. § 1349; (3) securities fraud, 15 U.S.C. §§ 78j and 78ff; 17 C.F.R. § 240.10b-5;

(4) wire fraud, 18 U.S.C. §§ 1343 and 2; and (5) bank fraud, 18 U.S.C. §§ 1344 and 2. Hild maintained his innocence and proceeded to trial. The jury convicted him on all five counts.

Following trial, Hild moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. The Court denied the motions in their entirety. *See Hild*, 644 F. Supp. 3d at 53. It then sentenced Hild to 44 months' imprisonment and later granted him bail pending the resolution of his appeal before the Second Circuit. That appeal remains pending. The Court denied a second Rule 33 motion for a new trial on September 12, 2023. *Hild*, 2023 WL 5928350 at *13. The instant motion is Hild's third motion for a new trial.[1]

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).[2] "[T]he standard for granting such a motion is strict." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). It requires "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009); *see United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993), such that "letting a guilty verdict stand would be a manifest injustice," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

The defendant bears the burden of demonstrating that such circumstances exist. *See McCourty*, 562 F.3d at 475. Where his motion relies on newly discovered evidence, he must establish that "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which

---

[1] Hild originally filed redacted memoranda and sealed exhibits in support of his Rule 33 motion. *See* Dkt. 235 & 242. After the Court ordered him to supplement his justification for doing so, *see* Dkt. 243, Hild refiled unsealed and unredacted versions of the memoranda and exhibits, except for protected medical information. Hild's applications to redact and seal his filings are thus moot.

[2] Unless otherwise indicated, this opinion and order omits all internal quotations marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015).

Where, as here, a defendant's appeal is pending, Federal Rule of Criminal Procedure 37 permits a district court to "(1) defer considering [a Rule 33] motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a). Stated differently, a "district court retains jurisdiction to deny a Rule 33 motion during the pendency of an appeal, even though it may not grant such motion unless the Court of Appeals first remands the case to the district court." *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002).

## DISCUSSION

Hild seeks a new trial based on purportedly newly discovered evidence that Dan Foster, a cooperating witness, influenced the Bloomberg market pricing used to convict him. In particular, he identifies two new pieces of evidence: (1) a contract between Bloomberg and Foster's employer, after he left Live Well, listing Foster among "key personnel" providing Bloomberg with "data and information" on relevant bonds;[3] and (2) an informational brochure indicating that Bloomberg relied on quotes from individuals such as Foster in pricing relevant bonds.

Whatever the import of such evidence, the Court cannot "infer due diligence on the part of [Hild] to obtain" it. *Forbes*, 790 F.3d at 406–07. Hild maintains that he was unable to obtain the evidence earlier because the pre-trial disclosure about Foster indicated that Bloomberg did *not* rely on Foster's quotes. Accordingly, he continues, he had no reason to seek discovery on Foster's potential influence. The Court disagrees. The government's notes of its interview of Foster, which

---

[3] The Government disputes that the contract pertained to relevant bonds, but Bloomberg's counsel represented that it received quotes for "certain [relevant] bonds." Def.'s Reply, Ex. A. at 1, Dkt. 242.

7

it disclosed nearly a month before trial, suggest the opposite. They indicate that Foster may well have influenced Bloomberg's pricing:

> Also *still* does consulting for Baird. Advising Bloomberg for HECM questions. Secondly, they give list of bonds that *they request weekly quotes on*. *DF provides quotes on HMBS, IOs, floaters, inverse Ios*. Multiple people do this for Bloomberg; DF's is not used *directly* by Bloomberg. Does not know details of their process.

Def.'s Mot., Ex. E (emphases added). According to the interview notes, Foster told the government that he provided pricing quotes to Bloomberg in connection with his work for Robert W. Baird & Co. Nowhere do the notes state that Bloomberg did not rely on those quotes, as Hild represents. Rather, they note only that Bloomberg did not rely on the quotes "*directly*." *Id*. (emphasis added). If Bloomberg requested "weekly" pricing quotes, it would be nonsensical to infer that Bloomberg did not somehow rely on those quotes. *Id*. Hild mischaracterizes the disclosure about Foster and, with due diligence, could have relied on it to seek the evidence at issue.[4] *See* Fed. R. Crim. P. 17(c).

As an alternative to his motion for a new trial, Hild seeks an extension of the filing deadline so that he may further develop evidence of Foster's involvement with Bloomberg. Under Rule 33(b)(1), "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). "Th[is] time limit[] w[as] expressly framed to resist ad hoc relaxation and, thus, may fairly be characterized as rigid." *United States v. Canova*, 412 F.3d 331, 345 (2d Cir. 2005). Nonetheless, under Federal Rule of

---

[4] Hild further suggests that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the interview notes "prominently," Def.'s Mot. at 4, and "separately," Def.'s Reply at 3, from its disclosure under 18 U.S.C. § 3500. The Court is unpersuaded. "The government's duty to disclose generally does not include a duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018). Nor did the government bury the interview notes within a "voluminous, undifferentiated open case file." *Id*. The notes appeared within a production of only nine documents, none of which was longer than three pages. Furthermore, there is no *Brady* violation "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997).

Hild also maintains that he was unable to obtain the evidence earlier because the government did not call Foster or a Bloomberg representative as a witness at trial. That the government did not do so, however, has no bearing on Hild's ability to draw on the interview notes to seek the evidence at issue.

Criminal Procedure 45(b)(1), "the court on its own may extend the time[] or for good cause may do so on a party's motion made . . . before the originally prescribed . . . time expires." Fed. R. Crim. P. 45(b)(1)(A). For much the same reason the Court found Hild's justification for a new trial unpersuasive, the Court finds his argument for an extension unconvincing. Hild fails to establish good cause for an extension because, with due diligence, he could have developed evidence on Foster's involvement with Bloomberg long ago.

## CONCLUSION

Ultimately, Hild fails to meet his burden to prove that "letting [his] guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. His motion for a new trial, filed under Federal Rule of Criminal Procedure 33, is thus denied. His motion for an extension of the deadline for filing such a motion is also denied, as Hild fails to establish good cause for an extension.

SO ORDERED.

Dated:   July 10, 2024
         New York, New York

_____
Ronnie Abrams
United States District Judge