MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com
————

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536
#

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN
——
RETIRED/PARTNER EMERITUS
PAUL R. GRAND
——
ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

June 10, 2026

**BY ECF & EMAIL**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

>        Re:    United States v. Michael Hild, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

I am counsel for defendant Michael Hild, and I write respectfully to request that the Court grant Mr. Hild continued bail pending a petition for habeas corpus that Mr. Hild intends to file in this District within 45 days. In an Order issued yesterday, the Court set Mr. Hild's surrender date for July 10, 2026, and I respectfully request that the surrender date be stayed pending the Court's determination of this bail motion.

Mr. Hild meets the standard for bail pending habeas because he has two substantial constitutional claims, described below, on which he is likely to succeed, relating to (1) his prior counsel's ineffective assistance in failing to pursue evidence of cooperating witness Dan Foster's involvement in Bloomberg's pricing of the bonds at issue in this case, which the government presented to the jury as "neutral," and which is an issue the Second Circuit expressly left open in resolving Mr. Hild's direct appeal, and (2) newly discovered evidence that the primary cooperating witness against Mr. Hild on whom this Court and the Second Circuit relied to sustain Mr. Hild's conviction has now said, in the context of recent civil proceedings, that the process leading to his guilty plea was "corrupt," and has suggested that the "shocking" Foster/Bloomberg evidence would have materially changed his testimony. In addition, Mr. Hild meets the standard because a prominent Virginia attorney has threatened, by email, to use connections to inmates and others in the prison system to cause harm to Mr. Hild after he surrenders to the BOP—threats that Mr. Hild reported to his Probation Officer but which have not, to Mr. Hild's knowledge, yet been fully investigated or acted upon.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 10, 2026
Page 2 of 6

Courts in this District have the power to grant bail pending habeas where the contemplated petition "raises at least one substantial claim" and where "'extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *United States v. Nkanga*, 452 F. Supp. 3d 91, 95-96 (S.D.N.Y. 2020) (Furman, J.) (quoting *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (internal quotation marks and alterations omitted)). For example, Judge Brieant granted a defendant convicted of conspiring to commit securities fraud and sentenced principally to three years' imprisonment "bail pending determination of the habeas petition." *Ostrer v. United States*, 584 F.2d 594, 596-97 (2d Cir. 1978). For another example, in *Nkanga*, with the government's consent, Judge Furman granted bail pending habeas, finding that the following "extraordinary circumstances" made "this case an appropriate one for bail": "the defendant's age; his multiple health issues; the nature of the defendant's offense; the precise timing of the sentencing proceeding (which occurred on March 12, 2020) in relation to the emerging COVID-19 pandemic; and the conclusions already reached by the Court in previous aspects of this litigation regarding the defendant's health issues, and apparent lack of dangerousness or risk of flight." *Id.* at 96. Judge Furman also relied on the fact that one of the claims in the habeas was that "but for counsel's allegedly ineffective assistance, the judgment would have included a surrender date permitting the defendant to be released on bail pending the COVID-19 crisis." *Id.*; *see also Rado v. Manson*, 435 F. Supp. 349 (D. Conn. 1977) (granting bail pending habeas given strength of constitutional claims).

Mr. Hild meets the standard for bail pending habeas. First, Mr. Hild intends to argue in his forthcoming petition that his trial counsel was ineffective in failing to pursue evidence of cooperating witness Dan Foster's involvement with Bloomberg's pricing of the bonds at issue, which Mr. Hild personally discovered after trial, but which this Court previously found was sufficiently disclosed in one page of government notes Mr. Hild's counsel received with Foster's 3500 material. Foster's involvement in Bloomberg pricing was significant because the government's core fraud theory depended upon persuading the jury that Bloomberg's valuations represented neutral, independent market evidence demonstrating that Live Well's valuations were knowingly inflated. Throughout trial and summation, the government repeatedly relied upon the disparity between Bloomberg pricing and Live Well's valuations as proof of scienter. The government presented Bloomberg as the benchmark against which falsity and fraudulent intent were measured. Evidence that Bloomberg's pricing for the bonds at issue was influenced by cooperating witness Dan Foster—a former Live Well insider who was seeking favorable treatment from the government—would have directly undermined the reliability and independence of that benchmark and therefore undermined completely the government's valuation and scienter theory.

