MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

_____

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536
#

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

_____

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

_____

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

June 20, 2026

**BY ECF & EMAIL**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

Re:    United States v. Michael Hild, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

I am counsel for defendant Michael Hild, and I write respectfully to respond to the letter the government submitted yesterday, June 19, 2026 (the "Gov. Letter") (Docket Entry 266), opposing Mr. Hild's motion for continued bail pending a petition for habeas corpus.

The government's opposition largely ignores the central issue Mr. Hild's motion raises. Rather than engaging with the evidence concerning Dan Foster's role in the Bloomberg valuation process, the government mischaracterizes that evidence as peripheral to the case. The trial record shows otherwise—Bloomberg pricing was central to the government's ability to establish the "market" prices for the bonds at issue, which Mr. Hild was accused of inflating. The government's opposition minimizes also the significance of important new evidence from the government's primary cooperating witness, Darren Stumberger, ignoring both his email calling his guilty plea "corrupt" and his federal court filings explaining in detail how Live Well's demise was not due to fraud but rather to a coordinated conspiracy by government agencies—together with Foster—to bring down the company. Given the Foster/Bloomberg evidence and Mr. Stumberger's new narrative, if Mr. Hild were tried today, he would likely be acquitted. His trial attorney was deficient in not pursuing the Foster/Bloomberg evidence. His habeas petition is thus likely to succeed. For the reasons below, the Court should reject the government's arguments and grant Mr. Hild's motion.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 20, 2026
Page 2 of 7

**I.    Mr. Hild's Claim About Dan Foster Supplying Bloomberg Prices While Cooperating with the Government Qualifies as a Substantial Claim**

The government argues that Mr. Hild's "claim about Dan Foster is not 'substantial'" for three reasons: (1) "Hild was convicted based on overwhelming proof of his intent to defraud his lenders" (Gov. Letter at 2); (2) "the Government did not proffer the Bloomberg prices as the relevant comparator for establishing that Hild intentionally inflated the value of Live Well's portfolio" and "the word 'Bloomberg' was uttered only *once* during the entirety" of the government's summation and rebuttal (Gov. Letter at 3 (emphasis in original)); and (3) trial counsel's failure to pursue the Foster/Bloomberg evidence was thus not deficient performance (Gov. Letter at 4).

The government's arguments all turn on a sleight-of-hand through which the government is attempting to minimize the significance of the Foster/Bloomberg evidence.  The government's argument that the word "Bloomberg" appeared only once in the summations is telling, because the relevant word is not "Bloomberg"; rather the relevant word is "*market*"—a word uttered over 1,000 times in the trial transcript.  The government's core argument at trial was that Live Well's prices "weren't *market* prices" but rather "were jacked up."  (*E.g.*, Tr. 26 (opening) (emphasis added); Tr. 2162 ("prices are already jacked up way above *market*") (summation) (emphasis added).)  The word "market" was effectively a synonym for "Bloomberg" at trial because it was Bloomberg's prices that multiple government witnesses relied upon when they testified about the "market" value of the bonds.  For this reason, the government's argument that it "did not offer any proof of the specific prices that Bloomberg assigned to the bonds" (Gov. Letter at 3) is irrelevant, because the government's witnesses testified about "market" prices of the bonds based on what they saw on Bloomberg, even if no specific Bloomberg prices were admitted at trial.

For example, the government elicited testimony from Alan Levy (from ICBC) about the "market" price of the bonds at issue and how the IDC prices were inaccurate, and on cross examination, Levy acknowledged that his basis for believing the IDC prices were not market prices was that "Bloomberg started marking up those assets" and the IDC prices "were materially different from the Bloomberg marks."  (Tr. 720; Tr. 721 ("Bloomberg started providing prices on these securities, which was off from where IDC was pricing it, so my understanding is strictly off of the – what the industry th[ought] these – this collateral is worth . . . ."); Tr. 721 ("Bloomberg came back as the market price.").)

For another example, the government asked Joe Redoutey (from Flagstar) on direct whether Flagstar attempted "to determine whether there was another pricing source for the value of the collateral," meaning the market value.  Redoutey answered, "we were able to determine that some of the bonds, I'm not sure if all of the bonds, were valued by Bloomberg," so they "look[ed] it up on the Bloomberg system."  (Tr. 749.) The government asked Redoutey how the

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 3 of 7

Bloomberg values compared to the IDC values, and Redoutey said they were "[d]ramatically different" and that "Bloomberg was lower." (Tr. 749.)

