## MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

———

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536
#

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN
———
RETIRED/PARTNER EMERITUS
PAUL R. GRAND
———
ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

June 23, 2026

**BY ECF & EMAIL**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

> Re:    United States v. Michael Hild, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

I am counsel for defendant Michael Hild, and I write respectfully to respond to the unauthorized sur-reply letter the government submitted last night, June 22, 2026 (the "Gov. Reply Letter") (Docket Entry 269), opposing Mr. Hild's motion for continued bail pending a petition for habeas corpus. To the extent the Court considers the government's sur-reply, the Court should consider this letter response as well, which explains why each of the three points in the government's sur-reply misses the mark. The Court should also order the government to disclose all communications with Mr. Stumberger and his counsel, which the government's sur-reply letter reveals for the first time took place in or about 2025.

*First*, the government inaccurately claims that the Bloomberg prices for the bonds were "**not** the proof the Government employed at trial" to show the market prices of the bonds. (Gov. Reply Letter at 1 (emphasis in original).) Rather, the government claims it relied on the "price at which Live Well bought the bonds" to prove the market value, and that the testimony by Messrs. Levy, Redoutey, and Haddock concerning the Bloomberg pricing was offered "primarily to explain the actions of certain trial witnesses." (Gov. Reply Letter at 1.) But there was never a dispute that Live Well purchased the bonds at prices lower than the prices at which Live Well marked them; Mr. Hild's defense was that he genuinely believed the bonds were worth more than Live Well paid and could be sold at that price. The government's counter to that argument was essentially that the bonds were *not* worth more than Live Well paid and could not be sold at the marked price. The key support for the government's argument was not the prices Live Well paid in the first place, but rather was the evidence offered by Levy, Redoutey, and Haddock—

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 23, 2026
Page 2 of 4

based on Bloomberg valuations—about how the values of the bonds dropped to Bloomberg's "market" values after IDC stopped pricing them.  For the government to claim now that the Bloomberg prices were "**not** the proof the Government employed at trial" is not accurate.

For example, in summation, the government highlighted Mr. Redoutey's testimony, including how Redoutey testified about seeing the bond values drop according to "Bloomberg," which proved that the prices Live Well was giving IDC were "jacked up."  (Tr. 2176; 2129-30.)  For another example, in summations, the government highlighted Mr. Levy's testimony "about the *market*."  (Tr. 2236 (emphasis added).)  Mr. Levy's testimony about the market included how the Bloomberg values were lower than the Live Well values.  (Tr. 721-22 ("Bloomberg, who is a major entity, started pricing these securities, and I saw it on the screen, so that is my understanding, as both the understanding from a company that gave me the listing of the prices that Live Well had on IDC and what they went to look to see what they could sell it in the marketplace at, due to various models, to model it as well, and also *what Bloomberg came back as the market price*." (emphasis added)).  The government specifically asked the jury to rely upon Levy's testimony because it showed "these things are way off market."  (Tr. 2167.)  And the government highlighted Mr. Haddock's testimony as well, claiming that Haddock got "wise to the scheme."  (Tr. 2168-69.)  Each of these witnesses—as the government's sur-reply letter does not dispute—testified about the Bloomberg values of the bonds being lower than Live Well's.  When the government relied on these witnesses by name in the summations to convince the jury that the Live Well prices were "jacked up," the government was effectively relying on the Bloomberg prices to prove this element, even if the government said the word "Bloomberg" just once and even if the government did not introduce the specific Bloomberg prices themselves.  The Court should reject the government's attempt to minimize the significance of the Foster/Bloomberg evidence to its case.

*Second*, the government reveals—for the first time—that sometime in 2025, "the Government reached out to counsel for Stumberger," who responded "[s]everal weeks later," and said that counsel "did not believe Stumberger was saying or would say anything that would jeopardize his previous admission of guilt" in the *Flagstar* litigation.  (Gov. Reply Letter at 2.)  The government notably does not include the actual correspondence with its letter.  On this threadbare basis, the government asserts that it need not provide an affidavit from Stumberger and has no "*Brady*" material."  (Gov. Reply Letter at 2.)  But Mr. Stumberger's description of the communications his counsel received from the government was different.  Mr. Stumberger said that the government's communications "contained explicit threats impacting both myself and my children" and said he was unable to "safely respond" to questions—including about his "corrupt" plea where he just read a paper handed to him—because he was "liv[ing] under direct threat." (19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 148 at 2) (emphasis added); Ex. A); *see also* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13) (Court transcript: "I'm not at liberty to talk . . . . about my involvement with Live Well, because I've been *threatened excessively* with jail time, as it relates to the plea and my defense for this case.") (emphasis added).)  If the Court credits Stumberger's statements made in open court—and the government has urged the jury,

Morvillo Abramowitz Grand Iason & Anello P.C.

