UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MICHAEL HILD, )<br><br>Petitioner )<br><br>- v. - )<br><br>UNITED STATES OF AMERICA, )<br><br>Respondent. ) | 26-cv-_____ |
| UNITED STATES OF AMERICA, )<br><br>- v. - )<br><br>MICHAEL HILD, )<br><br>Defendant. ) | 19-cr-602 (RA) (KHP) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITIONER MICHAEL HILD'S MOTION PURSUANT TO 28 U.S.C. § 2255

Dated: July 20, 2026
    New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

Brian A. Jacobs
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
bjacobs@maglaw.com

*Attorneys for Michael Hild*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ........................................................................................................................ 6

I.    District Court Proceedings ............................................................................................. 6

    A.    Live Well Financial and Mr. Hild's Conviction ..................................................... 6

    B.    Trial Counsel's Undisclosed Conflict Comes to Light ........................................ 11

    C.    Mr. Hild's Rule 29 and 33 Motions .................................................................... 14

    D.    Mr. Hild's Rule 33 Motion Based on Newly Discovered Evidence ..................... 16

II.   Appellate Court Proceedings ....................................................................................... 20

    A.    The Second Circuit's Decision .......................................................................... 20

    B.    Petition for Certiorari ........................................................................................ 20

III.  Newly Discovered Evidence ........................................................................................ 21

TIMELINESS .......................................................................................................................... 26

ARGUMENT ........................................................................................................................... 26

POINT 1:   TRIAL COUNSEL'S FAILURE TO INVESTIGATE THE
    FOSTER/BLOOMBERG EVIDENCE CONSTITUTES INEFFECTIVE
    ASSISTANCE OF COUNSEL WARRANTING VACATUR ............................... 27

I.    Legal Framework ........................................................................................................ 27

II.   Discussion ................................................................................................................... 28

    A.    Dusing's Failure to Investigate the New Bloomberg Evidence Constitutes
    Deficient Performance ...................................................................................... 28

        1.    This Court's Finding of a Lack of Facts Showing Due Diligence
        Establishes Deficient Performance ......................................................... 28

        2.    The Foster Notes Put Counsel on Notice That Bloomberg's Independence
        Was Compromised, Requiring Immediate Investigation ......................... 29

        3.    No Conceivable Trial Strategy Justified Ignoring This Evidence ............ 30

4.  Dusing's Conflict of Interest with the Kentucky Litigation ................... 32

B.  Dusing's Failure to Investigate Foster/Bloomberg Severely Prejudiced the Defense ........................................................................................ 34

1.  Without Witness Testimony Based on Bloomberg as the Benchmark, the Government's Inflation Theory Would Have Collapsed ......................... 34

2.  Stumberger—the Government's Key Witness—Now Confirms that Bloomberg's Prices Were Not Reliable ..................................................... 35

3.  Stumberger's Significance to the Government's Case Underscores the Prejudice ............................................................................................... 37

POINT 2:   THE COURT SHOULD GRANT THE PETITION BASED UPON STUMBERGER'S RECENT STATEMENTS ALONE ........................................ 38

I.   Legal Framework .................................................................................... 38

II.   Discussion ................................................................................................ 40

A.  Stumberger Was the Government's Most Important Witness and the Foundation of the Conviction ................................................................................. 40

B.  Stumberger's New Statements Directly Contradict the Government's Central Trial Theory .................................................................................................. 40

C.  Stumberger's Recent Statements Are Corroborated, Internally Consistent, and Made Despite Threats—Warranting Credit .......................................... 42

POINT 3:   THE COURT SHOULD GRANT THE PETITION, OR ELSE ALLOW HILD TO SEEK DISCOVERY AND HOLD AN EVIDENTIARY HEARING ..................... 45

I.   The Court Should Allow Mr. Hild To Conduct Limited Discovery ............................... 45

II.   The Court Should Hold a Hearing ................................................................. 48

CONCLUSION ................................................................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armienti v. United States,*
 234 F.3d 820 (2d Cir.2000) .................................................................................. 27, 48

*Bracy v. Gramley,*
 520 U.S. 899 (1997) ................................................................................................. 46

*Clemente v. Lee,*
 72 F.4th 466 (2d Cir. 2023) ..................................................................................... 26

*Cuyler v. Sullivan,*
 446 U.S. 335 (1980) ....................................................................................... 14, 15, 28

*Henry v. Poole,*
 409 F.3d 48 (2d Cir. 2005) ....................................................................................... 27

*Henry v. Scully,*
 78 F.3d 51 (2d Cir. 1996) ......................................................................................... 38

*House v. Bell,*
 547 U.S. 518 (2006) ................................................................................................. 39

*In re Bloomberg Finance L.P.,*
 Securities Act Release No. 11150 (Jan. 23, 2023) ............................................. 18, 44

*In re Dusing,*
 701 S.W.3d 393 (Ky. 2024)...................................................................................... 14

*Jimenez v. Lilley,*
 No. 16-cv-8545 (AJN) (JCF), 2017 WL 4535946 (S.D.N.Y. Oct. 10, 2017) .............. 39, 42, 43

*Lindstadt v. Keane,*
 239 F.3d 191 (2d Cir. 2001) ..................................................................................... 38

*LoCascio v. United States,*
 395 F.3d 51 (2d Cir. 2005) ................................................................................. 27, 28

*Ortega v. Duncan*,
   333 F.3d 102 (2d Cir. 2003) ................................................................................ 38, 39

*Puglisi v. United States*,
   586 F.3d 209 (2d Cir. 2009) ................................................................................ 27, 48

*Sanders v. Sullivan*,
   863 F.2d 218 (2d Cir. 1988) ................................................................................ 38, 39

*Strickland v. Washington*,
   466 U.S. 668 (1984) ..........................................................................................Passim

*United States v. Fisiorek*,
   43 M.J. 244 (C.A.A.F. 1995)..................................................................................... 29

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) ..................................................................................... 20

*United States v. Kelly*,
   663 F. App'x 222 (3d Cir. 2016)............................................................................... 29

*United States v. Lespier*,
   No. 398-cr-102 (AHN), 2006 WL 533792 (D. Conn. Mar. 1, 2006) ........................ 39

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ..................................................................................... 30

*United States v. Malpiedi*,
   62 F.3d 465 (2d Cir. 1995) ....................................................................................... 28

*United States v. Tarricone*,
   996 F.2d 1414 (2d Cir.1993) ..................................................................................... 27

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ................................................................................ 38, 39

*Wiggins v. Smith*,
   539 U.S. 510 (2003) .................................................................................................. 28

*Winkler v. Keane*,
   7 F.3d 304 (2d Cir. 1993) ......................................................................................... 28

**Statutes**

28 U.S.C. § 2255 ................................................................................................................ Passim

**Rules**

Federal Rule of Criminal Procedure 17 ....................................................................... 29

Federal Rule of Criminal Procedure 29 ....................................................................... 14

Federal Rule of Criminal Procedure 33 ................................................................... 14, 16

## PRELIMINARY STATEMENT

Michael Hild was convicted based on a government theory that he "inflated" bond prices above their true "market value." The cornerstone of that theory—the objective benchmark against which the government measured "inflation"—was Bloomberg's pricing for the bonds. Witness after witness testified that Bloomberg's prices represented the market's prices, and that the market prices were lower than the Live Well marks. In summation, the government told the jury that Mr. Hild's prices were "pie-in-the-sky" marks that "bore no relation to where you could sell the bonds in the market"—that is, at Bloomberg's prices. Without Bloomberg as the benchmark, the government's case would have collapsed.

What the jury never learned—and what trial counsel inexplicably failed to investigate—is that Bloomberg's "market" prices were not, as the jury was led to believe, based solely on Bloomberg's neutral, independent market analysis. They were based on information provided to Bloomberg by Dan Foster, a former Live Well insider who had helped create the very "Scenario 14" pricing methodology that the government claimed was fraudulent. And Foster was not merely a former insider: he was simultaneously cooperating with the U.S. Securities and Exchange Commission ("SEC"), and later the U.S. Attorney's Office for the Southern District of New York ("SDNY"), while at the same time providing pricing information to Bloomberg that would later be used against Mr. Hild at trial. The pricing information that formed the foundation of the government's fraud theory was thus supplied by a government cooperator with powerful incentives to lower his valuations in a way that supported the government's case. Foster's efforts were fruitful, as he later obtained a non-prosecution agreement in exchange for his cooperation.

1

This remarkable chain of events has now been exposed.  Post-trial productions reveal that Foster became one of the "key personnel" providing bond valuations to Bloomberg just as he entered a proffer agreement with the SEC.  A 2023 SEC settlement found that Bloomberg's valuations for thinly-traded securities such as the bonds at issue here "could, in certain circumstances, be largely driven by a single data input, such as a broker quote."  And Darren Stumberger—the government's own key cooperating witness, the "reverse mortgage bond guru" whose testimony this Court relied on extensively in affirming Mr. Hild's conviction—now describes what happened with Foster and Bloomberg as a "shocking chain of events" that was never "investigated, examined, or fully litigated."  The pricing information used by the government, Stumberger now says, was "not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government."

The story does not end there.  Stumberger—the witness the government called "very helpful . . . in terms of thinking about how to present the case to the jury and making sure that we ourselves understood the mechanics of the bonds"—has made a series of devastating admissions. He has described his plea proceeding as "among the most corrupt elements of the entire case." He has stated that the plea allocution he wanted to read "was torn up and thrown out" and that he was simply "handed a piece of paper" to read.  He has said there was "fake testimony."  And he has explained that the alleged losses were not caused by fraud at Live Well, but by the government's own investigation—which "dismantled the independent pricing mechanism that the entire repo lending structure depended upon" and replaced it with "valuation pricing supplied

2

by the government's cooperating witness [Foster]." In short, the government's star witness now attributes the losses to the Foster/Bloomberg pricing.

This evidence escaped scrutiny at trial due to the deficient performance and divided loyalties of Mr. Hild's trial counsel, Benjamin Dusing. Dusing was simultaneously embroiled in contentious Kentucky family court proceedings involving findings of domestic abuse, contempt sanctions, and a jail sentence. With multiple Kentucky hearings scheduled for May 4, 2021, Dusing rushed through the defense to conclude trial before that date. His paralegal—whose proffered testimony this Court credited—confirmed that Dusing stated he "wouldn't be able to make his [May 4] hearing if we call all these witnesses." Trial concluded one business day before the Kentucky hearing. Dusing was later suspended from the practice of law in two states for "troubling and egregious" violations, including witness bribery, threats to intimidate judicial participants, and making false statements to the court.

