UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | **19 Cr. 602 (RA) (KHP)** |
| MICHAEL HILD, | |
| Defendant. | |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO MICHAEL HILD'S MOTION
PURSUANT TO 28 U.S.C. § 2255**

JAMES M. McDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Maggie Lynaugh
Assistant United States Attorney
    *Of Counsel*

## **TABLE OF CONTENTS**

FACTUAL BACKGROUND .......................................................................................................... 1

   I. The Indictment............................................................................................................... 1

   II. The Government's Case-in-Chief ................................................................................ 2

      A. Background on Live Well and the Bond Portfolio............................................. 3

      B. The Beginning of the Fraudulent Scheme ........................................................ 4

      C. The Fraudulent Financial Statements ................................................................ 6

      D. The Liquidity Events in February and March 2017 .......................................... 6

      E. The End of the Fraudulent Scheme .................................................................... 7

      F. The Cooperating Witnesses ............................................................................... 8

   III. The Verdict, Sentencing, and Post-Trial Motions ..................................................... 9

   IV. The Appeal ................................................................................................................ 10

ARGUMENT ........................................................................................................................ 11

   I. Hild's Ineffective Assistance of Counsel Claim Is Meritless..................................... 11

      A. Legal Standard ................................................................................................. 11

      B. Hild's Ineffective Assistance Claim Is Meritless ............................................ 14

   II. Stumberger's Recent Statements Do Not Provide a Basis for Relief ................................. 26

      A. Legal Standard ................................................................................................. 26

      B. Hild's Claim Related to Darren Stumberger is Without Merit. ....................... 27

   III. Hild's Requests for an Evidentiary Hearing and Discovery Should Be Denied ................. 31

CONCLUSION...................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Chang v. United States*,
  250 F.3d 79 (2d Cir. 2001)......................................................................................... 30, 31

*Flagstar Bank, FSB v. Stumberger*,
  19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) ................................................................. 26, 27, 28

*Haouari v. United States*,
  510 F.3d 350 (2d Cir. 2007).......................................................................................... 25, 26

*Harrington v. Richter*,
  562 U.S. 86 (2011)......................................................................................................... 11, 23

*Hernandez v. United States*,
  202 F.3d 486 (2d Cir. 2000)............................................................................................... 11

*Hopkinson v. Shillinger*,
  866 F.2d 1185 (10th Cir. 1989) ......................................................................................... 30

*Lockhart v. Fretwell*,
  506 U.S. 364 (1993)............................................................................................................ 12

*Mills v. Scully*,
  826 F.2d 1192 (2d Cir. 1987)............................................................................................. 17

*Newfield v. United States*,
  565 F.2d 203 (2d Cir. 1977)............................................................................................... 30

*Pham v. United States*,
  317 F.3d 178 (2d Cir. 2003)............................................................................................... 30

*Pri-Har v. United States*,
  83 F. Supp. 2d 393 (S.D.N.Y. 2000).................................................................................. 15, 25

*Raines v. United States*,
  423 F.2d 526 (4th Cir. 1970) ............................................................................................. 31

*Rosario v. Ercole,*
  601 F.3d 118 (2d Cir. 2010)............................................................................................... 13

*Strickland v. Washington*,
    466 U.S. 668 (1984)........................................................................................... passim

*United States v. Aguirre*,
    912 F.2d 555 (2d Cir. 1990)..................................................................................... 11

*United States v. Baran*,
    192 F. Supp. 3d 496 (S.D.N.Y. 2016)....................................................................... 25

*United States v. Caracappa*,
    614 F.3d 30 (2d Cir. 2010)................................................................................. 12, 21

*United States v. Gaskin*,
    364 F.3d 438 (2d Cir. 2004)..................................................................................... 11

*United States v. Kearney*,
    682 F.2d 214 (D.D.C. 1982) .................................................................................... 25

*United States v. Malpeso*,
    17 Fed. App'x 23 (2d Cir. 2001)............................................................................... 15

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008)..................................................................................... 24

*United States v. Stantini*,
    85 F.3d 9 (2d Cir. 1996)........................................................................................... 30

**Statutes**

15 U.S.C. §§ 78j(b), 78ff ............................................................................................... 2

18 U.S.C. § 1343............................................................................................................ 2

18 U.S.C. § 1344............................................................................................................ 2

18 U.S.C. § 1349............................................................................................................ 1

18 U.S.C. § 2.................................................................................................................. 2

iii

18 U.S.C. § 371......................................................................................................... 1

28 U.S.C. § 2255.............................................................................................. passim

**Rules**

17 C.F.R. § 240.10b-5............................................................................................... 2

Federal Rule of Criminal Procedure 29 ................................................................... 8

Federal Rule of Criminal Procedure 33 ........................................................... passim

**Constitutional Provisions**

U.S. Const. amend. VI .......................................................................................... 11

The Government respectfully submits this memorandum of law in opposition to the motion filed by Michael Hild ("Hild") for relief pursuant to Title 28, United States Code, Section 2255 (the "Motion" or "Mot."). (Dkt. 275).[1]

Hild alleges (i) that his trial counsel was constitutionally ineffective because he failed to investigate the role Dan Foster ("Foster")—a witness who entered into a non-prosecution agreement with the Government but did not testify at trial—played in setting Bloomberg's prices for bonds held by Hild's company, Live Well Financial ("Live Well"), and (ii) that certain unsworn statements made nearly four years post-trial by Darren Stumberger ("Stumberger")—another cooperating witness—constitute new evidence that undermines the Government's theory of the case and call into question the reliability of Stumberger's trial testimony. For the reasons set forth below, even assuming trial counsel failed to investigate the Foster/Bloomberg evidence, Hild cannot meet the high burden of *Strickland v. Washington*, 466 U.S. 668 (1984), and Stumberger's recent unsworn statements do not provide a basis for relief. Accordingly, Hild's Section 2255 petition is meritless and should be summarily denied without a hearing or further discovery.

**FACTUAL BACKGROUND**

## I. The Indictment

Indictment 19 Cr. 602 (RA) (the "Indictment") was unsealed on August 29, 2019 and charged defendant Michael Hild in five counts. Count One charged Hild with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; Count Two charged Hild with conspiracy to

---

[1] Cites to Dkt. are to this Court's docket in *United States v. Michael Hild*, 19 Cr. 602 (RA); cites to App. Dkt. are to the Second Circuit docket in *United States v. Michael Hild*, 23-6136 (2d Cir.).

1

commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349; Count Three charged Hild with substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2; Count Four charged Hild with substantive wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and Count Five charged Hild with substantive bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. For all counts except Count Five, the time period covered by the Indictment ran from at least in or about 2015 through in or about May 2019; for Count Five the time period ran from in or about March 2017 through in or about May 2019.

