UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                    )
MICHAEL HILD,                       )
                                    )
              Petitioner,           )
                                    )
         - v. -                     )
                                    )    26-cv-6191 (RA) (RWL)
UNITED STATES OF AMERICA,           )
                                    )
              Respondent.           )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         - v. -                     )
                                    )    19-cr-602 (RA) (KHP)
MICHAEL HILD,                       )
                                    )
              Defendant.            )
                                    )
```

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONER MICHAEL HILD'S MOTION PURSUANT TO 28 U.S.C. § 2255

Dated: August 11, 2026
       New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

Brian A. Jacobs
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
bjacobs@maglaw.com

*Attorneys for Michael Hild*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.    Trial Counsel's Failure To Investigate the Foster/Bloomberg Evidence Constitutes Ineffective Assistance of Counsel Warranting Vacatur ................................................. 3

    A.    Dusing's Failure To Investigate the Foster/Bloomberg Evidence Was Constitutionally Deficient Performance ................................................................. 3

        1.    The Government Failed To Present Any Evidence ......................................... 3

        2.    Trial Counsel Would Have Discovered Critical Evidence Had He Investigated ................................................................................................... 5

        3.    The Government's Attempt To Minimize the Bloomberg Evidence Fails ....... 6

        4.    Counsel's Otherwise Satisfactory Performance Does Not Excuse the Failure To Investigate Foster/Bloomberg ..................................................... 9

    B.    Mr. Hild Was Prejudiced Because the Foster/Bloomberg Evidence Would Have Undermined the Government's Central Theory ..................................................... 11

II.    Stumberger's Recent Statements Independently Warrant Relief Because the Government's Key Witness Now Attributes the Alleged Losses to Foster's Compromised Bloomberg Pricing Rather Than Fraud ................................................. 14

III.    The Court Should Grant Discovery and an Evidentiary Hearing Because the Government's Speculation Cannot Substitute for Evidence on Disputed Factual Issues ................................................................................................... 17

CONCLUSION ............................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Chang v. United States*,
  250 F.3d 79 (2d Cir. 2001) .................................................................................. 18

*Chambers v. Lilly*,
  735 F. Supp. 3d 196 (E.D.N.Y. 2024) ................................................................. 4, 5

*Espinal v. Bennett*,
  588 F. Supp. 2d 388 (E.D.N.Y. 2008) ................................................................. 4, 10

*Espinal v. Bennett*,
  342 F. App'x 711 (2d Cir. 2009) .......................................................................... 4

*Haouari v. United States*,
  510 F.3d 350 (2d Cir. 2007) ................................................................................ 15

*Ortega v. Duncan*,
  333 F.3d 102 (2d Cir. 2003) ................................................................................ 16

*Strickland v. Washington*,
  466 U.S. 668 (1984) ............................................................................................ passim

*United States v. Velazquez*,
  197 F. Supp. 3d 481 (E.D.N.Y. 2016) ................................................................. 10

**Statutes**

28 U.S.C. § 2255 ....................................................................................................... 1, 18

## PRELIMINARY STATEMENT

This is an extraordinary Section 2255 motion.  Mr. Hild was convicted of providing fraudulently inflated bond values to a pricing service called IDC, and the government tried to prove the values were fraudulently inflated by having multiple witnesses testify about the neutral "market values" of the bonds based on Bloomberg's prices being lower than Mr. Hild's.  Now, a government cooperating witness—Dan Foster—has been unmasked as the key individual providing the marks to Bloomberg.  This means Bloomberg's values were not neutral, but rather were the tainted submissions of a cooperator trying to curry favor with the government to avoid prosecution—which the jury never heard.  In the face of this new evidence, the government's star cooperating witness against Mr. Hild—Darren Stumberger—has stated in recent federal court filings and emails that he did not know about the Foster/Bloomberg connection when he pled guilty, that he now views his prosecution as "corrupt," that there are questions concerning the reliability of Foster's valuations, and that the government has threatened him.

On this record, which is effectively unrebutted, Mr. Hild has met the two-pronged *Strickland* standard, and the Court should grant the petition.  On the first prong, deficient performance, Mr. Hild's trial counsel failed to investigate the Foster/Bloomberg connection, which the government concedes, and did not even tell Mr. Hild about it.  In support of his petition, Mr. Hild has produced substantial documentary evidence, a sworn declaration, and Stumberger's statements.  The government has submitted no contrary evidence, even though the government has access to Stumberger, who remains bound by the terms of his cooperation agreement.  On the second prong, prejudice, if trial counsel had investigated Foster/Bloomberg, there is a reasonable probability the trial result would have been different.  If the jury had heard

1

that a cooperator was the source of the Bloomberg marks that government witnesses said were neutral "market" values, there is a reasonable probability the jury would have acquitted.