Mr. Hild previously made a Rule 33 motion in this Court based on his discovery of the Foster/Bloomberg evidence, and this Court denied it. (Docket Entry 245.) In denying that motion, this Court relied exclusively on its finding that "the Court cannot 'infer due diligence on the part of [Hild] to obtain" the evidence of Foster's involvement with Bloomberg. (Docket

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 10, 2026
Page 3 of 6

Entry 245 at 7.)  The Court wrote that "with due diligence, he could have developed evidence on Foster's involvement with Bloomberg long ago."  (Docket Entry 245 at 9.)  The Court did not assess whether Hild's counsel's failure to pursue the Foster/Bloomberg evidence amounted to ineffective assistance.  On direct appeal of this Court's decision, Mr. Hild argued, among other things, that to the extent this Court's ruling was based on a lack of diligence, his trial counsel, Benjamin Dusing, provided ineffective assistance.  The Second Circuit ruled that Mr. Hild's claim that his "counsel's failure to connect the Foster notes to the Bloomberg evidence amounted to constitutionally ineffective assistance at trial" is "best raised on collateral review."  *United States v. Hild*, No. 23-6136-CR, 2025 WL 2924205, at *4 (2d Cir. Oct. 15, 2025).  Thus, in accordance with that decision, Mr. Hild's claim of ineffective assistance in connection with the Foster/Bloomberg issue may now be raised in Mr. Hild's habeas petition.

Mr. Hild is likely to succeed on his claim that his trial counsel provided ineffective assistance in failing to pursue evidence of Foster's involvement with Bloomberg.  To establish ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), Mr. Hild "must show both that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result."  (Docket Entry 140 at 49.)

As to *Strickland*'s first prong, in the face of claims of ineffective assistance, the government typically requests, and courts generally grant, motions to permit the allegedly ineffective attorney to provide an affidavit responding to the allegations of ineffective assistance.  In the context of the Foster/Bloomberg issue, such an affidavit could theoretically attempt to explain counsel's failure to investigate Foster's relationship with Bloomberg despite the exculpatory nature of the evidence.  But in the unusual circumstances of this case, it is difficult to see how a court could possibly credit any such affidavit.  This Court has already refused to rely upon an affidavit supplied by trial counsel due to his "deeply troubling conduct" in another matter "which included threatening to 'blow up' a judge, staff attorneys, and opposing counsel— and his subsequent suspension from the practice of law in two states."  (Docket Entry 140 at 30-31.)  It is difficult to see how trial counsel could possibly offer a credible affidavit explaining his reasons for not pursuing the essential Foster/Bloomberg evidence given this backdrop and the importance of the Foster/Bloomberg evidence to Mr. Hild's case.

As to *Strickland*'s second prong, Mr. Hild expects in his petition to explain at length how the evidence of Foster's involvement with Bloomberg's pricing would have compromised the government's case and demonstrated Mr. Hild's innocence by undermining the government's claim that the Bloomberg prices were neutral, "market" prices, which was the crux of the government's trial presentation and summation.  The government relied on testimony from numerous witnesses that Bloomberg prices were independent and neutral (*e.g.*, Trial Tr. 782-85) and argued in summation that Bloomberg's neutral prices conflicted with IDC's, which purportedly proved fraud (*e.g.*, Trial Tr. 2176).  But the Bloomberg prices were not neutral; they were influenced by a government cooperating witness.  In fact, recent statements in civil litigation by the government's own primary cooperating witness, Darren Stumberger, strongly

Morvillo Abramowitz Grand Iason & Anello P.C.

Hon. Ronnie Abrams
June 10, 2026
Page 4 of 6

support Mr. Hild's argument and demonstrate that if Mr. Stumberger had known about what he calls the "shocking" Foster/Bloomberg connection, his testimony would have supported Mr. Hild's position that the Bloomberg prices were not neutral.