For yet another example, former Live Well CFO Glen Haddock testified about how when IDC ceased pricing the bonds, Bloomberg subsequently became the pricing source reflected in reports being received from U.S. Bank, with valuations that were materially lower than the prior IDC valuations. (Tr. 1606-07 ("U.S. Bank was, appeared to be getting the numbers from Bloomberg instead of from IDC, and therefore the values were showing much less.").) Haddock then used the U.S. Bank valuations to make mark-to-market entries in Live Well's financial statements to align the company's financial reporting with the valuations being reported by U.S. Bank. (Tr. 1621.)

The fact that the government did not use the word "Bloomberg" extensively is of little moment, where the government's key witnesses relied upon Bloomberg's pricing for their understanding of the "market" prices of the bonds and testified at length about the "market" prices of the bonds, where Haddock's adjustments to Live Well's financial reporting were based on those "market" prices, and where the government's central argument at trial was that Live Well's prices were fraudulently inflated above the "market" price of the bonds. The Bloomberg prices were not merely a collateral issue, as the government now contends. Rather, the government's trial narrative was about how the accurate market values (rooted in Bloomberg prices) replaced the fraudulently inflated IDC values (which Live Well had been supplying), lenders reacted to those lower valuations (based on Bloomberg), margin calls followed, and Live Well's financial reporting changed. The government cannot credibly contend that the Bloomberg marks played no meaningful role in this narrative.

A substantial question exists as to whether trial counsel's failure to pursue the Foster/Bloomberg evidence was deficient performance—which it clearly was—and whether Mr. Hild suffered prejudice, which he clearly did. Mr. Hild is likely to succeed on these claims. The Court should reject the government's attempt to downplay the Foster/Bloomberg evidence, which formed the backbone of the government's proof of "market" value, where Bloomberg was the source the government's key witnesses consulted for their testimony about "market" value.

II.    **Mr. Hild's Claim About New Evidence from Darren Stumberger Is Substantial**

The government argues that Mr. Hild's related claim about Mr. Stumberger is "not substantial" (Gov. Letter at 4) because, in the government's view, Mr. Stumberger's statements in the *Flagstar* litigation do not undermine his trial testimony. The government argues that Mr. Stumberger told the *Flagstar* court that he was not going to "commit perjury," and that his argument there amounts to nothing more than that the Foster/Bloomberg evidence relates to damages in that litigation. (Gov. Letter at 4.)

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 4 of 7

As an initial matter, I provided the government with materials reflecting Mr. Stumberger's statements in the *Flagstar* case back in April 2025, so the government has had over a year to contact Mr. Stumberger and investigate his new claims.  It is telling that the government's opposition is silent on whether it has been in touch with Mr. Stumberger, whether it has requested an affidavit from him disavowing his statements in the civil case (such as his characterization of his guilty plea as "corrupt"), and whether Mr. Stumberger is still cooperating with the government as his cooperation agreement requires.  If the government has had contact with Mr. Stumberger in the last year and he has refused to continue cooperating, the government must disclose that as *Brady* information.  If the government has made no effort to contact Mr. Stumberger to determine whether he stands by his guilty plea, it should disclose that as well, as such a failure would substantially weaken its response.  Total inaction by the government would be practically inexplicable, given that Mr. Stumberger said his guilty plea was "among the most corrupt elements of the entire case" and that the AUSAs do not want him speaking publicly about it.  (Docket Entry 264 Ex. A, C.)

Mr. Stumberger's own statements in the *Flagstar* case suggest that the government *has* been in touch with him, at least through his criminal counsel.  In the *Flagstar* litigation, both in filings and on the record, Mr. Stumberger has stated that after he alleged in that litigation that his guilty plea was corrupt, he "received an extraordinary email from my former attorney . . . which *contained explicit threats* impacting both myself and my children" and that he is "liv[ing] under *direct threat*, and can no longer safely respond to inquiries related to this case or my defense." (19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 148 at 2) (emphasis added)); *see also* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13) (Court transcript: "I'm not at liberty to talk . . . . about my involvement with Live Well, because I've been *threatened excessively* with jail time, as it relates to the plea and my defense for this case.") (emphasis added).)  Considering Mr. Stumberger's allegations that he has been threatened based on his statements that are inconsistent with his plea, the government should have to disclose its communications with Mr. Stumberger and his counsel.

In addition to the government's failure to supply the Court with an affidavit or comparable assurance that Mr. Stumberger would stand by his trial testimony (which he apparently would not), the government's response is also deficient because it ignores Mr. Stumberger's most recent sur-reply filing in the *Flagstar* case, docketed on June 12, 2026—after Mr. Hild had submitted his original letter but before the government's submission.  *Flagstar Bank, FSB v. Live Well Financial, Inc.*, 19 Civ. 11512 (MFL) (E.D. Mich.) (the "6/12 Stumberger Brief") (Docket Entry 171).  The new 6/12 Stumberger Brief lays out in even more detail how the Foster/Bloomberg evidence undermines the argument that Live Well's bond prices were fraudulently inflated above market value—the central tenet of the government's fraud theory at Mr. Hild's trial.