Hon. Ronnie Abrams
June 23, 2026
Page 3 of 4

this Court, and the Second Circuit to rely on Stumberger throughout this case—then the Court should not credit the description in the government's sur-reply letter of what the government said to Stumberger's counsel.  At a minimum, the need to explore the conflicting accounts of the government's interactions with Stumberger—and whether the government threatened him as he said in open Court—only supports Mr. Hild's position that the circumstances here are extraordinary.  Further, Mr. Stumberger's filings are important due largely to his statements about the Foster/Bloomberg evidence and how that evidence changes the trial narrative, and the government's account of its communications with him sidesteps those issues.

The Court should order the government immediately to disclose all communications with Stumberger and his counsel from the close of trial to the present.  If the government in fact threatened Stumberger, such a threat would be *Brady* material that should have been disclosed over a year ago, while Mr. Hild's direct appellate process was still ongoing.  At a minimum, the mere fact that Stumberger's lawyer emailed the government a year ago with a reassurance expected from defense counsel—which the government has failed to disclose—does nothing to diminish the significance of Stumberger's statements in the *Flagstar* case, which demonstrate the importance of the new Bloomberg evidence.

Even accepting the government's characterization of its interaction with Stumberger, the Foster issue remains substantial because the government's witnesses relied upon Bloomberg-derived market information while the jury never heard who was supplying those prices, how Bloomberg obtained them, or whether Foster was a contributor.  Stumberger's filings confirm the importance of the Foster/Bloomberg evidence, and nothing about the government's interaction with his counsel changes that.

The government's reply letter includes a footnote arguing that the government's investigation began in 2019 (Gov. Reply Letter at 2-3 n.3), and that Foster's submissions to Bloomberg before that thus could not have been biased by his cooperator status.  But Foster's efforts to cooperate with federal authorities began with the SEC in 2017, not with the SDNY in 2019.  According to Stumberger, the relevant chain of events began when the SEC's investigation caused IDC to cease pricing the bonds, thereby eliminating the independent benchmark upon which the repo lending structure depended.  Bloomberg then assumed that role through a pricing relationship Foster sought to develop, including proposing that Bloomberg and his firm team up while he was seeking to cooperate with federal authorities.  The chronology is also significant because the SEC investigation was subsequently referred to the Department of Justice.  Thus, the SEC and SDNY phases are not wholly separate events, but part of the same sequence identified by Stumberger.  Notably, the SEC portion of that chronology occurred during the tenure of current United States Attorney Jay Clayton as Chairman of the SEC.  By beginning its timeline in 2019, the government omits the very events that Stumberger identifies as the origin of the pricing disruption, the Bloomberg valuation process, and the resulting losses.  The Court should reject the government's timeline.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 23, 2026
Page 4 of 4

*Third*, and finally, the government argues that Mr. Hild has not set forth "any extraordinary circumstances" (Gov. Reply Letter at 3), but the government still fails to grapple with and recognize the significance of the Foster/Bloomberg evidence and Mr. Stumberger's ringing endorsement of the importance of that evidence.  If the case were tried today, Mr. Hild would be acquitted.  Mr. Hild's counsel was ineffective in not pursuing the Foster/Bloomberg evidence, which would have changed the case and Mr. Stumberger's testimony.  The government's sur-reply also never meaningfully addresses the central ineffective-assistance issue presented by Mr. Hild's motion.  The question is not simply whether Bloomberg was mentioned frequently at trial or whether Mr. Stumberger has formally recanted his guilty plea.  The question is whether counsel's failure to investigate the Foster/Bloomberg evidence was deficient performance.  Even accepting the government's characterization of the facts, the sur-reply never adequately explains why counsel's failure to investigate those issues was objectively reasonable, or why evidence bearing directly on the source of the purported market prices, the causes of the alleged losses, and the credibility of key witnesses would not have made a difference to the jury. Those are the issues that make the forthcoming habeas petition and the circumstances extraordinary.

The Court should order the government to produce all communications with Mr. Stumberger and his counsel and grant bail pending habeas.

Respectfully submitted,

*/s/ Brian A. Jacobs*

Brian A. Jacobs

cc: All counsel (by ECF)