The government disclosed a page of notes to Dusing—revealing Foster's connection to Bloomberg—weeks before trial. This Court has already found that the notes "indicate that Foster may well have influenced Bloomberg's pricing" and that "it would be nonsensical to infer that Bloomberg did not somehow rely on those quotes." Yet Dusing never investigated. He never subpoenaed Bloomberg. He never subpoenaed Foster or Robert W. Baird & Co. (Foster's employer, which in turn contracted with Bloomberg). He never called an expert witness, despite having consulted one who supported the defense theory. He did not give notice of an advice of counsel defense. He introduced virtually no defense exhibits. The failure was complete—and, as the Court suggested with respect to the Foster notes, reflects a "lack of due diligence."

3

The simple chronology of events illustrates how the government engineered this case from the start—and how Mr. Hild's trial was tainted by the fact that the jury did not hear about Foster's role submitting pricing to Bloomberg. In 2017, the SEC began its investigation of Live Well, and that same year, Foster left Live Well, began cooperating with the SEC, and proposed that Bloomberg "team up" with him so he could begin pricing HECM IOs, which Bloomberg had never previously priced. In 2018, Bloomberg began publishing HECM IO pricing using Foster's submissions. Those pricing levels differed materially from the prices Foster had previously submitted to IDC while at Live Well. In early 2019, IDC ceased pricing HECM IOs, Bloomberg became the operative market benchmark, and lenders, trustees, and market participants began relying upon Bloomberg-derived valuations. At that time, Live Well was torpedoed through margin calls, write-downs, defaults, forced liquidation, and ultimately bankruptcy. In the summer of 2019, the SEC referred its investigation to the SDNY, and even in 2021, when Mr. Hild's trial took place, Foster was still supplying Bloomberg pricing. At Mr. Hild's trial, Bloomberg-derived valuations served as the market benchmark relied upon by lenders and reflected in U.S. Bank reporting. The government repeatedly relied upon witnesses whose understanding of "market" value derived from Bloomberg pricing. But the jury never learned that Bloomberg had not previously priced HECM IOs, that Foster initiated Bloomberg's pricing of that market, and that Foster was simultaneously cooperating with federal authorities. The Bloomberg-derived valuations continued to serve as the operative benchmark upon which lenders relied in valuing the collateral, liquidating the portfolio, and supporting the government's theory of market value at trial, sentencing, and its loss and restitution calculations. Had trial

4

counsel investigated the Foster/Bloomberg evidence and presented that evidence to the jury, Mr. Hild would have been acquitted.

This chronology explains why the Foster/Bloomberg evidence demanded investigation. It shows how the government's benchmark for "market value" ultimately came to be supplied by a government cooperator—a fact the jury never heard because trial counsel failed to investigate the Foster/Bloomberg relationship.

Mr. Hild now moves to vacate his conviction pursuant to 28 U.S.C. § 2255.  The record establishes that trial counsel's failure to investigate the Foster/Bloomberg evidence constitutes ineffective assistance of counsel warranting vacatur under *Strickland v. Washington*.  This Court has already effectively found a lack of facts showing due diligence; no conceivable trial strategy justified ignoring such critical evidence; and Dusing's preoccupation with Kentucky explains his failings.  The prejudice is manifest: without Bloomberg as an objective "market" benchmark, the government's inflation theory would have collapsed.  The government's own bond expert and star cooperator, Stumberger, now says precisely that.

Independently, Stumberger's recent statements—characterizing his prosecution as "corrupt," describing "fake testimony," and attributing the losses to Foster's Bloomberg pricing rather than fraud—establish that the key testimony on which the conviction rested is no longer reliable.  When the government's key witness now contends that the pricing benchmark was compromised by a government cooperator seeking leniency, and when that witness has disavowed the very proceedings that produced his testimony, confidence in the outcome is fundamentally undermined.  If Stumberger were to testify today, Mr. Hild would be acquitted.

5

The Second Circuit, in affirming this Court's denial of Mr. Hild's Rule 33 motion based on Foster/Bloomberg, expressly declined to address the ineffective assistance claim, holding it "best raised on collateral review." Mr. Hild now raises it. This Court denied Mr. Hild's Rule 33 motion based solely on the finding that the Court could not infer due diligence to obtain the Foster/Bloomberg evidence. That failure of diligence was due to trial counsel's ineffective assistance. This record compels the conclusion that Mr. Hild's conviction must be vacated.

## BACKGROUND

### I.  District Court Proceedings

#### A.  Live Well Financial and Mr. Hild's Conviction

Petitioner Michael Hild founded Live Well Financial ("Live Well") in 2005 and served as CEO. (Tr. at 343, 391.)[1] Live Well was a mortgage broker and banker that facilitated home equity conversion mortgages ("HECMs"), commonly known as reverse mortgages. Order at 5, *United States v. Hild*, No. 19-cr-602 (RA) (S.D.N.Y.) (Dkt. No. 140) ("December 7, 2022 Order"). In around 2011, Live Well began securitizing reverse mortgages into bonds that could be sold to investors. (*Id.*)

In 2014, Live Well purchased a portfolio of HECM-IO bonds ("interest only" bonds) for about $55 million, financed in part through repurchase ("repo") agreements with lenders. (*Id.* at 6.) The amount of credit extended was determined by the value of the bonds, which lenders generally valued using a third-party pricing service called Interactive Data Corporation ("IDC"). (*Id.* at 7.) The government alleged that beginning in September 2015, Mr. Hild and others at Live Well began submitting inflated bond prices to IDC using a methodology they called

---

[1] Unless noted otherwise, all citations to "Tr." are to the transcript of Mr. Hild's trial.

"Scenario 14." (*Id.* at 8.)  The government's theory was that Live Well concealed from lenders both that it was supplying prices to IDC and that the prices published by IDC did not reflect market values.  (*Id.* at 8–10.)

Mr. Hild asserted that the prices provided to IDC were a good-faith effort to value the extraordinarily difficult-to-price bonds.  (*Id.* at 10.)  The HECM-IO bonds were complex instruments requiring significant expertise to value; even experts disagreed on pricing inputs and assumptions.  (Tr. 235.)  The market for the bonds was highly illiquid, with only a few market participants and no reliable way to determine a sale price at any given time.  (Tr. 241–44, 503–06, 1267–74.)  Even Darren Stumberger—the government's key cooperating witness—agreed that Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint."  (Tr. 544; *see also* Tr. 1583–86.)

Mr. Hild was charged in a five-count indictment with conspiracy to commit securities fraud, conspiracy to commit wire and bank fraud, securities fraud, wire fraud, and bank fraud. (Indictment (Dkt. No. 2).)  He maintained his innocence and proceeded to trial, asserting, among other things, that Scenario 14 reflected a good-faith effort to determine accurate values for the bonds in an illiquid market.  (December 7, 2022 Order at 10.)

At Mr. Hild's trial, the government offered two theories of fraud.  The first was the now-legally-invalid right-to-control theory.  That is, the government's theory was that Mr. Hild was guilty of fraud because he failed to inform Live Well's lenders that Live Well was "pulling the strings at IDC," the pricing service.  (Tr. 2123.)  The second was that Mr. Hild had misrepresented the value of certain bonds by giving pricing information to IDC that was

7

"inflated," where the prices were not actually obtainable in the market.  (Indictment ¶¶ 24–42, 50–60; Tr. 25–32.)

At trial, the government pointed to the spread between the bonds' purchase price and Live Well's Scenario 14 price as evidence that the bonds could not be sold at the higher Scenario 14 price.  The government contended that the original purchase price was the "best indicator" of market value.  (Tr. 2149.)  But there was never a dispute that Live Well purchased the bonds at prices that were lower than Live Well's Scenario 14 valuations.  Mr. Hild himself testified at his trial that Mr. Stumberger had explained how "it was common" in the industry to purchase a bond and then immediately mark the bond at "what you thought it was worth based upon your framework," as opposed to the price "you bought it for."  (Tr. 1901.)  This testimony was consistent with the contracts between Live Well and the lenders, which defined "market value" simply as the price "obtained from" IDC (*e.g.*, Ex. H at 11 (GX 603)),[2] and the IDC contracts, which confirmed that IDC quotes "may not conform to actual purchase or sale prices in the marketplace" (Ex. I at 2 (DX D.1a.2)).[3]

---

[2] Unless noted otherwise, exhibit citations refer to the exhibits attached to the Declaration of Brian A. Jacobs, Esq., dated July 20, 2026.

[3] In the Court's December 7, 2022 Order, it found "unpersua[sive]" Mr. Hild's argument that "the IDC Master Services Agreement permit[ted] Live Well to provide quotes that did not conform to purchase and sale prices." (December 7, 2022 Order at 24 n.4 (quotation marks omitted).)  The Court's reasoning underscores the value the Bloomberg marks provided the government at trial.  The Court found that the definition of "Evaluations" in the Master Services Agreement "create[d] an expectation that the rates provided by IDC are tied to market rates." (*Id.*)  Quoting the language from that definition, the Court held that there was "sufficient evidence for the jury to reject [Mr. Hild's] reading in favor of one that lenders reasonably expected that the IDC prices were tied to 'what the holder would receive in an orderly transaction for the securities . . . *under current market conditions.*'" (*Id.* (quoting DX D.1a.2 at 1 (IDC Master Services Agreement)) (emphasis added).)  But the primary evidence of "current market conditions" presented to the jury was Bloomberg's prices, which were supplied by a government cooperator.  Without this key evidence, the government's case would have been undermined.

The government contended at trial that Mr. Hild was guilty of fraudulently inflating the bonds' value because the bonds *could not be sold* at Scenario 14 prices, but the government could not likely have succeeded with this argument without evidence that others in the market valued the bonds differently than Live Well did.  That evidence came from three witnesses who testified about what they viewed as the "market" value of the bonds, and each of them relied on Bloomberg prices—which were lower than Live Well's valuations—to assess "market" value.

For example, Joe Redoutey, on behalf of Flagstar Bank, a lender to Live Well, testified that Bloomberg is "a company that provides market values for various marketable securities" and "is used . . . to establish what the market value is of something."  (Tr. 784.)  Alan Levy, testifying on behalf of another lender to Live Well (ICBC), testified about what "the industry thought . . . this collateral is worth" and as support pointed to the prices provided by Bloomberg's valuations as being "the market price."  (Tr. 721–22.)