## II.  The Government's Case-in-Chief

Trial against Hild began on April 13, 2021. The evidence established that Hild, along with others at Live Well, engaged in a scheme to fraudulently inflate the value of Live Well's bond portfolio in order to induce lenders into loaning Live Well more money than they otherwise would. The scheme allowed Live Well to grow its bond portfolio exponentially, from approximately 15 bonds with a stated value of $50 million in 2014 (Tr. 1082) to approximately 50 bonds with a stated value of over $500 million by the end of 2016 (Tr. 1097).

The Government presented the testimony of eight witnesses, including two cooperating witnesses—Stumberger and Eric Rohr ("Rohr")—as well as one witness who entered into a non-prosecution agreement with the Government—Hayden Novikoff. The Government also introduced over 140 exhibits, including recorded calls, showing Hild's knowing and willful participation in the scheme.

2

### A.    Background on Live Well and the Bond Portfolio

Live Well was a private company based in Richmond, Virginia that originated, serviced, and securitized government-guaranteed reverse mortgages known as Home Equity Conversion Mortgages ("HECMs"). (Tr. 944-47). Hild founded Live Well and was its Chief Executive Officer and largest shareholder. (Tr. 944-45, 1089, 1131-32; GX 321).

In or about 2014, at Hild's direction, Live Well acquired a portfolio of bonds, each entitling the holder to receive a portion of the interest payments, but not the principal payments, from a particular pool of reverse mortgages ("HECM IO bonds."). (Tr. 58-59, 951-52). Live Well purchased the HECM IO bond portfolio from Stifel for approximately $50 million. (Tr. 72-73, 968-69). Live Well financed the acquisition and growth of its bond portfolio through a series of loans in which it used the bond portfolio as collateral. (Tr. 76-77, 731-32, 952, 1002, 1061). Many of Live Well's lenders were securities dealers whose lending arrangements with Live Well were structured as bond repurchase agreements, also known as "repo agreements." (Tr. 76-77, 568-72, 672-75, 953-54). A repo agreement is a short-term loan in which both parties agree to the sale and future repurchase of an asset within a specified contract period. (Tr. 76-77, 572-75). The seller sells the asset to the lender with a promise to buy it back at a specific date and at a price that includes an interest payment. (Tr. 572-75). Functionally, a repo agreement is a collateralized loan in which title of the collateral is transferred to the lender. (Tr. 76-77). When the loan is repaid by the borrower, the collateral is returned to the borrower through a repurchase. (Tr. 572-75).

Live Well's financing agreements with all but one of the lenders required that any bond that Live Well sought to borrow against be priced by a third-party pricing source in order to

3

determine the market value of the bond as of the measurement date. (Tr. 79-80, 598-600, 697, 1069-70; GX 603, 702, 1003). The lenders generally relied on a widely utilized subscription service, Interactive Data Corporation ("IDC"), to price the bonds and determine the amount of money to lend to Live Well. (Tr. 575, 600, 697, GX 603, 1003). In the event of a default, the lenders could sell the collateral to recoup their money. (Tr. 573, 674; GX 603, 702, 1003).

When Live Well first obtained the bond portfolio, IDC did not yet have the capability to value the bonds itself, so IDC agreed it would take "broker quotes" from Live Well on a temporary basis, until IDC could provide its own evaluated pricing of the bonds. (Tr. 83-84, 971, 1535). By at least early 2015, IDC was using its own pricing model to value the bonds. (Tr. 84).

Hild and others at Live Well, however, were unhappy with IDC's pricing. (Tr. 85-87, 972). After a discussion with IDC, in February 2015, Live Well and IDC agreed that they would return to the "broker quote" system, in which Live Well provided IDC its prices for the bonds. (Tr. 87-89, 978-79; GX 104). IDC then published those prices verbatim. (GX 978-79, 1014-15; GX 104). There was no disclosure from IDC of who the broker quotes came from; nor did Live Well disclose its role in IDC's pricing to its lenders. (Tr. 603, 623, 997-1012, 1017).

### B. The Beginning of the Fraudulent Scheme

The fraudulent scheme began in or about September 2015. (Tr. 993-98). Rather than price the bonds as the market would price them, Hild asked Live Well's bond traders to run pricing "scenarios" with varying inputs to see how different inputs affected a bond's price. (Tr. 95-98; 989-98; GX 113). Hild and his co-conspirators ultimately selected a particular scenario— "Scenario 14" —to use in the pricing of the bonds. (Tr. 105-06, 114-15, 993-96). Among other

4

things, Scenario 14 did not account for the "yield" (*i.e.*, the return an investor sees on the bond) demanded by the market, which generally required the price of a bond to be lowered each month to maintain a high yield. (Tr. 110-15, 994). As a result, the bond prices under Scenario 14 increased dramatically. (Tr. 1009, 1027-29, 1068; GX 1600). For example, after pricing bonds that were acquired in September 2015 with Scenario 14 methodology, those bonds alone increased in value by approximately $11 million. (Tr. 1028-29; GX 120).

Hild and his co-conspirators were well-aware that the prices under Scenario 14 were not obtainable in the market and that, if the lenders scrutinized the IDC marks and learned this, they would either end the lending relationship or significantly reduce the amount of money they were willing to lend to Live Well. (Tr. 993-1011; GX 401, 403, 404). To hide the scheme from the lenders and IDC, in September 2015, Hild directed that the trading desk use a "glide path" to slowly implement the Scenario 14 prices over time. (Tr. 1009; GX 402). On recorded calls, Hild explained that the glide path was to avoid triggering "alarm bells all over the place." (Tr. 121-22, 1009; GX 402).

Hild and his co-conspirators thus concealed from lenders (i) that they were supplying prices to IDC and (ii) that the marks published by IDC did not reflect market realities. (Tr. 993-1011; GX 401, 403, 404). Because of the size of the markups under Scenario 14, the lenders no longer had any protection against market risk. (Tr. 128-29, 1002). If Live Well defaulted, there was virtually no chance that the lenders could sell the bonds on the market to cover the amount Live Well owed. (Tr. 1007, 1143, 1160, 1171). Ultimately, due to the asset overvaluation and the purchase of

additional bonds using the capital generated by the scheme, Live Well grew the purported value of its bond portfolio to over $500 million by December 2016. (Tr. 1069; GX 1600).

### C.   The Fraudulent Financial Statements

In addition to providing inflated bond prices to IDC, Hild and his co-conspirators also deceived Live Well's lenders by misrepresenting the value of the bond portfolio in Live Well's financial statements. The bond portfolio was Live Well's largest asset, and Live Well used the same inflated Scenario 14 bond values in the financial statements, making it appear that Live Well's assets were more valuable than they really were. (Tr. 1081-89; GX 310, 312, 314). Live Well falsely represented that it valued the bond portfolio at "exit prices"—that is the price for which a buyer and seller would transact. (Tr. 1085; GX 310, 312, 314). Live Well similarly used inflated Scenario 14 prices to calculate Live Well's revenue on the bond portfolio. (Tr. 1083-84; GX 310, 312, 314). The lenders relied on these fraudulent financial statements in determining how much credit to extend to Live Well. (Tr. 595-98, 688-93).