Stumberger's recent statements underscore the prejudice.  The government's star witness has now explained that a "pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations." Stumberger also stated Foster "dramatically lowered his own valuations after becoming a government cooperator" and that, through Foster, "the government investigation dismantled the independent pricing mechanism" for the bonds, which destroyed Live Well.  His statements would have been devastating to the prosecution if he had offered them from the witness stand.

The government's response is remarkable for what it omits.  It does not dispute Stumberger's statements or expertise.  It does not address how its witnesses Levy, Redoutey, and Haddock—all of whom relied on Bloomberg as the "market value" in their trial testimony— would have had their testimony impeached or changed had they had known Bloomberg was compromised.  Instead, the government primarily highlights evidence that Live Well's prices exceeded the prices at which Live Well acquired the bonds and the fact that Live Well's own valuation metrics changed at one point—facts never disputed that do not establish fraud.

The question was whether Live Well's prices exceeded what the "market" would pay. The government's proof was testimony from Levy, Redoutey, and Haddock about the neutral market value of the bonds, based on Bloomberg—prices that the jury never learned came from a government cooperator.

2

The Court should grant Mr. Hild's motion and vacate his conviction or, at minimum, authorize discovery and an evidentiary hearing.

## ARGUMENT

### I.    Trial Counsel's Failure To Investigate the Foster/Bloomberg Evidence Constitutes Ineffective Assistance of Counsel Warranting Vacatur

In his opening brief, Mr. Hild demonstrated that trial counsel's failure to investigate the Foster/Bloomberg evidence constitutes deficient performance under *Strickland*—an argument supported by this Court's finding that Mr. Hild and his counsel, "with due diligence, could have relied on [the Foster Notes] to seek the evidence at issue" (Dkt. No. 245 at 8.)—and that he was prejudiced.  The government fails to rebut Mr. Hild's showing.[1]

#### A.    Dusing's Failure To Investigate the Foster/Bloomberg Evidence Was Constitutionally Deficient Performance

##### 1.    The Government Failed To Present Any Evidence

The government admits it did not seek an affidavit from Dusing because the Court previously declined to "credit trial counsel's affidavit."  (Opp'n 14 n.2.)  The government instead "assumes for the sake of this opposition that trial counsel did not conduct any investigation of the connection between Foster and Bloomberg."  (Opp'n 14 n.2.)  In fact, it appears the government

---

[1] The government's opposition contains multiple statements that are inaccurate, incomplete, or require clarification. For example, it states that the Second Circuit held that "Hild's ineffective assistance argument based on counsel's purported conflict of interest was without merit" (Opp'n 10) without clarifying that the Circuit specifically held that Mr. Hild's Foster/Bloomberg arguments were "best raised" on collateral review. *United States v. Hild*, No. 23-6136-CR, 2025 WL 2924205, at *4 (2d Cir. Oct. 15, 2025).  The government states that after Live Well received an SEC subpoena, "the prices Live Well submitted to IDC remained static, at above-market Scenario 14 levels" (Opp'n 7) but does not clarify whether counsel advised Live Well to leave prices as-is in response to a subpoena.  It states that Hild's "co-conspirators discussed recruiting a 'slimy' broker who would be willing to stand behind their inflated valuation" (Opp'n 18) without clarifying that it was Eric Rohr who said this and then immediately noted that this was "not [a] good option[]." (GX-407-T.)  It claims a "federal court in Michigan granted summary judgment to Flagstar on its conspiracy claim against Hild" when, in fact, judgment was entered against Stumberger, not Hild. (Opp'n 28 n.7.) The government argues "[t]here was no disclosure from IDC of who the broker quotes came from" (Opp'n 4), but IDC's portal appears to show "Dan Foster" as the source, per an exhibit trial counsel marked. (Ex. 1.)