It bears noting that when this Court previously addressed Mr. Hild's Rule 29 motion, this Court's opinion denying that motion relied extensively upon Mr. Stumberger's trial testimony, citing it and quoting it at length, including in multiple block quotes. (*See generally* Docket Entry 140 at 5-13, 19-28.) Mr. Stumberger, however, in a filing earlier this month dated June 1, 2026, in the Eastern District of Michigan, in a matter in which Flagstar Bank is seeking a judgment against Mr. Stumberger, has written the following:

> The Court should be aware by now of the remarkable chain of events involving numerous individuals, financial institutions, valuation providers, and professional advisors whose actions materially affected the valuation and disposition of the securities at issue. *To my knowledge, none of this information was presented during the 2021 trial in United States v. Hild. I am certain none of it was available to me when I entered my plea agreement in 2019.* While the 'Dan Foster' matters have been addressed in Hild's related proceedings from a notice perspective (or Hild's counsel had a chance to investigate), they have never been investigated, examined, or fully litigated. The *shocking chain of events related to Foster and others* has only been introduced to this Court's docket and record in 2025.
>
> Central to these newly developed facts is Dan Foster, a former Vice President of Live Well Financial who was identified by the Government as a cooperating witness and an unnamed co-conspirator in *United States v. Hild*. Following his departure from Live Well, Foster became involved in supplying HECM Interest-Only ("HECM IO") bond valuations to Bloomberg under extreme pressure to obtain a Non-Prosecution Agreement from the Government—which he ultimately received. *Evidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ("IDC") while at Live Well. These discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself.* To the extent Flagstar's alleged damages theory relies upon valuations derived from, influenced by, or otherwise connected to Foster's pricing submissions, the reliability of those damages calculations is directly called into question.

*Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) (Docket Entry 168 at 2, dated June 1, 2026) (Stumberger opposition to plaintiff's motion for entry of judgment) (emphases added). Stumberger's filing goes on to say:

> Foster entered into a proffer agreement with the SEC in 2017 and later obtained a non-prosecution agreement in connection with investigations involving Live Well Financial in 2019. The timing of his involvement presents factual issues directly relevant to valuation

Morvillo Abramowitz Grand Iason & Anello P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 5 of 6

reliability. *A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations.*

(*Id.* at 11 (emphasis added).)

Mr. Stumberger continues:

Foster affirmatively proposed a pricing relationship with Bloomberg for HECM CMO/IO securities. In an email within Exhibit E to ECF No. 144, Foster wrote that "the evaluation range is so wide for this particular product" and proposed that "Baird & Bloomberg team up," offering "an annual fee of 25k for 50 HECM CMO's priced weekly." Foster signed an SEC proffer agreement in November 2017, before the Bloomberg pricing relationship became operative, and by August 2019 the government had executed Foster's non-prosecution agreement. *The pricing information utilized to generate alleged losses was thus not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government.*

Bloomberg's Larry Mattera asked whether Bloomberg could use Foster's levels "in production now," confirming Bloomberg was "a bit starved for data in this sector"—an admission confirming the absence of a robust, observable market. Foster sent Bloomberg the first "BAIRD - HECM CMO - BV AL Price Export," noting Bloomberg had "turned [it] on to immediately go into production." Bloomberg later acknowledged receiving quotes from Foster and Olivier Dupiton; but subsequent Bloomberg discovery failed to produce meaningful pricing submissions from Dupiton, leaving a record dominated by Foster's submissions, exports, and communications. This raises substantial questions about whether Foster was in practice the dominant or potentially sole identified contributor for the securities at issue. The pricing levels Foster later supplied into the Bloomberg ecosystem were materially lower than those previously supplied through the IDC process while at Live Well. A contributor who dramatically lowered his own valuations after becoming a government cooperator presents an obvious factual issue regarding the reliability of the resulting benchmark.

(*Id.* at 27-28 (emphasis added).)

Mr. Stumberger's filing shows that if called to testify today against Mr. Hild, his testimony would be different considering the Foster/Bloomberg evidence, which he was not aware of at the time of his plea. His testimony would not support the key component of the government's fraud theory, that the Bloomberg prices were neutral, market prices. Rather, at a minimum, Mr. Stumberger would confirm that the Foster/Bloomberg connection presents

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 6 of 6

"obvious questions concerning the independence and reliability of those [Bloomberg] valuations." (*Id.*)

Second, Mr. Hild intends to raise the additional related argument that newly discovered evidence from Mr. Stumberger—namely, Mr. Stumberger's apparent view that his prosecution was "corrupt," that his plea was questionable, and that his testimony could have been different in light of the Foster/Bloomberg evidence—establishes that the testimony Mr. Stumberger gave at Mr. Hild's trial is no longer reliable. Because the jury would not have convicted without Mr. Stumberger's testimony, Mr. Hild is likely to succeed in his petition. *See, e.g.*, *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003) (granting habeas petition where significant witness recanted trial testimony such that "Ortega's conviction is in violation of his due process rights because without Garner's testimony, the jury would probably not have found Ortega guilty").