If the contents of Mr. Stumberger's 6/12 Brief had been part of his trial testimony against Mr. Hild, Mr. Hild would likely have been acquitted.  Mr. Stumberger's 6/12 Brief demonstrates

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

that if called to testify today, his testimony would show that the Bloomberg marks were the questionable, self-interested submissions of a government cooperator who stepped into the void to provide pricing on the bonds when IDC stopped pricing them because of the government's investigation. Significantly, Mr. Stumberger's 6/12 Brief does not retreat from his prior statements concerning the Foster/Bloomberg evidence. He expands upon them. Mr. Stumberger now expressly argues that the alleged losses were not the product of the conduct alleged at trial but were instead shaped by what he describes as a "simultaneous and deleteriously orchestrated chain of events" (6/12 Stumberger Brief at 1) involving the government investigation, IDC's cessation of pricing, Foster's Bloomberg submissions, and liquidation in a distorted market.

Mr. Stumberger writes, "[t]he government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon—and the structure was then replaced with valuation pricing supplied by the government's cooperating witness [Foster]." (6/12 Stumberger Brief at 10.) Mr. Stumberger explains that the "pricing structure" for Live Well's bonds "*did not collapse because the market determined the bonds were worth less*." (Emphasis added.) Rather, "[i]t collapsed because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities." Thus, the SEC's actions "removed the one pricing benchmark that the entire lending and collateral structure depended upon, *not because independent market participants had reached a different view of value, but because the government's investigation had made IDC unwilling to continue publishing prices*." (6/12 Stumberger Brief at 11 (emphasis added).) Mr. Stumberger's statement that the pricing change was "*not* because independent market participants had reached a different view of value" would have undermined a key component of the government's trial presentation: that the market value of the bonds proved that Live Well's marks were fraudulently inflated.

Mr. Stumberger continues, "[i]nto that vacuum stepped Bloomberg—and into Bloomberg's data collection for these securities stepped Dan Foster. Foster was a former Live Well Vice President who had departed Live Well in 2017, entered into a proffer agreement with the SEC in November 2017, and was actively cooperating with federal investigators while simultaneously developing a formal pricing relationship with Bloomberg for HECM collateralized mortgage obligations . . . ." Mr. Stumberger details how "[t]he pricing levels Foster supplied to Bloomberg after departing Live Well differed materially from the valuations he had supplied to IDC while at Live Well." But there "has never been testing as to the accuracy or integrity of the model Foster used. . . . All that is known is that Foster was a government cooperator with the SEC and then the SDNY, and he supplied valuations to Bloomberg. . . . A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and securing a non-prosecution agreement presents an obvious conflict and unresolved questions about the independence and reliability of those valuations." (6/12 Stumberger Brief at 12.) By questioning the reliability of the Bloomberg valuations, Mr. Stumberger casts doubt on the government's whole case. Further, Mr. Stumberger's argument is not merely that Bloomberg's valuations are unreliable, but also that the losses in this case were

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 6 of 7

not caused by conduct at Live Well, and instead were caused by a sequence of events attributable to the government's own actions—from IDC's cessation of pricing, to Bloomberg's replacement role based on Foster's prices, to lenders relying on Bloomberg.

The positions reflected in Mr. Stumberger's 6/12 Brief were not newly created for purposes of that reply brief but rather elaborate on positions Mr. Stumberger previously expressed. Months earlier, during proceedings before Judge Leitman in the *Flagstar* litigation, Mr. Stumberger stated on the record that there had been "fake testimony," asserted that "Dan Foster . . . did this for all of these parties and they paid for it with a non-prosecution agreement," and represented that the threat came through his former counsel, Xavier Donaldson, who had received messages and calls from the Southern District of New York. (*See* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13-15).)

Mr. Stumberger was the single most important witness at Mr. Hild's trial and the one whose testimony this Court principally relied in affirming Mr. Hild's conviction. Mr. Stumberger himself highlights in his 6/12 Brief how the government told this Court at his sentencing that meeting with him was "very helpful . . . in terms of thinking about how to present the case to the jury and *making sure that we ourselves understood the mechanics of the bonds*." (Exhibit A at 3 (quoting Sentencing Tr. at 7:21-8:1, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023)) (emphasis added).) Yet Mr. Stumberger, who knows the mechanics of the bonds as well as anyone, now attributes the losses in this case to the outside events and the Foster/Bloomberg pricing, not to fraud at Live Well.