The government juxtaposed what these witnesses said about the lower prices that Bloomberg posted beginning in about May 2019 (Tr. 2176; *see also* Tr. 782–85) with the higher prices that IDC had previously posted, which the government argued traced back to Live Well's internal models (principally Scenario 14).  Redoutey testified that Bloomberg's prices for the bonds were "dramatically different" and "lower" than IDC's prices.  (Tr. 749–50.)  He also testified that he raised his concerns with the "differentiation" between the Bloomberg and IDC values on a May 2019 call with Mr. Hild and Glen Haddock of Live Well.  (Tr. 750, 786–89.)

Levy testified that IDC's prices (and therefore Live Well's prices) "were totally inaccurate" because, when "Bloomberg started" providing pricing for the bonds in about late 2018, IDC's prices "were materially different from the Bloomberg marks."  (Tr. 720.)

9

Glen Haddock—who served as, among other things, Live Well's Chief Financial Officer—testified that (1) in 2019, he learned that "U.S. Bank . . . appeared to be getting the [bond pricing] numbers from Bloomberg instead of from IDC" (which had stopped pricing the bonds by that point) "and therefore the values were showing much less" than they had been when IDC had been providing pricing (Tr. 1606; *see also* Tr. 1607–1610, 1631–38 (similar)); (2) the lenders began raising concerns with him and others at Live Well about the disparity (Tr. 1607–10); (3) he thereafter "felt like [Live Well was] carrying [the bonds] at too high a number" (Tr. 1610); and (4) he accordingly refused to sign Live Well's financial statements, causing the company's operations to shut down (Tr. 1615–22).

In summation, the government highlighted the disparity between the Bloomberg and IDC prices. (Tr. 2176–79.) The government further highlighted how Haddock wrote down the value of its bond portfolio by some $200 million (Tr. 2169)—a markdown that occurred directly because of Bloomberg's prices and that ultimately caused Live Well to fail. Using Bloomberg's prices as the benchmark, the government argued Live Well's prices were "inflated" and "pie-in-the-sky prices" that "bore no relation to where you could sell the bonds in the market," that is, at Bloomberg's "market" prices. (Tr. 29, 2122; *see also, e.g.*, Tr. 2126 ("These bonds were not valued based on where you could sell them."), Tr. 2148 ("These Scenario 14 prices are way above where these bonds trade in the market, and [Mr. Hild] knew that.").)

After a 14-day trial in April 2021, a jury found Mr. Hild guilty on all counts.

**B.      Trial Counsel's Undisclosed Conflict Comes to Light**

Following the verdict, Mr. Hild discovered that his lead trial counsel, Benjamin Dusing (and co-counsel Brandy Katy Lawrence, a relatively inexperienced junior attorney), had been operating under undisclosed conflicts of interest that compromised his defense.

During trial, Dusing was simultaneously a defendant in contentious custody disputes in Kentucky family court—disputes that culminated in findings of domestic abuse, contempt sanctions, a jail sentence, court-mandated psychiatric counseling, and ultimately Dusing's suspension from the practice of law. Lawrence served as Dusing's personal attorney in the Kentucky litigation (where he at times represented himself pro se) while simultaneously serving as co-counsel in Mr. Hild's case. With multiple Kentucky hearings scheduled for May 4, 2021, Dusing and Lawrence rushed through the defense to conclude trial before that date, declining to call expert witnesses and introducing virtually no defense exhibits despite marking hundreds for potential use. Dusing's paralegal later confirmed that Dusing stated he "wouldn't be able to make his [May 4] hearing if we call all these witnesses." (December 7, 2022 Order at 43.) Trial concluded one business day before the Kentucky hearing. (*Id.* at 29.)

On March 9, 2021—just over a month before jury selection in Mr. Hild's trial—the Kentucky family court sanctioned Dusing for making frivolous motions, held him in contempt, and sentenced him to "7 days in jail." (Dkt. 136-1 at 7, 14 of 54.)

On March 20, 2021, as discussed in more detail below, the government made a 3500 disclosure to Dusing containing the one-page of notes reflecting the key Foster/Bloomberg relationship. (Dkt. No. 244-1 at 40 of 40.)

11

On April 5, 2021—eight days before jury selection—the Kentucky court awarded sole custody to the mother based on findings that Dusing had "perpetuated violence" and "physical and emotional abuse," and had attempted to bribe an expert witness.  (December 7, 2022 Order at 28, 47.)  This ruling triggered deadlines, precipitating a "flurry of activity" for Dusing throughout Mr. Hild's trial.  (*Id.* at 28.)

On April 13, 2021—the first day of jury selection in Mr. Hild's trial—the mother in one of the Kentucky cases filed the first of four sanctions motions against Dusing and Lawrence based on their conduct in the Kentucky matter, all of which were noticed for a hearing on May 4, 2021.  (*Id.* at 28–29.)

On April 15, 2021—the day Dusing cross-examined Darren Stumberger, the government's key cooperating witness—Dusing also filed, pro se, a 44-page motion to vacate the April 5 custody order in Kentucky, in which he broadly accused the Kentucky court of corruption.  (*Id.* at 28.)  That motion was also noticed for the May 4 hearing.  (*Id.*)

On April 16, 2021, as Dusing continued his cross-examination of the key cooperator, the mother in the Kentucky case filed a second sanctions motion against Dusing, arguing that he had misled the court in filings.  (*Id.* at 28.)

On April 19, 2021, Lawrence—acting as Dusing's personal counsel in the Kentucky matter—filed a motion in Kentucky seeking to continue all proceedings.  (*Id.* at 29.)  The motion acknowledged that the Kentucky proceedings had been "a distraction" from Mr. Hild's trial and argued that counsel would suffer "serious prejudice" in Kentucky absent a continuance.  (*Id.* at 29.)

About a week later, on April 27, 2021, the defense case in Mr. Hild's trial began.  The Kentucky court had still not ruled on the motion for a continuance of the May 4 hearing. Dusing's paralegal—whose proffered testimony the Court credited—explained that Dusing was "well-aware of the proceedings in Kentucky" and had stated, while planning Mr. Hild's defense case, that he "wouldn't be able to make his [May 4] hearing if we call all these witnesses."  (*Id.* at 29, 42–43.)

Mr. Hild's defense case proceeded rapidly, in an apparent effort by Dusing and Lawrence to conclude before May 4.  Despite the complexity of the HECM-IO bonds—which the government's own witnesses agreed were "among the most complex in fixed income"—Dusing declined to call an expert witness.  (Tr. 235–44, 503–06, 1267–70.)  He did so despite consulting an expert who had prepared a report supporting the defense theory that intrinsic value was an appropriate measure for the illiquid bonds.  (December 7, 2022 Order at 43–44, 50.)

Dusing did not introduce a single exhibit during the direct examination of Mr. Hild (and introduced only limited exhibits on redirect), and the government seized on this dearth of defense exhibits in summation.  (Tr. 2244.)  Dusing called only one other witness besides Mr. Hild and introduced only one insignificant exhibit through that witness.

On April 29, 2021, the day closing arguments began in Mr. Hild's case, the Kentucky court finally issued an order denying Dusing's application for a continuance.  (December 7, 2022 Order at 29.)  The jury returned its guilty verdict on April 30, 2021—one business day before the May 4 Kentucky hearing.  (*Id.*)

Dusing was later suspended from practice in both Kentucky and Ohio.  (*Id.* at 3.)  In February 2022, the Kentucky Supreme Court temporarily suspended Dusing, finding probable

13

cause to believe he posed "a substantial threat of harm to his clients or the public or that he is mentally disabled and lacks the mental fitness to continue to practice law." (Dkt. No. 124 at 11 of 13.) Ohio followed in March 2022. (Dkt. No. 125.) In September 2024, the Kentucky Supreme Court imposed a three-year suspension for "troubling and egregious" violations, including witness bribery, threats to intimidate participants in judicial proceedings, filing frivolous motions, and making false statements to the court. *In re Dusing*, 701 S.W.3d 393, 394 (Ky. 2024).

C.      **Mr. Hild's Rule 29 and 33 Motions**

After the jury returned a guilty verdict in April 2021, Mr. Hild hired new counsel and, on July 27, 2021, moved for a judgment of acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. (Dkt. No. 102.) In his motion, Mr. Hild argued that Dusing and Lawrence provided ineffective assistance of counsel under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and *Strickland v. Washington*, 466 U.S. 668 (1984). (December 7, 2022 Order at 4.)

The government opposed and submitted a 76-page affidavit from Dusing, together with affidavits from Lawrence and a third lawyer, Jeffrey Otis, who was involved in the Kentucky litigations. (Dkt. No. 118.) Dusing asserted that he was "not aware of much of the activity" in the Kentucky litigation during Mr. Hild's trial, including that the May 4 hearing had been scheduled, that Otis "handled all of the court filings" in Kentucky, that Dusing did not "cut short" Hild's case, and that the decision not to notice an expert was made because no expert was "willing to give the desired opinion and [because of] Mr. Hild's [un]willingness to pay." (Dkt. No. 118-1 ¶¶ 5, 70.) Lawrence's affidavit was similar. (Dkt. No. 118-2.)

14

On December 7, 2022, the Court issued a 64-page opinion denying Mr. Hild's motions. The Court acknowledged that the case "presents a challenging question at the intersection of the Sixth Amendment right to conflict-free counsel and the modern reality." (December 7, 2022 Order at 2.)  The District Court largely accepted Mr. Hild's factual recitation regarding Dusing's conduct.  (*Id.* at 27–32.)

Critically, the Court expressly declined to rely on Dusing's affidavit "in light of Dusing's deeply troubling conduct in the Kentucky matter—which included threatening to 'blow up' a judge, staff attorneys, and opposing counsel—and his subsequent suspension from the practice of law in two states."  (*Id.* at 30–31.)  The Court also "credit[ed] . . . as true" the proffered testimony of Dusing's former paralegal, who explained Dusing had stated he "wouldn't be able to make his [May 4] hearing if we call all these witnesses."  (*Id.* at 43.)

The Court acknowledged that the case is "distinguishable from the run-of-the-mill case where a lawyer has multiple obligations" and that the circumstances were "unusual and troubling."  (*Id.* at 3 (quotation marks omitted).)  Nevertheless, the Court denied Mr. Hild's motion.  (*Id.* at 4.)

The Court recognized that the Supreme Court has established a framework under *Sullivan* in which prejudice is presumed when a defendant shows "(1) an actual conflict of interest" that (2) "adversely affected [the] lawyer's performance."  (*Id.* at 32 (quoting *Sullivan*, 446 U.S. at 348).)  But the Court concluded that Mr. Hild had not demonstrated an "actual conflict" triggering this framework.  (*Id.* at 40.)  Having found no actual conflict, the Court applied *Strickland*'s more burdensome standard and held that Mr. Hild failed to meet it.  (*Id.* at 3–4.)