### D.   The Liquidity Events in February and March 2017

The fraudulent scheme escalated in early 2017 after one of the repo lenders, Wedbush, asked Live Well to have a broker provide a price for one of the bonds Wedbush was lending against. (Tr. 1142). In January of 2017, Hild and his co-conspirators discussed how to address the issue on a call, because having a broker price the bond could result in the lenders discovering that the bond values were fraudulently inflated. (Tr. 1145; GX 407). They discussed going to a "slimy" broker who would be willing to help out with their fraudulent scheme. (Tr. 1147; GX 407).

6

Shortly thereafter, Wedbush told Live Well that it wanted to reduce Live Well's credit line and stop lending against certain bonds known as "MACRs." (Tr. 1157). Wedbush's request caused a liquidity crisis because Live Well needed to pay down its debt to Wedbush, and it could not do so by selling the bonds at their fraudulently inflated values. (Tr. 1157-60). In a January 20, 2017 email, Hild described the liquidity crisis as a "catastrophe." (Tr. 1164; GX 151). Indeed, Eric Rohr, Live Well's former CFO who cooperated with the Government, testified that if Live Well defaulted on its debt to Wedbush, that would create cross-defaults with other lenders, likely leading to the company's insolvency. (Tr. 1164).

To survive the liquidity crisis, Hild ordered that the trading desk inflate the bond prices in IDC above the already-inflated Scenario 14 prices. (Tr. 1167-68). Hild provided no justification for the price increases, which Rohr said made him "sick to [his] stomach." (Tr. 1168). The trading desk ultimately marked-up the portfolio by over $36 million in February 2017. (Tr. 1172; GX 408). At Hild's direction, they implemented the price increases incrementally, to avoid raising red flags with IDC or the lenders. (Tr. 1172-73; GX 408).

### E.  The End of the Fraudulent Scheme

In the summer of 2017, Live Well reversed the price increases that were implemented in February and March 2017 to survive the liquidity crisis, but the bond prices remained at the fraudulently inflated Scenario 14 values. (Tr. 1196-97). Shortly thereafter, in July of 2017, Live Well received a subpoena from the United States Securities and Exchange Commission ("SEC"). Thereafter the prices Live Well submitted to IDC remained static, at above-market Scenario 14 levels. (Tr. 1204-05).

7

In or about 2018, two of Live Well's repo lenders, Mirae Asset Securities ("Mirae") and the Industrial and Commercial Bank of China ("ICBC"), began questioning the high pricing for Live Well's bonds. (Tr. 1205-08). Both lenders tried to reduce the amount they were lending to Live Well, but Live Well did not have the money to pay down the debt. (Tr. 606-11, 1208).

Around that time, Rohr began considering leaving Live Well, because, as he put it, he felt "morally bankrupt." (Tr. 1212). Rohr told Hild he was thinking of leaving, and Hild warned him that they "potentially could face criminal charges if the lenders lost money." (Tr. 1215). Rohr asked Hild to reduce Hild's compensation, in an effort to generate more liquidity for the company to help pay the lenders back. (Tr. 1215). Hild refused and Rohr did not return to work. (Tr. 1216).

Hild replaced Rohr with Glen Haddock, who had no knowledge of the fraudulent scheme. (Tr. 1601-12). In or about May 2019, Haddock informed Hild that he would not sign the company's interim financial statements because he believed that the company's carrying value for the bond portfolio was significantly overstated. (Tr. 1616-17). In or about May 2019, Live Well announced that it would cease operations and unwind. (Tr. 1617-18). After the announcement of Live Well's closing, Haddock provided a balance sheet to Live Well's lenders showing that Live Well had reduced the value of its bond portfolio by over $200 million. (Tr. 1620-22; GX 323).

### F.   The Cooperating Witnesses

Two cooperating witnesses—Darren Stumberger and Eric Rohr—as well as one witness who entered into a non-prosecution agreement with the Government—Hayden Novikoff—testified at trial. All three of those witnesses were former Live Well employees involved in managing Live Well's portfolio of bonds and submitting price quotes to IDC. All three testified

8

that Live Well employees, acting at Hild's direction, artificially inflated the value of Live Well's bond portfolio by submitting above-market price quotes to IDC. (*See* Tr. 115-16, 220; 818, 821-22, 842, 860; 996-1011). Their testimony was supported by voluminous documentary evidence, including emails, chats, and recorded phone calls among themselves and others at Live Well, including Hild. Dan Foster, a former Live Well employee who left the company in March of 2017 also entered into a non-prosecution agreement with the Government, but he did not testify at trial.

### III.   The Verdict, Sentencing, and Post-Trial Motions

On April 30, 2021, the jury found Hild guilty of all five counts of the Indictment. Post-trial, Hild moved pursuant to Federal Rules of Criminal Procedure 29 and 33 (the "First Rule 33 Motion"). Hild argued, in part, that the evidence presented at trial was insufficient to sustain his conviction, and that he was separately entitled to relief because his trial counsel suffered from an undisclosed conflict of interest that resulted in a violation of his Sixth Amendment rights. (Dkt. 104 at 15-40). On December 7, 2022, the Court issued a decision (the "First Rule 33 Decision") denying Hild's motions in their entirety. (Dkt. 140). With respect to Hild's argument based on insufficient evidence, the Court found that the evidence was sufficient for a reasonable jury to find that Hild deceived Live Well's lenders and that, in doing so, Hild acted with criminal intent. (Dtk. 140, at 18-26). With respect to Hild's ineffective assistance argument, the Court found no actual conflict of interest and concluded that Hild had not demonstrated that but for any of counsel's alleged deficiencies, the outcome of the trial would have been different. (*See* Dkt. 140, at 53). Approximately one month after the Court issued its decision on the First Rule 33 Motion, the Court sentenced Hild to 44 months' imprisonment.

On May 29, 2023, Hild filed a second motion pursuant to Rule 33 (the "Second Rule 33 Motion"), arguing, among other things, that he should receive a new trial due to certain newly discovered evidence regarding the coupon payments obtained by the lender-victims. The Court denied the motion. (Dkt. 192).

On April 29, 2024, one day before the three-year deadline set out under Rule 33(b)(1), Hild filed a third motion for a new trial (the "Third Rule 33 Motion"). (Dkt. 235). Hild claimed that he was entitled to relief because of different newly discovered evidence—evidence establishing that Bloomberg pricing information for certain of Live Well's bonds was influenced by Foster. On July 10, 2024, the Court denied the motion, concluding that "[w]hatever the import of [the Foster/Bloomberg] evidence, the Court cannot infer due diligence on the part of [Hild] to obtain it." (Dkt. 245, at 7). The Court also denied Hild's request for an extension of the Rule 33(b)(1) filing deadline to further develop evidence of Foster's involvement with Bloomberg. (Dkt. 245, at 8-9).