3

conducted no investigation whatsoever beyond reviewing the filings.  It submitted no evidence—no affidavits from Dusing, co-counsel Lawrence, Stumberger (who remains bound by his cooperation agreement), or anyone else.  The government's failure to provide evidence to support its speculation about why Dusing failed to investigate undermines its argument.  *See Chambers v. Lilly*, 735 F. Supp. 3d 196, 237 (E.D.N.Y. 2024) (holding where prosecutor "declined to present any evidence from trial counsel to justify his conduct" there was "simply no factual predicate" for court to find counsel's alleged errors were "strategic"); *Espinal v. Bennett*, 588 F. Supp. 2d 388, 401 (E.D.N.Y. 2008) ("Courts have found that a trial counsel's failure to investigate potentially exculpatory evidence, in the absence of a reasonable explanation, falls below the constitutional standard of effective representation required by *Strickland.*"), *aff'd*, 342 F. App'x 711, 712 (2d Cir. 2009) ("trial counsel rendered constitutionally deficient performance under *Strickland . . .* in failing to investigate a police report").

In contrast, Mr. Hild provided his own affidavit establishing that Dusing "never discussed" the Foster Notes or Foster's Bloomberg connection with him, "never consulted with him" about subpoenaing Bloomberg or Foster, and never told him of a "strategic decision" to forego that investigation.  (Dkt. No. 276 ¶¶ 3–4.)  Mr. Hild states he "would have insisted" on an investigation had he known.  (Dkt. No. 276 ¶ 5.)  This record—Mr. Hild's declaration, Stumberger's statements, and the Bloomberg/Foster evidence—shows deficient performance.

Rather than submit evidence, the government surmises that "trial counsel had no reason to investigate the connection between Foster and Bloomberg's pricing of the bonds and good

4

reason not to do so." (Opp'n 22.)[2]  But this Court should not credit such speculation. *See Chambers*, 735 F. Supp. 3d at 237 (prosecutor "declined to present any evidence from trial counsel to justify his conduct").  No conceivable strategy justifies not investigating Bloomberg.

### 2.    Trial Counsel Would Have Discovered Critical Evidence Had He Investigated

The government argues "Hild has cited to no significant new evidence that trial counsel would have discovered had counsel investigated the relationship between Foster and Bloomberg." (Opp'n 14.)  This ignores the record. (Mem. 29-30.)  Investigation would have revealed, among other things: (1) a formal data acquisition agreement between Baird and Bloomberg listing Foster as "key personnel" obligated to provide bond valuations (Dkt. No. 244-1 Ex. B at BBG-LW-0000521); (2) Bloomberg's methodology confirming it relied on "pricing contributors" including Foster (Dkt. No. 244-1 Ex. D at BBG-LW-0000379) and that Foster was likely the sole contributor (Dkt. No. 244-2); (3) evidence that Foster had been providing quotes since at least December 2017—just weeks after signing an SEC proffer agreement (Ex. G at 11–12); (4) evidence that Foster proposed that Baird and Bloomberg "team up," Bloomberg's view that it was "starved for data" in the sector, and Foster's submissions[3]; and (5) evidence that the SEC began pressuring Foster to cooperate against his "bosses" as early as July 2017[4].  In fact, in July 2017, the SEC told Foster that it had evidence "indicating that you personally provided off-

---

[2] The government suggests Foster was unimportant because he "did not testify at trial." (Opp'n 1 & 22.)  But Foster did not testify because the government did not call him, which raises questions about whether the government avoided calling him to hide the Foster/Bloomberg connection.  Discovery on this point, among others, is warranted.

[3] *Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) (DE 169-1 at 82) (Stumberger Exhibit Packet B ("DS B")).

[4] *Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) (DE 169-2 at 82) (Stumberger Exhibit Packet C ("DS C")).

5

market prices to IDC" and telling him that the evidence "indicates that your bosses were fully aware of what was going on" but that "their fingerprints are not all over the place like yours." (DS C.)  The SEC thus made clear, in mid-2017, how Foster could save himself.  Bloomberg's "independent" prices thus came from a cooperator with reason to give artificially low valuations.

The government's suggestion that this evidence is "more of the same" as what was apparent from the Foster proffer notes (Opp'n 15) misapprehends the distinction between the vague reference to "advising Bloomberg" in those notes and concrete documentary proof that Foster was contractually obligated to provide pricing data Bloomberg published for the bonds. Bloomberg admitted Foster was one of just two individuals providing quotes (Dkt. No. 244-2 Ex. A ("Bloomberg has determined that they received quotes for certain of the bonds you identified from Mr. Foster and also from someone named Olivier Dupiton at HELIOS Strategic Advisers")) and was likely the only source for the bonds at issue here.[5]  Trial counsel could have devastated the government's inflation theory with this evidence.