For example, in connection with the civil litigation noted above, in an email to the court, Mr. Stumberger said that the transcript of his plea proceeding was "among the most corrupt elements of the entire case." (Ex. A.) When discussing his plea allocution in court, Mr. Stumberger said, "[a]ll I can say about the guilty plea is it was solely the advice of counsel at the time" and that he was told there was "no other options" by his criminal counsel. (Ex. B at at 8.) He said that the plea allocution he wanted to read "was torn up and thrown out" and that he was simply "handed a piece of paper before the arraignment" that he read. (Ex. B at 8.) He also said that his defense in the civil case would be the "truth, better said, the facts of what happened" (as opposed to what he said in his plea allocution in the criminal case). (Ex. B at 8.) In an email to Mr. Hild's civil counsel, Mr. Stumberger highlighted his plea hearing transcript as an example of "corruption," and asked whether "Hartman and Racz" (the AUSA and FBI agent in the criminal case) "really want me [Stumberger] talking about this publicly?" (Ex. C.) On this record, in which newly discovered evidence confirms that Mr. Stumberger's testimony would be different today and that the lynchpin of the government's case—the Bloomberg "market" prices—would not withstand scrutiny, Mr. Hild's petition is likely to succeed.

Finally, bail pending habeas, or at least a stay of Mr. Hild's surrender date, is warranted considering the serious threats Mr. Hild has received from a prominent member of the Virginia bar. As reflected in the attached exhibits, which are being submitted under seal by email to Chambers only so that the Court may assess whether they may be filed publicly, a Virginia attorney—who is a partner at a Virginia firm and has practiced for more than 40 years—representing a defendant in separate litigation involving Mr. Hild and his wife, recently sent multiple unsolicited communications to Mr. Hild concerning his surrender date, including the following statement: "When do you report to your new accommodations? I know some people where you are headed and just want to make sure they will pay you a welcome visit. I suggest you have a welcome present ready to offer them just for your continued good health." (Exhibit D.) In a separate communication, the same attorney wrote: "When and where do you report? Since you won't be in the Richmond case anymore, the least I can do is send a housewarming gift c/o the warden so you will have something there to welcome you when you arrive." (Exhibit

Morvillo Abramowitz Grand Iason & Anello P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 7 of 6

E.)[1]  Mr. Hild reported these communications to the U.S. Probation Officer supervising him on release, and the Officer responded, "[d]efinitely sounds like cyberstalking and threatening bodily harm/injury."  The attorney's emails suggest he may try to ensure that individuals he knows at whatever facility Mr. Hild gets designated to (whether inmates or BOP personnel) will pay Mr. Hild a "welcome visit" after he surrenders where they will cause him harm or extort him.  In addition to being inconsistent with any standard of professional conduct for a licensed and experienced attorney, these threats give rise to a genuine concern for Mr. Hild's welfare that the government should investigate and assess prior to his surrender, just as Judge Furman considered the safety of the defendant in *Nkanga* (from the pandemic in that case) in his decision approving bail pending habeas.  If Mr. Hild suffers harm while in custody, that would render any habeas remedy ineffective.  Mr. Hild poses no danger or risk of flight, as this Court's prior bail decisions have found.

For all these reasons, the Court should find that bail pending habeas is warranted, in which case Mr. Hild anticipates filing his petition in 45 days, far in advance of the due date of April 27, 2027.  The Court should also stay Mr. Hild's surrender date pending determination of this motion.

Respectfully submitted,

*/s/ Brian A. Jacobs*

Brian A. Jacobs

Enclosures (sealed enclosures by email only)

cc: All counsel (by ECF)

---

[1] Exhibits D and E are being submitted solely by email to Chambers to give the Court and the government the opportunity to assess whether they may be filed publicly or whether they should be filed under seal.