If the very witness who had helped the government and the jury "under[stand] the mechanics of the bonds" had questioned the "market" price of those bonds at trial as the biased submissions of a government cooperator, the result of the trial would have been different. The government attempts to wave away that argument as Mr. Hild's "self-serving gloss on Stumberger's remarks in a separate litigation," but that response only underscores the deficient effort the government has put into opposing Mr. Hild's motion. (Gov. Letter at 5.) Mr. Hild's original letter did not offer a "self-serving gloss" on Mr. Stumberger's statements but rather offered multiple pages of block quotes from Mr. Stumberger's filings, in Mr. Stumberger's own words, without any gloss. In the face of Mr. Stumberger's own words, the government has done *nothing* to assure the Court that Mr. Stumberger's testimony would be the same today.

## III.    This Case Involves Extraordinary Circumstances

The circumstances of this case are extraordinary by any standard. In no other case of note has a trial court discredited a lengthy affidavit from trial counsel, as this Court did, only to have additional evidence come to light that undermines the government's core argument at trial—evidence that is corroborated by new statements from the government's primary cooperating witness, including in filings in another federal court. These exceedingly rare

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 7 of 7

circumstances demonstrate that Mr. Hild meets the standard for bail pending habeas.[1]  The Court should grant Mr. Hild's motion and stay his surrender date pending its determination.[2]

Respectfully submitted,

*/s/ Brian A. Jacobs*

Brian A. Jacobs

cc: All counsel (by ECF)

---

[1] The government submits as Exhibit A to its letter an email from the attorney who sent threatening communications to Mr. Hild (the "6/12 Email"), but the 6/12 email provides little assurance.  On the contrary, the email is notable for at least three reasons:  *First*, the email attempts to excuse the communications sent to Mr. Hild as "tongue in cheek" jokes.  But nothing about the original emails was funny.  The prospect of Mr. Hild needing a "welcome present" to ensure his "good health"—to avoid being attacked in prison—is not remotely humorous.  No reasonable person receiving the original emails would have taken them as "tongue in cheek" jokes.  *See Elonis v. United States*, 575 U.S. 723 (2015) ("A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke.").  *Second*, the Rules of Professional Conduct in Virginia and elsewhere prohibit lawyers from "mak[ing] a false statement of fact."  Virginia Rules of Professional Conduct Rule 4.1(a).  The statement in the 6/12 Email that the attorney does "not know a single soul in any jail or prison" is inconsistent with the statement in the original email that "I know some people where you are headed and just want to make sure they will pay you a welcome visit"—a statement Mr. Hild would naturally have taken as true given the requirement that lawyers not make false statements (a rule the government seems content to ignore).  *Third*, it is notable that in arguing that the original email was not a threat, the attorney lobs another threat, stating, "[s]o that you won't be accused of misleading the court, you should supplement your letter to Judge Abrams with this email."  This statement merely confirms that the government should do more to assess whether there is a threat before Mr. Hild's surrender.  The government's assertion that it spoke with the attorney and credits the attorney's "just kidding" defense (Gov. Letter at 5) suggests an inadequate investigation.  The government notes that Mr. Hild has filed lawsuits the government views as "potentially frivolous" (Gov. Letter at 5), but no court has so ruled, and it is irrelevant to how a reasonable person would view the attorney's emails.

[2] The government states that for the Bureau of Prisons to designate a facility for Mr. Hild, Mr. Hild must submit to "processing by the Marshals."  (Gov. Letter at 7 n.3.)  But Mr. Hild was already processed at the time of his initial arrest, and defendants generally do not need to be processed a second time by the Marshals to be designated to a facility.  Courts in this district often set surrender dates, and we are unaware of any defendant ever being required to submit to processing for a second time before a facility can be designated.  The government offers no sound reason why this additional process is uniquely necessary in Mr. Hild's case.  In any event, the issue has nothing to do with whether the Court should grant bail pending habeas corpus.

Mr. Hild's application to stay his surrender date pending the Court's ruling on his application for bail pending habeas is denied. The Court will rule on the bail application promptly.  Mr. Hild is further directed to comply with all of the Marshals' procedures, including any additional processing they deem necessary.

Furthermore, Mr. Hild shall file his habeas petition no later than July 20, 2026.  The Government shall respond no later than July 30, 2026.  Any reply shall be filed by August 6, 2026.  No adjournments shall be granted absent good cause.

SO ORDERED.

_____

Hon. Ronnie Abrams
June 22, 2026