15

The Court sentenced Mr. Hild to 44 months' imprisonment.  (Dkt. No. 148.)  Based on the "challenging" and "novel" nature of the legal issue and the lack of precedent, the Court granted Mr. Hild bail pending appeal over the government's objection.  (Dkt. No. 154.)

**D.      Mr. Hild's Rule 33 Motion Based on Newly Discovered Evidence**

On April 29, 2024, Mr. Hild filed another motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on newly discovered evidence.  (Dkt. No. 235.)

Following the verdict, new evidence was discovered (the "New Bloomberg Evidence") that shows that Bloomberg did not derive its prices independently and neutrally, but instead based those prices at least in part on information provided by an individual who at the time was seeking to cooperate with the government, and who ultimately obtained a non-prosecution agreement thanks to his efforts.  (Dkt. No. 244.)  Bloomberg used quotes to help value the bonds provided by former Live Well employee Dan Foster.  While at Live Well, Foster was directly involved in valuing the bonds at issue and creating Scenario 14.  (Tr. 73–76, 139, 996.)  Foster reported to Darren Stumberger, the government's key cooperating witness.  (Tr. 73–76, 134–35.)

At Live Well, Foster was responsible for "the analytics, the modeling, [and] the analysis on the portfolio" in order to "determine the valuations" of the bonds.  (Tr. 75, 134.)  In 2017, Foster left Live Well (Tr. 403–06), and began cooperating with the SEC.  He signed a proffer agreement with the SEC in November 2017.  (Dkt. No. 244-1 Ex. C.)  He began attempting to cooperate with the government, and he obtained a non-prosecution agreement in August 2019 thanks to his successful efforts.  (Dkt. No. 244-1 Ex. A.)  In that non-prosecution agreement, the government promised that it "will not criminally prosecute Dan Foster for any crimes . . . related to his participation in a criminal scheme, from in or about September 2015 through in or about

16

May 2017, to defraud repurchase agreement counterparties and lenders in connection with the mismarking of the bond portfolio of Live Well Financial Inc." (*Id.* at 1.)  The government met with Foster several times including as late as March 18, 2021 (Dkt. No. 244-1 Ex. E), just weeks before Mr. Hild's trial started on April 13, 2021.  The government included Foster on its trial witness list but ultimately elected not to call him.

After trial, in connection with a separate civil litigation, Bloomberg produced documents showing that it used Foster's quotes to value the bonds at issue in Mr. Hild's case.[4]  First, Bloomberg produced a "data acquisition agreement" (the "Agreement") from July 2016 (amended in December 2017) between Bloomberg and Robert W. Baird & Co. ("Baird").  (Dkt. No. 244-1 Ex. B.)  Under the Agreement, Baird agreed to provide Bloomberg with "data and information."  (*Id.* at BBG-LW -0000520.)  Bloomberg agreed to pay a fee in exchange for receiving Baird's "[p]ricing of HECM pools."  (*Id.* at 519 (Schedule A).)  Bloomberg could then use that pricing information for various purposes, including "in its generic, 'fair value,' composite or theoretical prices or ratings and in its proprietary databases."  (*Id.* at 509 § 1(b).)  Schedule A to the Agreement (as amended) lists Dan Foster as one of Baird's "key personnel" (*id.* at 521) who was obligated to "remain . . . involved with the creation and/or generation of" the bond information (*id.* at 510 § 3(d)).  Thus, the Agreement reveals that, after Foster left Live Well in 2017 (Tr. 403–06), and just after Foster first signed a proffer agreement with the SEC (Dkt. No. 244-1 Ex. C), he became a "key" person at Baird providing Bloomberg with bond valuations, which Bloomberg used to value the bonds.

---

[4] This information was disclosed in connection with Mr. Hild's separate civil litigation, *Carickhoff v. Hild*, No. 21-50966-LSS (Del. Bankr. Ct.).

Second, after trial, Bloomberg disclosed its methodology for pricing the bonds.  (Dkt. No. 244-1 Ex. D.)  The methodology provides for a three-step "approach" to pricing "based on a combined sequence of pricing algorithms."  (*Id.* at BBG-LW-0000379.)  At the first step, Bloomberg receives "market data" from "pricing contributors"— including Foster—and "analyze[s]" that data with a "proprietary screening algorithm."  (*Id.*)  At the second step, where bonds have "limited or no direct market observations," Bloomberg uses a "proprietary relative value model to price [the] bonds" by looking at "comparable observable pools."  (*Id.*)  At the third step, Bloomberg "weight[s] and aggregate[s]" the outcomes of the first two steps and derives a final price for publication.  (*Id.*)  Thus, according to Bloomberg's pricing methodology, Bloomberg uses and relies on information provided by "pricing contributors" including Foster.

Third, a post-trial settlement between Bloomberg and the SEC in 2023 shows that Foster's information may well have been even more important than Bloomberg's newly disclosed methodology suggests.  In 2023, Bloomberg entered into a settlement with the SEC in which the SEC found that, for the period 2016 to 2022 (the time period relevant to Mr. Hild's case), Bloomberg made misleading disclosures about its valuation methodologies for "certain thinly-traded fixed income securities."  Specifically, the SEC found that Bloomberg's valuations "could, in certain circumstances, be largely driven by a single data input, such as a broker quote," making Bloomberg's "statements to customers regarding valuation methodologies materially misleading."  *In re Bloomberg Finance L.P.*, Securities Act Release No. 11150, at 2 (Jan. 23, 2023).[5]  The SEC settlement shows that Bloomberg's valuations of "certain thinly-

---

[5] Available at https://www.sec.gov/files/litigation/admin/2023/33-11150.pdf.

traded fixed income securities" were "largely driven" by the first step, without steps two and three.

The New Bloomberg Evidence was not disclosed to Mr. Hild before trial.  The only relevant disclosure was a single piece of Section 3500 material (Dkt. No. 244-1 Ex. E (the "Foster Notes")) the government disclosed to Dusing.  Just weeks before trial, the government disclosed for the first time a page of notes dated March 18, 2021, suggesting that Foster had told the government that day that he "still does consulting for Baird. Advising Bloomberg for HECM questions" and that he "provides quotes" to Bloomberg on certain bonds.  (*Id.*)  Although the notes were provided to Dusing, Mr. Hild does not recall ever having seen or been provided with the Foster notes until long after his trial had concluded.  (Hild Declaration ¶¶ 2–5 ("Hild Decl.").)

Following Mr. Hild's April 29, 2024 motion, the government filed an opposition (Dkt. No. 238), and Mr. Hild filed a reply (Dkt. No. 244-2).

In an Opinion and Order dated July 10, 2024, the Court denied Mr. Hild's motion for a new trial.  (Dkt. No. 245.)  The Court's ruling was based entirely on its finding that there were no facts "from which the court can infer due diligence on the part of the movant to obtain the evidence."  (*Id.* at 6–7.)  Critically for the purposes of this motion, the Court found that the Foster Notes "indicate that *Foster may well have influenced Bloomberg's pricing*" and that "it would be nonsensical to infer that Bloomberg did not somehow rely on those quotes."  (*Id.* at 8 (emphasis added).)  The Court also found that the "notes appeared within a production of only nine documents, none of which was longer than three pages" that were produced "nearly a month before trial" and that "the defendant or his attorney either knew, or should have known, of the

19

essential facts permitting him to take advantage of that evidence." (*Id.* at 8 & n.4 (quoting

*United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997).)  The Court did not address whether

counsel was ineffective in failing to pursue the New Bloomberg Evidence.

## II.    **Appellate Court Proceedings**

### A.    **The Second Circuit's Decision**

Mr. Hild filed his appellate brief on December 14, 2023.  *United States of America v.*

*Hild*, No. 23-6136-cr (2d Cir.) (Dkt. Entry 40).  Thereafter, he filed a supplemental appeal

regarding the Court's denial of his motion for a new trial based on the Bloomberg/Foster

evidence.  *Id.* (Dkt. Entry 59).  On July 30, 2025, the Second Circuit issued an opinion and

separate summary order.  *Id.* (Dkt. Entries 76–77).  On October 15, 2025, the Second Circuit

issued an Amended Summary Order.  *Id.* (Dkt. Entry 80).  With respect to the newly discovered

Bloomberg/Foster evidence, the Second Circuit found no abuse of discretion in this Court's

finding that, "with due diligence," Mr. Hild could have uncovered the evidence at issue.  *Id.* at 6.

As to Mr. Hild's argument that his counsel was ineffective for failing to investigate the

Foster/Bloomberg connection "with due diligence," the Second Circuit declined to address it.

(*Id.* at 11.)  The court held the claim would be "best raised on collateral review."  (*Id.* at 11.)

### B.    **Petition for Certiorari**

Mr. Hild filed with the Supreme Court a timely petition for a writ of certiorari on March

23, 2026.  Petition for Writ of Certiorari, *Hild v. United States*, 2026 WL 860070 (2026) (No.

25-1120).  The Supreme Court denied the petition on April 27, 2026.  No. 25-1120 (Apr. 27,

2026 Dkt. Entry).

III.    **Newly Discovered Evidence**

Following Mr. Hild's conviction, additional evidence came to light that undermines his conviction.  At trial, Darren Stumberger—"arguably the government's key cooperating witness" (December 7, 2022 Order at 28) and "reverse mortgage bond guru" (Tr. 1816)—testifed at length.  Stumberger is a former Live Well employee who worked there from 2014 to 2019 and testified at trial as a government cooperating witness.  (Tr. 50–51.)  He pleaded guilty to securities fraud, bank fraud, wire fraud, and related conspiracies, and testified that he participated with Mr. Hild in conduct to defraud banks by causing Live Well into borrow more than it should have.  (Tr. 51.)  Stumberger, an expert on the bonds at issue, testified that Scenario 14 was a "departure" from how the "market" valued the bonds, that the resulting prices were "higher" than market prices.  (Tr. 115.)  He agreed that the "market" was "how other people value" the bonds.  (Tr. 538.)  He also testified that Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint."  (Tr. 544.)

This Court's December 7, 2022 Order relied extensively on Stumberger's trial testimony. (*See generally* December 7, 2022 Order at 5–13, 19–28.)  The government told the Court at Stumberger's sentencing that meeting with him was "very helpful . . . in terms of thinking about how to present the case to the jury and making sure that we ourselves understood the mechanics of the bonds."  Sentencing Tr. at 7, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023) (Dkt. No. 42).  Yet, Mr. Stumberger now attributes the losses in this case to outside events and the Foster/Bloomberg pricing—not to fraud at Live Well.