## IV. The Appeal

The Court of Appeals affirmed Hild's conviction and this Court's denial of Hild's requests for a new trial pursuant to Rule 33. (App. Dkts. 75, 76, 80). The Second Circuit agreed with this Court that there was "more than enough evidence" for the jury to convict (App. Dkt. 75, at 17), and that Hild's ineffective assistance argument based on counsel's purported conflict of interest was without merit. (App. Dkt. 80, at 11). The Circuit similarly found no error in this Court's conclusion that Hild could have discovered the Foster/Bloomberg evidence with due diligence (App. Dkt. 80, at 6), but it declined to address Hild's argument that he was entitled to a new trial

10

based on trial counsel's ineffective assistance in failing to investigate that evidence, reserving that claim for collateral review. (App Dkt. 80, at 11).

On July 20, 2026, Hild filed the instant petition under 28 U.S.C. § 2255 challenging the validity of his conviction.

**ARGUMENT**

### I.  Hild's Ineffective Assistance of Counsel Claim Is Meritless

Hild claims that his trial counsel was constitutionally ineffective due to counsel's alleged failure to investigate Foster's influence on Bloomberg's pricing of certain bonds. Even assuming trial counsel did not conduct such an investigation, counsel's performance was not deficient. Moreover, Hild cannot show that he was prejudiced in any way by any such failure to investigate.

### A.  Legal Standard

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel necessarily includes "the right to the effective assistance of counsel." *Strickland*, 466 U.S. at 686.

The general standard for ineffective-assistance claims is well established: To prevail, a defendant must (1) demonstrate that his "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from counsel's allegedly defective performance. *Id*. at 688, 693; *see also Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000). A defendant bears a "heavy burden" under the *Strickland* test. *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

11

### 1. Deficient Performance

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). The defendant's burden is to show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). When it comes to a lawyer's duty to investigate, the law "requires defense counsel either 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 691). The duty to investigate "does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense . . . or 'to scour the globe on the off-chance something will turn up.'" *Id.* at 47 (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)). "[R]easonably diligent counsel may draw a line where they have good reason to think further investigation would be a waste." *Id.* (quoting *Rompilla*, 545 U.S. at 383).

### 2. Prejudice

To establish prejudice under the second prong of *Strickland*, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is

12

a probability sufficient to undermine confidence in the outcome." *Id*. Thus, a defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id*. at 693. "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Thus, "the prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id*. at 372 (internal quotations omitted).

Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. When considering these two prongs, the Supreme Court has provided commonsense instructions, explaining that "[t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id*. at 697. Accordingly, the Second Circuit has often rejected ineffectiveness claims by determining that, in view of the strength of the prosecution's case, the defendant is unable to establish prejudice. *See, e.g.*, *Rosario v. Ercole,* 601 F.3d 118, 136 (2d Cir. 2010) (Straub, J., concurring) ("*Strickland* makes clear that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" (quoting *Strickland*, 466 U.S. at 696)).

### B. Hild's Ineffective Assistance Claim Is Meritless

Hild's ineffective assistance argument fails to satisfy both prongs of *Strickland*'s test: even assuming counsel did not investigate any connection between Foster and Bloomberg,[2] counsel's performance was not deficient and Hild was not prejudiced.

### 1. Any Failure to Investigate the Foster/Bloomberg Evidence was Not Deficient

Hild argues that that Bloomberg's pricing for the Live Well bonds was the "cornerstone" of the Government's theory of the case, the "objective benchmark against which the government measured 'inflation,'" and that, therefore, trial counsel was ineffective for failing to investigate Foster's influence on Bloomberg's pricing for HECM bonds. (Mot. at 1). That assertion is utterly baseless for five reasons.

### (a) Hild Cites to No Significant New Evidence Trial Counsel Would Have Discovered

As an initial matter, Hild has cited to no significant new evidence that trial counsel would have discovered had counsel investigated the relationship between Foster and Bloomberg. The Foster proffer notes that the Government produced on March 18, 2021 stated that Foster:

> Also still does consulting for Baird. Advising Bloomberg for HECM questions. Secondly, they give list of bonds that they request weekly quotes on. DF provides quotes on HMBS, IOs, floaters, inverse Ios. Multiple people do this for Bloomberg; DF's is not used directly by Bloomberg. Does not know details of their process.

---

[2] Given the Court's finding in deciding Hild's First Rule 33 Motion that it would not credit trial counsel's affidavit in addressing Hild's ineffective assistance argument (Dkt. 140, at 30-31), the Government has not sought to obtain an affidavit from trial counsel that specifically addresses the Foster/Bloomberg evidence. Instead, the Government assumes for the sake of this opposition that trial counsel did not conduct any investigation of the connection between Foster and Bloomberg. Even under that generous factual assumption, Hild's argument is entirely without merit.

(Dkt. 245, at 8). As this Court has already found, those notes made clear that Foster "may well have influenced Bloomberg's pricing." (Dkt. 245, at 8). The purportedly new material that trial counsel would have uncovered had he investigated—an agreement listing Foster as "key personnel" in providing Bloomberg with bond valuations; confirmation that Bloomberg relied on "pricing contributors;" and a 2023 SEC settlement with Bloomberg that found Bloomberg's valuations in a "comparable context" could largely be driven by a single datapoint[3] (Mot. at 43)— is just more of the same: confirmation of Foster's statement that he may well have influenced Bloomberg's pricing of the bonds. Thus, more than two years after Hild's discovery of the connection between Foster and Bloomberg, and Hild's apparent service of legal process on Bloomberg itself in connection with bankruptcy proceedings (Mot. at 17 & n.4), Hild does not cite to any additional and compelling evidence that trial counsel should have discovered upon investigation. *See United States v. Malpeso*, 17 Fed. App'x 23, 26 (2d Cir. 2001) (in the Rule 33 context, newly discovered evidence must be so material and non-cumulative that "its admission would probably lead to an acquittal"); *Pri-Har v. United States*, 83 F. Supp. 2d 393, 399 (S.D.N.Y. 2000) ("[F]or a petitioner to succeed on a habeas petition brought pursuant to § 2255 or a motion pursuant to Rule 33 based upon newly-discovered evidence, he must demonstrate . . . that "the evidence is so material and non-cumulative that its admission would probably lead to an

---

[3] Hild's trial concluded in April of 2021, two years before the SEC settlement. There is, therefore, no way that trial counsel could have discovered that settlement even with the most rigorous investigation. Moreover, it is not clear that settlement had anything to do with the particular bonds at issue in Hild's case. Hild's use of the phrase "comparable context" to describe that settlement suggests that it does not.

15

acquittal"). Therefore, it is not clear that even if Hild's counsel had conducted an investigation—once again assuming that he did not—that he would have discovered any material evidence beyond what was already clear from the Foster proffer notes disclosed by the Government in March 2021.