### 3.    The Government's Attempt To Minimize the Bloomberg Evidence Fails

Mr. Hild demonstrated that if the jury had been presented with the Foster/Bloomberg evidence at trial—along with Stumberger's statements in response to that evidence—there is a reasonable likelihood that the result would have been different.  The government attempts to minimize the importance of the Bloomberg evidence, arguing it was not the "cornerstone" of its case and "barely discussed at trial."  (Opp'n 14, 20.)  This argument fails.

---

[5] Despite Bloomberg's counsel identifying both Foster and Dupiton as contributors of quotes, the documents Bloomberg produced only name Foster, suggesting Foster was the sole contributor.

First, the government argues it relied on Live Well's acquisition prices rather than Bloomberg to prove that Live Well fraudulently inflated its marks. (Opp'n 16–17.) But Mr. Hild did not dispute that Live Well's valuations were marked up from the purchase prices. (Mem. 9–10.) Mr. Hild's defense was that Scenario 14 prices (and other Live Well valuations) were a good faith effort. The cooperators, Stumberger and Rohr, agreed Scenario 14 was "an effort [] to get it right" from "an intrinsic value standpoint." (Tr. 544, 1583–86.)

The government's reliance on acquisition prices and internal valuation changes does not answer the relevant question and does not alone prove fraud. Those facts establish merely that Live Well valued certain bonds above the acquisition prices, which is why Live well bought them; they do not prove those securities possessed a single objectively "correct" value below Live Well's.[6] The government even concedes it "did not offer evidence or argument at trial that Live Well's bonds had a 'correct' valuation." (Opp'n 16.) The critical point the government had to prove to show fraud was that Live Well's valuations above the purchase prices were intentionally outside the range supportable in the market. On that precise point, the testimony about the "market" prices based on supposedly independent Bloomberg valuations—introduced through Levy, Redoutey, and Haddock—was critical. The government's claim that its "proof focused almost entirely on the period from 2014 through 2017, before Bloomberg pricing became available" (Opp'n 21) is simply wrong.

Bloomberg pricing triggered every major inflection point: Flagstar raising concerns (Tr. 749–51 ("Q: How did the values in Bloomberg compare with the values on IDC? A:

---

[6] The quotations the government cites out of context are equally consistent with Live Well believing it had identified underpriced bonds in the market and that it could legitimately profit off them, such as the phrase "self-generating money machine" (Opp'n 17, 30) and the desire to adjust values incrementally to avoid "alarm bells" that would alert the market to the value proposition in the bonds. (Opp'n 5, 30.)

Dramatically different."; "we said what's going on with the values?"); ICBC concluding the bonds were overpriced (Tr. 720–22 ("Bloomberg started providing prices on these securities, which was off from where IDC was pricing it," which shows "what the industry thought . . . this collateral is worth")); and Haddock refusing to sign financial statements (Tr. 1606–17 ("U.S. Bank was, appeared to be getting the numbers from Bloomberg instead of from IDC, and therefore the values were showing much less"), 1615–23 ("the value was much less")).  The government cannot claim Bloomberg was incidental when it was behind the key proof that Live Well's valuations were intentionally outside the range supportable in the market and the foundation for the major events the government cited as proof of fraud.

The government's assertion that it did not rely on Bloomberg as a market comparator (Opp'n 16–18) is thus contradicted by the record.  Many references to "market value" at trial necessarily referred to Bloomberg.  Redoutey described Bloomberg as the standard for "what the market value is of something."  (Tr. 784.)  Levy testified IDC's prices were "totally inaccurate" because they differed from Bloomberg.  (Tr. 720–22.)  In summation, the government referenced Bloomberg when arguing IDC values were higher than market and specifically referenced Bloomberg's pricing in that context.  (Tr. 2176.)  The government's attempt to sever "market value" from the only real evidence of market value it presented is semantics, not substance.

The government ignores Stumberger's statements showing the import of the Foster/Bloomberg evidence.  Stumberger has recently explained in another federal court why the alleged "losses" were not attributable to fraud but to Foster's compromised Bloomberg pricing.  Had counsel investigated, he would have been positioned to develop this evidence and establish

8

that the price discrepancies between Live Well's valuations and the market prices witnesses testified about were the product of artificially low Bloomberg valuations from a cooperator.