On December 17, 2024, in an email to the court in a civil action proceeding in Michigan—*Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) (the

"Flagstar litigation")—Mr. Stumberger said that the transcript of his plea proceeding was "among the most corrupt elements of the entire case." (Ex. A.)

On March 5, 2025, when discussing his plea allocution at a hearing in the Flagstar litigation, Mr. Stumberger said, "[a]ll I can say about the guilty plea is it was solely the advice of counsel at the time" and that he was told there were "no other options" by his criminal counsel. (Ex. B at 8.) He said that the plea allocution he wanted to read "was torn up and thrown out" and that he was simply "handed a piece of paper before the arraignment" that he read. (Ex. B at 8.) He also said that his defense in the civil case would be the "truth, better said, the facts of what happened" (as opposed to what he said in his plea allocution). (Ex. B at 8.)

In an email to Mr. Hild's civil counsel on June 5, 2025, Mr. Stumberger highlighted his plea hearing transcript as an example of "corruption," and asked whether "Hartman and Racz" (the AUSA and FBI agent in the criminal case) "really want me [Stumberger] talking about this publicly?" (Ex. C.)

At a status conference in the Flagstar litigation on September 26, 2025, Mr. Stumberger stated on the record that there had been "fake testimony," asserted that "Dan Foster . . . did this for all of these parties and they paid for it with a non-prosecution agreement." (*See* Ex. D at 13–15.) Mr. Stumberger stated that he was "not at liberty to talk about" his "involvement with Live Well, because [he had] been threatened excessively with jail time, as it relates to the plea and [his] defense for this case." (Ex. D at 13.)

In a filing on October 7, 2025, Mr. Stumberger stated he "received an extraordinary email from [his] former attorney . . . which contained explicit threats impacting both [himself] and [his]

22

children" and that he is "liv[ing] under direct threat, and can no longer safely respond to inquiries related to this case or [his] defense."  (Ex. E at 2.)

On June 1, 2026, Mr. Stumberger wrote in a filing:

> The Court should be aware by now of the remarkable chain of events involving numerous individuals, financial institutions, valuation providers, and professional advisors whose actions materially affected the valuation and disposition of the securities at issue. *To my knowledge, none of this information was presented during the 2021 trial in United States v. Hild. I am certain none of it was available to me when I entered my plea agreement in 2019*. While the 'Dan Foster' matters have been addressed in Hild's related proceedings from a notice perspective (or Hild's counsel had a chance to investigate), they have never been investigated, examined, or fully litigated. *The shocking chain of events related to Foster and others* has only been introduced to this Court's docket and record in 2025.
>
> Central to these newly developed facts is Dan Foster, a former Vice President of Live Well Financial who was identified by the Government as a cooperating witness and an unnamed co-conspirator in *United States v. Hild*. Following his departure from Live Well, Foster became involved in supplying HECM Interest-Only ("HECM IO") bond valuations to Bloomberg under extreme pressure to obtain a Non-Prosecution Agreement from the Government—which he ultimately received. *Evidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ("IDC") while at Live Well. These discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself.* To the extent Flagstar's alleged damages theory relies upon valuations derived from, influenced by, or otherwise connected to Foster's pricing submissions, the reliability of those damages calculations is directly called into question.

(Ex. F at 2–3 (emphasis added).)

Stumberger's filing goes on to say:

> Foster entered into a proffer agreement with the SEC in 2017 and later obtained a non-prosecution agreement in connection with

23

investigations involving Live Well Financial in 2019. The timing of his involvement presents factual issues directly relevant to valuation reliability. *A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations.*

(*Id.* at 11 (emphasis added).)

Mr. Stumberger continues:

Foster affirmatively proposed a pricing relationship with Bloomberg for HECM CMO/IO securities. In an email within Exhibit E to ECF No. 144, Foster wrote that "the evaluation range is so wide for this particular product" and proposed that "Baird & Bloomberg team up," offering "an annual fee of 25k for 50 HECM CMO's priced weekly." Foster signed an SEC proffer agreement in November 2017, before the Bloomberg pricing relationship became operative, and by August 2019 the government had executed Foster's non-prosecution agreement. *The pricing information utilized to generate alleged losses was thus not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government.*

Bloomberg's Larry Mattera asked whether Bloomberg could use Foster's levels "in production now," confirming Bloomberg was "a bit starved for data in this sector"—an admission confirming the absence of a robust, observable market. Foster sent Bloomberg the first "BAIRD - HECM CMO - BV AL Price Export," noting Bloomberg had "turned [it] on to immediately go into production." Bloomberg later acknowledged receiving quotes from Foster and Olivier Dupiton; but subsequent Bloomberg discovery failed to produce meaningful pricing submissions from Dupiton, leaving a record dominated by Foster's submissions, exports, and communications. *This raises substantial questions about whether Foster was in practice the dominant or potentially sole identified contributor for the securities at issue.* The pricing levels Foster later supplied into the Bloomberg ecosystem were materially lower than those previously supplied through the IDC process while at Live Well. *A contributor who dramatically lowered his own valuations after becoming a government cooperator presents an obvious factual issue regarding the reliability of the resulting benchmark.*

24

(*Id.* at 27–28 (emphasis added).)

On June 12, 2026, Mr. Stumberger argued in a filing that the alleged losses were not the product of the conduct alleged at Mr. Hild's criminal trial but were instead shaped by what he describes as a "simultaneous and deleteriously orchestrated chain of events" involving the government investigation, IDC's cessation of pricing, Foster's Bloomberg submissions, and liquidation in a distorted market.  (Ex. G at 1).  Mr. Stumberger writes, "[t]he government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon—and the structure was then replaced with valuation pricing supplied by the government's cooperating witness [Foster]." (*Id.* at 10.)

Mr. Stumberger explains that the "pricing structure" for Live Well's bonds "did not collapse because the market determined the bonds were worth less."  (*Id.* at 11.)  Rather, "[i]t collapsed because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities."  (*Id.*)  Thus, according to Stumberger, the SEC's actions "removed the one pricing benchmark that the entire lending and collateral structure depended upon, *not because independent market participants had reached a different view of value, but because the government's investigation had made IDC unwilling to continue publishing prices*." (*Id.* (emphasis added).)

Mr. Stumberger continues:

> "[i]nto that vacuum stepped Bloomberg — and into Bloomberg's data collection for these securities stepped Dan Foster. Foster was a former Live Well Vice President who had departed Live Well in 2017, entered into a proffer agreement with the SEC in November 2017, and was actively cooperating with federal investigators while simultaneously developing a formal pricing relationship with Bloomberg for HECM collateralized mortgage obligations . . . ."

25

(*Id.*)

Mr. Stumberger details how "[t]he pricing levels Foster supplied to Bloomberg after departing Live Well differed materially from the valuations he had supplied to IDC while at Live Well" but there "has never been testing as to the accuracy or integrity of the model Foster used. . . . All that is known is that Foster was a government cooperator with the SEC and then the SDNY, and he supplied valuations to Bloomberg. . . . A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and securing a non-prosecution agreement presents an obvious conflict and unresolved questions about the independence and reliability of those valuations." (*Id.* at 12.)

## TIMELINESS

This motion is timely because it was filed within one year after the Supreme Court denied Mr. Hild's petition for a writ of certiorari. 28 U.S.C. § 2255(f)(1); *Clemente v. Lee*, 72 F.4th 466, 476 (2d Cir. 2023). Here, Mr. Hild's petition for certiorari was denied on April 27, 2026. *Hild v. United States*, No. 25-1120 (Apr. 27, 2026 Docket Entry). The motion is timely also because it is being filed according to the schedule this Court set. (Dkt. No. 268.)

## ARGUMENT

Under Section 2255, a "prisoner in custody" may move the sentencing court to vacate, set aside, or correct the sentence on the ground that such sentence was illegally imposed. 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).

Mr. Hild is "in custody" under Section 2255 because he surrendered to the Federal

Bureau of Prisons to begin serving his sentence on July 10, 2026.

To warrant a hearing, the defendant need establish only that he has a "plausible" claim,

not that "he will necessarily succeed on the claim." *Armienti v. United States*, 234 F.3d 820, 823

(2d Cir.2000) (quoting *United States v. Tarricone*, 996 F.2d 1414, 1418 (2d Cir.1993)

(remanding for a hearing when appellant alleged several specified instances of attorney's

deficiencies that were product of specific conflict of interest). "If material facts are in dispute, a

hearing should usually be held, and relevant findings of facts made." *Puglisi v. United States*,

586 F.3d 209, 213 (2d Cir. 2009).

## POINT 1:   TRIAL COUNSEL'S FAILURE TO INVESTIGATE THE FOSTER/BLOOMBERG EVIDENCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL WARRANTING VACATUR

Mr. Hild's conviction should be vacated because his trial counsel, Benjamin Dusing,

provided constitutionally ineffective assistance by failing to investigate critical evidence that

would have undermined the government's case.

### I.   Legal Framework

A defendant may show a violation of the Sixth Amendment by showing that

(1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the

deficient performance prejudiced the defense." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005)

(quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). Here, Mr. Hild's conviction

should be vacated under *Strickland*.[6]

---

[6] "A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005) (quotation marks omitted). "Although a defendant is generally required to show prejudice to prevail on an ineffective assistance of counsel

27

## II.    Discussion

### A.    Dusing's Failure to Investigate the New Bloomberg Evidence Constitutes Deficient Performance

Under *Strickland v. Washington*, the first prong of the ineffective assistance analysis requires the defendant to show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. 668, 688 (1984). A lawyer's duty to investigate is fundamental to that standard. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (quoting *Strickland*, 466 U.S. at 690–91)). Here, Dusing's failure to investigate the Foster/Bloomberg evidence and use it at trial was not merely deficient—it was a complete abdication of his fundamental obligations to his client. The record here establishes that (1) this Court has already effectively found a lack of facts showing due diligence by trial counsel and given that this Court refused to credit trial counsel, no further facts will be forthcoming; (2) the Foster Notes warranted investigation; (3) no trial strategy justified ignoring this critical evidence; and (4) Dusing's conflict with the Kentucky litigation provides one explanation for the failure.

### 1.    This Court's Finding of a Lack of Facts Showing Due Diligence Establishes Deficient Performance

This Court has already found that Hild and his counsel, "with due diligence, could have relied on [the Foster Notes] to seek the evidence at issue," including by issuing subpoenas under

---

claim, this is not so when counsel is burdened by an actual conflict of interest." *Id.* (quotation marks omitted). Prejudice is presumed when "a defendant shows (1) an actual conflict of interest that (2) adversely affected his counsel's performance." *Id.* (quotation marks omitted); *see United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995). Counsel's performance is "adversely affected" by the conflict where the conflict causes "an 'actual lapse in representation.'" *LoCascio*, 395 F.3d at 56 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980)). An "actual lapse" is demonstrated by "some plausible alternative defense strategy or tactic" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993) (quotation marks omitted). Mr. Hild satisfies this standard in addition to *Strickland*'s.