### (b)    The Government's Proof Focused on Showing that Hild Knew the Prices He Assigned to the Bonds Were Not Obtainable in the Market

*Second*, contrary to Hild's assertions, Bloomberg pricing was not the "cornerstone" of the Government's theory of the case. The Government did not offer evidence or argument at trial that Live Well's bonds had a "correct" valuation. Rather, as review of the Government's summation and rebuttal reveal, the Government's case focused on showing that the "Scenario 14" prices Hild assigned to the bonds and fed to IDC were prices Hild knew could not be obtained in the market, as evidenced by Hild's own emails and recorded conversations. (Tr. 2121-2181; 2232-2245).

For example, the jury saw and heard testimony about Government Exhibit 201, a March 2017 email from Hild to his co-conspirators attaching a chart prepared at Hild's direction. The chart indicated that if Live Well were to cease providing Scenario 14 prices to IDC and instead were to provide "market contextual" prices, Live Well would be required to return between $110 million and $140 million in borrowed cash to the lenders. (Tr. 204-08; GX 201). Thus, GX 201 is contemporaneous evidence that the conspirators themselves believed that Live Well's bonds were marked at more than $100 million above market.

The jury also heard Government Exhibit 406, a January 14, 2016 telephone call involving Hild that was surreptitiously recorded by one of the conspirators. During the call, Hild instructed the traders to prepare an analysis showing a comparison of Scenario 14 prices to "current market pricing" so that he could see "what the inherent markup would be to the full SC14." (Tr. 1065; GX

16

406; GX 406-T). That markup was also evidenced by Government Exhibit 1603, a chart prepared by the Government's summary witness that reflected the difference between the prices at which Live Well acquired bonds and the Scenario 14 marks that Hild and his co-conspirators supplied to IDC (and borrowed against) immediately thereafter. As GX 1603 demonstrated, Hild purchased bonds in the market and then immediately marked them up, often by 20% to 30%. (Tr. 1660-63, 2148-51; GX 1603).

In determining which bonds to buy, Hild also had Live Well's traders prepare spreadsheets that showed both the yield that the market assigned to a particular bond and the much lower yield that Live Well would use to calculate a Scenario 14 price, as well as the "net [Live Well Financial] cash w[ith] new mark"—that is, how much excess cash Live Well would receive after buying a bond, marking it up in IDC, and covering the purchase price with borrowed cash. (*See, e.g.* Tr. 1022; GX 117). The trial proof additionally included a September 9, 2015, recorded call in which Hild described his practice of buying bonds in the market and immediately marking them up so that the lenders would advance Live Well enough cash to cover the purchase cost and generate excess as a "self-generating money machine." (Tr. 1002; GX 402; GX 402-T). And, in an October 9, 2015 recorded call, Hild explicitly acknowledged that the "market doesn't look at" bond pricing in the same manner as Scenario 14. (Tr. 1008; GX 403; GX 403-T).

Hild's knowledge that the prices he supplied to IDC were not obtainable in the market was further proven by his efforts to hide the disparity between his prices and the market's prices from Live Well's lenders. Thus, for example, Hild directed his co-conspirators to buy entire tranches of bonds so that the lenders would not see the prices of individual bonds offered by Live Well and

17

discover that they did not match the prices from comparable bonds in a tranche. (Tr. 1040; GX 416). And when one of Live Well's lenders sought to obtain an independent price quote for a Live Well bond that it was financing, in a January 2017 call Hild and his co-conspirators discussed recruiting a "slimy" broker who would be willing to stand behind their inflated valuation. (Tr. 1144-48; GX 407; GX 407-T).

Because the Government did not rely on the Bloomberg prices to prove the actual value of the bonds—and, in fact, did not even introduce evidence of what Bloomberg's prices were for the bonds at issue—trial counsel had good reason to focus the trial defense on the issue of Hild's knowledge and intent, rather than the reliability of Bloomberg's pricing model. *See Mills v. Scully*, 826 F.2d 1192, 1197 (2d Cir. 1987) (not ineffective assistance to forgo a defense approach that poses greater risks than benefits).

### (c)  Bloomberg Pricing Was Scarcely Mentioned at Trial

*Third*, the extremely limited references to Bloomberg in the trial transcript further demonstrate that Bloomberg pricing simply was not a focus of the Government's case. Review of the Government's opening, closing, and rebuttal arguments reveals that the word "Bloomberg" was uttered only <u>once</u> during the entirety of both of those jury addresses, and that reference was only to explain that one particular lender called Hild after seeing Bloomberg's pricing and began to ask questions. (*See* Tr. 2176). Indeed, review of the entirety of the more than 2,000 pages of trial transcript reveals that references to Bloomberg[4] can be found on fewer than approximately 20

---

[4] The Government is not including in this list references to Bloomberg chats or messages, which are simply electronic messages exchanged on the Bloomberg platform. Nor does the Government include a single use of the word "Bloomberg" during Eric Rohr's ("Rohr") testimony that is

18

pages, and—as set forth below—many of those references were raised on cross-examination, not as part of the Government's offered testimony:

| Testimony | Transcript Cite |
|---|---|
| Alan Levy Cross Examination | Tr. 720-722, 725 |
| Joe Redoutey Direct Examination | Tr. 749-750 |
| Joe Redoutey Cross Examination | Tr. 783-787, 792 |
| Glen Haddock Direct Examination | Tr. 1606-08 |
| Glen Haddock Cross Examination | Tr. 1634-1635, 1647 |
| Government Summation | Tr. 2176 |

In fact, only two witnesses uttered the word "Bloomberg" on direct examination—Joe Redoutey ("Redoutey"), a representative of one of the victim-lenders, and Glen Haddock ("Haddock"), an individual Hild promoted to be Live Well's CFO at the very end of the scheme. (Tr. 1599). This limited testimony was offered to explain why Redoutey and Haddock took the actions that they did. Redoutey testified that after he observed the difference between IDC prices and Bloomberg prices in April and May of 2019, he raised concerns with Hild, who failed to disclose Live Well's role in IDC pricing and otherwise acted evasively. (Tr. 750-751). Similarly, Haddock testified that he began to suspect that the valuations that Live Well assigned to the bonds on its balance sheet were too high after Live Well's bond custodian was unable to obtain IDC pricing and switched to Bloomberg pricing, which was substantially lower. (Tr. 1606-1610). Haddock thereafter undertook his own investigation of the way that Live Well had been pricing the bonds and learned for the first time that Live Well had been supplying prices to IDC, that it

unrelated to the issue before the Court. In that testimony, Rohr describes a particular email as a "VCON ticket, which is basically a trade ticket" that he thinks was "generated through Bloomberg or something like that." (Tr. 1044).

19

had been modeling the bonds based on assumptions that Haddock believed were unrealistic, and that the prices had remained static for two years. (Tr. 1608-1612). On the basis of that investigation, Haddock refused to sign the company's financial statements, effectively forcing it to shutter. (Tr. 1616-1617).