Next, the government conflates quantity with quality, noting "Bloomberg" appeared on "fewer than approximately 20" transcript pages. (Opp'n 18–19.) But significance is not necessarily measured by word count. DNA evidence might appear on a handful of transcript pages in a murder trial yet be the most important evidence in the case. The testimony about Bloomberg pricing came at critical junctures in the government's narrative, from key witnesses, whose testimony based on Bloomberg spanned pages. (*E.g.*, Tr. 749–51, 720–22, 1606–17.)

Bloomberg evidence also foreclosed a critical defense argument. To prove fraud, the government had to show Live Well's prices exceeded what the "market" would pay—not merely that they exceeded acquisition prices—and Mr. Hild's defense was that Live Well's prices were not fraudulently inflated. Bloomberg's supposedly "independent" prices undercut that defense because witnesses, relying on Bloomberg, testified that Live Well's prices were above market. Had counsel investigated, he could have turned this dynamic on its head. Evidence that Bloomberg's prices were supplied by a cooperating witness with an incentive to provide artificially low valuations would have allowed the defense to argue the "market" gap was manufactured—and that Bloomberg's benchmark (Levy/Redoutey/Haddock) was unreliable.

### 4. Counsel's Otherwise Satisfactory Performance Does Not Excuse the Failure To Investigate Foster/Bloomberg

The government argues counsel was not deficient because he was a "zealous, passionate, articulate, and compelling advocate who presented a cogent defense theory." (Opp'n 23 (quoting Dkt. 140 at 52–53).) This argument is hardly relevant to the question of whether the failure to investigate Foster/Bloomberg was deficient performance. An attorney can be skilled in the

9

courtroom and still render constitutionally deficient performance by failing to investigate a

critical issue.  For example, in *United States v. Velazquez*, although then-District Judge Bianco

praised counsel's trial performance, Judge Bianco ultimately found that the *Strickland* standard

was met principally because of counsel's failure to investigate certain issues:

> As a threshold matter, having presided over the trial, it was apparent to the Court that defense counsel was prepared during the course of the trial, conducted thorough cross-examinations of the government's witnesses, and gave effective opening and closing statements to the jury.  There is no doubt that he took his responsibility as defense counsel in this case very seriously, that he is an experienced and talented defense lawyer, and that he used that experience to substantially undermine the government's case. . . . *However, as discussed in detail below, defense counsel's performance was deficient in several major respects, including failing to develop evidence that would have been highly favorable to the defendant's case. . . .*

*United States v. Velazquez*, 197 F. Supp. 3d 481, 485 (E.D.N.Y. 2016) (Bianco, J.) (emphasis

added) (granting Rule 33 motion based on ineffective assistance of counsel where defense

counsel failed to investigate alibi defense and ownership of a particular car among other things);

*see Espinal v. Bennett*, 588 F. Supp. 2d 388, 401 (E.D.N.Y. 2008) (counsel "vigorous[ly]

represent[ed]" client at trial, but failure to investigate rendered performance ineffective).  Failure

to investigate can thus still be deficient even if other performance is exemplary.

In sum, the record on deficient performance is one-sided.  The government chose not to

obtain an affidavit from Dusing, leaving no evidence for its speculation about strategic

justifications.  Mr. Hild provided his sworn declaration establishing that Dusing never discussed

the Foster/Bloomberg connection with him.  (Dkt. No. 276 ¶¶ 3–4.)  This Court found that

counsel, "with due diligence, could have relied on [the Foster Notes] to seek the evidence at

issue."  (Dkt. No. 245 at 8.)  Investigation would have uncovered extensive documentary

evidence proving Foster's role in Bloomberg's pricing and would have positioned counsel to

cross-examine the government's witnesses regarding the accuracy of the "market" values they saw on Bloomberg. The Court should find the first prong satisfied.

### B.    Mr. Hild Was Prejudiced Because the Foster/Bloomberg Evidence Would Have Undermined the Government's Central Theory

In his opening brief, Mr. Hild established that trial counsel's failure to investigate the Foster/Bloomberg evidence prejudiced his defense because there is a reasonable probability that, had counsel investigated, the result would have been different. *See Strickland*, 466 U.S. at 694.