Federal Rule of Criminal Procedure 17.  (Dkt. No. 245 at 8.)  Courts have recognized that such a finding supports an ineffective assistance claim.  *See United States v. Kelly*, 663 F. App'x 222, 225 & n.5 (3d Cir. 2016) ("[A] lack of due diligence by defendant's counsel would support, and not hinder, a defendant's ineffective assistance of counsel claim."); *see also United States v. Fisiorek*, 43 M.J. 244, 248 (C.A.A.F. 1995) ("[A] ruling of 'lack of due diligence' invoked against the conduct of a *defense counsel* raises the awesome specter of 'ineffective-assistance-of-counsel' claims.").  This Court's finding of a lack of facts showing due diligence falls squarely on Dusing—Mr. Hild does not recall ever seeing the Foster Notes until long after his trial had concluded.  (Hild Decl. ¶¶ 2–5.)  No further facts will be forthcoming, given that this Court refused to credit trial counsel's prior affidavit due to trial counsel's troubling conduct.

### 2.    The Foster Notes Put Counsel on Notice That Bloomberg's Independence Was Compromised, Requiring Immediate Investigation

This Court has already found that the Foster Notes—disclosed weeks before trial in a production of only nine documents, none longer than three pages—put counsel on notice that Foster "provides quotes" to Bloomberg and that Foster was "[a]dvising Bloomberg for HECM questions."  (Dkt. No. 245 at 8 & n.4.)  As the Court observed, "it would be nonsensical to infer" from the Foster Notes "that Bloomberg did not somehow rely on those quotes."  (*Id.* at 8.)

The objectively reasonable response to these notes would have been for counsel to recognize the critical need to investigate further.  The significance of what investigation would have revealed cannot be overstated: as Stumberger, the government's key cooperating witness and an expert on the bonds at issue, now explains, the Bloomberg valuations that formed the cornerstone of the government's "market value" theory were "not supplied by a neutral third

29

party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government." (Ex. F at 27–28.) Had Dusing investigated, he would have discovered that Foster—who had been directly involved in creating the very Scenario 14 pricing the government claimed was fraudulent—was simultaneously providing pricing information to Bloomberg while cooperating with the SEC and later the government. This extraordinary fact would have undermined the government's theory of fraud.

Stumberger's newly discovered statements underscore the critical importance of what investigation would have uncovered. According to Stumberger, "[t]he pricing levels Foster supplied to Bloomberg after departing Live Well differed materially from the valuations he had supplied to IDC while at Live Well." (Ex. F at 27–28.) Stumberger further identifies the obvious conflict that investigation would have exposed: "A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and securing a non-prosecution agreement presents an obvious conflict and unresolved questions about the independence and reliability of those valuations." (Ex. F at 11; *see also* Ex. G at 12.) No reasonable attorney would have failed to investigate such an obvious issue regarding an individual on the government's witness list undermining a cornerstone of the government's case.

### 3. No Conceivable Trial Strategy Justified Ignoring This Evidence

There is no conceivable alternative trial strategy that would explain not seeking and using the New Bloomberg Evidence at trial. In "inflation" cases such as this one, the method utilized to value the property at issue is perhaps the most valuable evidence in the case. *Cf. United States v. Litvak*, 808 F.3d 160, 182 (2d Cir. 2015) (finding that expert testimony could have helped the jury to understand complex residential mortgage-backed securities, which have "more

30

complicated" and "subjective" pricing than typical markets due to their highly specialized nature and lack of an efficient secondary market).  At trial, the government presented evidence suggesting that Bloomberg's prices were an independent and neutral measure of the "market value" of the bonds—a cornerstone of the government's theory that Mr. Hild had fraudulently "inflated" bond values.  (Tr. 26–32 ("They weren't market prices.  They were much higher than market value.  They were jacked up."); Tr. 2122 (government summation arguing Live Well's prices were inflated, "pie-in-the-sky prices" that "bore no relation to where you could sell the bonds in the market").)  Trial counsel did not meaningfully challenge the witness testimony on the reliability of Bloomberg's numbers or its supposedly neutral and independent status.  Had counsel sought and obtained the New Bloomberg Evidence, counsel would have been able to undercut the government's central theory: that Live Well's prices were false because they were "inflated" compared to Bloomberg's supposedly objective "market" prices.

Stumberger's recent statements reveal just how devastating the failure to investigate was.  In his filing dated June 12, 2026, Stumberger explains that "[t]he government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon—and the structure was then replaced with valuation pricing supplied by the government's cooperating witness [Foster]."  (Ex. G at 10.)  Stumberger states that the "pricing structure" for Live Well's bonds "did not collapse because the market determined the bonds were worth less," but rather "[i]t collapsed because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities."  (*Id.* at 11.)  This testimony—from the government's own key cooperating witness—would have

31

directly contradicted the government's central trial narrative that Bloomberg represented independent "market" prices.  Trial counsel should have pursued this line of investigation.

The Foster Notes should have made it obvious to Dusing that he had to investigate Foster's role with Bloomberg.  Foster was a former Live Well employee who had been responsible for submitting HECM IO prices to IDC from 2014 to early 2017, and who began cooperating with the government immediately after leaving Live Well.  Of the more than 3,000 FINRA-registered broker-dealer firms and hundreds of thousands of registered securities professionals in the United States, the extraordinary convergence of these facts was far too significant to ignore.  The same individual who had been Live Well's source of the allegedly fraudulently inflated HECM IO pricing submissions to IDC later became Bloomberg's HECM IO pricing contributor while simultaneously cooperating with the SEC and later the SDNY.  Any reasonably competent defense attorney would have investigated these circumstances.

### 4.    Dusing's Conflict of Interest with the Kentucky Litigation

The failure to review and use the Foster Notes is yet another casualty of Dusing and Lawrence's effort to curtail Mr. Hild's defense to focus on their Kentucky proceedings.  Just a week and a half before receiving the Foster Notes, Dusing was sanctioned in Kentucky for making frivolous motions, held in contempt, and sentenced to "7 days in jail."  (Dkt. 136-1 at 7, 14 of 54.)  In the weeks following receipt of the Foster Notes—when trial counsel should have been diligently reviewing 3500 material, drafting cross-examination outlines, preparing defense witnesses, and sending subpoenas—the Kentucky court awarded J.B. (the mother of one of Dusing's children) sole custody of her child with Dusing, and J.B. filed a sanctions motion against Dusing and Lawrence noticed for a hearing on May 4.  (December 7, 2022 Order at 28–

29.)  According to his paralegal, whose proffered testimony this Court credited, Dusing stated that he "wouldn't be able to make his [May 4] hearing if we call all these witnesses."  (December 7, 2022 Order at 43.)  Had counsel developed a defense based on the Foster Notes, the trial would have extended beyond May 4 because he would have needed time to call additional witnesses—including potentially an expert, witnesses from Bloomberg and Baird, and Foster himself.  Dusing either failed to review the 3500 materials closely (if at all) or, worse, chose not to pursue the evidence to avoid elongating the trial.  Either way, the failure was the direct result of trial counsel's focus on the Kentucky proceedings rather than on Mr. Hild's criminal trial.

Dusing cannot present any reliable testimony to justify ignoring the Foster Notes.  First, as explained above, there can be no reasonable explanation for ignoring such important evidence.  Second, this Court has expressly declined to rely on Dusing's prior lengthy affidavit "in light of Dusing's deeply troubling conduct in the Kentucky matter—which included threatening to 'blow up' a judge, staff attorneys, and opposing counsel—and his subsequent suspension from the practice of law in two states."  (*Id.* at 30–31.)  By contrast, this Court "credit[ed]" the proffered testimony of Dusing's former paralegal, who confirmed that Dusing stated he "wouldn't be able to make his [May 4] hearing if we call all these witnesses."  (*Id.* at 43.)  The reasonable inference from this record is that Dusing failed to investigate because his focus was on Kentucky—not on defending Mr. Hild.

Trial counsel's failure to investigate the Foster/Bloomberg evidence fell far below an objective standard of reasonableness and constitutes deficient performance under *Strickland*.

33

      **B.**      **Dusing's Failure to Investigate Foster/Bloomberg Severely Prejudiced the Defense**

The second prong of *Strickland* requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Here, the record leaves no doubt that Dusing's failure to investigate and utilize the New Bloomberg Evidence severely prejudiced Mr. Hild's defense.

      **1.**      **Without Witness Testimony Based on Bloomberg as the Benchmark, the Government's Inflation Theory Would Have Collapsed**

As detailed above, the government's fraud case depended on proving that Live Well's bond prices were fraudulently "inflated" above "market value." The fact that Live Well valued the bonds at prices higher than the prices Live Well paid to acquire the bonds was never disputed; the critical question as the government framed it was whether the bonds *could be sold* at the Scenario 14 price. To answer that question, the government needed an objective benchmark—and that benchmark was witness testimony about market prices the government's witnesses based on Bloomberg prices.

The government presented those witnesses' testimony about market prices (based on Bloomberg's prices) as based on an independent, objective measure of "market value" against which Live Well's Scenario 14 prices could be deemed "inflated." (*See* Section I.A, *supra*, at 7–10.) Multiple witnesses testified that Bloomberg represented "the market price" for these bonds. (Tr. 720–22, 749–50, 784, 1606–10.) In summation, the government argued that Live Well's prices were "pie-in-the-sky prices" that "bore no relation to where you could sell the bonds in the market"—that is, at Bloomberg's prices. (Tr. 2122.)

34

Without Bloomberg as the benchmark, the government's theory would have collapsed. The government's evidence showed only that Live Well valued the bonds at more than it paid—a position Mr. Hild openly held.  It was Bloomberg's "market" prices that the government used to prove the bonds *could not* be sold at the marked price.  Yet trial counsel's failure to investigate the Foster/Bloomberg connection left this cornerstone of the government's case entirely unchallenged.

### 2. Stumberger—the Government's Key Witness—Now Confirms that Bloomberg's Prices Were Not Reliable

The newly discovered statements by Darren Stumberger, the government's key cooperating witness, demonstrate that the New Bloomberg Evidence would have been devastating to the government's case.  Stumberger now explains that "[e]vidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ('IDC') while at Live Well," and that "[t]hese discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself."  (Ex. F at 2–3.)  Had this evidence been introduced, the jury would have understood that the government's "market value" benchmark was not independent at all but was instead derived from the very insider who had helped create the Scenario 14 prices the government claimed were fraudulent—and who had a powerful incentive to lower his valuations to curry favor with the SEC and government in exchange for a non-prosecution agreement.