Given the dearth of trial testimony about Bloomberg pricing, it is completely unsurprising that neither this Court's 64-page opinion addressing the sufficiency of the Government's evidence, nor the Second Circuit's 30-page opinion affirming this Court's decision, never once use the word "Bloomberg." (*See* Dkt. 140; App Dkt. 75). Clearly Bloomberg's pricing of the Live Well bonds was not the "cornerstone" of the Government's trial theory (Mot. at 1) when it was not discussed in the Government's jury addresses, was only mentioned in passing by two of eight Government witnesses, and played no role in this Court's or the Circuit's assessment of the sufficiency of the evidence. Rather, the reality is that Bloomberg pricing was simply not a focus of the Government's case. Trial counsel, therefore, had no reason to investigate any connection between Foster and Bloomberg and any failure by trial counsel to do so simply does not amount to Constitutionally deficient representation.

### (d) References to the "Market" or "Market Value" Are Not References to Bloomberg's Pricing

*Fourth*, apparently recognizing that Bloomberg was barely discussed at trial, Hild attempts to save his argument by conflating "Bloomberg" with the term "market value." (*See, e.g.*, Mot. at 1 (asserting that Bloomberg prices were "market" prices)). But references throughout the trial transcript to the "market" or "market value" are not implicitly references to Bloomberg. "Market" and "market value" were simply terms used to describe the price at which the bonds could be

20

bought and sold between willing counterparties. Although one conceivable way the Government *could* have proved market prices would have been to compare Hild's prices to those reported by independent pricing services, the Government instead undertook to compare Hild's prices to the prices at which Live Well acquired its bonds. *See supra* at 4-8; Tr. 2149 (the "best indicator" of "market value" is the price at which Live Well bought the bonds). Indeed, had it attempted to use Bloomberg's prices as the basis for comparison, the Government would have confronted the difficulty that, for nearly the entire period of the conspiracy, Bloomberg pricing apparently did not exist. The Indictment alleged Hild's mispricing scheme extended from 2015 through May of 2019. Witnesses testimony, however, indicates that Bloomberg did not even begin pricing the relevant bonds until very late in that period—late 2018 or early 2019. (*See* Tr. 720-22; 784-86; *see also* Mot. at 4, 9).

Moreover, the Government's proof focused almost entirely on the period from 2014 through 2017, before Bloomberg pricing became available.[5] For example, Government Exhibit 1603, the chart presented by the Government's summary witness that shows how Hild purchased bonds in the market and then immediately marked them up, often by 20% to 30%, only spans 2014 to 2017. *See supra* 16-17; GX 1603; Tr. 1655-1667). Similarly, the Government's summation walked the jury through a chronology of the scheme, beginning roughly in August of 2014 and focusing largely on Hild's conduct in early 2017. (Tr. 2136-2185). References to "market" prices during that time period could not conceivably have referred to Bloomberg because Bloomberg

---

[5] And after which Live Well generally held its bond prices static in light of the SEC investigation. (Tr. 1204-05).

21

pricing of the bonds did not exist. Nor could Foster have had any influence on Bloomberg pricing at that time because he was employed by Live Well, not Robert W. Baird & Co. ("Baird").[6]

In light of the case presented by the Government, trial counsel had no reason to investigate the connection between Foster and Bloomberg's pricing of the bonds and good reason not to do so. Any attack on Bloomberg's pricing would not offer the jury a basis to discount the market price evidence the Government offered for the heart of the conspiracy. Moreover, Foster was not a testifying witness and bringing to light any involvement by Foster in setting Bloomberg's prices would have done nothing to undermine the abundant documentary evidence and recorded conversations demonstrating Hild's knowledge that the prices he supplied to IDC were not obtainable in the market. The law does not require defense counsel to "conduct a comprehensive investigation of every possible lead or defense . . . or to scour the globe on the off-chance something will come up," *Caracappa*, 614 F. 3d at 47, and an investigation of Bloomberg's pricing service would have been a pointless labor. As a result, trial counsel's conduct does not fall below an objective standard of reasonableness and Hild's claim should be denied. See *Strickland*, 466 U.S. at 688.

### (e) Trial Counsel's Performance at Trial Was Strong

*Finally*, despite the numerous pages Hild devotes to rehashing trial counsel's "undisclosed conflict of interest" (*See* Mot. at 11-14, 32-33), that issue has already been addressed and rejected as a basis for relief by this Court and the Court of Appeals. (*See* Dkt. 140; App. Dkt.

---

[6] Documentary evidence presented at trial shows Foster employed at Live Well at least as late as March 2017. (*See* GX 210). Foster's proffer notes further reveal that he did not begin his new employment at Baird until May of 2017.

22

80, at 11). Moreover, despite trial counsel's conduct in the Kentucky litigation that gave rise to the alleged conflict, in assessing Hild's claim the Court described counsel's performance as "strong." (Dkt. 140, at 52). More specifically, the Court assessed that: "On the whole, [trial counsel] was a zealous, passionate, articulate, and compelling advocate who presented a cogent defense theory that was similar, if not identical, to the theory set forth in Hild's post-trial briefing." Counsel advanced Hild's case by "thorough cross examination," "synthesize[d] the complicated financial concepts and transactions at issue in the case," and "had a disposition that appeared to be well-received by the jury." (Dkt. 140, at 52-53). Thus, there is no basis to infer that counsel's conduct in connection with the Kentucky litigation means that his performance was necessarily deficient with respect to the investigation of Hild's case.

### 2. Hild Suffered No Prejudice From Any Failure to Investigate

Assuming *arguendo* that trial counsel's performance was deficient—and it was not—Hild must still "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He cannot do so.

As an initial matter, despite Hild's conjecture, and the now more than two years that have passed since Hild filed his Third Rule 33 Motion, Hild has not set forth any actual evidence demonstrating that Foster artificially suppressed any pricing information he provided to Bloomberg regarding bonds held in Live Well's portfolio. Indeed, Hild's entire theory that Foster had a "powerful incentive[] to lower his valuations in a way that supported the government's case" (Mot. at 7) makes little sense. Hild surmises that such an incentive existed because Foster "signed a proffer agreement with the SEC in November 2017" and "began attempting to cooperate with

23

the government." (Mot. at 16). That timeline, however, ignores the fact that the Government did not even open its investigation into Live Well until approximately May of 2019, and only met with Foster in June of 2019—a date outside of the date range covered by the Indictment. Thus, any pricing data Foster provided to Bloomberg could not have been motivated by a desire to please the Government, because the Government had nothing to do with Foster during the period of Hild's unlawful conduct. Moreover, the proffer in which Foster informed the Government that he was "[a]dvising Bloomberg for HECM questions" occurred on March 18, 2021. (Dkt. 245, at 8). But Foster entered into his non-prosecution agreement with the Government nearly two years prior, in August of 2019. Thus, under Hild's theory, the Court would have to believe that Foster was motivated to suppress Bloomberg's bond prices in order to please the Government and obtain a non-prosecution agreement, even though at the time the Government and Foster were discussing a non-prosecution agreement the Government didn't have any idea Foster was involved in setting Bloomberg's bond prices. Such an inference defies all logic. A more plausible inference is that given Foster's knowledge of the SEC investigation as of at least November 2017, from that point forward he was highly motivated to ensure that his bond pricing methodologies were carefully calculated and accurate.