The government argues that "Hild's entire theory that Foster had a 'powerful incentive[] to lower his valuations' . . . makes little sense." (Opp'n 23 (quotation marks omitted).) It contends the timeline contradicts any improper motive because the government did not open its investigation until May 2019 and first met Foster in June 2019—outside the Indictment's date range—so Foster's pricing "could not have been motivated by a desire to please the government." (Opp'n 24.) The government notes Foster signed his NPA in August 2019, nearly two years before disclosing his Bloomberg involvement, and argues inferring Foster "suppress[ed]" prices to obtain an NPA "even though . . . the Government didn't have any idea Foster was involved in setting Bloomberg's bond prices" would "defy[] all logic." (Opp'n 24.) Instead, the government posits that Foster's knowledge of the SEC investigation would have motivated "accurate" pricing. (Opp'n 24.) This argument is unavailing for multiple reasons.

First, the government mischaracterizes Foster's role. It frames Mr. Hild's theory as "suppress[ing]" prices (Opp'n 24), but the evidence shows Foster was affirmatively setting prices. Foster was not merely influencing prices at the margins; he was positioned to be the dominant—and potentially sole—contributor of pricing data. (Mem. 17–19.) To show prejudice, Mr. Hild need not show that Foster intentionally manipulated Blomberg pricing; Mr.

Hild just needs to show that if his counsel had investigated Foster/Bloomberg, there is a reasonable probability of a different outcome, which he has done by showing that the jury would have discounted the Bloomberg-based "market" evidence if the jury had learned of Foster's role.

Second, the government's timeline undermines its argument. It concedes Foster "signed a proffer agreement with the SEC in November 2017" and knew of the SEC investigation as of that date. (Opp'n 24 (quotation marks omitted).) The government then argues that Foster's awareness of the SEC investigation would have motivated him to ensure his pricing was "carefully calculated and accurate." (Opp'n 24.) But the government's inference does not follow. The SEC investigation was premised on the theory that Live Well's prices—prices Foster helped generate—were inflated. The SEC Staff in fact *told* Foster in July 2017 that it believed Live Well's prices were inaccurate, that it had "documents indicating that you personally provided off-market prices to IDC," and that the SEC believed Foster's "bosses" were involved but that "their fingerprints are not all over the place like yours." (DS C.) Foster would have known as early as July 2017 that regulators believed his prices were inflated and that his one chance to help himself was to help regulators go after his "bosses." (DS C.) A jury could easily have understood how a cooperating witness facing regulatory (and potential criminal) exposure would have an incentive to distance himself from those earlier valuations by submitting lower prices to Bloomberg—regardless of whether the DOJ had yet opened its investigation.

Stumberger has explained his view on this point: "A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations." (Ex. F at 11.) Stumberger further observed that Foster

12

"dramatically lowered his own valuations after becoming a government cooperator" and that "[a] contributor who dramatically lowered his own valuations after becoming a government cooperator presents an obvious factual issue regarding the reliability of the resulting benchmark." (Ex. F at 27–28.) Far from "defy[ing] all logic" (Opp'n 24), Foster's conduct reflects a rational response to regulatory pressure. In any case, the jury—not the government— should have determined whether Bloomberg prices (and thus, Levy, Redoutey, Haddock, and the government's thesis) were unreliable due to Foster.

Third, the government's assertion that it "didn't have any idea Foster was involved in setting Bloomberg's bond prices" (Opp'n 24) is unsupported. The current AUSA was not involved in the investigation and presented no evidence to back up this claim. In any case, aside from what the government knew or should have known, the question is whether there is a reasonable probability of a different outcome if the jury had heard about Foster's role with Bloomberg, including his incentive to submit lower prices, regardless of government knowledge.

Next, the government argues that "Bloomberg pricing was simply not a focal point of the Government's case and, therefore, any evidence that defense counsel may have unearthed about Foster's involvement in Bloomberg's pricing would have done little to undermine the Government's proof." (Opp'n 24.) This is the same minimization tactic employed throughout the opposition—and fails for the same reasons addressed above. (Bloomberg pricing was central to the government's proof of the ongoing scheme through 2019, the government's own witnesses testified Bloomberg represented "market value," and the culminating events of the government's fraud narrative—lender inquiries, Haddock's refusal to sign financial statements, and Live Well's destruction—were driven by Bloomberg pricing.)