The prejudice is further demonstrated by Stumberger's explanation of the causal chain that led to the purported "losses" in this case.  Stumberger's statement that the pricing change was "not because independent market participants had reached a different view of value" (Ex. G

at 11) directly undermines the government's central trial theory.  If the jury had understood that (1) IDC stopped pricing the bonds not because the market had determined they were overvalued, but because the SEC's investigation made IDC "unwilling to continue publishing prices" (*id.*); (2) "[i]nto that vacuum stepped Bloomberg — and into Bloomberg's data collection for these securities stepped Dan Foster" (*id.* at 11); and (3) Foster was "a government cooperator with the SEC and then the SDNY" who "supplied valuations to Bloomberg" (*id.* at 12)—the government's fraud theory would have been severely undermined, if not destroyed entirely.  In fact, additional evidence undermining the government's fraud theory could potentially have been elicited at trial from other witnesses, including Rohr and Hild himself, if Dusing had fully investigated the Foster/Bloomberg evidence.

Stumberger's characterization of the Foster/Bloomberg connection as a "shocking chain of events" that was never "investigated, examined, or fully litigated" (Ex. F at 2) underscores the reasonable probability that the outcome would have been different had this evidence been presented.  Stumberger—an expert on the bonds at issue whom the government described at his sentencing as having been "very helpful . . . in terms of thinking about how to present the case to the jury and making sure that we ourselves understood the mechanics of the bonds," Sentencing Tr. at 7, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023) (Dkt. No. 42)—now attributes the alleged losses in this case not to fraud at Live Well, but to the "simultaneous and deleteriously orchestrated chain of events" involving the government investigation, IDC's cessation of pricing, Foster's Bloomberg submissions, and liquidation in a distorted market.  (Ex. G at 1).  Had the jury been presented with evidence undermining the reliability of Bloomberg's prices, and had they understood that the government's chosen "market

value" benchmark was supplied by a cooperating witness with obvious incentives to manipulate valuations, there is a reasonable probability that the jury would not have convicted Mr. Hild.

### 3.    Stumberger's Significance to the Government's Case Underscores the Prejudice

Stumberger was the single most important government witness at Mr. Hild's trial.  When this Court previously addressed Mr. Hild's Rule 29 motion, this Court's opinion denying that motion relied extensively upon Mr. Stumberger's trial testimony, citing it and quoting it at length, including in multiple block quotes.  (December 7, 2022 Order at 5–13, 19–28.)  Mr. Stumberger knows the mechanics of the bonds better than anyone.  Yet Stumberger now contends that "[t]he pricing information utilized to generate alleged losses was thus not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government."  (Ex. F at 27–28.)  If the government's own key witness now disputes the reliability of the Bloomberg pricing that formed the foundation of the government's fraud theory, there can be little question that Dusing's failure to investigate that evidence was severely prejudicial to Mr. Hild.

Stumberger's recent statements—his view that his prosecution was "corrupt," that his plea was questionable, and that his testimony could have been different in light of the Foster/Bloomberg evidence that he only learned about "years after my plea and after the window in which I could have raised it in my own criminal proceeding," (Ex. G at 23)—establishes that the testimony Mr. Stumberger gave at Mr. Hild's trial is no longer reliable.  If Stumberger, the government's star witness, were to testify again, the jury would not convict Mr. Hild.

Under *Strickland*, this Court should find that there is a reasonable probability that, but for counsel's deficient performance in failing to investigate and utilize the New Bloomberg

Evidence, the result of Mr. Hild's trial would have been different. Counsel's failure to seek and use this evidence is, standing alone, sufficient to warrant relief. When combined with Stumberger's recent statements and the litany of other errors set out in Mr. Hild's original motions under Rules 29 and 33 (all of which are incorporated by reference), the cumulative effect of counsel's deficiencies makes clear that this Court should grant the petition. *See Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (evaluating performance based on cumulative effect of counsel's errors); *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (same).

**POINT 2:    THE COURT SHOULD GRANT THE PETITION BASED UPON STUMBERGER'S RECENT STATEMENTS ALONE**

The Court should grant the petition because the government's key cooperating witness—Darren Stumberger—has now made statements that directly undermine the central theory of the government's case and call into question the reliability of his own trial testimony.

## I.    Legal Framework

"Few rules are more central to an accurate determination of innocence or guilt than the requirement that one should not be convicted on false testimony." *Ortega v. Duncan*, 333 F.3d 102, 109 (2d Cir. 2003) (quotation marks and alteration omitted). Even where the prosecution did not know of false testimony, due process is violated and a petitioner is entitled to Section 2255 relief if (1) "the testimony was material" and (2) "the court is left with a firm belief" that without the testimony "the defendant would most likely not have been convicted." *Id.* at 108–09 (2d Cir. 2003) (alteration omitted). Courts evaluating such claims "consider whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id.* (quotation marks and alterations omitted)); *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991); *Sanders v.*

38

*Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988); *see also United States v. Lespier*, No. 398-cr-102 (AHN), 2006 WL 533792, at *7 (D. Conn. Mar. 1, 2006) (noting that courts have held that "[a]n unrepudiated recantation . . . is substantial and material evidence entitling a party to a new trial" (quotation marks omitted) (alterations in original)).

When newly discovered evidence undermines the corroborating evidence that supported the government's case, courts must reassess whether a conviction remains supported. *See House v. Bell*, 547 U.S. 518, 554 (2006); *Jimenez v. Lilley*, No. 16-cv-8545 (AJN) (JCF), 2017 WL 4535946, at *12 (S.D.N.Y. Oct. 10, 2017) (concluding "any reasonable juror would have reasonable doubt" where prosecution's case was "particularly weak" and rested on testimony undermined by new evidence), *report and recommendation adopted in full*, No. 16-cv-8545 (AJN) (RWL), 2018 WL 2768644 (S.D.N.Y. June 7, 2018). The materiality of false or recanted testimony is heightened where the witness was central to the government's case. *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991).

While witness recantations "must be looked upon with the utmost suspicion," *Ortega*, 333 F.3d at 107 (quotation marks omitted), "[s]uch evidence must not, however, simply be dismissed out of hand," *Jimenez*, 2017 WL 4535946, at *12. As with any witness testimony, "the court evaluates recanted testimony in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require." *Id.* (quotation marks omitted).

39

II.    **Discussion**

   A.    **Stumberger Was the Government's Most Important Witness and the Foundation of the Conviction**

As discussed above, Stumberger's testimony was central to the government's case. Stumberger was a government cooperating witness who had been directly involved in the transactions at issue as the head of Live Well's trading desk.  (Tr. at 71, 86.)  He testified extensively about Scenario 14, bond valuation, and Mr. Hild's conduct.  This Court's December 7, 2022 Order relied extensively on his testimony (December 7, 2022 Order at 5–13, 19–28), and the government acknowledged at his sentencing that he was "very helpful . . . in terms of thinking about how to present the case to the jury."  Sentencing Tr. at 7, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023).

   B.    **Stumberger's New Statements Directly Contradict the Government's Central Trial Theory**

Stumberger's new statements directly undermine the central theory of the government's case.  As described above, Stumberger now contends that the Bloomberg valuations that formed the cornerstone of the government's "market value" theory were "not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government."  (Ex. F at 27–28.)  In his June 2026 filing, Stumberger explains that "[t]he government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon—and the structure was then replaced with valuation pricing supplied by the government's cooperating witness [Foster]." (Ex. G at 10.)  Stumberger further states that the "pricing structure" for Live Well's bonds "did not collapse because the market determined the bonds were worth less," but rather "[i]t collapsed

40

because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities." (*Id.* at 11.)  This statement directly contradicts the government's central trial narrative.

Stumberger emphasizes that "[e]vidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ('IDC') while at Live Well," and that "[t]hese discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself." (Ex. F at 2–3.)

If the jury had known the facts that Stumberger now articulates, Mr. Hild would not have been convicted.  The government's fraud theory depended on establishing that Live Well's prices were "inflated" compared to an objective "market" benchmark.  But if Bloomberg's prices were not independent—if they were instead supplied by a government cooperator who had powerful incentives to lower his valuations to curry favor with prosecutors—then the government's entire theory of "inflation" collapses.

The materiality of Stumberger's new statements is further demonstrated by his characterization of the entire prosecution.  Stumberger has described the transcript of his plea proceeding as "among the most corrupt elements of the entire case." (Ex. A.)  He has stated that his plea allocution "was torn up and thrown out" and that he was "handed a piece of paper before the arraignment" that he simply read. (Ex. B at 8.)  He has stated that his defense in the civil case would be "the truth, better said, the facts of what happened"—as opposed to what he said in his plea allocution in the criminal case. (Ex. B at 8.)  He has stated that there had been "fake

41

testimony" and asserted that "Dan Foster . . . did this for all of these parties and they paid for it with a non-prosecution agreement." (*See* Ex. D at 13–15).)

Stumberger's new statements combined with the new Foster/Bloomberg evidence would have led to a different result at trial, particularly given the other evidence that emerged during the trial. The government's cooperating witnesses—Stumberger and Rohr—testified that Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint." (Tr. 544; *see also* Tr. 1583–86 (Rohr calling Scenario 14 a "brilliant insight" into valuations).) The bonds were "among the most complex in fixed income" and required "expertise" to value. (Tr. 235.) The market for the bonds was highly illiquid with "no way of telling where a bond could be sold at any given point in time." (Tr. 242–44, 503–06, 1267–74.) Against this backdrop, the government's case depended heavily on establishing that Bloomberg's prices represented an objective benchmark against which Live Well's prices could be deemed "inflated." If Stumberger—the government's own bond authority—testified, as he now says, that that benchmark was unreliable and supplied by a government cooperator with obvious conflicts, there is a reasonable probability that the jury would have acquitted. If Stumberger testified, as he now says, that his own guilty plea was corrupt, there is likewise a reasonable probability that the jury would have acquitted.

### C.    Stumberger's Recent Statements Are Corroborated, Internally Consistent, and Made Despite Threats—Warranting Credit

Stumberger's recent statements about Foster/Bloomberg have hallmarks of reliability. Even if these statements are not a formal recantation—Stumberger has not signed an affidavit disavowing his trial testimony and has stated he is not recanting—courts have recognized that "[s]uch evidence must not, however, simply be dismissed out of hand." *Jimenez v. Lilley*, No.