Additionally, as set forth in detail above, Bloomberg pricing was simply not a focal point of the Government's case and, therefore, any evidence that defense counsel may have unearthed about Foster's involvement in Bloomberg's pricing would have done little to undermine the Government's proof. Evidence of such limited import does not provide a basis for relief. *Harrington*, 562 U.S. at 104 ("It is not enough to show that the errors had some conceivable effect

24

on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.") (internal quotation marks omitted).

Finally, and perhaps most importantly, the Government's evidence of Hild's guilt at trial was substantial. *See United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008) (in determining prejudice, "the strength of the Government's case is probably the single most critical factor") (internal quotation marks omitted). Its proof involved the testimony of three Live Well insiders who each stated that Hild artificially inflated the value of Live Well's bond portfolio by having Live Well employees submit above-market price quotes to IDC (*see* Tr. 115-16, 220; 818, 821-22, 842, 860; 996-1011), along with 140 exhibits including emails, chats, and recorded calls showing Hild's knowing and willful participation in the scheme. As this Court explained in its detailed assessment of the sufficiency of the evidence in connection with Hild's First Rule 33 Motion, there was a "plethora" of evidence presented at trial supporting the conclusion that Hild intentionally defrauded Live Well's lenders. (Dkt. 140, at 19-21, 24-26). The Second Circuit agreed with that assessment. (*See* App. Dkt. 75, at 14, 17 ("plenty of evidence was presented at trial that Hild deceived Live Well's lenders" and the "jury was presented with more than enough evidence to find that Hild knowingly caused Live Well to submit above-market bond prices to IDC")). Given the record evidence of such ample proof—especially combined with the irrelevance of the Foster/Bloomberg evidence—there is no reason to think that any further investigation by counsel regarding Foster's participation in Bloomberg's pricing would have had an impact on the outcome of the trial.

25

Thus, because Hild has shown neither a deficiency in counsel's performance nor prejudice from such deficiency, his ineffective assistance of counsel claim should be denied in its entirety.

## II.   Stumberger's Recent Statements Do Not Provide a Basis for Relief

Hild separately claims that he is entitled to relief based on newly discovered evidence— certain statements made more than four years after trial by Darren Stumberger, a Live Well insider who cooperated with the Government and testified at trial. Hild asserts that Stumberger's statements, made in connection with civil litigation related to the Live Well fraud in federal court in Michigan, undermine the "central theory of the government's case and call into question the reliability of his own trial testimony." (Mot. at 38). Hild's argument is completely without merit.

### A.   Legal Standard

In order to obtain relief based on newly discovered evidence, a § 2255 petitioner bears the "heavy burden of convincing the court that the newly-discovered evidence would have resulted in an acquittal." *Pri-Har*, 83 F. Supp. 2d at 399. A petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *United States v. Baran*, 192 F. Supp. 3d 496, 501 (S.D.N.Y. 2016) (internal quotation marks omitted). Motions based on newly discovered evidence are "not favored," and "should be granted only with great caution." *Pri-Har*, 83 F. Supp. 2d at 399.

Moreover, "[a]ttempts are numerous by convicted defendants to overturn their criminal convictions by presenting affidavits of recanting witnesses in support of a section 2255 motion." *United States v. Kearney*, 682 F.2d 214, 219 (D.D.C. 1982). As a result, witness recantations "must be looked upon with the utmost suspicion." *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007). "[S]uspicions are even greater when . . . the recanting witness is one who was involved in

26

the same criminal scheme and, having received the benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting." *Id.* Thus, the Second Circuit has explained that "cases involving different stages of habeas review and cases outside the habeas context amply support the view that a general, unsworn recantation . . . is insufficient to contradict sworn trial testimony." *Id.* at 354.

### B. Hild's Claim Related to Darren Stumberger is Without Merit.

Hild's arguments based on Stumberger's recent statements in federal court in Michigan are without merit for three reasons.

### (a)  Stumberger Has Not Submitted a Sworn Affidavit

*First*, Hild has not submitted any affidavit from Stumberger stating that Stumberger lied during this trial testimony or is otherwise recanting this testimony. Instead, Hild relies on unsworn statements made by Stumberger during a civil suit in the U.S. District Court for the Eastern District of Michigan, in which Stumberger is defending claims arising from his role in the Live Well fraud. *See Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.). The lack of a sworn affidavit from Stumberger is alone sufficient reason to deny Hild's petition. *See Haouari*, 510 F.3d at 354 (holding in the context of 28 U.S.C. § 2244 that "before a recantation statement may qualify as competent evidence for habeas review, it would need to be in sworn affidavit form, subject to penalty for perjury"). And the circumstances surrounding Stumberger's statements— namely, the near certainty that he would be ordered to pay substantial damages to victims of the Live Well scheme if he were to admit his role—should lead the Court to treat his statements with the "utmost suspicion," as the Second Circuit has counseled. *See Id*. at 353.

27

### (b)    Stumberger Has Not Recanted His Trial Testimony

*Second*, Stumberger's statements do not even amount to a recantation of his trial testimony. The statements at issue concern (i) Stumberger's guilty plea, and (ii) the evidence related to the connection between Foster and Bloomberg. (Mot. at 21-26). With respect to the statements concerning his plea, Stumberger confirmed on the record in the Michigan case that he was not saying he had committed perjury. Specifically, when asked by the district court judge whether what Stumberger planned to say in the Michigan litigation was different from what he said under oath at his plea in New York, Stumberger responded: "No. I'm not going to commit perjury. All I'm saying is what [plaintiff] has provided in terms of their allegations . . . are . . . false, partially false, omit truths and I dispute them. That's all I want to do. I'm not going to commit perjury and I'm not going to be forced to commit perjury. I just want to defend myself against the allegations." (Dkt. 264, Ex. B at 9).  Stumberger recently confirmed as much at a proceeding in April before the Michigan court, stating that he would not make statements that could expose him to perjury charges and that he would not otherwise revisit matters arising from his criminal case. *See Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512, Dkt. 162, at 16-17.[7]

With respect to Stumberger's statements that Hild cites regarding the Foster/Bloomberg evidence, those statements do not recant Stumberger's trial testimony because he did not testify at

---

[7] On April 27, 2026, the federal court in Michigan granted summary judgment to Flagstar on its conspiracy claim against Hild, based on Stumberger's statements during his plea colloquy in this district. *See Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512, Dkt. 162, at 20-23.