Finally, the government argues Mr. Hild was not prejudiced because its trial evidence was "substantial." (Opp'n 25.) But the question under *Strickland* is not whether the government presented substantial evidence; it is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." 466 U.S. at 694. The Foster/Bloomberg evidence and Stumberger's statements support a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 694. Yet the government fails to address Stumberger's statements in the context of the prejudice inquiry. Although Mr. Hild's opening memorandum devoted extensive discussion to these statements (Mem. 35–38), the government's response is notable for its silence. It does not dispute Stumberger made these statements. It does not dispute Stumberger's expertise in HECM-IO bond valuation. It offers no competing analysis, instead resorting to rhetoric, substituting its unsupported opinion for Stumberger's. Notably, the government has a cooperation agreement requiring Stumberger to respond "with respect to any matters about which this Office may request his testimony," so it could have asked him about his statements but apparently did not. (3537-025 at 3.)

If the jury had heard that a cooperator, Foster, was the source of the Bloomberg bond valuations that government witnesses wrongly thought were neutral "market" values, there is a reasonable probability the jury would have acquitted. The prejudice prong is satisfied.

## II. Stumberger's Recent Statements Independently Warrant Relief Because the Government's Key Witness Now Attributes the Alleged Losses to Foster's Compromised Bloomberg Pricing Rather Than Fraud

Mr. Hild demonstrated in his opening brief that the Court should also grant the petition because Stumberger—the government's key cooperating witness—has made statements that directly undermine the government's central theory. The government argues the lack of a sworn

affidavit from Stumberger is "alone sufficient reason to deny Hild's petition." (Opp'n 27.) This overstates the law. While the Second Circuit noted a "general, unsworn, and conclusory" letter from a co-conspirator is "insufficient to contradict sworn trial testimony," *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007), the statements here are neither "general," "conclusory," nor typical recantations, as they do not so much contradict Stumberger's trial testimony as supplement it. (The "prima facie showing" Mr. Hild must make "is not a particularly high standard." *Id.* at 353 (citation omitted).) Although not "sworn," the statements here have indicia of reliability also because Stumberger made them before a federal court in Michigan and in written filings, facing potential sanctions for untruthful representations. Unlike a co-conspirator who "sits in jail with nothing to lose by recanting," *id.*, Stumberger has every incentive *not* to make these statements. He has been "threatened excessively with jail time" by prosecutors (Ex. D at 13), is "liv[ing] under direct threat," and received "explicit threats impacting" himself "and [his] children" (Ex. E at 2).[7] Far from having a motive to fabricate, Stumberger is making statements despite personal risk. Mr. Hild has thus satisfied the not particularly high standard to show a "sufficient likelihood of satisfying the strict standards of § 2255 to warrant a fuller exploration by the district court.'" *Haouari*, 510 F.3d at 353 (citation omitted).

The government's technical objection that Stumberger's statements are unsworn rings hollow also because *the government itself* is best positioned to obtain sworn testimony from Stumberger. Under his cooperation agreement, Stumberger must "truthfully testify . . . at any trial *and other court proceeding* with respect to any matters about which this Office may request

---

[7] Notably, the government does not refute that it has "threatened" Stumberger with "jail time."

his testimony." (3537-025 (emphasis added).)  If the government wanted to hear from Stumberger, it could have asked him (through his recently-appointed counsel).

The government further argues Stumberger's "statements do not even amount to a recantation." (Opp'n 28.)  This misses the point of his statements, which supplement his trial testimony and would have created a reasonable likelihood of a different outcome.  The question is not whether his statements recant his testimony but rather whether they would likely change the result.  *See Ortega v. Duncan*, 333 F.3d 102, 109 (2d Cir. 2003).  Stumberger may have believed what he said at trial, but knowing what he now knows about Foster/Bloomberg— evidence not available to him at the time—he would have testified differently.  That his statements supplement rather than repudiate his testimony does not diminish their significance.[8]

The government's speculation about Stumberger's motivations is equally unavailing.  It suggests his statements "relate[] primarily" to damages calculations in civil litigation.  (Opp'n 29.)  This is pure conjecture.  If the government wanted further explanation, it could have asked him.  Speculation cannot substitute for inquiry when a cooperator is available to the government.

In any event, Stumberger's subjective purpose is irrelevant.  What matters is the effect his statements would have on a jury.  His statements—that the Bloomberg benchmark was "not supplied by a neutral third party . . . but by a former Live Well insider facing substantial federal prison time, cooperating with the government" (Ex. F at 27–28); that Foster "dramatically lowered his own valuations after becoming a government cooperator" (Ex. F at 27–28); and that "the government investigation dismantled the independent pricing mechanism . . . and . . . was

---

[8] Even if Stumberger's recent statements, standing alone, do not independently warrant vacatur, those statements remain highly relevant to the *Strickland* inquiry because they demonstrate how the government's key cooperating bond witness assesses the significance of the Foster/Bloomberg evidence once that evidence was known—the very evidence Dusing failed to investigate.