16-cv-8545 (AJN) (JCF), 2017 WL 4535946, at *12 (S.D.N.Y. Oct. 10, 2017), *report and recommendation adopted in full*, 2018 WL 2768644 (S.D.N.Y. June 7, 2018).  As with any witness testimony, "the court evaluates recanted testimony in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require."  *Id.* (quotation marks omitted).

Here, there are strong reasons to credit Stumberger's new statements.  First, the government itself touted Stumberger's credibility and expertise at trial, relying heavily on his testimony to secure Mr. Hild's conviction.  Stumberger was not a peripheral witness whose credibility could be questioned without consequences to the government's case; he was, as the government acknowledged, central to the prosecution's understanding of "how to present the case to the jury" and "the mechanics of the bonds."  Sentencing Tr. at 7, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023) (Dkt. No. 42).  If Stumberger now says the pricing evidence was unreliable, that assessment carries significant weight precisely because the government relied on him as its effective expert.

Second, Stumberger's new statements are corroborated by the New Bloomberg Evidence discovered after trial.  Bloomberg's post-trial production revealed the data acquisition agreement listing Foster as "key personnel" providing Bloomberg with bond valuations.  (Dkt. No. 244-1 Ex. B at BBG-LW-0000521.)  Bloomberg's pricing methodology confirmed that it relied on "pricing contributors" including Foster.  (Dkt. No. 244-1 Ex. D at BBG-LW-0000379.)  And the SEC's 2023 settlement with Bloomberg found that Bloomberg's valuations in a comparable context "could, in certain circumstances, be largely driven by a single data input, such as a

43

broker quote," making its "statements to customers regarding valuation methodologies materially misleading." *In re Bloomberg Finance L.P.*, Securities Act Release No. 11150 (Jan. 23, 2023). Stumberger's statements are thus consistent with the documentary record. In fact, Bloomberg had not priced HECM IO bonds until working with Foster.

Third, although Stumberger made these statements in the context of civil litigation, other facts show that he has no incentive to lie. Stumberger has stated that he has been "threatened excessively with jail time" by the prosecutors in this case in connection with his statements (Ex. D at 13) and that he is "liv[ing] under direct threat" (Ex. E at 2). He has stated that he "received an extraordinary email from [his] former attorney . . . which contained explicit threats impacting both [himself] and [his] children." (*Id.*) These threats would motivate Stumberger not to speak—yet he has continued to make statements that undermine the government's case. Far from having a motive to fabricate, Stumberger appears to be making these statements despite significant personal risk.

Fourth, Stumberger's new statements are internally consistent and detailed. He does not simply assert that the prosecution was unfair; he explains the specific mechanism by which Bloomberg's valuations were corrupted—through Foster's involvement as a cooperating witness supplying pricing information while seeking a non-prosecution agreement. He highlights the specific timeline—Foster signed a proffer agreement with the SEC in November 2017 and obtained a non-prosecution agreement in August 2019, during which time he was supplying valuations to Bloomberg. (Ex. G at 11–12.) He explains how this affected the alleged "losses"—the pricing structure "did not collapse because the market determined the bonds were worth less" but because the SEC's investigation caused IDC to cease publishing prices, at which

44

point Bloomberg (using Foster's data) became the default benchmark. (Ex. G at 11.) Live

Well's collapse thus was not due to fraud, on Stumberger's account, but rather was due to Foster

(the government cooperator) working with Bloomberg, which substituted for IDC: "[t]he

government investigation dismantled the independent pricing mechanism that the entire repo

lending structure depended upon—and the structure was then replaced with valuation pricing

supplied by the government's cooperating witness [Foster]." (Ex. G at 10.) This detail and

specificity supports the credibility of Stumberger's account, and the jury should have heard about

the true cause of Live Well's collapse.

Accordingly, Stumberger's recent statements provide another basis for this Court to grant

Section 2255 relief.

**POINT 3:    THE COURT SHOULD GRANT THE PETITION, OR ELSE ALLOW HILD TO SEEK DISCOVERY AND HOLD AN EVIDENTIARY HEARING**

Mr. Hild has already shown in this motion that he is entitled to relief under 28 U.S.C.

§ 2255 and the Court should grant the petition. At a minimum, the Court should permit Mr. Hild

to obtain discovery and then hold a hearing pursuant to Rules 6 and 8 of the Rules Governing

Section 2254 Cases and Section 2255 Proceedings.[7]

**I.       The Court Should Allow Mr. Hild To Conduct Limited Discovery**

Under Rule 6, "[a] judge may, for good cause, authorize a party to conduct discovery

under the Federal Rules of Civil Procedure and may limit the extent of discovery." *Id.* Good

cause exists where specific allegations before the court show "reason to believe that the

---

[7] Available here:
https://www.uscourts.gov/sites/default/files/rules_governing_section_2254_and_2255_cases_in_the_u.s._district_courts_-_dec_1_2019.pdf.

petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quotation marks omitted).

Here, good cause exists for discovery because the record establishes that Mr. Hild will, if the facts are fully developed, be able to demonstrate that he is entitled to relief. Specifically, Mr. Hild seeks discovery regarding:

    a. Documents and communications between Dan Foster and Bloomberg, including all pricing submissions, methodology discussions, and correspondence regarding HECM-IO bond valuations from 2017 through 2023;

    b. To the extent they have not yet been disclosed, documents, communications, and notes of meetings between Dan Foster (including through Foster's counsel, Dani James and her firm) and the government (including the SEC and the U.S. Attorney's Office), including all proffer session notes, cooperation agreements, emails, and any discussions regarding Foster's role in providing pricing information to Bloomberg;

    c. Bloomberg's records regarding its HECM-IO bond valuation methodology, including the relative weight given to pricing contributors such as Foster, the extent to which Bloomberg's published prices were "driven by a single data input" as found by the SEC, and any internal discussions or analyses regarding the reliability of Foster's submissions;

    d. Documents sufficient to show whether Bloomberg's published prices for the HECM-IO bonds at issue were materially affected by Foster's pricing submissions, and if so, to what extent;

    e. A deposition of Dan Foster, to seek evidence regarding: (i) the nature and extent of his relationship with Bloomberg; (ii) the methodology he used to value the HECM-IO bonds for Bloomberg; (iii) why his Bloomberg valuations differed materially from the valuations he supplied to IDC while at Live Well; (iv) the extent to which his cooperation with the government influenced the pricing information he provided to Bloomberg; and (v) any communications with the government regarding his Bloomberg pricing activities;

    f. A deposition of Darren Stumberger, to seek evidence regarding: (i) his recent statements in the Flagstar litigation regarding the Foster/Bloomberg evidence and its impact on bond valuations; (ii) his characterization of the prosecution as "corrupt" and his plea allocution as having been "torn up and thrown out"; (iii) his statement that his defense in the civil case would be "the truth" as opposed to what he said in his plea allocution; (iv) his assertion that there had been "fake

46

testimony"; (v) his contention that the alleged losses were caused by the Foster/Bloomberg pricing rather than by fraud at Live Well; (vi) any communications with the government regarding his trial testimony, plea allocution, or cooperation; and (vii) the threats he has received, including threats that were included in the "extraordinary email" from his former attorney "which contained explicit threats impacting both [himself] and [his] children" (Ex. E at 2), and his statement that he is "liv[ing] under direct threat" and "can no longer safely respond to inquiries related to this case" (*id.*);

g.  All documents, communications, and notes of meetings between the U.S. Attorney's Office for the Southern District of New York and Darren Stumberger or his counsel Xavier Donaldson, from the inception of the investigation through the present, including any communications regarding Stumberger's cooperation obligations, his trial testimony, his plea allocution, his sentencing, and any post-sentencing communications;

h.  Documents and communications between Benjamin Dusing and/or Brandy Katy Lawrence and the government regarding the Foster Notes, including any discussions of the Foster/Bloomberg connection and any strategic decisions regarding whether to investigate or pursue this evidence at trial;

i.  Documents reflecting Benjamin Dusing's and Brandy Katy Lawrence's time records, billing records, and calendars from February 2021 through May 2021, to assess the extent to which the Kentucky litigation diverted their attention from Mr. Hild's defense;

j.  Documents and communications reflecting the government's knowledge or awareness, prior to or during trial, of Foster's relationship with Bloomberg and his role as a pricing contributor for the HECM-IO bonds at issue, including all communications about Foster, Live Well, and Hild between the SEC and SDNY.

The materials available today, including Stumberger's statements and filings, and the Foster/Bloomberg evidence, amply support granting the petition. At a minimum, the Court should order the discovery described above because the Foster/Bloomberg evidence goes to the heart of the government's case. Discovery will further develop these facts and provide additional confirmation of: (1) the extent to which Foster's pricing submissions drove Bloomberg's published prices; (2) the extent to which Foster's valuations were influenced by his

47

cooperation with the government; (3) the additional reasons for trial counsel's failure to investigate this evidence including inattention and the Kentucky distractions.

## II.    The Court Should Hold a Hearing

In addition to ordering discovery, the Court should hold a hearing. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b).

Here, the motion and the files and records of the case do not "conclusively show" that Mr. Hild is entitled to no relief. To the contrary, the record establishes Mr. Hild is entitled to habeas relief. To the extent the government disputes issues of material fact contained herein, then an evidentiary hearing is warranted. *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) ("If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made."); *Armienti v. United States*, 234 F.3d 820, 825 (2d Cir. 2000) (remanding for a hearing when appellant alleged specified instances of attorney deficiencies that were the product of a specific conflict of interest).

48

## **CONCLUSION**

For the foregoing reasons, Mr. Hild respectfully requests that this Court grant his motion

pursuant to 28 U.S.C. § 2255 and vacate his conviction and sentence or, in the alternative, grant

Mr. Hild leave to conduct discovery and hold an evidentiary hearing on the issues raised herein.


Dated: July 20, 2026
          New York, New York


                          MORVILLO ABRAMOWITZ
                          GRAND IASON & ANELLO, P.C.

                          By:  /s/ *Brian A. Jacobs*
                                Brian A. Jacobs
                                *Attorneys for Michael Hild*

49

## CERTIFICATE OF COMPLIANCE

This document complies with the page limitation ordered by the Court in its July 9, 2026 order (Dkt. No. 273) because it is less than 50 pages.

This document complies with the typeface requirements of Local Civil Rule 7.1 because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point font Times New Roman with one-inch margins.


Dated: July 20, 2026
        New York, New York

                                MORVILLO ABRAMOWITZ
                                GRAND IASON & ANELLO, P.C.

                                By:  /s/ *Brian A. Jacobs*
                                     Brian A. Jacobs
                                     *Attorneys for Michael Hild*