28

trial about Bloomberg pricing. Not once during direct or cross examination did Stumberger utter the word "Bloomberg," except in reference to a "Bloomberg" text message. (*See* Tr. 50-558). Since his testimony did not concern Bloomberg pricing, it makes no sense that his post-trial statements concerning that pricing or Foster's involvement with it somehow amount to a recantation of that testimony. The fact that Stumberger may now—years later—have seen notes or emails regarding Foster's relationship to Bloomberg pricing has nothing to do with his trial testimony. Stumberger's trial testimony was appropriately limited to his knowledge at that time, and any information he has since learned from reviewing notes or emails does not undermine the veracity of that testimony at the time of trial. Moreover, reading Stumberger's statements in the context of the Michigan litigation in which they were made, it seems likely that Stumberger's issue with Foster and Bloomberg's pricing relates primarily whether it is fair to rely on the Bloomberg data in calculating the plaintiff's damages in that litigation, an issue that he did not address as part of his testimony in Hild's criminal matter. *See Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.), Dkt. 168, filed June 1, 2026.

Thus, what Hild has presented is merely unsworn statements of a trial witness made years after trial where the witness has "not signed an affidavit disavowing his trial testimony" and has even "stated he is not recanting" (Mot. at 42). Such statements do not provide a basis for relief.

### (c) Stumberger's Trial Testimony Was Supported by Ample Documentary Evidence and the Testimony of Other Cooperators

*Third*, Stumberger has not recanted his trial testimony for good reason: his statements at trial were well-supported by substantial documentary evidence. His testimony was also completely consistent with that of other trial witnesses, including two additional former Live Well employees.

29

In particular, review of Stumberger's trial testimony reveals that his statements were supported by emails, chats, and recorded conversations with Hild. For example, Stumberger's testimony was supported by more than five recorded phone calls in which Hild was a participant, including a call in which Hild directed the trading desk to slowly implement the Scenario 14 prices over time to avoid triggering "alarm bells all over the place" and described his practice of buying bonds and immediately marking them up as a "self-generating money machine" (Tr. 118-29; GX 402, 402-T), as well as a call in which Hild and his co-conspirators discussed turning to a "slimy broker" to help them out after a lender asked Live Well to have a broker provide a price for one of the bonds it was lending against (Tr. 166-77; GX 407). Similarly, emails Stumberger presented to the jury included a March 2017 email from Hild to Stumberger and Rohr attaching a chart showing that if Live Well were to cease providing Scenario 14 prices to IDC and instead were to provide "market contextual" prices, Live Well would be required to return between $110 million and $140 million in borrowed cash to the lenders—powerful documentary evidence that corroborated Stumberger's statements. (*See* Tr. 204-08; GX 201).

Moreover, Stumberger was not the only cooperating witness who testified. In total, three former Live Well employees cooperated with the Government and took the stand. The testimony of those witnesses was consistent: all three stated that Live Well employees, acting at Hild's direction, artificially inflated the value of Live Well's bond portfolio by submitting above-market price quotes to IDC. (*See* Tr. 115-16, 220; 818, 821-22, 842, 860; 996-1011). Moreover, as is clear from the Court's decision on the Rule 33 motions, much of Stumberger's testimony was overlapping with—and consistent with—Rohr's. (*See* Dkt. 140, at 21 (stating that "[a] reasonable

30

jury could have accepted Stumberger's and Rohr's account of the pricing over Hild's"), 25 (the jury heard "testimony from Stumberger and Rohr that Hild directed them to increase the prices submitted to IDC in order to increase the company's ability to borrow from lenders"). Stumberger and Rohr participated in many of the same calls with Hild and the evidence they presented was, in many respects, cumulative.

In light of the substantial corroboration of Stumberger's testimony, even if Stumberger had now recanted—which he has not—such recantation would not be credible. And given the substantial evidence of Hild's guilt, presented not only through Stumberger but through other cooperating witnesses and through voluminous documentary evidence, Hild has not made any showing that his newly discovered evidence would have resulted in an acquittal. Accordingly, Hild's motion for relief based on the newly discovered evidence of Stumberger's recent statements should be summarily denied.

## III.  Hild's Requests for an Evidentiary Hearing and Discovery Should Be Denied

Hild's request for an evidentiary hearing and further discovery should also be rejected. The filing of a Section 2255 petition does not, by itself, obligate the district court to conduct an evidentiary proceeding. *Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977) (filing of motion "does not entitle petitioner automatically to a hearing"). Rather, a district court may summarily dismiss a Section 2255 petition where the defendant submits no supporting affidavit or fails to raise "detailed and controverted issues of fact." *Id*. Similarly, where the existing record "conclusively show[s] that the petitioner is entitled to no relief," summary dismissal may be appropriate. *Id*.; *see also* 28 U.S.C. § 2255; *United States v. Stantini*, 85 F.3d 9, 17 (2d Cir. 1996)

31

(no need for further factual development because defendant failed to raise plausible ineffectiveness claim regarding attorney's performance in plea negotiations or at trial); *Hopkinson v. Shillinger*, 866 F.2d 1185, 1211 (10th Cir. 1989) ("Conclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, as are contentions that in the face of the record are wholly incredible.").

Even where the defendant's petition survives this initial hurdle, the district court is still not required to hold an evidentiary hearing to resolve disputed factual issues. Instead, the district court has the discretion to choose a "middle road" and resolve the petition based on written material, such as affidavits from relevant witnesses. *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003) ("Our precedent . . . permits a 'middle road' of deciding disputed facts on the basis of written submissions."); *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (finding it "within the district court's discretion" to choose the "middle road" of deciding the case based on written submissions, including affidavits); *Raines v. United States*, 423 F.2d 526, 529-30 (4th Cir. 1970) ("[T]here is a permissible intermediate step that may avoid the necessity for an expensive and time consuming evidentiary hearing in every Section 2255 case. It may instead be perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and, in an appropriate case, even affidavits.").

This Court—which has seven years of experience with this case—has all the information required to decide the claims advanced based on the voluminous record before it. As such, it is well within the Court's discretion to decide the petition based on the record currently before it and

32

thus to avoid "the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing." *See Chang*, 250 F.3d at 86 (upholding the district court's decision to decide a habeas petition based on briefing and affidavits where the court concluded testimony would add "little or nothing to the written submissions" and the court was "intimately familiar with the trial proceedings and the events and circumstances surrounding them"). This is especially true here, where Hild has spent years using bankruptcy and civil proceedings to try to obtain evidence that might support his claim and has failed to find any.

## CONCLUSION

For the foregoing reasons, the Petition should be denied in its entirety without an evidentiary hearing or discovery. Because the Petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability should issue.

Dated: New York, New York
      August 4, 2026

Respectfully submitted,

JAMES M. McDONALD
United States Attorney for the
Southern District of New York

By: _____
    Maggie Lynaugh
    Assistant United States Attorney
    (212) 637-2448

33