16

then replaced with valuation pricing supplied by the government's cooperating witness" (Ex. G at 10)—would, if credited, likely have resulted in acquittal.  Whether Stumberger made them to defend himself in civil litigation does not change their relevance here.

The government argues Stumberger's trial statements "were well-supported by substantial documentary evidence." (Opp'n 29–30.)  This misapprehends the claim.  Consistency with other evidence does not provide independent corroboration—it shows how the Foster/Bloomberg evidence infected other witnesses' testimony.  The government's witnesses testified based on their belief that Bloomberg represented an independent benchmark.  (*See, e.g.*, Tr. 720–22, 784.)  But if that benchmark was the product of a cooperating witness submitting artificially low valuations, the consistency of the testimony reflects a tainted narrative.

This point is significant because other witnesses testified Scenario 14 was "an effort [] to get it right." (Tr. 544, 1583–86.)  Stumberger agreed.  (Tr. 544.)  That agreement bolsters the defense position that Mr. Hild was engaged in a legitimate valuation effort.  The Foster/Bloomberg evidence would have allowed the jury to understand why the government's contrary evidence was unreliable.  When the government's witnesses testified consistently with the defense theory, and newly discovered evidence explains why the government's contrary theory was based on compromised evidence, prejudice is manifest.

The government's opposition fails at every turn.  The Court should grant the petition.

### III.    The Court Should Grant Discovery and an Evidentiary Hearing Because the Government's Speculation Cannot Substitute for Evidence on Disputed Factual Issues

If the Court does not grant this motion on the papers, it should grant discovery and an evidentiary hearing.  (Mem. 43–45.)  The government argues the Court should not grant

discovery or a hearing because it has "all the information required to decide the claims." (Opp'n 32.) It asserts this is "especially true here, where Hild has spent years using bankruptcy and civil proceedings to try to obtain evidence" and "failed to find any." (Opp'n 33.) Not so.

Mr. Hild submitted extensive substantial documentary evidence, a declaration, and Stumberger's statements, as detailed above. The government produced nothing. Rather than evidence, the government relies on speculation. (Opp'n 20 (assuming counsel decided not to pursue Foster/Bloomberg because he "had no reason to"); Opp'n 24 (assuming Foster "was highly motivated" to ensure accurate pricing); Opp'n 29 (arguing "it seems likely" Stumberger's statements "relate[] primarily" to damages); Opp'n 30–31 (assuming other witnesses would not change testimony).) Having chosen speculation over evidence, the government cannot argue the record "conclusively" forecloses relief. The case law the government relies on shows the opposite, that speculation is not enough. In *Chang v. United States*, for example (Opp'n 32), the Second Circuit approved a "middle road" short of a hearing because the record included a detailed affidavit from trial counsel. 250 F.3d 79, 86 (2d Cir. 2001). The government declined to seek an affidavit yet asks the Court to guess at a strategic explanation. *Chang* supports expansion of the record, not denial. The Court should permit discovery and a hearing per Rules 6 and 8 of the Rules Governing Section 2255 Proceedings.

## CONCLUSION

For the foregoing reasons, Mr. Hild respectfully requests that this Court grant his motion pursuant to 28 U.S.C. § 2255 and vacate his conviction or, in the alternative, grant Mr. Hild leave to conduct discovery and hold an evidentiary hearing on the issues raised herein.

Dated: August 11, 2026              MORVILLO ABRAMOWITZ
      New York, New York          GRAND IASON & ANELLO, P.C.

                                By:  /s/ *Brian A. Jacobs*
                                Brian A. Jacobs
                                *Attorneys for Michael Hild*

19

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the page limit of this Court's August 3, 2026 Order (Dkt.

No. 281) because it is no more than 18 pages.

This document complies with the typeface requirements of Local Civil Rule 7.1 because

this document has been prepared in a proportionally spaced typeface using Microsoft Word in

12-point font Times New Roman with one-inch margins.


Dated:  August 11, 2026
        New York, New York

                        MORVILLO ABRAMOWITZ
                        GRAND IASON & ANELLO, P.C.

                        By:  /s/ *Brian A. Jacobs*
                             Brian A. Jacobs
                             *Attorneys for Michael Hild*

20